# Exhibit 1

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

October 30, 2017

By courier (*advance copy by email*)

Koch Minerals Sàrl and
Koch Nitrogen International Sàrl
c/o Mr. J. Kory Parkhurst
Koch Companies Public Sector, LLC
4111 East 37th Street North
Wichita, Kansas 67220, USA
 and
Mr. Robert Volterra
Mr. Graham Coop
Mr. Giorgio Mandelli
Ms. Zuzana Morháčová
Ms. Jessica Pineda
Mr. Govert Coppens
Volterra Fietta
1 Fitzroy Square
London W1T 5HE, United Kingdom
 and
Mr. Mark Beckett
Cooley LLP
1114 6ᵗʰ Ave #46
New York, NY 10036
USA

Bolivarian Republic of Venezuela
c/o Dr. Reinaldo Enrique Muñoz Pedrosa
Procurador General de la República (E)
Procuraduría General de la República
Av. Los Ilustres, c/c calle Francisco Lazo Martí
Edif. Procuraduría General de la Rep., Piso 8
Urb. Santa Mónica
Caracas 1040, Venezuela
 and
Mr. Christopher Ryan
Mr. Thomas B. Wilner
Shearman & Sterling LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004, USA
 and
Ms. Anna Tevini
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022, USA
 and
Mr. Guillermo Salcedo Salas
Shearman & Sterling LLP
114, avenue des Champs-Elysées
75008 Paris, France
 and
Mr. José Pertierra
The Law Office of José Pertierra
1010 Vermont Ave. NW
Suite 514
Washington, D.C. 20005, USA

**Re: <u>Koch Mineral Sarl & Koch Nitrogen International Sarl v. Bolivarian Republic of</u>**
**<u>Venezuela</u>**
(ICSID CASE NO. ARB/11/19)

Dear Mesdames and Sirs,

Please find enclosed certified copies of the English and Spanish language versions of the Tribunal's Award dated October 30, 2017 together with the English and Spanish language versions of the Partially Dissenting Opinion (the "Opinion") of Professor Zachary Douglas dated October 30, 2017.

Pursuant to Arbitration Rule 48, I have authenticated the original text of the Award and the Opinion, and deposited them in ICSID's archives. In accordance with Arbitration Rule 48, the Award together with the Opinion is deemed to have been rendered on the date of dispatch to the parties, which is indicated on the original text of the Award and on all copies.

As stated in Paragraph 20.1 of Procedural Order No. 3, (Minutes of the First Session), the Parties did not consent to the publication of the Award. I would be grateful if the parties could inform us whether they consent to the publication of the Award and Opinion on the ICSID website.

Yours sincerely,

Gonzalo Flores
Acting Secretary-General

Enclosures

cc (with enclosures): Members of the Tribunal

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**KOCH MINERALS SÁRL**
First Claimant
("KOMSA")

**KOCH NITROGEN INTERNATIONAL SÁRL**
Second Claimant
("KNI")

and

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**
Respondent

**ICSID CASE No. ARB/11/19**

_____

# AWARD
_____

*Members of the Tribunal:*
V.V. Veeder, President, QC
Hon. Marc Lalonde PC, OC, QC
Professor Zachary Douglas QC

*Secretary to the Arbitration Tribunal:*
Mairée Uran Bidegain

*Date of dispatch to the Parties*: 30 October 2017

## TABLE OF CONTENTS

**PART I:**      ***THE ARBITRATION*** ..................................................................................... *1*

**PART II:**     ***THE PARTIES' DISPUTE*** ................................................................. *21*

**PART III:**    ***THE PRINCIPAL ISSUES*** ............................................................... *37*

**PART IV:**     ***THE PRINCIPAL LEGAL TEXTS*** .................................................. *52*

**PART V:**      ***THE PRINCIPAL FACTS*** ................................................................ *66*

**PART VI:**     ***JURISDICTION ISSUES*** ................................................................ *106*

**PART VII:**    ***EXPROPIATION ISSUES*** ................................................................ *133*

**PART VIII:**   ***NON-EXPROPRIATION ISSUES*** .................................................. *152*

**PART IX:**     ***COMPENSATION ISSUES*** ............................................................. *172*

**PART X:**      ***SUMMARY AND CONCLUSIONS*** .................................................. *262*

**PART XI:**     ***INTEREST AND COSTS*** ................................................................. *263*

**PART XII:**    ***THE OPERATIVE PART*** ................................................................ *272*

### ABBREVIATED TERMS

| | |
|---|---|
| *2009 Petrochemical Law* | Organic Law for the Development of Petrochemical Activities (16 June 2009) (C-8) |
| *Arbitration Rules* | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| *Barrientos WS1* | Witness Statement of Victor D. Barrientos (28 February 2013) |
| *Barrientos WS2* | Second Witness Statement of Victor D. Barrientos (30 December 2013) |
| *Bond Offering Circular* | Offering Circular - Bond Offering of $250,000,000 between FertiNitro Finance Inc and FertiNitro (8 April 1998) (C-115) |
| *C-[#]* | Claimants' Exhibit |
| *CERTs* | Special Certificates of Tax Refunds (*Certificados Especiales de Reembolso Tributario*) |
| *CLA-[#]* | Claimants' Legal Authority |
| *Cls. Mem.* | Claimants' Memorial (4 June 2012) |
| *Cls. PHB* | Claimants' Post-Hearing Brief (30 January 2015) |
| *Cls. Rej.* | Claimants' Rejoinder on Jurisdiction (14 March 2014) |
| *Cls. Reply* | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction (2 September 2013) |
| *Comisario Report* | FertiNitro Report from the Statutory Auditor and Consolidated Financial Statements (7 September 2006) (C-63) |
| *EPC Contract* | Engineering, Procurement and Construction Contract by and between FertiNitro and Snamprogetti (8 April 1998) (C-24) |
| *Esty ER1* | Expert Report of Benjamin C. Esty (23 August 2013) |
| *Esty ER2* | Second Expert Report of Benjamin C. Esty (14 March 2014) |
| *Expropriation Decree* | Decree 7,713 (10 October 2010) (Official Gazette No. 380,113 of 11 October 2010) (C-9) |
| *Expropriation Law* | Expropriation Law for Public or Social Benefit (1 July 2002) (Official Gazette of the Republic No. 37,475 of 1 July 2002) (R-9, R-53, C-140) |

| | |
|---|---|
| *FertiNitro* | Joint venture companies Fertilizantes Nitrogenados de Oriente, SA; Fertilizantes Nitrogenados de Oriente, CEC; Fertilizantes Nitrogenados de Venezuela, SRL, and Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC |
| *First (September) Hearing* | Hearing on Jurisdiction, Merits, and examination of Fact Witnesses, held on 8 September 2014 and from 10 to 12 September 2014 |
| *First Advantis Report* | Advantis Report entitled "Valoracíon de FertiNitro" (May 2011) (R-86) |
| *Flores ER1* | Expert Report of Daniel Flores (28 February 2013) |
| *Flores ER2* | Second Expert Report of Daniel Flores (3 March 2014) |
| *Flórez WS1* | Witness Statement of Edgar A. Flórez (28 February 2013) |
| *Giles ER1* | Expert Report of Tim Giles (2 June 2012) |
| *Giles ER2* | Second Expert Report of Tim Giles (30 August 2013) |
| *Gwaltney WS1* | Witness Statement of Brent W. Gwaltney (30 May 2012) |
| *Gwaltney WS2* | Second Witness Statement of Brent W. Gwaltney (20 August 2013) |
| *Historical Claims* | KOMSA's claims regarding tax related measures and VAT credits |
| *ICSID Convention* | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (18 March 1965) |
| *ICSID or the Centre* | International Centre for Settlement of Investment Disputes |
| *JIA* | Joint Investors Agreement by and among Pequiven, Koch Oil SA, Snamprogetti Netherlands BV, and Polar Uno, CA (8 April 1998) (C-18) |
| *KNI* | Koch Nitrogen International Sàrl |
| *KOMSA* | Koch Minerals Sàrl |
| *KOMSA Draft MOU* | KOMSA Draft Memorandum of Understanding (non-dated) (C-92) |
| *Municipal Decree* | Decree D.A.M.S.B.-042-A-2006 (14 November 2006) (C-48) |
| *Municipal Ordinance* | Ordinance for Taxes on Industrial, Commercial, Service or Similar Economic Activities (29 December 2005) (C-45) |

| | |
|---|---|
| *Nunez WS1* | Witness Statement of Carolina Nuñez (28 February 2013) |
| *Offtake Agreement* | Offtake Agreement by and among Pequiven, IPSL and Koch Oil SA as Buyers and FertiNitro as Seller (8 April 1998) (C-19). |
| *Parra WS1* | Witness Statement of Melquíades A. Parra (29 May 2012) |
| *PDVSA* | Petróleos de Venezuela, S.A. |
| *Pequiven Draft MOU* | Pequiven Draft Memorandum of Understanding (non-dated) (C-93) |
| *R-[#]* | Respondent's Exhibit |
| *Resp. C-Mem.* | Counter-Memorial of the Bolivarian Republic of Venezuela (Merits) (28 February 2013) |
| *Resp. PHB* | Post-Hearing Brief of the Bolivarian Republic of Venezuela (30 January 2015) |
| *Resp. Preliminary Objections* | Preliminary Objections of the Bolivarian Republic of Venezuela to the Jurisdiction of the Arbitral Tribunal (28 February 2013) |
| *Resp. Rej.* | Rejoinder of the Bolivarian Republic of Venezuela (Merits) (3 March 2014) |
| *Resp. Reply on Jurisdiction* | Reply on Jurisdictional Objections of the Bolivarian Republic of Venezuela (3 March 2014) |
| *RfA* | Claimants' Request for Arbitration (28 June 2011) |
| *RLA-[#]* | Respondent's Legal Authority |
| *Sanders ER1* | Expert Report of Richard Sanders (30 May 2012) |
| *Sanders ER2* | Second Expert Report of Richard Sanders (27 August 2013) |
| *Science and Technology Law* | Organic Law on Science, Technology and Innovation (effective as of 1 January 2006) (C-43) |
| *Second (November) Hearing* | Hearing on Merits and Quantum and examination of Expert Witnesses, held on 23 to 26 November 2014 |
| *Second Advantis Report* | Advantis Report entitled "Valoracíon de FertiNitro" (July 2011) (C-157) |
| *Sorlie WS2* | Second Witness Statement of Jim Sorlie (26 July 2013) |
| *Third (June) Hearing* | Reconstitution Hearing held on 9 to 10 June 2016 |

| | |
|---|---|
| *Tr. Day. [#page. line(s)] (Speaker(s))* | Transcripts of Hearings |
| *Tribunal or Arbitral Tribunal* | Arbitral Tribunal constituted on 8 November 2011 |
| *Urea Decree* | Decree 5,218 (26 February 2007) (C-80) |
| *Urea Resolution* | Joint Resolution by the Ministry of the People's Power for Agriculture and Land, the Ministry of the People's Power for Light Industry and Trade, and the Ministry of the People's Power for Energy and Petroleum (Official Gazette No. 38,674) (3 May 2007) (C-82) |
| *VAT Law* | Law of Partial Reform of the Law on Value Added Tax (11 August 2004) (C-55) |
| *Villarroel WS2* | Second Witness Statement of Aníbal Villarroel (30 December 2013) |

## *LEGAL MATERIALS*

| | |
|---|---|
| *AAPL v. Sri Lanka* | *Asian Agricultural Products Limited v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No ARB/87/3, Award (27 June 1990) (RLA-42) |
| *Abaclat v. Argentina* | *Abaclat and others (formerly Giovanna A. Beccara and others) v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility (4 August 2011) (RLA-31) |
| *ADC Affiliate v. Hungary* | *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award (27 September 2006) (CLA-16) |
| *Ambiente Ufficio v. Argentina* | *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9 (formerly Giordano Alpi and others v. Argentine Republic), Decision on Jurisdiction and Admissibility (8 February 2013) (CLA-90) |
| *Autopista v. Venezuela* | *Autopista Concesionada de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/00/5, Award (23 September 2003) (RLA-60) |
| *Azurix v. Argentina* | *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award (14 July 2006) (CLA-43) |
| *Bayindir v. Pakistan* | *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction (14 November 2005) (CLA-11) |
| *BG Group v. Argentina* | *BG Group Plc. v. Republic of Argentina* UNCITRAL, Final Award, (24 December 2007) (CLA-37) |
| *Biwater v. Tanzania* | *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award (18 July 2008) (CLA-24) |
| *Burlington v. Ecuador* | *Burlington Resources, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Reconsideration and Award (7 February 2017) |
| *Caratube v. Kazakhstan* | *Caratube International Oil Company LLP v. The Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award (5 June 2012) (RLA-107) |
| *Chevron v. Ecuador* | *Chevron Corporation and Texaco Petroleum Corporation v. The Republic of Ecuador,* UNCITRAL, Final Award (31 August 2011) (CLA-63) |

| | |
|---|---|
| *Chorzów Factory Case* | *Chorzów Factory Case (Germany v Poland)*, PCIJ Series A, No. 17, Decision on Merits (13 September 1928) (CLA-49) |
| *CME v. Czech Republic* | *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award (13 September 2001) (CLA-14) |
| *CMS v. Argentina* | *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award (12 May 2005) (CLA-36) (CLA-130) |
| *ConocoPhillips v. Venezuela* | *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits (3 September 2013) (CLA-155) |
| *CSOB v. Slovak Republic* | *Československá Obchodní Banka, A.S. v. Slovak Republic,* ICSID Case No. ARB/97/4, Decision on Objections to Jurisdiction (24 May 1999) (RLA-5) |
| *Daimler v. Argentina* | *Daimler Financial Services A.G. v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment (7 January 2015) |
| *Delaume, ICSID Arbitration* | G. R. Delaume, ICSID and the Transnational Financial Community (1986) (CLA-96) |
| *Deutsche Bank v. Sri Lanka* | *Deutsche Bank AG v. The Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award (31 October 2012) (CLA-100) |
| *EDF v. Romania* | *EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award (8 October 2009) (RLA-85) |
| *El Paso v. Argentina* | *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award (31 October 2011) (CLA-52) |
| *Electrabel v. Hungary* | *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) (RLA-110) |
| *ELSI* | *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, ICJ, Judgment, (20 July 1989) (CLA-41) |
| *EnCana v. Ecuador* | *EnCana Corporation v. Republic of Ecuador*, UNCITRAL, Award (3 February 2006) (RLA-71) |
| *Fedax v. Venezuela* | *Fedax N.V. v. The Republic of Venezuela*, ICSID Case No. ARB/96/3, Decision on Jurisdiction (11 July 1997) (CLA-142) |

| | |
|---|---|
| *Flughafen v. Venezuela* | *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award (18 November 2014) (RLA-154) |
| *GAMI v. Mexico* | *GAMI Investments, Inc. v. United Mexican States*, UNCITRAL, Award (15 November 2004) (RLA-64) |
| *GEA Group v. Ukraine* | *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (31 March 2011) (RLA-30) |
| *Gemplus v. Mexico* | *Gemplus S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Cases Nos. ARB(AF)/04/3 and ARB(AF)/04/4, Award (16 June 2010) (CLA-54) |
| *Glamis v. USA* | *Glamis Gold, Ltd. v. United States of America,* UNCITRAL, Award, (8 June 2009) (RLA-83) |
| *Global Trading v. Ukraine* | *Global Trading Res. Corp. and Globex Int'l v. Ukraine*, ICSID Case No. ARB/09/11, Award (1 December 2010) (RLA-27) |
| *Gold Reserve v. Venezuela* | *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 September 2014) (CLA-156) |
| *Gotanda – Compound Interest* | John Yukio Gotanda, Compound Interest in International Disputes (2003) (CLA-61) |
| *HICEE v. Slovakia* | *HICEE B.V. v. Slovak Republic*, UNCITRAL, Partial Award (23 May 2011) |
| *Hulley v. Russia* | *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226, Final Award (18 July 2014) (CLA-152) |
| *ICSID Convention History* | ICSID, Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Documents Concerning the Origin and the Formulation of the Convention, Volume II, Part 1 (1968) (RLA-6) |
| *ICSID Convention: A Commentary* | Christoph H. Schreuer et al., The ICSID Convention: A Commentary (2d ed. 2009) (RLA-21) (RLA-106) (CLA-3) |
| *Inmaris v. Ukraine* | *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction (8 March 2010) (CLA-91) |
| *Joy Mining v. Egypt* | *Joy Mining Machinery Limited v. Arab Republic of Egypt,* ICSID Case No. ARB/03/11, Award on Jurisdiction (6 August 2004) (RLA-10) |

| | |
|---|---|
| *Kardassopolous v. Georgia* | *Kardassopoulos v. Republic of Georgia*, ICSID Case No. ARB/05/18 and ARB/07/15, Award (28 February 2010) (CLA-20) |
| *Lauder v. Czech Republic* | *Ronald S. Lauder v. Czech Republic*, UNCITRAL, Final Award (3 September 2001) (CLA-45) |
| *Lemire Award* | *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award (28 March 2011) (RLA-89) |
| *Lemire v. Ukraine* | *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability (14 January 2010) (CLA-89) |
| *Levi v. Peru* | *Renée Rose Levy de Levi v. The Republic of Peru*, ICSID Case No. ARB/10/17, Award (26 February 2014) (CLA-150) |
| *LG&E v. Argentina* | *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006) (CLA-39) (RLA-123) |
| *LIAMCO v. Libya* | *Libyan American Oil Company (LIAMCO) v. Libyan Arab Republic*, Award, 20 I.L.M. 1 (12 April 1977) (RLA-37) |
| *Mann – British Treaties* | F.A. Mann, British Treaties for the Promotion and Protection of Investments, 52 British Yearbook of International Law 241 (1981) (CLA-86) |
| *Mann - Further Studies* | F. A. Mann, Further Studies in International Law - Compound Interest as an Item of Damage (1990) (CLA-60) |
| *Mann – Legal Aspect of Money* | F.A. Mann, The Legal Aspect of Money (4th ed, 1982) |
| *Marboe - Calculation of Compensation* | Irmgard Marboe, Calculation of Compensation and Damages in International Investment Law, (2009) (CLA-137) |
| *Methanex v. USA* | *Methanex Corporation v. United States of America*, UNCITRAL, Final Award of the Tribunal on Jurisdiction and Merits (3 August 2005) |
| *MHS v. Malaysia* | *Malaysian Historical Salvors Sdn Bhd v. Malaysia,* ICSID Case No. ARB/05/10, Decision on Application for Annulment (16 April 2009) (RLA-23) |

| | |
|---|---|
| *Mobil v. PDVSA* | *Mobil Cerro Negro Ltd v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.,* ICC Case No. 15416/JRF/CA, Final Award (23 December 2011) (EO-45) |
| *Mytilineos v. Serbia* | *Mytilineos Holdings SA v. State Union of Serbia & Montenegro and Republic of Serbia,* UNCITRAL, Partial Award on Jurisdiction (8 September 2006) (CLA-92) |
| *National Grid v. Argentina* | *National Grid P.L.C. v. Argentine Republic,* UNCITRAL, Award (3 November 2008) (CLA-32) |
| *Noble Venture v. Romania* | *Noble Ventures, Inc. v. Romania, ICSID Case No. ARB/01/11, Award (12 October 2005) (RLA-67).* |
| *Occidental UNCITRAL* | *Occidental Exploration and Production Co. v. Republic of Ecuador,* UNCITRAL (LCIA), Case No. UN 3467, Final Award (1 July 2004) (CLA-27) |
| *Occidental v. Ecuador* | *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador,* ICSID Case No. ARB/06/11, Award (5 October 2012) (CLA-129) |
| *Ooestergetel v. Slovak Republic* | *Oostergetel v. Slovak Republic,* UNCITRAL, Decision on Jurisdiction (30 April 2010) (CLA-147) |
| *Pantechniki v. Albania* | *Pantechniki S.A. Contractors & Engineers v. Republic of Albania,* ICSID Case No. ARB/07/21, Award (30 July 2009) (CLA-97) |
| *Paushok v. Mongolia* | *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Government of Mongolia,* UNCITRAL, Award on Jurisdiction and Liability (28 April 2011) (RLA-94) |
| *Pey Casado v. Chile* | *Víctor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Award (8 May 2008) (RLA-102) |
| *Philip Morris Award* | *Philip Morris Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay,* ICSID Case No. ARB/10/7, Award (8 July 2016) |
| *Philip Morris v. Uruguay* | *Philip Morris Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay,* ICSID Case No. ARB/10/7, Decision on Jurisdiction (2 July 2013) (CLA-144) |
| *Phoenix v. Czech Republic* | *Phoenix Action v. Czech Republic,* ICSID Case No. ARB/06/05, Award (15 April 2009) (RLA-22) |

| | |
|---|---|
| *PSEG Global v. Turkey* | *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award (19 January 2007) (CLA-40) |
| *Quiborax Award* | *Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award (16 September 2015) (RLA-157) |
| *Quiborax v. Bolivia* | *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction (27 September 2012) (RLA-33) |
| *Ripinsky - Damages* | Sergey Ripinsky and Kevin Williams, Damages in International Investment Law (2008) (CLA-53) (CLA-134) |
| *Romak v. Uzbekistan* | *Romak S.A. v. Republic of Uzbekistan*, PCA Case No. AA 280, Award (26 November 2009) (RLA-24) |
| *Rosinvest v. Russia* | *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration V (079/2005), Final Award (12 September 2010) (CLA-9) |
| *Saba Fakes v. Turkey* | *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award (14 July 2010) (RLA-26) |
| *Salini v. Morocco* | *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction (16 July 2001) (RLA-7) |
| *Saluka v. Czech Republic* | *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award (17 March 2006) (CLA-19) |
| *Santa Elena v. Costa Rica* | *Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica,* ICSID Case No. ARB/96/1, Award (17 February 2000) (CLA-136) |
| *SD Myers v. Canada* | *S.D. Myers, Inc. v. Canada*, UNCITRAL, Partial Award (13 November 2000) (RLA-52) |
| *SGS v. Paraguay* | *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction (10 February 2010) (RLA-25) |
| *Siemens v. Argentina* | *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award (6 February 2007) (CLA-15) |
| *Sistem v. Kyrgyz* | *Sistem Muhendislik Insaat Sanayi ve Ticaret A.S. v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award (9 September 2009) |

| | |
|---|---|
| *Southern Pacific v. Egypt* | *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award (20 May 1992) (CLA-12) |
| *Standard Chartered v. Tanzania* | *Standard Chartered Bank v. The United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award (2 November 2012) (RLA-109) |
| *Técnicas v. Mexico* | *Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award (29 May 2003) (CLA-28) |
| *The Experience of ICSID* | Ibrahim Shihata & Antonio Parra, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Rev.–F.I.L.J. 299 (1999) (RLA-4) |
| *The First 50 Years of ICSID* | The First 50 Years of ICSID, Zachary Douglas, "Property Rights as the Object of an Expropriation" (2016) |
| *The Norwegian Shipowners' Case* | *The Norwegian Shipowners' Case (Norway v. USA)*, RIAA (13 October 1922) |
| *Thunderbird v. Mexico* | *International Thunderbird Gaming Corp. v. United Mexican States*, UNCITRAL (NAFTA), Award (26 January 2006) (CLA-31) |
| *Treaty* | Agreement between the Swiss Confederation and the Republic of Venezuela on the Reciprocal Promotion and Protection of Investments (18 November 1993) (CLA-1) |
| *Ulysseas v. Ecuador* | *Ulysseas, Inc. v. The Republic of Ecuador*, UNCITRAL, Final Award (12 June 2012) (RLA-108) |
| *Venezuela Holdings v. Venezuela* | *Venezuela Holdings, B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (9 October 2014) (RLA-153) |
| *Vivendi v. Argentina* | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award (21 November 2000) |
| *Waste Management v. Mexico* | *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award (30 April 2004) (CLA-34) |

## PART I: THE ARBITRATION

### (1)   Introduction

1.1   This arbitration concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement between the Swiss Confederation and the Government of the Republic of Venezuela on the Reciprocal Promotion and Protection of Investments dated 18 November 1993, which entered into force on 30 November 1994 (the "BIT" or "Treaty"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965, which entered into force on 14 October 1966 (the "ICSID Convention").

### (2)   The Parties

1.2   *The First Claimant*: Koch Minerals Sàrl is a company incorporated under the laws of Switzerland.  It was initially named Koch Oil SA, but changed its name to Koch Minerals SA on 11 April 2003 and its corporate form from S.A. to Sàrl on 20 March 2009.[1]  For ease of reference, the First Claimant and its prior designations are here referred to collectively as "KOMSA" or "Koch".

1.3   *The Second Claimant*: Koch Nitrogen International Sàrl is also a company incorporated under the laws of Switzerland.  For ease of reference, the Second Claimant is here referred to as "KNI".

1.4   Both KOMSA and KNI are "nationals of another Contracting State" as defined in Article 25(2)(b) of the ICSID Convention.  Switzerland signed the Convention on 22 September 1967, deposited its instrument of ratification on 15 May 1968 and the Convention entered into force for Switzerland on 14 June 1968.

---

[1] Claimants' Request for Arbitration ("RfA") (28 June 2011), n. 22; Extract from the Registre du Commerce du Canton de Fribourg for Koch Minerals, SA, Historical Data from 5 November 1998 to 1 April 2009, certified on 6 May 2011; Extract from Registre du Commerce du Canton de Fribourg for Koch Minerals, Sàrl, registration date 24 January 1972 and Extract with Potential Deletions (C-3); Request for registration for the Registre du Commerce du Canton de Fribourg for transformation of Koch Minerals, SA to Koch Minerals, Sàrl, registration date 20 March 2009 (C-16).

1.5    *The Claimants' Legal Representatives:* The Claimants were represented in this proceeding by Mr J. Kory Parkhurst, representative of the Koch Companies Public Sector, LLC, of Wichita, Kansas, USA; and by Mr Robert Volterra, Mr Graham Coop, Mr Giorgio Mandelli, Mr Stephen Fietta (until 7 December 2015), Mr Ashique Rahman (until 7 December 2015), Ms. Zuzana Morháčová, Ms Jessica Pineda and Mr Govert Coppens of the law firm Volterra Fietta of London, United Kingdom; and Mr Mark Beckett of the law firm Cooley LLP of New York, NY, USA; and Ms Christina Hioureas of the law firm Chadbourne & Parke LLP of New York, NY, USA (until March 2016). .

1.6    *The Respondent:* The Respondent is the Bolivarian Republic of Venezuela.  For ease of reference, the Respondent is here called "Venezuela" or the "Respondent".

1.7    The Respondent is a Contracting State to the ICSID Convention.  It signed the Convention on 18 August 1993, deposited its instrument of ratification on 2 May 1995 and the Convention entered into force for the Respondent on 1 June 1995

1.8    *The Respondent's Legal Representatives:* The Respondent was represented in this proceeding by Dr Reinaldo Enrique Muñoz Pedrosa, Procurador General de la República (E) of the Procuraduría General de la República in Caracas, Venezuela; and Mr Christopher Ryan, Mr Thomas B. Wilner, Ms Katia Yannaca-Small (until April 2017) of the law firm Shearman & Sterling LLP of Washington D.C., USA; and Ms. Anna Tevini and Mr Guillermo Salcedo Salas from the same law firm in NYC, NY, USA and Paris, France, respectively; and Mr José Pertierra, of The Law Office of José Pertierra of Washington, D.C., USA.

1.9    *FertiNitro:* The Claimants allege that in March 1998, a series of joint venture companies were formed for the purposes of implementation of their investment in Venezuela.  These companies included Fertilizantes Nitrogenados de Oriente, SA; Fertilizantes Nitrogenados de Oriente, CEC; Fertilizantes Nitrogenados de Venezuela, SRL, and Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC.   These joint venture companies are collectively referred to as "FertiNitro" or "the Fertinitro Companies."  None of these joint venture companies are parties to this arbitration or legally represented before this Tribunal.

1.10    *Koch José Cayman Limited*: Koch José Cayman Limited is company organised under the laws of the Cayman Islands, as a subsidiary of Koch ("Koch José").  KOMSA held its interest in the FertiNitro Companies through Koch José.  Koch José is not a party to this arbitration, nor legally represented before this Tribunal.

1.11    *Petroquímica de Venezuela, SA:* The Venezuelan company Petroquímica de Venezuela, SA (also known as "Pequiven") is a wholly-owned subsidiary of PDVSA, the Respondent's State-owned oil company.  Neither of these companies is a party to this arbitration or legally represented before this Tribunal.

### *(3)    The Request for Arbitration*

1.12    On 28 June 2011, the Claimants filed a request for arbitration before ICSID (the "Request" or "Request for Arbitration").

1.13    On 19 July 2011, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "ICSID Arbitration Rules").

### *(4)    The Arbitration Tribunal*

1.14    On 19 August 2011, the Claimants informed the Secretariat that they maintained their proposal made in the Request that the Tribunal consist of three arbitrators, one arbitrator to be appointed by each Party and the third, who would be the president of the Tribunal, appointed by agreement of the Parties.  In this letter the Claimants also appointed the Hon Marc Lalonde, a national of Canada, as arbitrator and requested that the Chairman of the Administrative Council appoint any arbitrators not appointed pursuant to ICSID Convention Article 38 and Rule 4(1) of the ICSID Arbitration Rules.

1.15    On 23 September 2011, the Secretariat confirmed that, in the absence of any agreement between the Parties within 60 days after the registration of the Request, the Tribunal would

be constituted pursuant to Article 37(2)(b) of the ICSID Convention and Rule 2(3) of the ICSID Arbitration Rules.

1.16    On 27 September 2011, the Secretariat informed the Parties that Mr Lalonde had accepted his appointment as arbitrator.

1.17    On 13 October 2011, the Respondent appointed Justice Florentino Feliciano, a national of the Philippines, as arbitrator.

1.18    By letter of 18 October 2011, the Secretariat informed the Parties that Mr Feliciano had accepted his appointment as arbitrator and confirmed that, further to the Claimants' request and in the absence of the constitution of the Tribunal within 90 days of the Request's registration, the Chairman of the Administrative Council, under Article 38 of the ICSID Convention, would appoint the President of the Tribunal in consultation with the Parties.

1.19    The Chairman of the ICSID Administrative Council, through ICSID's Secretary-General, proposed three arbitrators for the Parties' consideration by letter dated 28 October 2011.

1.20    On 31 October 2011, the Claimants informed the Secretariat that the Parties had reached an agreement to appoint Mr V.V. Veeder, a national of the United Kingdom, as the President of the Tribunal.  On 4 November 2011, Mr Veeder accepted his appointment as President of the Tribunal.

1.21    On 8 November 2011, the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore constituted on that date, in accordance with ICSID Arbitration Rule 6(1).  Ms Mairée Uran-Bidegain, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

1.22    *First Disqualification Proposal:* On 24 December 2013, the Respondent filed a proposal for the disqualification of Mr Feliciano as a member of the Tribunal (the "First Disqualification Proposal").  This was the first of two separate attempts to disqualify members of the Tribunal.

1.23    On 29 December 2013, the ICSID Secretariat notified the Parties that the proceedings were suspended pursuant to ICSID Arbitration Rule 9(6) and transmitted a schedule for the

Parties to submit further observations on the First Disqualification Proposal.  In that same letter, it was noted that according to Procedural Order No. 6, the Respondent's Rejoinder was due by 30 December 2013.  The Respondent was therefore invited by the Tribunal to proceed with its written submission on the previously scheduled date in order to minimise any disruption to the arbitration.

1.24   By letter of 30 December 2013, the Respondent stated that it was not in a position to accept the invitation described above.

1.25   The Claimants filed observations on the First Disqualification Proposal on 26 December 2013 and 15 January 2014.  The Respondent filed further comments on its proposal on 8 January 2014.  On 1 February 2014, Mr Feliciano furnished written explanations pursuant to ICSID Arbitration Rule 9(3).  On 1, 6 and 7 February 2014, the Claimants and the Respondent filed additional comments.

1.26   On 10 February 2014, Mr Veeder and Mr Lalonde (the "Unchallenged Arbitrators") notified the ICSID Secretariat that they were "equally divided" within the meaning of Article 58 of the ICSID Convention and ICSID Arbitration Rule 9(4), for reasons "unrelated to [the] merits or demerits" of the First Disqualification Proposal.  On the same date, ICSID's Secretary-General transmitted the Unchallenged Arbitrators' notice to the Parties and informed them that the decision on the First Disqualification Proposal would be made by the Chairman of the Administrative Council, in accordance with Article 58 of the ICSID Convention and ICSID Arbitration Rule 9.

1.27   On 24 February 2014, after considering the written submissions made by the Parties and the observations of Mr Feliciano, the Chairman of the Administrative Council decided to reject the Respondent's Proposal to Disqualify Mr Feliciano. The Chairman's written decision was transmitted to the Parties and the Tribunal.  These arbitration proceedings resumed on that same day.

1.28   *Second Disqualification Proposal:* On 29 March 2014, shortly before the hearing fixed to take place in Paris, the Respondent proposed the disqualification of all three Members of the Tribunal (the "Second Disqualification Proposal").  On that same date, the ICSID Secretariat notified the Parties that the arbitration proceedings were suspended pursuant to

5

ICSID Arbitration Rule 9(6). It also transmitted a schedule for the Parties to submit further observations on the Second Disqualification Proposal.

1.29 The Claimants submitted their observations on the Second Disqualification Proposal on 1 and 15 April 2014. The Respondent filed further comments on its Second Disqualification Proposal on 16 April 2014.

1.30 On 8 April 2014, the Secretariat transmitted to the Parties the respective statements of Mr Veeder, Mr Lalonde and Mr Feliciano on the Second Disqualification Proposal (the "Arbitrators' Statements").

1.31 On 30 April 2014, after considering the Parties' observations and the Arbitrators' statements, the Chairman of the Administrative Council issued a Decision rejecting the Respondent's Second Disqualification Proposal. The Chairman decided (inter alia) that:

> "[A]t the heart of the Respondent's argument is its discontent with a provisional ruling taken by the Tribunal in order to decide on a procedural question. The mechanism set forth under Article 57 of the ICSID Convention and Arbitration Rule 9 seeking to safeguard the integrity of the proceeding is not a mechanism for reconsideration of adverse rulings. Absent any objective circumstances, the mere existence of an adverse ruling in and of itself, is insufficient to prove a manifest lack of impartiality or independence, as required by Articles 14 and 57 of the ICSID Convention."[2]

1.32 These arbitration proceedings resumed on that same day, namely 30 April 2014.

**(5)** **_The Arbitral Procedure_**

1.33 _First Meeting:_ On 21 December 2011, the Tribunal held its First Session with the Parties by telephone conference call. The Parties confirmed that the Members of the Tribunal had been validly appointed. It was agreed (inter alia) that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish and that the place of these arbitration proceedings would be Washington, DC, USA, with all such matters to be memorialised in a later procedural order

---

[2] Decision on the Proposal for Disqualification of the Arbitral Tribunal (30 April 2014), Paragraph 100.

including the Minutes of the First Session.  The Parties also agreed that these arbitration proceedings would comprise a written phase and an oral phase. The Parties were unable at that time to agree on a full schedule for the jurisdictional/merits phase(s) of these proceedings.

1.34    On 2 January 2012, the Tribunal issued its Procedural Order No. 1 requiring the Claimants to file a full memorial of their case on 2 April 2012.

1.35    On 16 February 2012, in response to the Respondent's written application dated 2 February 2012, the Tribunal issued its Procedural Order No. 2, suspending these arbitration proceedings for a two-month period (starting on 2 February 2012 and ending on 2 April 2012), due to the regrettable death in January 2012 of the Attorney General of Venezuela, Dr Carlos Escarrá.  The Tribunal's procedural order also provided that the Claimants' Memorial should now be filed on 2 June 2012.

1.36    On 18 May 2012, the Tribunal sent to the Parties its draft Procedural Order No. 3, Minutes of the First Session and Schedule of Written Pleadings and requested the Parties' written comments on these drafts.  Between 31 May 2012 and 28 June 2012, the Parties submitted written comments on the Tribunal's draft schedule.

1.37    On 3 July 2012, having considered the Parties' submissions, the Tribunal issued its Procedural Order No. 3, Minutes of the First Session and Schedule of Written Pleadings, in which it fixed the procedural calendar for the arbitration.

1.38    The Tribunal's schedule for the written phase was subsequently amended on 15 August 2012 by agreement of the Parties, and on 22 November 2012, 18 December 2012, 29 May 2013 and 26 February 2014, pursuant to Procedural Orders of the Tribunal Nos. 4, 5, 6 and 7 respectively, upon the application of a Party or as a result of the Respondent's two disqualification proposals (described above).

1.39    *Bifurcation*. Considering the Respondent's various applications for extensions to the deadline to submit its counter-memorial, the Tribunal further decided in Procedural Order No. 4 dated 22 November 2012, that any jurisdictional objections would be joined to the merits pursuant to ICSID Arbitration Rule 41.

1.40    The schedule for the oral phase was originally fixed by the Tribunal in Procedural Order No. 6 of 29 May 2013 and subsequently amended by the Tribunal following a joint application by the Parties, whereby the Parties agreed to amend the original hearing dates but could not agree on new hearing dates.

1.41    On 13 March 2014, the Tribunal decided that the Hearing would be held in Paris, France, in two separate sessions: the first hearing starting on 31 March 2014 and ending no later than 4 April 2014 (mid-day); and the second session starting on 19 May 2014 and ending no later than 23 May 2014.

1.42    On 29 March 2014, the first part of the hearing scheduled to start in Paris on 31 March 2014 was adjourned as a consequence of the Respondent's Second Disqualification Proposal.  The final dates for the oral phase of this proceeding were re-fixed orally by the Tribunal on 19 May 2014, and further confirmed in the Tribunal's Procedural Order No. 9 of 4 August 2014.

1.43    *The Claimants' Submissions:* As regards the written phase of the arbitration, the Claimants filed (i) their Memorial on 4 June 2012, (ii) their Reply on the Merits and Counter-Memorial on Jurisdiction on 2 September 2013 and (iii) their Rejoinder on Jurisdiction on 14 March 2014.

1.44    *The Respondent's Submissions:* The Respondent filed (i) its Counter-Memorial on the Merits and its Preliminary Objections to the Jurisdiction of the Arbitral Tribunal on 28 February 2013, and (ii) its Rejoinder on the Merits and its Reply on Jurisdiction on 3 March 2014.

1.45    *The Claimants' Testimony:* The Claimants adduced signed written statements from the following factual witnesses:

- Brent W. Gwaltney, statements dated 30 May 2012, 20 August 2013 and 23 May 2014;

- Jim Sorlie, statements dated 29 May 2012, 26 July 2013 and 28 May 2014; and

- Melquiades A. Parra, statements dated 29 May 2012 and 12 August 2013.

1.46    The Claimants also adduced signed expert reports from:

- Benjamin Esty, expert reports dated 23 August 2013 and 14 March 2014;

- Tim Giles, export reports dated 2 June 2012 and 30 August 2013; and

- Richard S. Sanders, expert reports dated 30 May 2012 and 27 August 2013.

1.47    *The Respondent's Testimony:* The Respondent adduced signed written statements from the following factual witnesses:

- Anibal Villarroel, statements dated 28 February 2013 and 30 December 2013;

- Carolina Nuñez, statements dated 28 February 2013 and 30 December 2013;

- Edgar Flórez, statements dated 28 February 2013 and 30 December 2013;

- Victor Barrientos, statements dated 28 February 2013 and 30 December 2013, and

- Francisco Toro, statement dated 30 December 2013 (later withdrawn by the Respondent, as explained below).

1.48    The Respondent also adduced signed expert reports from Daniel Flores (of Econ One) dated 28 February 2013 and 3 March 2014.

1.49    *Procedural Meetings:* Further to the Tribunal's Procedural Order No. 5, the Tribunal held a procedural conference call with the Parties on 6 March 2013 to discuss the need, scope and timing of any document production and the dates of the proposed two-week hearing.

1.50    On 19 May 2014, upon the resumption of these arbitration proceedings (following the rejection of the Respondent's Second Disqualification Proposal) the Tribunal held a procedural meeting with the Parties in Paris, at the offices of the World Bank ("the Paris Procedural Meeting").   Mr Veeder, Mr Lalonde and the Parties' legal representatives attended the procedural meeting in person; and Mr Feliciano attended by video-link from the offices of the World Bank in Manila. (Mr Feliciano had recently suffered an accident and had been medically forbidden to travel to Paris).  The Paris Procedural Meeting was

conducted without objections from the Parties. It was recorded, with the verbatim transcript (corrected) issued to the Parties on 20 May 2014.

1.51   In addition, the President of the Tribunal, with the Parties, and the Secretary of the Tribunal, held pre-hearing organisational meetings by telephone conference calls on 24 March 2014 and 25 August 2014.

1.52   *The First (September) Hearing:* As regards the oral phase of this arbitration, the first hearing on jurisdiction and merits, including the examination of witnesses, took place at the World Bank in Paris, France on 8 September and subsequently from 10-12 September 2014 (the "First (September) Hearing").

1.53   In addition to the Tribunal and its Secretary, the following persons were present at this First (September) Hearing:

1.54   *For the Claimants:* Mr J. Kory Parkhurst, legal representative of KOMSA & KNI; Mr Robert Volterra, Mr Stephen Fietta, Mr Ashique Rahman, Mr Ernesto J. Féliz De Jesús, Ms Zuzana Morháčová, Ms Jessica Pineda, and Ms Zsófia Young, of the law firm of Volterra Fietta. Mr Mark Beckett, Ms Christina Hioureas, Mr Christian Urrutia and Mr Ariel Meyerstien, of the law firm of Chadbourne & Parke LLP.  The Claimants' witnesses and experts were also present: Mr Brent Gwaltney, Mr Melquíades A. Parra, Mr Jim Sorlie and Mr Richard Sanders. (Mr Gwaltney, Mr Parra and Mr Sorlie were examined during the First (September) Hearing).

1.55   *For the Respondent*: Mr Christopher Ryan, Ms Katia Yannaca-Small, Ms Anna Tevini, Mr Peik Mäkelä, Mr Guillermo Salcedo Salas, Mr Agustín Acosta Cárdenas, Ms Evelyn Wiese, Mr Ricardo Alarcón Sierra and Ms Victoria Cadiz (all of the law firm of Shearman & Sterling); and Mr Isaias Medina (PDVSA).  The Respondent's witnesses were also present: Mr Aníbal Villarroel, Mr Edgar Flórez (FertiNitro); Mr Víctor Barrientos (Pequiven).  Messrrs Villaroel, Flores and Barrientos, were examined during the First (September) Hearing, as described below.

1.56   Witnesses examined during the First (September) Hearing were, in alphabetical order:

   ▪ Victor Barrientos, Day 3 (11 September 2014), at 09:03:19ff

- Edgar Flórez, Day 4 (12 September 2014), at 10:55:18ff

- Brent Gwaltney, Day 2 (10 September 2014), at 09:17:20ff

- Melquíades A. Parra, Day 2 (10 September 2014), at 11:08:13ff

- Jim Sorlie, Day 2 (10 September 2014), at 12:48:22ff

- Anibal Villarroel, Days 3 & 4 (11 and 12 September 2014), at 14:24:06ff and 09:00:12ff.

1.57   *The Second (November) Hearing:* A second hearing on the merits and quantum, including the examination of the Parties' expert witnesses, took place at the International Dispute Resolution Centre, in London, UK, from 23 to 26 November 2014 (the "Second (November) Hearing").

1.58   In addition to the Tribunal and its Secretary, the following were present at this Second (November) Hearing:

1.59   *For the Claimants:* Mr J. Kory Parkhurst; Messrs. Jeff Brenner and Kevin Barb of KOMSA & KNI; Mr Robert Volterra, Mr Stephen Fietta, Mr Giorgio Mandelli, Mr Ashique Rahman, Ms Zuzana Morháčová, Ms Jessica Pineda, and Ms Zsófia Young, of the law firm of Volterra Fietta; Mr Mark Beckett, Ms Christina Hioureas, and Mr Christian Urrutia, of the law firm of Chadbourne & Parke LLP.  The Claimants' expert witnesses were also present: Mr Richard Sanders, Mr Tim Giles and Ms Jessica Resch. (Mr Sanders and Mr Giles were examined during the November Hearing).

1.60   *For the Respondent:* Mr Thomas Wilner, Christopher Ryan, Ms Katia Yannaca-Small, Ms Anna Tevini and Ms Evelyn Wiese of the law firm of Shearman & Sterling.   The Respondent's expert witnesses were also present: Mr Daniel Flores, Mr Ettore Komi and Mr Mark Khouzam. (Mr Flores was examined during the November Hearing).

1.61   Witnesses examined during the Second (November) Hearing were, in alphabetical order:

- Daniel Flores, Days 2 & 3 (24 and 25 November 2014), at 12:51:02ff and 09:28:03ff

- Tim Giles, Day 2 (24 November 2014), at 09:30:03ff

       ▪  Richard Sanders, Day 1 (23 November 2014), at 14:09:03ff.

1.62    Both the First (September) and Second (November) Hearings were recorded by verbatim transcript in English and Spanish, available to the Parties.[3]

*(6)*      ***Other Procedural Matters***

1.63    *The Submission of Additional Documents*: By letter of 12 March 2014, the Claimants requested that the Tribunal order the Respondent to produce: (a) a witness statement and an expert report submitted by the Respondent in *Gambrinus Corp. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/31) (the "Gambrinus Arbitration"), made by a witness and an expert who also submitted a statement and a report on behalf of the Respondent in this case, and (b) a jurisdictional decision rendered in *Longreef Investments A.V.V. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/5). The Claimants further requested permission from the Tribunal to introduce into the evidential record ten new documents (the "Additional Documents"), which they sent to the Tribunal and the Respondent along with their request.

1.64    On 14 March 2014, the Respondent objected to the Claimants' request and requested in response that, if the Tribunal were to accede to the Claimants' request, the first week of the hearing (as then scheduled) should be moved to 19 May 2014 so as to give the Respondent sufficient time to prepare a response.  The Claimants opposed the Respondent's request on 16 March 2014. The Respondent replied on 17 March 2014, reiterating its request that the first week of the scheduled hearing be postponed to May 2014, and submitting that failure to provide such further time would infringe upon the Respondent's due process and procedural rights.  The Respondent further stated that it reserved all its rights in this respect.

1.65    On 18 March 2014, the Tribunal decided upon the Claimants' request of 12 March 2014 (the "18 March Decision").   In this decision, the Tribunal rejected the Claimants' application regarding the *Gambrinus* documentation and the *Longreef* decision.

---

[3] References to all transcripts of hearings below are made thus: "First (September) Hearing D1.10" denotes Day 1, page 10 of the transcript.

1.66   As to the Additional Documents, being the third application in the Claimant's request, the Tribunal decided (inter alia) as follows:

> *"As regards the third application, given that this documentation is said by the Claimants to respond directly in rebuttal to the Respondent's (delayed) Rejoinder of 3 March 2014, the Tribunal here orders its admission de bene esse for the purpose only of allowing the Tribunal to read the documentation in order to decide the Claimants' application and the Respondent's opposition (i.e. not as 'evidence').*
> *The Tribunal also orders the Claimant's third application (with the Respondent's opposition) to be argued more fully during the Parties' opening oral submissions at the outset of the first week's hearing in Paris beginning on Monday, 31 March 2014. In the event (which should not here be assumed) that the Tribunal should then decide to admit into evidence any part of this documentation, the Parties should be ready for any consequential order, including any response from the Respondent as regards further submissions and rebuttal evidence."*

1.67   On 21 March 2014, the Claimants made a second request to the Tribunal for permission to submit six additional documents into the evidential record (the "New Documents").

1.68   On 24 March 2014, the Tribunal, represented by its President, held a pre-hearing organisational meeting with the Parties and the Secretary of the Tribunal, by telephone conference call.  The Respondent reiterated that it was participating in this call with "full reservation of its rights."  The President noted (inter alia) that he could not by himself alone decide the disputed admissibility of the Claimants' application of 21 March 2014 without his co-arbitrators and that the Tribunal expected the Respondent to comment on the Claimants' application regarding Mr Toro on the first day of the scheduled hearing.

1.69   On 25 March 2014, the Respondent objected to the Claimants' 21 March 2014 application and to the 18 March Decision, arguing that it prejudiced its due process rights.  The Respondent further alleged that the Tribunal's Procedural Order No. 3 obliged the Claimants to argue the relevance of each document before submitting it to the Tribunal and that the Respondent should be accorded sufficient time to provide counter-arguments and evidence on the relevance of each disputed document.  The Respondent requested again that the merits phase of the Hearing be postponed until 19 May 2014, and it further reserved all its rights with respect to the facts surrounding the Claimants' applications and the Tribunal's decisions.  The Claimants opposed the Respondent's request on 26 March 2014.

1.70    *The Admissibility of the Written Statement of Mr Toro*: On 19 March 2014, the Claimants requested that the written statement of Mr Francisco Toro (the "Toro Statement") be struck from the evidential record, on the grounds that, *inter alia*, Mr Toro had passed away before his statement was submitted to the Tribunal, and he was therefore not available for cross-examination at the Hearing.   The Tribunal invited the Respondent to comment on this application by 24 March 2014.

1.71    On Thursday, 27 March 2014, the Tribunal issued Procedural Order No. 8, deciding (inter alia) the following:

> *"To require all pending procedural applications to be raised with the Tribunal during the Parties' opening submissions on 31 March 2014, including [...]: (i) the submission of additional documents into the evidential record; (ii) the hearing schedule and the Claimants' latest application for 15 minutes' direct examination; (iii) the Respondent's application for an adjournment of the hearing; and (iv) the admissibility of the witness statement of Mr Francisco Toro; and without the Tribunal prejudging any of these applications, the Parties shall prepare for the five-day hearing to the fullest extent, including all preparations on the provisional assumption that any or all of these applications may be refused by the Tribunal on 31 March 2014."*

1.72    On 29 March 2014, as already summarised above, the Respondent submitted its Second Disqualification Proposal, which was subsequently rejected by the Chairman of the Administrative Tribunal on 30 April 2014. As also summarised above, the effect of this Second Disqualification Proposal was to cause the abandonment of the scheduled hearing in Paris.

1.73    The Respondent filed additional exhibits and correspondence regarding the Toro Statement on 28 May 2014, followed by the Claimants' supplementary witness statements of Brent Gwaltney and Jim Sorlie on 29 May 2014.   The Claimants also submitted correspondence regarding the Toro Statement on 9 June 2014, to which the Respondent replied on 13 June 2014, followed by the Claimants' application on 26 July 2014.

1.74    On 5 September 2014, the Tribunal issued its Procedural Order No. 10, whereby it decided (inter alia):

> *"a. To permit the Respondent to withdraw from the evidential record the proffered witness statement of Mr Toro dated 30 December 2013 (as a result of which it shall not be treated as evidence in these arbitration proceedings); and*
> *b. To reserve its decision for the time being over any adverse inferences to be drawn from the withdrawal of the Toro Statement and the non-production by the Respondent of Mr Toro's witness statement(s) in the Gambrinus arbitration under Procedural Order No.9."*

1.75    On 19 December 2014, the Respondent transmitted to the Secretariat the Parties agreed redactions to the Respondent's Rejoinder and Second EconOne Expert Report that resulted from Respondent's withdrawal of the Toro Statement from the record as indicated above. On 22 December 2014, the Claimants confirmed their agreement with the transmitted redactions, stating in that same communication that they believed further redactions were appropriate and necessary, to which the Respondent replied on 29 December 2014.

1.76    Following the reconstitution of the Tribunal as indicated below, on 17 May 2016, the Claimants submitted an additional application to the Tribunal reiterating their request that additional redactions be applied to the Respondent's Rejoinder and the Second EconOne Expert Report by Dr Flores. This was followed by Respondent's response of 1 June 2016 and the Tribunal's Procedural Order No. 11, of 8 June 2016 ruling on this matter, as explained below.

1.77    *The Advantis Reports*: By letter dated 12 March 2014, the Claimants applied to the Tribunal for permission to introduce into the evidential record a valuation report by Advantis (known as the Second Advantis Report). The Claimants' letter stated, in material part:[4]

> *"Respondent's Advantis valuation report of FertiNitro: This document was referenced in the Claimant's Reply [paragraph 105] and Mr Brent Gwaltney's Second Witness Statement at paragraph 40 and is clearly relevant to the Respondent's valuation of FertiNitro in this proceeding. In its Rejoinder [paragraph 228], the Respondent makes reference to the alleged good-faith negotiations, in the course of which it presented the document (on a non-without prejudice and confidential basis) to the Claimants. Given that it is already referenced in the Claimants' submissions, was created for the Respondent and, therefore, is already in*

---

[4] Claimants' letter to the Arbitral Tribunal of 12 March 2014, p. 4.

> *the Respondent's possession, there can be no prejudicial effect in admitting the exhibit at this stage. Furthermore, such evidence of the Respondent's previous valuations of FertiNitro should clearly be relevant to the Tribunal's assessment of the Respondent's purported valuation in this proceeding." (Footnote omitted)*

1.78 The Claimants' application was disputed by the Respondent's letter of 14 March 2014, to which the Claimants responded by letter of 16 March 2014 and to which the Respondent responded in turn by letter of 17 March 2014.

1.79 By its instruction letter of 18 March 2014, the Tribunal decided to examine the disputed document for itself, for the time being *de bene esse* only. (The Tribunal there also indicated that the dispute between the Parties would be discussed further with the Parties during the forthcoming hearing, then scheduled to start on 31 March 2014; but later suspended following the Respondent's Second Disqualification Proposal).

1.80 Subsequently, during the Paris Procedural Meeting on 19 May 2014, the Parties agreed upon the admission of this document into the evidential record, with others.[5] This Second Advantis Report was designated as C-157, comprising of three pages under the title "Special Document" with five pages of annexes, submitted in the original Spanish with an English translation. The Respondent submitted, with the Claimants' agreement, the First Advantis Report designated as R-86, comprising of 22 pages of the report, the emails from Advantis to Pequiven and from Pequiven to the Fertinitro shareholders of 18 and 19 May 2011, respectively, transmitting the report, and five pages of annexes in the original Spanish.

1.81 *Post-Hearing and Costs Submissions*: The Parties filed simultaneous post-hearing briefs on 30 January 2015. The Parties filed their submissions on costs on 13 February 2015.

1.82 Mr Feliciano regrettably died in December 2015, at a time when the Tribunal's deliberations had not been fully completed.

---

[5] *See* Procedural Order No. 9, Paragraphs 17 and 18; Claimants' email message of 28 May 2014; Respondent's email message of 28 May 2014.

**(7)      *The Rule 12 Resumption of the Proceedings***

1.83    By letter from the ICSID Secretariat of 16 December 2015, resulting from the death of Mr Feliciano and the vacancy on the Tribunal, these arbitration proceedings were suspended pursuant to ICSID Arbitration Rule 10(2).

1.84    By letter dated 1 February 2016, the ICSID Secretariat notified the Parties that the vacancy created in the Tribunal resulting from the death of Mr Feliciano had been filled with the appointment of Professor Zachary Douglas QC as co-arbitrator made by the Respondent and, further, that, in accordance with ICSID Arbitration Rule 12, these proceedings resumed as from 1 February 2016 from the point it had reached at the time the vacancy occurred.

1.85    By its Procedural Order No. 11 of 8 June 2016, the Tribunal addressed the Claimant's application of 17 May 2016, opposed by the Respondent's letter dated 1 June 2016, to redact certain references to Mr Toro in the Respondent's Rejoinder and its Second EconOne expert report by Dr Flores adduced by the Respondent.  The Tribunal decided to order parts of the requested redactions from the Rejoinder and the report, as there set out, subject to further order.

1.86    Before the Third (June) Hearing, the Tribunal sent to the Parties non-exhaustive lists of issues and topics to be addressed at that Hearing.  These lists are set out in Part III below.

1.87    *The Third (June) Hearing*: Pursuant to ICSID Arbitration Rule 12, an oral hearing was held at the IDRC in London, United Kingdom on 9 and 10 June 2016, recorded by verbatim transcript available to the Parties.  The procedure for this Reconstitution Hearing was set by the Tribunal's letter of 29 April 2016 to the Parties.

1.88    In addition to the Tribunal and its Secretary, the following persons were present at this Third (June) Hearing:

1.89    *For the Claimants:* Mr Jeff Brenner and Mr J. Kory Parkhurst (legal representatives of KOMSA & KNI); Mr Robert Volterra, Mr Graham Coop, Mr Govert Coppens, Ms Jessica Pineda, Ms Zusana Morháčová, Ms Isabella Sif and Ms Chiara Atzeni of the law firm of Volterra Fietta; and Mr Mark Beckett of the law firm Chadbourne & Parke.

1.90    *For the Respondent*: Mr Christopher Ryan, Mr Thomas Wilner, Ms Anna Tevini, Mr David Earnest, Mr Guillermo Salcedo Salas, Ms Evelyn Wiese (all of the law firm of Shearman & Sterling).

1.91    The Third (June) Hearing was recorded by verbatim transcript in English and Spanish, available to the Parties.

1.92    On 30 June 2016, the Parties completed their respective responses to the Claimants' Tables 1 to 4 of agreements and disagreements between Mr Giles and Dr Flores, their expert witnesses on quantum, as requested by the Tribunal at the Third (June) Hearing.[6] The Parties submitted their respective updated claims for costs by written submissions dated 8 and 12 July 2016.  By several email messages dated 12 and 26 July 2016, the Parties submitted their respective tables on interest.

1.93    By letter dated 7 July 2016, the Respondent objected to the admissibility of certain parts of the presentational slides used by the Claimants during their closing oral submissions at the Reconstituted Hearing.   At the Tribunal's request, the Claimants responded to the Respondent's objections by letter dated 22 July 2016.   The Tribunal decided to reserve its decision on the Respondent's objection until this Award.   It has decided to reject that objection, conscious also that these objected parts play no material part in the reasons for or result of this Award.

1.94    *Closing:* This proceeding was closed on August 31, 2017, pursuant to ICSID Arbitration Rule 38(1).

---

[6] Third (June) Hearing D2.110-111.

**(8)**    *The Parties' Claims for Relief*

1.95    *The Claimants' Requests:* The Claimants claim, as finally pleaded in Section VI of their Post-Hearing Brief (as also confirmed by the Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, Paragraph 601), requested that the Tribunal render an Award:

a.    Declaring that the Respondent has violated Articles 4, 6 and 11 of the Treaty;

b.    Ordering that the Respondent pay to KOMSA compensation for the expropriation of its investment and historical losses in the amount of US$ 444.6 million (as at 30 January 2015, subject to adjustment as at the date of the Award); [7]

c.    Ordering that the Respondent pay to KNI compensation for the expropriation of its investment in the amount in the amount of US$ 227.8 million (as at 30 January 2015; subject to adjustment as at the date of the Award);[8]

d.    Declaring that the Respondent's expropriation of the Claimants' investments was unlawful;

e.    Ordering such other damages or relief that the Tribunal deems appropriate for the unlawful character of the Respondent's expropriation and other violations of the BIT;

f.    Ordering that the Respondent pay interest on the amounts that the Tribunal awards to the Claimants (including costs and interest), at the LIBOR three-month US Dollar rate plus 2%, compounded on a quarterly basis, from the date of the award until full payment of the amount of the award by the Respondent;

g.    Ordering that the Respondent pay the costs of the arbitration, including all the fees and expenses of ICSID and the Tribunal and all the legal costs and expenses incurred by the Claimants, apportioned between the Claimants in the ratio in which

---

[7] Updated figure as included in the Claimants' Post Hearing Brief.  The compensation requested in Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction for KOMSA amounts to US$ 432.7 million as of 31 August 2013.

[8] Updated figure as included in the Claimants' Post Hearing Brief.  The compensation requested in Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction for KNI amounts to USD 220.8 million as of 31 August 2013.

they are awarded compensation, with interest calculated in accordance with paragraph [f], directly above; and

h.   Ordering such other and further relief as the Tribunal deems appropriate.

1.96   In their Rejoinder on Jurisdiction,[9] the Claimants requested that the Tribunal "dismiss the Respondent's objections to jurisdiction in their entirety and that the costs for the jurisdictional proceedings be awarded to the Claimants."

1.97   *The Respondent's Requests:* The Respondent, as finally pleaded in its Rejoinder on the Merits[10] and in its Post-Hearing Brief,[11] claims the following relief from the Tribunal:

> *"(i) declaring that KNI's interests in the Offtake Agreement do not constitute an investment within the meaning of Article 25 of the ICSID Convention and/or Article 1(2) of the Venezuela-Switzerland BIT and, thus, are not within the jurisdiction of the Arbitral Tribunal;*
> *(ii) dismissing KNI's claims in their entirety for lack of jurisdiction;*
> *(iii) declaring that the Republic has not breached any of the standards of protection under the Venezuela-Switzerland BIT;*
> *(iv) dismissing all of the Claimants' claims;*
> *(v) awarding the Republic all costs and fees incurred in this arbitration, including reasonable attorneys' fees and expert fees;*
> *(vi) granting the Republic any other relief the Arbitral Tribunal determines to be appropriate."*

---

[9]  Cls. Rej., Paragraph 93.
[10]  Resp. Rej., Paragraph 531.
[11]  Resp. PHB, Paragraph 273.

## PART II: THE PARTIES' DISPUTE

### (1) Introduction

2.1    Inevitably, as these arbitration proceedings progressed, the issues arising from the Parties'
original dispute became more complex and significantly more numerous, extending
originally from an ostensible dispute largely about quantum (in regard to KOMSA's
expropriation claim at the First Session) to a major dispute about jurisdiction, liability,
compensation, interest and costs by the time of this Award.

2.2    The Tribunal here summarises only the Parties' respective cases as to jurisdiction, liability
and quantum.  Other parts of the Parties' respective cases are addressed later in this Award.

### (2) The Claimant's Case

2.3    *Jurisdiction:* In summary, as to jurisdiction, the Claimants contend that the Tribunal has
jurisdiction over the merits of the Parties' investment dispute in this arbitration.  The
Claimants submit that the dispute arises from several violations by the Respondent of its
obligations under the Treaty and the Claimants' corresponding rights (including the
Claimants' rights under customary international law) entitling the Claimants to full
compensation for the losses that the Claimants have suffered as a direct result of the
Respondent's violations of the Treaty.

2.4    The Claimants contend that the Claimants and the Respondent have each consented in
writing to refer such an investment dispute to arbitration in accordance with the ICSID
Convention, as expressed in Article 25 of the ICSID Convention and Article 9 of the
Treaty.  The Claimants contend that the Respondent's written consent became effective
upon the entry into force of the Treaty on 30 November 1994, duly accepted by the
Claimants with their Request for Arbitration of 28 June 2011.

2.5    The Claimants contend that the Parties' dispute comprises an "investment dispute" between
a Contracting Party and investors of another Contracting Party and falls within the scope
of the Respondent's consent under Article 25 of the ICSID Convention and Article 1(1)

(defining "investors"), Article 1(2) (defining "investment") and Article 9(5) of the Treaty.[12]

2.6    The Claimants submit that both KOMSA and KNI are companies constituted under the laws of Switzerland and are accordingly "investors" as defined in Article 1(1)(b) of the Treaty.  The Claimants also submit that KOMSA and KNI possessed "investments" in Venezuela, as defined in Article 1(2) of the Treaty.  In particular, the Claimants submit that: (i) KOMSA, through Koch José, held an interest in the equity of FertiNitro, thereby constituting an "investment" under the Treaty; and (ii) KNI held an interest in the Offtake Agreement between KNI and FertiNitro,[13] constituting rights to performance under a contract and thereby an "investment" under the Treaty.

2.7    The Claimants contend that there is a "dispute" between the Claimants and the Respondent in respect of the Respondent's failure to comply with its obligations under the Treaty towards the Claimants' investments in Venezuela, including the Respondent's expropriation of KOMSA's interest in FertiNitro and KNI's interest in the Offtake Agreement, together with the Respondent's failure to provide any compensation to the Claimants.

2.8    Accordingly, so the Claimants conclude, there is an "investment dispute" between a Contracting Party and investors of the other Contracting Party that falls within the scope of the Respondent's consent to arbitration under the Treaty and the ICSID Convention.

2.9    The Claimants contend that they requested consultations with the Respondent – to no avail. On 9 November 2010, Mr Steve Packebush (of KOMSA) sent a letter to Mr Saúl Ameliach (President of Pequiven), copied to His Excellency Rafael Ramírez (the Respondent's Minister of Energy and Petroleum) to notify formally the Respondent of the investment dispute between the Claimants and the Respondent relating (as the Claimants contended)

---

[12] Agreement between the Swiss Confederation and the Republic of Venezuela on the Reciprocal Promotion and Protection of Investments (18 November 1993) ("Treaty") (CLA-1).

[13] Offtake Agreement by and among Pequiven, IPSL, and Koch Oil SA as Buyers and FertiNitro as Seller, dated 8 April 1998 ("Offtake Agreement") (C-19).

to the Respondent's violations of the Treaty.[14]   The Claimants there proposed that representatives of the Claimants should meet representatives of the Respondent "to commence discussions and consult as to how Venezuela will compensate Koch for the loss of its investments in Venezuela."  The Claimants contend that Pequiven failed to make any offer to the Claimants of compensation for the Respondent's violations of the Treaty.  The Claimants then instructed their legal representatives (Latham & Watkins) to submit to the Respondent a further request for consultations, by letter of 20 January 2011 to the Respondent's President, copied to (*inter alios*) the Respondent's Attorney General.[15] Subsequently, according to the Claimants, meetings were held between representatives of the Claimants and the Respondent, producing no satisfactory result to either Claimant.

2.10    Accordingly, the Claimants conclude that they did request and hold consultations with the Respondent in order to arrive at an amicable settlement of the Parties' dispute, as required by the Treaty.  The Claimants further conclude that they also waited until the expiry of the 'cooling-off' period required under Article 9(2) of the Treaty, thereupon becoming entitled to submit the Parties' dispute to ICSID for arbitration, as they did with their Request for Arbitration of 28 June 2011 and, further, that this Tribunal has jurisdiction to decide the Parties' dispute.

2.11    *Liability*: In summary, as to liability, the Claimants contend that the Respondent violated its obligations in the Treaty causing loss and damage to each of the Claimants and their investments.

2.12    The Claimants contend that during the 1990s, Venezuela was actively pursuing a policy of encouraging foreign investment, in particular in its hydrocarbon and petrochemicals industries.   At this time, Pequiven (as the Respondent's state-owned petrochemical company) was seeking foreign partners to participate in the development of a fertilizer plant in José in the Venezuelan state of Anzoátegui.

---

[14] Letter from Mr Steve Packebush, KOMSA to Mr Saúl Ameliach, Pequiven SA (9 November 2010) (RfA, Exh. 6).
[15] Letter from Robert Volterra, Latham & Watkins to President Hugo Rafael Chávez Frías (20 January 2011) (RfA, Exh. 7).

2.13   In 1997, KOMSA was selected as a foreign partner with the requisite expertise to participate in the development of the proposed fertilizer plant and to market the fertilizer to be manufactured by the proposed plant.   KOMSA and Pequiven proceeded to enter into a joint venture for the construction and operation of two ammonia and two granular urea plants in José (the "FertiNitro Plant") and the marketing and sale of the ammonia and urea produced at the Plant.

2.14   In March 1998, a series of joint venture companies were formed for the purpose of implementing the project.   These were the FertiNitro Companies (here collectively called "FertiNitro").   External funding for the development of the FertiNitro Plant was secured on the understanding that the offtake from the Plant would be sold to KNI, Pequiven and International Petrochemical Sales Limited (a subsidiary of Pequiven) on the terms contained in the Offtake Agreement.   According to the Claimants, from the outset, the Offtake Agreement was integral to the Claimants' investments.

2.15   Once external funding for the development of the Plant had been secured, Pequiven, KOMSA, Snamprogetti Netherlands BV ("Snamprogetti") and Polar José Investments, Limited ("Polar") entered into a series of agreements in respect of the project.   These agreements included: (i) the "Joint Investors' Agreement" dated 8 April 1998 between Pequiven, KOMSA, Snamprogetti and Polar,[16] which provided (inter alia) that FertiNitro would be 35% owned by Koch José, 35% owned by Pequiven, 20% owned by Snamprogetti and 10% owned by Polar; (ii) the "Offtake Agreement" dated 8 April 1998,[17] which granted to KOMSA the right to purchase a guaranteed quantity of ammonia and urea produced by FertiNitro at a discounted price for a 20-year term (KOMSA, through Koch José, later owned 25% of the equity in FertiNitro; and KOMSA's rights under the Offtake Agreement later vested in KNI) and (iii) the "EPC Contract" dated 8 April 1998,[18] for the

---

[16] Joint Investors' Agreement by and among Pequiven, Koch Oil SA, Snamprogetti Netherlands BV, and Polar Uno, CA (8 April 1998) ("JIA") (C-18).
[17] Offtake Agreement (C-19).
[18] Engineering, Procurement and Construction Contract by and between FertiNitro and Snamprogetti (8 April 1998) (C-24).

construction of the Plant between FertiNitro, CEC and Snamprogetti as the main contractor.

2.16   Construction of the Plant commenced in May 1998 and was completed in December 2001 when FertiNitro granted the provisional acceptance certificate to Snamprogetti.  Earlier, in May 2001, FertiNitro had commenced commercial production at the Plant.  The Claimants submit that, other than certain periods of interruption (for example when PDVSA failed to provide methane gas or Pequiven failed to provide electricity to the Plant), commercial production at the Plant continued until the Respondent expropriated FertiNitro on 11 October 2010, as summarised below.

2.17   The Claimants contend that the Respondent took unlawful measures against the Claimants' investments in violation of the Treaty, which have caused the Claimants to suffer considerable losses.  These measures culminated on 11 October 2010 in the expropriation of KOMSA's interest in FertiNitro and the expropriation of KNI's interest in the Offtake Agreement.  The Respondent failed to provide to the Claimants any compensation for its expropriation of their investments.  In brief, the Claimants list the Respondent's unlawful measures against the Claimants' investments, in violation of Articles 4(1), 4(2), 6, and 11(2) of the Treaty, as follows.

2.18   *New and Increased Taxes:* The Respondent imposed on FertiNitro a series of new taxes and tax increases with the object and effect of diverting its profits to the Respondent. This is the first of KOMSA's "Historical Losses".

2.19   These new taxes eroded the profitability of FertiNitro and deprived KOMSA of the economic benefits of its investments.  These taxes and tax increases were directly contrary to KOMSA's legitimate expectations on which it relied when deciding to invest in FertiNitro.  For example, in December 2005, the Respondent imposed a Narcotic and Psychotropic Substances Tax on FertiNitro that obliged FertiNitro to allocate funds to specified social programs or to provide to the Respondent 1% of FertiNitro's annual net income.  At about this time, the Respondent further enacted the Organic Law on Science,

Technology and Innovation.[19]   It obliged FertiNitro, beginning on 1 January 2006, to allocate funds to specified scientific development programs or to provide to the Respondent 0.5% of its gross income generated in Venezuela.  Further, the municipal tax applicable to FertiNitro was increased in 2006 from 1% to 2% and in 2007 to 2.4% of FertiNitro's turnover.  These measures, particularly when considered cumulatively, negatively affected the profitability of FertiNitro at the expense of KOMSA and to the benefit of the Respondent.

2.20    *VAT:* The Respondent failed promptly or at all to provide to FertiNitro VAT rebates to which they were entitled.  This is the second of KOMSA's "Historical Losses".

2.21    In May 1999, the Respondent enacted the Value Added Tax ("VAT") Law.[20] This law provided for a zero rate tax for exporters and granted to such exporters the right to recover Special Tax Rebate Certificates ("CERTs") in respect of VAT paid on the purchase or import of goods and services.  Under the VAT law, the taxpayer would submit a request to the tax administration of the Respondent, the "SENIAT" (abbreviated from the Spanish "*Servicio Nacional Integrado de Administración Aduanera y Tributaria*"); and the SENIAT would then issue a "CERT" (abbreviated from the Spanish, "*Certificados Especiales de Reembolso Tributario*").  The taxpayer could then use its CERTs to pay any federal revenue taxes (including income tax and VAT) or assign them to third parties for similar purposes.  FertiNitro paid substantial amounts of VAT to the Respondent during the course of its operations.   In respect of these payments, FertiNitro duly submitted requests to the SENIAT.

2.22    However, from about 2005 onwards, the SENIAT unreasonably and arbitrarily delayed the issue of CERTs to FertiNitro.  This delay resulted in losses to FertiNitro particularly when the CERTs were paid after considerable delay during which local inflation - increased and the Venezuelan Bolivar was devalued against hard currencies (including the US Dollar).  The Respondent also failed to provide to FertiNitro a substantial amount of VAT rebates

---

[19] Organic Law on Science, Technology and Innovation (effective as of 1 January 2006) ("Science and Technology Law") (C-43).
[20] Law of Partial Reform of the Law on Value Added Tax (11 August 2004) (C-55).

despite its obligation to do so.  This arbitrary conduct by the Respondent further eroded the profitability of FertiNitro at the expense of KOMSA (and its other non-State shareholders), to the benefit of the Respondent.

2.23   *Urea Decree and Urea Resolution:* The Respondent issued a Urea Decree and a subsequent Urea Resolution that obliged FertiNitro to sell urea to the Respondent (through Pequiven) at substantially below production costs and market values, as summarised below.  This is the third of KOMSA's "Historical Losses".

2.24   On 26 February 2007, the President of the Respondent signed Decree 5,218 (the "Urea Decree").[21]  The Urea Decree was published in the Official Gazette No. 38,638 on 6 March 2007 and took effect on that date.   Article 2 of the Urea Decree provided that: "Manufacturers, suppliers […] exporters of nitrogenous fertilizers […] are required to supply these on a priority basis to the national market, in accordance with the price regulations established for their sale."   Article 3 provided that the prices would be established by joint resolutions of the Ministries of Agriculture and Land, Light Industries and Trade and Energy and Petroleum.

2.25   Pursuant to Article 3 of the Urea Decree, the Respondent's Ministries of Agriculture, Light Industries and Trade and Energy and Petroleum issued a joint resolution (the "Urea Resolution").[22]  It was published in the Official Gazette No. 38,674 on 2 May 2007.  The Urea Resolution provided (inter alia) that Pequiven was solely authorised to administer the delivery of urea in accordance with the Urea Decree and that Pequiven could purchase "the urea it requires to cover the needs of the Nation, from any manufacturer established in the country, at the maximum bulk sales price at the plant gate of Bs. 155,200/MT."[23]

2.26   The sales prices at which FertiNitro was obliged to sell urea to Pequiven were substantially less than the costs of production of urea incurred by FertiNitro.  Other than Pequiven,

---

[21] Decree 5,218 (26 February 2007) ("Urea Decree") (C-80).
[22] Joint Resolution by the Ministry of the People's Power for Agriculture and Land, the Ministry of the People's Power for Light Industry and Trade, and the Ministry of the People's Power for Energy and Petroleum (3 May 2007) ("Urea Resolution") (C-82).
[23] Urea Resolution (C-82), Art. 10.

FertiNitro was the sole manufacturer and exporter of urea in Venezuela. Accordingly, the Urea Decree and the Urea Resolution were aimed by the Respondent directly at FertiNitro and compelled FertiNitro to divert urea to the Respondent (through Pequiven) at prices that were below production costs. The quantity of urea that the Respondent (through Pequiven) could purchase from FertiNitro at the price set in the Urea Resolution was unlimited.

2.27   Subsequently, as required by the Urea Decree and the Urea Resolution, FertiNitro sold substantial quantities of urea to Pequiven at prices significantly below its production costs. These arbitrary and discriminatory measures by the Respondent eroded the profitability of FertiNitro at the expense of the Claimants (and the other non-State shareholders), to the benefit of the Respondent.

2.28   *Interference - FertiNitro:* The Respondent (acting through Pequiven) progressively interfered in the management and operation of FertiNitro.

2.29   KOMSA invested in FertiNitro with the legitimate expectation that its investment was a commercial venture in which KOMSA and Pequiven would be equal partners. KOMSA had a legitimate expectation that any control that Pequiven might have over FertiNitro would be balanced by KOMSA's control over FertiNitro. KOMSA had a legitimate expectation that FertiNitro would be operated as a commercial enterprise for the generation of profits for all its shareholders.

2.30   From around 2006, the Respondent, acting through Pequiven, proceeded to interfere in the management and operation of FertiNitro and ultimately assumed control over FertiNitro. The Respondent's strategy culminated in the expropriation of FertiNitro by the Respondent on 11 October 2010.

2.31   *Expropriation - FertiNitro:* The Respondent expropriated FertiNitro on 11 October 2010 with no compensation, in breach of Article 6 of the Treaty.

2.32   On 10 October 2010, the President of the Respondent announced the expropriation of FertiNitro on his weekly television broadcast "Aló Presidente". During this broadcast, the President signed what appeared to be a decree providing for the expropriation of

28

FertiNitro.[24]   On 11 October 2010, Decree Number 7713 dated 10 October 2010 was published in Official Gazette No. 380.113.34.   It provided for the expropriation of FertiNitro (the "Expropriation Decree").[25]

2.33   The Expropriation Decree includes the following provisions: Article 1 provides for the mandatory acquisition by the Respondent of the assets of FertiNitro; Articles 2, 3 and 5 specifically task Pequiven with the role of carrying out the expropriation of FertiNitro and identify Pequiven as the "expropriation entity"; and Article 6 orders Pequiven to occupy the assets.   The Expropriation Decree made no provision for the payment of compensation to KOMSA in accordance with the Treaty.

2.34   On 11 October 2010, Venezuelan State television reported that the Respondent's Minister of Energy and Petroleum of the Respondent had visited the Plant in person in order to take it over.   In his public address at the FertiNitro Plant, the Minister was reported to have stated, "[W]e are already in control of the Plant and we are carrying out an inspection of our facilities."[26]   Also on 11 October 2010, Mr Clark Inciarte (who was at that time both President of FertiNitro and an employee of Pequiven) indicated during a telephone call with the two KOMSA-appointed directors of FertiNitro that FertiNitro was under the complete control of the State and that its board of directors had ceased to function.[27]   Following the announcement of the Expropriation Decree, no board of directors or Finance Committee meetings of FertiNitro were convened by FertiNitro.

2.35   KOMSA had received no advance notice that the Respondent's President would make this announcement or that the Respondent would expropriate FertiNitro.   KOMSA had no opportunity to object to this expropriation of its investment in FertiNitro.   To the contrary, the expropriation was announced by the Respondent's President as a 'fait accompli'.

---

[24] Transcript of Spanish language video file, "Minister Ramírez Heads Takeover of FertiNitro" (11 October 2010) (C-107).
[25] Decree 7,713 (10 October 2010) ("Expropriation Decree") (C-9).
[26] Transcript of Spanish language video file, "Minister Ramírez Heads Takeover of FertiNitro" (11 October 2010) (C-107).
[27] Witness Statement of Brent W. Gwaltney (30 May 2012) ("Gwaltney WS1"), Paragraph 122.

2.36    *Expropriation - KNI:* The Respondent also expropriated KNI's interest in the Offtake Agreement without compensation, in breach of Article 6 of the Treaty, on 11 October 2010.  Contemporary statements made by representatives of Pequiven, as the expropriating entity for the Respondent which had taken over FertiNitro under the Expropriation Decree, confirmed to the Claimants that KNI's interest in the Offtake Agreement had also been expropriated by the Respondent.

2.37    *Compensation:* In summary, the Claimants contend that the Respondent's several violations of the Treaty have caused considerable losses to the Claimants.  Accordingly, the Respondent is obliged to provide to the Claimants full compensation for such losses in accordance with the applicable principles of customary international law.

2.38    The Claimants claim full compensation including (but not limited to) the profits which KOMSA has lost as a result of the Respondent's expropriation of its investment in the equity of FertiNitro, its Historical Losses and the Respondent's expropriation of KNI's interest in the Offtake Agreement.

2.39    As later formulated by the Claimants, the compensation claimed by KOMSA for the unlawful expropriation of its interest in FertiNitro and its Historical Losses amount to US$ 444.6 million (as at 30 January 2015); and the compensation claimed by KNI for the expropriation of its interest in the Offtake Agreement amounts to US$ 227.8 million (also as at 30 January 2015).[28]

*(3)*    **The Respondent's Case**

2.40    *Jurisdiction:* In summary, the Respondent objects to the competence or jurisdiction of the Tribunal and ICSID to address KNI's claims regarding the Offtake Agreement.  The Respondent contends that it is a "foundational principle of international investment law" that the jurisdiction of arbitral tribunals is limited to "investments" within the meaning of the ICSID Convention and the applicable investment treaty, law or agreement.  In this arbitration, therefore, KNI may assert a claim only if the Offtake Agreement (a mere

---

[28] Claimants' Post-Hearing Brief (30 January 2015) ("Cls. PHB"), p. 99 (Section VI, (b)(c)).

commercial sales agreement) constitutes an "investment" within the meaning of both Article 25(1) of the ICSID Convention and Article 1(2) of the Treaty. The burden of proof lies with KNI, which must prove that it has made a covered investment under the ICSID Convention and the Treaty. The Respondent contends that KNI has failed to do so because no such investment exists with respect to the Offtake Agreement.

2.41    The meaning of "investment" has an objective and inherent meaning pursuant to both the ICSID Convention and the Treaty. That meaning, in turn, requires the making of a "contribution", over a certain "duration", with an element of "risk" and subject to "territoriality". A mere commercial sales agreement is not an "investment". KNI's failure to fit the Offtake Agreement within the meaning of "investment" strips both ICSID and this Tribunal of any competence and jurisdiction concerning the alleged expropriation of the Offtake Agreement in October 2010 and even more so over the termination of the Offtake Agreement by FertiNitro in February 2012.

2.42    *Liability:* In summary, the Respondent denies any liability to either Claimant under the Treaty. The Respondent is a sovereign state and guarantor of the public interest within Venezuela. The Respondent contends that, as such, it has the obligation and the authority under both national and international law to act in the interest of the people of Venezuela and their general well-being, including the issuance of laws and regulations and the mandatory acquisition of private interests. This right is embedded in the Respondent's Constitution[29] and its Expropriation Law for Public or Social Benefit of 1 July 2002 (the "Expropriation Law").[30] These texts provide the legal framework for expropriation in the public interest, as also under customary international law and the Treaty.

2.43    The Respondent repeatedly confirmed that sovereign control over the domestic production of food and food-related products was a matter of national importance in Venezuela. To that end, in 2007 the Respondent issued the Urea Decree.[31] This Decree declared food production to be in the "national interest," "essential for the economic and social

---

[29] Constitution of the Bolivarian Republic of Venezuela (15 February 2009) (R-3) (C-47).
[30] Expropriation Law for Public or Social Benefit (1 July 2002) (R-9, R-53, C-140).
[31] Urea Decree (C-80).

development of the Nation," and "an essential element of national safety and sovereignty." As a consequence, the Urea Decree declared nitrogenous fertilizers as goods of "basic necessity" which were critical to the protection of Venezuela's national interest.

2.44  In 2008, the Respondent issued Decree No. 5,835 ("Decree 5,835") [32] to ensure that the supply of products necessary to food production could continue uninterrupted. This Decree declared goods necessary for food production and products of "basic necessity" to be items in the public utility and social interest.

2.45  Through these measures, and the promulgation of various national plans designed to boost agricultural productivity, the Respondent articulated a public purpose of securing a sufficient supply of nitrogenous fertilizer to achieve its goal of food sovereignty within Venezuela.

2.46  *Historical Losses*: KOMSA asserts, wrongly, that the Respondent breached Articles 4(1), 4(2), and 11(2) of the Treaty in regard to its claims for "Historical Losses." These claims relate principally to the following: (i) the enactment of the Organic Law on Science, Technology and Innovation (the "Science and Technology Law"); [33] (ii) the issuance of the Municipal Ordinance by the Municipality of Simón Bolívar increasing a pre-existing municipal tax (the "Municipal Ordinance"); [34] (iii) the Respondent's alleged refusal to provide to FertiNitro certain VAT credits; and (iv) the Urea Decree and the Urea Resolution. The Respondent submits that these claims for "Historic Losses" are groundless as described below.

2.47  *New and Increased Taxes:* The Science and Technology Law was a measure of general application that required companies to invest a small percentage of their revenues back into the company through scientifically focused research and development. Nothing in that law conflicts with the Respondent's obligations under the Treaty. The increase in pre-existing municipal tax, from 1% to 2% and ultimately to 2.4%, did not violate any of the

---

[32] Decree 5,835 (28 January 2008) (R-23).
[33] Science and Technology Law (C-43).
[34] Ordinance for Taxes on Industrial, Commercial, Service or Similar Economic Activities (29 December 2005) (C-45).

Respondent's obligations under the Treaty. This municipal tax is generally applicable to entities operating in the Municipality of Simón Bolívar; it was not directed at FertiNitro; and it was not punitive.

2.48    *VAT:* As regards the Claimants' claim regarding VAT credits, the factual evidence shows that all VAT credits applied for by FertiNitro were, in fact, granted by the Respondent.

2.49    *The Urea Decree and Urea Resolution*: The Urea Decree and Urea Resolution were vital and necessary measures intended to give effect to the Respondent's policy of securing access to materials critical to the production of food in Venezuela. Those measures required FertiNitro to sell limited quantities of urea to Pequiven to cover any domestic demand that could not be met through Pequiven's own production. The Respondent was forced to enact such measures after FertiNitro's refusal to make such sales voluntarily on the basis of need.

2.50    *Interference – FertiNitro*: There is no evidence that the Respondent interfered with the management and operation of FertiNitro. To the contrary, the evidence shows that the Respondent took no steps to interfere with FertiNitro's management or operation. FertiNitro's board of directors consisted of nine directors, of which only three were appointed by Pequiven, with the remaining six appointed by KOMSA and FertiNitro's other shareholders. According to the Joint Investors' Agreement of 8 April 1994 (the "JIA"), no decision could be taken without KOMSA's acceptance.[35]

2.51    *Expropriation - FertiNitro*: The Respondent denies this claim. FertiNitro was a Venezuelan corporation and, as such, operated in Venezuela within the legal, political, social and economic framework of Venezuela. Pequiven was a Venezuelan State-owned petrochemical company and the 35% owner of FertiNitro and, as such, it spent years unsuccessfully attempting to persuade FertiNitro voluntarily to engage in commercial activities that would further the Respondent's legitimate and reasonable policy objectives

---

[35] JIA (C-18).

relating to food security in Venezuela.  When those efforts failed, Pequiven attempted to purchase FertiNitro outright, but Pequiven was rebuffed by KOMSA.

2.52    After it became clear that FertiNitro would not voluntarily undertake commercial activities designed to accommodate the Respondent's interests, the Respondent was left with no option but to set in motion procedures to acquire FertiNitro in accordance with Venezuelan law.  Thus, on 11 October 2010, the Respondent published the Expropriation Decree, ordering the mandatory acquisition of FertiNitro's assets.  This Expropriation Decree declared that the acquisition was part of the Respondent's long-standing policy to protect Venezuela from the harmful effects of fluctuations in the global food market by securing domestic and sovereign control over industries critical to the production of food within Venezuela.

2.53    Although the Expropriation Decree initiated the acquisition process, it did not in and of itself operate to transfer the ownership of FertiNitro's assets.  According to Venezuelan law, such a transfer only occurs following a judgment by the Venezuelan courts. Pequiven, as the designated acquiring entity, initiated the necessary proceedings in the Venezuelan courts on 26 July 2011, after KOMSA withdrew from negotiations over the amount of compensation due following FertiNitro's acquisition.[36]

2.54    The Respondent's actions in relation to the mandatory acquisition of FertiNitro's assets were lawful and did not constitute any breach of the Treaty.  The evidence shows that the Respondent's actions surrounding the issuance of the Expropriation Decree and its application were lawful and carried out by the Respondent in accordance with due process. The Claimants' efforts to seek compensation, therefore, must fail as a matter of liability under the Treaty.  Moreover, Venezuelan law provides more than adequate procedures to compensate KOMSA.  For all these reasons, the Tribunal should dismiss KOMSAs' claim.

2.55    *Expropriation – KNI:* This claim is denied by the Respondent (in addition to its jurisdictional objection).   KNI asserts, wrongly, that KNI's interest in the Offtake

---

[36] Decision accepting jurisdiction to hear the Request of Arbitration, Court of First Instances of the Judicial Circuit Anzoátegui (29 July 2011) (R-63).

Agreement was expropriated by the Respondent.  The Offtake Agreement was a commercial sales contract, by which Pequiven, IPSL and KNI agreed to purchase 100% of FertiNitro's production; it was not an "investment" by KNI; and it was not expropriated by the Respondent.

2.56   As submitted in the Respondent's jurisdictional objection, KNI's claim flies in the face of the well-settled principle that sales contracts do not constitute "investments" pursuant to Article 25 of the ICSID Convention; and a commercial sales contract, such as the Offtake Agreement, does not satisfy the definition of "investment" in the Treaty.

2.57   The Expropriation Decree did not address or cover the Offtake Agreement.  The factual evidence shows that the Offtake Agreement remained in effect for over 16 months after the date when the Expropriation Decree was issued by the Respondent.  Ultimately, FertiNitro's directors (not the Respondent) decided to terminate the Offtake Agreement on 28 February 2012.  That decision was made for commercial reasons and was taken solely by FertiNitro.  In these circumstances, the Claimants' claim that KNI's interest in the Offtake Agreement was expropriated by the Respondent must fail under the Treaty.

2.58   *Compensation:*  In summary, in the event that the Tribunal determines that the Respondent's actions in relation to the mandatory acquisition of FertiNitro's assets did violate Article 6 of the Treaty, the Claimants are entitled only to the "fair market value" of KOMSA's interests in FertiNitro, as provided by both Venezuelan and international law.  Despite the clarity of Venezuelan and international law, the Claimants are seeking substantially more than a "fair market value" in this arbitration.

2.59   Further, the Claimants have asserted several additional claims in this arbitration, for which they argue they are entitled to extraordinary, unreasonable and unsupported amounts for KNI's interest in the Offtake Agreement and additional amounts as KOMSA's "Historical Losses" for the alleged breaches of Articles 4(1), 4(2), 6 and 11(2) of the Treaty.  There is no support for these claimed amounts; and the Claimants have failed to substantiate any losses associated with those alleged breaches of the Treaty.

2.60   The Respondent concludes that the amount of compensation claimed by the Claimants in this arbitration is obscenely overstated.  The Treaty sets forth a precise and exhaustive

standard of compensation.  Under this standard, the Claimants are entitled only to the "fair market value" of KOMSA's interest in FertiNitro immediately before the issuance of the Expropriation Decree on 11 October 2010.  There is no legal basis to support the Claimants' position that they are both entitled to some measure of punitive damages by virtue of the allegedly unlawful nature of the Respondent's acts.  In particular, the amount the Claimants seek in relation to the Expropriation Decree is grossly overstated; and the Claimants' "fair market value" calculations are wrongly predicated on untenable assumptions.

## PART III: THE PRINCIPAL ISSUES

**(1)    Introduction**

3.1     The Tribunal lists below the six principal issues relevant to this Award. This list is not exhaustive of all issues raised by the Parties in this arbitration.

**(2)    The Principal Issues**

3.2     *Issue 1 – Jurisdiction: KNI and the Offtake Agreement (not KOMSA):*  This jurisdictional issue arises under Articles 1(2) and 2 of the Treaty and Article 25(1) of the ICSID Convention. This jurisdictional issue is addressed in Part VI of the Award below.

3.3     *Issue 2 – Factual Background:*  These factual matters are addressed principally in Part V of this Award below, as also when addressing issues of jurisdiction, liability and compensation in Parts VI, VII, VIII and IX.

3.4     *Issue 3: Liability:*  The issues of liability arise under Articles 4(1), 4(2), 6 and 11(2) of the Treaty, as cited in Part IV of this Award.  Liability for expropriation under Article 6 of the Treaty, as regards KOMSA and KNI respectively, is addressed in Part VII of this Award below.  Liability under Articles 4(1), 4(2) and 11(2) of the Treaty, as regards KOMSA, is addressed in Part VIII of this Award below.

3.5     *Issue 4 – Compensation:* This issue arises under the Treaty and, as submitted by the Claimants, customary international law.  As regards the former, Article 6 of the Treaty provides, in material part: "… Such compensation shall amount to the market value of the investment expropriated immediately before the expropriatory action was taken or became public knowledge, whichever is earlier, shall include interest from the date of expropriation, be paid without delay in a freely convertible currency to the person entitled thereto and be freely transferable."  Compensation is addressed in Part IX of this Award below.

3.6     *Issue 5 – Interest:*  This issue arises under the Treaty and, as submitted by the Claimants, under customary international law.  As to the former, Article 6 of the Treaty provides, in

material part that compensation thereunder "shall include interest from the date of expropriation."  Interest is addressed in Part XI of this Award below.

3.7   **Issue 6** – *Costs*:  The issue of legal and arbitration costs arises under Article 61(2) of the ICSID Convention and Rule 47(1)(j) of ICSID Arbitration Rules.  Costs are also addressed in Part XI of this Award below.

### *(3)*   *Detailed Issues, Questions and Related Matters*

3.8   During the arbitration, the Parties and (for the Third Hearing) also the Tribunal developed successive lists of issues, questions and ancillary comments on related matters.  These are lengthy, repetitive and duplicate much of what already appears in a different form elsewhere in this Award.  Nevertheless, the schedule below served as a check-list of matters that the Tribunal addressed during the Hearings and in arriving at its several decisions in this Award.  However, it has not been necessary for the Tribunal to decide all these matters.  Again, the schedule is not exhaustive of all detailed issues, questions and related matters raised by the Parties during the arbitration.


*\* Schedule of Detailed Issues, Questions and Related Matters*

**Issue 1** – *Jurisdiction: KNI and the Offtake Agreement*

3.9   According to the Respondent, as already briefly summarised above, the Tribunal has no jurisdiction to address the claim made by KNI in respect of the Offtake Agreement.  According to the Claimants, the Offtake Agreement was an integral part of the FertiNitro Project; and KNI's interest in the Offtake Agreement qualifies as an "investment" under both the ICSID Convention and the Treaty.  The Claimants therefore take issue with the Respondent's jurisdictional objection.

**Issue 2** – *Factual Background*

3.10   According to the Claimants, three essential facts were and remain entirely unchallenged on the evidential record adduced in this arbitration. First, the Respondent's 'Apertura' policy, and its other assurances, precipitated the Claimants' investments in Venezuela. Second, starting in 2005, the Respondent progressively interfered with the Claimants' investments. Third, on 11 October 2010, without any formal notice, the Respondent openly and unambiguously expropriated both KOMSA's equity interest in FertiNitro and KNI's interest in the Offtake Agreement.  There are thus, according to the Claimants, few (if any) principal issues as to the factual background to the Parties' dispute.

3.11    According to the Respondent, none of the facts alleged by the Claimants establish any breach of its obligations under the Treaty.  The Claimants are put to proof of their factual allegations to the contrary.

***Issue 3:*** *Liability*

3.12    *Expropriation:* According to the Claimants, the Respondent breached Article 6 of the Treaty by unlawfully expropriating KOMSA's interest in FertiNitro and KNI's interest in the Offtake Agreement on 11 October 2010; and, to date, the Respondent has failed to compensate the Claimants for its expropriation of the Claimants' investments.

3.13    According to the Respondent, its mandatory acquisition of FertiNitro's assets was lawful because the Respondent complied with the requirements of Article 6 of the Treaty. Also according to the Respondent, it did not mandatorily acquire the Offtake Agreement; FertiNitro terminated the Offtake Agreement in February 2012 for commercial reasons; and FertiNitro's decision to terminate the Offtake Agreement is not attributable to the Respondent under international law.

3.14    *FET*: This issue of liability arises under Article 4(1) of the Treaty.  It provides, in material part, that the Respondent "shall provide, in accordance with the rules and principles of International Law, investments in its territory of investors of the other Contracting Party fair and equitable treatment […]" (the "FET standard").

3.15    According to the Claimants, the Respondent breached its obligation under Article 4(1) to accord fair and equitable treatment to the Claimants' investments.  According to the Respondent, it did not breach the FET standard of Article 4(1) of the Treaty. The Respondent contends that this FET standard is tied to the minimum standard of customary international law; and that the Claimants have failed to substantiate their claims.

3.16    *FPS:* This issue arises under Article 4(1) of the Treaty. It provides, in material part, that the Respondent: "shall provide, in accordance with the rules and principles of International Law, investments in its territory of investors of the other Contracting Party […] full protection and security […]" (the "FPS standard").

3.17    According to the Claimants, the Respondent breached its obligation under Article 4(1) to accord full protection and security to the Claimants' investments.  According to the Respondent, it complied with its obligation under Article 4(1) to afford full protection and security: this FPS standard relates to physical injury only; and the Respondent did not fail to protect KOMSA's investment.

3.18    *Interference:* This issue also arises under Article 4(1) of the Treaty. It provides, in material part, that the Respondent "shall [not] impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, expansion, disposal or liquidation of such investments."

3.19    According to the Claimants, the Respondent breached its obligation under Article 4(1) by putting in place arbitrary and discriminatory measures that impaired KOMSA's management, operation, use and enjoyment

of its investment.  According to the Respondent, it did not impair the management, operation, use or enjoyment of FertiNitro through any arbitrary or discriminatory measures.  The Respondent submits that the Claimants have misapplied the applicable standard; and the Claimants have provided a misleading account of the Respondent's actions to allege a breach of Article 4(1) of the Treaty.

3.20    *National Treatment*: This issue arises under Article 4(2) of the Treaty. It provides, in material part: "The treatment accorded by each Contracting Party to the investment by investors of the other Contracting Party in its territory, or to the investors themselves as regards their investments, shall not be less favourable than that accorded to investments of their own investors […], or to the investors concerned as regards their investments" (the "National Treatment standard").

3.21    According to the Claimants, the Respondent breached its obligation under Article 4(2) to accord to the Claimants and their investments treatment in accordance with the National Treatment standard.  According to the Respondent, it did not breach the National Treatment standard in Article 4(2) of the Treaty.  The Respondent submits that the Claimants have misapplied the applicable standard; and that it did not treat Pequiven more favourably than KOMSA.

3.22    *Umbrella Clause:* This issue arises under Article 11(2) of the Treaty.  It provides: "Each Contracting Party shall observe any obligation it has assumed regarding the treatment of investments in its territory by investors of the other Contracting Party" (the "Umbrella Clause").

3.23    According to the Claimants, the Respondent failed to observe the obligations assumed in Article 11(2) regarding the treatment of the Claimants' investments. According to the Respondent, it has not breached Article 11(2) of the Treaty, particularly because there were no such "obligations".

***Issue 4** – Compensation*

3.24    In brief, the Claimants submit that the Respondent must pay full compensation under Article 6 of the Treaty and international law for all their losses caused by the Respondent's expropriatory and other non-expropriatory violations of the Treaty (namely KOMSA's "Historical Losses").  Such compensation for KOMSA amounts to a total principal sum of US$ 444.6 million (calculated as at 30 January 2015).  As to KNI, such compensation amounts to a total principal sum of US$ 227.8 million (calculated as at 30 January 2015).

3.25    In brief, the Respondent submits that the Claimants' quantification of their damages must be rejected by the Tribunal, for several reasons. First, the Respondent contends that the compensation claimed by KOMSA and KNI is vastly overstated.  Second, it submits that the relevant standard of compensation is to be found in the Treaty (not in customary international law).  Third, the Respondent contends that KOMSA's alleged "Historical Losses" are unfounded.

***Issue 5*** – *Interest*

3.26    The Claimants submit that they are they are entitled to compound interest on any sums awarded by the Tribunal.  The Respondent contends that the Claimants' claims for compound interest are ill-founded.

***Issue 6*** – *Costs*

3.27    The Claimants seek an order requiring the Respondent to pay the costs of the arbitration, including all the fees and expenses of ICSID and the Tribunal and all the legal costs and expenses incurred by the Claimants, apportioned as between the Claimants in the ratio in which they are awarded compensation. The Respondent seeks an order requiring the Claimants to bear all costs and fees incurred in this arbitration, including the Respondent's reasonable attorney's fees and expert fees.

***The Third (June) Hearing***

3.28    For the purpose of the Third (June) Hearing before the reconstituted Tribunal, so as to allow the Parties to prepare in full their respective oral submissions, the Tribunal sent to the Parties a non-exhaustive check-list of issues on 16 May 2016 and later a further list of issues on 2 June 2016, taken from the Parties' own pleadings.  These documents are set out successively below, in relevant part.

### *The Check-List of 16 May 2016 (in Three Parts)*

**\* Part I (from the Claimants' pleaded case):**

3.29    ***Claimants' Issue 1 -*** Jurisdiction:

3.30    The Tribunal's jurisdiction over KNI's claim is clear, because:

**A.** The Offtake Agreement was an integral part of the FertiNitro Project;

**B.** KNI's rights under the Offtake Agreement qualify as an "investment" under both the ICSID Convention and the Treaty (and satisfy the non-jurisdictional indicia), because:

(i) The Offtake Agreement is an "investment" under the ICSID Convention;

(ii) The Offtake Agreement is an "investment" under the Treaty; and

(iii) In any event the Offtake Agreement also satisfies the non-jurisdictional indicia.

3.31    ***Claimants' Issue 2*** - The Principal Facts: The oral testimony at the First (September) Hearing confirmed the central tenets of the Claimants' case and materially undermined the Respondent's Case, because:

41

**A.** The essential facts remain entirely unchallenged on the evidential record in this arbitration, as listed under B, C and D below.

**B.** The Respondent's "Apertura" policy, with its other assurances, precipitated the Claimants' investment in Venezuela.

**C.** Starting in 2005, the Respondent progressively interfered with the Claimants' investments.

**D.** On 10/11 October 2010, without any formal notice, the Respondent openly and unambiguously expropriated both KOMSA's equity in FertiNitro and KNI's rights under the Offtake Agreement.

**E.** The First (September) Hearing showed that the Respondent's claim (that it never expropriated the Offtake Agreement) is a study in contradiction, because

(i) If the Respondent did not expropriate the Offtake Agreement, as it claims, then it could not have had a legitimate purpose for the expropriation of FertiNitro;

(ii) The Respondent always planned to take KNI's offtake; and

(iii) The Urea Decree and the Urea Resolution already guaranteed the Respondent access to FertiNitro's product at significantly below production cost.

**F.** The First (September) hearing confirmed that Pequiven was, at all relevant times, an agent of the Respondent.

3.32    ***Claimants' Issue 3*** - Liability: The Respondent's conduct violated the Treaty:

**A.** Expropriation: The Respondent breached Article 6 of the Treaty by unlawfully expropriating KOMSA's equity in FertiNitro and KNI's rights under the Offtake Agreement:

(i) The Respondent's expropriation of the Claimants' investments was not carried out in the public interest;

(ii) The Respondent's expropriation of the Claimants' investments was carried out in a discriminatory manner;

(iii) The Respondent's expropriation of the Claimants' investments was not carried out under due process of law; and

(iv) To date, the Respondent has failed to compensate the Claimants for its direct expropriation of the Claimants' investments.

**B.** FET: The Respondent breached its duty under Article 4(1) of the Treaty to accord fair and equitable treatment to the Claimants' investments.

**C.** FPS: The Respondent breached its duty under Article 4(1) of the Treaty to accord full protection and security to the Claimants' investments.

**D.** Impairment: The Respondent breached Article 4(1) of the Treaty by putting in place arbitrary and discriminatory measures that impaired the Claimants' management, operation, use and enjoyment of its investments.

**E.** National Treatment: The Respondent breached its duty under Article 4(2) of the Treaty to accord national treatment to the Claimants' investments.

**F.** Umbrella Clause: The Respondent breached its obligations assumed under Article 11(2) of the Treaty regarding the treatment of the Claimants' investments.

3.33    ***Claimants' Issue 4*** - Compensation:

**A.** The Claimants have demonstrated that the Respondent must pay full compensation under international law:

(i) Recent jurisprudence confirms that the Respondent must pay full compensation to the Claimants in a "but for" scenario for the illegal expropriation of their investments;

(ii) KOMSA is also entitled to full compensation under international law for the losses caused by the Respondent's 'other (non-expropriation) violations' of the Treaty; and

(iii) KOMSA is entitled to compensation for its 'Historical Losses'.

**B.** Testimony from the First (September) Hearing demonstrated that the Parties' quantum experts have adopted fundamentally different approaches to the valuation exercise:

(i) Mr Giles's valuation (for the Claimants) is supported by contemporaneous documentary evidence and the testimony of the only independent fertiliser industry expert in this arbitration (Mr Sanders); and

(ii) Dr Flores's valuation (for the Respondent) is a coalescence of (i) a series of assertions that are either outside the evidential record or are beyond his expertise; and (ii) a mechanical averaging of data and sources without any appreciation of the contemporaneous and industry evidence.

**C.** Whilst the Parties' quantum experts agree on a number of compensation parameters, their outstanding differences of fact and expertise on quantum issues remain significant.

3.34    ***Claimants' Issue 5*** - Compound Interest: The Claimants have demonstrated that they are entitled to compound interest.

**A.** The Treaty confirms that compound interest is payable;

**B.** The last five years of ICSID jurisprudence (on the record of these proceedings) confirms that compound interest is payable; and

**C.** Leading commentaries confirm that compound interest is payable.

*** Part II (from the Respondent's pleaded case):***

3.35 ***Respondent's Issue 1*** - Jurisdiction: The Tribunal has no jurisdiction over the claims relating to the Offtake Agreement, because:

**A.** The Offtake Agreement is a sales contract that does not constitute an "investment" within the meaning of the Treaty or Article 25 of the ICSID Convention:

(i) Sales Contracts are not investments under international law; and

(ii) Complexity, length, project finance implications or the general unity of investment concept do not transform the Offtake Agreement into an investment.

**B.** KNI has neither made a contribution nor incurred the type of risk necessary to qualify as an investment under the Treaty or under Article 25 of the ICSID Convention, because:

(i) The Term "investment" has an objective and inherent meaning under both the Treaty and the ICSID Convention, which requires the assumption of an investment risk and the making of a contribution; and

(ii) KNI has not incurred an investment risk in connection with the Offtake Agreement.

**C.** The Offtake Agreement does not have a territoriality nexus with the Republic of Venezuela to qualify for protection under the Treaty.

3.36 ***Respondent's Issue 2*** - Expropriation: The Respondent did not mandatorily acquire the Offtake Agreement, because:

**A.** The Offtake Agreement granted KNI a right to purchase FertiNitro's product;

**B.** Decree 7713 did not order the mandatory acquisition of KNI's rights under the Offtake Agreement or of the Offtake Agreement itself;

**C.** KNI continued to purchase offtake under the Offtake Agreement until February 2012;

**D.** FertiNitro terminated the Offtake Agreement in February 2012 for commercial reasons; and

**E.** FertiNitro's decision to terminate the Offtake Agreement is not attributable to the Respondent.

3.37 ***Respondent's Issue 3*** - Expropriation: The mandatory acquisition of FertiNitro's assets was lawful; and the Respondent complied with the requirements of Article 6 of the Treaty, because.

**A.** The Respondent's acquisition of FertiNitro's assets was in the public interest:

(i) The Respondent should be afforded ample deference regarding its public interest policies; and

(ii) The mandatory acquisition of FertiNitro's assets was carried out pursuant to the public policy of food security.

**B.** The mandatory acquisition of FertiNitro's assets was carried out in a non-discriminatory manner, because:

(i) Pequiven/IPSL and KOMSA/KNI were not similarly situated;

(ii) KOMSA did not receive differential treatment; and

(iii) Any differential treatment was not improper because it was based on a reasonable justification.

**C.** The Respondent's actions were carried out under the process of law, because:

(i) "Advance Notice" is not a requirement of due process under the Treaty or international law; and

(ii) The Respondent repeatedly provided notice to KOMSA that it planned to take control of FertiNitro.

**D.** The Respondent met (and continues to meet) its payment obligation under Article 6 of the Treaty, because:

(i) Article 6 of the Treaty requires the Respondent to make a reasonable offer of compensation – not immediate payment;

(ii) The Respondent made a reasonable offer of compensation, which KOMSA rejected; and

(iii) The Respondent will compensate KOMSA through the Mandatory Acquisition Procedure.

3.38    ***Respondent's Issue 4*** - FET: The Respondent did not breach the FET standard in Article 4(1) of the Treaty, because:

**A.** The applicable standard is tied to the minimum standard of customary international law;

**B.** The Claimants have failed to substantiate their claims, because:

(i) The Claimants have failed to establish that they had any legitimate expectations in relation to the Respondent's tax regime;

(ii) The Respondent has provided FertiNitro with VAT Credits in line with the Respondent's obligations;

(iii) The Respondent did not interfere in the management and operations of FertiNitro;

(iv) The Respondent did not frustrate any legitimate expectation by issuing the Urea Decree and Urea Resolution; and

(v) The Respondent provided a stable and predictable legal and business environment, treated the Claimants with transparency and procedural fairness and did not abuse its authority.

3.39    ***Respondent's Issue 5*** - FPS: The Respondent complied with its obligation under Article 4 of the Treaty to afford full protection and security, because:

**A.** The FPS standard relates to physical injury.

**B.** The Respondent did not fail to protect KOMSA's investment.

3.40    ***Respondent's Issue 6*** - Interference/Impairment: The Respondent did not impair the management, operation, use or enjoyment of FertiNitro through arbitrary or discriminatory measures under Article 4(1) of the Treaty, because:

**A.** The Claimants have misapplied the applicable standard; and

**B.** The Claimants have also provided a misleading account of the Respondent's actions that are alleged to have breached Article 4(1) of the Treaty.

3.41    ***Respondent's Issue 7*** - National Treatment: The Respondent did not breach the National Treatment standard under Article 4(2) of the Treaty, because:

**A.** The Claimants have misapplied the applicable standard; and

**B.** The Respondent did not treat Pequiven more favourably than KOMSA.

3.42    ***Respondent's Issue 8*** - Umbrella Clause: The Respondent did not breach Article 11(2) of the Treaty.

3.43    ***Respondent's Issue 9*** - Compensation: The Tribunal must reject the Claimants' quantification of damages, because:

**A.** The compensation claimed by KOMSA and KNI is vastly overstated:

(i) The relevant standard of compensation is found in the Treaty, not in customary international law;

(ii) Irrespective of the legal standard for compensation, the Parties agree that the expert witnesses on compensation should apply the Fair Market Value (FMV) standard; and

(iii) The Claimants ultimately fail to apply the FMV standard.

**B.** The Fair Market Value (FMV) of KOMSA's economic interest in FertiNitro was no more than US$ 34.6 million:

(i) While Dr Flores' DCF valuation is reasonable, Mr Giles' DCF analysis is overstated and does not reflect FertiNitro's FMV because:

46

a. The Claimants' DCF analysis is inconsistent and highly speculative;

b. The Claimants' DCF valuation inappropriately excludes actual production volumes from 2009 and 2010 in projecting future production:

(1) The Claimants inappropriately project a three-year turnaround cycle for FertiNitro;

(2) The number of gas and electricity disruptions and unplanned shutdowns in 2009 and 2010 was not materially higher than in recent prior years;

(3) The Claimants' position that a hypothetical buyer would believe FertiNitro could consistently achieve nameplate production levels is unfounded;

(4) The Claimants' position that the exclusion of the 2009-2010 period is justified by law is entirely baseless;

c. The Claimants' projections of FertiNitro's future costs are understated:

(1) The Claimants unreasonably relied upon budgeted instead of actual turnaround and maintenance costs;

(2) The Claimants' other cost estimates are also understated.

d. The Claimants' proposed discount rate is understated:

(1) The Claimants' reliance upon out-dated global market risk premium data is unreasonable and inappropriate;

(2) The Claimants inappropriately relied upon limited survey data to determine their base country risk rate;

(3) The Claimants inappropriately excluded political risk from their country risk rate;

(4) The Claimants' calculation of a 0.40 *lambda* for FertiNitro is entirely arbitrary and unreasonable;

(5) The Claimants' application of a 1% liquidity discount is contrary to basic valuation principles; and

(6) The unreasonableness of the Claimants' discount rate is confirmed by the two *ExxonMobil* awards and the *Flughafen Zürich* award.

(ii) The Claimants' "Reasonableness Checks" do not support their valuation of KOMSA's 25% Share in FertiNitro:

a. The October 2008 MOU Price, if properly adjusted, confirms Dr Flores' valuation;

b. Construction costs of other plants are irrelevant;

c. The Advantis Reports confirm Dr Flores' valuation;

d. The Claimants' 'new argument' based on FertiNitro's book value is irrelevant.

**C.** The Claimants' valuation of the Offtake Agreement is overstated, because:

(i) The Claimants make the same inappropriate assumptions regarding sales volumes and discount rate as in their valuation of KOMSA's equity interest in FertiNitro.

(ii) The Claimants' valuation period improperly includes a 16-month period during which KNI suffered no losses.

(iii) The Claimants use the wrong valuation methodology based on unrealistic factual assumptions, because:

a. The Claimants inappropriately calculate KNI's lost profits rather than the value of KNI's alleged rights under the Offtake Agreement;

b. The Claimants fail to prove that they would have been unable to replace the FertiNitro Offtake through purchase on the open market;

c. The Claimants' lost profits calculations are flawed and highly speculative.

**D.** The Claimants' alleged "Historical Losses" are unfounded.

3.44    *Respondent's Issue 10* - Interest: The Claimants' claims for compound interest are ill-founded.

3.45    *Respondent's Issue 11* - Costs: The Claimants' claims for costs are denied.

   *\* Part III: Specific Further Queries (by the Tribunal)*

3.46    The Parties were invited by the Tribunal to summarise at the Third (June) Hearing their respective cases on the relationship between the Offtake Agreement and the FertiNitro Project.

3.47    The Parties were requested to summarise their respective cases on whether or not the Offtake Agreement satisfies the legal and economic characteristics of an investment under the Treaty.

3.48    The Parties were requested to summarise the evidence regarding the impact of Decree 7713 on KNI's rights under the Offtake Agreement.

3.49    The Parties were requested to summarise their respective cases on the attribution under the Treaty or otherwise to the Respondent of FertiNitro's decision to terminate the Offtake Agreement.

3.50    In addition, the Parties were invited to address the following matters:

3.50.1    What steps, if any, did either of the Claimants take to oppose the Urea Decree?

48

3.50.2   What has happened with actual and projected natural gas price, since the last submissions by the Parties on this subject?

3.50.3   Why should the "expected rate of return" on equities rather than the "required rate of return" be used for the determination of the market risk premium?

3.50.4   Taking into account the fact that sales of product to KNI, after an interruption between October 2010 and January 2011, started again in January 2011 until the termination of the Offtake Agreement in February 2012, how much money, if any, did KNI lose compared to the continuing operation of that Offtake Agreement?

3.50.5   Would the Parties elaborate on their respective views concerning the relevance to this case (if any) of the discount rates used in the two *ExxonMobil* awards and in the *Flughafen* and *Gold Reserve awards* and the Advantis Report of May 2011, referred to by the Parties in their respective submissions?

3.50.6   What is the relevance, if any, of the Booz Allen valuation of FertiNitro made in 2007?


### *The Tribunal's Additional Topics of 2 June 2016 for the Parties*

*A. Offtake Agreement*

3.51   Topic A1: Assuming, arguendo, that the Offtake Agreement was included within the ambit of the Expropriation Decree, what is the legal effect of a Venezuelan decree on the rights and obligations under the Offtake Agreement, which is governed by the laws of the State of New York?

3.52   Topic A2: Assuming, arguendo, that the Offtake Agreement was not included within the ambit of the Expropriation Decree, was the termination of the Offtake Agreement on 28 February 2012 a breach of the Offtake Agreement?

3.53   Topic A3: Was there any exercise of sovereign powers involved in the termination of the Offtake Agreement on 28 February 2012 (assuming, arguendo, that it was not terminated earlier by the Expropriation Decree etc)?  If so, what sovereign powers were relied upon and by whom?

3.54   Topic A4: Did KNI respond to Mr Betulio Hernandez's letter of 28 February 2012 (Exhibit C-114)?  Was there any subsequent correspondence between the Parties to the Offtake Agreement?  If so, where is such correspondence to be found on the record?

*B. Negotiations and local procedures relating to compensation*

49

3.55    Topic B1: Do the Claimants agree with the summary provided at paragraph 111 of the Respondent's Post-Hearing Brief?  If not, what specific amendments would they wish to make?

3.56    Topic B2: Have there been any developments relating to the local court proceedings (the "Mandatory Acquisition Procedure") since the Post-Hearing Briefs were filed by the Parties?

*C. Quantum Issues*

3.57    Topic C1: Does the Respondent agree with the presentation of the points of agreement and disagreement between Mr Giles and Dr Flores in the tables on pages 55-60 of the Claimants' Post-Hearing Brief?  If not, what specific amendments would the Respondent wish to make?

*Projection of Future Cash Flows*

3.58    Topic C2: Are there any examples of tribunals adopting budgetary forecasts for production and/or costs for the purposes of calculating the cash flows of an enterprise for a DCF valuation in respect of a time period before the violation of an investment treaty obligation in circumstances where actual data for production and/or costs were available?

3.59    Topic C3. What is the general impact of inflation and the freeze on the exchange rate in Venezuela on FertiNitro's costs between 2008-2010?

*Offtake Agreement*

3.60    Topic C4: Is the calculation of damages relating to the Offtake Agreement by either quantum expert consistent with the manner in which damages would be calculated on the hypothesis of a breach of the Offtake Agreement under the laws of the State of New York?  If not, how are they different?

*Market Risk and the Country Risk Premium*

3.61    Topic C5: Does the Respondent accept the Claimants' definition of market risk and country risk at paragraph 198 of its Post-Hearing Brief?

3.62    Topic C6: Explain the basis for the market risk and country risk premiums in the Advantis valuation reports of May and July 2011.

3.63    Topic C7: What should be the evidential threshold for the application of a *lambda* factor to an enterprise operating in a particular country?  In other words, how common is it in valuation practice to apply a lambda factor to take into account greater or lesser exposure of a particular enterprise to country risk and what degree of certainty is required?

3.64    Topic C8: Are there any examples of tribunals adopting a liquidity discount in investment treaty arbitration?

3.65    Topic C9: Compare and contrast the market risk and country risk premiums adopted by other tribunals in publicly available investment treaty awards involving Venezuela.

3.66    Topic C10: Is an asset that qualifies for Treaty protection analogous to having "insurance-like protection" [Transcript, D6/P66 (Giles)]?  Would it be appropriate to discount country risk in relation to a lawful as opposed to unlawful expropriation?

*Sanity Checks on Valuations*

3.67    Topic C11: Does the book value of KOMSA's 25% interest in FertiNitro at the time of the valuation date provide an appropriate sanity check on the DCF valuations in this case?

3.68    Topic C12: What adjustments, if any, would need to be made to the MOU valuations in 2007 and 2008 for them to be relevant as a sanity check on a DCF valuation done at the valuation date in 2010?

3.69    Topic C13: What adjustments, if any, would need to be made to the Advantis valuations in May and July 2011 for them to be relevant as a sanity check on a DCF valuation done at the valuation date in 2010?

## PART IV: THE PRINCIPAL LEGAL TEXTS

### (1)     Introduction

4.1     It is necessary to cite in full several of the relevant legal texts at the outset of this Award, for ease of reference elsewhere.  This is not to suggest that, to decide the legal issues in dispute between the Parties, the Tribunal may be limited to the sources identified herein or otherwise invoked by the Parties.  To the contrary, the Tribunal agrees with the following statement of the *Daimler v. Argentina ad hoc* committee[37]:

> *"This Committee is of the view that an arbitral tribunal is not limited to referring to or relying upon only the authorities cited by the parties. It can, sua sponte, rely on other publicly available authorities, even if they have not been cited by the parties, provided that the issue has been raised before the tribunal and the parties were provided an opportunity to address it. […]. Once such an opportunity was provided the Tribunal was not obliged to confine itself to only those authorities, which had been cited by the parties. No rule of law or procedure or requirement of due process prevented it from referring to or relying upon other authorities that were in the public domain. Such reliance did not violate any rule of natural justice including the right to be heard."*

4.2     Where the original text is Spanish, the Tribunal here cites the English translation, as noted.

### (2)     The Switzerland-Venezuela Treaty[38]

4.3     Article 1(1) of the Treaty defines "investors" for purposes of the Treaty as follows:

> *"The Term "investor" refers with regard to either Contracting Party to:*
>
> a) *natural persons who, according to the law of that Contracting Party, are considered to be its nationals;*
> b) *legal entities, including companies, corporations, business associations and other organizations which are constituted or otherwise duly organised under the law of that Contracting Party;*

---

[37] *Daimler Financial Services A.G. v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment (7 January 2015), Paragraph 295.
[38] Agreement between the Swiss Confederation and the Republic of Venezuela on the Reciprocal Promotion and Protection of Investments (18 November 1993) (CLA-1).

> *c)  legal entities not established under the law of that Contracting Party but effectively controlled by natural persons as defined in (a) above or by legal entities as defined in (b) above."*

4.4     Article 1(2) of the Treaty defines the term "investment" as follows:

> *"The term 'investment' comprises every kind of asset and more particularly, though not exclusively:*
> *a)  movable and immovable property as well as any other rights in rem;*
> *b)  shares, parts or any other kinds of participation in a company;*
> *c)  claims to money or to any performance under a contract;*
> *d)  intellectual property rights, technical processes, know-how and goodwill;*
> *e)  concessions and other rights granted under public law."*

4.5     Article 2 of the Treaty provides:

> *"The present Agreement shall apply to investments in the territory of one Contracting Party made in accordance with its laws and regulations by investors of the other Contracting Party, whether prior to or after the entry into force of the Agreement. It shall, however, not be applicable to divergencies or disputes the causes of which have arisen prior to its entry into force."*

4.6     Article 4(1) of the Treaty provides:

> *"Each Contracting Party shall provide, in accordance with the rules and principles of International Law, investments in its territory of investors of the other Contracting Party fair and equitable treatment and full protection and security; neither of them shall impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, expansion, disposal or liquidation of such investments."*

4.7     Article 4(2) of the Treaty provides:

> *"The treatment accorded by each Contracting Party to the investment by investors of the other Contracting Party in its territory, or to the investors themselves as regards their investments, shall not be less favourable than that accorded to investments of their own investors or those of any third State, or to the investors concerned as regards their investments."*

4.8     Article 6 of the Treaty provides:

> *"Neither of the Contracting Parties shall take, either directly or indirectly, measures of expropriation, nationalization or any other measures having the same nature or the same effect against investments of investors of the other Contracting Party, unless the measures are taken in the public interest, on a non-discriminatory basis, and under due process of law, and provided that provisions be made for effective and adequate compensation. Such compensation shall amount to the market value of the investment expropriated immediately before the expropriatory action was taken or became public knowledge, whichever is earlier, shall include interest from the date of expropriation, be paid without delay in a freely convertible currency to the person entitled thereto and be freely transferable."*

4.9     Article 9 of the Treaty provides:

> *"(1) With a view to an amicable solution of disputes between a Contracting Party and an investor of the other Contracting Party consultations will take place between the parties concerned.*
> *(2) If these consultations do not result in a solution within six months from the date of the request for consultations, the investor may submit the dispute to the arbitration of the International Center for Settlement of Investment Disputes (I.C.S.I.D.) instituted by the Convention on the settlement of investment disputes between States and nationals of other States, opened for signature at Washington, on 18th March, 1965.*
> *(3) As an alternative to I.C.S.I.D. arbitration the parties to the dispute may, by mutual consent, have recourse to an <u>ad hoc</u> arbitral tribunal which unless otherwise agreed upon by the parties to the dispute shall be established under the arbitration rules of the United Nations Commission on International Trade Law (U.N.C.I.T.R.A.L.). Such arbitration shall in any case take place if for whatever reason I.C.S.I.D. arbitration is not available.*
> *(4) The arbitral award shall limit itself to determine whether the Contracting Party concerned has failed to comply with an obligation under this Agreement, whether such failure has resulted in damages to the investor, and, if this is the case, the amount to be paid by the Contracting Party to the investor as compensation for such damages.*
> *(5) Each Contracting Party hereby consents to the submission of an investment dispute to international arbitration in accordance with the provisions of this article.*
> *(6) The Contracting Party which is a party to the dispute shall not at any time during the procedures, assert as a defence its immunity or the fact that the investor has received compensation under an insurance contract covering the whole or part of the incurred damage or loss.*

*(7) The arbitral award shall be final and binding for the parties involved in the dispute."*

4.10    Article 11(2) of the Treaty provides:

*"Each Contracting Party shall observe any obligation it has assumed regarding the treatment of investments in its territory by investors of the other Contracting Party."*

*(3)*    ***The Offtake Agreement***[39]

4.11    Article 2.2 of the Offtake Agreement provides:

*"<u>Allocation of Products</u>. Subject to the provisions of Sections 11.4 and 11.5, the Parties agree that the allocation of Products to each Buyer hereunder is expected to be fifty percent (50%) of the actual total Plants [sic] Output, with the following provisions to apply to the allocation of Products assuming full production in a given Contract Year:*

*(a) Koch shall have the exclusive right and obligation to purchase from Seller for resale or its own consumption (i) seventy five percent (75%) of the Plants [sic] Output of ammonia available for sale during each Contract Year (estimated to be approximately 270,000 tons annually assuming full production at Nameplate Capacity) and (ii) forty-four percent (44%) of the Plants [sic] Output of urea for sale during each Contract Year (estimated to be approximately 640,000 annually tons assuming full production at Nameplate Capacity) and*

*(b) Pequiven Offtaker shall have the exclusive right and obligation to purchase from Seller for resale or its own consumption (i) twenty-five percent (25%) of the Plants [sic] Output of ammonia available for sale during each Contract Year (estimated to be approximately 90,000 tons annually assuming production at Nameplate Capacity) and (ii) fifty-six percent (56%) of the Plants [sic] Output of urea for sale during each Contract Year (estimated to be approximately 820,000 tons annually assuming production at Nameplate Capacity)."*

4.12    Article 2.3 of the Offtake Agreement provides:

*"<u>Assignment of Markets</u>. Each Buyer agrees that the following territorial restrictions shall apply throughout the Primary Term with respect to the marketing and sale of Products:*

---

[39] Offtake Agreement by and among Pequiven, IPSL, and Koch Oil SA as Buyers and FertiNitro as Seller (8 April 1998) (C-19).

(a) *Koch shall have the exclusive right to market and sell Products for delivery to and ultimate consumption in North America.*

(b) *Pequiven Offtaker shall have the exclusive right to market and sell Products for delivery to and ultimate consumption in South America, Central America, and the Caribbean.*

(c) *Each Buyer further agrees not to sell Products such Buyer knows or has reason to believe ultimately will be resold in essentially their original form into any of the countries reserved to the other Buyer under paragraph (a) or (b) above, respectively.*

(d) *Notwithstanding any provision in this Section 2.3 to the contrary, at Koch's sole option, Koch may request that Pequiven Offtaker market, on Koch's behalf, all or a portion of Koch's allocated Products taken hereunder in South America, Central America and/or the Caribbean. Likewise, at Pequiven Offtaker's sole option, Pequiven Offtaker may request that Koch market on Pequiven Offtaker's behalf all or a portion of Pequiven Offtaker's allocated Products taken hereunder in North America. Each Buyer may elect to accept or reject the other Buyer's request under this Section 2.3(d) in its sole discretion.  If a Buyer ("Passive Agent") accepts the other Buyer's ("Active Principal") request under this Section 2.3(d), the Buyers shall share equally the difference (whether positive or negative) between: (i) the price obtained by the Passive Agent, on a best efforts basis, from a Third Party (net of all expenses, fees and charges reasonably incurred by the Passive Agent in marketing, selling and/or transporting the Active Principal's Products) and (ii) the applicable FOB Jose Price stated in Section 3.1 below.*

(e) *Notwithstanding any provision in this Section 2.3 to the contrary, at Koch's sole option, it may make a request to market in North America, on Pequiven Offtaker's behalf, all or a portion of Pequiven Offtaker's allocated Products taken hereunder. Likewise, at Pequiven Offtaker's sole option, it may make request to market in South America, Central America and/or the Caribbean, on Koch's behalf, all or a portion of Koch's allocated Products taken hereunder. Each Buyer may elect to accept or reject the other party's request under this Section 2.3(e) in its sole discretion. If a Buyer ("Passive Principal") accepts the other Buyer's ("Active Agent") request, the Buyers shall share equally the difference (whether positive or negative) between: (i) the price obtained by the Active Agent, on a best efforts basis, from a Third Party (net of all expenses, fees and charges reasonably incurred by the Active Agent in marketing, selling and/or transporting the other Passive Principal's Products) and (ii) the applicable FOB Jose Price stated in Section 3.l below."*

4.13   Article 3.1 of the Offtake Agreement provides:

"*Purchase price. The purchase price of Products to be sold in North America, Central America, South America and the Caribbean shall be calculated in accordance with the formulae set forth in Sections 3.1(a) and (b). The purchase price of Products to be sold for delivery in other markets ("Alternative Markets") shall be determined in accordance with the provisions of Sections 3.1(d) and (e): […]"*

4.14   Articles 3.2 and 3.3 of the Offtake Agreement provide:

"*3.2. Failure to Take Delivery of Products. The provisions of subsections (a) and (b), below, shall apply during the time any loans are outstanding under the Loan Agreements. Upon the repayment in full of the loans made to Seller under the Loan Agreements, the provisions of subsection (c), below, shall apply.*

(a)   *Take-or Pay if Tender Obligation Met. If Seller is prepared and able to meet its obligation to tender Product to a Buyer and such Buyer fails to take delivery of its allocation of Products in accordance with Articles II, V or VI ("Non-Taking Buyer") within thirty (30) days after the scheduled delivery date therefor, such Non-Taking Buyer shall nevertheless pay Seller (i) the corresponding price, determined in accordance with the applicable formula in Section 3.1(a) or Section 3.1(b) (without reduction for the relevant marketing fee discount), for all such Products tendered by Seller but not taken by such Non-Taking Buyer and (ii) all costs and expenses of Seller in the event that the Non-Taking Buyer's failure to take the Products contributes to a reduction of Plant production. Notwithstanding the foregoing, no Buyer shall be required to pay for (y) quantities of Products not tendered or not taken by reason of a Force Majeure Event and (z) quantities of Products not tendered by reason of non-performance by Seller in accordance with the terms of this Agreement except to the extent such non-performance was attributable to the Non-Taking Buyer.*

(b)   *Products Not Taken. Seller shall promptly give notice of any Non-Taking Buyer's failure to take any Product to the other Buyer so long as such other Buyer is taking delivery of its allocation of Products in accordance with Articles II, V or VI ("Taking Buyer"). The Taking Buyer shall have a right of first refusal to purchase any Product not taken by the Non-Taking Buyer, for resale or [sic] its own consumption, at the corresponding Product price determined pursuant to Section 3.1. (a) or (b), as the case may be, and upon acceptance, the obligations to purchase and take delivery of such Product shall be binding upon the Taking Buyer. If the Taking Buyer declines or fails to exercise such right of first refusal by giving notice thereof to Seller within five (5) days after the Taking Buyer's receipt of the notice from Seller, Seller shall have the right to sell such Product to a Third Party at any price. Notwithstanding the sale of the corresponding*

*Products pursuant to this Section 3.2(b), the Non-Taking Buyer shall pay the Seller the amounts set forth in Section 3.2(a) (without reduction for the Ammonia Marketing Fee Discount or the Urea Marketing Fee Discount, as appropriate), together with any sales costs that Seller incurred to sell the Product. Seller shall provide a credit to a Non-Taking Buyer for amounts received by Seller from the Taking Buyer or a Third Party under this Section 3.2(b) if the Non-Taking Buyer has paid the amounts due to Seller pursuant to Section 3.2(a) (together with any sales costs that Seller incurred to sell the Product), such credit to be applied by Seller against future invoices issued by the Seller to the relevant Buyer.*

(c) *Modification of Certain Provisions Upon Repayment of Loans. Notwithstanding any provision contained herein to the contrary, upon the repayment in full of the loans made by the lenders to Seller under the Loan Agreements, including any refinancing thereof, each Buyer's obligation to take-or-pay for Product if tendered under Section 3.2(a) above shall terminate, and the modifications to this Agreement set forth in Exhibit B shall be effective for all purposes hereunder as of such date.*

*3.3. Income Taxes. Except as specifically provided in Section 3.1(f), each Buyer shall indemnify Seller against and hold it harmless from any and all taxes assessed or claimed against such Buyer based on or measured against such Buyer's income (including penalties, interest and expenses) imposed by any jurisdiction or political subdivision thereof or therein (other than the Republic of Venezuela or any Venezuelan state or local governmental or taxing authority therein) arising out of or relating to the sale of Products hereunder or the performance by Buyer of its obligation hereunder, whether or not such taxes were correctly or legally assessed."*

4.15    Article 11.1 of the Offtake Agreement provides:

*"Term of Agreement – Subject to the terms and conditions herein, this Agreement shall be effective as of the date first written above and shall run for a primary term of twenty (20) Contract Years thereafter ("Primary Term"); provided, however, in the event that the Bonds have not been fully paid or redeemed and remain outstanding under their original repayment schedule upon the conclusion of the Primary Term, neither of the Buyers not the Seller shall cancel this Agreement and the Primary Term shall be extended for such period of time as the Bonds remain outstanding under their original repayment schedule. This Agreement shall be automatically renewed following the Primary Term for one or more successive terms of five (5) Contract Years (each a "Secondary Term") unless one of the Parties gives written notice to the contrary to the other Parties at least six (6) months prior to the end of the Primary Term or the then current Secondary Term, as appropriate. If this Agreement is renewed for one or more Secondary Terms, the Parties shall consult with each other at least three (3) months prior to the commencement of any such Secondary Term to*

*determine whether, under the circumstances then prevailing, the provisions of Section 2.3 shall apply."*

4.16    Article 12.2 of the Offtake Agreement provides:

"(a) *Arbitration Pursuant to ICC Rules. If the Dispute has not been resolved through negotiation within ninety (90) days after the date of the notice of Dispute received pursuant to Section 12.1, the Dispute shall be finally settled and resolved by arbitration in accordance with the ICC Rules, subject to such modifications of the ICC Rules as are set forth in this Article XII."*

"(c) *Venue and Language. The arbitration proceeding shall be conducted in the City of Miami, Florida, United States of America, or any other location upon which the parties to the arbitration proceeding may agree, in the English language […]"*

"(f) *Applicable Law. The arbitrators shall be required to apply New York substantive law in ruling upon any Dispute in accordance with the Parties' intent as expressed in Section 13.1."*

4.17    Article 13.1 of the Offtake Agreement provides (printed in upper case):

*"[…] This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of New York, United States of America, without regard to the Conflicts-of-Law provisions thereof."*

**(4)    The Urea Decree**[40]

4.18    The Urea Decree provides (as translated into English), beginning with its Preamble:

*"WHEREAS the production of food is of national interest and is fundamental for the economic and social development of the Nation, an essential element of national safety and sovereignty, […]"*

4.19    Article 1 of the Urea Decree provides:

*"Nitrogenous fertilizers and the supplies necessary for their manufacture, in their various formats and presentations, aimed at satisfying the national demand, are declared to be basic necessities throughout the national territory."*

4.20    Article 2 of the Urea Decree provides:

---

[40] Decree 5,218 (26 February 2007) (C-80).

*"Manufacturers, suppliers, merchants, distributors, importers and exporters of nitrogenous fertilizers and the supplies necessary for their manufacture are required to supply these on a priority basis to the national market, in accordance with the price regulations established for their sale."*

4.21   Article 3 of the Urea Decree provides:

*"The activity for marketing nitrogenous fertilizers and the supplies necessary for their manufacture, conducted by individuals and legal entities, shall be subject to the prices, volumes, controls, regulations and audits established by joint Resolutions by the Ministry of Agriculture and Land, the Ministry of Light Industries and Trade and the Ministry of Energy and Petroleum, which are to be issued within thirty days after the publication of this Decree."*

**(5)    The Urea Resolution**[41]

4.22   The Urea Resolution provide (as translated into English), beginning with its Article 1:

*"The purpose of this Resolution is to regulate control and inspect the production commercialization, distribution and sales of urea, to guarantee the supply of the national market. Furthermore, it regulates its exports once the internal demand has been satisfied."*

4.23   Article 10 of the Urea Resolution provides:

*"The State Company, Petroquimica de Venezuela S.A. (Pequiven S.A.) may purchase the urea it requires to cover the needs of the Nation, from any manufacturer established in the country, at the maximum bulk sales price at the plant gate of Bs. 155,200/MT (Bolivars per Metric Ton)."*

**(6)    The Decree 5,835**[42]

4.24   Decree 5,835 provides (translated into English), as to Article 4:

*"All of the goods necessary to carry out the activities of production, manufacture, importing, gathering, transportation, distribution and sale of foods or products*

---

[41] Joint Resolution by the Ministry of the People's Power for Agriculture and Land, the Ministry of the People's Power for Light Industry and Trade, and the Ministry of the People's Power for Energy and Petroleum (3 May 2007) (C-82).

[42] Decree 5,835 (28 January 2008) (R-23).

*declared to be of first need or subject to price controls are hereby declared to be of, and are therefore subject to, public utility and social interest.*

*The National Executive shall, without other prior formality, initiate expropriation through decree for reasons of food security and sovereignty"*

**(7)     The Expropriation Decree**[43]

4.25    The Expropriation Decree provides (as translated into English), beginning with its Article 1:

*"The mandatory acquisition of movable and real estate assets is ordered, including improvements, installations, facilities, industrial equipment, office and other assets, required or necessary for the production, processing, transportation and warehousing activities of fertilizers (urea and ammoniac) that are owned by, or in the possession of, the business companies Fertilizantes Nitrogenados de Oriente, S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. y Fertilizantes Nitrogenados de Venezuela, C.E.C., or any other company or persons related, with the objective of achieving the absolute and effective realization of the national plans of sowing and production formulated by the National Executive, and that are necessary for the execution of the 'Socialist Plan for Agri-Food Sovereignty'"*

4.26    Article 2 of the Expropriation Decree provides:

*"The project "Socialist Plan for Agri-Food Sovereignty" will be executed by Petroquímica de Venezuela, S.A. (PEQUIVEN), assigned to the People´s Power Ministry for Energy and Petroleum, as the expropriation entity, or the subsidiary that the entity appoints."*

4.27    Article 3 of the Expropriation Decree provides:

*"The expropriated goods will be transferred free of encumbrances or limitations to the Venezuelan State by means of the company Petroquímica de Venezuela, S.A. (PEQUIVEN), as the expropriation entity, or the subsidiary that this entity appoints, in accordance to what is stipulated in article 11 of the Expropriation Law for Public or Social Benefit."*

---

[43] Decree 7,713 (dated 10 October 2010) (C-9).

4.28    Article 4 of the Expropriation Decree provides:

> *"In compliance to what is stipulated in article 12 of the Expropriation Law for Public or Social Benefit, the company Petroquímica de Venezuela, S.A. (PEQUIVEN) is hereby authorized to carry out the necessary steps for the acquisition of real estate and other assets as stipulated in article 1 of the present Law, subrogating its position in all rights and obligations that correspond to the Bolivarian Republic of Venezuela on such matters."*

4.29    Article 5 of the Expropriation Decree provides:

> *"Petroquímica de Venezuela, S.A. (PEQUIVEN) will initiate and carry out the expropriation process as stipulated in the Expropriation Law for Public or Social Benefit until total and definite transfer of the ownership of the properties indicated in article 1 of the present Law takes place."*

4.30    Article 6 of the Expropriation Decree provides:

> *"In compliance with stipulations of article 3 of the Decree with Rank, Value and Force of the Organic Law for Security and Agri-food Sovereignty, the occupancy of the assets indicated in article 1 of the present Law by the company Petroquímica de Venezuela, S.A. (PEQUIVEN) is ordered with the objective of placing these into operation, administration and capitalization."*

## *(8)    The Expropriation Law*[44]

4.31    The Expropriation Law provides (as translated into English), beginning with Article 2:

> *"**Concept of expropriation**. Expropriation is an institution of Public Law by which the State acts in furtherance of a purpose having public utility or societal interest, in order to obtain the compulsory transfer unto itself of the right to property or some other private right, by final judgment and timely payment of fair compensation."*

4.32    Article 7 of the Expropriation Law provides:

> *"**Requirements for expropriation**. The Compulsory expropriation of property of any nature may only take effect through compliance with the following requirements:*
> *1.   Formal finding declaring the public interest.*

---

[44] Expropriation Law for Public or Social Benefit (1 July 2002) (C-140). *See also* R-53, containing another English translation of the Expropriation Law.  The Parties did not raise the issue of the alternative English translations during the proceeding.

> 2. *Declaration that carrying out such [interest] necessarily requires the total or partial transfer of the property or right.*
> 3. *Fair price for the property subject to expropriation.*
> 4. *Timely payment in cash of fair compensation."*

4.33    Article 31 of the Expropriation Law provides:

> *"**Rights of the holder**. The holder has the right to become a party to the expropriation proceeding, in order to seek, from the price of the expropriated property, the portion applicable to him for the value of his improvements and for damages suffered by him."*

4.34    Article 35 of the Expropriation Law provides:

> *"**Procedure in the absence of compromise**. In the event that a compromise is not reached, the judge shall call a hearing during the third business day thereafter, for the naming of a Valuation Commission, appointed in accordance with the provisions of Article 19 of this Law, which shall establish the fair price pursuant to the regulations of the Code of Civil Procedure."*

4.35    Article 36 of the Expropriation Law provides:

> *"**Elements requiring consideration.**  The fair price valuation of any property or right to be expropriated, in whole or in part, shall specifying its type, quality, location, approximate dimensions, its likely production and all other circumstances that bear upon the evaluations and calculations made to determine its fair value. In all cases, the valuation shall represent the equivalent value applicable to the expropriated property. Among the elements of the valuation, in the case of real property, [the following] are required to be considered:*
> 1. *The taxable value of the property, declared or tacitly accepted by the owner.*
> 2. *The value set forth in conveyance documents, executed at least six (6) months prior to the expropriation decree.*
> 3. *The average prices at which similar properties have been sold in the last twelve (12) months, counted as of the date the valuation was prepared.*
> *In the event that any of these elements, which are required to be considered, are absent, the experts shall provide express reasons therefor in the valuation report. Under no circumstances shall the incremental value of real property be taken into account, attributable to its proximity to the work in progress."*

**(9)** *Mr Hernandez's Letter Dated 28 February 2012*[45]

4.36   This document is not a legal text; but it merits citing at length here.  It is the letter from Betulio Hernández, President of the Temporary *Ad-Hoc* Board of Trustees, to KNI on the impact of the Expropriation Decree (Decree 7,713) on the Offtake Agreement (as translated into English):

> *"I hereby notify you that, in accordance with the Resolution issued by the Board of Temporary Ad-Hoc Trustees of Fertilizantes Nitrogenados de Venezuela, FertiNitro, C.E.C., ("FertiNitro"), as is evidenced by appointment effected by Decrees handed down by the Second Civil, Commercial, Agricultural, and Traffic Court of First Instance of the Judicial District of the State of Anzoátegui on August 8 and 9, 2011 and September 22, 2011, Case BP02-V-2011-000998, the first two of which have been recorded in the First Commercial Registry of the State of Anzoátegui on August 11, 2011, under No. 09, Volume 1; effective from the date of this communication, FertiNitro shall not sell any more nitrogen fertilizers (urea and ammonia) to Koch Oil, S.A. under the marketing agreement entered into between Petroquímica de Venezuela S.A., International Petrochemical Sales Limited, Koch Oil S.A., and Fertilizantes Nitrogenados de Venezuela, C.E.C. on April 8, 1998; all of which is in fulfilment of what is established in Decree 7,713 published in Official Gazette of the Bolivarian Republic of Venezuela No. 39,528 of October 11, 2010, which orders the compulsory acquisition of movable and immovable property, including improvements, facilities, plants, industrial and office equipment and all other assets necessary or required for the production, processing, transport, and storage of fertilizers (urea and ammonia) that belong to or are in the possession of the companies Fertilizantes Nitrogenados de Oriente, S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. and Fertilizantes Nitrogenados de Venezuela, C.E.C., or any other related companies or persons."*

**(10)** *The ICSID Convention*

4.37   Article 25 of the ICSID Convention provides:

> *"(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to*

---

[45] Letter from B. Hernández to Koch Oil SA and Koch Nitrogen Company re: Offtake Agreement (28 February 2012) (C-114).

*submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*

*(2) "National of another Contracting State" means:*

*(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and*

*(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.*

*(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.*

*(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary- General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1)."*

4.38    Article 41 of the ICSID Convention provides:

*"(1) The Tribunal shall be the judge of its own competence.*

*(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute."*

4.39    Article 42(1) of the ICSID Convention provides:

*"The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."*

*PART V: THE PRINCIPAL FACTS*

## *(1)     Introduction*

5.1     The Parties' principal dispute relates to the alleged expropriation by the Respondent of (i) KOMSA's twenty-five per cent (25%) indirect equity interest in FertiNitro, a joint venture project comprising several legal entities, established by three private shareholders (including KOMSA) and Pequiven, the Venezuelan State-owned petrochemical company; and (ii) KNI's interest in the Offtake Agreement between (inter alios) FertiNitro, Pequiven and KNI.   FertiNitro was engaged in the production and sale of nitrogen fertilisers (ammonia and urea) through the operation and maintenance of four petrochemical plants at José in Venezuela (also described collectively as the "FertiNitro Plant").

5.2     The FertiNitro project originated in 1998; and the plants commenced commercial operations in 2001.   FertiNitro's plants encountered several technical and operational difficulties.   These led to an international commercial arbitration between FertiNitro and the project's EPC contractor and minority shareholder, Snamprogetti.  The Parties disagree as to the causes and consequences of the Plants' operational and technical difficulties.

5.3     Venezuela's food production and agriculture have been marked by underdevelopment since the 1990s.   In response, the Respondent developed a policy to attain greater food security for the people of Venezuela, which included, amongst others matters, laws and regulations to secure State control over the domestic production of food and food-related products, including fertilizer for domestic agriculture.

5.4     On 11 October 2010, the Respondent's Expropriation Decree 7,713 dated 10 October 2010, declaring the compulsory acquisition of the assets of FertiNitro, came into effect.  KOMSA did not receive any compensation for the expropriation of its indirect equity interest in FertiNitro.

5.5     The Tribunal includes below in chronological order certain principal facts relevant to its several decisions in regard to the Claimants' two claims for expropriation under Article 6 of the Treaty and to KOMSA's "Historical Claims" under Articles 4 and 11 of the Treaty.

Accordingly, notwithstanding an element of repetition later in this Award, this chronology is not an exhaustive account of all factual issues in dispute between the Parties. The Tribunal has nonetheless considered the evidence in full, as adduced by the Parties in this lengthy arbitration.

5.6     This chronology addresses, as found by the Tribunal on the materials adduced by the Parties: (i) the development of the FertiNitro project; (ii) the construction and operation of the FertiNitro Plant; (iii) Pequiven's negotiations to buy-out FertiNitro's private shareholders (including KOMSA); (iv) Venezuela's legal and regulatory framework leading to the Expropriation Decree dated 10 October 2010; (v) the events following the Expropriation Decree; and (vi) certain other measures taken by the Respondent which, so the Claimants allege, have interfered with their investments in violation of the Treaty.

### (2)     Factual Chronology

#### (i)     The Development of the FertiNitro Project

5.7     In the 1990s, Venezuela (as also certain other countries in Latin America) pursued economic policies that sought, among other matters, to attract foreign investment and reduce State control over important economic sectors. In the case of Venezuela, such policies covered the petrochemical and hydrocarbon sector.[46]

5.8     By the end of the 1990s, Venezuela imported more than 64% of its food and agricultural products;[47] it had a surplus of non-commercialised natural gas, deriving from its petroleum reserves; and it sought to develop its petrochemical sector.[48]

---

[46] Daniel Yergin, *The Quest: Energy, Security, and the Remaking of the Modern World* (Penguin Books 2011), (C-10). *See also* Cls. Mem., Paragraph 25; Resp. C-Mem., Paragraph 31, citing R-44. As part of their effort to attract foreign investment to Venezuela, PDVSA and Pequiven participated in promotional conferences on the Petrochemical sector: *See Petrochemical Industry in Venezuela: Investment Opportunity* (Caracas, Venezuela 8, 9, and 10 of April 1997, Hotel Tamanaco Intercontinental (C-15), p. 6.

[47] Christina Schiavoni & William Camacaro, *The Venezuelan Effort to Build a New Food and Agricultural System*, in 61 Monthly Review (1 July 2009) (R-29), p. 3.

[48] Global Forum, Flaring Reduction & Gas Utilisation: *"Venezuelan Experiences and Perspectives about Natural Gas Flaring and Venting in the Oil Industry"* Arcangelo Sena D'Anna & Janeth Lopez de Morena (C-11); *see also* Offering Circular - Bond Offering of $250,000,000 between FertiNitro Finance Inc and FertiNitro (8 April 1998) ("Bond Offering Circular") (C-115), p. 7.

5.9     Pequiven, KOMSA,[49] Snamprogetti Netherlands BV, a company organized under the laws of the Netherlands, ("Snamprogetti"), and Polar Uno CA, a company organized under the laws of Venezuela ("Polar") entered into a series of agreements as "Owners" for the development, construction and operation of two ammonia and two urea plants, to be located in an industrial complex in the Venezuelan State of Anzóategui, in the northeast of the country (the "FertiNitro project").  Ammonia and urea are nitrogen-based fertilisers that are used to increase productivity and crop yield in agriculture.[50]  Ammonia is required to produce urea; and therefore "ammonia is the basic building block of the nitrogen fertilizer industry."[51]

5.10     On 8 April 1998, the Owners concluded the Joint Investors Agreement (the "JIA"), providing for the incorporation and capitalisation of four interrelated Venezuelan companies,[52] organised in an investment structure through which the Owners would own, construct and operate the FertiNitro Project.[53]  As already indicated above, these four interrelated Venezuelan companies are described as the "FertiNitro Companies" or collectively as "FertiNitro".

5.11     On that same day, in accordance with the JIA,[54] FertiNitro Venezuela CEC, Pequiven, International Petrochemical Sales Limited ("IPSL", a subsidiary of Pequiven) and

---

[49] Koch Oil S.A was incorporated in Switzerland on 24 January 1972. On 11 April 2003, Koch Oil S.A. changed its name to Koch Minerals S.A. *See* Extract from the Commerce Register of the Canton of Fribourg, Report (30 June 1999) (C-2), and on 2009, the company changed its corporate form to Koch Minerals Sàrl, one of the Claimants in this case. *See* Request for Registration in the Commercial Register of the Canton of Fribourg (20 March 2009) (C-3).  For ease of reference, the company under its different denominations and corporate forms is referred to in this Award as "KOMSA."

[50] Witness Statement of Edgar Alonso Flórez (28 February 2013) ("Flórez WS1"), Paragraph 6.

[51] Flórez WS1, Paragraph 6. According to the Respondent, "Approximately 67% of the ammonia produced by FertiNitro is used to make urea."  "Ammonia is made by combining nitrogen and hydrogen with the use of catalysts, high heat, and elevated pressure. Air is the main source of the nitrogen. Natural gas is the most commonly used source of hydrogen."  *See also* Resp. C-Mem., Paragraphs 52, 54.

[52] Namely: (i) Fertilizantes Nitrogenados de Oriente S.A.; (ii) Fertilizantes Nitrogenados de Oriente CEC; (iii) Fertilizantes Nitrogenados de Venezuela, SRL; and (iv) Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC (this last company was the "Operating Company").

[53] Joint Investors' Agreement by and among Pequiven, Koch Oil SA, Snamprogetti Netherlands BV, and Polar Uno, CA (8 April 1998) ("JIA") (C-18), Exhibit A, Investment Structure.

[54] Pursuant to the JIA, the joint investors acknowledged and agreed that certain agreements were "necessary to give effect to [the JIA], and w[ould] be executed and delivered on or following the Effective Date" including, among others, the EPC Contract, the financing agreements, the Equity Contribution Agreement and the Offtake Agreement. JIA (C-18), Article IV.

KOMSA (later succeeded by KNI as described below) concluded the Offtake Agreement.[55] Pursuant to the Offtake Agreement, Koch and Pequiven/IPSL (the "Offtakers") agreed to purchase on a "take or pay" basis a guaranteed quantity of ammonia and urea produced by FertiNitro at a discounted set price,[56] for the Offtakers' own consumption or resale in both the local and export markets, for a 20-year term.[57]   The Offtake Agreement could be "automatically renewed" thereafter for five-year terms, unless otherwise notified by any of the parties to the Offtake Agreement.[58]

5.12    On 30 June 2000, KOMSA assigned its rights and obligations under the Offtake Agreement to Koch Oil Marketing S.A.  On 3 April 2003 Koch Oil Marketing S.A. assigned its rights under the Offtake Agreement to KNI.[59]

5.13    The Offtake Agreement gave to Pequiven/IPSL the exclusive right to market and sell ammonia and urea domestically, as also in South America, Central America and the Caribbean. Pequiven's sales to the local domestic market were not to exceed 10% of its total volume of purchased product with FertiNitro.  That percentage rose to 15% in 2004 and further 1% per year thereafter.[60]   KOMSA (later KNI) had the exclusive selling rights for North America, including Mexico.  Each of KOMSA/KNI and Pequiven/IPSL bought approximately 50% of FertiNitro's total production of urea and ammonia in any given month.[61]

5.14    In addition to the JIA and Offtake Agreement, numerous contracts were concluded in connection with the FertiNitro project.[62]   These included the Engineering, Procurement

---

[55] *See* Offtake Agreement by and among Pequiven, IPSL and Koch Oil SA as Buyers and FertiNitro as Seller (8 April 1998) ("Offtake Agreement") (C-19).

[56] The pricing was advantageous for the Offtakers. The purchase price for ammonia was based on published prices for ammonia less a 4% "Ammonia Marketing Fee Discount", and the purchase price for urea was based on published prices for urea less a 3% "Urea Marketing Fee Discount".

[57] Offtake Agreement (C-19), Art. 11.1.

[58] *Id*.

[59] *See* Assignment (30 June 2000) (C-33) and Assignment & Assumption Agreement (3 April 2003) (C-34).

[60] Offtake Agreement (C-19), Art. 2.5.

[61] *Offtake Agreement (C-19), Art. 2.2.*  The Ammonia was roughly divided 75% to KNI and 25% to Pequiven/IPSL; As to the urea, the distribution was 43% KNI and 57% Pequiven/IPSL. See Bond Offering Circular (C-115), p. 5. *See also* Resp. C-Mem., Paragraph 85; Cls. Reply, Paragraph 11.

[62] For a list of the projects agreements, see the Common Security Agreement (21 April 1998) (C-137), Appendix G.

and Construction Contract by and between, FertiNitro, CEC, and Snamprogetti for the "turn-key" construction by Snamprogetti of the ammonia and urea plants (the "EPC Contract"),[63] as well as agreements for the supply of gas, electricity and water, among many others.[64]   Under these gas agreements, FertiNitro received gas from PDVSA at preferential prices.

5.15    As already indicated, FertiNitro was 35% owned by KOMSA, 35% owned by Pequiven, 20% owned by Snamprogetti and 10% owned by Polar, in accordance with the terms of the Joint Investors' Agreement (the "JIA").[65]   KOMSA held its interest in FertiNitro through Koch José, a company organised under the laws of the Cayman Islands.[66]   KOMSA transferred 28.571% of its equity in Koch José on 18 February 1998, to the Latin American Infrastructure Fund ("LAIF").[67]   As a result, KOMSA and LAIF indirectly owned 25% and 10% of FertiNitro, respectively.

5.16    The FertiNitro project included a project finance lending structure where the lenders "receive[d] a security interest in the project's cash flow and assets";[68] and such lenders and bondholders looked to the assets and income stream of the project for repayment.   Under this structure, "the project's debt [was] secured by the receivables owed by Koch [KOMSA] and Pequiven to FertiNitro under the Offtake Agreement".[69]   In accordance with this financing structure, the Offtake Agreement was to remain in effect for a period equal to the length of FertiNitro's financing obligations and at least 20 years.[70]

---

[63] Engineering, Procurement and Construction Contract by and between FertiNitro and Snamprogetti (8 April 1998) ("EPC Contract") (C-24).

[64] *See* e.g, Methane Gas Supply Agreement by and between PDVSA Gas SA and FertiNitro (8 April 1998) (C-25); Electric Energy Supply Agreement by and between Pequiven and FertiNitro (8 April 1998) (C-26); Industrial Water Supply Agreement by and between Pequiven and FertiNitro (8 April 1998) (C-27); and other related energy supply and technical services agreements.

[65] JIA (C-18), Paragraphs 2.1.1 to 2.1.4; *see also* Bond Offering Circular (C-115), p. 3.

[66] JIA (C-18), Paragraph 2.4 and Recitals.

[67] Register of Members for Koch Jose Cayman Limited (13 May 2011) (C-21).

[68] Witness Statement of Brent W. Gwaltney (30 May 2012) ("Gwaltney WS1"), Paragraph 20.

[69] Memorandum by Davis Polk & Wardwell (18 May 2005) (C-118), p. 2.

[70] Offtake Agreement (C-19), Art. 11.1.

5.17   FertiNitro was organised as a commercial enterprise; and its management was undertaken through a nine-member board of directors of the FertiNitro Companies.[71] After the transfer of shares to LAIF, FertiNitro's board of directors was composed of three directors appointed by Pequiven, two directors appointed by KOMSA, two directors appointed by Snamprogetti, one director appointed by LAIF and one director appointed by Polar.[72] The chairman of the board of directors (who also served as President of FertiNitro) alternated between an appointee of either KOMSA or Pequiven, for a two-year term or as otherwise agreed by KOMSA and Pequiven.[73] According to Clauses 5.4.1 and 5.4.2 of the JIA, decisions of FertiNitro's board and shareholders decisions could only be taken with the majority approval from each of the representatives of Pequiven, KOMSA and Snamprogetti.

(ii)   *The Construction and Functioning of the FertiNitro Plant*

5.18   *1998-2001:* The construction of the FertiNitro Plant began in 1998 and the Plant commenced commercial production in May 2001.[74]

5.19   In accordance with the EPC Contract, each of the ammonia plants was built to have a minimum "nameplate" capacity of 1800 metric tons ("MT"); and each of the urea plants had a nameplate capacity of 2,200 MT.[75] The total cost of the project was US$ 1.1 billion, of which over US$ 740 million was funded by bonds and loans from a consortium of banks.[76]

5.20   *2001-2004:* Between 2001 and 2002 FertiNitro made warranty claims against Snamprogetti under the EPC, regarding "defects, deficiencies and failures" of the Plant's

---

[71] JIA (C-18), Paragraph 5.2.1.
[72] JIA (C-18), Paragraph 5.2.1*;* Resp. C-Mem., Paragraph 30.
[73] JIA (C-18), Paragraph 5.2.4.
[74] FertiNitro, Financial Statement for the Year Ended Dec. 31, 2004 and 2003 (non-dated) (R-14), Note 1, p. 8. *See also* Cls. Mem., Paragraphs 52-53; Resp. C-Mem., Paragraph 27.
[75] EPC Contract (C-24), Art. 1, Paragraph 1.97, p. 12.  "Nameplate" capacity is the projected sustainable capacity of a piece of equipment under specifically defined operating conditions.  *See* Resp. C-Mem., Paragraph 56, citing Witness Statement of Aníbal José Villarroel García (28 February 2013) ("Villarroel WS1"), Paragraph 11.
[76] *See* FertiNitro 31 December 2000 and 1999 Report of Independent Accountants and Financial Statements (2 February 2001) (C-61); FertiNitro, Financial Statements for the Years Ended Dec. 31, 1999 and 1998 (non-dated) (R-4); Resp. C-Mem., Paragraph 28.

equipment and operations.[77]  From 2002 onwards, FertiNitro experienced shutdowns for repairs and maintenance issues.  FertiNitro started withholding payments due to Snamprogetti in its capacity as EPC contractor.

5.21   In 2002 Snamprogettti commenced an arbitration under the EPC before the International Court of Arbitration of the International Chamber of Commerce, against FertiNitro (the "ICC Construction Arbitration"), claiming payment of the sums withheld by FertiNitro. FertiNitro advanced counterclaims based on Snamprogetti's alleged breach of warranties in the EPC related to the design, construction and engineering of the Plant.  FertiNitro and Snamprogetti settled the arbitration on 14 December 2004. The settlement included (*inter alia*) the forgiveness of certain debts owed by FertiNitro to Snamprogetti and a cash payment by Snamprogetti to FertiNitro of US$ 6.5 million.[78]

5.22   *2004-2009:* The Parties disagreed on the working conditions of the FertiNitro Plant after the settlement of the ICC Construction Arbitration and FertiNitro's corresponding repairs to the Plant.  The Claimants assert that: "following the settlement […] in late 2004, and after the necessary construction repairs were made, the plant's performance significantly improved";[79] and that "by 2006, it was achieving 98 percent of the previously anticipated production levels."[80]   The Respondent alleges that many critical repairs remained outstanding as more than one third of the critical issues identified by the 2003 Report of

---

[77] FertiNitro, Financial Statement for the Year Ended Dec. 31, 2004 and 2003 (non-dated) (R-14), Note 9, p.16.  The Parties differ on the number of warranty claims, but at least 77 distinct claims were referred to the ICC Arbitration. *See*, Resp. C-Mem., Paragraph 58; Cls. Reply, Paragraph 34.

[78] FertiNitro, Financial Statement for the Year Ended Dec. 31, 2004 and 2003 (non-dated) (R-14), Note 9, p.16; Gwaltney WS1, Paragraph 40; Villarroel WS1, Paragraph 17.

[79] Cls. Mem., Paragraph 153, Cls. Reply, Paragraph 33.

[80] Cls. Reply, Paragraph 36, citing FertiNitro December 2006 Monthly Report (5 February 2007) (C-97); and Bond Offering Circular (C-115).

the project's independent engineers (Jacobs Consultancy)[81] could not have been completely resolved by 2005.[82]

5.23    The Plant's production levels between 2003 and 2009, as reported by the FertiNitro Monthly Reports for the relevant years, are shown in the table below. [83] The table shows the production of the plant as percentage of the nameplate capacity. According to the Respondent, based on the reports of the Jacobs Consultancy, "on an annual basis, FertiNitro has never in its history succeeded in reaching nameplate production levels."[84]   The Claimants contend that these calculations wrongly assume that the plant would operate 365 days of the year.[85]

| Year | Ammonia | Urea |
|------|---------|------|
| 2003 | 66%     | 58%  |
| 2004 | 84%     | 77%  |
| 2005 | 72%     | 71%  |
| 2006 | 91%     | 86%  |
| 2007 | 83%     | 81%  |
| 2008 | 77%     | 74%  |
| 2009 | 78%     | 74%  |

---

[81] On 12 March 2003, Jacobs Consultancy, the Project's independent engineer, issued a first report. *See* Jacobs Consultancy Report, FertiNitro Fertilizer Project, Plant Improvement Cost Estimate and Revised Production Forecast (March 2003) (C-125) (These reports were addressed to the Project's Senior Lenders with the purpose of "identifying each of the repairs and improvements that would be required in order to allow the plant to achieve the production levels that had been anticipated in the outset of the project." In accordance with the 2003 Jacobs Report, as much as US$ 66.7 million were required at that time for FertiNitro to achieve its projected production levels. Jacobs Consultancy issued a second report in 2006).

[82] *See* Resp. Rej., Paragraph 44, citing Jacobs Consultancy Report titled "Review of Major Maintenance Plan and Organizational Plan for Quarter Ending December 31, 2004" (February 2005) (C-132), indicating that 57% of the 51 critical issues identified in the 2003 report had been solved by the end of 2004.

[83] FertiNitro, Monthly Report, Dec. 2003 (R-12), p. 7; FertiNitro, Monthly Report, Dec. 2004 (R-13), p. 12; FertiNitro, Monthly Report, Dec. 2005 (C-95), p. 15; FertiNitro, Monthly Report, Dec. 2006 (C-97), p. 14; FertiNitro, Monthly Report, Dec. 2007 (C-98), p. 14; FertiNitro, Monthly Report, Dec. 2008 (C-83), p. 14; FertiNitro, Monthly Report, Dec. 2009 (C-102), p. 14; Chart provided by Respondent. *See also* Resp. C-Mem., Paragraph 75, n. 139 Resp. Rej., Paragraph 59.

[84] Resp. Rej., Paragraph 45, relying on Second Witness Statement of Anibal Villarroel, Paragraph 4. *See also* Resp. C-Mem., Paragraph 75.

[85] Second (November) Hearing D5. 68.23-25, 69.1 (Fietta).

5.24   From 2006, there was a clear downturn in production levels.[86] The Parties however disagree as to the causes.  According to the Claimants, the operational problems are related to "the repeated failures of PDVSA Gas and Pequiven to supply the contracted levels of gas and electricity to the plant, combined with Respondent's increased interference with and distraction of the management of the plant."[87]  For its part, the Respondent admits that there were problems in the supply of raw materials;[88] but it adds that FertiNitro's operational issues "have their roots" in the plant's construction and design flaws attributable to the EPC Contractor.[89]

5.25   FertiNitro was also subjected to and failed a "reliability test", and thereafter continued to experience planned and unplanned shutdowns, relating among others to mechanical failures.[90]  In between these tests, FertiNitro underwent "turnarounds." A "turnaround" is a scheduled period of down time in which all production in a plant is stopped; and catalysts and raw materials are removed.  FertiNitro had its first turnaround in 2005. Thereafter, turnarounds took place in 2008, 2009 and 2010.  The cost of the turnarounds, as well as the annual maintenance costs, significantly exceeded the originally allocated budget and also significantly increased after 2008.[91]

*(iii)   Pequiven's Negotiations to Buy-Out the FertiNitro Private Shareholders*

5.26   *2005-2006:* Between June 2005 and October 2006 the Pequiven-appointed directors submitted to the FertiNitro board of directors Pequiven's proposals to buy additional

---

[86] Expert Report of Tim Giles (2 June 2012) ("Giles ER1"), Paragraph 4.21 ("the performance from 2006 to 2008 was below what could be expected from a Plant of this type").  Cls. Reply, Paragraph 36; Cls. Mem., Paragraph 158; Resp. C-Mem., Paragraph 75.

[87] Cls. Reply, Paragraph 36.

[88] Resp. C-Mem., Paragraphs 75, 80, 83.

[89] Resp. C-Mem., Paragraph 76; Resp. Rej., Paragraphs 61-67.

[90] Fertinitro Board of Directors' Meeting No. 75 (31 October 2006) (R-58), p. 2; Fertinitro Board of Directors' Meeting No. 81 (24 May 2007) (R-61), p.4.  According to the Respondent, the mechanical failures also created safety risks for workers at the plant. Resp. C-Mem., Paragraphs 64-76.

[91] On 5 August 2010, the FertiNitro Board discussed the Plants' escalating functioning costs and pointed that since 2008, the costs had increased more than "twofold" in terms of US$.  The turnarounds were all over budget.  The 2005 turnaround cost US$ 21.4 million, approximately US$ 10 million over budget. The second turnaround scheduled for 2008, cost US$ 40.4 million. Further maintenance work was required in 2009 and 2010, and a third, unscheduled turnaround took place in 2010, at a cost US$ 40 million.  FertiNitro Board of Directors' Meeting Minutes No. 111 (5 August 2010) (C-105). *See also* Resp. C-Mem., Paragraphs 70-74.

amounts of urea from FertiNitro on an annual basis at a reduced price for a period from 2005 to 2007.[92]   The amount of urea that Pequiven was to be allowed to purchase under its proposals was capped at 75,000 tons.[93]   According to the testimony of Mr Gwaltney, the proposed reduced price was below FertiNitro's production costs.[94]

5.27    During the FertiNitro board meetings, the Pequiven-appointed directors explained that the additional urea was to be used for resale in the domestic market and thereby support the Government's agricultural plans.[95]   The Pequiven-appointed directors added that Pequiven's proposals would only take effect "in the event that Pequiven [could not] cover demands with its own production" from plants at el Moron and el Tablazo.[96]

5.28    FertiNitro's board of directors (with its general management) analysed, considered and eventually rejected Pequiven's request.[97]

5.29    During this same period, a commission was created to analyse the Offtake Agreement.[98]   It recommended that: (i) the market distribution between the Offtakers should be eliminated; (ii) the limit applicable to domestic sales should be modified; and (iii) the price

---

[92] FertiNitro Board of Directors' Meeting Minutes No. 57 (21 June 2005) (C-74), point 3; Pequiven Presentation to FertiNitro's Board of Directors, "Special Price for Urea destined for the national market, for a specified period." (June 2005) (C-75); FertiNitro Board of Directors' Meeting Minutes No. 59 (20 September 2005) (C-77), p. 3-4; FertiNitro Board of Directors' Meeting Minutes No. 65 (5 April 2006) (C-51), p. 17.

[93] Pequiven Presentation to FertiNitro's Board of Directors, "Special Price for Urea destined for the national market, for a specified period." (June 2005) (C-75).

[94] Second Witness Statement of Brent Gwaltney (20 August 2013) ("Gwaltney WS2"); *see also* Cls. Reply, Paragraph 74.

[95] Pequiven Presentation to FertiNitro's' Board of Directors, "Special Price for Urea destined for the national market, for a specified period." (June 2005) (C-75) pp. 10-12; *see also* FertiNitro Board of Directors' Meeting Minutes No. 57 (21 June 2005) (C-74) p. 4; FertiNitro Board of Directors' Meeting Minutes No. 59 (20 September 2005) (C-77) p. 4.

[96] *See* FertiNitro Board of Directors' Meeting Minutes No. 57 (21 June 2005) (C-74), p. 4.   *See also* Cls. Mem., Paragraphs 118-119; Resp. C-Mem., Paragraphs 45, 99.   According to the Claimants, "FertEcon data on Venezuela fertiliser imports and exports positively disproves [a] fertiliser shortage or fertiliser emergency in Venezuela" (Cls. Reply, Paragraph 86).   Venezuela's export figures for Latin America were higher in 2006 than in 2007. *See* Venezuela Urea Imports, FertEcon Urea Outlook, Appendix (C-138).

[97] FertiNitro asked the "General Management" and the "Finance and Offtake Committee" to consider the proposal and present to the board all the legal, operative and economic consequences of accepting the proposal and amending the Offtake Agreement. *See* FertiNitro Board of Directors' Meeting Minutes No. 57 (21 June 2005) (C-74) p. 4 (SP) p. 16 (EN); FertiNitro Board of Directors' Meeting Minutes No. 58 (21 July 2005) (C-76), pp. 18-19 (EN) (rejecting the proposal).

[98] *See* FertiNitro board of directors' Meeting Minutes No. 57 (21 June 2005) (C-74) p. 17-18; FertiNitro board of directors' Meeting Minutes No. 69 (29 June 2006) (C-52) p. 19

limits of the Offtake Agreement should be amended.[99]  These recommendations were not adopted by FertiNitro's board of directors.

5.30    In 2005 a draft amended Petrochemical law was submitted to the Respondent's National Assembly.  Its effects on FertiNitro were discussed in several meetings of FertiNitro's board of directors, held between 2005 and 2007.[100]

5.31    During those meetings, Mr Toro, a Pequiven-appointed director, informed the other shareholder-appointed directors that, pursuant to the text of the proposed amended law: (i) FertiNitro would be required to supply the domestic demand for urea before exporting urea; and (ii) the Respondent needed to have at least a 51% controlling share of FertiNitro,[101] so as take control of the business, and that "time [was] run[ning] out."[102]  Mr Toro further stated that "Pequiven will be bringing specific proposals for the consideration of all the shareholders" and that "all shareholders rights and agreements will be respected."[103]

5.32    *2007:* Further to those discussions, from 2007 onwards, Pequiven entered into buy-out negotiations with all the private shareholders in FertiNitro.  On 7 November 2007, KOMSA representatives presented a draft Memorandum of Understanding for the sale to Pequiven of the non-Pequiven shareholders' shares in FertiNitro (the "KOMSA Draft MOU").[104]

5.33    According to paragraph 2.1 of the KOMSA Draft MOU:

> *"The Parties hereby agree that the aggregate purchase price to be paid by Pequiven for the Shares will consist of (a) USD$ 1,210,000,000.00, less the outstanding balance of principal and accrued interest on FertiNitro's existing bank and bond financing as of the Closing Date, plus (b) the Excess Cash (the '*Purchase Price*'). 'Excess Cash' would be defined as FertiNitro's cash balance on the Closing Date,*

---

[99]   *See* FertiNitro board of directors' Meeting Minutes No. 57 (21 June 2005) (C-74) p. 17-18.
[100]  Gwaltney WS1, Paragraphs 64-66.
[101]  Gwaltney WS1, Paragraph 65.
[102]  Email from T. Parra to F. Toro re:  FertiNitro – Future Initiatives (18 January 2007) (C-79).
[103]  *Id.*
[104]  Email from T. Parra to F. Toro and J. Lazo re:  Draft MOU (attaching the KOMSA Draft MOU) (12 November 2007) (C-92).

*including all required reserve accounts, less USD$25,000,000."*[105] *(Emphasis in original)*

5.34   *2008:* Discussions relating to the buy-out negotiations were halted between January and April 2008.[106]   In October 2008, Pequiven presented a revised draft Memorandum of Understanding (the "Pequiven Draft MOU").[107] According to paragraph 1 of the Pequiven Draft MOU:

> *"(a) The purchase price ("Purchase Price") to be paid by Pequiven to Koch Shareholder for the Acquired Shares is US$297,500,000.00, which shall be payable in cash at the closing of the Proposed Transaction (the "Closing").*
> *(b) For reference purposes only and with the agreement by Pequiven and Koch Shareholder that the Purchase Price is a fixed amount and not subject to adjustment the Purchase Price was determined by taking a starting value for 100% of the Companies of US$1,200,000,000.00, and (i) subtracting the outstanding balance of principal and all accrued interest on the Companies' existing bank and bond financing as of October 6, 2008, (ii) adding excess cash, exclusive of reserves, as of such date, and (iii) multiplying the resulting agreed net value of US$850,000,000.00 by the 35% total equity interests in the Companies owned directly or indirectly by Koch Shareholder and LAIF."*[108] *(Emphasis in original)*

5.35   Neither the KOMSA nor the Pequiven draft MOUs were executed.  The Parties' disagree as to the cause for such non-execution.  According to the Claimants, the drafts were not finalised because Pequiven indicated that the sale was no longer a priority for the Respondent.[109]   According to the Respondent, the "[n]egotiations were interrupted in November 2008 due to financing issues."[110]

---

[105] KOMSA Draft MOU (C-92), Paragraph 2.1.
[106] Gwaltney WS1, Paragraph 115.
[107] Pequiven Draft Memorandum of Understanding (C-93).
[108] Pequiven Draft Memorandum of Understanding (C-93), Paragraph 1(a)–(b), pp. 2-3.  The price referred to in paragraph (b), as it pertains to Koch, would have represented US$ 212.5 million for its 25% share of Fertinitro, after payment to it of some US$ 37.5 million in dividends in April and October 2008.
[109] Cls. Mem., Paragraph 151.
[110] Resp. C-Mem., Paragraph 92 and Resp. Rej., Paragraph 100, citing Gwaltney WS1, Paragraph 118 (stating that "PDVSA was indefinitely suspending any funding to Pequiven for the purchase of KOMSA's shares.").

5.36    In April and October 2008, FertiNitro paid dividends to its shareholders amounting to US$ 150 million.[111]

5.37    *2009:* By the end of December 2009, FertiNitro was in deficit, with its liabilities exceeding its assets.[112]

(iv)    *The Respondent's Measures and the Relevant Legal Framework*

5.38    *1998:* On 6 December 1998, President Chavez was elected as the Respondent's Head of State. He took office in February 1999. During the period leading to his election, Venezuela was importing 64% of its food and was a "net importer" of agricultural products.[113] Article 305 of the 1999 Venezuelan Constitution enacted under the Government of President Chavez enshrined the policy objectives of pursuing food security and food sovereignty.[114] Thereafter, the Respondent engaged in a process to increase its capacity for agricultural production.

5.39    *2001:* In September 2001, the Respondent issued a 2001-2007 "Plan for Economic and Social Development of the Nation."[115]  According to paragraph 1.1.3.1-4 of the Plan, the Government was to prioritise improvement in agricultural productivity to meet domestic demands for food.  In 2002, the Respondent developed a three-year national programme to develop food security and rural development, with the assistance of the United Nations Food and Agriculture Organization.[116]

5.40    *2002:* On 1 July 2002, the Expropriation Law for Public or Social Benefit entered into effect.[117]  In accordance with Article 2 of the Expropriation Law, expropriation is an "institution of Public Law by which the State acts in furtherance of a purpose having public utility or societal interest."  Article 7 sets out the mandatory requirements for any

---

[111] *See* FertiNitro, Financial Statements for the Year Ended Dec. 31 2009 and 2008 (30 April 2010) (R-30), note 16.
[112] *See* FertiNitro, Financial Statements for the Year Ended Dec. 31 2009 and 2008 (30 April 2010) (R-30)
[113] Christina Schiavoni & William Camacaro, *The Venezuelan Effort to Build a New Food and Agricultural System*, in 61 Monthly Review (1 July 2009) (R-29), p. 3.
[114] Constitution of the Bolivarian Republic of Venezuela (non-dated) (R-3).
[115] Plan for Economic and Social Development of the Nation (September 2001) (R-5).
[116] Food and Agriculture Organization of the United Nations, *Feature: FAO in Venezuela* (2002) (R-7).
[117] Expropriation Law for Reasons of Public or Social Utility ("Expropriation Law") (1 July 2002) (R-53) and (R-9).

expropriation, which include: (i) a "formal finding declaring the public interest; (ii) a declaration that carrying out such [interest] necessarily requires the total or partial transfer of the property or right; (iii) a fair price for the property subject to expropriation; and (iv) timely payment in cash or fair compensation."  Article 5 of the Law provides:

> *"The Expropriation Decree consists of a declaration that the execution of a project requires the compulsory acquisition of the totality of a property or various properties, or a portion thereof. […] The Expropriation Decree shall require a prior finding of public utility, in accordance with the provisions of Articles 13 and 14 of this Law."*

5.41   On 2 December 2002, political and civic organisations began a national civic work-stoppage in Venezuela. It "seriously affected many of the country's economic activities, especially the oil industry."[118] Employees of PDVSA took part in the stoppage.[119]  It affected Pequiven, whose operations were shut down.[120]  The stoppage also brought important changes to the staffing of Pequiven, and consequently to the personnel of FertiNitro.[121]  According to the Claimants, subsequent to the stoppage, the Respondent replaced management in PDVSA, Pequiven and FertiNitro with individuals who were deemed loyal to the Government, regardless of their technical qualifications.[122]

5.42   *2004:* In 2004, Pequiven had to import urea to meet local demand.[123]  At that time, Pequiven and FertiNitro were the only companies in Venezuela producing urea. Pequiven's production facilities, "El Tablazo" and "Moron", experienced significant problems. According to the Respondent, Pequiven's plants could not meet local demand.

---

[118] FertiNitro, Financial Statements for the Years Ended Dec. 31, 2004 and 2003 (10 February 2005) (R-14), p. 9.

[119] ICIS News, Venezuela Strike, crisis enter third and crucial week (16 December 2002) (C-36).

[120] *Id*.

[121] Amongst other workers, its President was fired, allegedly as a result of his support for the strike (*Venezuela's Pequiven boss sacked for backing strike*, ICIS News (16 December 2002) (C-37). *See also, Venezuela Strike, crisis enter third and crucial week*, ICIS News (16 December 2002) (C-36)).

[122] Cls. Mem., Paragrahps 99-100.

[123] *See* Witness Statement of Víctor Daniel Barrientos (28 February 2013) ("Barrientos WS1"), Paragraph 23. According to the Claimants, "FertEcon data on Venezuelan fertiliser imports and exports positively disproves [a] fertiliser shortage or fertiliser emergency in Venezuela" (Cls. Reply, Paragraph 86). Claimants further allege that Venezuela's export figures for Latin America were higher in 2006 than in 2007 (Cls. Reply, Paragraph 87).

5.43   *2005:* In 2005, the Respondent adopted a four-year "National Seed Plan" (*Plan Nacional de Semillas*).[124]   At that time, the Respondent was importing over 70% of its food, 100% of its vegetable seeds and over 60%-70% of its corn seed.[125]   The national plan sought to reduce import dependency and to increase domestic food production, through (inter alia) seed production and development.[126]

5.44   *2006:* On 28 July 2006, the "Partial Reform Law of the Law on Incentives for Development of the Petrochemical and Carbochemical Activities and other related activities" entered into force.[127]   In accordance with Articles 2 and 3 of this law, Pequiven "shall comply and execute the policies dictated by the National Executive […]" and "shall be the exclusive property of […] Venezuela."

5.45   In December 2006, President Chavez was re-elected to a third presidential term.

5.46   *2007:* On 6 March 2007, Decree 5,218 dated 26 February 2007 (the "Urea Decree") came into effect.[128]   Pursuant to Articles 1 and 2, nitrogenous fertilizers and the supplies necessary for their manufacture were "declared to be basic necessities throughout the national territory," and manufacturers, suppliers, and exporters of nitrogenous fertilizers were "required to supply [urea] on a priority basis to the national market."   In accordance with Articles 3 and 5 of the Urea Decree, the price and production of fertilizers were to be regulated by joint resolutions of the Ministry of Popular Power for Agriculture and Land, the Ministry for Light Industries and Commerce and the Ministry for Energy and Oil.

---

[124] National Seed Plan: Cultivating Food Sustainability (*Plan Nacional de Semillas: Cultivando la Sustentabilidad Alimentaria*, 2005-2009 (April 2005) (R-15) ("*National Seed Plan*").
[125] National Seed Plan (R-15) p. 5 (SP), p. 15 (EN).
[126] National Seed Plan (R-15) p. 8 (SPA).
[127] Partial Reform Law of the Law on Incentives for Development of the Petrochemical and Carbochemical Activities and other related activities (1 November 2005) (C-7).
[128] Decree 5,218 (26 February 2007) ("Urea Decree") (C-80).

5.47    Under the Urea Decree, a joint resolution was adopted, coming into effect on 2 May 2007 (the "Urea Resolution").[129] Pequiven was consulted by the Respondent during the drafting process of the Urea Decree and the Urea Resolution.[130]

5.48    The Urea Resolution established the maximum price at which urea manufacturers could sell urea to Pequiven.  It authorised Pequiven to purchase from any manufacturer in Venezuela the necessary quantities of urea to satisfy national demand.[131]  In addition, urea manufacturers in Venezuela had to inform the relevant ministry of the Respondent as to the amount of urea produced by them, together with the percentages of urea product destined for domestic and international consumption.[132]

5.49    At this time, as was well known to the Claimants and the Respondent, only Pequiven and FertiNitro produced urea in Venezuela.[133]  Therefore, apart from Pequiven's production facilities, "El Tablazo" and "Morón", which had encountered difficulties since 2004, the Urea Decree and Urea Resolution, in practice applied only to the FertiNitro Plant (Pequiven being 100% owned by the Respondent).

5.50    Pursuant to the Urea Decree and Urea Resolution, FertiNitro was required to sell urea to Pequiven at below production costs and below the price specified in the Offtake Agreement.[134]  After the devaluation of the Venezuelan Bolivar in 2010, the difference in value between the production price and the regulated price increased.

5.51    During that same period, Pequiven's other plant, El Tablazo, was exporting urea to other markets, including Ecuador, which could affect the levels of urea required from FertiNitro to meet the local urea demand.[135]   Mr Toro, the then Pequiven-appointed director,

---

[129] Joint Resolution by the Ministry of the People's Power for Agriculture and Land, the Ministry of the People's Power for Light Industry and Trade, and the Ministry of the People's Power for Energy and Petroleum (3 May 2007) ("Urea Resolution") (C-82).
[130] Resp. C-Mem., Paragraph 295; Cls. Reply, Paragraph 52.
[131] Urea Resolution (C-82), Art. 10.
[132] *Id.*, Art. 11.
[133] Cls. Mem., Paragraph 131; Resp. C-Mem., Paragraph 50; Barrientos WS1, Paragraphs 16, 23.
[134] FertiNitro March 2007 Monthly Report (13 April 2007) (C-86), p.13; FertiNitro January 2010 Monthly Report (25 February 2010) (C-87), p. 13; *See also* Cls. Mem., Paragraph 136.
[135] Parra WS1, Paragraph 66; Gwaltney WS1, Paragraph 104.

explained that urea was being exported because of "geopolitical reasons" and that those amounts were irrespective of those destined to the local market.[136]

5.52    *2008:* On 31 January 2008, Venezuela's Decree Law 5,835 became effective. In accordance with Article 4 of the Decree:

> *"All of the goods necessary to carry out the activities of production, manufacture, importing, gathering, transportation, distribution and sale of foods or products declared to be of first need or subject to price controls are hereby declared to be of, and are therefore subject to, public utility and societal interest.*
> *The National Executive shall, without other prior formality, initiate expropriation through decree for reasons of food security and sovereignty."*[137]

5.53    On 31 July 2008, the Law on Food Security and Sovereignty entered into effect.[138] Article 3 of the law provided that "[t]he goods that ensure the availability and timely access to foods of sufficient quality […] are declared to be of public interest and social welfare" and that "[w]hen there exist reasons related to food security, the Executive of the Nation may decree the mandatory acquisition in its entirety–with fair compensation and timely payment–of one of several goods needed to carry out projects or activities related to the production […] of foods."   In addition, Article 20 granted the Executive the power to, amongst other matters, "pass economic and financial measures that may be necessary for the implementation of national production plans."

5.54    *2009:* On 18 June 2009, the Organic Law for the Development of Petrochemical Activities dated 16 June 2009 came into effect (the "2009 Petrochemical Law").[139] Article 5 of this Law provides:

> *"The basic and intermediate petrochemical activity is reserved for the State, as well as the works, assets and facilities required for its operation. This reserve will be exercised directly by the National Executive or through companies of its exclusive ownership. It can also be exercised by the State through Mixed Companies in which*

---

[136] FertiNitro Board of Directors' Meeting Minutes No. 83 (30 July 2007) (C-88), p. 7.
[137] Decree 5,835 (28 January 2008) (R-23), Art. 4.
[138] Decree 6,071 (14 May 2008), Organic Law for Food Security and Sovereignty (R-27).
[139] Organic Law for the Development of Petrochemical Activities (16 June 2009) (C-8).

*it has decision control and a participation of not less than fifty percent (50%) of the capital stock.*

*Mixed Companies will be subject to the prior authorization of the National Assembly, to which effect the National Executive, acting through the Ministry of the People's Power competent for Energy and Oil Matters, will inform the National Assembly of the pertinent circumstances and conditions."*

5.55    On 15 July 2009, Mr C. Inciarte, President of FertiNitro and of Pequiven, informed the FertiNitro board of directors that, according to the official policy of the Respondent's Vice-Ministry of Petrochemistry (with which Pequiven agreed), the 2009 Petrochemical Law, and in particular its Article 5, would not apply to FertiNitro, because it was not to be applied retroactively by the Respondent.[140]

5.56    *2010:* On 10 October 2010, President Chavez appeared to sign Decree 7,713, in front of television cameras during his weekly television show called "*Alo Presidente*." ("Decree 7,713"; or the "Expropriation Decree").  As President Chavez signed the Expropriation Decree, he was recorded as stating (as translated into English):

*"Look, so as to accomplish the capable and effective carrying out of the national plans of seeding and production, formulated by the National Executive, and that are necessary for the execution of the work of the socialist agro-alimentary sovereignty plan… Approved, that it be expropriated and it pass to the property, to the nation's property."*[141]

5.57    This Expropriation Decree dated 10 October 2010, which was published in the Respondent's Official Gazette on 11 October 2010 over President Chavez's signature, provided (inter alia):[142]

*"Article 1. The mandatory acquisition of movable and real estate assets is ordered, including improvements, installations, facilities, industrial equipment, office and other assets, required or necessary for the production, processing, transportation and warehousing activities of fertilizers (urea and ammoniac) that are owned by, or in the possession of, the business companies Fertilizantes Nitrogenados de Oriente,*

---

[140] FertiNitro Board of Directors' Meeting Minutes No. 101 (15 July 2009) (C-72), p. 6 (SP), p. 15 (EN).
[141] VTV Broadcast transcript (11 October 2010) (R-33), p. 6.
[142] Decree 7,713 (dated 10 October 2010) ("Expropriation Decree") (C-9).

*S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. y [sic] Fertilizantes Nitrogenados de Venezuela C.E.C., or any other company or persons related, with the objective of achieving the absolute and effective realization of the national plans of sowing and production formulated by the National Executive, and that are necessary for the execution of the 'Socialist Plan for Agri-Food Sovereignty'*

*Article 2. The project 'Socialist Plan for Agri-Food Sovereignty' will be executed by Petroquímica de Venezuela, S.A. (PEQUIVEN), assigned to the People's Power Ministry for Energy and Petroleum, as the expropriation entity, or the subsidiary that the entity appoints.*

*Article 3. The expropriated goods will be transferred free of encumbrances or limitations to the Venezuelan State by means of the company Petroquímica de Venezuela, S.A.(PEQUIVEN), as the expropriation entity, or the subsidiary that the entity appoints, in accordance to what is stipulated in Article 11 of the Expropriation Law for Public or Social Benefit.*

*Article 4. In compliance to what is stipulated in article 12 of the Expropriation Law for Public or Social Benefit the company Petroquímica de Venezuela S.A. (PEQUIVEN) is hereby authorized to carry out the necessary steps for the acquisition of real estate and other assets as stipulated in article 1 of the present Law, subrogating its position in all rights and obligations that correspond to the Bolivarian Republic of Venezuela on such matters.*

*Article 5. Petroquímica de Venezuela, S.A. (PEQUIVEN) will initiate and carry out the expropriation process as stipulated in the Expropriation Law for Public or Social Benefit until total and definite transfer of the ownership of the properties indicated in article 1 of the present Law takes place.*

*Article 6. In compliance with stipulations of article 3 of the Decree with Rank, Value and Force of the Organic Law for Security and Agri-food Sovereignty, the occupancy of the assets indicated in article 1 of the present Law by the company Petroquímica de Venezuela, S.A.–(PEQUIVEN) is ordered with the objective of placing these into operation, administration and capitalization.*

*[...]*

*Article 8. The Minister of the People's Power for Energy and Oil is appointed for the execution of the present Decree"*[143]

5.58   There is disagreement between the Parties on whether any notice was provided to the Claimants (or to KOMSA) of the Expropriation Decree.  The Claimants contend that no advance notice of the Expropriation Decree was given by the Respondent.[144]   The Respondent contends, in turn, "Venezuela provided both constructive and actual notice that FertiNitro could be subject to a mandatory acquisition" through a series of actions starting as early as 2005.[145]

5.59   On 11 October 2010, the day following the televised signing of the Expropriation Decree by President Chavez, the Respondent's Minister of Energy and Oil (Mr Rafael Ramírez) travelled in person to the FertiNitro Plant.  He there made the following statement during an interview by journalists broadcast on public television, directed also to employees of FertiNitro, Pequiven and PDVSA assembled at the Plant.  This public address merits citing almost in full (as translated into English), with paragraph numbers here added for ease of later reference:[146]

> *"[1]… [Minister Rafael Ramirez unrecorded] …mandate of our laws, of our government, of our revolution, because this is a fundamental plant for agricultural development of our country, our food sovereignty, this is a plant with which we have been meeting with for a long time, without any success whatsoever, to try to have them adapt to our needs in the national development plan.  So that we may see the importance that this company [i.e. FertiNitro]*[147] *has in the national agricultural system … well, first is to announce that at a national level we produce 380,000 tons per year of fertilizers, and urea in particular. But this sole plant produces 1,500,000 tons per year of urea. This is a very large plant, the largest we have in the country.*

---

[143] Article 11 of the Expropriation Law (cited in the Expropriation Decree) relates to "Releases of encumbrances on expropriated property" and Art. 12 to the Right of Subrogation. *See* Expropriation Law (1 July 2002) (R-53).

[144] Gwaltney WS1, Paragraph 120; Cls. Mem., Paragraph 163; Cls. Reply, Paragraph 90.

[145] Resp. C-Mem., Paragraph 168ff.

[146] English translation of VTV Broadcast transcript of the Spanish language interview of Minister Ramírez (11 October 2010) (R-33 & C-107). This English translation cited above is taken from the Respondent's translation in R-33. It was not agreed by the Claimants who submitted their own English translation (C-107). *See also* Video file in mp4 format "Minister Ramirez Heads Takeover of FertiNitro" (11 October 2010) (C-139).

[147] The Tribunal's interpretation is here added in square brackets, as also the insertions in square brackets below.

*[2] Ok now, this is a plant that, receiving gas produced by the Venezuelan State at as subsidized price, that is to say, between 0.5 and 1.5 dollars per MMBTU, one must consider that outside the country gas is now selling for between 3 and 12 dollars per MMBTU. Notwithstanding this subsidized price, it is impossible that this plant, in which Pequiven had a minority interest, would not adjust to the fertilizer supply requirements for national development.*

*[3] We currently have a consumption of 600,000 tons of urea, but we are in now in our development plans, the total seeding plan designed by the national government, to cover up to 5 million hectares. We are setting a requirement of more than 1.3 million tons. With the control of this plant that the Venezuelan state will be taking [i.e. the FertiNitro Plant], we now have guaranteed all of the urea that our farm workers may need, all of the urea that our producing sector may need, to sustain this extraordinary seeding plan and to sustain national development.*

*[4] On another topic, this plant, which had a group of private shareholders, we had serious problems with sales. Being a fertilizer produced with Venezuelan gas, well, we had a limit where we could only acquire up to 10% of its production for the domestic market.  And, when they sold it to us, they sold it at a price that was 2.5 to 3 times in excess of the price at which Pequiven sells its fertilizers. [These appear to be references to the Offtake Agreement].*

*[5] Such that, we are here very satisfied, because we know that this step is a step closer toward our sovereignty.  We are with the workers, who are the fundamental actors of this process and, of course, paying attention to the guidelines of Commandant Chavez, of President Chavez, in the deepening of our Bolivarian revolution."*

*[…]*

*[6] Well, here we have a plant of about 400 workers. Of course, the private parties were using an outsourcing model. We are going to eliminate the outsourcing and enter upon a process of worker action – regularize all of the relationships with our workers – because socialism is about an economic system where the base, the relationship, the production relationships have to be within the framework of the ethics of socialism. It can't be; we can't have workers here that are being exploited by trans-national companies while they are the ones making the profits outside the country. [These appear to be references (inter alia) to FertiNitro's foreign shareholders, including KOMSA].*

*[7] So then, now a process is beginning, of course, a legal proceeding; all of the mechanisms are being initiated to complete the legal steps for expropriation. But we*

*are here with our workers, workers from Pequiven, workers from FertiNitro, and workers from PDVSA, already in control of the plant and making inspections of the installations because, of course, we have to guarantee that all of the assets are preserved, which from here on out belong to the Republic.*

*[8] Newsperson: The benefits of the countries of ALBA, which FertiNitro will have also? Minister Rafael Ramirez: Well, look. First of all, with this we guarantee our supply to the internal market. And later, we will have the control of sales. Up to this moment, the trans-national that operated here was the one that managed the volumes quoted, in accordance with its own criteria, according to its commercial policy. We, as you all know, in the heart of ALBA in Latin America and in our own domestic market, we have a different view. We have available people and natural resources, such as natural gas, which is the one used in this case, to convert it into inputs for the manufacturing process. In this sense, this plant will allow us to ensure that our policy is carried out in the future. [These appear to be references (inter alia) to the Offtake Agreement].*

*[9] Newsperson: (Unintelligible). Minister Rafael Ramirez: Well, yes, we are first taking here. We are guaranteeing ... take note that a plant stoppage has been started right now, at the beginning of their work. For that reason, there is a lot of movement... because we are always tending to the maintenance of our installations in optimum condition.*

*[10] Newsperson: What will be the impact of the nationalization of FertiNitro on the people? Minister Rafael Ramirez: Well, very positive, because it will now allow us to have available the volumes of fertilizers that we may need of urea at national prices. Note that Pequiven sells the 50 kilo sack of urea at 19 Bolivars, and here FertiNitro used to sell it to us at 50 Bolivars. That is to say, a difference of more than 2.5 times. Now we will have available the price that is regulated by the state, of 19.5, and we will be able to have available all of the urea that the domestic market may require. In that sense, between this operation and the nationalization of AgroIsleña, now AgroPatria, we are going to have the entire chain to be able to supply our farm working sector, over there in the Andes so that they may produce coffee, there in the plains so they may produce corn, so that they may produce sorghum. That is to say, all that we have seen is a fundamental element for us to be able to transcend the oil-producing model, and it is a fundamental model for guaranteeing the security and the feeding of our people. In the measure that we have the inputs for the entire chain controlled by the state, such that it guarantees that no speculation will take place with them, that is to say, with the fertilizers, the chemicals, the agro-chemicals, our people we be able to continue to have food available, there will be more work the*

*fields and, our people, across the socialist distribution network, we will then be able to have secure food at low prices, in abundance for all of our country. [Again, these appear to be references (inter alia) to the Offtake Agreement].*

*[11] Newsperson: What steps for our national sovereignty? Minister Rafael Ramirez: That's right, I also want to underscore and thank the unwavering support of workers, the support of our FUTEC, which is the confederation of our workers, Socialist Workers Vanguard, all of the peoples' organizations, the worker organizations that from, just yesterday, when the president made the announcements, are here safeguarding these installations, here at FertiNitro, as well as concurrently, our workers are in the State of Carabobo, guaranteeing, safeguarding the installations of Industria Venoco, which has also been nationalized by the revolution. Both steps are very important, because it is a sector in which we have to guarantee sovereignty. In the case of Venoco, we are dealing with a sector fundamental for production of chemicals, lubricants, greases, needed by the electrical and the industrial sectors, where the same situation was being repeated. It being PDVSA, being the State, which supplies the raw materials; well, there is a sale policy that, in a clear way, was impeding the plans to make available the natural resources for service to the people.*

*[12] Newsperson: How many people? Minister Rafael Ramirez: In FertiNitro, 400 persons. In Venoco we have about 360 persons. Yes, FertiNitro, FertiNitro. In ... national they have about [4]50 persons, that's more or less the number, which is the largest concentration of persons.*
*[...]*
*[13] These are very important actions, because these companies, as you well know, were companies and businesses that were remnants of the prior republic. They were companies and businesses of trans-national and national capital that were taking advantage of the supply of raw materials, cheaply, of the Venezuelan state, and of PDVSA in this plant, in particular.*

*[14] And I want to salute all of the workers and their political organizations. I want to salute the workers of FUTEC. I want to salute the workers of the Socialist Workers' Vanguard. I want to salute all of our workers who, as of just yesterday, came here to secure and guarantee the operations of, and the integrity of these assets that, today, belong to the Venezuelan state. We know that we can always count on the petroleum workers, we can always count on the petrochemical workers, we can count on the working class, we can count on the workers, the engineers, the technicians that make it all possible, that from day to day, we get our energy inputs. You all know that we have waged the battle for full petroleum sovereignty; that battle, that the Bolivarian*

88

*government has advanced and consolidated. And today, with Chavez, we can say that we are sovereign in the management of our petroleum resources.*

*[15] Now we are on the offensive to deepen food sovereignty. Only a few days ago, Commandant Chavez announced the nationalization of the AgroIsleña company, today the AgroPatria company. It is a company that allows us to provide for our farm workers, for our people, the agricultural inputs produced in the country and that the private parties held as a speculative tool, bringing poverty to the fields. This is now under the control of the State.*

*[16] Yesterday, the nationalization of FertiNitro was announced. So that we can see the importance of this plant we, with our petrochemical industry - Pequiven - produce at a national level two hundred, three hundred eighty thousand tons/year of urea that, as you all know, is fundamental for food production. This sole plant- FertiNitro - produces, on its own, 1,500,000 tons/year of urea. That is to say, five times more than what is produced in all of the plants nation-wide.*

*[17] But what was the problem? That this plant being, this plant [i.e. the FertiNitro Plant] receives gas produced by Petróleos de Venezuela, gas belonging to all Venezuelans. We sell it to them at a subsidized price, between 0.5 and 1.5 dollars per ton, per MMBTU. One has to consider, that in the world gas sells for 3 and has even gotten as high as 12 dollars per MMBTU. Here there is a subsidized price, 12 times less than it is sold for outside the country. But then these gentlemen, these private capitalists, foreign and national, produce urea fertilizer with that gas in large quantities and the majority of it is exported. That is to say, it doesn't come to supply national needs. [These appear to be references (inter alia) to FertiNitro's foreign shareholders, including KOMSA, and to KNI and the Offtake Agreement].*

*[18] It has cost us a lot to get these gentlemen to sell some fertilizer to the country. And after many discussions, we were able to secure that they would sell us only 10% of their production. And do you know at what price they would sell it to us? At triple the price at which Pequiven sells fertilizer in the national market. Such that, all of the fertilizer that was produced was at the disposal of the marketing companies, in this case a North American company, Koch, which would grab all of our fertilizer and sell it outside the country at speculative prices. [These appears to be references (inter alia) to KNI and the Offtake Agreement].*

*[19] With this nationalization action, we are guaranteeing, in the first instance, that all of the fertilizer that our farm workers may need, all of the fertilizer that our national seeding plan may need, all of the fertilizer that we may need to produce food*

89

*for our people, will be abundant, cheap and secure for all of our people. That is, that would be, the only reason.*

*[20] This is what Commandant Chavez has indicated - These large industrial installations located in national territory, which exploit the workers, which speculate with our own resources, should pass into the hands of the Venezuelan state. They should pass into the hands of the people. With the acquisition, with the nationalization of this plant, what we are doing is strengthening our nation's property, the property of all the men and women that live in the national territory. But in addition, and most importantly, the control of a plant like this one, FertiNitro, will enable us to guarantee the National Seeding Plan and the food sovereignty of the country. It will guarantee that the gas produced by our workers over there in PDVSA Gas, that they produce in Anaco with so much effort and what it has cost us to have controlled our oil & gas industry, may then be converted into fertilizer to benefit our people, so that our men, women and children may have a secure food supply.*

*[21] Also, in the same way that we are gathered here today in the State of Anzoátegui, in the Jose Antonio Anzoátegui complex, our fellow workers are in the State of Carabobo securing the nationalized installations of the Venoco company...*

*[22] Finally, I want to say in the name of our President, to guarantee to our workers, that all of the despicable capitalist practices, like the outsourcing and exploitation of workers, will end at this company. There can be no outsourcing whatsoever. There can be no exploitation whatsoever of our workers.*

*[23] We are going to build socialism... we are going to build socialism and in this sense, the Venezuelan state and the working class have an extraordinary role to play. Fellow workers, the future is yours. For you we are building socialism, for the men and women working every day in our national industries, in order to be able to guarantee to our people, to our communities, the communities that live near all of our industrial complexes, the communities of Viñedo, the communities of Barcelona, the communities of Puerto Espirito, that all of the Venezuelan people will receive the benefits that the Venezuelan state and its workers control, then, as important a company as this one that we are controlling - FertiNitro. Companions, workers, the call is to deepen the combat, to continue deepening our revolution, and, under the guidance and orientation of Commandant Chavez, we are sure that we are going to prevail. Country, Socialism or Death! We shall conquer! Thank you, companions."*

5.60    The Tribunal finds the following facts established by the events of 10 and 11 October 2010, as recorded above. First, the Minister's visit to and address at the FertiNitro Plant took place in the context of the Expropriation Decree, particularly Article 1 on the "mandatory acquisition of movable and real estate assets"[148] of FertiNitro and Article 6 on the "occupancy" of FertiNitro's assets. Under Article 8 of the Decree, the Minister was responsible for its execution; and the Minister referred expressly to President Chavez's "announcements" of 10 October 2010: see paragraphs [11] and [16] above. Second, pursuant to the Expropriation Decree, the Minister was carrying out or confirming the Respondent's "control" of the FertiNitro Plant: see paragraphs [3], [7], [20] and [23] above. Third, that control, in the Minister's words, derived from FertiNitro's "nationalisation" and "expropriation" by the Respondent under the Expropriation Decree: see paragraphs [7], [10], [16] and [20] above. Fourth, that control necessarily extended beyond the physical and other assets of the FertiNitro Plant to include the abrogation of any existing contractual restrictions on FertiNitro's product being sold otherwise than for the domestic Venezuelan market, or as the Respondent might otherwise decide: see paragraphs [3], [4], [8], [10], [17], [18] and [19]. The Expropriation Decree itself said nothing expressly in regard to the abrogation of FertiNitro's existing contracts; but its effect, read with the Minister's address, leave no room for doubting the Respondent's intentions towards the Offtake Agreement. Fifth, as one motive for the Expropriation Decree, the Minister referred in derogatory terms to "trans-national" companies and "foreign" capitalists: see paragraphs [6], [8], [13 and [17] above.   Last, but not least, the Minister was careful to describe the Respondent's actions within the framework of Venezuelan law: see his reference to "legal proceeding" and "legal steps for expropriation" in paragraph [7] above.

5.61    According to the Respondent, there was no physical occupation of the Plant at that point by Pequiven's employees or others.   Instead, Mr Ramirez, as the responsible Minister "[took] control of the plant and was inspecting the installations in order to guarantee that

---

[148] *See* Expropriation Decree (C-9), Art. 1: "*Se ordena la adquisición forzosa de los bienes muebles e inmuebles, incluyendo bienhechurías, instalaciones, plantas, equipos industriales, de oficina y demás activos, requeridos o necesarios para la actividad de producción, procesamiento, transporte y almacenamiento de fertilizantes […]*"

all of FertiNitro's assets had been secured."[149]   The Tribunal does not consider this description to be factually complete.  By this time, the FertiNitro Plant was occupied by persons answerable to the Respondent (as distinct from FertiNitro) and whose conduct in seizing and physically controlling the FertiNitro Plant was approved and ratified by the Minister for the Respondent, as evidenced by the terms of his public address on 11 October 2010 and the Expropriation Decree cited above.

5.62   *2011:* On 26 July 2011, Pequiven (represented by Mr Barrientos) applied for orders to "request the expropriation of the asset" [of FertiNitro] (in the Spanish text of the application: "*solicitar la expropiación de los bienes*") to the Second Circuit of First Instance of Civil, Commercial, Agrarian and Transit Law of the Judicial Circuit of the Anzoátegui State.[150]   As explained by the Respondent's counsel at the Third (June) Hearing, Pequiven thereby sought orders regarding (*inter alia*) the appointment of an *ad hoc* (temporary) board of trustees to run FertiNitro with legal power of control of all aspects of its business.[151]

5.63   As regards its authority to request such orders from the Anzoátegui Court, Pequiven's application read as follows:[152]

> "By virtue of the Expropriation Decree [...] PEQUIVEN is authorized to make the necessary arrangements for the acquisition of the movable and immovable property of FERTINITRO, being granted all rights and obligations pertaining to the Bolivarian Republic of Venezuela for such purposes. PEQUIVEN is also authorized to initiate and execute the expropriation proceedings under the Expropriation Law for Public Benefit or Social Interest, published in the Official Gazette of the Bolivarian Republic of Venezuela No. 37,475 on July 1, 2002 (hereinafter "Expropriation Law") until full and final transfer of ownership of the property listed therein to the Bolivarian Republic of Venezuela, through PEQUIVEN or a designated subsidiary thereof."

---

[149] Resp. Rej., Paragraph 158.
[150] Petition for Expropriation and Provisional Relief to the Court of First Instance of the Civil, Commercial, Agrarian and Transit Law of the Judicial Circuit of the Anzoátegui State (26 July 2011).  Each Party provided their own translation under R-36 and C-141 (the "Expropriation Petition").
[151] Third (June) Hearing, D1.157.13-16.
[152] *See* Expropriation Petition (C-141), p. 84.

5.64    On 29 July and 8, 9 and 10 August 2011, as requested by Pequiven, orders were made by the Anzoátegui Court pursuant to Article 6 of the Expropriation Decree, with Pequiven treated as the expropriating body under the Decree.[153]   These court orders overrode the existing governance by-laws of FertiNitro under Venezuelan law.[154]   However, much earlier as a matter of fact, these by-laws were no longer being applied within or to FertiNitro.

*(v)    Other Events Following the Expropriation Decree*

5.65    *2010*: According to the Respondent, at the time of the Expropriation Decree (dated 10 October 2010), KOMSA's personnel at FertiNitro were no longer fulfilling their tasks.[155]   The control exercised by FertiNitro's board of directors had ceased, as Pequiven "was given control of the operations, management and capitalization of FertiNitro."[156]

5.66    No meetings of FertiNitro's board of directors or committee meetings were convened subsequent to the Expropriation Decree.[157]   On 9 November 2010, the FertiNitro directors appointed by KOMSA formally resigned from their positions.[158]   The FertiNitro-appointed directors by Polar formally resigned a few days later, on 22 November 2010.[159]

5.67    On 26 November 2010, Mr Flores (of FertiNitro) sent a letter to Mr Strand (for KNI), stating:

> *"As per our conversation this afternoon, FertiNitro confirms the continuing of the Offtake Agreement under the fulfil of each clause such as: price, allocations of products, assignments of markets, and all the other clauses related in that agreement.*

---

[153] Judicial Records before Second Circuit of First Instance of Civil, Commercial, Agrarian and Transit Law of the Judicial Circuit of the Anzoátegui State, Resolutions of 8, 9, 10 August 2010 (C-141), pp. 38ff (SP), pp. 116 ff (EN).
[154] Judicial Records before Second Circuit of First Instance of Civil, Commercial, Agrarian and Transit Law of the Judicial Circuit of the Anzoátegui State, Resolutions of 8, 9, 10 August 2010 (C-141), pp. 24, 52-55 (SP), pp. 122, 130-133 (EN).
[155] Resp. C-Mem., Paragraph 69, Resp. Rej., Paragraph 159; Villarroel WS1, Paragraph 27.
[156] Resp. Rej., Paragraph 159.
[157] Parra WS1, Paragraph 73; Cls. Mem., Paragraph 167.
[158] Koch Resignation Letters (9 November 2010) (C-109).
[159] Polar Resignations Letters (22 November 2010) (C-110).

> *Based on, that FertiNitro will send the FNSTOCK before the workday end in order to each Offtaker can see the volumes available in December".[160]*

5.68    On 1 December 2010, Mr Jorge Perdomo, the General Manager of FertiNitro sent a letter to Mr Strand (for KNI) as follows:

> *"After the announcement of Venezuelan government about FertiNitro nationalizing. FertiNitro hereby confirms the continuing and fulfilling of the Offtake Agreement made and entered on April 8, 1998 […]*
>
> *Based on the current start up of the plants, FertiNitro has sent the December and January allocation of products to each Offtakers and it is expected to comply fifty percent (50%) of the actual total plants output, such as it is stipulated in the agreement.  Please note that total volume for Koch in December is as follow:*
> *Ammonia: 23.000MT +/- 10%*
> *Urea: 34.345 MT +/- 10%*
> *Please let us know your December program in order to FertiNitro can make all the necessary arrangement with authorities as customs, export permissions, etc."[161]*

5.69    On 3 December 2010, Mr Gwaltney (for KNI) sent an email message to Mr Perdomo (of FertiNitro) replying as follows:

> *"I am in receipt of your letter of December 1, 2010 to Jacob Strand of KNI acknowledging the nationalization of FertiNitro and KNI has authorized me to respond on their behalf. As you are aware, the government's recent action constitutes an expropriation of KNI's, and its affiliates, interests in FertiNitro including, but not limited to, the Offtake Agreement.*
>
> *Mr. Francisco Garcia recently informed me that he has been appointed by Pequiven to lead a commercial team to negotiate and compensate KNI and FertiNitro's shareholders for the expropriation. I also understand that Pequiven has confirmed they have taken the offtake in its entirety, as part of the expropriation, and that they will compensate KNI for that. I further understand that Pequiven has requested that KNI purchase product under terms and conditions similar with the Offtake Agreement for a limited period of time while Pequiven negotiates with the lenders so as to ensure steady cash flow, in large part, for the benefit of the lenders. While we are still analyzing the full impact and ramifications of the government's actions, we*

---

[160] Email from E. Flores to J. Strand re: Offtake Agreement FertiNitro (26 November 2010) (C-111).
[161] Letter from J. Perdomo to J. Strand (1 December 2010) (C-112).

94

*understand both Pequiven and FertiNitro's desire to continue a commercial relationship with KNI despite having expropriated its and its affiliates' property.*

*Given this, and on the understanding that Pequiven intends to compensate KNI, and its affiliates, in a manner to which they are entitled for the expropriation of their property under international law, for limited period of time until further notice, KNI agrees to purchase product under terms consistent with the Offtake Agreement. Payment for product shall be to the same historical bank accounts. It is also KNI's expectation that FertiNitro will conduct its business affairs consistent with any and all lending obligations and in full compliance with all relevant laws.*

*This communication and KNI's action in agreeing to purchase product from FertiNitro is on strictly without prejudice basis. KNI and its affiliates, hereby expressly reserve any and all rights that may exist including under the Offtake Agreement, resulting from, or in any way associated with, governmental actions including, but not limited to, rights under any domestic or international laws."*[162]

5.70    *2011:* From December 2010 onwards, Pequiven entered into agreements with the FertiNitro project's bankers and bondholders to settle the debts of FertiNitro. This exercise was apparently completed by January 2012.[163]

5.71    During 2011, representatives of Pequiven and of the other FertiNitro shareholders met on various occasions to discuss the amount of compensation due to these other shareholders (including KOMSA) from the Respondent. Such meetings were held on 16 February 2011 in New York;[164] 6 April and 23 May 2011 in Caracas and 1 September 2011 in Miami.[165] A crucial issue between Pequiven and these shareholders was the study of and methodology for FertiNitro's valuation.

5.72    The negotiations between Pequiven and the FertiNitro shareholders eventually resulted in amicable settlement agreements with LAIF (as a 10% shareholder). Snamprogetti (as a 20% shareholder and EPC Contractor) also reached an inchoate agreement with

---

[162] Email from B. Gwaltney to J. Perdomo, copying J. Strand, M. Parra, F. Garcia re: KNI Offtake (3 December 2010) (C-113).
[163] Barrientos WS1, Paragraph 44.
[164] *See* Letter from Betulio Hernandez, Executive Director, Pequiven, to Shareholders (28 February 2011) (R-35).
[165] Gwaltney WS2, Paragraph 39; Barrientos WS1, Paragraphs 35-37; Second Statement of Witness Víctor Daniel Barrientos Casanova (30 December 2013) ("Barrientos WS2"), Paragraphs 37ff.

Pequiven.[166]  It seems that there was no concluded agreement with Polar.  No agreement was made with KOMSA, still less KNI which was not separately privy to these negotiations.

5.73    On 28 June 2011, *i.e.* before the final meeting in September 2011, the Claimants filed their Request for Arbitration before ICSID.

5.74    As already noted above, on 26 July 2011, Pequiven filed a Petition to the Court of First Instance of the Judicial Circuit of Anzoátegui in order to carry out the mandatory acquisition and requesting that a temporary *Ad Hoc* Board of Temporary Judicial Administrators be established to govern FertiNitro, further to the Venezuelan law on domestic expropriation procedure.[167]   Shortly thereafter, the Court designated the requested *Ad Hoc* Board.[168]   On 29 July 2011, the Court of First Instance of the Judicial Circuit of Anzoátegui issued a decision accepting jurisdiction to hear the Request for Mandatory Acquisition.[169]   Thereafter, these legal proceedings continued and, apparently, still continue, without payment of any compensation to the Claimants under the Expropriation Decree.

5.75    In the summer of 2011, during their negotiations, Pequiven presented to FertiNitro's shareholders (including KOMSA) valuation reports prepared by financial consultants called Advantis (also mistakenly called in the evidence "Adventis").  Advantis had been created by former officers of Booz Allen in Venezuela.[170]   There were two written reports of May and July 2011, both dated "September 2010."[171]   That was not the date of the

---

[166] Barrientos WS2, Paragraph 41; Resp. Rej., Paragraph 151.

[167] Expropriation Petition (R-36).

[168] Provisional Measures of the Court of First Instance of the Judicial Circuit of Anzoátegui (11 August 2011) (R-37) (C-141).

[169] Court of First Instance of the Judicial Circuit of Anzoategui, Decision accepting jurisdiction to hear the Request for Mandatory Acquisition (29 July 2011) (R-63).  Thereafter, on 28 November 2013, the Court of First Instance, "received the certificate of encumbrances from the Records Office"; and on 12 December 2013, "the judge issued the Edict ordering its publication in two major newspapers pursuant to the Expropriation Law." *See* Records Office, Certificate of Encumbrances and Liens (28 November 2013) (R-70); and Edicts issued by the Court of First Instances of the Judicial Circuit of Anzoátegui (13 December 2013) (R-72). Subsequently KOMSA was to make an appearance in court and then a valuation committee would be established *See* Resp. Rej., Paragraph 152.

[170] Second (November) Hearing D.6. 193 (Flores).

[171] Advantis Valuation Report of FertiNitro (July 2011) (C-157); Advantis Valuation Report of FertiNitro (May 2011) (R-86).

documents' production, but rather (presumably) the end-date of the calculations made by Advantis. Advantis were independent consultants retained by Pequiven to value FertiNitro in their negotiations with (inter alios) KOMSA. Advantis was not advising or howsoever acting for the Claimants. Their reports were not "joint reports;" nor were their valuations ever accepted as correct by KOMSA or (so it appears) by the Respondent itself. Neither valuation was professed by Pequiven as a firm offer by the Respondent capable of acceptance by KOMSA, without further negotiations. Moreover, Pequiven had indicated to the shareholders that it did not have the authority nor the funds - to conclude by itself - any agreement for the Respondent.[172]

5.76   The circumstances whereby these two reports were transmitted to KOMSA in 2011 remain unclear on the evidence adduced in this arbitration. As to the first Advantis report of May 2011 entitled "Valoracíon de FertiNitro", it appears from contemporary email messages dated 18 and 19 May 2011 that it was sent by Advantis to Pequiven and by Pequiven to KOMSA as a shareholder in FertiNitro, [173] presumably for the meeting that took place between their representatives on 23 May 2011 in Caracas.[174] Mr Gwaltney (for KOMSA) sent a letter of 19 May 2011 to Pequiven criticising this first Advantis valuation.[175] As to the second Advantis report of July 2011 also entitled "Valoracíon de FertiNitro", the Claimants accept that, as with the first report, it was transmitted by Pequiven to KOMSA as a shareholder in FertiNitro.[176]

5.77   Mr Barrientos (of Pequiven) explained the background to these Advantis reports in his oral testimony at the First (September) Hearing:[177]

   *"At the first meeting that we had in February 2011, one of the requests that Pequiven tabled was that, working together with the expropriated shareholders, that we would*

---

[172] Gwaltney WS2, Paragraph 41.
[173] *See* email of 18 May 2011, from Ignacio Pulido of Advantis (Director), to Francisco Garcia of Pequiven, presumably transmitting the First Advantis Report to Pequiven ("18 May 2011 email"); and email of 19 May 2011 from Francisco Garcia to representatives of the Fertinitro shareholders, including M. Parra and G. Waltney of KOMSA/KNI, V. Barrientos and Jorge Luis Perdomo of Pequiven, R. Biondi of Snamprogetti and O. Grossman of Polar, transmitting the Reports from Pequiven to the other shareholders (R-86), p. 2.
[174] 18 May 2011 email (R-86), *see also supra* Paragraph 5.71.
[175] Gwaltney WS2, Paragraph 40.
[176] Third (June) Hearing, D2. 103-104.
[177] First (September) Hearing, D3. 83ff.

97

*hire a third party to come in and give us an evaluation of the company, and then on that basis, establish compensation. But none of the expropriated shareholders accepted that proposal and that is why Pequiven on its own hired a third party to do the evaluation […] Adventis is a company that has provided services to a variety of mixed companies in valuation for Pequiven, in other areas as well, it is a well recognised firm, and of course this is something that we have taken very seriously. It was something that was enshrined in a Government decree. We [Pequiven] were designated as the expropriating entity and we were taking this very seriously. We hired Adventis, we were trying to reach a consensus with the expropriated shareholders in order to get them involved in selecting a single valuation expert and since they didn't agree with this we felt free to go out and work with the company that we felt was the most qualified to do this job, and that was Adventis. It has considerable credentials which give it trustworthiness for this type of valuation and that's why we decided to work with them. […] as part of the negotiation team I met with them, along with the rest of the group […] I can tell you that Adventis is a well recognised company and I don't think they would have jeopardised their reputation by getting involved in that type of valuation."*

The witness had been asked whether Advantis had been instructed by Pequiven "to make the valuation as low as possible."[178]

5.78   The Tribunal returns to the content of these two Advantis Reports later in Part IX of this Award.  For present purposes, it suffices to record that the first report valued FertiNitro at US$ 398 million as at 30 September 2010[179]  (thereby valuing KOMSA's 25% interest at US$ 99.5 million); and the second report valued FertiNitro at US$ 452 million as at 30 September 2010 under a first scenario;[180] that report also contained an alternative scenario which contained elements which increased and others which decreased the value of Fertinitro with a total value of US$ 561million (thereby valuing KOMSA's 25% interest at US$ 113 million under the first scenario and US$ 140.25 million under the second).[181] Both reports used a DCF methodology.

---

[178] The insertion in square brackets is here made by the Tribunal.
[179] Advantis Valuation Report of FertiNitro (May 2011) (R-86), p.11.
[180] Advantis Valuation Report of FertiNitro (July 2011); (C-157), p.3.
[181] Advantis Valuation Report of FertiNitro (July 2011) (C-157), p. 5.

5.79   *2012:* By January 2012, as already indicated, FertiNitro had satisfied the debts owed to its bondholders and banks.  As confirmed by the Respondent's counsel at the Third (June) Hearing:

> *"In December 2011, FertiNitro satisfied its obligations with respect to the bond-holders and the banks. At that point, once those obligations were satisfied, there was no longer a commercial requirement to have the offtake agreement in place. As part of its obligation to operate for the commercial purpose of FertiNitro, the ad hoc board of trustees took the decision that by getting rid of the offtake agreement, it would have the opportunity to pursue more lucrative sales agreements with other customers; or, to the extent necessary, to use production to satisfy domestic demand."[182]*

5.80   On 28 February 2012, the President of the *ad hoc* board of trustees of FertiNitro sent a letter to KOMSA and KNI, for the attention of Mr Gwaltney and Mr Parra, stating (inter alia):

> *"I hereby notify you that, in accordance with the Resolution issued by the Board of Temporary Ad-Hoc Trustees of Fertilizantes Nitrogenados de Venezuela, FertiNitro, C.E.C., ("FertiNitro"), as is evidenced by appointment effected by Decrees handed down by [the Anzoátegui Court] […]; effective from the date of this communication, FertiNitro shall not sell any more nitrogen fertilizers (urea and ammonia) to Koch Oil, S.A. under the marketing agreement entered into between Petroquímica de Venezuela S.A., International Petrochemical Sales Limited, Koch Oil S.A., and Fertilizantes Nitrogenados de Venezuela, C.E.C. on April 8, 1998; all of which is in fulfilment of what is established in Decree 7,713 published in Official Gazette of the Bolivarian Republic of Venezuela No. 39,528 of October 11, 2010, which orders the compulsory acquisition of movable and immovable property […]"[183]*

5.81   The Parties disagree as to the nature of the sales transactions of ammonia and urea from FertiNitro to KNI made from the date of the Expropriation Decree (dated 10 October 2010) to the issuance of FertiNitro's letter above (28 February 2012).

---

[182] Third (June) Hearing, D1. 167.5-15.
[183] Letter from Mr Betulio Hernández (of FertiNitro) to Koch Oil SA and Koch Nitrogen Company re: Offtake Agreement (28 February 2012) (C-114). This letter is quoted more fully in Part 4 above.

5.82   According to the Respondent, all of FertiNitro's ammonia and urea was sold pursuant to the Offtake Agreement; and that, until February 2012, FertiNitro continued "[complying] with the percentages permitted under the Offtake Agreement to supply the domestic market."[184] It was only after February 2012 that the percentage allocated to the domestic market increased substantially to fulfil the Respondent's needs.[185] Similarly, "KNI and Pequiven received their share of urea and ammonia, at the same discounted price."[186] In addition, Mr Barrientos (as the Project Manager and General Manager of Pequiven) testified that, after Decree 7,713 was issued, FertiNitro entered into a Stand Still Agreement with its banks and bondholders which provided for the further continuation of the Offtake Agreement; and that it was only terminated later for commercial reasons.[187]

5.83   The Tribunal notes that this Stand Still Agreement was apparently made in December 2010 by Pequiven for FertiNitro.  It was not adduced in evidence by the Respondent in this arbitration. The Claimants were not parties to this Stand Still Agreement.  There is no evidence that its terms were known at the time by KNI, save as Pequiven chose to describe its effect to the Claimants.

5.84   In response to the Respondent's case, the Claimants allege that the "post expropriation product purchases made by KNI from FertiNitro were made pursuant to a new *ad hoc* arrangement".[188]  They claim that "after the expropriation, the bondholders and creditors continued to look to the product purchases and the revenues they generated, continued to have power, through the trustee, over the Offshore Accounts, and could have exercised remedies, including assuming control of the plant in the event [of default]."[189]

5.85   The Tribunal finds, on the limited evidence adduced in this arbitration, that the Respondent's conduct was ambiguous, being dependent upon different perspectives. Even from Pequiven's own perspective, as Mr Barrientos acknowledged in his testimony:

---

[184] Resp. C-Mem., Paragraphs 15, 84.
[185] Resp. Rej., Paragraph 125.
[186] Resp. Rej., Paragraph 126.
[187] Barrientos WS1, Paragraph 43.
[188] Cls. Reply, Paragraph 17, 92.
[189] Cls. Reply, Paragraph 17.

"Without any doubt whatsoever, immediately after Decree 7713, a great deal of uncertainty arose."[190]  Towards FertiNitro's banks and bondholders, it became important for the Respondent ostensibly to maintain the continuing efficacy of the Offtake Agreement, as apparently achieved by the Stand Still Agreement, so as to avoid a cross-default under the Common Security Agreement and other agreements with the banks and bondholders.  From the Respondent's perspective towards KNI, there was there no such necessity. The Tribunal returns to KNI's position in Part VII below.

*(vi)   The "Historical Claims" (as regards Taxes and VAT)*

5.86    As summarised in Part II above, KOMSA advances claims relating to three tax related measures and VAT credits, as part of its "Historical Claims".

5.87    *New Taxes:*  In August 2005, the Respondent enacted the Organic Law on Science, Technology and Innovation (*Ley Orgánica de Ciencia, Tecnología e Inovación*) ("Science and Technology Law").[191]   In accordance with Articles 35 and 42 of this Law, "large companies in the country dealing with the activities established in the Organic Law on Hydrocarbons and Gaseous Hydrocarbons" shall donate two per cent of their gross revenue obtained in the Venezuelan territory, to activities that would be "considered to be Contributions and Investments in Science, Technology and Innovations and their Application."[192]  According to the Respondent, Article 39 of the Science and Technology Law provides that contributions can be tax deductible.[193]

5.88    This Science and Technology Law, a law of general application, was being implemented before FertiNitro began to operate and upon FertiNitro's initiation of operations it also became applicable to it.  After the enactment of the 2009 Petrochemical Law, FertiNitro's contribution rate under the Science and Technology Law was reduced from 2% to 0.5%,

---

[190] Barrientos WS1, Paragraph 41.
[191] Organic Law on Science, Technology and Innovation, 3 August 2005, effective as of 1 January 2006 (C-43).
[192] Organic Law on Science, Technology and Innovation, 3 August 2005, effective as of 1 January 2006 (C-43), Arts. 35 and 42 (10).
[193] Resp. C-Mem., Paragraph 123.

because petrochemical activities stopped being categorized as an activity within the Hydrocarbon sector.[194]

5.89   According to the Claimants, the total amount that FertiNitro contributed in compliance with the Science and Technology Law in the period 2006-2010 amounted to approximately US$ 22.35 million.[195]   According to the Respondent "FertiNitro's contributions were almost exclusively invested internally,"[196] and "on rare occasions, [FertiNitro] contributed to a public project."[197]

5.90   *Increased Taxes:* On 30 December 2005, the municipality of Simón Bolivar, in the State of Anzoátegui (where the FertiNitro Plant is located), issued an ordinance that set or modified the tax rate applicable to all companies considered to be in the "industrial, commercial, service or similar economic activities" in the municipality (the "Municipal Ordinance").[198] The Municipal Ordinance, applicable to FertiNitro for the 2006 fiscal year, established an increase in the municipal tax rate from 1% to 4%.[199]

5.91   Pursuant to the Municipal Ordinance "[a]ll industrial economic activities exercised by consortium or any other kind of association […] of the Energy Natural Gas Production Sector and all activities related to the oil and gas and petrochemical industry […] linked to the activity that is directly or indirectly related to the Jose Petrochemical Complex" would be subject to a 4% tax rate over the company's gross revenue.[200]   The Parties disagree on which types of companies are located in the Jose Petrochemical complex and would be affected by the Ordinance.[201]

---

[194] FertiNitro, Declarations 2006-2012 (R-40); FertiNitro, Declarations 2006-2013 (R-74); Resp. Rej., Paragraph 165. *See also* FertiNitro, Chart on Contributions (R-47).

[195] Cls. Mem., Paragraph 78 citing Giles ER1, paragraph 3.23.

[196] Resp. C-Mem., Paragraph 122.

[197] Resp. C-Mem., Paragraph 120.

[198] Ordinance for Taxes on Industrial, Commercial, Service or Similar Economic Activities (30 December 2005) (C-45).

[199] *See* FertiNitro 31 December 2005 and 2004 Report of Independent Auditors and Financial Statements, dated 1 March 2006 (C-49), p. 22. *See also* Cls. Mem., Paragraph 82, citing "Municipal Tax Rate Chart for 2005" (C-46).

[200] Ordinance for Taxes on Industrial, Commercial, Service or Similar Economic Activities (30 December 2005) (C-45), Group 1-D, p. 14.

[201] According to the Claimants, all the companies that are located in the Jose Petrochemical complex are partly foreign-owned, and were therefore those affected by the Municipal Ordinance (Cls. Mem., Paragraph 82). The Respondent

5.92    In 2006, before FertiNitro would start paying the taxes at the higher rate, Pequiven engaged in negotiations with the municipality to reduce the municipal tax for all the mixed companies in which Pequiven had equity investments, including FertiNitro, Metor, Superoctoanos and Supermetanol.[202]   FertiNitro's Board agreed to entrust Pequiven to handle such negotiations.[203]

5.93    In connection with these negotiations, on 14 November 2006, the Municipality issued a decree pursuant to which FertiNitro would be applied a 2% municipal tax for 2006 and 2.4% for 2007, instead of 4% (the "Municipal Decree").[204]   The Decree was formally notified to FertiNitro on 6 December 2006.[205]

5.94    On 14 December 2006, the FertiNitro Board of Directors Meeting issued a Resolution that "ratified the General Management's decision to accept the 2% rate for 2006 and approved accepting the 2.4% rate for 2007."[206]

5.95    *VAT:* As an exporter from Venezuela, FertiNitro had the right under Venezuelan law to recover credits for VATs borne for the acquisition and import of goods and services used in the manufacture of goods for export.[207]   Such tax credits were provided in the form of Special Certificates of Tax Refunds (or "CERTS" for the Spanish acronym) and were governed by the Law of May 1999 on Partial Reform of the Law on Value Added Tax (the "VAT Law").[208]   CERTS could "be used or assigned for the payment of national taxes […] tax liability, tax penalties and procedural expenses."[209]   CERTS are issued in Bolivares and

---

rejects this characterisation and asserts that the Ordinance was applicable to "all companies operating in the Municipality of Simón Bolívar", which includes mixed-owned companies, located in the Jose Complex (Resp. C-Mem., Paragraph 125; Resp. Rej., Paragraph 177).

[202] *See* Email from Oswaldo Parilli, Pequiven's legal counsel, to Saul Ameliach and other Pequiven representatives (28 November 2006) (C-48), pp.3-4; and Email from Oswaldo Parilli to Pequiven representatives re:  Municipal Taxes (28 November 2006) (C-53) pp. 5-6.

[203] FertiNitro Board of Directors' Meeting Minutes No. 65 (5 April 2006) (C-51).

[204] Decree D.A.M.S.B.-042-A-2006 (14 November 2006) (C-48), pp. 20-22.

[205] *See* Notice No. 1093-06 from SABAT/Alcaldía del Municipio Simón Bolívar to FertiNitro (6 December 2006) (C-48) p. 5 (SP), p. 19 (EN).

[206] FertiNitro Board of Directors' Meeting Minutes No. 76 (14 December 2006) (C-54) (*see also* Resp. Rej., Paragraph 179. According to the Claimants, Pequiven entered into this agreement without consulting the other FertiNitro shareholders and without the authority to do so.  (*See* Cls. Mem., Paragraph 84).

[207] Law of Partial Reform of the Law on Value Added Tax (29 July 2004) (C-55) ("VAT Law"), Art. 43.

[208] VAT Law.

[209] *Id*., Art. 43.

the income tax is also levied in Bolivares.  The Respondent did not make "actual payments" to FertiNitro pursuant to VAT credit requests.

5.96    Ms Carolina Nunez, a former SENIAT employee, testified that: "[b]etween 2007 to 2012, the process took as long as two or three years from submission of a request to final issuance of a CERT" (even though the Law prescribes a 30-day period); and it affected all tax payers equally.[210]

5.97    During the course of its operations, FertiNitro regularly submitted request for reimbursements to the Respondent's competent authorities.  On or around 2007 and thereafter, the Respondent's tax authorities failed to issue certain of the requested CERTS to FertiNitro on a timely basis.[211]  FertiNitro complained to the relevant tax authorities.[212]

5.98    The Parties disagree on whether the requested VAT credits were ultimately granted to FertiNitro.  According to the Respondent, "each of the VAT credits claimed by the Claimants in this proceeding was provided to FertiNitro."[213]  It adds that the amounts issued to FertiNitro could differ from the amount initially requested; and that FertiNitro never complained about those differences.[214]

5.99    *The Comisario Report:* In accordance with Venezuelan law, FertiNitro was required to obtain annual audit reports from a *Comisario*. The Parties agree that "[a] *Comisario*" is an

---

[210] Witness Statement of Carolina Nuñez (28 February 2013) ("Nuñez WS1"), Paragraph 16 (*see* Resp. C-Mem., Paragraph 131).  According to the VAT Regulations, the request for CERTS was to be addressed to the "National Integrated Service of Customs and Tax Administration" (known as SENIAT, using its Spanish acronym), which would decide to approve it or reject it.  All approved requests are then reviewed by the Ministry of Finance, in charge of issuing the CERT to taxpayers (thus adding more time). *See* Partial Regulation No. 1 of the Law that Establishes the Value Added Tax, with regard to Tax Credit Recovery for Exporter Taxpayers (16 September 2003) (C-59), Arts. 8-16, pp. 14-19.

[211] Letter from Ikbal Samad (on behalf of FertiNitro) to Minister of the People's Power for Economy and Finance re: Request to Grant Refund Certificates and Administrative Orders to Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC. (21 December 2009) (C-60), pp. 11-12.

[212] Letter from Ikbal Samad (on behalf of FertiNitro) to the Minister of the People's Power for Economy and Finance re: Request to Grant Refund Certificates and Administrative Orders to Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC (21 December 2009) (C-60), pp. 8-10.

[213] Resp. Rej., Paragraph 21.

[214] Witness Statement of Carolina Nuñez (28 February 2013), Paragraph 17 and Annex A; Resp. C-Mem., Paragraph 132.

"auditor that is required under Venezuelan law to review audits conducted by private auditors."[215]

5.100  In accordance with the Venezuelan Code of Commerce, the *Comisarios* are appointed by the company's shareholders; and they have to report to the audited company's shareholders. Along with the report in which they explain the results of their examination of the balance sheets and management practices, the *Comisarios* may include proposals, suggestions and observations. Such recommendations are not binding on the audited company.

5.101  On 7 September 2006, the *Comisario* for FertiNitro issued its report containing certain recommendations and criticisms (the "Comisario Report").[216]  It is a document of some four pages, with additional appendices.  The Claimants contend that this *Comisario* had a prior relationship with Pequiven and therefore the *Comisario* Report is biased in Pequiven's favour.[217]  The Tribunal does not accept this criticism as affecting the relevant contents of the report (to which it returns later in this Award).

---

[215] Cls. Mem., Paragraph 103; Resp. Rej., Paragraph 75.
[216] FertiNitro Summary Report from the Statutory Auditor and Consolidated Financial Statements (7 September 2006) ("*Comisario* Report") (C-63).
[217] Cls. Mem., Paragraphs 103-110.

## PART VI: JURISDICTION ISSUES

### (1)   Introduction

6.1    The Respondent objects to the jurisdiction of ICSID and the competence of the Tribunal *ratione materiae*, alleging that the Offtake Agreement does not constitute an "investment" under both the Treaty and the ICSID Convention; and that the Tribunal has therefore no competence, or jurisdiction, to decide KNI's claims against the Respondent in this arbitration.  As already indicated, the Respondent makes no jurisdictional objection to KOMSA's claims.

6.2    For present purposes, the Respondent's principal submissions can be summarised briefly as follows: (i) there is an inherent meaning of the term "investment," under both Article 25(1) of the ICSID Convention and Article 1(2) the Treaty, which requires among others, a contribution and risk; (ii) KNI has neither made a contribution, nor incurred the type of risk necessary to qualify as an "investment"; (iii) the Offtake Agreement is a simple commercial sales contract and the complexity, length and project finance implications or the general unity of the investment concept don't transform it into an "investment"; (iv) the Offtake Agreement fails to meet the territoriality requirement of Article 2 of the Treaty as it has not provided any benefit in Venezuela; and (v) KNI's claim is covered by the dispute resolution provisions in Article 12 of the Offtake Agreement, providing for the resolution of "any dispute" relating to that agreement, including its termination.

6.3    KNI's principal submissions in response, asserting the jurisdiction and competence of ICSID and the Tribunal, can also be summarised briefly as follows: (i) it is far from well-settled that an "objective and inherent" meaning of "investment" under the ICSID Convention can supplant the scope of the treaty parties' consent as to the meaning of an "investment" in the treaty; (ii) there is no requirement under this Treaty or the ICSID Convention to make a contribution to Venezuela's development; these factors as to contribution and risk are not strict jurisdictional requirements, but simply indicia or "hallmarks" of investments under the ICSID Convention; (iii) in any event, the Offtake Agreement satisfies these factors as to both contribution and risk; (iv) international law

prescribes that investment transactions be viewed in their totality; and therefore the Offtake Agreement cannot be considered as a commercial contract in isolation from the entire FertiNitro project, but instead as an integral and critical part of that project's financing, structure, profitability and purpose; (v) Article 2 of the Treaty is a standard clause that "merely establishes the temporal scope and subject-matter of the Treaty", and it cannot be interpreted as incorporating a requirements that the Treaty contribute to the host State's development; and (vi) KNI's rights under the Offtake Agreement and under the Treaty are conceptually distinct; and the dispute resolution provisions in Article 12 of the Offtake Agreement do not cover KNI's claim against the Respondent arising out of the Treaty under international law.

6.4    It is necessary to develop certain of these submissions further below, for the Respondent and KNI in turn.  The Tribunal has considered in full the factual and legal materials presented by the Parties relating to the Respondent's jurisdictional objection.  The Tribunal here addresses only the materials that it considers to be determinative factors in deciding that objection to KNI's claim.

### *(2)    The Respondent's Case*

6.5    *"Investment":* The Respondent submits that the term "investment" has an objective and inherent meaning both under (i) the Treaty and (ii) the ICSID Convention.  The burden of proof lies with the alleged investor asserting the alleged investment, who must demonstrate that is has made the alleged investment within the meaning of both the Treaty and the ICSID Convention.[218]

6.6    With regard to Article 25(1) of the ICSID Convention*,* the Respondent asserts that arbitration tribunals, including *Global Trading v. Ukraine*, *Joy Mining v. Egypt*, and *Saba Fakes v. Turkey,* have recognised that the term "investment" has an objective meaning under the ICSID Convention, or in the words of Article 31(1) of the Vienna Convention on the Law of Treaties ("VCLT"), an "ordinary meaning" which cannot be established only

---

[218] Resp. Preliminary Objections, Paragraph 14.

by reference to the Treaty, as an instrument of consent.[219] It cites the tribunal's decision in *GEA Group v. Ukraine*, for the proposition that "is not so much the term 'investment' in the ICSID Convention than the term 'investment' *per se* that is often considered as having an objective meaning in itself, whether it is mentioned in the ICSID Convention or in a BIT."[220]

6.7    As to the objective meaning in Article 1(2) of the Treaty, the Respondent asserts that: "[t]he argument that 'every kind of asset' constitutes a protected 'investment' under the [Treaty] is untenable." It concludes: "[the] indicative list of the types of assets which the term may cover […] [is] not intended to mean that every one of the listed asset-type is an investment in all circumstances. This is why the definition uses the phrase 'investment includes' rather than 'investment means.'"[221]

6.8    The Respondent contends that KNI has not "made a contribution" or incurred an "investment risk" in connection with the Offtake Agreement. The term "investment" has the same inherent and objective meaning under both the ICSID Convention and the Treaty.[222] That meaning requires a contribution, duration and risk each of which is a *sine qua non* requirement for the existence of an "investment."[223] The Respondent further

---

[219] Resp. Preliminary Objections, Paragraphs 20-27.

[220] Resp. Preliminary Objections, Paragraph 34, citing *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (31 March 2011) ("*GEA Group v. Ukraine*") (RLA-30), Paragraph 141.

[221] Resp. Reply on Jurisdiction, Paragraphs 49, 50.

[222] Resp. Preliminary Objections, Paragraph 38; Resp. Reply on Jurisdiction, Paragraph 27. Similarly, relying on *Romak v. Uzbekistan*, where the tribunal was faced with an allegedly identical dispute resolution provision in the Switzerland-Uzbekistan Treaty, the Respondent submits that "the term 'investment' in Article 1(2) of the [Treaty] has an objective, inherent meaning." (Resp. Preliminary Objections, Paragraphs 32-33, citing *Romak S.A. v. Republic of Uzbekistan*, PCA Case No. AA280, Award (26 November 2009) ("*Romak v. Uzbekistan*") (RLA-24), Paragraph 207).

[223] Resp. Preliminary Objections, Paragraph 38; Resp. Reply on Jurisdiction, Paragraphs 51-55, relying on *Ulysseas, Inc. v. The Republic of Ec*uador, UNCITRAL, Final Award (12 June 2012) (RLA-108), Paragraphs 251-252; *Abaclat and others (formerly Giovanna A. Beccara and others) v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility (4 August 2011) ("*Abaclat v. Argentina*") (RLA-31), Paragraph 371, for the proposition that Article 1 of the Treaty requires these three elements, and *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award (14 July 2010) (RLA-26), Paragraph 110; *Deutsche Bank AG v. The Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award (31 October 2012) ("*Deutsche Bank v. Sri Lanka*") (CLA-100), Paragraphs 294-295, for the proposition that Article 25(1) requires the making of a contribution and an assumption of risk.

contends that these minimum requirements have been identified by both ICSID[224] and non-ICSID Tribunals.[225]

6.9     The Respondent acknowledges, as a fact, that KOMSA was an original party to the Offtake Agreement.   However, the Respondent contends that the assignment of rights and obligations under the Offtake Agreement from KOMSA to KNI was part of an intra-company restructuring; and that neither KOMSA nor its assignee, KNI, have made any "contribution" or incurred any "risk" with respect to the Offtake Agreement, for the purposes of Article 25(1) of the ICSID Convention and Article 1(2) of the Treaty. [226]

6.10    *Contribution:* As to a relevant "contribution", the Respondent asserts that KNI was created primarily to sell and distribute offtake from the FertiNitro Plant to North America; but that KNI made no "contribution"; and it did not "engage in the action of investing," when it was assigned KOMSA's contractual interest in the Offtake Agreement.[227]   KOMSA's investment, for its part, related to the formation of the joint venture comprising the FertiNitro project; and the Offtake Agreement was an ancillary sales contract signed by the joint venture with KOMSA for the purchase of urea and ammonia.   There was never a contribution by KOMSA that related to the Offtake Agreement that could have been transferred to KNI along with KOMSA's interests in that sales contract.[228]   The Respondent submits that the performance of the Offtake Agreement does not qualify as a contribution, which must be made at its inception and not with hindsight.[229]

6.11    The Respondent relies on the decision in *Standard Chartered v. Tanzania* for the proposition that "the treaty protects investments 'made' by an investor in some active way,

---

[224] Resp. PHB, Paragraph 19, citing *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) ("*Electrabel v. Hungary*") (RLA-110), Paragraph 5.43.

[225] Resp. Reply on Jurisdiction, Paragraph 43, quoting *Caratube International Oil Company LLP v. The Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award (5 June 2012) (RLA-107), Paragraph 360, indicating that non-ICSID and ICSID tribunals require the same minimum requirements.

[226]  Resp. Preliminary Objections, Paragraph 8; Resp. Reply on Jurisdiction, Paragraph 57.

[227] Resp. Preliminary Objections, Paragraph 68.

[228] Resp. Reply on Jurisdiction, Paragraph 60.

[229] Resp. Reply on Jurisdiction, Paragraphs 63-64.

rather than simple passive ownership."[230]   It concludes that the mere acceptance of contractual rights and obligations, asset and ownership of shares is not sufficient to constitute an investment or prove a contribution of money or assets.[231]

6.12   *Risk:* As to a relevant "risk", the Respondent contends that the risks alleged by the Claimants, such as the demand risk, price risk, counterparty risk and non-performance risk do not go beyond the ordinary risks of a counter-party's non-performance of a commercial contract.  These are purely commercial risks generally associated with doing business.[232]

6.13   The Respondent also contends that these commercial risks would be covered and largely mitigated by the provisions of the Offtake Agreement.[233]   Moreover, since KNI was guaranteed offtake at a pre-determined discount price, "[t]he entire price risk remained with the producer, FertiNitro." In addition, under the terms of the Offtake Agreement, KOMSA guaranteed KNI's obligation under the Offtake Agreement and any risks associated to it.[234]   The Respondent notes that in the unlikely event of a total collapse of the "international demand" for the FertiNitro project's output, "the price mechanism would deprive the take-or-pay provision of the Offtake Agreement of any effect."[235]

6.14   The Respondent submits that the Offtake Agreement was a mere commercial sales contract; and that the complexity, length, project finance implications or the 'unity of investment concept' do not transform the Offtake Agreement into an "investment".  The

---

[230] Resp. PHB, Paragraph 23, citing *Standard Chartered Bank v. The United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award (2 November 2012) (RLA-109), Paragraph 225.

[231] Resp. PHB, Paragraph 24; Resp. Preliminary Objections, Paragraphs 65-68, citing *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia,* ICSID Case No. ARB/06/2, Decision on Jurisdiction (27 September 2012) (RLA-33), Paragraphs 232-233 ("*while shares or other securities or title may be the legal materialization of an investment, mere ownership of a share is, in and of itself, insufficient to prove a contribution of money or assets*"); Resp. Reply on Jurisdiction, Paragraph 61. The Respondent also asserts that irrespective of whether the terms "contribution" or "make" are incorporated in the Treaty or the ICSID Convention, "a contribution" is a fundamental requirement that is "not only consistent with the weight of authority, but is also dictated by common usage of the term 'investment'." Resp. Preliminary Objections, Paragraph 41.

[232] Resp. PHB, Paragraph 21; Resp. Preliminary Objections, Paragraphs 71-74, citing *Romak v. Uzbekistan* (RLA-24), Paragraph 229; *See also* Resp. Preliminary Objections, Paragraphs 43-44, citing in addition *Joy Mining Machinery Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction (6 August 2004) ("*Joy Mining v. Egypt*") (RLA-10), Paragraph 57.

[233] Resp. PHB, Paragraph 21.

[234] Resp. Reply on Jurisdiction, Paragraphs 65-68.

[235] Resp. Reply on Jurisdiction, Paragraph 68.

Offtake Agreement was and remained a classical sales contract, in the sense that KNI paid a discounted price (fixed through a purchase price formula) in exchange of ammonia and urea;[236] and payments were due in accordance with normal commercial terms.[237]

6.15    According to the Respondent, myriad legal materials, including the *travaux préparatoires* for the ICSID Convention and scholarly commentators confirm that mere sales contracts, as a type of commercial transaction, do not amount to "investments" within the meaning of Article 25(1) of the ICSID Convention.[238]   The Respondent also points to the decisions in *SGS v. Paraguay* and *MHS v. Malaysia,* which confirmed that sale contracts are not investments under international law,[239] and to the ICSID Secretariat's decision to refuse to register a request on the basis that the underlying transaction could not be considered an investment as it arose "out of a sale of goods transactions."[240]

6.16    *Unity of Investment:* The Respondent also asserts that applying the concept of the 'unity of investment' in this case would improperly expand the scope of ICSID jurisdiction. Relying on the decisions in *ATA Constructions v. Jordan* and *CSOB v. Slovak Republic*, the Respondent submits that to be part of an "investment", the specific transactions "cannot be disassociated from all other transactions involving the economic purpose of the investment" and must be "inseparable from [the] others or comparatively free-standing."[241]

6.17    According to the Respondent, the Offtake Agreement relates to the operations of the FertiNitro Plant, but it is not an inseparable element.   The JIA's objective was fully

---

[236] Resp. Preliminary Objections, Paragraph 9.

[237] Resp. Preliminary Objections, Paragraph 61.

[238] Resp. PHB, Paragraph 13, citing *First (September) Hearing D1. 9*; ICSID, Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Documents Concerning the Origin and the Formulation of the Convention, Volume II, Part 1, Documents 1-43, 54 (1968) (2d prtg. 2001) (RLA-6), Paragraph 54; and Christoph H. Schreuer et al., The ICSID Convention: A Commentary 117 (2d ed. 2009) ("*ICSID Convention: A Commentary*") (citations omitted) (RLA-21).

[239] Resp. PHB, Paragraph 13, citing *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction (10 February 2010) *("SGS v. Paraguay")* (RLA-25), Paragraph 93; and *Malaysian Historical Salvors Sdn Bhd v. Malaysia*, ICSID Case No. ARB/05/10, Decision on Application for Annulment (16 April 2009) ("*MHS v. Malaysia*") (RLA-23), Paragraph 69; *see also* Resp. Preliminary Objections, Paragraphs 48-50, referring also to *Global Trading Res. Corp. and Globex Int'l v. Ukraine*, ICSID Case No. ARB/09/11, Award (1 December 2010) (RLA-27), Paragraph 45.

[240] Resp. Preliminary Objections, Paragraph 46, referring to Ibrahim Shihata & Antonio Parra, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Rev.–F.I.L.J. 299, 308 (1999) (RLA-4).

[241] Resp. Reply on Jurisdiction, Paragraph 17.

achievable without the Offtake Agreement.  The Offtake Agreement was not essential to a single economic goal; and the Tribunal can "parse each component part of the overall transaction" and examine whether it would satisfy the jurisdictional requirements of the Treaty and the ICSID Convention.[242]

6.18   The Respondent contends that the equity interest of KOMSA and FertiNitro's other shareholders in FertiNitro was not impaired by the termination of the Offtake Agreement, which demonstrates that the Offtake Agreement is ancillary and separable from the FertiNitro project - unlike the factual background in the *Inmaris* and *Ambiente Ufficio* decisions.[243]  The Offtake Agreement can be easily dissociated from the equity investment: even if FertiNitro had not terminated the Offtake Agreement, KOMSA could still pursue its investment claim in this arbitration.[244]  The Offtake Agreement has been critical for the FertiNitro project, but it was not critical that the contract be concluded with KOMSA specifically, just that there had to be a long-term offtake contract to secure payment of the loans to finance the project.  The Offtake Agreement was not an incentive to persuade KOMSA to become a shareholder in FertiNitro.[245]

6.19   *Article 2:* The Respondent contends that Article 2 of the Treaty contains a territoriality requirement not met by the Offtake Agreement.  Article 2 of the Treaty provides that the Treaty is only applicable to "investments in the territory of one Contracting Party."  The territorial nexus is further highlighted by Articles 1, 3, 4, 7 and 8 and by the Preamble to the Treaty, when it states the signatories' intent to "assure favourable conditions for investments [...] *in the territory* of the other Contracting Party." (Emphasis added)

6.20   The Respondent further submits that arbitral tribunals have assessed the territorial nexus by scrutinizing the beneficial value emanating from the investment to the host state.[246]  As the Offtake Agreement "permitted less than 5% of total resales to be made domestically,

---

[242] Resp. Reply on Jurisdiction, Paragraph 22.
[243] Resp. PHB, Paragraph 15.
[244] *Id.*
[245] Resp. Rej., Paragraph 29.
[246] Resp. Reply on Jurisdiction, Paragraph 72.

with the major portion of the offtake designated for re-sale overseas,"[247] the Offtake Agreement's benefit to Venezuela was minimal.  Thus, it did not satisfy the Treaty's territorial requirement.

6.21    *Article 12:*  The Respondent contends that the Offtake Agreement contains a multi-tier forum selection clause for the resolutions of "any Dispute" relating to the Offtake Agreement, including the present disputed claim made by KNI.  Under Article 12 of the Offtake Agreement, "any Dispute", including claims for termination of the Offtake Agreement, "would initially be subject to negotiation […] [followed by] arbitration in accordance with the ICC Rules" if the negotiations failed.[248] Article 12, so it submits, is not overridden by the Treaty.

6.22    The Respondent submits that the decision to terminate the Offtake Agreement was made by FertiNitro's Temporary *Ad Hoc* Trustees on commercial grounds.  KNI has, at most, a commercial dispute with FertiNitro concerning the allegedly wrongful termination of a sales contract, which KNI has failed to pursue in accordance with the forum selection clause of Article 12 of the Offtake Agreement.[249]  Therefore, so the Respondent concludes, this Tribunal lacks any jurisdiction to decide KNI's claim.[250] Although KNI has asserted a breach of contract claim disguised as an expropriation claim, such a claim remains a commercial dispute referable only to the Offtake Agreement's forum selection clause in Article 12.[251]

**(3)    The Claimants' Case**

6.23    *"Investment":*  KNI accepts that the Tribunal's task of interpretation for the treaty and the ICSID Convention should be guided by Article 31 of the VCLT.  As to the Treaty, according to KNI, "the ordinary meaning of Article 1(2) of the [Treaty] clearly and unambiguously provides that contractual rights, such as those bestowed by the Offtake

---

[247] Resp. PHB, Paragraph 28 (citation omitted).
[248] Resp. Preliminary Objections, Paragraph 62.
[249] Resp. Preliminary Objections, Paragraph 83ff.
[250] Resp. Preliminary Objections, Paragraphs 86-87; Resp. Reply on Jurisdiction, Paragraph 12.
[251] Resp. PHB, Paragraph 16.

Agreement, were contemplated as investments by the Contracting Parties."[252] Accordingly, so KNI submits, KNI's rights to the supply of urea and ammonia under the Offtake Agreement fall within the non-exhaustive chapeau of Article 1(2) of the Treaty: "[t]he term 'investment' comprises every kind of asset."  It also corresponds to the type of investment defined in Article 1(2)(c) of the Treaty: "claims to money or to any performance under a contract."[253] A *fortiori,* so KNI concludes, "given that 'claims […] to any performance under a contract' constitute an investment under the [Treaty], it follows that contractual rights do as well."[254]

6.24    KNI submits that any interpretation restricting the scope of the very broad, non-exhaustive definition of "investment" in Article 1(2) of the Treaty would be contrary to the Treaty's plain language and its object and purpose, which is to promote investment.[255]  This was accomplished, according to KNI, even if the Offtake were considered in isolation:

> "It was a critical component that allowed FertiNitro to raise approximately USD 750 million in debt.  This in turn allowed the construction of a substantial fertiliser plant, which in turn allowed the Respondent to monetise natural gas that it would otherwise have flared. Even assuming arguendo [that it was] a 'mere' sales agreement, the Offtake Agreement was a long-term, twenty-year (or longer) agreement that required significant outlays and risks to KNI, not the least because it required KNI to take or pay for half the plant output regardless of actual need [as a purchaser]."[256]

6.25    As to the ICSID Convention, KNI contends that there is no objective and inherent definition of the term "investment" in Article 25(1) of the ICSID Convention; and that the ICSID Convention defers to the parties' consent to define the scope of an investment in the Treaty.[257]  According to KNI:

> *"[R]ecent case law confirms the primacy of a [Treaty] over the ICSID Convention when determining the scope of the applicable consent to ICSID arbitration and that*

---

[252] Cls. Reply, Paragraph 338.
[253] Cls. Mem., Paragraph 182.
[254] Cls. Reply, Paragraph 340; Cls. PHB, Paragraph 29.
[255] Cls. Reply, Paragraph 341; Cls. PHB, Paragraph 30.
[256] Cls. Reply, Paragraph 344 (citations omitted).
[257] Cls. PHB, Paragraph 26; Cls. Reply, Paragraph 305.

*a claimant is not required to establish the existence of an 'investment' both under a relevant investment treaty and under Article 25(1) of the ICSID Convention."*[258]

6.26    KNI further contends:

> *"[I]n the absence of restrictions to consent under Article 25(4) [affording States the possibility of restricting ICSID jurisdiction ratione materiae to certain type of investments], the scope of the term 'investment' should be construed within the contours defined by the [relevant States in the relevant instrument]."*[259]

6.27    Thus, KNI alleges, in the absence of restrictions under Article 25(4) of the ICSID Convention and considering the primacy of the Treaty definition of "investment," KNI's contractual rights clearly fall within the definition of "investment" under the ICSID Convention.[260]   KNI rejects the argument that the definition of investment under Article 25 of the ICSID Convention can be confined to certain "outer-limits," as such a concept would not be faithful to the ordinary meaning, immediate context or object and purpose of this provision.[261]   Similarly, so KNI contends, the enumerated definition of investment in Article 1(2) of the Treaty, cannot be substituted by an alleged "objective and inherent" definition as argued by the Respondent.   This would transgress the rules of interpretation of customary international law codified in Articles 31 and 32 of the VCLT.[262]   KNI thus contends that its rights under the Offtake Agreement qualify as an "investment" under both the ICSID Convention and the Treaty, and that such rights also satisfy non-jurisdictional indicia.[263]

---

[258] Cls. PHB, Paragraph 25, citing *SGS v. Paraguay* (RLA-25), Paragraph 93 (tribunal holding that "in most cases— including, in the Tribunal's view, this one—it will be appropriate to defer to the State parties' articulation in the instrument of consent (*e.g.* the [Treaty]) of what constitutes an investment"; *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction (8 March 2010) ("*Inmaris v. Ukraine*") (CLA-91), Paragraph. 130.  *See also* Cls. Reply, Paragraph 352; Cls. Rej., Paragraphs 51-55.

[259] Cls. Reply, Paragraph 350. *See also* Cls. PHB, Paragraph 28. This interpretation, according to the Claimants, is also supported by the Convention's preparatory work to which the Tribunal may make recourse pursuant to Article 32 of the VCLT. The oft-cited Report of Directors expressly links the lack of a definition of 'investment,' first, to the 'essential requirement of consent by the parties' and, second, to the 'mechanism' of Art. 25(4) of the ICSID Convention (*See* Cls. Reply, Paragraph 349 (citation omitted)).

[260] Cls. Reply, Paragraph 350.

[261] Cls. Reply, Paragraphs 351-364.

[262] Cls. Rej., Paragraphs 56-57.

[263] Cls. PHB, Paragraph 14.

6.28    KNI contends that the ordinary meaning of the term "investment" must also be interpreted in the broader context of the provision in which it is found and the rest of the treaty's text.[264] Even if the Offtake Agreement were considered separately from the rest of the FertiNitro project, instead of an integral part, it would still qualify on its own as an investment under both the ICSID Convention and the Treaty.  According to KNI, the *Salini* criteria are not jurisdictional requirements, but instead simple indicia or 'hallmarks' of investments under Article 25(1) of the ICSID Convention, to which tribunals attached a variety of weight.[265]  Moreover, it is well established that the *Salini* elements "should be viewed collectively under a balancing test, rather than requiring that all elements be fulfilled or that any one criterion is more important than any other."[266] KNI concludes that it made an "investment" under Article 25(1) of the ICSID Convention; and that its investment fully satisfied the *Salini* criteria of duration, risk, contribution, economic development, territorial nexus and regularity of profit and return.

6.29    *Contribution:* As to a relevant "contribution", KNI contends that KOMSA made a substantial initial contribution of equity to the FertiNitro project, of which KOMSA's original share was thirty-five percent;[267] and that KOMSA later assigned its rights and obligations under the Offtake Agreement to KNI in April 2003.  Thus, the same initial investor (KOMSA) made the initial contribution with respect to both the equity investment and the Offtake Agreement and all that later transpired was an assignment of rights and obligations as part of an internal structuring of the investment, to KNI.[268]

6.30    KNI submits that the assignment, as an essential part of restructuring, is completely acceptable under international investment law and does not undermine the subsequent holder's substantive and procedural protection under a treaty, so long as there is an

---

[264] Cls. Reply, Paragraph 347.
[265] Cls. PHB, Paragraphs 31-32; Cls. Reply, Paragraphs 367-371, citing *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award (18 July 2008) ("*Biwater v. Tanzania*") (CLA-24), Paragraphs 312, 314; *Abaclat v. Argentina* (RLA-31), Paragraph 364; and *SGS v. Paraguay* (RLA-25), Paragraph 98; Cls. Rej., Paragraphs 3, 54.
[266] Cls. Reply, Paragraph 373.
[267] Cls. Reply, Paragraph 9.
[268] Cls. Reply, Paragraphs 385-386 (citations omitted).

unbroken continuum in nationality.[269]   KNI further submits that KOMSA's (and subsequently KNI's) legal commitment to take half of the FertiNitro Plant's output under the Offtake Agreement was a contribution in its own right; that KNI agreed to purchase vast quantities of output for two decades; and that it was this commitment that enabled the FertiNitro Plant to be financed, constructed and operated with the support of international credit from banks and other lending institutions.

6.31   KNI rejects the Respondent's reliance on the decision in *Deutsche Bank v. Sri Lanka* for the proposition that the existence of an investment must be assessed "at its inception and not with hindsight."   According to KNI, the issue whether an investor has made a contribution must be assessed "at the time the proceedings are instituted", as with any other jurisdictional criteria.   Whether the contribution existed from the initiation of the investment is irrelevant, as the contribution may extend over a certain period of time.[270]

6.32   KNI also submits that: that "there is no requirement under either the ICSID Convention or the [Treaty] for KNI to have engaged in the 'action of investing' [or make a 'fresh investment'] in order for its rights in the Offtake Agreement to qualify as an 'investment.'"[271]   Such an interpretation would be contrary to the terms of the Treaty and the Convention:   "[O]nce the Tribunal has satisfied itself that an 'asset' exists in line with the definitions in Article 1 of the Switzerland-Venezuela BIT, it need not inquire further that successors in interest to such assets have made further 'contributions.'"[272]

6.33   KNI further contends that, as decided by the *Salini v. Morocco*, *Deutsche Bank v. Sri Lanka* and *Jan Oostergetel v. Slovak Republic* tribunals, a contribution is not limited to financial

---

[269] Cls. Reply, Paragraph 388.
[270] Cls. Rej., Paragraphs 79-82.
[271] Cls. PHB, Paragraph 33 ("Tribunals have held that there is: (a) a continuity of investment even when the identity of an investor changes; (b) an 'investment' even when it results from an acquisition of shares made free of charge; and (c) an 'investment' even when the assets or funds have not been contributed by the investor itself"; citing *Fedax N.V. v. The Republic of Venezuela*, ICSID Case No. ARB/96/3, Decision on Jurisdiction (11 July 1997) (CLA-142), Paragraph 40; *Víctor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Award (8 May 2008) (RLA-102), Paragraph 542; *Renée Rose Levy de Levi v. The Republic of Peru*, ICSID Case No. ARB/10/17, Award (26 February 2014) (CLA-150), Paragraph 146; and (c) *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award (13 September 2001) (CLA-14), Paragraph 418). *See also* Cls. Reply, Paragraphs 382-392; First (September) Hearing D1.58-59.
[272] Cls. Rej., Paragraphs 67-71.

terms, but it can take a majority of forms, including know-how, equipment, personnel and services.  On this basis, "KNI and its personnel made an invaluable contribution to the FertiNitro project through the performance of the Offtake Agreement."[273]

6.34    *Risk:* As to relevant "risk", KNI alleges that KNI's risks under the Offtake Agreement were not limited to the risk of non-performance identified in the *SGS v. Paraguay* and *Romak v. Uzbekistan* cases cited by the Respondent.  KNI's risks under the Offtake Agreement included "investment risk" defined by the *Romak* tribunal as: "a situation in which the investor cannot be sure of a return on his investment, and may not know the amount he will end up spending, even if all relevant counterparties discharge their contractual obligations."[274]

6.35    KNI seeks further support from Mr Sorlie's witness statement adduced in this arbitration, where he testified as follows:

> *"KNI took on certain economic risks with respect to the Offtake Agreement; risks that would have been borne by FertiNitro (and indirectly by the equity holders) without the existence of the Offtake Agreement. For example, KNI took on market risk associated with agreeing to a "take-or-pay" obligation. This meant that as long as FertiNitro could produce and tender product, KNI was under the obligation to take and pay or not take, but still pay for the product regardless of the market conditions. These market risks included: demand risk - the risk that the market demand for the product may be very low, resulting in a difficulty finding a counterparty interested in taking the product, price risk - closely related to demand risk, KNI faced the risk of market price fluctuations, and counterparty risk - this is the risk that KNI's ultimate counterparty fails to perform, such as the failure to pay for product in a timely fashion. These market risks apply also to the freight market which would include the additional risks associated with transporting goods, including the increased risks associated with transporting ammonia."[275]*

6.36    KNI also refers to KOMSA's guarantee of KNI's obligations under the Offtake Agreement, annulling any risks associated with the Offtake Agreement because KNI would still be

---

[273] Cls. Reply, Paragraph 392; *Oostergetel v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction (30 April 2010) (CLA-147), Paragraphs 170-171.
[274] Cls. Reply, Paragraph 379, citing *Romak v. Uzbekistan* (RLA-24), Paragraph 230.
[275] Cls. Reply, Paragraph 380, citing Second Witness Statement of Jim Sorlie (26 July 2013), Paragraph 15.

responsible in the case that KOMSA was insolvent.  Moreover, if KOMSA did have to satisfy KNI's obligations at any point, KOMSA could have sought indemnification from KNI:[276] "Once risk pertaining to that investment has been identified, […] there is no cause to search for additional risks born by subsequent assignees as the risks entailed in the original investment have not dissipated." [277]

6.37   *Unity of Investment:* If the Offtake Agreement were not to be viewed as an "investment" in isolation (contrary to KNI's primary case), KNI submits that the Offtake Agreement was an "integral part" of the overall investment and structure of the FertiNitro project and that it cannot be dismissed as a separate sales contract not qualifying as an investment.[278]  The Offtake Agreement was not a "one-off" sales agreement; but instead, as is the case for all offtake agreements in project financing, it was a long term, take-or-pay sales agreement for the output of a particular plant put in place to secure financing for the FertiNitro project.[279]

6.38   Under the ICSID Convention and the Treaty, an investment operation must be considered in its totality, without looking at each specific transaction that composes "the overall operation."[280]   KNI relies upon the decisions in *Inmaris v. Ukraine* and *Ambiente Ufficio v. Argentina* for the proposition that, for jurisdictional purposes, an investment must be evaluated in a "holistic manner", considering its "economic substance" and its "larger context."[281]

6.39   According to KNI, the "unity of investment" theory does not require that all the underlying contracts share identical economic objectives and rights, but instead, whether the dispute arises directly out of the totality of the investment.[282]   The fact that the Offtake

---

[276] Cls. Rej., Paragraph 86.

[277] Cls. Rej., Paragraph 84.

[278] Cls. Reply, Paragraph 7; *see also* Cls. PHB, Paragraph 13.

[279] Cls. Rej., Paragraphs 45-47.

[280] Cls. Reply, Paragraphs 310-311, citing Schreuer et al, *The ICSID Convention: A Commentary* (CLA-108), Art. 25, Paragraph 104

[281] Cls. Reply, Paragraphs 306-308, citing inter alia, *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9 (formerly *Giordano Alpi and others v. Argentine Republic*), Decision on Jurisdiction and Admissibility (8 February 2013) ("*Ambiente Ufficio v. Argentina*") (CLA-90), Paragraphs 422-34; and *Inmaris v. Ukraine* (CLA-91), Paragraph 98.

[282] Cls. Rej., Paragraph 37, citing *Inmaris v. Ukraine* (CLA-91), Paragraph 98.

Agreement's purpose was the purchase and sale of ammonia and urea, instead of the construction, ownership and operation of the FertiNitro Plant, (as was the purpose of the JIA) is irrelevant.  KNI asserts that "the purpose of the project was not simply to build the plant but to operate it and sell its output, an objective KNI helped FertiNitro achieve through the Offtake Agreement."[283]  In the present case, the dispute arises out of the totality of the investment, of which the Offtake Agreement is an inseparable part.  Relying on the decisions in *Mytilineos*, *Electrabel* and *CSOB*, KNI submits that the Tribunal should take a "holistic view" of the Claimants' investment.[284]

6.40    KNI contends that "KOMSA's equity investment and KOMSA's (later KNI's) offtake commitment were interdependent and inseparable. […] [A]ll parties viewed the equity and offtake investments as a 'package deal.'"[285]  Since KOMSA and Pequiven pursued a project finance model, "the Offtake Agreement was essential to properly allocating the project's overall risk and, by extension, to securing financing from international lenders."[286]  Besides being an equity investor, KOMSA was interested in FertiNitro as a new source of ammonia and urea for its fertiliser sales and trading business and operations.[287]  One of KOMSA's central investment objectives was to obtain offtake at below market price, coupled with the ability to trade that product in assigned geographic areas.[288]  Thus, "in addition to mitigating project risk, without the economic value of the Offtake Agreement, 'KOMSA would not have made its investment in FertiNitro;'"[289] "nor

---

[283] Cls. Rej., Paragraph 35.
[284] Cls. Rej., Paragraphs 38-39, citing *Mytilineos Holdings SA v. State Union of Serbia & Montenegro and Republic of Serbia*, UNCITRAL Partial Award on Jurisdiction (8 September 2006) (CLA-92), Paragraphs 123-125; *Electrabel v. Hungary* (RLA-110), Paragraph 5.44; and *Československá Obchodní Banka, A.S. (ČSOB) v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Objections to Jurisdiction (24 May 1999) ("*CSOB v.Slovak Republic*") (RLA-5), Paragraph 80.
[285] Cls. Rej., Paragraph 13.
[286] Cls. Reply, Paragraphs 12-16; Cls. PHB, Paragraphs 18-19.
[287] The Offtake Agreement contained a 20-year extendable "take-or-pay" commitment for 50 percent of the FertiNitro Plant's output for each of KNI and Pequiven; *see above* at Cls. PHB, Paragraph 19; Cls. Reply, Paragraphs 315-316.
[288] *See* Cls. PHB, Paragraphs 16, 21.
[289] Cls. Reply, Paragraphs 18; *See also* Cls. Reply, Paragraph 315; Cls. PHB, Paragraph 16.

would the [FertiNitro] project have received the necessary financing from international markets necessary to its completion and ultimate success."[290]

6.41    KNI asserts that the FertiNitro project consisted of a bundle of integrated, interwoven contracts signed on the same day and defined as the "Project Documents," each of which did not stand on its own, as is clear from the documentary evidence, the expert evidence and the witness testimony.[291]   KNI relies on the expert testimony of Professor Esty who considered the Offtake Agreement to be "a critical, integrated and economically inseparable" of the overall FertiNitro project.[292]   In any case, so KNI submits, KNI need not prove that the Offtake Agreement was essential to the realisation of the FertiNitro project for it to be an integral part of the overall economic transaction.[293]

6.42    In project finance, so KNI maintains, because there is no recourse beyond the project itself, the lender and bond holders "look primarily to the cash flow from the project as the source of funds to service their loans."[294]   As such, offtake agreements are typically the primary source of project revenues.   This Offtake Agreement guaranteed the FertiNitro project's income stream and the payments by the Offtakers were remitted to an escrow account managed by the lenders.[295]   In particular, "[t]he lenders relied on the Offtake Agreement to establish an assured distribution channel for the plant's output as well as on the credit support, liquidity and currency risk mitigation inherent in the obligations of the Offtakers to take and pay for product tendered by the [FertiNitro] plants."[296]   The Offtake Agreement itself provides for "critical linkages between the project documents and serve to integrate the Offtake Agreement with key rights and obligations of other parties, particularly the

---

[290] Cls. Reply, Paragraph 8; *See also* Cls. PHB, Paragraph 20, citing Witness Statement of Brent W. Gwaltney (30 May 2012) ("Gwaltney WS1"), Paragraph 33.
[291] Cls. PHB, Paragraphs 13, 23, n. 4 and Paragraph 24, citing the Offering Circular - Bond Offering of $250,000,000 between FertiNitro Finance Inc and FertiNitro (8 April 1998) ("*Bond Offering Circular*") (C-115), Page 5; and Witness Statement of Victor D. Barrientos (28 February 2013), Paragraphs 41-44; Cls. Reply, Paragraphs 321-325; Cls. Rej., Paragraphs 17-25.
[292] *See* Cls. Reply, Paragraphs 300-320, citing Expert Report of Benjamin C. Esty (23 August 2013) ("Esty ER1"), Paragraphs 25, 37.
[293] Cls. Rej., Paragraphs 26-32.
[294] Cls. Reply, Paragraph 319.
[295] *See* Cls. PHB, Paragraphs 16-18; *see also* Cls. Rej., Paragraphs 10-12.
[296] Citing Memorandum to Offtake Agreement Review Committee of the Board of Directors of FertiNitro (18 May 2005) (C-118) page 2; Cls. Reply, Paragraphs 329-332.

sponsors and the lenders, under the other central project documents."[297]  This is confirmed (*inter alia*) by Articles 11.4 and 11.5 of the Offtake Agreement.[298]  Pursuant to Article 11.4, if an Offtaker's interest in FertiNitro fell below 20% of the equity, FertiNitro had the right to renegotiate the terms and conditions of the Offtake Agreement with respect to that buyer.  Under Article 11.5, if the equity interest fell below 5%, the respective right and obligations of the Offtaker under the Offtake Agreement would be terminated.[299]  In addition, the duration of KNI's obligations under the Offtake Agreement was tied directly to the status of the project debt.  The original term of 20 years under the Offtake Agreement was to be extended in the event that bonds were still outstanding.[300]

6.43    KNI distinguishes this case from the facts in *Joy Mining* and *Global Trading v. Ukraine* cases, alleging that the Offtake Agreement was a much more important part of the overall FertiNitro project than the contract at issue in *Joy Mining*.  In *Global Trading*, the tribunal adopted a pragmatic approach when considering whether the sale of poultry could be an investment; and it did not categorically exclude all purely commercial transactions from the definition of investment.[301]

6.44    *Article 2:*  KNI contends that the Offtake Agreement was an "[investment] in the territory of one Contracting Party made in accordance with its laws and regulations by investors of the other Contracting Party" in accordance with Article 2 of the Treaty.  According to KNI, Article 2 of the Treaty is a standard clause in bilateral investment treaties that "merely establishes the temporal scope and subject-matter of the Treaty."[302] This provision cannot be interpreted as incorporating requirements that the investment contribute to the host State's economic development.  Moreover, such a developmental requirement has been dismissed by many tribunals, given its highly subjective nature.[303]  In addition, the cases on which the Respondent attempts to rely "focus on *geographical connections* where an

---

[297] Cls. Rej., Paragraph 22.
[298] Cls. PHB, Paragraph 22.
[299] Cls. Reply, Paragraph 325; Cls. Rej., Paragraph 14.
[300] Cls. Rej., Paragraph 16.
[301] Cls. Reply, Paragraphs 355-361.
[302] Cls. Reply, Paragraph 394.
[303] *Id*.

investment's impact was felt," and not upon whether the investment benefited the host government.[304]

6.45   In any event, so KNI submits, the Respondent's argument should be dismissed as "the project was forecasted to bring and has indeed brought, considerable benefits to the local population and the country writ large, particularly through its monetisation at considerable prices of natural gas that would otherwise have been flared and payment of various national taxes."[305]  Further,

> *"After passing through the off-shore accounts and the project waterfall, a portion of the proceeds of the offtake – the net income – would make their way to FertiNitro in Venezuela. There were also derivative domestic sales in Venezuela.  The Offtake Agreement clearly had an impact in Venezuela that more than satisfies any territoriality requirement."*[306]

6.46   *Article 12:* KNI contends that the dispute resolution provisions in Article 12 of the Offtake Agreement do not prevent the Tribunal from deciding KNI's claim against the Respondent under the Treaty.  Article 41 of the ICSID Convention empowers this Tribunal to determine its own jurisdiction.

6.47   KNI submits that KNI's rights under the Offtake Agreement and under the Treaty are conceptually distinct.  Article 12 of the Offtake Agreement relates only to commercial arbitration for contractual disputes between its contracting parties, that is FertiNitro, Pequiven, IPSL and KNI.  By contrast, this dispute involves claims under international law brought by KNI against the Respondent on the basis of the Respondent's consent to ICSID jurisdiction in the Treaty regarding its unlawful expropriation of KNI's investment under the Treaty.  Thus, the Offtake Agreement's commercial arbitration clause has no effect on the jurisdiction of this Tribunal.[307]

---

[304] Cls. Rej., Paragraphs 90-92.
[305] Cls. Reply, Paragraph 395 (citations omitted).
[306] Cls. Rej., Paragraph 92.
[307] Cls. Reply, Paragraph 397.

*(4)*      ***The Tribunal's Analysis and Decision***

6.48    The Tribunal starts with Article 41 of the ICID Convention.  It is not disputed between the Parties, nor could it be, that the Tribunal "shall be the judge of its own competence."  As already indicated, this issue of jurisdiction concerns KNI and the Respondent, regarding KNI's claim for the alleged unlawful expropriation under Article 6 of the Treaty of its alleged investment comprising its interest in the Offtake Agreement.[308]

6.49    The Respondent's jurisdictional objections relate only to KNI's claim.  In the Tribunal's view, the Respondent was right not to advance any like jurisdictional objection to KOMSA's claims in this arbitration: it is manifest that KOMSA made an "investment" as an indirect shareholder in FertiNitro from the outset of the FertiNitro project, within the meaning of Article 25(1) of the ICSID Convention and Article 1(2) of the Treaty.

6.50    The Tribunal accepts the Respondent's submission that KNI must satisfy the definitions of "investment" in both the Treaty and the ICSID Convention, as to which KNI bears the legal burden of proving its case on the Tribunal's jurisdiction.  It is a double test, each limb of which KNI must establish, applying the customary rules of international law for treaty interpretation codified in the VCLT, in particular Article 31 (1), whereby "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

6.51    This double test was described in Paragraph 25 of the Executive Directors' Report on the ICSID Convention:

> *"While consent of the parties is an essential prerequisite for the jurisdiction of the Centre, consent alone will not suffice to bring a dispute within its jurisdiction. In keeping with the purpose of the Convention, the jurisdiction of the Centre is further limited by reference to the nature of the dispute and the parties thereto."*[309]

---

[308] Offtake Agreement by and among Pequiven, IPSL and Koch Oil SA as Buyers and FertiNitro as Seller (8 April 1998) (C-19).

[309] Report of the Executive Directors on the Convention for the Settlement of Investment Disputes Between States and Nationals of Other States, pages 43-44. *See also*, Georges R. Delaume, "ICSID and the Transnational Financial Community", (1986) (CLA-96), page 104.

More recently, the editors of *Schreuer* have commented:

> *"If jurisdiction is to be based on a treaty containing an offer of consent, the treaty's definition of investment will be relevant. In addition, the tribunal will have to establish that the activity is an investment in the sense of the [ICSID] Convention. This dual test has at times been referred to as the 'double keyhole' approach or as a 'double-barrelled' test."*[310]

The Tribunal turns to the Treaty, as the first part of this dual test.

6.52    *The Treaty:* The Tribunal accepts KNI's submission that the definition of "investment" in Article 1(2) of the Treaty is very broad.  Its opening words succinctly define "investment" as including "every kind of asset.".  In the Tribunal's view, this wording does not permit additional requirements not implicit in the meaning of the word "investment". However, in the list that follows, there are five particular, non-exhaustive examples of such assets satisfying the definition of "investment."   KNI relies on Articles 1(2)(b) and (c) of the Treaty listing "shares, parts [sic] or any other kinds of participation in a company" and "claims to […] any performance under a contract."

6.53    For the present case, subject to Article 2 of the Treaty and the ICSID Convention (considered below), the Tribunal considers that its jurisdiction as to a covered "investment" under the Treaty is established under Articles 1(2)(b) and (c) of the Treaty.  The Treaty expressly there defines shares or participation in a company and contractual performance as an asset meeting its own definition of "investment." The ordinary meaning of these words, in their context and in the light of the Treaty's object and purpose under Article 31 of the VCLT, is unambiguous.

6.54    As was decided in *Rosinvest v. Russia* on the interpretation of a similarly broad definition of an investment:

> *"The very wide wording of that definition does not contain any term limiting 'investment' to something created under applicable national law. The definition states that 'investment' means every kind of asset and goes on to set out a non-exhaustive list of types of asset including 'shares in, and stock, bonds and debentures*

---

[310] ICSID Convention: A Commentary (CLA-3), page 117.

*of, and any other form of participation in, a company or business enterprise'. In drafting this straightforward and very wide definition, the State parties to the IPPA [the BIT between the UK and the USSR] clearly expressed the intention that any asset should be included and the Tribunal considers Claimant's holding of Yukos shares to be such an asset."*[311]

6.55   In these circumstances, it would be inappropriate, under Article 31 of the VLCT or otherwise, to add to this express definition and specific examples any other requirement. However, even if this result were wrong in treating KNI's "investment" on a stand-alone basis, the same result is nonetheless achieved under Article 1(2) of the Treaty by applying the concept of "unity of investment", as considered below under Article 25(1) of the ICSID Convention.

6.56   *The ICSID Convention:* The Tribunal interprets Article 1(2) of the Treaty independently from Article 25(1) of the ICSID Convention, whilst bearing in mind the admonition in the annulment decision in *MHS v. Malaysia*:

*"It is those bilateral and multilateral treaties which today are the engine of ICSID's effective jurisdiction. To ignore or depreciate the importance of the jurisdiction they bestow upon ICSID, and rather to embroider upon questionable interpretations of the term 'investment' as found in Article 25(1) of the Convention, risks crippling the institution."*[312]

Hence, the issue of the Tribunal's disputed jurisdiction must turn next upon the meaning of Article 25(1) of the ICSID Convention, as the second part of this 'dual test'.

6.57   The Tribunal accepts the Respondent's legal submission that a "pure sales contract" cannot, by itself, satisfy the meaning of "investment" in Article 25(1) of the ICSID Convention. However, as was decided in *Pantechniki v. Albania*: that submission "may quickly lose traction in the reality of economic life."[313]

---

[311] *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration V (079/2005), Final Award (12 September 2010) (CLA-9), Paragraph 388. (This award was annulled by the Swedish courts on unrelated jurisdictional grounds).
[312] *MHS v. Malaysia* (RLA-23), Paragraph 73.
[313] *Pantechniki S.A. Contractors & Engineers v. Republic of Albania*, ICSID Case No. ARB/07/21, Award (30 July 2009) (CLA-97), Paragraph 44.

6.58    In the Tribunal's view, the Offtake Agreement was not a "pure sales contract" legally or economically.  It is, on the evidence, impossible to separate it out as a separate stand-alone transaction wholly unrelated to the overall FertiNitro project, which was, by any standards, a legal and economic behemoth.  As was decided in *CSOB v. Slovakia*:

> "*An investment is frequently a rather complex operation, composed of various interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment. Hence, a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms an integral part of an overall operation that qualifies as an investment […] The foregoing analysis indicates that the term 'directly', as used in Article 25(1) of the Convention, should not be interpreted restrictively to compel the conclusion that CSOB's claim is outside the Centre's jurisdiction and the Tribunal's competence merely because it is based on an obligation of the Slovak Republic which, standing alone, does not qualify as an investment.*"[314]

6.59    Other arbitration tribunals have adopted the same holistic approach to the meaning of "investment" in Article 25(1) of the ICID Convention, without necessarily using that term or the similar term "unity of investment".  The Tribunal refers to the decisions in *Inmaris v. Ukraine*,[315] where the tribunal considered the "claimed investments as component parts of a larger, integrated investment undertaking"; *Ambiente Ufficio v. Argentina,* [316] where the tribunal stated that "when a tribunal is in presence of a complex operation, it is required to look at the economic substance of the operation in question in a holistic manner"; *ADC Affiliate v. Hungary*,[317] where the tribunal looked "at the totality of the transaction as encompassed by the Project Agreements"; *Electrabel v. Hungary,*[318] where the tribunal decided that "all the elements of the Claimant's operation must be considered for the purpose of determining whether there is an investment under Article 25"; and *Chevron v.*

---

[314] *CSOB v. Slovak Republic* (RLA-5), Paragraphs 72, 74.
[315] *Inmaris v. Ukraine* (CLA-91), Paragraph 92.
[316] *Ambiente Ufficio v. Argentina* (CLA-90), Paragraphs 428, 453.
[317] *ADC Affiliate Ltd. v. Republic of Hungary,* ICSID Case No. ARB/03/16, Award (27 September 2006) (CLA-16), Paragraph 331.
[318] *Electrabel v. Hungary* (RLA-110), Paragraph 5.44.

*Ecuador*,[319] where it was said that "[i]nvestments must also be examined holistically and not separated into components."  It is thus not permissible to slice up an overall investment into its constituent parts, like a sausage, so as to contend that one part, isolated by itself alone, is not an "investment" whereas as an integrated part of the whole investment, it is.

6.60    The question remains whether the Offtake Agreement was an integral part of KOMSA's original investment in the overall FertiNitro project.  The Tribunal notes, again, that the Respondent does not contend that KOMSA was not an investor with an investment under Article 25(1) of the ICSID Convention, as regards its equity interest in the FertiNitro project.  (The Tribunal returns to KNI's position as KOMSA's assignee later below.)

6.61    In the Tribunal's view, the economic evidence is overwhelming.  Professor Esty (of Harvard University and an expert on business economics) testified that an offtake agreement "is a critical, integrated, and economically inseparable part of a project company, and is viewed this way by all project participants including lenders, sponsors and credit analysts;"[320] this Offtake Agreement "was a critical, integrated and economically inseparable part of the FertiNitro project company;" it was also critical "to the project's success and its ability to pay expenses, service debt obligations and generate returns for the sponsors";[321] and "I do not believe this project [the FertiNitro project] could have been financed without an offtake agreement.  In fact, the offtake agreement is precisely what provided the credit support needed to finance the project."[322]  The Tribunal notes that the FertiNitro project required credit support from lenders to finance US$ 700 million (in the form of US$ 250 million as Bonds and US$ 450 million as Senior Bank Debt), secured (*inter alia*) on the stream of FertiNitro's revenue under the Offtake Agreement.  As a result, at the time, Moody's rating of the FertiNitro project was materially influenced by the Offtake Agreement.[323]

---

[319] *Chevron Corp. (USA) v. Republic of Ecuador*, UNCITRAL, Final Award (31August 2011) (CLA-63), Paragraph 19.
[320] Esty ER1, Paragraph 27 (emphasis omitted).
[321] Esty ER1, Paragraphs 28-29.
[322] Second Expert Report of Benjamin C. Esty (14 March 2014) ("Esty ER2"), Paragraph 4.
[323] P. List, A Chemical Storm, 8 Proj. Fin. 35 (June 1998) (C-17), page 36.

6.62    The Offtake Agreement was also legally integrated with the FertiNitro project.   Its preamble referred expressly to the JIA; Article 11.1 provided for a term of 20 years or until FertiNitro had repaid its Bonds; and Articles 11.4 and 11.5 provided that output available to offtake buyers was dependent upon continued levels of equity in FertiNitro by such buyers.[324]  The Offtake Agreement also referred to other Project Documents: see Articles 3.2, and 4.2.  In turn, Article IV of the JIA referred to the Offtake Agreement, where the parties agreed that the Offtake Agreement was "necessary to give effect to this [JIA] […]" and "[…] necessary and appropriate to give effect to the intent of the Owners as expressed in this [JIA] and to enable the construction of the Plants and operation of the Business."

6.63    Section 3.01(b) and (c) of the Common Security Agreement with the Senior Banks recorded FertiNitro's representation that it had authority to enter into the Offtake Agreement and that the Offtake Agreement was legally binding upon FertiNitro; Sections 5.01(b) and 5.03(b) required FertiNitro to give irrevocable instructions to Offtakers (including KOMSA and later KNI) to make payments to offshore accounts in US dollars under the Offtake Agreement, for the benefit of the lending banks (as earlier indicated in the Bond Offering Circular);[325]  Section 6.01(a)(iii) recorded FertiNitro's pledge to the lending banks of all its rights in the Offtake Agreement; Section 9.01(c) made the Offtake Agreement a condition precedent to the Common Security Agreement; and Section 10.01(g) made a default by KOMSA (later KNI) under the Offtake Agreement an event of default by FertiNitro under the Common Security Agreement.[326]

6.64    The factual evidence from contemporary witnesses is consistent with this economic and legal analysis.  Mr Barrientos (of Pequiven) testified that the purpose of the Offtake Agreement, although (in his legal view) a separate sales contract, "was to provide FertiNitro a continuous revenue stream.  This enabled FertiNitro to fulfill its obligations, especially with banks and bondholders […]. The Offtake Agreement was implemented pursuant to this concept: it was not to ensure revenues to KOMSA or any shareholder in

---

[324] Joint Investors Agreement by and among Pequiven, Koch Oil SA, Snamprogetti Netherlands BV, and Polar Uno, CA (8 April 1998) (C-18).
[325] Bond Offering Circular (C-115).
[326] Common Security Agreement (21 April 2008) (C-137).

particular."[327] At the time, FertiNitro's US lawyers, Davis Polk & Wardwell, advised its board of directors by letter dated 18 May 2005:[328]

> *"As the Board will be aware, the terms of the current Offtake Agreement are the product of extensive negotiations among the offtakers, the FertiNitro shareholders and the FertiNitro creditors, are legally binding and reflect not only the fertilizer market conditions existing or anticipated at the time, but also the overall contractual […] framework for the project and their attendant financial impact on the parties. Therefore, any change to the Offtake Agreement cannot be viewed in isolation as a negotiation between FertiNitro's shareholders and the offtakers but must also account for the creditors as well as the prior and current roles of the participants in capacities other than as shareholders and offtakers (for example, Pequiven and its affiliates as the suppliers of feedstock and other services to the project and Snamprogetti as the construction contractor for the project).*
>
> *In particular, the lenders relied on the Offtake Agreement to establish an assured distribution channel for the plant's output as well as on the credit support, liquidity and currency risk mitigation inherent in the obligations of the offtakers to take and pay for product tendered by the plants. The project's debt is secured by the receivables owed by Koch and Pequiven to FertiNitro under the Offtake Agreement (including a pledge by IPSL of its own receivables from export sales). The attributes of the Offtake Agreement were fundamental to the lenders and the lenders view the financial strength of the project as linked to the financial and marketing strength of the offtakers and their respective commitments to the project."*

6.65 Mr Gwaltney (of Koch, and an alternate director of FertiNitro nominated by KOMSA) testified that Offtake Agreement was "an integral part of the overall investment and structure of the FertiNitro project. It was a 'package deal'. KOMSA would obtain an equity interest in the FertiNitro Companies and would also commit to purchasing offtake on a long-term, take-or-pay basis." He testified further:

> *"The Offtake Agreement was an essential element of Koch's investment. Without these valuable rights, KOMSA would not have made its investment in FertiNitro. Furthermore, given that the Offtake Agreement obligated KNI to purchase product*

---

[327] Second Witness Statement of Victor D. Barrientos (30 December 2013), Paragraph 28.
[328] Memorandum to Offtake Agreement Review Committee of the Board of Directors of FertiNitro (18 May 2005) (C-118) page 2.

*from FertiNitro on a 'take or pay' basis and for an extended period of time, it satisfied a critical requirement of the project finance lenders."*[329]

6.66    Based on these materials, the Tribunal considers that the Offtake Agreement was an integral and essential part of the overall investment made by KOMSA.  It was not a distinct or separate part, to be considered as a different unrelated transaction.  Nor was it a 'pure sales contract', whether judged from an economic, legal or broader commercial perspective.   Accordingly, whether KOMSA's interest in the Offtake Agreement was an investment under the ICSID Convention must stand or fall with KOMSA's entire transaction relating to the FertiNitro project.

*6.67*    In brief, the Tribunal concludes that KOMSA's entire transaction, with its related equity contribution and offtake rights and obligations, were part of a single integrated investment within the meaning of Article 25(1) of the ICSID Convention.  Apart from the Offtake Agreement (if a separate transaction which the Tribunal has here rejected), the Respondent does not contend otherwise.  As regards this single transaction (including the Offtake Agreement), the Tribunal decides that it meets all the indicia of an investment as to contribution, risk, duration and economic development under the *Salini* test, howsoever applied.[330]

*6.68*    *Article 2 of the Treaty:* As an integral part of an entire transaction, the Tribunal accepts KNI's submission that the Offtake Agreement was an "[investment] in the territory of one Contracting Party made in accordance with its laws and regulations by investors of the other Contracting Party" in accordance with Article 2 of the Treaty.

6.69    *Article 12:* The Tribunal can also address summarily the Respondent's reliance on the dispute resolution provisions in Article 12 of the Offtake Agreement.  Whilst possibly relevant to issues of liability under Article 6 of the Treaty (to which the Tribunal returns

---

[329] Gwaltney WS1, Paragraph, 33.
[330] *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction (16 July 2001) (RLA-7), Paragraphs 50-58.   *See also Phoenix Action v. Czech Republic*, ICSID Case No. ARB/06/05, Award (15 April 2009) (RLA-22), Paragraphs 82-85; and *Philip Morris Brand Sàrl et al. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction (2 July 2013) (CLA-144), Paragraph 200.

below), the Tribunal decides that these provisions do not support the Respondent's jurisdictional objection.  KNI's claim is directed in this arbitration to the Respondent and not FertiNitro; KNI invokes the Respondent's obligations under the Treaty and international law (as its applicable law), and not FertiNitro's obligations under the Offtake Agreement and New York law (as its applicable law).  The causes of action, the legal texts, the applicable laws and the disputing parties are thus all materially different.

6.70    Lastly, does it make a difference to any part of this analysis that KOMSA later assigned (or novated) its interest in the Offtake Agreement to KNI, whereby (so it could be said) the Offtake Agreement ceased to be part of an entire integrated investment?  This question too could have raised difficulties here, but for one important factor.  The assignment from KOMSA to KNI was an internal reorganization between associated companies within the same Koch group of companies.  It did not introduce an unrelated third party or materially change the transaction.  Nor could it have done so given Articles 11.4 and 11.5 of the Offtake Agreement.  The Respondent does not challenge the efficacy of the assignment under the Offtake Agreement.  Hence, although different in form, given the different legal personalities of KOMSA and KNI, the assignment produced no material economic, legal or commercial difference in substance.

6.71    *Decision*: In conclusion, for all these reasons, the Tribunal dismisses the Respondent's jurisdictional objection to KNI's claim in this arbitration under Articles 1(2) and 2 of the Treaty and Article 25(1) of the ICSID Convention.

## *PART VII: EXPROPIATION ISSUES*

### *(1)*    *Introduction*

7.1    As already indicated, the Claimants contend that the Respondent is liable under six provisions of the Treaty; namely: (1) Article 6 ("Expropriation"), (2) Article 4(1) ("FET"), (3) Article 4(1) ("FPS") (4) Article 4(1) ("Arbitrary or Discriminatory Measures"); (5) Article 4(2) ("National Treatment"); and (6) Article 11(2) ("Umbrella Clause").  In this Part VII of the Award, the Tribunal addresses the issue of liability for the Claimants' claims for unlawful expropriation under Article 6 of the Treaty.  The issues of liability for the other non-expropriatory claims are addressed in Part VIII below.

7.2    It is again necessary to summarise the Parties' respective cases as to the expropriation issues.  As with the jurisdictional issues and indeed all other issues, the Tribunal has considered the Parties' cases on liability in full; and it should not be assumed that the omission from these summaries of any submission or other material invoked by any Party has been overlooked by the Tribunal.

### *(2)*    *The Claimants' Case*

7.3    In summary, the Claimants contend that the wording of Article 6 of the Treaty captures any taking of property, whether tangible or intangible, thus including shares, equity and contractual interests; and that it prohibits expropriation unless a four-prong test is satisfied, namely: (i) the measure must be taken in the public interest, (ii) on a non-discriminatory basis, (iii) under due process of law, and (iv) with payment of compensation.[331]   The Claimants then turn to the two alleged unlawful expropriations by the Respondent; namely: KOMSA's interest in FertiNitro and KNI's interest in the Offtake Agreement.[332]

7.4    *KOMSA:* With regard to KOMSA's interest in FertiNitro, KOMSA submits that the Respondent's measure, Decree 7713 (the Expropriation Decree) read with the Minister's public statements, constituted an unlawful indirect expropriation.  First, the Respondent

---

[331] Cls. Mem., Paragraphs 200-214.
[332] Cls. Mem., Paragraphs 215-220.

cannot prove the public interest prong because there was no shortage of fertilizer impacting its domestic food production, and the taking was in any case disproportionate.[333] Second, the measure was discriminatory because it furthered Pequiven's interests to the detriment of all other shareholders in FertiNitro.  KOMSA rejects the Respondent's argument that Pequiven and KOMSA were not similarly situated because they operated in different markets and thus were not competitors.[334]   Third, the measure breached due process because no advance notice was provided to KOMSA, the expropriation having been notified during the President's weekly television show during which the President signed the Expropriation Decree.  KOMSA rejects the Respondent's argument that various channels of information, including earlier threats or unrelated governmental actions, could have constituted proper notice to KOMSA under international law.[335]  Fourth, no effective compensation has ever been paid to KOMSA.[336]  KOMSA submits that Article 6 requires effective compensation for the Respondent to discharge its obligations, not mere negotiations or lengthy domestic litigation.[337]

7.5   *KNI:* With regard to KNI's interest in the Offtake Agreement, KNI submits that Decree 7713 constitutes an unlawful indirect expropriation for the same reasons as those submitted by KOMSA.  KNI contends that the Respondent nullified KNI's rights to performance by FertiNitro of the Offtake Agreement.[338]  The fact that the Offtake Agreement was only terminated by FertiNitro in February 2012 (as contended by the Respondent), many months after the Expropriation Decree and the Minister's statements is irrelevant, according to KNI, because the substance of the Offtake Agreement had already been adversely impacted on 11 October 2010 and, in any event, the later termination was attributable to the Respondent (by its control of Pequiven and, consequentially, FertiNitro).[339]   In addition, KNI rejects the Respondent's argument that it did not expropriate KNI's interest in the Offtake Agreement because that argument is incompatible

---

[333] Cls. Reply, Paragraphs 133-146; Cls. PHB Paragraph 86.
[334] Cls. Reply, Paragraphs 147-161; Cls. PHB Paragraphs 87-91.
[335] Cls. Reply, Paragraphs 162-177; Cls. PHB Paragraphs 92-94.
[336] Cls. Mem., Paragraphs 221-235.
[337] Cls. Reply, Paragraphs 120-132; 178-179; Cls. PHB Paragraphs 95-100.
[338] Cls. Mem., Paragraphs 236-241; Cls. Reply, Paragraphs 180-186.
[339] Cls. Reply, Paragraphs 187-199.

with its public interest defence in defending FertiNitro's expropriation.  That defence relies upon Venezuela's alleged food production crisis that could only be mitigated if FertiNitro's performance of its contractual obligations towards KNI to acquire urea was also taken, *i.e.* expropriated, by the Respondent.[340]  As with KOMSA, the Respondent has paid no compensation to KNI, as at the date of this Award.

### (3)   *The Respondent's Case*

7.6     In summary, the Respondent contends that Decree 7713 ordered the mandatory acquisition of FertiNitro's assets, in accordance with Venezuela's domestic law and as expressly authorised under Article 6 of the Treaty.  It denies any liability under Article 6 to either KOMSA or KNI.

7.7     *KOMSA:* The Respondent contends that this acquisition was carried out in the public interest and for a public purpose, as to which States enjoy broad latitude under international law.  Specifically, the Respondent wished to ensure sovereign control over the means of domestic food production.  The Respondent contends that there is a direct link between the fertilizer sector and food production.  It points to the Venezuelan food crisis of 1998 and the potential general impact of malnutrition on a country's social peace.

7.8     The Respondent rejects the Claimants' heightened test according to which the Respondent must also prove the underlying hardship that gave rise to the policy and prove that the new policy is untainted by any political motives.  It submits that the proportionality test asserted by the Claimants is misplaced.   It is here only relevant to determine whether certain measures can rise to the level of expropriation. It has nothing to do with assessing the Respondent's food policy (which the Respondent submits was reasonable and proportionate in any event).[341]

7.9     The Respondent contends that its acquisition of FertiNitro was carried out in a non-discriminatory manner because Pequiven and KOMSA were not similarly situated.  They were not operating in the same markets, particularly with the Offtake Agreement.  The

---

[340] Cls. PHB, Paragraph 85.
[341] Resp. C-Mem., Paragraphs 144-148; Resp. Rej., Paragraphs 196-203; Resp. PHB, Paragraphs 66-80.

Respondent submits that merely acting in the same sector is not sufficient to be similarly situated. Moreover, Pequiven is a state-owned entity that was in charge of promoting food security (even before Decree 7713 was issued), whereas KOMSA is a private Swiss company. Further, there was a reasonable justification for treating Pequiven and KOMSA differently, given the policy of ensuring Venezuela's food security. In addition, Pequiven did not benefit from FertiNitro's acquisition. That acquisition merely facilitated the administrative process; and (ultimately) Pequiven had also to surrender its own equity interest in FertiNitro, just like all other FertiNitro shareholders. There was thus no intent by the Respondent specifically to target foreigners. Pequiven did not ultimately hold the assets of FertiNitro; and KOMSA did not receive any differential adverse treatment. [342]

7.10    The Respondent contends that the acquisition of FertiNitro was carried out under due process. KOMSA had received multiple notices of the upcoming acquisition. In the absence of any such language in Article 6, the Respondent challenges KOMSA's argument that prior notice is always required under a due process standard under international law. The Respondent had earlier expressed strong interest in the fertilizer sector; and KOMSA had received notice through various channels (including the press, Pequiven employees and other laws or decrees) that showed the Respondent's interest in the sector. Moreover, there were legal remedies available to KOMSA under domestic laws, including amicable negotiations, to challenge the acquisition of FertiNitro. [343]

7.11    The Respondent contends that it met its obligations under international law and Article 6 because it offered to negotiate effective and adequate compensation for KOMSA. At that time, only the amount of compensation, not the principle of compensation, was disputed between the Respondent and KOMSA. Also, according to the Respondent, Article 6 does not require immediate payment of compensation by the Respondent. The Respondent also submits that Pequiven (for the Respondent) always negotiated in good faith and made a reasonable offer of compensation, until KOMSA itself put an end to the negotiations. Under international law, so the Respondent submits, where only the valuation of the asset

---

[342] Resp. C-Mem., Paragraphs 149-164; Resp. Rej., Paragraphs 204-216; Resp. PHB, Paragraphs 83-97.
[343] Resp. C-Mem., Paragraphs 165-175; Resp. Rej., Paragraphs 217-224; Resp. PHB, Paragraphs 98-104.

remains in dispute, the offer of compensation suffices for the State to discharge its obligation regarding compensation under the treaty.  The Respondent also submits that the pending litigation before the Venezuelan courts regarding the amount of compensation will lead to compensation to be paid by the Respondent to the Claimant in due course.[344]

7.12    *KNI:* The Respondent contends that it did not expropriate KNI's contractual interest in the Offtake Agreement, even assuming (contrary to its jurisdictional objection) that such an interest was an "investment" under the Treaty.

7.13    According to the Respondent, Decree 7713 does not include any language regarding KNI's contractual rights to buy urea and ammonia under the Offtake Agreement; KNI's contractual rights were unaffected by the Decree; and those rights were not an "asset" under the Decree.

7.14    In addition, KNI continued to purchase such products under the Offtake Agreement after October 2010.  That was not done (as KNI asserts) under an *ad hoc* agreement made by an exchange of letters after the Expropriation Decree 7713 was issued.  KNI's interest in the Offtake Agreement was thus not expropriated by Decree 7713.  The Respondent challenges the testimony of the Claimants' witnesses according to which KNI was confused by the Decree and had understood the Offtake Agreement to be expropriated, thus requiring products to be delivered under a new *ad hoc* agreement for the future.  The Respondent submits that there is no convincing evidence supporting KNI's position. Ultimately, so the Respondent contends, FertiNitro (but not the Respondent) terminated the Offtake Agreement for its own clearly stated commercial reasons in February 2012.[345]

7.15    In any event, so the Respondent further contends, the alleged treatment of KNI's interest in the Offtake Agreement cannot be attributed to the Respondent under international law because FertiNitro was not part of the Respondent's organic structure, does not exercise governmental powers, nor was it under the effective control of the Respondent.  Pequiven

---

[344] Resp. C-Mem., Paragraphs 176-177; Resp. Rej., Paragraphs 225-232; Resp. PHB, Paragraphs 105-115.
[345] Resp. C-Mem., Paragraphs 181-184; Resp. Rej., Paragraph 237; Resp. PHB, Paragraphs 30-63.

was the only entity that administratively managed the acquisition of FertiNitro, without ultimately holding the assets.[346]

7.16    The termination of the Offtake Agreement by FertiNitro in February 2012 was a commercial decision that cannot be qualified as an expropriation under Article 6 of the Treaty; nor can it give rise to any liability under international law because it would be, at most, an ordinary contractual breach by FertiNitro that cannot amount to any "taking" by the Respondent under the Treaty.[347]

*(4)    The Tribunal's Analysis*

7.17    The Tribunal's starting-point is necessarily the Respondent's state policies on food security and domestic food production for the people of Venezuela, pre-dating Decree 7713 (the Expropriation Decree dated 10 October 2010). These policies are ostensibly laudable, with their origins pre-dating the Claimants' investments. In the Tribunal's view, short of the Expropriation Decree of 10 October 2010, there is nothing in these governmental policies that, by themselves, amount to a violation of the Claimants' rights under Article 6 of the Treaty. The Tribunal accepts that these policies were adopted by the Respondent in good faith, for a public purpose in feeding the people of Venezuela, in accordance with Venezuelan law and falling within the boundaries of rationality.

7.18    Moreover, it is not the function of this Tribunal to second-guess the design or existence of those policies under the Treaty, unless their execution by the Respondent actually violates the rights of KOMSA or KNI under the Treaty. As to that, as the Claimants, KOMSA and KNI bear the legal burden of proving their respective allegations in regard to the Expropriation Decree and the Minister's statements.

7.19    The bar for the Claimant's claims is thus high under international law, as confirmed by a '*jurisprudence constante*' established over many years. As was decided by the NAFTA tribunal in *Methanex v. USA*,[348] an intentionally discriminatory regulation against a foreign

---

[346] Resp. C-Mem., Paragraphs 185-194; Resp. Rej., Paragraphs 238-249; Resp. PHB, Paragraphs 64-65.
[347] Resp. C-Mem., Paragraphs 195-200; Resp. Rej., Paragraphs 250-251.
[348] *Methanex Corporation v. United States of America*, UNCITRAL, Final Award of the Tribunal on Jurisdiction and Merits (3 August 2005), Part IV, Chapter D, Page 4, Paragraph 7.

investor can fulfill a key requirement for establishing expropriation.   However, it also concluded:

> "[A]s a matter of general international law, a non-discriminatory regulation for a public purpose, which is enacted in accordance with due process and, which affects, inter alios, a foreign investor or investment is not deemed expropriatory and compensable unless specific commitments had been given by the regulating government to the then putative foreign investor contemplating investment that the government would refrain from such regulation."

More recently, the tribunal in *Philip Morris v. Uruguay* decided:[349]

> "As indicated by earlier investment treaty decisions, in order for a State's action in exercise of regulatory powers not to constitute indirect expropriation, the action has to comply with certain conditions. Among those most commonly mentioned are that the action must be taken bona fide for the purpose of protecting the public welfare, [and] must be non-discriminatory and proportionate."

7.20   Accordingly, the standard of review of a State's conduct to be undertaken by an international tribunal includes a significant measure of deference towards the State making the impugned measure.   Such a tribunal cannot simply put itself in the position of the Sate and weigh the measure anew, particularly with hindsight.   In *Lemire v. Ukraine*,[350] the ICSID tribunal referred to "the legitimate right of Ukraine to pass legislation and adopt measures for the protection of *what as a sovereign it perceives to be* its public interest" (emphasis here supplied).   It also decided:

> "As a sovereign State, Ukraine has the inherent right to regulate its affairs and adopt laws in order to protect the common good of its people, as defined by Parliament and Government. The prerogative extends to promulgating regulations which define the State's own cultural policy […]. The 'high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders' is reinforced in cases when the purpose of the legislation affects deeply felt cultural or linguistic traits of the community." (emphasis omitted).

---

[349] *Philip Morris Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award (8 July 2016), Paragraph 305.

[350] *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability (14 January 2010) (CLA-89), Paragraphs 273, 505.

The cited passage was there taken from the NAFTA award in *SD Myers v. Canada*.[351]

7.21   That same passage on deference was adopted by the tribunal in the *Saluka* award:[352]

> *"No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to regulate domestic matters in the public interest must be taken into consideration as well. As the S.D. Myers tribunal has stated, the determination of a breach of the obligation of 'fair and equitable treatment' by the host State 'must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders.'"*

7.22   The Respondent also cited passages from the decisions in *Kardassopolous v. Georgia* and *LIAMCO v. Libya*.  The former recorded the tribunal's view that "the Respondent is entitled to a measure of deference" in regard to the expropriation of the claimant's rights "in the Georgian public interest."[353]  The latter recorded the tribunal's decision that "motives are indifferent to international law, each State being free 'to judge for itself what it considers useful or necessary for the public good [...].'"[354]  The Tribunal accepts this general statement as forming the high water mark of a '*jurisprudence constante*" on deference. In this case, the Tribunal prefers a lower tide.  Motives are not wholly irrelevant and can be important in determining whether the act of a State was unlawful. Whilst it is inappropriate to second-guess a State's decision-making processes, for example as to issues of public interest, it is appropriate to consider whether such processes took at the relevant time any account of such issues.

7.23   In the Tribunal's view, even with this lower tide, the Claimants (both KOMSA and KNI) have not proven the first part of their four-pronged test, namely that the measures at issue

---

[351] *S.D. Myers, Inc. v. Canada*, UNCITRAL, Partial Award (13 November 2000) (RLA-52), Paragraph 263.

[352] *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award (17 March 2006) (CLA-19), Paragraph 305.

[353] *Kardassopoulos v. Republic of Georgia*, ICSID Case No. ARB/05/18 and ARB/07/15, Award (28 February 2010) (CLA-20), Paragraph 391.

[354] *Libyan American Oil Company (LIAMCO) v. Libyan Arab Republic*, Award, 20 I.L.M. 1 (12 April 1977) (RLA-37), Paragraph 114.

were not taken in the public interest.  As to the second and third prongs relating to discrimination and due process, the Claimants also bear the legal burden of proof.  The Tribunal decides that the Claimants have failed to prove their factual allegations relating to discrimination.  As to due process, the Tribunal does not consider that it here required advance notice of the Expropriation Decree – not under the Treaty, customary international law or Venezuelan law.

7.24    *KOMSA:* As regards the fourth prong, the Expropriation Decree 7713 and subsequent events speak largely for themselves.  The Decree provided for the immediate acquisition of all FertiNitro assets by the Respondent on 11 October 2010. If there were any ambiguity as to its terms or effect (which the Tribunal discounts as regards KOMSA's interest in FertiNitro), the public statements of the Respondent's Minister of Energy and Oil, made at the FertiNitro Plant also on 11 October 2010, confirmed that the Respondent was mandatorily acquiring, nationalising and seizing all of FertiNitro's assets: the Tribunal refers to its findings in Part V above.  There was at the time no compensation paid to KOMSA by the Respondent. Despite intimations by the Respondent to the contrary, there has still been no compensation paid to KOMSA more than seven years later.

7.25    In these circumstances, the Tribunal decides that the Respondent indirectly expropriated KOMSA's interest in FertiNitro on 11 October 2010. By that date, the Respondent should have complied with the express proviso in Article 6, requiring it (inter alia) to make "provisions […] for effective and adequate compensation" to be paid "without delay" to KOMSA for its expropriated interest in FertiNitro, then or later.  The Respondent did not do so.  It does not dispute that no compensation has ever been paid to KOMSA, even as of the date of this Award.  As from 11 October 2010, KOMSA's interest in FertiNitro was completely extinguished for all practical purposes: none of the rights associated with its shareholding in FertiNitro (via Koch José) could be exercised with the Respondent controlling FertiNitro's management and seizing all of FertiNitro's assets.

7.26    The Tribunal does not consider that the Respondent's subsequent offers to negotiate compensation with KOMSA (through Pequiven) complied with Article 6's proviso, still less when it is recalled that the Respondent has not tendered or paid even a small part of what it considered to be indubitably due to KOMSA.  Nor does the Tribunal consider that

the proviso was met by the opportunity afforded to KOMSA to engage in lengthy and uncertain legal proceedings in the Respondent's own courts in Venezuela, under Venezuelan law.  These legal proceedings were begun by Pequiven on 26 July 2011 and have reached no conclusion as regards compensation payable to KOMSA.[355]  The Tribunal recalls the frank statement made by the Respondent at the first session of this arbitration: "[…] as a State, we're conscious that there is an expropriation and that every expropriation requires a compensation, a fair compensation […]."[356]  For KOMSA, the issue was then correctly seen as the amount of compensation properly due to KOMSA, but not whether or not there was a liability by the Respondent to pay compensation to KOMSA under Article 6 of the Treaty. Even then, no compensation was tendered by the Respondent to KOMSA.

7.27    The Respondent cited a passage from the ICSID award in *Venezuela Holdings, B.V. et al (case formerly known as "Mobil Corporation, Venezuela Holdings B.V. et al"), v. Venezuela*, where the tribunal decided:

> "[…] the mere fact that an investor has not received compensation does not in itself render an expropriation unlawful. An offer of compensation may have been made to the investor and, in such a case, the legality of the expropriation will depend on the terms of that offer.  In order to decide whether an expropriation is lawful or not in the absence of payment of compensation, a tribunal must consider the facts of the case."[357]

This Tribunal does not reject this approach to the wording of Article 6 of the Treaty at issue in this arbitration.  However, on the facts of this particular case, there was no such firm offer of compensation made to KOMSA by the Respondent itself, but rather only belated, limited and unsuccessful negotiations with different figures advanced by Pequiven subject to further discussion and prior approval by the Respondent.  These were not "provisions […] for

---

[355] Petition for Expropriation and Provisional Relief to the Court of First Instance of the Judicial Circuit of Anzoátegui (26 July 2011) (R-36).
[356] First Session (21 December 2011), Transcript, p. 103.
[357] *Venezuela Holdings, B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (9 October 2014) (RLA-153), Paragraph 301. (This award was partially annulled on different grounds; *see* Decision on Annulment (9 March 2017), Paragraph 196.4.)

effective and adequate compensation" to be paid "without delay" to KOMSA, as required by Article 6 of the Treaty.

7.28    In these factual circumstances, under the approach taken by the *Mobil* tribunal, the Tribunal concludes that the Respondent has not made any meaningful offer of compensation or provided any meaningful procedure for compensation to KOMSA as required by Article 6 of the Treaty.

7.29    For these reasons, the Tribunal decides that the Respondent unlawfully indirectly expropriated KOMSA's interest in FertiNitro on 11 October 2010 in violation of Article 6 of the Treaty, as evidenced by the Expropriation Decree 7713 and the Minister's public statements of 11 October 2010 attributable to the Respondent.  Given the terms of Article 9(4) of the Treaty (set out in Part IV above), the Tribunal confirms that such an expropriation, as found by the Tribunal, is unlawful because the Respondent failed to comply with its obligations under Article 6 of the Treaty.  It was an indirect expropriation because, as the Tribunal accepts, there was no formal transfer of ownership of FertiNitro's assets until July 2011 under Venezuelan law; but it had, as an expropriatory measure, the same effect as a direct expropriation on 11 October 2010.

7.30    *KNI:* The Expropriation Decree 7713 issued on 11 October 2010 made no express reference to the Offtake Agreement or to KNI. However, on the same day, the Minister responsible for the Decree's execution, explained its immediate effect in public statements inconsistent with FertiNitro's further performance of the Offtake Agreement in accordance with its existing terms. As explained by the Minister, the effect of the Decree extended beyond FertiNitro's physical assets to include the abrogation of any existing contractual restrictions on FertiNitro's products being delivered in Venezuela otherwise than under the complete control of the Respondent, principally for the domestic Venezuelan market. Indeed, that was the motive for the Respondent seizing FertiNitro. In the Minister's own words: "With the control of this plant that the Venezuelan state will be taking, we now have guaranteed all of the urea that our farm workers may need, all of the urea that our producing sector may need, to sustain this extraordinary seeding plan and to sustain national development" (see Part V above). There was no point in the Respondent seizing FertiNitro's assets without the Respondent also seizing full and effective control over all its future production

in Venezuela.   Hence, Decree 7713 and the Minister's address are to be considered together, as one composite act.

7.31   At the time, that was the understanding of both Pequiven and KNI's officers. In his oral testimony, Mr Barrientos (of Pequiven) testified that the Minister's references on 11 October 2010 to the Respondent's new supply of 1.5 million tonnes of fertiliser to the Respondent referred to FertiNitro's total production of 1.5 million tonnes.[358] Mr Gwaltney (for KNI) also understood, as confirmed on 12 October 2010 by Mr Inciarte (then President of FertiNitro and President of Pequiven), that the Respondent had taken complete control of FertiNitro.[359] Mr Parra (for KNI) also understood from Mr Inciarte that  "KNI's offtake would also be taken over by the government."[360] Mr Inciarte was not made available by the Respondent as a witness in this arbitration.

7.32   The Respondent, however, now faced a significant problem with FertiNitro's bondholders and lending banks, for whom sale proceeds paid by KNI under the Offtake Agreement operated as security. To avoid a default, with possibly wide ramifications for FertiNitro and the Respondent at the time, the Respondent (through Pequiven) invited KNI to continue to purchase FertiNitro's product.

7.33   The first relevant exchange between FertiNitro and KNI was the letter dated 26 November 2010 from Mr Edgar Alonso Flóres (FertiNitro's commercial manager) to Mr Strand (for KNI), confirming "the continuing of the Offtake Agreement under the fulfil of each clause […]".[361] It was followed by the letter dated 1 December 2010 from Mr Perdomo (FertiNitro's general manager) also to Mr Strand (for KNI), confirming "the continuing and fulfilling of the Offtake Agreement.[362]   (Both letters are cited more fully in Part V above).

---

[358] First (September) Hearing, D3.111-112.
[359] Witness Statement of Brent W. Gwaltney (30 May 2012) ("Gwaltney WS1"), Paragraph 122.
[360] Witness Statement of Melquíades A. Parra (29 May 2012) ("Parra WS1"), Paragraph 73.
[361] Email from E. Flores to J. Strand re: Offtake Agreement FertiNitro (26 November 2010) (C-111).
[362] Letter from J. Perdomo to J. Strand (1 December 2010) (C-112).

7.34    As to this first letter, Mr Flóres testified that FertiNitro had no product available for delivery to KNI in October 2010 because the FertiNitro Plant was shut down; and that he had been instructed to send his letter to KNI by Mr Perdomo.[363]   As to this second letter, Mr Perdomo was not made available by the Respondent as a witness in this arbitration.

7.35    The next relevant exchange came with a visit by Mr Garcia (for Pequiven and a member of FertiNitro's *ad hoc* board of trustees) to Messrs Gwaltney and Parra (for KNI) on 2 December 2010. Mr Gwaltney testified: "He [Mr Garcia] emphasized that the main goal was to maintain stability at FertiNitro while Pequiven's negotiations with the lenders to repay the outstanding debt were underway. He said that Pequiven wanted KNI to take product from FertiNitro until Pequiven had reached arrangements with the lenders to prevent a default. He added that once a path forward had been agreed to with the lenders, Pequiven would work to compensate the shareholders and would assume KNI's obligation for purchasing the product."[364]   Mr Parra testified in similar terms: "He told us that Pequiven wanted KNI to lift product from FertiNitro until Pequiven had reached a solution with the lenders and bondholders. He added that once a path forward had been agreed to with the lenders and bondholders, Pequiven would work to compensate the shareholders and would purchase KNI's share of the offtake."[365] Mr Garcia was not made available by the Respondent as a witness in this arbitration.

7.36    In response to Pequiven's correspondence and Mr Garcia's visit, Mr Gwaltney then wrote KNI's email message of 3 December 2010 to Mr Perdomo (of FertiNitro), recited in Part V above.[366] It can be assumed that, on both sides, lawyers were by now actively involved in drafting or vetting all correspondence between Pequiven and KNI. Words now mattered for all parties; but, in the Tribunal's view, the parties' contemporary conduct is more significant, viewed objectively.

---

[363] First (September) Hearing, D4.78ff.
[364] Gwaltney WS1, Paragraph 126.
[365] Parra WS1, Paragraph 75.
[366] Email from B. Gwaltney to J. Perdomo, copying J. Strand, T. Parra, F. Garcia re:  KNI Offtake (3 December 2010) (C-113).

145

7.37    Mr Flóres (of FertiNitro) saw Mr Gwaltney's email to Mr Perdomo "a few days after Mr Perdomo received it."[367] He confirmed that neither he nor anyone else at FertiNitro replied to Mr Gwaltney or voiced any objection to KNI regarding his email.[368]  If FertiNitro did not agree with KNI's understanding of the position following the events of 11 October 2010, FertiNitro should have said so at the time before deliveries resumed to KNI in late 2010.  There is no evidence before this Tribunal that FertiNitro's omission to do so was due to any inadvertence or mistake. In the circumstances, KNI could reasonably understand, as it did, that FertiNitro shared KNI's understanding of the situation.

7.38    Where their accounts differ as to these several events, the majority of the Tribunal finds more persuasive the testimony of Mr Gwaltney and Mr Parra called by KNI to the factual witnesses called by the Respondent.

7.39    From 3 December 2010 onwards, the majority of the Tribunal finds that KNI took offtake from FertiNitro on the terms of Mr Gwaltney's email message of 3 December 2010 for about 15 months, totalling about 333,000 tonnes of ammonia and 650,000 tonnes of urea. Those offtakes ceased with FertiNitro's letter dated 28 February 2012, signed by Mr Hernández (as the president of FertiNitro's *ad hoc* board of trustees).[369]  This letter was drafted with legal advice from Mr Barrientos, as he confirmed in his testimony.[370]  Mr Barrientos also testified, somewhat grudgingly, that FertiNitro would have continued selling product to KNI, but for the Expropriation Decree and the resignation of FertiNitro's board of directors.[371]  Mr Hernández was not made available by the Respondent as a witness in this arbitration  (The relevant terms of this letter are also recited in Part V above).

7.40    FertiNitro's letter dated 28 February 2012 was not expressed as a termination of the Offtake Agreement.  It announced that FertiNitro would no longer sell its product to KNI under the Offtake Agreement "all of which is in fulfilment of what is established in the

---

[367] First (September) Hearing, D4.80.
[368] First (September) Hearing, D4.81-82.
[369] Letter from B. Hernández to Koch Oil SA and Koch Nitrogen Company re:  Offtake Agreement (28 February 2012) (C-114).
[370] First (September) Hearing, D3.74.
[371] First (September) Hearing, D3.82-83.

[Expropriation Decree] which orders the compulsory acquisition of movable and immovable property […]".  At this time, so it appears, FertiNitro and the Respondent no longer faced the risk of default to bondholders and banks, because FertiNitro had apparently satisfied the debt to its lenders by December 2011, following the Stand Still Agreement of December 2010 (not made available by the Respondent in this arbitration). Hence, so it seems, sale proceeds from KNI were no longer required to prevent an act of default by FertiNitro. It is not clear to the majority of the Tribunal, on the evidence available in this arbitration, that the Offtake Agreement was terminated in February 2012, whether by FertiNitro, Pequiven or the Respondent (it was not terminated by KNI).  What was being terminated was the *ad hoc* arrangement described in Mr Gwaltney's email message of 3 December 2010.

7.41    In the majority of the Tribunal's view, there was a material difference between the Parties' positions under the Offtake Agreement before the expropriation on 11 October 2010 and their positions thereafter to 28 February 2012 under the terms of Mr Gwaltney's email message of 3 December 2010.

7.42    Mr Parra (of the Koch group of companies and a former director of FertiNitro) testified as to this difference for the period from 11 October 2010:[372]

> "*It was not an Offtake Agreement anymore.  We continued to purchase product on a spot basis, and my trading experience in crude oil and refined products made this a very, very clear spot type of agreement, and I'm happy to go into the details of why I say that. The conditions under which we were buying were very different from the conditions that existed prior to expropriation in the Offtake Agreement, sir. We were buying on a spot basis without obligation to lift a product. The supplier did not have any obligation whatsoever to supply the product. The fact that the pricing mechanism was agreed between the parties to be the same was a matter of practicality in the sense that there was a formula already existing and the parties said: well, we can carry on with the formula. But the sales themselves were not tied, as they were before the expropriation, they were not tied to a specific time period, they were not tied to an obligation to buy. They were not tied to an obligation to pay if you did not take the product, so it was a completely different character of the contract, sir.*"

---

[372] First (September) Hearing, D2.88-89.

7.43    The change meant that, with the Respondent fully controlling FertiNitro and its production, KNI lost any contractual security of supply from FertiNitro. KNI was thus unable to optimise future sales of product or to optimise future freight arrangements. As Mr Parra testified, the change required KNI to operate, effectively, on the spot market. This diminished operation mitigated KNI's resulting losses up to 28 February 2012; but, whilst relevant to the assessment of compensation (addressed in Part IX below), it cannot affect the issue of liability as at 11 October 2010. In the majority of the Tribunal's view, KNI's interest in the Offtake Agreement was nullified from 11 October 2010 onwards.

7.44    Notwithstanding several intimations otherwise, including Mr Garcia's tentative offer of compensation on 2 December 2010 (as described above), the Respondent has not made any meaningful offer of compensation or provided any meaningful procedure for compensation to KNI as required by Article 6 of the Treaty.

7.45    Just as the Offtake Agreement was an integral part of the Claimants' single investment in the FertiNitro project (initially both made by KOMSA), so too was the object of the Respondent's expropriation, comprised of both KOMSA's interest in FertiNitro and KNI's interest in the Offtake Agreement. From 11 October 2010 onwards, FertiNitro was fully controlled and permanently disabled by the Respondent from complying with its obligations to KNI under the Offtake Agreement, save and insofar as the Respondent might permit FertiNitro to sell product to KNI on terms materially different from those provided by the Offtake Agreement; *i.e.* on the terms of Mr Gwaltney's email message of 3 December 2010. Following the events of 11 October 2010, FertiNitro, its production and sales were subject to the Respondent's full and effective control owing to FertiNitro's Venezuelan nationality and location in Venezuela, with the place of performance by FertiNitro of the Offtake Agreement also in Venezuela.

7.46    On 28 February 2012, by express reference to the Expropriation Decree, the Respondent (through Pequiven and FertiNitro) permitted such sales to KNI no longer. FertiNitro remained fully and effectively controlled by the Respondent, whereby FertiNitro was precluded by the Respondent from making any further *ad hoc* sales to KNI from 28 February 2012, just as it had been precluded from performing the Offtake Agreement from 11 October 2010 onwards. Throughout, FertiNitro (with Pequiven) thus acted under the

Respondent's "direction or control" within the meaning of Article 8 of the ILC Articles on State Responsibility.

7.47    The Tribunal does not consider that the Offtake Agreement can be treated as a mere offshore sales agreement unrelated to KOMSA's interest in FertiNitro. It is necessary to view the Respondent's measures of 11 October 2010 as the indirect expropriation of a single integrated investment. As the ICSID tribunal decided in *Electrabel v. Hungary*:[373]

> *"If it were possible so easily to parse an investment into several constituent parts each forming a separate investment […], it would render meaningless that tribunal's approach [in Tecmed] to indirect expropriation based on 'radical deprivation' and 'deprivation of any real substance' as being similar in effect to a direct expropriation or nationalisation. It would also mean, absurdly, that an investor could always meet the test for indirect expropriation by slicing its investment as finely as the particular circumstances required, without that investment as a whole ever meeting that same test."*

7.48    The majority of the Tribunal considers both KOMSA's original investment and the Offtake Agreement as a unitary package.  Just as the original investment would not have taken place without the Offtake Agreement, so too the expropriation of 11 October 2010 was not limited to FertiNitro's physical assets or shareholders, as expressed by the Minister's public statements explaining the intended effect of the Expropriation Decree.  KNI's investment cannot be sliced off and isolated, like a piece of sausage.

7.49    Moreover, the majority of the Tribunal does not consider that this is a case where KNI's interest in the Offtake Agreement (by reason of its foreign applicable law and foreign arbitral seat) could not be the subject of any claim under Article 6 of the Treaty against the Respondent because any claim by KNI could only be a contractual claim against FertiNitro, subject to a foreign substantive law and, in theory, with an arbitral remedy in a foreign country.  As KNI has made clear from the outset of this arbitration, its claim is advanced against the Respondent under the Treaty and international law and not as a contractual claim against its co-contractor, FertiNitro, under any national law.  The Respondent was

---

[373] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) (RLA-110) Paragraph 6.57.

never a party to the Offtake Agreement; domestic and international proceedings result from different causes of action with different forms of relief under different applicable systems of law; and there is here no satisfaction of any triple identity test.  In this case, such a contractual remedy (if, in practice, it existed at all) does not extinguish KNI's remedy against the Respondent for the indirect expropriation of its interest in the Offtake Agreement under Article 6 of the Treaty, as pleaded by KNI.

7.50     In this regard, it is unnecessary to list here the long line of awards from *Vivendi Annulment I* onwards which consistently distinguishes between a contract claim and a treaty claim in an ICSID or other investor-State international arbitration.[374]  KNI's claim under Article 6 is manifestly a treaty claim made under the Treaty against the Respondent and not a contractual claim under the Offtake Agreement against FertiNitro.  It is equally unnecessary to list the legal materials establishing that international law general prohibits the unlawful expropriation of contractual rights, both directly and indirectly, as does the Treaty.[375]  Under the Treaty, therefore, there is no cause to nullify a foreign investor's interest in the performance of its contract by its counter-party, where such performance has been deliberately thwarted and rendered valueless by the host State at the place of performance by the unlawful exercise of a power *iure imperii* within the State's own territory.

7.51     In these circumstances, the Tribunal decides (by a majority) that the Respondent unlawfully indirectly expropriated KNI's interest in the Offtake Agreement on 11 October 2010 in violation of Article 6 of the Treaty, as evidenced by the Expropriation Decree 7713 and the Minister's public statements both of 11 October 2010 attributable to the Respondent.  This was confirmed by FertiNitro's letter dated 28 February 2012 referring to its "fulfilment of what is established in the [Expropriation Decree] which orders the compulsory acquisition

---

[374] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award (21 November 2000); *see also* Christoph H. Schreuer et al., The ICSID Convention: A Commentary (2d ed. 2009), 73ff.

[375] *See, e.g.*, *The Norwegian Shipowners' Case (Norway v. USA)*, RIAA (13 October 1922), Volume I, Page 307 (1948), 325; *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award (20 May 1992), Paragraph 165; and *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction (14 November 2005) (CLA-11), Paragraph 255.

of movable and immovable property."[376]   As with KOMSA, given the terms of Article 9(4) of the Treaty, the Tribunal (by a majority) confirms that such an expropriation is unlawful because the Respondent failed to comply with its obligations under Article 6 of the Treaty.

7.52   It goes without saying, but it is best confirmed expressly, that the Tribunal has done its best to understand, perhaps for too long, its members' different reasoning, both as regards the Respondent's liability for KNI's claim but also (as will appear in Part IX below) the quantum of KNI's claim assuming such liability.   Although the minority's dissent raises factors not in the forefront of the Parties' respective cases, unfortunately these differences remain between the Tribunal's majority and minority; and, as is his right, the minority has recorded his disagreement with the majority in a dissenting opinion attached to this Award as required by ICSID Arbitration Rule 47(3).[377]

### (5)   The Tribunal's Decisions

7.53   *KOMSA:* The Tribunal decides that the Respondent is liable to KOMSA in regard to its claim for the Respondent's violation of Article 6 of the Treaty on 11 October 2010.

7.54   *KNI:* The Tribunal (by a majority) decides that the Respondent is liable to KNI for its claim for the Respondent's violation of Article 6 of the Treaty on 11 October 2010.

---

[376] Letter from B. Hernández to Koch Oil SA and Koch Nitrogen Company re:  Offtake Agreement (28 February 2012) (C-114).

[377] The genesis of the dissenting arbitrator's dissent can be found in A. Mann 'State Contracts and State Responsibility' in *Studies in International Law* (OUP, 1973), cited in the minority's dissent.

*PART VIII: NON-EXPROPRIATION ISSUES*

### *(1)    Introduction*

8.1    KOMSA's "Historical Losses" are advanced as claims against the Respondent under Article 4(1), Article 4(2) and Article 11(2) of the Treaty.  They comprise of losses allegedly suffered by KOMSA from losses allegedly suffered by FertiNitro originally, from: (i) new and increased taxes, (ii) non-payment (or late payment) of VAT credits, (iii) the effect of the Urea Decree and Urea Resolution, and, (iv) interference in FertiNitro's business.

8.2    The total compensation claimed by KOMSA for its "Historical Losses" is US$ 42 million. For KOMSA, Mr Giles calculates the breakdown of this total amount as follows: (i) US$ 4.7 million for the increased Municipal taxes and US$ 5.4 million for the new Science and Technology tax; (ii) US$ 7.7 million for VAT; (iii) US$ 22.4 million for the Urea Decree and Urea Resolution; and (iv) as to interference in FertiNitro's business, no specific figure is advanced by Mr Giles.[378]

8.3    For the Respondent, Dr Flores does not advance any specific figures for "Historic Losses". However, as regards VAT, Dr Flores testified that he included FertiNitro's outstanding VAT credits as working capital within his DCF calculations for KOMSA's expropriated interest in FertiNitro (without arriving at a separate, specific figure).  Dr Flores also testified that KOMSA lost nothing from the devaluation of Venezuela's currency in regard to VAT credits because FertiNitro used its VAT credits to pay local taxes in Venezuelan currency.[379]

8.4    The Tribunal summarises below the cases respectively pleaded by KOMSA and the Respondent, as to applicable law and fact. It then addresses in turn the merits of each claim. There is a significant overlap as to the legal and factual bases for KOMSA's claims.

---

[378] Cls. PHB, Table 4, "Points of Disagreement – Historical Losses" (set out below in Part IX).
[379] Expert Report of Daniel Flores (28 February 2013) ("Flores ER1"), Paragraph 168; Second Expert Report of Daniel Flores (3 March 2014) ("Flores ER2"), Paragraph 240.

**(2)**     ***The FET Standard – Article 4(1) of the Treaty***

8.5     ***KOMSA's Case****: In summary, as to law, KOMSA contends that the FET standard under Article 4(1) protects investors' legitimate expectations relating to their investment,[380] citing *Tecmed v. Mexico.*[381]   It concludes that States should not frustrate an investor's legitimate expectations that it will not act in an arbitrary manner or inconsistently with its legal framework, and more generally that modifications of the legal, regulatory and business framework on which the investor relied is a breach of the FET standard, further citing *Thunderbird v. Mexico,*[382] *Occidental v. Ecuador,*[383] and *National Grid v. Argentina.*[384]   KOMSA also contends that, under the FET standard, the requirement of transparency and procedural fairness includes openness in a State's decision-making process relating to investments, as well as the investors' involvement in that process,[385] citing *Tecmed v. Mexico* and *Waste Management v. Mexico.*[386]

8.6     KOMSA also invokes, under the FET standard*,* the requirement to maintain a stable and predictable legal and business environment, overlapping with the requirements regarding legitimate expectation and transparency,[387] citing *CMS v. Argentina,*[388] *LG&E v. Argentina,*[389] *PSEG v. Turkey*[390] and *Bayindir v. Pakistan.*[391]   KOMSA invokes the

---

[380] Cls. Mem., Paragraphs 242-253.

[381] *Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award (29 May 2003) (CLA-28).

[382] *International Thunderbird Gaming Corp. v. United Mexican States*, UNCITRAL (NAFTA), Award (26 January 2006) (CLA-31).

[383] *Occidental Exploration and Production Co. v. Republic of Ecuador,* UNCITRAL (LCIA), Case No. UN 3467, Final Award (1 July 2004) (CLA-27).

[384] *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award (3 November 2008) ("*National Grid v. Argentina*") (CLA-32).

[385] Cls. Mem., Paragraphs 242-245, 278-283; Cls. Reply, Paragraphs 232-233.

[386] *Waste Management, Inc. v. United Mexican States,* ICSID Case No. ARB(AF)/00/3, Award (30 April 2004) (CLA-34).

[387] Cls. Mem., Paragraphs 293-299.

[388] *CMS Gas Transmission Co v. Argentine Republic*, ICSID Case No. ARB/01/8, Award (12 May 2005) (CLA-36), Paragraph 276 (partially annulled).

[389] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006) (CLA-39), Paragraph. 131.

[390] *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award (19 January 2007) (CLA-40) Paragraph 254.

[391] *Bayindir Isaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction (14 November 2005) (CLA-11), Paragraph.240.

requirement of consistency, citing *Tecmed,* being applicable to all constituent parts of the State; [392] and the requirement that States must not abuse their authority. [393]

8.7    As to the facts, KOMSA alleges the following breaches of the FET standard in the Treaty: [394]

8.8    *Taxes:* The Respondent imposed a series of new taxes and tax increases on FertiNitro which prejudiced its profitability to the detriment of KOMSA, namely the new Science and Technology Tax (2% of gross income, ultimately causing FertiNitro to pay US$ 22.35 million from 2006 to October 2010) and the increase in Municipal taxes (from 1 to 4%, ultimately causing FertiNitro to pay US$ 18.82 million also from 2006 to October 2010). [395]

8.9    *VAT:* The Respondent repeatedly failed, either promptly or at all, to provide FertiNitro with VAT credits from 2005, ultimately causing FertiNitro to be owed US$ 28.3 million of VAT credits by the Respondent. [396]

8.10   *Urea Decree and Urea Resolution:* These new urea regulations impacted FertiNitro from 2007.  The Respondent had given assurances to a third party (METOR) that these new regulations would not apply to existing enterprises, such as FertiNitro.  Such compulsion interfered with pricing for FertiNitro's products and, also, the allocation of export markets between FertiNitro and Pequiven under the Offtake Agreement. [397]

8.11   *Interference:* The Respondent progressively interfered with the management, operations and profitability of FertiNitro, whereas KOMSA had received assurances that Pequiven would only act as a "commercial partner".  As an example, the Claimants refer to the Comisario Report of 7 September 2006, [398] as evidence of the Respondent's improper interference in FertiNitro's business.  The Respondent ultimately expropriated KOMSA's

---

[392] Cls. Mem., Paragraphs 311-313.
[393] Cls. Mem., Paragraph 316.
[394] Cls. PHB, Paragraphs 103-108.
[395] Cls. Mem., Paragraphs 256-260, 285, 315, 318; Cls. Reply, Paragraphs 220-225, 236-240.
[396] Cls. Mem., Paragraphs 261-267, 285, 286-288, 300-304, 315, 318; Cls. Reply, Paragraphs 226-227, 241-242.
[397] Cls. Mem., Paragraphs 268-277, 305-310, 315, 319-324; Cls. Reply, Paragraphs 228-231, 243-244; Cls. PHB, Paragraph 103.
[398] FertiNitro Report from the Statutory Auditor and Consolidated Financial Statements (7 September 2006) ("*Comisario Report*") (C-63)

interest in FertiNitro unlawfully in October 2010.[399]  (The Tribunal has already addressed this claim for expropriation under Article 6 of the Treaty, in Part VII above, and it is therefore unnecessary to do so again here.)

8.12  ***The Respondent's Case****:*  In summary, as to law, the Respondent contends that KOMSA relies upon an overbroad definition of the FET standard, ignoring both the text of the Treaty and international law.[400]  The Respondent emphasises the wording "in accordance with the rules and principles of international law" in Article 4(1) of the Treaty.  It also cites the decisions[401] in *Lauder v. Czech Republic,*[402] *Glamis Gold v. USA*[403] and *El Paso v. Argentina.*[404]  It submits that the similarly worded FET standards in these cases were correctly interpreted as the minimum standard under international customary law.  The Respondent also relies on the decision in *Flughafen v. Venezuela* (where the same Treaty was analysed), submitting that the tribunal there interpreted Article 4(1) of the Treaty as the minimum standard under customary international law.[405]

8.13  The Respondent challenges KOMSA's reliance on *Tecmed*'s broad formulation of the FET standard.  It asserts that the *Tecmed* award has been widely criticised and also runs counter to the express wording in Article 4(1) of the Treaty.  It rejects also other decisions cited by KOMSA as inapposite because the FET standards in those cases did not refer expressly to customary international law, as here. The Respondent concludes that, even adopting a broad interpretation of the FET standard, KOMSA does not articulate the evidential sources for its expectations or how those expectations were in fact legitimate.[406]

8.14  Generally, as with all KOMSA's "Historical Losses", the Respondent contends that KOMSA's alleged losses are not recoverable under the Treaty, unless KOMSA proves that

---

[399] Cls. Mem., Paragraphs 289-292, 315; Cls, PHB, Paragraph 103.
[400] Resp. C-Mem., Paragraph 202.
[401] Resp. C-Mem., Paragraphs 204-207.
[402] *Ronald S. Lauder v. Czech Republic*, UNCITRAL, Final Award (3 September 2001) ("*Lauder v. Czech Republic*") (CLA-45).
[403] *Glamis Gold, Ltd. v. United States of America*, UNCITRAL, Award (8 June 2009) (RLA-83).
[404] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award (31 October 2011) ("*El Paso v. Argentina*") (CLA-52).
[405] *Flughafen Zurich A.G. and Gestion e Ingenieria IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award (18 November 2014) ("*Flughafen v. Venezuela*") (RLA-154).
[406] Resp. C-Mem., Paragraphs 204-217; Cls. Rej., Paragraphs 252-274; Resp. PHB, Paragraphs 116-121.

the Respondent's allegedly wrongful actions impacted KOMSA's own financial position (as "flow-through damage"), and not only impacted FertiNitro (which, as to both, the Respondent denies).  The Respondent contends that KOMSA has failed to prove that it suffered any losses of its own, such as lost dividends as a minority indirect shareholder in FertiNitro.

8.15   The Respondent denies the factual allegations advanced by KOMSA, as follows:

8.16   *Taxes*: The Respondent contends that the new and increased tax measures do not breach the FET standard because KOMSA could not have had any legitimate expectations that tax rates would remain unchanged in the absence of specific representations or commitments from the Respondent.   There were no such representations or assurances; nor any stabilisation agreement concluded between KOMSA (or FertiNitro) and the Respondent.[407] In addition, the Respondent submits that the increase of such taxes was neither egregious nor shocking.  The Respondent refers to the decisions in *Paushok v. Mongolia,*[408] *EnCana v. Ecuador,*[409] *EDF v. Romania*[410] and *El Paso v. Argentina*.[411]

8.17   The Respondent further contends that the tax measures were transparent and not procedurally unfair, with KOMSA failing to point to any evidence that would prove otherwise.  In addition, the Respondent contends that the FET standard under customary international law imposes no such requirement as to transparency.[412]

8.18   *VAT:* The Respondent contends that its treatment of FertiNitro's VAT credits did not breach the FET standard because: (a) VAT credits were issued for each application filed by FertiNitro, albeit subject to delays which are common in Venezuela; (b) credit refund processing was transparent and procedurally fair, in compliance with Venezuelan law; (c) the Respondent's delays in the treatment of VAT credits did not create an inconsistent,

---

[407] Resp. Rej., Paragraphs 279, 515.
[408] *Sergei Paushok, CJSC Golden East Co. and CJSC Vostokneftegaz Co v. Govt of Mongolia*, UNCITRAL, Award on Jurisdiction and Liability (28 April 2011) ("*Paushok v. Mongolia*") (RLA-94).
[409] *EnCana Corporation v. Republic of Ecuador*, UNCITRAL, Award (3 February 2006) ("*EnCana v. Ecuador*") (RLA-71).
[410] *EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award (8 October 2009) (RLA-85).
[411] Resp. C-Mem., Paragraphs 225-235; Cls. Rej., Paragraphs 276-287; Resp. PHB, Paragraphs 124-129.
[412] Resp. C-Mem., Paragraphs 236-239; Cls. Rej., Paragraph 291; Resp. PHB, Paragraph 144.

unstable or unpredictable legal framework, because such delays applied generally to any applicant in Venezuela, including FertiNitro. Further, so the Respondent alleges, FertiNitro had legal remedies to challenge delays before the Venezuelan courts, which FertiNitro chose not to do.[413] The Respondent also rejects KOMSA's assertion that the VAT credits could be refunded directly to KOMSA, as a minority shareholder of FertiNitro (the VAT taxpayer).[414]

8.19    The Respondent also submits that KOMSA is incorrect that part of the outstanding recoverable VAT was 'written off' by the Respondent during 2006-2010. Rather, so the Respondent alleges, FertiNitro simply took accounting provisions (or allowances) in its balance sheet following reporting standards. The Respondent contends that the financial documentation shows that the credits were indeed recovered, so that ultimately no damage was suffered by FertiNitro. The Respondent submits that Mr Giles' approach, in contrast, is flawed since it results in double, triple, and quadruple counting.

8.20    *Urea Decree and Urea Resolution:* The new urea regulations did not frustrate any of KOMSA's legitimate expectations because they were not entitled to any regulatory stabilisation in the absence of any specific contractual commitment by the Respondent to KOMSA. The regulations were in any case issued to further a legitimate policy of the Respondent relating to food safety; and they could be challenged before the Venezuelan courts if FertiNitro (with KOMSA) so wished; but they were not so challenged.[415]

8.21    *Interference:* The Respondent contends that Pequiven's participation in the management and operations of FertiNitro did not violate the FET standard because Pequiven was run as a commercial, not political, entity; Pequiven was a shareholder in FertiNitro; it was a party to the Offtake Agreement; and FertiNitro was not controlled by Pequiven. In addition, KOMSA had legal remedies, under Venezuelan corporate law, to challenge certain

---

[413] Resp. Rej., Paragraph 107.
[414] Resp. C-Mem., Paragraphs 240-248; Cls. Rej., Paragraph 287; Resp. PHB, Paragraphs 133-139.
[415] Resp. PHB, Paragraphs 140-143; Resp. Rej., Paragraph 107.

measures such as the appointment of new directors by Pequiven, which it chose not to pursue.

8.22    The Respondent submits that the Comisario report (alleged by KOMSA to stand as evidence of the Respondent's interference in FertiNitro's business) is irrelevant to that issue.  This Comisario was appointed as FertiNitro's statutory auditor by the entire board of FertiNitro and thus, as the Respondent contends, with KOMSA's support.  Likewise, Pequiven's proposal to acquire more fertilizer (allegedly under the Respondent's instructions) followed a normal procedure under Venezuelan corporate law; and it was rejected by FertiNitro.  Moreover, the alleged assurances given to a third party (METOR) that the new laws would not apply to foreign companies are irrelevant. They are not attributable to the Respondent.  They are also derived from a letter sent a decade after the event and hinge upon an erroneous interpretation of that letter.  Finally, so the Respondent submits, Pequiven only participated in the drafting of the urea regulations in an advisory capacity based on its experience in fertilizers, without thereby unlawfully interfering in FertiNitro's business.[416]

### (3)    The FPS Standard – Article 4(1)

8.23    ***KOMSA's Case:***  In summary, KOMSA contends that the FPS standard protects investments from both physical and non-physical interference by the Respondent,[417] citing the decisions in *ELSI*[418] and *Azurix v. Argentina.*[419]  The FPS standard, so KOMSA contends, obliges the Respondent, as the host State, to ensure that it provides a secure and stable legal and regulatory environment to the investor, namely KOMSA.[420]

8.24    KOMSA contends that (i) the failure to pay VAT credit, (ii) the regulations forcing the sale of urea by FertiNitro to Pequiven, and  (iii) the progressive interference with the

---

[416] Resp. C-Mem., Paragraphs 249-254; Cls. Rej., Paragraphs 288-290; Resp. PHB., Paragraphs 130-132.
[417] Cls. Mem., Paragraphs 325-330.
[418] *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, ICJ, Judgment, (20 July 1989) (CLA-41).
[419] *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award (14 July 2006) (CLA-43).
[420] Cls. Mem., Paragraphs 256-261; Cls. Reply, Paragraphs 253-261; Cls. PHB, Paragraph 109.

management and operation of FertiNitro ultimately leading to the expropriation of contractual rights, each constitute a breach of the FPS standard by the Respondent.[421]

8.25   ***The Respondent's Case****:* In summary, the Respondent contends, as with the FET standard, that the FPS standard in Article 4 of the Treaty refers to the minimum standard under customary international law.[422]   The Respondent interprets that standard as referring to physical security, citing[423] the decision in *Saluka v. Czech Republic,*[424] *Lauder v. Czech Republic,*[425] *Noble Ventures v. Romania,*[426] and *Paushok v. Mongolia.*[427] It submits that this standard only imposes "a level of diligence in attempting to ensure that foreign investments are not harmed during periods of strife or violence".   The Respondent also invokes[428] *Gold Reserve v. Bolivarian Republic of Venezuela,*[429] where the tribunal interpreted an identical clause in the Canada-Venezuela BIT and found that the FPS standard was limited to physical harm to persons and property.[430]   The Respondent thus dismisses KOMSA's argument that the standard extends to legal protection.   It submits that, if it did, that would wrongly conflate the FPS standard with the FET standard.

8.26   The Respondent then turns to the alleged breaches of the FPS standard.   It submits that the treatment of VAT credits could not breach the FPS standard because the refund applications were ultimately approved; and that any processing delays (that applied to all taxpayers in Venezuela) could not amount to a breach of the FPS standard.   The enactment of the Urea Decree and Urea Resolutions did not breach the FPS standard because they were reasonably created under the Respondent's food and security policies and could be challenged in Venezuela's courts, if KOMSA had so wished (which it did not do).   The

---

[421] Cls. Mem., Paragraphs 331-339; Cls. Reply, Paragraphs 262-265.
[422] Resp. C-Mem., Paragraph 257.
[423] Resp. C-Mem., Paragraphs 256-258.
[424] *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award (17 March 2006) ("*Saluka v. Czech Republic*") (CLA-19).
[425] *Lauder v. Czech Republic* (CLA-45).
[426] *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award (12 October 2005) (RLA-67).
[427] *Paushok v. Mongolia* (RLA-94).
[428] Resp. PHB, Paragraph 148.
[429] *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 September 2014) (CLA-156).
[430] Resp. C-Mem., Paragraphs 255-261; Resp. Rej., Paragraphs 292-310.

Respondent at no point interfered with the management and operations of FertiNitro's business; and its conduct could not amount to any breach of the FPS standard.[431]

**(4)**     ***"Arbitrary and Discriminatory Measures" – Article 4(1)***

8.27   ***KOMSA's Case***: In summary, KOMSA contends that the standard for arbitrary and discriminatory measures under Article 4(1) of the Treaty imposes a requirement on the Respondent not to treat investors in an arbitrary or discriminatory manner, including "inconsistent and confusing" measures.[432] Such measures can constitute a breach of Article 4(1) if they are arbitrary *or* (not "and") discriminatory.[433]

8.28   KOMSA contends that: (i) the imposition of the tax measures on FertiNitro had a discriminatory impact on KOMSA because the new and increased taxes targeted entities that were majority foreign-owned or were large companies (conversely, these tax measures exempted public sector entities such as Pequiven or applied lower rates to other companies); (ii) the Urea Decree and Urea Resolution compelled FertiNitro to sell urea to Pequiven at prices below market value (these measures were discriminatory measures because KNI did not benefit from preferential prices, nor did KOMSA (or KNI) participate in the drafting of these Urea regulations, unlike Pequiven); and (iii) the Expropriation Decree No. 7713 was discriminatory because it furthered Pequiven's interest to KOMSA's detriment.[434]

8.29   ***The Respondent's Case***: In summary, the Respondent contends that the test for arbitrary conduct consists in determining whether the measures were a wilful disregard of due process of law that shocks or surprises a sense of juridical propriety.  It extends also to whether the measures can be defended as reasonable, *i.e.* where the State's actions can be linked to a reasonable policy. The test for discrimination consists in whether the State treated differently, without justification, entities otherwise similarly placed.   The

---

[431] Resp. C-Mem., Paragraphs 262-266; Resp. Rej., Paragraphs 311-324; Resp. PHB, Paragraphs 149-150.
[432] Cls. Mem., Paragraphs 340-343.
[433] Cls. Reply, Paragraphs 266-274
[434] Cls. Mem., Paragraphs 344-356; Cls. Reply, Paragraphs 275-280; Cls. PHB, Paragraphs 110-111.

Respondent rejects KOMSA's test of inconsistent or confusing measures in the absence of malign prejudice or preference.[435]

8.30    The Respondent submits that the tax measures were neither arbitrary nor discriminatory as they applied to all similarly situated entities, both domestic and foreign.  One of the taxes was a contribution intended to be re-invested in FertiNitro for research and development purposes, thus benefiting FertiNitro and not harming KOMSA at all.[436] Further, the urea regulations could not be discriminatory because KOMSA and Pequiven were not similarly situated.  They operated in distinct markets and were not competitors, even if they were involved in the same sector of the Venezuelan economy. In any event, the measures were passed pursuant to the Respondent's food policy and were not discriminatory.[437]

*(5)*     *National Treatment – Article 4(2)*

8.31    *KOMSA's Case:* In summary, KOMSA contends that the National Treatment standard in Article 4(2) of the Treaty entitles investors to treatment no less favourable than that accorded by the State to its own nationals.  It submits that this question turns on the particular facts of the case, making it necessary to take into account all circumstances.[438] KOMSA contends that by seeking to add the wording "in like circumstances" that is not found in Article 4(2), the Respondent wrongly makes that standard less protective of the investor.[439]

8.32    KOMSA submits that the Respondent's discriminatory measures constitute breaches of the National Treatment standard. KOMSA contends that: (i) the tax measures favoured Pequiven, a national entity, because it was exempt, and the urea regulations, drafted to appear facially neutral, targeted foreign companies and, in turn, KOMSA; (ii) the urea regulations granted Pequiven advantageous purchasing terms as it could buy urea below market price, an option that was not available to KNI; and (iii) the expropriation of October

---

[435] Resp. C-Mem., Paragraphs 267-277; Resp. Rej., Paragraphs 326-331; Resp. PHB, Paragraphs 151-153.
[436] Resp. C-Mem., Paragraphs 278-281; Resp. Rej., Paragraphs 332-335.
[437] Resp. C-Mem., Paragraphs 382-384; Resp. Rej. Paragraph 337; Resp. PHB, Paragraphs 154-158.
[438] Cls. Mem., Paragraphs 357-359.
[439] Cls. Reply, Paragraphs 281-286.

2010 transferred assets and rights to Pequiven, a national entity thus enjoying benefits to the detriment of KOMSA.[440]

8.33   ***The Respondent's Case:*** In summary, the Respondent determines that the standard is necessarily one of comparison between the treatment afforded to foreigners and the treatment afforded to nationals in similar positions, considering the entirety of the circumstances.  The Respondent objects to KOMSA's test according to which it would not be necessary to find a national comparator similarly situated.  The Respondent contends that the test of "in like circumstances" always applies under international law, whether or not language to that effect is found in the BIT.  It adds that States can always resort to sovereign discretionary rights to implement certain policies.[441]

8.34   The Respondent contends that no Venezuelan national benefited from a more favourable treatment because Pequiven, although exempt itself as to certain taxes, was impacted no less than KOMSA, as a direct shareholder in FertiNitro (the actual tax payer).  As for the urea regulations, they were rational in furthering the Respondent's food policy.  Finally, the Expropriation Decree No. 7713 did not favour Pequiven because Pequiven did not ultimately hold any of the assets acquired thereunder. [442]

**(6)**   ***Umbrella Clause – Article 11(2)***

8.35   ***KOMSA's Case:*** In summary, KOMSA contends that the Respondent undertook to comply with any obligation, whether contractual or derived from its domestic law.[443] KOMSA then submits that the Respondent's failure to comply with its domestic law (with regard to the VAT refunds to FertiNitro) constitutes a breach of this standard by the Respondent.[444]

8.36   ***The Respondent's Case:*** In summary, the Respondent contends that no obligation was breached regarding the VAT credits as the latter were ultimately issued and paid.[445]

---

[440] Cls. Mem., Paragraphs 360-366; Cls. Reply, Paragraphs 287-291; Cls. PHB, Paragraph 112.
[441] Resp. C-Mem., Paragraphs 285-290; Resp. Rej., Paragraphs 338-347; Resp. PHB, Paragraphs 159-163.
[442] Resp. C-Mem., Paragraphs 291-296; Resp. Rej., Paragraphs 350-358; Resp. PHB, Paragraphs 164-165.
[443] Cls. Mem., Paragraphs 367-369; Cls. Reply, Paragraphs 292-295.
[444] Cls. Mem., Paragraphs 370-374; Cls. PHB, Paragraph 113.
[445] Resp. C-Mem., Paragraphs 297-301; Resp. Rej., Paragraphs 359-363; Resp. PHB, Paragraphs 166-168.

**(7)     *The Tribunal's Analysis and Decisions***

8.37     As summarised above, KOMSA's non-expropriatory claims for "Historical Losses" under Articles 4 and 11 and the Treaty derive from new and increased taxes, non-payment (or late payment) of VAT credits, the effects of the Urea Decree and Urea Resolution and interference with FertiNitro's business.  Although advanced under five distinct provisions of the Treaty, each claim is subject to certain common factual factors.

8.38     ***Articles 1(1) and (2):*** The alleged harm was suffered by FertiNitro directly and only consequentially by KOMSA, as an indirect minority shareholder in FertiNitro.  In this arbitration, KOMSA is asserting its own claim for its own losses and not as any derivative claim for losses suffered by FertiNitro only.  If it were otherwise, KOMSA's claim would face obvious jurisdictional difficulties under Articles 1(1) and 1(2) of the Treaty and Article 25 of the ICSID Convention.  KOMSA is legally distinct from FertiNitro (and also Koch José).  FertiNitro is a juridical person of Venezuelan nationality; and it is not a covered investor with protected investments under the Treaty.[446]

8.39     Accordingly, KOMSA can only claim compensation for loss actually suffered by it arising from its own indirect minority investment in FertiNitro.  In principle, a minority shareholder, even with shares held indirectly by an associated company, can claim compensation for proven indirect loss.  As was decided in *Rosinvest v. Russia:* "modern investment treaty arbitration does not require that a shareholder can only claim protection in respect of measures that directly affect shares in their own right, but that the investor can also claim protection for the effect on its shares by measures of the host state taken against the company."[447]  However, the investor must still prove actual crystallised loss from the indirect effect on its equity interest, as distinct from loss by the company.

---

[446] *See HICEE B.V. v. Slovak Republic*, UNCITRAL, Partial Award (23 May 2011).

[447] *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration V (079/2005), Final Award (12 September 2010) (CLA-9), Paragraph 608. (This award, as already indicated above, was annulled by the Swedish courts on unrelated jurisdictional grounds).  For a more guarded approach, see *GAMI Investments, Inc. v. United Mexican States*, UNCITRAL, Award (15 November 2004) (RLA-64).  One member of the Tribunal does not accept that the broad statement on the admissibility of shareholder claims in *RosInvestCo* is correct, however, given the Tribunal's ultimate conclusion on these claims, the member sees no utility in expanding upon the point of disagreement in this Award.

8.40    In the Tribunal's view, there is no cogent evidence that KOMSA, as regards its own indirect interest as a minority shareholder in FertiNitro, suffered a loss sufficiently quantifiable in money terms from any of its "Historical Claims". There was no sufficient evidence of any simple "pass through" of loss suffered by FertiNitro, so as to become a pro-rated loss to KOMSA as a partial indirect shareholder of FertiNitro. KOMSA also adduced insufficient proof of its own actual direct losses, as distinct from losses sustained by FertiNitro. The position could be different if FertiNitro was wholly owned by KOMSA; but it never was.

8.41    This approach would suffice for the Tribunal to dismiss KOMSA's claims "for Historical Losses" *in limine*. However, the Tribunal considers that this approach could unfairly impose too high an evidential hurdle for KOMSA in this case; and, given the efforts made by the Parties and their expert witnesses on quantum, it would be discourteous to stop the analysis here. Hence, for present purposes, it is prepared to assume that some part of FertiNitro's alleged losses did "pass through" to KOMSA as regards taxes, VAT, the Urea Decree and the Urea Resolution. However, given the absence of any separate quantifiable figure for interference in FertiNitro's business, no assumption as to loss is there made by the Tribunal. Further, if and to the extent that KOMSA is advancing a claim for loss to KNI (unquantified) resulting from "Historical Losses", separately from KNI's claim for expropriation, the Tribunal dismisses that claim also as lacking any evidential justification.

8.42    ***Article 4(1):*** The FET and FPS standards accorded to covered investments in Article 4(1) of the Treaty are prefaced by the words: "[i]n accordance with the rules and principles of international law". In the Tribunal's view, as explained below, these words import the customary international law minimum standards, rather than any autonomous higher standards, applying the rule of interpretation codified in Article 31(1) of the VCLT as to "the ordinary meaning to be given to the terms in their context."

8.43    The Tribunal need not here debate the jurisprudence or doctrinal writings, so neatly captured by Dr Mann long ago. As is well known, in his 1982 publication, Dr Mann concluded that a FET standard: "[...] in essence, is a duty imposed by customary international law [...] which in law is unlikely to amount to more than a confirmation of

the obligation to act in good faith, or to refrain from abuse or arbitrariness."[448]   It was perhaps a more considered conclusion than his earlier opinion to the contrary:

> *"The terms 'fair and equitable treatment' envisage conduct which goes far beyond the minimum standard and afford protection to a greater extent and according to a much more objective standard than any previously employed form of words. A tribunal should not be concerned with a minimum, maximum, or average standard. It will have to decide whether in all the circumstances the conduct in issue is fair and equitable or unfair and inequitable. No standard defined by other words is likely to be material. The terms are to be understood and applied independently and autonomously."*[449]

This debate has continued in later arbitral decisions, as cited in the Parties' submissions to different effect; but that debate is not relevant here.

8.44   The FET and FPS standards in this Treaty are prefaced with the express qualification: "in accordance the rules and principles of international law."   In the Tribunal's view, this additional express wording is conclusive in confirming the meaning of the FET and FPS standards as the duties imposed by customary international law and in precluding an independent or autonomous meaning.  In *AAPL v. Sri Lanka*, it was the "non-reference to international law" which led that tribunal to adopt an autonomous FPS standard; and (with the dissent), it is clear the tribunal would have decided otherwise with the express additional wording in this Treaty.[450]

8.45   The Tribunal also adopts the reasoning of the decision in *Flughafen v. Venezuela*, cited by the Respondent, on the same wording of Article 4(1) of the Treaty.[451]   That case also concerned (inter alia) the same Switzerland-Venezuela BIT, where the express additional qualification was translated into English as: "in accordance with the norms and criteria of international law". The tribunal there decided:

---

[448] F.A. Mann, *The Legal Aspect of Money* (4th ed, 1982), p. 510.
[449] F.A. Mann, British Treaties for the Promotion and Protection of Investments, 52 *British Yearbook of International Law* 241 (1981) (CLA-86), page 244.
[450] *Asian Agricultural Products Limited v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No ARB/87/3, Award (27 June 1990) (RLA-42), Paragraph 52.
[451] *Flughafen v. Venezuela* (RLA-154), Paragraph 573 (non-official translation provided by counsel).

> *"If the BITs must be interpreted in accordance with Customary International Law, and if the minimum treatment is part of that set of uses and customs, then one has to reach the inevitable conclusion that an interpreter, when determining whether or not a particular action violates Article 4 of the BITs, must take into consideration the manner in which Customary International Law defines FET. Therefore, the Tribunal considers that the provision included in the BITs, requiring that FET be defined in accordance with International Law necessarily incorporates a reference to the level of protection that International Law provides to foreigners, that is, to what is known as the customary minimum standard."*

8.46    The Tribunal's interpretation suffices to dismiss KOMSA's claim under the FPS standard on the facts alleged by KOMSA.  Under its meaning well-settled in customary international law, the FPS standard is confined to physical protection to aliens against acts of third persons not attributable to the host State.[452]  As such, it can give rise to a limited form of liability in factual circumstances where the host State has failed to exercise reasonable diligence to prevent such acts. That is manifestly not this case.

8.47     As regards the FET standard under customary international law, the factual evidence remains relevant, to be addressed below. However, as to such evidence, the Tribunal does not consider that the result in this case would be materially different under an FET's autonomous standard.  There was no cogent evidence of KOMSA's legitimate expectations induced by any specific undertaking or representation made to KOMSA by the Respondent to induce KOMSA's investment.  It is well settled that provisions of general legislation or state policies applicable to a plurality of persons do not suffice generally to establish legitimate expectations required under an FET autonomous standard.

8.48    As to the third limb of Article 4(1) of the Treaty, namely the protection against "arbitrary or discriminatory measures", the issue arises whether it means what it says *tout court*; or whether, because the use of a semi-colon (as opposed to a full stop or a separate sub-clause), this further limb should also be read subject to the express additional wording.  In the Tribunal's view, this third limb must be read separately, without reference to a customary international law minimum standard (if any exists).  However, its meaning is

---

[452] *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Final Award (24 December 2007) (CLA-37), Paragraphs 326-328; *El Paso v. Argentina* (CLA-52), Paragraph 522.

clearly directed at "the management, operation, maintenance, use, enjoyment, expansion, disposal or liquidation" of KOMSA's "investment", namely KOMSA's indirect minority equity interest in FertiNitro, as distinct from FertiNitro itself.  KOMSA is not here advancing a claim for any direct interference with its own equity interest in FertiNitro, as such.  In the Tribunal's view, KOMSA's claim under this limb of Article 4(1) is better (or not worse) advanced under the FET standard, as to which its claim succeeds or fails on the relevant evidence.  Accordingly, the Tribunal proceeds on that basis below.

8.49    *Article 4(2):*  The Tribunal does not consider that Pequiven as a local state-owned and state-controlled company, is an appropriate 'comparator' to KOMSA under Article 4(2) of the Treaty.  It is true that both were shareholders in FertiNitro and that both were engaged, directly or indirectly, in the fertiliser business in Venezuela; but the similarities stop there. Pequiven was a direct and active participant in that local business, whereas KOMSA was an indirect foreign investor.  KOMSA cannot here be assimilated to FertiNitro. Accordingly, in the absence of any appropriate comparator, the Tribunal dismisses KOMSA's claims regarding "National Treatment" under Article 4(2) of the Treaty.

8.50    *Article 11(2):*  KOMSA does not assert any "stabilisation" clause as regards its investment in FertiNitro; and, as Mr Parra (of KOMSA) testified, KOMSA received from the Respondent no "specific assurance, written document, letter, other than what existed in the law at the time."[453]  The Tribunal has indeed not seen any cogent evidence of any material representation, assurance or undertaking made by the Respondent to KOMSA in regard to its interest in FertiNitro, whether explicit or even necessarily implicit, in any contemporary document or agreement.  Accordingly, the Tribunal dismisses KOMSA's claim under Article 11(2), the "Umbrella Clause", of the Treaty.

8.51    *The FET Standard:*  The Tribunal begins with certain general observations. First, from the outset, the FertiNitro project was known by all participants, including KOMSA, to be subject to significant political, economic and other uncertainties in Venezuela.  As recorded

---

[453] First (September) Hearing, D2.81-82 (Parra).

in the 1998 Bond Offering Memorandum for the FertiNitro project,[454] these uncertainties included "changes in taxation policies", whereby FertiNitro's results "are expected to be affected generally by […] changes in Venezuelan governmental leadership, policy and taxation […]".  It was also known that the next Presidential elections in Venezuela would take place later in December 1998.  In those elections, Mr Chavez was elected President of Venezuela and subsequently re-elected until his death in 2013.

8.52   Second, the protections accorded to investors and their investments under the Treaty do not operate as an insurance against normal business risks, changes in domestic laws or regulatory action by the host State.  As was decided in *Saluka v. Czech Republic* (already cited in Part VI above): "[i]t is now established in international law that States are not liable to pay compensation to a foreign investor when, in the normal exercise of their regulatory powers, they adopt in a non-discriminatory manner bona fide regulations that are aimed at the general welfare."[455]  Such regulatory powers extend to taxation.  As was decided in *EnCana*; "[i]n the absence of a specific commitment from the host State, the foreign investor has neither the right nor any legitimate expectation that the tax regime will not change, perhaps to its disadvantage, during the period of the investment."[456]  As the Bond Offering Memorandum expressly stated (cited above), this is no more than business common sense, as would have been well understood by KOMSA at the time.

8.53   The question therefore is not whether the Respondent has exercised its regulatory or other powers causing loss to KOMSA, but whether in so doing, the Respondent has violated its obligations to KOMSA under the Treaty.  As to that question, as already explained above, the Respondent's measures are to be weighed, with due deference, on the factual evidence adduced in this arbitration.

8.54   Third, FertiNitro was, long before the events of October 2010, a troubled and unhappy company (or, rather, "companies").  The Tribunal refers to the Comisario Report of 7

---

[454] Offering Circular - Bond Offering of $250,000,000 between FertiNitro Finance Inc and FertiNitro (8 April 1998) (C-115), page 50.
[455] *Saluka v. Czech Republic* (CLA-19), Paragraphs 255ff.
[456] *EnCana v. Ecuador* (RLA-71).

September 2006, made by FertiNitro's statutory auditor reporting to all its shareholders. It identified (as translated into English) "conflicts of interest between the Directors making swift-decision-making difficult"; "excessive disputes, particularly the problems concerning the Plants and the Offtake Agreement"; "uncertainty regarding the safety and operational continuity of the Plants"; "the union claims for work benefits which […] have not been solved"; an "absence of handbooks, approved by the Management Board, on the policies, norms and procedures for technical, operative, administrative and accounting functions and duties"; and the necessity for "revising the Company's organization structure in accordance with existing needs […]".[457]  After 2006 and by 2010, FertiNitro's condition worsened significantly.   In these circumstances, confirmed by other contemporary evidence, FertiNitro's business difficulties cannot be lightly attributed to effects for which the Respondent might be legally responsible under the Treaty or international law.

8.55    *Taxes*: Ostensibly at least, the impugned taxes were of general application. As to Municipal taxes, the classifier for Group 1-D identified:[458] "[a]ll industrial economic activities exercised by […] legal […] entities of the Energy, Natural Gas Production Sector and all activities related to the oil and gas and petrochemical industry, which is linked to the activity that is directly or indirectly related to the Jose Petrochemical Complex […]."  As to the Science and Technology tax, Article 37 of the Law targeted generally "[t]he large companies in the country dealing with other sectors of production of goods and provision of services […]."[459]  Moreover, this Law conferred direct benefits on FertiNitro.

8.56    The Tribunal does not consider that KOMSA, on the factual evidence, has established a violation of the FET standard by the Respondent (or Article 4(1)'s third limb).   In particular, these were not tax measures proven to have been made in bad faith, arbitrarily, irrationally or with an improper intent to discriminate directly against FertiNitro (or indirectly against KOMSA). Given later events in October 2010, it could be tempting to use hindsight in evaluating these tax measures; but the Tribunal thinks it inappropriate to

---

[457] FertiNitro Report from the Statutory Auditor and Consolidated Financial Statements (7 September 2006) (C-63).
[458] Ordinance for Taxes on Industrial, Commercial, Service or Similar Economic Activities (29 December 2005) (C-45), page 14.
[459] Organic Law on Science, Technology and Innovation (effective as of 1 January 2006) (C-43), page 8.

do so.  These measures must be assessed at the time of their enactment, when different circumstances existed.

8.57    *VAT:* As to VAT, the Respondent maintains that all the VAT credits requested by FertiNitro have been paid, as shown by its VAT tables from 2001 to 2010.[460] At the Third (June) Hearing, the Respondent acknowledged that VAT credits were paid late, as is also evidenced by its own VAT tables.

8.58    There is no cogent evidence of any specific monetary loss suffered by FertiNitro from the Respondent's delays, still less of any resulting specific monetary loss to KOMSA.  Mr Giles, albeit not a factual witness, testified that for each year from 2006 to 2010, "part of the outstanding recoverable VAT was written off" by the Respondent.  Dr Flores testified that this was incorrect; and that FertiNitro's accounting provisions had no "real cash flow effects" as Mr Giles suggested.[461]  Dr Flores was likewise not a factual witness.

8.59    The Tribunal regrets the paucity of cogent evidence on this issue.  It is clear that the Respondent issued VAT credits late to FertiNitro; but that was the usual practice in Venezuela suffered by all VAT taxpayers entitled to tax credits.  The evidence was all one way as regards such regular delays.  In the circumstances, the Tribunal does not consider that KOMSA, on the factual evidence, has established a violation of the FET standard by the Respondent (or Article 4(1)'s third limb).  In particular, these delays were not proven to have been made in bad faith, arbitrarily, irrationally or with an improper intent to discriminate directly against FertiNitro (or indirectly against KOMSA).

8.60    *Urea Decree and Urea Resolution:* The Urea Decree and Urea Resolution were issued in March and May 2007 respectively.[462]  The Respondent submits that the Urea Decree and the Urea Resolution were issued by the Respondent as part of its regulatory role in ensuring

---

[460] FertiNitro, VAT Credits 2001-2010 (updated to December 2010) (R-73).
[461] Expert Report of Tim Giles (2 June 2012), Paragraph 3.14; Flores ER1, Paragraphs 165-168; Flores ER2, Paragraphs 229ff.
[462] Decree 5,218 (26 February 2007) (C-80); Joint Resolution by the Ministry of the People's Power for Agriculture and Land, the Ministry of the People's Power for Light Industry and Trade, and the Ministry of the People's Power for Energy and Petroleum (Official Gazette No. 38,674) (3 May 2007) (C-82).

food supply and security for the people of Venezuela.[463]   At the time, KOMSA did not actively oppose the Urea Decree or Urea Resolution by litigation or like administrative action within Venezuela's legal system; nor did FertiNitro itself.[464]

8.61   As already found in Part VII above, the Tribunal, in the exercise of the deference due to the Respondent, considers these urea regulations to have been made in pursuit of the Respondent's policies on food security and supply for the people of Venezuela. Ostensibly, albeit causing direct loss to FertiNitro, the Tribunal does not consider that KOMSA, on the factual evidence, has established a violation of the FET standard by the Respondent (or Article 4(1)'s third limb).   In particular, these urea regulations were not proven to have been made in bad faith, arbitrarily, irrationally or with an improper intent to discriminate directly against FertiNitro (or indirectly against KOMSA).  Similarly, given the later events in October 2010, although it could be tempting to use hindsight in evaluating these urea regulations (as KOMSA suggests), the Tribunal again thinks it inappropriate to do so. These urea regulations must also be assessed at the time of their enactment.

8.62   *Decisions:* For these reasons, as to liability, the Tribunal decides to dismiss KOMSA's claims against the Respondent for "Historical Losses" under Articles 4(1), 4(2) and 11(2) of the Treaty.

---

[463] Resp Rej., Paragraphs 319-320.
[464] Cls. Mem., Paragraph 85.

*PART IX: COMPENSATION ISSUES*

*(1)      Introduction*

9.1     In the light of the Tribunal's decisions on jurisdiction and liability above, it is now necessary to consider the appropriate quantum of compensation payable by the Respondent to each of the Claimants, namely KOMSA for its expropriated interest in FertiNitro and KNI for its expropriated interest in the Offtake Agreement.  The Tribunal begins with an outline of its general approach to compensation, turning then to a summary of the Parties' attempts to negotiate compensation due by the Respondent to KOMSA, which has already been addressed in greater detail in the chronology set out in Part V above.  It is appropriate next to summarise the Claimants' quantum submissions and the Respondent's submissions in response, before turning to the Tribunal's consideration of those competing submissions and its decisions as to the appropriate amounts of compensation.

9.2     Given the evolutionary development of the Parties' respective cases on compensation during this arbitration, the very significant differences between the testimony of their respective expert witnesses (Mr Giles and Dr Flores) and the complexities of the issues relating to compensation (for both KOMSA and KNI), the Tribunal has found it necessary to summarise at some length the Parties' successive submissions on compensation.  That summary may also provide a useful reference as to what was and what was not submitted by the Parties on such issues in this arbitration to be read with the lists of issues in Part III above.  Inevitably, however, parts of this summary are duplicative and (given the evolution of the Parties' cases) not fully consistent.

9.3     As to its general approach, the Tribunal bears much in mind, as contended by the Respondent, that the Claimants generally bear the legal burden of proving their respective cases on compensation.  This general principle is well established under international law: *onus probandi actori incumbit*.

9.4     The Tribunal also bears in mind that complex issues of compensation, dividing the disputing parties and their expert witnesses, can require a margin of appreciation by an arbitral tribunal applying the wording of a BIT and international law.  The required exercise

can be therefore less than an exact science. The Tribunal refers to the approach taken by international arbitration tribunals, such as the awards in *Sistem v. Kyrgyz Republic*[465] and *ADC v. Hungary.*[466]

9.5     As was decided in *Sistem v. Kyrgyz Republic*:

> *"154. The Tribunal is conscious of the desirability for conceptual clarity in valuing assets for the purposes of calculating compensation payable; and it is conscious of the criticism of 'triangulation' methods, which select a figure that lies somewhere in the middle ground of estimates put forward by the parties.*
>
> *155. The Tribunal is also aware of the fact that all valuations in the absence of an actual sale are estimates, and is mindful of the fact that the Tribunal has a legal duty to render an award under a process which the Respondent has freely agreed to establish and the Claimant has freely chosen to pursue, and to do so on the basis of the material that the parties have decided to put before it. That is, necessarily, an exercise in the art of the possible; and the Tribunal has sought to arrive at a rational and fair estimate, in accordance with the BIT, of the loss sustained by the Claimant rather than to engage in a search for the chimera of a sum that is a uniquely and indisputably correct determination of the value of what the Claimant lost. The Tribunal derives some comfort from Immanuel Kant's observation that 'Out of the crooked timber of humanity no straight thing was ever made.'"*

9.6     In *ADC v. Hungary*, the tribunal likewise decided that:

> *"[T]he assessment of damages is not a science. True it is that the experts use a variety of methodologies and tools in order to attempt to arrive at the correct figure. But at the end of the day, the Tribunal can stand back and look at the work product and arrive at a figure with which it is comfortable in all the circumstances of the case."*

9.7     Under international law, there is thus by now a well-established *'jurisprudence constante'* to the effect that, however difficult, an international tribunal must do its best to quantify a loss, provided that it is satisfied that some loss has been caused to the claimant by the

---

[465] *Sistem Muhendislik Insaat Sanayi ve Ticaret A.S. v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award (9 September 2009) ("*Sistem v. Kyrgyz*").

[466] *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award (2 October 2006) (CLA-16), Paragraph 521. *See also Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 September 2014) ("*Gold Reserve v. Venezuela*") (CLA-156), Paragraph 832.

wrongdoing of the respondent.[467]   In the Tribunal's view, there is no doubt that the Claimants have both suffered some loss caused by the Respondent's violations of Article 6 of the Treaty.

9.8     The difficulties in this case arise from the quantification of the monetary damages required from the Respondent to compensate each of the two Claimants.  As already indicated, international tribunals have traditionally resolved such difficulties applying a rule of reason, rather than a rule requiring certainty in calculating compensation based upon precisely calculated figures.  Almost invariably, this approach now requires tribunals to reject the full extent of the parties' primary cases on quantum and the often wildly differing results of their respective expert witnesses' methodologies, assumptions and instructions. For tactical reasons, a claimant may not wish to discount downwards the full amount of its pleaded claim; and a respondent denying loss similarly may not wish to offer a methodology resulting in any significant damages being awarded in a claimant's favour. A tribunal must then work by itself in the rational no man's land left vacant by the parties and their expert witnesses, as best it can.  In the present case, the Tribunal has faced grave difficulties in understanding how the Parties and their respective expert witnesses on quantum can have presented such very different figures.

*(2)     The Negotiations for Compensation*

9.9     In brief, as described in Part V above, negotiations were held between Pequiven for the Respondent (as the expropriating body designated under the Expropriation Decree) and FertiNitro's foreign shareholders, including KOMSA, between February and September 2011.  These negotiations did not include KNI, which had been led to expect separate but not dissimilar treatment.  At the time, these negotiations with FertiNitro's shareholders were described by Pequiven (for the Respondent) as encompassing amicable settlement talks for compensation "contemplated by both the applicable Venezuelan law, as well as the Bilateral Investment Protection Treaties".[468]

---

[467] See, for example, *Sistem v. Kyrgyz*, Paragraphs 154 and 155.
[468] Letter from Betulio Hernández, Executive Director, Pequiven, to Shareholders (28 February 2011) (R-35), Paragraph 1.

9.10   All four meetings were attended by Mr Barrientos (for Pequiven).  Mr Barrientos testified at the First (September) Hearing that he was privy to Pequiven's decision to engage Advantis, as consultants to advise on the amount of compensation payable to FertiNitro's foreign shareholders.[469]  Mr Barrientos was unable to explain to the Tribunal the difference between Advantis' valuation of KOMSA's interest in FertiNitro of about US$ 113 million (which he considered to be at the time a fair valuation and a "genuine estimate of what the company was worth") and Dr Flores' valuation (as the Respondent's expert witness in this arbitration) of US$ 34.6 million.[470]  However, as Mr Barrientos confirmed, the person working with Advantis was Mr Garcia (who was not called as a witness by the Respondent in this arbitration).[471]

9.11   The Tribunal returns to the two Advantis Reports of May and July 2011 below.

### *(3)*   *The Claimants' Quantum Submissions*

9.12   In summary, the Claimants' case on quantum is comprised of ten main submissions, each addressed separately in the sub-sections below.  These are:

   (a)   First, the Claimants have demonstrated that the Respondent must pay full compensation under international law;

   (b)   Second, testimony from the Second (November) Hearing demonstrated that the Parties' quantum experts have adopted fundamentally different approaches to the valuation exercise;

   (c)   Third, the Parties' quantum experts agree on a number of compensation parameters, but the differences of fact and expertise on quantum issues remain significant;

   (d)   Fourth, the central points of agreement and disagreement in relation to future cash flows at FertiNitro have been identified;

   (e)   Fifth, the central points of agreement and disagreement in relation to the valuation of the Offtake Agreement have been identified;

   (f)   Sixth, the central points of agreement and disagreement in relation to the discount rate and the country risk premium have been identified;

---

[469] First (September) Hearing D3.83-84.
[470] First (September) Hearing D3.87-88.
[471] First (September) Hearing D3.85-86.

(g)     Seventh, the award in *Gold Reserve v. Venezuela*[472] supports the FertiNitro-specific country risk premium adopted by the Claimants' quantum expert, Mr Giles; and it discredits the generic country risk premium adopted by the Respondent's quantum expert, Dr Flores.  By contrast, the two awards in the *ExxonMobil* and *Mobil* cases[473] do not identify any country risk premium for Venezuela and are clearly distinguishable;

(h)     Eighth, the adjusted MOU price of US$ 360 million for KOMSA's equity share as at 30 September 2010 (as submitted by Mr Giles in his first report and based on the Pequiven draft MOU of October 2008)[474] is an effective reality check on the Parties' valuations for KOMSA's interest in FertiNitro; it demonstrates that Mr Giles' equity valuation is conservative and that, by contrast, Dr Flores' purported fair market valuation is less than 10% of the price that was agreed by the Parties in 2007/2008 under threat of expropriation;

(i)     Ninth, there are multiple additional reality checks that validate the reasonableness of Mr Giles' valuations of KOMSA's equity investment and KNI's interest in the Offtake Agreement; and

(j)     Tenth, there are multiple further "lower bound" reality checks that discredit Dr Flores' valuation as an unsupportable outlier.

*(i)     The Claimants Have Demonstrated That the Respondent Must Pay Full Compensation Under International Law*

9.13    As submitted by the Claimants, the threshold issue is the determination of the appropriate standard by which compensation is to be calculated by the Tribunal.

9.14    The Claimants contend that, as a matter of customary international law, the full reparation standard articulated in the *Chorzów Factory Case*[475] is the appropriate standard of compensation for the Respondent's unlawful conduct.

---

[472] *Gold Reserve v. Venezuela* (CLA-156).

[473] Namely, *Mobil Cerro Negro Ltd v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award (23 December 2011) ("*Mobil v. PDVSA*" or "*Mobil*") (EO-45); *Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd. Mobil Venezolana De Petróleos Holdings, Inc. Mobil Cerro Negro, Ltd. And Mobil Venezolana De Petróleos, Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (9 October 2014) ("*Venezuela Holdings v. Venezuela*" or "*ExxonMobil*") (RLA-153).

[474] Expert Report of Tim Giles (2 June 2012) ("Giles ER1"), Paragraphs 4.88-4.89; *see also* Cls. Mem., Paragraph 150.

[475] *Chorzów Factory Case (Germany v. Poland)*, PCIJ Series A, No 17, Decision on Merits (13 September 1928) (CLA-49).

9.15    On the other hand, as explained in more detail below, the Respondent contends that the compensation standard in Article 6 of the Treaty should apply in respect of its allegedly unlawful expropriation of the Claimants' investments and its other treaty violations.

9.16    In response, the Claimants submit that the standard in Article 6 of the Treaty is inapplicable where an expropriation has been carried out unlawfully, as here.   Accordingly, the Claimants submit that they are entitled to full compensation under the customary international law standard in order to wipe out all of the consequences of the Respondent's unlawful conduct.

9.17    The Claimants accept that, in principle, there is a distinction in the standard of compensation for a "lawful" expropriation and the standard of compensation for an "unlawful" expropriation.   That is, as they say, the standard of compensation for a lawful expropriation is provided in Article 6 of the Treaty; but the standard of compensation for an unlawful expropriation is full reparation under customary international law.

9.18    Notwithstanding this distinction, the Claimants accept that, in this case, there is no material difference in result between the standard applicable under customary international law for an "unlawful expropriation" and the standard applicable under the Treaty for a "lawful expropriation".   Indeed, so the Claimants submit, both standards result in the calculation of the "fair market value" of the expropriated investments absent the Respondent's multiple violations.

9.19    The Claimants contend that the application of the proper standard supports its three submissions as to the appropriate compensation.   These include, but are not limited to recent arbitral decisions confirming that the Respondent must pay full compensation to the Claimants in a "but for" scenario for the unlawful expropriation of the Claimants' investments.

9.20    The Claimants submit that recent decisions support the principle of full compensation in a "but for" scenario for the unlawful expropriation of their investments.   The Claimants cite

177

*Hulley Enterprises Limited (Cyprus) v. The Russian Federation,*[476] where the tribunal, referring to Article 35 of the ILC Articles on State Responsibility, explained that a "State responsible for an illegal expropriation is in the first place obliged to make restitution by putting the injured party into the position that it would be in if the wrongful act had not taken place."  Similarly, they point to *ConocoPhillips v. Venezuela*[477], where the tribunal decided:

> *"The Tribunal, coming back to the terms of the BIT, does not consider that the extent of the compensation payable in respect of an unlawful taking of an investment, for instance because it is in breach of an 'undertaking' in terms of Article 6(b), is to be determined under Article 6(c): that provision establishes a condition to be met if the expropriation is in all other respects in accordance with Article 6.  So, in the Chorzów case, the Court did not determine reparation in accordance with the provisions of the Convention before it, because it was concerned with a dispossession in breach of those provisions.  It decided in accordance with 'the essential principle' quoted earlier, that is a principle of customary international law, not dependent on the Convention provisions."*

9.21    Accordingly, the Claimants contend that arbitral jurisprudence confirms that KOMSA is entitled to full compensation under international law for the losses caused by the Respondent's non-expropriation violations of the Treaty.

> (ii)    *Testimony from the Second (November) Hearing Demonstrated That the Parties' Quantum Experts Have Adopted Fundamentally Different Approaches To the Valuation Exercise*

9.22    The Claimants note that there is a difference of more than US$ 518 million between the Parties' experts' evidence in relation to the equity valuation, offtake valuation and KOMSA's Historical Losses (the latter of which have already been addressed in Part VIII above).  The Claimants contend that this large gulf between the two quantum experts' valuations can, in large part, be explained by their fundamentally different approaches to

---

[476] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226, Final Award (18 July 2014) (CLA-152), Paragraph 1766 (annulled by the Hague District Court on other grounds, but currently under appeal).

[477] *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits (3 September 2013) ("*ConocoPhillips v. Venezuela*") (CLA-155), Paragraph 342.

the valuation exercise.  The Claimants rely on their quantum expert, Mr Giles, who they contend has adopted a forensic approach to the determination of his valuation parameters in contrast to Dr Flores.

9.23    Specifically, the Claimants contend that Mr Giles' valuation reflects the available contemporaneous documentary evidence surrounding the revenues earned and the costs incurred at the FertiNitro Plant.  As such, so the Claimants contend, Mr Giles was able to determine whether the revenues and costs that appear in FertiNitro's accounts are reliable for the purposes of projecting future revenues and costs at the Plant, in a "but for scenario".

9.24    The Claimants further contend that Mr Giles was right to ignore the serious irregularities and a lack of transparency with respect to important cost data recorded in FertiNitro's accounts to arrive at a fair market valuation.  That approach is, it is contended, consistent with what a willing buyer and willing seller would do, namely analyse the historical output at the FertiNitro Plant to determine if that data is a reliable source for the forecasting long-term output at the Plant.

9.25    According to the Claimants, Mr Giles' evidence is also supported by the evidence of Mr Sanders, who at the Second (November) Hearing, confirmed that, in October 2010, a willing buyer would have viewed FertiNitro as a plant with substantial opportunities for improvement on both the costs and production side.  The Claimants describe Mr Sanders as "the only independent industry expert in this arbitration".[478]  The Claimants submit that Mr Sanders' evidence is consistent with what the Respondent itself has realised since the expropriation, overseeing a number of improvements to the FertiNitro Plant.  Indeed, the Claimants specifically point to Mr Sanders' evidence that his analysis of the contemporaneous documents revealed:[479]

> "Prior to the expropriation, the FertiNitro board expressed serious concern about this out of control spending, and they requested some additional documentation that would, through comparative charts and explanations of the costs, fully explain and allow a transparent look at what the money was being spent on.  These costs have no

---

[478] Cls. PHB, Paragraph 136.
[479] Second (November) Hearing D5.142 (Sanders).

*documentary support.  The requested documents that should explain the complete cost breakdown of this out of control spending was again requested, but however was never provided by Venezuela."*

9.26    According to the Claimants, the expert evidence of Mr Giles, insofar as it demonstrates that the FertiNitro Plant was not a "flawed plant", is supported not only by Mr Sanders, but also by the admissions of the Respondent's witness, Mr Anibal Villarroel.  In particular, the Claimants point to the ammonia trains at the FertiNitro Plant having operated at almost 100% of nameplate capacity on an annualized basis in 2006,[480] and to the fact that the urea trains at FertiNitro were capable of producing 2,200 tonnes per day.[481]

9.27    The Claimants conclude that the cash flow inputs adopted by Mr Giles are supported by contemporaneous documents, the independent expert testimony of Mr Sanders and admissions by the Respondent's witness, Mr Villarroel, under cross-examination.

9.28    The Claimants also point to various deficiencies in the Respondent's evidence.  In particular, the Claimants contend that the Respondent has not provided any credible account of the irregular and escalating maintenance and turnaround costs incurred at FertiNitro since 2008.  Under cross-examination, Dr Flores stated that he had relied on Mr Villarroel's account of turnaround and maintenance costs at the Plant:[482]

*"Q. [Y]ou relied on Mr Villarroel because you assumed that he had a good understanding of the maintenance and turnaround costs, correct?*
*A. Yes, I did assume that he has a good understanding of maintenance and turnaround costs.  He works at FertiNitro."*

9.29    Yet, the Claimants point to the fact that Mr Villarroel admitted that, as Operations Manager, he was not responsible for, nor did he even know about, costs at FertiNitro:[483]

"I only worry about the technical day-to-day reality of the plant, but obviously this type of thing costs, and at that degree of detail and whether or not they were duly

---

[480] First (September) Hearing D3.142-143 (Villarroel).
[481] First (September) Hearing D3.144 (Villarroel).
[482] Second (November) Hearing D6.230 (Flores).
[483] First (September) Hearing D4.34 (Villarroel). The Claimants also point to Mr Villarroel's admission that he had "no time to devote to costs at all": First (September) Hearing D4.31 (Villarroel).

authorized, I've got nothing to do with that, and in the day-to-day business, I'm miles away from that."

9.30   The Claimants contend that the expert evidence of Dr Flores cannot be relied upon because it is a mistaken coalescence of:

    (a)   a series of assertions that are either outside the evidential record or are beyond his expertise; and

    (b)   a mechanical averaging of data and sources without any appreciation of the contemporaneous and industry evidence.

9.31   As to (a), the Claimants' criticism is far ranging.  They contend that Dr Flores sought to testify on subjects such as: security and safety on Venezuelan roads; Venezuelan legal procedure; and Venezuelan labour markets and contracting processes.   During his testimony, he also assumed what the Claimants describe as:

> *"[T]he mantle of fertiliser plant, commodities trading and legal expert, opining on issues such as (1) turnarounds, maintenance and plant operations; (2) engineering and construction of fertiliser plants; (3) costs incurred at fertiliser plants; (4) arbitral procedure and decisions; and (5) ammonia and commodities trading".*[484]

9.32   As to (b), the Claimants submit that, in contrast to Mr Giles, Dr Flores has "adopted a mechanical average of production and costs data without considering whether a willing buyer and willing seller would have adopted such data to project future cash flows at the FertiNitro plant".[485]  In particular, the Claimants point to Dr Flores' failure to consider the available contemporaneous documents or investigate the exceptionally high maintenance and turnaround costs incurred at FertiNitro from 2008.  It follows, the Claimants say, from the failure to investigate the irregularities, that his valuation is "abjectly depressed."[486]

---

[484] Cls. PHB, Paragraph 144 (citations omitted).
[485] Cls. PHB, Paragraph 146.
[486] Cls. PHB, Paragraph 148.

*(iii)   The Parties' Quantum Experts Agree on a Number Of Compensation Parameters; However, the Outstanding Differences of Fact and Expertise on Quantum Issues Remain Significant*

9.33    At the Second (November) Hearing, the Parties were asked, in the course of their further submissions, to identify any points of agreement and disagreement between their respective quantum experts; and in relation to each point of disagreement, indicate whether the quantum experts disagreed because of a factual matter or because of a difference of expertise.

9.34    The Claimants' later submissions adopted that structure, their Tables 1 to 4 at Paragraph 149 of their Post-Hearing Brief identifying, respectively:

(a)    *the relevant issues subject of agreement between Mr Giles and Dr Flores and the nature of their agreement (Table 1);*

(b)    *the points of disagreement in relation to the Equity Valuation (Table 2);*

(c)    *the points of disagreement in relation to Offtake Valuation (Table 3); and*

(d)    *the points of disagreement in relation to the Historical Losses (Table 4).   (The Tribunal has already addressed and dismissed these "Historical Losses" in Part VIII above).*

9.35    These Tables are reproduced on the following pages.[487]  The Respondent subsequently added its comments to the Claimants' Tables 1 to 3 at the Third (June) Hearing,[488] to which the Claimants in turn added their responses by email message dated 30 June 2016.  These comments and responses are included in the Tables overleaf, as "Respondent's Comment" and "Claimants' Comment" respectively.   To the extent relevant, despite the Parties' procedural controversies, the Tribunal has nonetheless taken account of their contents,

---

[487] For the sake of completeness, Table 4 on "Historical Losses" is here included, although the Tribunal has already addressed these claims by KOMSA in Part VIII above.

[488] Third (June) Hearing D2.34ff.

which it decided to admit into the arbitration's files as part of the Parties' respective pleadings, but not as expert testimony from Mr Giles or Dr Flores.[489]

---

[489] Third (June) Hearing D2.111ff.

*TABLE 1: Points of Agreement between Mr Giles (for the Claimants) and Dr Flores (for the Respondent)*

| Issue | Mr Giles | Dr Flores | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|
| Fair market value standard | Giles Second Report, §1.9 | Flores Second Report, §157 | The experts agree that fair market value is the appropriate standard of value to use in this case. | Although the experts agree on the applicability of the fair market value in this case, there is disagreement over the interpretation as Mr. Giles makes assumptions that are incompatible with the fair market value definition (such as using a liquidity premium to reduce the discount rate). D.Flores Second Expert Report, paras. 159-160. | The relationship between fair market value and liquidity has already been addressed by Mr Giles. See: T. Giles Second Expert Report, para. 5.21-5.28. Quantum Hearing, Day 6, page 11, lines 20-21; page 35, lines 12-22. Reconstitution Hearing Day 1, page 221, lines 8-25. |
| Equity Valuation method | Giles First Report, §4.73 | Flores First Report, §94 | Both experts use a discounted cash flow analysis projecting free cash flows to the firm (or capital cash flows) to arrive at the enterprise value and then deduct the debt to determine equity value. | | |
| Plant lifetime | Giles First Report, §4.70 | Flores First Report, §136 | Cash flows for Equity Valuation are projected into perpetuity. | | |
| Exclusion of the 2001 to 2005 period | N/A | N/A | Although commercial production commenced in May 2001, the Parties' experts do not use output or cost data from 2001 to 2005 to project future output and costs at FertiNitro. | | |

| Issue | Mr Giles | Dr Flores | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|
| Return on Assets used as the discount rate | Giles First Report, §4.46 | Flores First Report, §94 | The discount rate formula is agreed between the two experts. The return on assets is used as the discount rate in both the Equity Valuation and the valuation of the Offtake Agreement.  Although, the methodology and formula are therefore agreed, the inputs are not (as to which, see Tables 2 and 3 below). | | |
| Inclusion of country risk premium in discount rate | Giles First Report, §4.50 | Flores First Report, §94 | Both experts add a country risk premium to the return on assets to account for country risk, although the experts disagree on the appropriate amount of the country risk premium (as to which, see Tables 2 and 3 below). | | |
| Application of lambda factor in country risk premium | Giles First Report, §§4.54-4.55 | Flores First Report, §96 and Figure 10 | Both experts apply a lambda factor to the country risk premium to account for the exposure of FertiNitro to country risk in Venezuela, although the experts disagree on the appropriate level of lambda (as to which, see Tables 2 and 3). | Dr Flores applies a Lambda of one, meaning that Lambda does not affect its calculations, whereas Mr Giles' Lambda lowers the country risk premium substantially. D. Flores Presentation, slide 18. | The relationship between country risk on average and lambda (the measure of a firm's exposure to that country risk) has already been addressed by Mr Giles. See: T. Giles First Expert Report, Annex B. paras B.43-B.46 and paras 4.64-4.66. T. Giles Second Expert Report, paras 5.29-5.61. Quantum Hearing, Day 6, page 11, lines 8-15; page 15 lines 7-25. Reconstitution Hearing Day 1, page 213, line 18 to page 221, line 6; Day 2, page 67, line 1 to page 68, line 10 and Day 2, page 81, line 16 to page 82, line 8. |

| Issue | Mr Giles | Dr Flores | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|
| Ammonia and Urea price forecasts used in Equity Valuation and Offtake Agreement valuation | Giles First Report, §4.14 | Flores First Report, §18 | FertEcon forecasts for Tampa, NOLA and Caribbean prices. | | |
| Application of Methane Gas Supply Agreement formula in Equity Valuation | Giles First Report, §§2.13 and 4.26 | Flores First Report, §37 | The experts agree on the gas formula as provided in the Methane Gas Supply Agreement, although their projections for the base price differ (as to which, see Tables 2 and 3). | | |
| Offtake Agreement pricing formula | Giles First Report, §5.1 | Flores First Report, §154 | The experts agree on the pricing formula used to determine the pricing at which KNI could purchase offtake from FertiNitro. | | |
| Historical Urea Decree volumes | Giles First Report, Table 3 | N/A | The historical volumes affected by the Urea Decree included in Mr Giles' analysis of historical Urea Decree losses are unchallenged by Dr Flores. | | |

*TABLE 2: Points of Disagreement – Equity Valuation*

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Historical period on which base production volume forecasts | Actual production 2006-08: Giles First Report, §2.11 | Actual production 2006-10: Flores First Report, §32 | Expertise | -US$ 25.7 million | | Mr Giles uses different time periods to project different variables. This inconsistency results in an overestimation of FertiNitro's value. D. Flores Presentation Slide 6. | The selection of data/time periods by Mr Giles has already been addressed. T Giles Second Expert Report, para. 1.13, paras 2.11-2.22 and paras 6.6-6.11. Reconstitution Hearing Day 1, page 197, lines 1-23; Day 1, page 200, lines 13-21; Day 2, page 72, line 15 to page 75, line 5. |
| Maintenance costs | FertiNitro management 2006-08 budgeted amounts: Giles First Report, §4.34 | Historical average 2006 – September 2010 and forecast 2010 – December 2010: Flores First Report, §58 | Expertise | -US$ 35 million | - | | |
| Turnaround costs | FertiNitro management 2008 budget and Mr Sanders' estimate: Giles First Report, §4.33 | Annualised average of 2008 actual cost and FertiNitro management 2010 budget: Flores First Report, §54 | Expertise | -US$ 13.3 million | The impact does not include the difference between the experts in relation to turnaround frequency. | | |

---

[490] The column headed "Valuation Impact" is the stand-alone decrease in Mr Giles' Equity Valuation of FertiNitro when changing his assumption to that of Dr Flores for each point of disagreement.

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Turnaround frequency | Turnaround every three years per EPC Agreement and Mr Sanders' testimony: Giles First Report, §2.10; Giles Second Report, §6.11 | Turnaround every 2 ½ years based on historical frequency between 2006-10: Flores First Report, fn 45 | Expertise | -US$ 2.5 million | - | | |
| Capital expenditure | US$ 10 million/year after first ten years of operation per Mr Sanders: Giles Second Report, §7.34 | US$ 10.6 million per year based on historical average 2006 – September 2010 and forecast October 2010 – December 2010: Flores First Report, §89 | Expertise | -US$ 4.4 million | - | Mr Giles' assumption runs counter to the historical record, even for the periods that he relies upon for other assumptions. D Flores First Expert Report, para 89, Figure 7. | The level of capital expenditure has already been addressed by Mr Giles. See: T. Giles Second Expert Report, para. 7.34. Quantum Hearing Day 6, page 51 line 5 to page 52 line 19. Reconstitution Hearing Day 2, page 75, line 6 to page 76, line 22. |
| Base gas cost | FertiNitro 2010 budget checked against market futures curve: Giles Second Report, §§7.3, and 7.13. | Average of three forecasts: Flores First Report, §42. | Expertise | -US$ 17.0 million | The base gas cost account for only about 25% of total gas costs: Giles First Report, Table 26. As mentioned in Table 1 above, the two experts agree on the gas formula provided in the Methane Gas Supply Agreement. | | |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Gas cost – efficiency factors | Mr Giles: 40.0 mmbtu of natural gas / 1MT of ammonia, 2.2 mmbtu / 1 MT of urea. Dr Flores First Expert Report para. 46. | Dr Flores: 40.7 mmbtu of natural gas / 1MT of ammonia, 2.4 mmbtu of natural gas / 1 MT of urea. D. Flores First Expert Report, para. 46. | Expertise | -US$ 4.5 million | | | Mr Giles has already explained the reason for choosing gas efficiency assumptions that are consistent with other production assumptions. See: T. Giles Second Expert Report, para. 7.16. Quantum Hearing, Day 6, page 9, line 9 to page 11, line 4. |
| The post-expropriation effect on the Urea Decree | Assumes no Urea Decree volumes: Giles First Report, §1.3; Giles Second Report, §6.4. | Assumes Urea Decree volumes continue based on 2006 – 2010 average volumes sold under Urea Decree: Flores First Report, §35. | Legal instructions | -US$ 72.0 million | Dr Flores assumes that the Urea Decree is in place indefinitely, while Mr Giles assumes no Urea Decree for the purposes of forecasting the future cashflows. | | |
| The post-expropriation effect of the Municipal tax | 1%: Giles First Report, §1.3. | 2.4%: Flores First Report, §67. | Legal instructions | -US$ 13.9 million | Mr Giles assumes a Municipal tax rate of 1% post-expropriation. Dr Flores assumes a Municipal tax rate of 2.4% post-expropriation. | | |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| The post-expropriation effect of the Science & Technology tax | No Science & Technology tax included in valuation: Giles First Report, §1.3. | 0.5%: Flores First Report, §67. | Legal instructions | -US$ 4.8 million | Mr Giles assumes no Science & Technology tax post-expropriation. Dr Flores assumes a Science & Technology tax rate of 0.5% post-expropriation. | | |
| Non-income Taxes (VAT, Municipal Tax, and Anti-Drug contribution) | VAT: 12% on all non-gas/non-personnel expenses and then subtracting an estimated recoverable amount; Municipal Tax: 1% of revenues; Anti-Drug Contribution: 1% of pre-tax income. T. Giles First Expert Report, para. 4.38, 4.39. | VAT: N/A; Municipal Tax: 2.4% of revenues; Anti-Drug Contribution: 1% of pre-tax income. D Flores First Expert Report, para. 67. | Legal Instruction | -US$ 10.1 million | | | |
| **Discount rate assumptions:** | | | | | | | |
| Risk-free rate | 3.42% based on 20 year US bond – 10/10/10: Giles First Report, §4.57. | 3.38% based on 20 year US bond – 30/09/10: Flores First Report, §98. | Factual / Expertise | +US$ 2.3 million | - | | |
| Beta (adjusted) | 0.99 based on comparable companies: Giles First Report, §4.58. | 0.86 based on comparable companies: Flores First Report, §§105-108. | Expertise. | +US$ 39.1 million | - | | |
| Market risk premium | 4.75% based on Dimson, Marsh and Staunton estimate of expected future return: Giles | 6.7% based on Ibbotson historical data: Flores First Report, §§102-103. | Expertise | -US$ 87.3 million | Respondent suggests this is a factual difference but Mr Giles argues that Dr Flores' source is | Mr Giles' global market risk premium is outdated and inconsistent with its country risk | Mr Giles has already explained that: (1) His market risk premium is consistent with the |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| | Second Report, §§4.5-4.6. | | | | not appropriate for an expected return calculation. | premium based on the U.S. D. Flores First Expert Report, para. 100; D. Flores Second Expert Report, para. 106. | valuation date and not "outdated". See: T. Giles Second Expert Report, paras 4.4 - 4.14. (2) His estimate was in the middle of a range of potential estimates T. Giles Direct, Slide 15. (3) Why a US-centric premium is not appropriate: T. Giles Second Expert Report, paras 4.6-4.8. Reconstitution Hearing Day 1, page 189, line 17 to page 195, line 18. |
| Generic Country Risk Premium | 6% based on Professor Damodaran's estimate and benchmarked to survey results: Giles First Report, §B.36. | 11.26%: Flores First Report, §117. Based on average of two estimates (Damodaran and Ibbotson Country Risk Rating) and one adjusted estimate (Ibbotson Country Spread increased by 150%). | Expertise | -US$ 93.4 million | -US$ 93.4 million is the difference between a generic country risk premium at 6% and 11.26%. | Mr Giles adjusts Professor Damodaran's method downward to arrive at this country risk premium, whereas Dr Flores averages three estimates. D. Flores First Expert Report, paras. 111, 114-117. | Mr Giles has already explained that he relied on data provided by Professor Damodaran and compared that to survey data illustrating country risk premiums actually applied by practitioners to estimate what rate would be applied in a market transaction and is therefore consistent with the |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| | | | | | | | fair market value standard. See: T. Giles Second Expert Report, paras 1.21 - 1.22 and 5.14 - 5.19. Quantum Hearing Day 6, page 63, lines 9-23. Reconstitution Hearing Day 2, page 58, line 9 to page 68, line 10. |
| Liquidity adjustment | 1% reduction to country risk premium to exclude the impact of less liquidity in emerging financial markets which is not relevant to fair market value: Giles First Report, §B.38. | N/A | Expertise | -US$ 21.5 million | A 1% reduction to the generic country risk premium increases Mr Giles' valuation by US$ 21.5 million. | Counter to Mr Giles' discount, the literature universally supports a liquidity premium for private companies. In other words, instead of increasing the valuation by US$21.5 million, a liquidity premium would decrease the valuation (an adjustment that Dr Flores does not make). D. Flores First Expert Report, paras. 120-122. | As set out in the first row of Table 1, the relationship between fair market value and liquidity has already been addressed. See: T. Giles Second Report, paras 5.21 - 5.28. Quantum Hearing Day 6, page 11, lines 20-21; page 35 lines 12-22. Reconstitution Hearing Day 1, page 221, lines 8-25. |
| Lambda | 0.25-0.40: Giles First Report, §§B.39-B.82. | 1.0: Flores First Report, Figure 10. | Expertise | -US$ 122.1 million | Mr Giles applies a lambda of 0.40 to the valuation.  The US$ 122.1 million valuation impact results from substituting Mr | Dr Flores applies a Lambda of one, meaning that Lambda does not affect its calculations, whereas Mr Giles' | The relationship between country risk *on average* and lambda (the measure of a firm's exposure to that country risk) |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[490] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| | | | | Giles' lambda of 0.40 with Dr Flores' lambda of 1.0. | Lambda lowers the country risk premium substantially. D. Flores Presentation, slide 18. | has already been addressed by Mr Giles. See: T. Giles First Expert Report, Annex B. paras B.43-B.46 and paras 4.64 - 4.66. T. Giles Second Expert Report, paras 5.29-5.61. Quantum Hearing Day 6, page 11, lines 8-15; page 15 lines 7-25. Reconstitution Hearing Day 1, page 213, line 18 to page 221, line 6; Day 2, page 67, line 1 to page 68, line 10 and Day 2, page 81, line 16 to page 82, line 8. |
| Risks covered by BIT to be excluded from the country risk premium in the FertiNitro Equity and Offtake Valuations | Some country risks can be excluded from the valuation due to existence of BIT protections: Giles First Report, Table 23. | BIT protection is irrelevant to country risk for valuation purposes: Flores Second Report, §124. | Legal instructions | There is no valuation impact as the 0.40 lambda used by Mr Giles does not specifically account for risks protected under the BIT: Giles Presentation Slides, slide 20. | Mr Giles' lambda would be reduced to 0.25 if the risks were deemed to be covered by the BIT protections:[491] §B.39 | | |

[491] Mr Giles' equity valuation would increase to US$ 408.1 million if Mr Giles used a *lambda* of 0.25 instead of 0.40. ("*Lambda"* is a factor measuring a particular enterprise's exposure to country risk).

*TABLE 3: Points of Disagreement – Offtake Valuation*

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[492] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Valuation basis | Valuation of Offtake Agreement at valuation date of 10 October 2010: Giles First Report, §5.4. | Damages model based on replacing offtake volumes after the expropriation: Flores First Report, §157. | Legal instructions / Expertise | N/A | - | | |

---

[492] This is the stand-alone decrease in Mr Giles' Offtake Valuation when changing his assumption to that of Dr Flores for each point of disagreement.

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[402] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Market for replacement tonnes | The only viable market in which the product could be replaced is the US Gulf at US Gulf prices. | Calculation based on replacing tonnes at a mid-Caribbean price: Flores First Report, §157. | Factual | N/A | Dr Flores relies on his unsupported assertion that KNI could purchase replacement tonnes at a mid-Caribbean price; the Claimants reject the existence of any such market: Day 6.2. | Claimants and Mr Giles have failed to present any data or documents to support the argument that KNI has been and will be completely unable to profitably replace the quantities it used to offtake from FertiNitro. On the contrary, the fundamental change in the fertilizer market in North America in recent years (low gas prices and no transportation costs) has made producing overseas less attractive. D. Flores Second Expert Report, paras. 198, 210-211. | Mr Giles has already explained that: (1) there was no replacement tonnage available at comparable prices, and (2) if there had been replacement tonnage available KNI would have purchased it whether the Offtake agreement was operative or not. T. Giles Second Expert Report, para 10.6. Quantum Hearing Day 6, page 82, lines 11-19. This was also addressed by J. Sorlie, in his second witness statement, para 12. Reconstitution Hearing Day 2, page 77, line 23 to page 81, line 15. |
| FertiNitro production volumes | Same as Equity Valuation | Same as Equity Valuation | Expertise | -US$ 9.2 million | See references at Table 2 above. | | |

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[492] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Discount Rate Inputs | Same as Equity Valuation | Same as Equity Valuation | Expertise | -US$ 67.3 million (Offtake Valuation alone) | See references at Table 2 above. Valuation impact here relates to the combined effect of all discount rate disagreements between the experts on the Offtake Valuation.[493] | | |
| *Lambda* applied to Offtake discount rate | 0.25-0.40 *lambda*, same as Equity Valuation. | 1.0 *lambda*, same as Equity Valuation. | Expertise | -US$ 23.1 million. | If *lambda* were assessed for the Offtake Agreement alone, Mr Giles states that it would be less than the 0.25 - 0.40 applicable to Equity Valuation because of the Offtake Agreement is even less exposed to Venezuelan country risk: Giles Second Report, §5.62. | | |

---

[493] Mr Giles' Offtake Valuation would to US$ 213.0 million if Mr Giles uses a *lambda* of 0.25 instead of 0.4.

| Issue | Mr Giles | Dr Flores | Nature of disagreement | Valuation impact[402] | Comment | Respondent's Comment | Claimants' Comment |
|---|---|---|---|---|---|---|---|
| Freight costs | Based on KNI sampled actual freight costs: Giles First Report, §5.7. | N/A. | Expertise / Factual | N/A | Dr Flores' analysis does not include freight costs. | Claimants' approach hinges on a reliable estimation of shipping costs, which Claimants have failed to provide. D. Flores Presentation, slides 40-42. | Mr Giles has already explained that he relied on actual shipping costs incurred in 2010 and the data was provided to the Respondents. See: T. Giles First Expert Report, para. 5.7. Quantum Hearing Day 6, page 89, line 7 to page 93, line 6. |
| *Ad hoc* tonnes from October 2010 through February 2012 | Mr Giles' valuation is of October 2010 so any later shipments under a new *ad hoc* arrangement are ignored for valuation purposes at that date. | Dr Flores treats *ad hoc* tonnes as replacement tonnes and thus reduces his Offtake Valuation accordingly: Flores First Report, §158. | Expertise / Legal instructions | N/A | If the expropriation of the Offtake Agreement is deemed to have taken place upon termination of the *ad hoc* arrangement in February 2010, Mr Giles' Offtake Valuation would be reduced to US$ 190.9 million: Giles Second Report, §10.9. | | |

*TABLE 4: Points of Disagreement – "Historical Losses" [with the Claimants' footnotes]*

| Issue | Giles | Flores | Nature of Disagreement | Valuation Impact[494] |
|---|---|---|---|---|
| Urea Decree | Calculates historical losses due to Urea Decree[495] | n/a | Legal Instructions | US$ 22.4 million |
| Municipal tax | Calculates losses due to historical application of municipal tax above 1%[496] | n/a | Legal Instructions | US$ 4.7 million |
| Science & Technology tax | Calculates losses due to historical application of Science & Technology tax[497] | n/a | Legal Instructions | US$ 5.4 million |
| VAT | Includes losses from non-recovery of VAT prior to expropriation[498] | n/a | Legal Instructions / Expertise | US$ 7.7 million |

---

[494] The Valuation Impact of this table shows each element of the historical loss as calculated by Mr Giles.
[495] CRAIEF – Summary of Changes to the Claimants' Valuation following Second Econ One Report.
[496] *Id.*
[497] *Id.*
[498] *Id.*

9.36    The Claimants identified the Parties' most significant points of disagreement in relation to: the quantum expert witnesses' projections of future cash flows at FertiNitro (sub-section (d) below); the Offtake Agreement (sub-section (e) below); and the discount rate and country risk premium applicable to the equity and offtake valuations (sub-section (f) below).

*(iv)    Central Points of Agreement and Disagreement in Relation to Future Cashflows at FertiNitro*

9.37    According to the Claimants, as indicated above, the Parties' quantum experts agree that the estimate of future output at the FertiNitro Plant should be based on the actual levels of ammonia and urea production achieved at the Plant over a certain period.  However, beyond this bare agreement, the experts disagree about which historical period of time should be used to forecast future output at FertiNitro.  That disagreement is significant, as submitted by the Claimants.

9.38    As set out at Table 2 above, Mr Giles uses the average of production achieved at FertiNitro between 2006 and 2008.  Dr Flores, on the other hand, uses the average of production achieved at FertiNitro between 2006 and 2010.  The difference between the quantum experts on this point reduces Mr Giles' equity valuation by US$ 25.7 million and the Offtake Valuation by a further US$ 9.2 million.

9.39    While both experts agree that the 2006 to 2008 period is an appropriate benchmark for forecasting future output at FertiNitro, their disagreement turns largely on whether or not the reduced output at FertiNitro during the years of 2009 and 2010 should also be included in the benchmark period.

9.40    Mr Giles' explanation at the Second (November) Hearing about the disfunctionality of the 2009 and 2010 years was as follows:

*"[The] 2009 and 2010 [period] is a particularly unsuitable period to use as a basis [for estimating future production at FertiNitro].  There are one-off costs, one-off curtailments caused by the start of the METOR 2 project, which just can't be included in an estimate, an ongoing estimate of performance.  And clearly, it is well documented, [there was] a distracted board, severe cost controls and management issues, until late 2010.  In my view, in my judgment, 2006 […] to 2008 represents a*

*balanced view.  I am not idealising the plant, nor am I creating the worst possible picture."*[499]

9.41   Mr Giles testified that the 2006 to 2008 period (which he uses) was far from an "ideal" production scenario as the FertiNitro Plant achieved production that was "virtually 10% below the EPC level."   It follows, so the Claimants submit, that his evidence is conservative: the Plant had demonstrated an ability to meet nameplate production.  In this regard, the Claimants again point to the evidence of Mr Villarroel under cross-examination that the urea plant at FertiNitro could be expected to achieve 100% EPC level.[500]

9.42   In relation to Dr Flores' expert evidence, the Claimants submit that he does no more than mechanically adhere to his averaging approach.  Specifically, he ignores the factors that depressed output in 2009 and 2010.  He forecast a level of future output that is, in fact, even lower than the Respondent's own post-expropriation forecast.  By contrast, the Claimants point to the valuation prepared by Advantis for the Respondent's settlement negotiations, which showed that the Respondent expected that, in the future, FertiNitro would produce higher figures.[501]  (Dr Flores, on the other hand, forecast only 1,730 MT/day of ammonia and 2,150 MT/day of urea).[502]   The Claimants contend that the fact that Advantis' valuation for the purposes of post-expropriation negotiations is higher than Dr Flores' output forecasts fatally undermines his evidence.

9.43   According to the Claimants, the second major source of disagreement between the Parties' quantum experts turns upon the maintenance and turnaround costs at the FertiNitro Plant.  The Claimants, on one hand, say that Mr Giles has evaluated the documentary record and has determined that the most reliable source for forecasting future maintenance costs is the budgets prepared by FertiNitro's plant management between 2006 and 2008.  Mr Giles testified that the most reliable source for forecasting future turnaround costs is the budget

---

[499] Second (November) Hearing D2.9-10
[500] First (September) Hearing D.3.142-143 (Villarroel) (for an explanation of the "nameplate" concept *see* Second (November) Hearing D5.65-66 (The Claimants' Opening on Quantum).
[501] Advantis Report entitled "Valoracíon de FertiNitro" (May 2011) ("*First Advantis Report*") (R-86), page 4.
[502] Updated Econ One Model.  By way of comparison, the Claimants point to Mr Giles' production forecasts for ammonia of 1,708 MT/day and for urea of 2,058 MT/day.  The Claimants contend that Mr Giles' production forecasts are more conservative than the Respondent's own forecasts in the valuation prepared by Advantis.

prepared by FertiNitro's plant management for the 2008 turnaround.  On the other hand, the Claimants contend that Dr Flores has adhered to his mechanical averaging of the actual maintenance costs incurred at FertiNitro between 2006 and September 2010.   More specifically, with respect to his projection of future turnaround costs, Dr Flores has averaged: (1) the cost of the 2008 turnaround; and (2) the budgeted cost prepared by FertiNitro's plant management in respect of the 2010 turnaround.

9.44    The Claimants make four main submissions in support of their position:

(a)    *First, they submit that the FertiNitro budgets are the only reliable source for the projection of future maintenance and turnaround costs at the Plant;*

(b)    *Second, there are what Mr Giles describes as "serious irregularities" with the actuals that render them unreliable for the purposes of projecting future maintenance and turnaround costs at FertiNitro;*

(c)    *Third, Dr Flores' maintenance and turnaround cost assumptions are based on a mechanical approach that ignores contemporaneous evidence of "serious irregularities" with maintenance and turnaround costs at FertiNitro; and*

(d)    *Fourth, the Respondent's purported "inflation" theory does not explain the high maintenance and turnaround costs incurred at the Plant.*

9.45    It is again necessary to describe further each of these submissions.

9.46    As to (a) – the "reliability of the FertiNitro budgets": Mr Giles explains that the management budgets provide the most reliable indicator for future maintenance and turnaround costs at the Plant.[503]   Indeed, so the Claimants say, such budgets have been regularly adopted by ICSID tribunals to project future costs.   They point to *Venezuela Holdings v. Venezuela* (also referred to as *ExxonMobil* case),[504] where, having been presented with a number of options (one of which included a 2006 business plan containing the budgeted operating expenses for 2007), Venezuela argued that the 2007 budget required

---

[503] Second (November) Hearing D6.7 (Giles).
[504] *Venezuela Holdings v. Venezuela* (RLA-153).

"various adjustments in order to develop the operating costs projections."[505]  The tribunal rejected this argument and held that the "[budgeted expenses were] the best indicator of what the Project participants expected to happen in the future in the absence of any adverse measures taken by the Venezuelan authorities."[506]

9.47    The Claimants contend that exactly the same rationale applies here.  It follows that the reasons for utilising management budgets in forecasting future costs at FertiNitro are overwhelming.  This is so particularly with regard to the unreliable nature of the alleged actual costs prior to the expropriation in October 2010.

9.48    As to (b) – the "serious irregularities": the Claimants contend that the budgets are the only reliable source available to the Tribunal for the purposes of projecting future maintenance and turnaround costs at the Plant.

9.49    The Claimants point, in particular, to the August 2010 minutes of FertiNitro's board of directors.  There, the costs were described as spiralling "out of control."[507]  The Claimants contend that, by 2010, it was clear to the Board that the costs at FertiNitro had become grossly inflated through the award of unauthorised contracts by Pequiven's plant management personnel.  Indeed, the Minutes of that Board meeting record:[508]

> "[…] five (5) contracts that collectively implied obligations for FertiNitro of approximately US$ 56 million, and that the new Management proceeded to rescind, since these contracts did not comply with suitable bidding procedures and lacked some of the qualified contractors that justify their selection.  Additionally, it was reported that in all of these contracts, the General Manager acted in violation of the limits of authorization and financial delegation approved by the Board of Directors."

9.50    The Claimants contend that these unauthorised contracts undoubtedly contributed to the exceptionally high maintenance and turnaround costs incurred at the Plant.

---

[505] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraph 343.
[506] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraph 342 (citation omitted).
[507] FertiNitro Board of Directors' Meeting Minutes No. 111 (5 August 2010) (C-105), page 12.
[508] FertiNitro Board of Directors' Meeting Minutes No. 111 (5 August 2010) (C-105), page 13.

9.51   While resolutions were passed at the FertiNitro board of directors' meeting of August 2010 setting out specific procedures and a timeline for the selection of external auditors and the appointment of an internal audit department, none of those resolutions or requests of the board were carried out, because (so the Claimants contend) the Respondent expropriated FertiNitro in October 2010.

9.52   As to (c) – ignorance of the "serious irregularities": the Claimants contend that Dr Flores himself accepted that there were irregularities to which regard should have been had in undertaking the valuation exercise.  In particular, they refer to his admission that "[i]f you had […] very serious concerns, then maybe yes, maybe those costs would have to be excluded."[509]   Irrespective of these matters, Dr Flores calculated the costs on a simple average.  The Claimants say that these matters are significant and require the rejection of his evidence.

9.53   As to (d) – the "inflation" theory: the Claimants contend that no credible explanation has been given by the Respondent as to the maintenance and turnaround costs incurred at the Plant.  In what the Claimants described as a "last-ditch attempt to explain these costs,"[510] the Respondent put forward an explanation that the significant maintenance and turnaround costs were the result of inflation.  Dr Flores adopted that theory for the first time at the Hearing.  The Claimants submit that it should be rejected, pointing to Mr Giles' rejection of inflation,[511] together with its absence from any of the contemporaneous documents.[512]

9.54   According to the Claimants, the third major source of disagreement concerns the turnaround periods.  The Claimants contend that, consistent with Mr Giles' evidence, the EPC Basis for Proposal confirmed that the project sponsors expected that there would be a turnaround at FertiNitro every three years.  The Claimants criticise the approach adopted by the Respondent, on the basis of Dr Flores' evidence, namely that a simple average

---

[509] Second (November) Hearing D7.61 (Flores).
[510] Cls. PHB, Paragraph 173.
[511] Second (November) Hearing D6.17 (Giles).
[512] The Claimants place particular reliance on minutes of the board of directors' meeting of 5 August 2010, which omit any reference to "inflation". FertiNitro Board of Directors' Meeting Minutes No. 111 (5 August 2010) (C-105)

should be applied.  That is to say, rather than adopt a three-year turnaround, Dr Flores' use of a turnaround of 2 ½ years is flawed, being based on the occurrence of two turnarounds in the period from 2006 to 2010.  It follows, so the Claimants contend, that Mr Giles' assessment is the only one that is supported by the contemporaneous evidence, international benchmarks and the independent opinion of Mr Sanders.

*(v)   Central Points of Agreement and Disagreement in Relation to Valuation of the Offtake Agreement*

9.55   The Claimants identify the central point of disagreement between the Parties' quantum experts in relation to the Offtake Agreement as the methodology that should be used for the valuation of KNI's interest in the Offtake Agreement.

9.56   The Claimants point to what they contend is the preferable approach of Mr Giles, namely three steps, as follows:

(a)   *calculation of the sales price for urea and ammonia in the USA (based on FertEcon projections as at October 2010);*

(b)   *the purchase price of ammonia and urea under the Offtake Agreement (again, based on FertEcon projections as at October 2010); and*

(c)   *the cost of shipping between FertiNitro and the USA.*

9.57   Mr Giles then applies his discount rate to calculate the net present value of the Offtake Agreement.

9.58   The Claimants point to the evidential support for this approach by Mr Jim Sorlie, who testified as to the Caribbean fertilizer market, such evidence being "unrebutted" by the Respondent and also discrediting Dr Flores' assumption of a spot market for fertilizer products at the so-called "mid Caribbean" price.

9.59   The Claimants contend that Dr Flores has undertaken no valuation of the Offtake Agreement as at October 2010.  Instead, the Claimants submit that the use of the replacement value employed by Dr Flores is contrary to the standard for compensation

under customary international law.  Such approach requires a determination of fair market value (not replacement value) as at the date of expropriation.

9.60    In relation to Dr Flores' approach, the Claimants also point to a number of matters which undermine it, namely (as contended by the Claimants):

(a)    *His unsupported assumption that KNI could replace the tonnes lost at a "mid Caribbean price", such assumption being contrary to the unrebutted evidence of Mr Sorlie that there is virtually no product available for KNI to purchase in the Caribbean market;*[513]

(b)    *His unsupported factual assumptions, including his statement that "Ammonia produced in Venezuela doesn't taste or doesn't look any different from ammonia produced in the Black sea";*[514] *and*

(c)    *His failure to mention that almost of all of the articles upon which he relied post-date the expropriation of October 2010.*

9.61    Finally, in relation to the Respondent's contention that the discovery and exploitation of shale gas in the USA has an impact, the Claimants contend that the post-2010 US shale gas developments cannot influence the fair market value of the Offtake Agreement as at October 2010.  Indeed, as a matter of fact, so the Claimants contend in reliance on Mr Sorlie's evidence, even in 2014 (four years after the expropriation), the USA was expected to remain a very large net importer of fertilizer products.[515]  On the other hand, Mr Sorlie's evidence confirmed that the exploitation of shale gas in the USA would not materially affect Mr Giles' valuation of the Offtake Agreement, even as at 2014.  That evidence, so the Claimants contend, is unrebutted by the Respondent.

9.62    In summary, therefore, the Claimants contend that Mr Giles' Offtake Valuation complies with the applicable legal standard, is based on reliable documentary and witness evidence and reflects a clear understanding of the Caribbean fertiliser market.  This is to be

---

[513] First (September) Hearing D2.119-20 (Sorlie).
[514] Second (November) Hearing D7.174 (Flores).
[515] First (September) Hearing D2.173 (Sorlie).

contrasted, so the Claimants say, with Dr Flores' Offtake Valuation, which is factually and legally flawed, betrays a misunderstanding of the Caribbean fertiliser market and is undermined by documentary and witness evidence.

*(vi)    Central Points of Agreement and Disagreement in Relation to the Discount Rate and the Country Risk Premium*

9.63    It is necessary now to turn to two further matters of disagreement between the Parties, namely the discount rate and the country risk premium components of the DCF model.

9.64    As to the discount rate, the Claimants rely on Mr Giles' rate of 10.1% in preference to Dr Flores' rate of 20.4%.

9.65    Noting that each expert has incorporated a market risk premium and a country risk premium into his expert rate, the Claimants point to Table 5 at Paragraph 197 of their Post-Hearing Brief (which is reproduced below) as demonstrating the downward effect of market and country risk assessments upon their respective valuations:

*TABLE 5: Valuation Scenarios*

| Valuation scenarios | Mr Giles' Equity Valuation | Dr Flores' Equity Valuation |
|---|---|---|
| Valuation with no market risk and no country risk | US$ 3,445.8 million | US$ 2,615.4 million |
| Valuation with market risk but no added Venezuela country risk (as if FertiNitro were in the US) | US$ 514.1 million | US$ 250.0 million |
| Valuation with market risk and added Venezuela country risk | US$ 361.0 million | US$ 34.6 million |

9.66    The Claimants emphasise that Mr Giles has incorporated both market risk and country risk into his Equity Valuation and Offtake Valuation.  They contend, accordingly, that Mr Giles has thus adopted a discount rate that takes into account all market and country risks that potentially affect the Claimants' investments in Venezuela, even though this results in a very substantial reduction to his valuation.

9.67    On the other hand, the Claimants describe Dr Flores' discount rate as being a "contrived" higher discount rate.[516]   In brief, the Claimants criticise Dr Flores for selecting an exaggerated market risk premium and an inflated generic country risk premium that fails to take into account FertiNitro's specific exposure to Venezuelan country risk.  According to the Claimants, there are several elements in such criticism.

9.68    First, the Claimants contend that Dr Flores has adopted an inflated market risk premium that depresses the valuation of the Claimants' investments.  That market risk premium was 6.7%.  At the Second (November) Hearing, Mr Giles explained that, out of 12 possible sources of market risk premia on the record of this arbitration (ranging from 3% to 6.7%), Dr Flores has selected the source that yields the highest possible market risk premium.[517] The Claimants contend that this stands in stark contrast to Mr Giles' market risk premium, which falls around the mid-point of the range of possible sources of market risk premium. The Claimants submit that the selection of an exaggerated market risk premium is a "blatant demonstration of reverse financial engineering by Dr Flores."[518]  The Claimants point, in this regard, to the fact that the market risk premium selected by Dr Flores is almost twice as high as the market risk premium of 3.5% adopted by the Respondent from the post-expropriation equity valuation commissioned from Advantis for the purposes of settlement negotiations.[519]  In brief, the Claimants contend that Dr Flores' approach is not a realistic representation of what a willing buyer and willing seller would have agreed in a transaction as at October 2010.

9.69    Second, despite starting at the same generic starting point (namely, Professor Damodaran's generic country risk premium for Venezuela), the Claimants say that Dr Flores' analysis takes three measures of Venezuelan country risk, averages them, and then fails to analyse the individual attributes of FertiNitro to determine exposure to country risk.  The Claimants focus on the fact that Dr Flores has not explained why the averaging of multiple sources

---

[516] Cls. PHB, Paragraph 200.
[517] Second (November) Hearing D6.12 (Giles).
[518] Cls. PHB, Paragraph 203.
[519] First Advantis Report (R-86), page 23.

(each of which provided vastly different country risk rates) provides an accurate methodology for calculating the country risk rate for Venezuela.

9.70    It follows, so the Claimants submit, that Mr Giles' methodology should be preferred.  He used a generic country risk premium of 6%, which he then adjusts: (1) to eliminate the impact of illiquidity (since the fair market value standard requires an assumption that there are no liquidity issues); and (2) to reflect FertiNitro's specific exposure to Venezuelan country risk i.e., the *lambda* factor.

9.71    The Claimants contend that Mr Giles' analysis is to be preferred because he acknowledges that FertiNitro, like every investment, is unique.  He based his generic country risk premium on Professor Damodaran's estimate of 6.75% for the generic country risk in Venezuela.  He then reduced Professor Damodaran's estimate by 0.75% to take into account survey data that is representative of what market participants use in what he says are "real world" transactions.

9.72    It follows, so the Claimants contend, that the Tribunal should use the only source that both experts in the arbitration agree is an appropriate source for assessing the generic country risk for Venezuela; that is, the estimates provided by Professor Damodaran - with the adjustments made by Mr Giles.

9.73    On this latter point, the Claimants conclude that the appropriate rate should be adjusted by reference to a liquidity adjustment.  That is, the generic country risk must be reduced to remove the risk of an illiquid market.  This results, so Mr Giles testifies, in a reduction of 1% (from 6% to 5%).

9.74    Third, the Claimants point to the fact that the experts agree in principle on the application of a FertiNitro-specific country risk adjustment in the form of a *lambda*.  The experts are agreed that, in principle, a *lambda* factor should be applied in order to determine an investment-specific country risk premium.  As Mr Giles explained:[520]

---

[520] Second (November) Hearing D6.15 (Giles).

> *"It must be uncontroversial, and I think even Dr Flores accepts that an investor would pay more for an investment that is more insulated from risk than a typical company.  It must be uncontroversial, it's set out in Dr Damodaran's work and elsewhere.  So we need to assess, make a judgment about the relative exposure of FertiNitro to Venezuelan country risk."*

9.75    The Claimants complain that Dr Flores has not, in fact, calculated a *lambda* factor.  The end result, say the Claimants, is that Dr Flores agrees with the application of a *lambda* factor, but he has failed to undertake the detailed investment-specific analysis that this approach requires.

9.76    Fourth, the Claimants conclude that Mr Giles is the only quantum expert witness who has actually applied the agreed *lambda* approach and thereby assessed the extent to which FertiNitro is exposed to Venezuelan country risk.

9.77    The Claimants contend that, although Dr Flores later claimed to have applied a *lambda* factor, the evidence at the Second (November) Hearing confirmed that only Mr Giles has conducted a proper examination of FertiNitro's exposure to Venezuelan country risk.  They point to Mr Giles' detailed analysis of the extent to which FertiNitro is exposed to 22 distinct risk factors that comprise the country risk for Venezuela.  Ultimately, Mr Giles determined that an appropriate *lambda* factor of 0.4 was to be applied.  As Mr Giles explained:[521]

> *"[First], on the revenue side, there is no specific price risk in Venezuela.  Absent the Urea Decree, all prices are set internationally under the Offtake Agreement.  So it doesn't matter what happens in the Venezuelan economy, the prices are set internationally.*
> *The demand, the demand is entirely set internationally.  The international markets – the international price can take any volume FertiNitro can produce, so irrespective of what's happening in the Venezuelan market, FertiNitro can sell its product.  Now that's actually quite different from a typical firm, a farm, a bakery, a hotel.  Typical firms are very exposed to local economic conditions."*

---

[521] Second (November) Hearing D6.16 (Giles).

9.78    The Claimants point to the fact that Mr Giles has implemented a forensic approach that looks at a host of country risk factors.  The Claimants also point to the fact that Mr Giles emphasises that the FertiNitro Plant is located in a secure location, and has low exposure to risks associated with social disorder, political strikes and organised crime.  It has access to a dedicated dock to export its products; and FertiNitro does not require external funding for its operations.   Further, it has low exposure to Venezuelan infrastructure and transportation risks.

9.79    The Claimants submit that Mr Giles is to be contrasted with Dr Flores, who admitted under cross-examination at the Second (November) Hearing that he had not independently studied the 22 country risk elements analysed by Mr Giles when calculating the *lambda* factor.[522]

9.80    The Claimants further contend that Mr Giles' assessment of, and conclusions about, the *lambda* factor are consistent with those of the international credit rating agency, Moody's, in its contemporaneous determination of the risks associated with FertiNitro's corporate debt.  At the commencement of the project, Moody's undertook a comparative analysis of the risk ratings of Venezuela and the FertiNitro project.   The analytical approach undertaken by Moody's in determining the bond rating of FertiNitro's corporate bonds is, so the Claimants submit, similar to the approach taken by Mr Giles in determining the *lambda* factor.  Moreover, international credit rating agencies rated FertiNitro's bonds as being less risky than Venezuela's sovereign debt.

9.81    In contrast, the Claimants contend that Dr Flores' *ad hoc* implementation of a *lambda* of 1.0 is contradicted by the contemporaneous assessments of the international credit rating agencies.  Under cross-examination, Dr Flores agreed that the Moody report (Exhibit BE-19) confirms the accepted position that country risk needs to be measured with respect to the specific asset or investment concerned.  In this regard, he explained:[523]

---

[522] Second (November) Hearing D7.97-98 (Flores).
[523] Second (November) Hearing D7. 133 (Flores).

> *"Q. So again the analysts from Moody's here are saying when you're making these kinds of assessments, you have to look at every project on an individual basis, correct? A. Yes, generally yes."*

9.82    The Claimants contend that, notably, Dr Flores acknowledged that, at the commencement of the FertiNitro project, Moody's had confirmed that FertiNitro was less exposed to Venezuelan country risk than other companies operating in Venezuela.[524]   The Claimants point to similar analytical criteria used by other agencies, such as Fitch[525] and Duff & Phelps.[526]   It follows, so the Claimants contend, that these contemporaneous conclusions corroborate the conclusions reached by Mr Giles on the *lambda* and, equally, confirm that Dr Flores' conclusion is an outlier.

9.83    Further, the Claimants note that Moody's noted that foreign investors can abate their exposure to country risk by structuring their transactions in order to benefit from the protections afforded under investment treaties.   Yet Dr Flores has assumed the opposite, assuming that the existence of the Treaty does not, in any way, mitigate the country risk with respect to the Claimants' investments.   This demonstrates what the Claimants suggest is another flaw with Dr Flores' assumption that a willing buyer and seller would view FertiNitro and the Offtake Agreement as being as exposed to Venezuelan country risk as the average asset located in Venezuela, resulting in a *lambda* of 1.00.

9.84    The Claimants contend that the arbitrariness of Dr Flores' *lambda* of 1.00 is further illustrated by the fact that he has entirely ignored the Offtake Agreement in his analysis. Mr Giles confirmed in his second report that "the Offtake Agreement is immune to changes in local costs in Venezuela, thus making it even less akin to a typical firm in Venezuela."[527] And yet, as he confirmed at the Second (November) Hearing, Dr Flores has simply applied

---

[524] Second (November) Hearing D7. 114 (Flores).
[525] Fitch rating press release (30 March 1998) (C-119).
[526] Duff & Phelps Credit Rating Co., FertiNitro Finance Inc. – Credit Analysis Update (September 1998) (BE-23), page 188.
[527] Second Expert Report of Tim Giles (30 August 2013) ("Giles ER2"), Paragraph 1.26.

the same 1.00 *lambda* to the Offtake Valuation without any separate assessment of the Offtake Agreement's exposure to Venezuelan country risk.[528]

9.85    The Claimants again point to the fact that Dr Flores' analysis is contrary to the contemporaneous record and real-life valuation practice.  International rating agencies, for example, have confirmed that the existence of an offtake agreement mitigates exposure to country risk.[529]

9.86    In summary, therefore, the Claimants contend that Dr Flores' opaque, superficial and self-serving exposition of the *lambda* issue is egregiously wrong, given the dramatic effect that the *lambda* has on both the Equity and Offtake Valuations.

*(vii)  The Award in <u>Gold Reserve Inc v. Venezuela</u> Supports The Fertinitro-Specific Country Risk Premium Adopted By The Claimants' Quantum Expert, Mr Giles, And Discredits The Generic Country Risk Premium Adopted by the Respondent's Quantum Expert, Dr Flores; By Contrast the Awards in the Exxonmobil And Mobil Cases Do Not Identify Any Country Risk Premium For Venezuela And Are Clearly Distinguishable*

9.87    In relation to the issue of country risk, the Claimants contend that the award in *Gold Reserve v. Venezuela*[530] supports the FertiNitro-specific country risk premium adopted by Mr Giles and discredits the generic country risk premium adopted by Dr Flores.  Further, the Claimants contend that the two awards in *ExxonMobil* and *Mobil*[531] do not identify any country risk for Venezuela and are clearly distinguishable.

9.88    The Claimants contend that the *Gold Reserve* award is of central relevance because of its treatment of the discount rate and Venezuelan country risk.  The tribunal in that case adopted a discount rate based on a weighted average cost of capital ("WACC"), of

---

[528] Second (November) Hearing D7. 170 (Flores).
[529] *See, e.g.,* Duff & Phelps Credit Rating Co. – Rating Approach to Project Finance (BE-18), page 13; Thomas Coleman, Moody's Investors Service – Piercing the Sovereign Ceiling: Issues in Oil and Gas Project Financing – (23 February1998) (BE-11), page 9.
[530] *Gold Reserve v. Venezuela* (CLA-156).
[531] Namely, *Mobil v. PDVSA* (EO-45); *Venezuela Holdings v. Venezuela* (RLA-153).

212

10.09%[532] (which is virtually identical to Mr Giles' like-for-like discount rate of 10.1%). In doing so, the tribunal incorporated a country risk premium of 4% to the cost of equity.

9.89   The Claimants make four arguments in this regard which (as they contend) support their approach, namely:

9.90   First, the *Gold Reserve* tribunal concluded that a 4% country risk premium "appropriately considers political risks, together with other risks, but has not been over-inflated on account of expropriation risks."[533]   In that tribunal's view "it is not appropriate to increase the country risk premium to reflect the market's perception that a State might have a propensity to expropriate investments in breach of BIT obligations."[534]   The Claimants further contend that this aspect of the tribunal's reasoning accords with the established international law principle of *nullus commodum capere de sua injuria propria*.[535]

9.91   This principle has been reaffirmed by the tribunal in *Flughafen v. Venezuela*, where the tribunal explained: "A State that increases country risk via the adoption of new political attitudes, adopted after an investment has materialized, cannot benefit from an unlawful act attributable to it in order to reduce the compensation to be paid out."[536]

9.92   Second, the country risk premium adopted by the tribunal in *Gold Reserve* confirms that an investment-specific approach to measuring country risk is required for the purposes of valuation.  The tribunal specifically rejected Venezuela's "generic" country risk calculation because it was "based on both full and 'generic' country risk for an investment in Venezuela."[537]   It referred instead to an RBC Capital Markets valuation that was investment-specific to *Gold Reserve* for the purposes of arriving at its 4% country risk premium.

---

[532] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 842.
[533] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 842.
[534] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 841.
[535] No State, it is said, can take advantage of its own wrongful acts.
[536] *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award (18 November 2014) ("*Flughafen v. Venezuela*") (RLA-154), Paragraph 905.
[537] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 840.

9.93    Third, in the *Gold Reserve* award, the country risk premium of 4% related to the cost of equity.  This resulted in a total cost of equity of 11.92% and a WACC of 10.09%.  The country risk premium element of the WACC was accordingly <u>lower</u> than 4%, as the WACC is a measure not just of equity, but also debt (which would have a lower or no country risk premium attached to it).  The Claimants contend that the Parties' experts agree that the appropriate discount rate to be applied in this case is the return on assets.  This rate is effectively identical to the WACC (with the exception of the treatment of debt tax shields).  The return on assets is, like the WACC, the return to both debt and equity holders.  As such, in order to compare the country risk premium applied in the *Gold Reserve* award to the country risk premium to be applied to FertiNitro, it is necessary to look not at the 4% added by the *Gold Reserve* tribunal to the cost of equity, but to the premium that was applied to the WACC.  While the award does not specify what premium was applied to the WACC in *Gold Reserve*, it must be lower than the 4% that the tribunal applied to the cost of equity.

9.94    Fourth, as explained by Mr Giles (see above) FertiNitro is far less exposed to country risk in Venezuela than the gold mine at issue in *Gold Reserve*.  The mine was located in the "environmentally fragile Imataca Forest Reserve" in the interior of Venezuela.[538]  This area in southeast Venezuela is not easily accessible and has poor transportation links, even compared to other remote locations in Venezuela.

9.95    Unlike *Gold Reserve*, the Claimants submit that the *ExxonMobil* and *Mobil* cases are distinguishable from the present arbitration and the resulting awards offer no meaningful precedent on the assessment of country risk and discount rate.  *ExxonMobil* obtained these awards in two separate arbitrations against Venezuela and its State-owned companies.  These awards relate to Venezuela's expropriation of an extra-heavy oil project and other investments formally held by the *ExxonMobil* group in Venezuela.

9.96    In relation to the ICC arbitration, Mobil Cerro Negro ("*Mobil*") initiated arbitration proceedings against PDVSA Cerro Negro SA ("PDVSA-CN") and Petróleos de Venezuela

---

[538] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 283.

SA ("PDVSA") pursuant to two inter-related agreements: (i) the "Association Agreement" and (ii) the "PDVSA Guaranty".[539]  The ICC tribunal's task was to "apply the common intention of the Parties reflected in the [Association Agreement]".[540]  In particular, the ICC tribunal was required to award compensation according to an indemnity formula provided in the Association Agreement.  In such circumstances, the ICC tribunal did not endorse any particular country risk calculation for Venezuela.  Instead, the ICC tribunal analysed the valuation of future cash flows under the indemnity formula provided in the Association Agreement.  When analysing this issue, the ICC tribunal emphasised that "there is a difference between valuing future cash flows under an indemnity formula and valuing the potential cash flows from a project".[541]

9.97    In these circumstances, the Claimants contend that the factors considered by the ICC tribunal in order to determine the appropriate discount rate applicable to contractual damages are demonstrably not relevant to the calculation of the discount rate for the DCF valuation of an investment.  The Claimants argue that neither Party nor expert in the present case has advanced any discount rate analysis comparable to that undertaken in the ICC award.

9.98    The Claimants also point to the fact that another distinguishing feature of the *ExxonMobil* and *Mobil* cases is that the claimant had consistently argued for a risk-free rate (namely, a discount rate that excluded any market risk premium and country risk premium).   In contrast, the Claimants' discount rate formula includes a substantial market risk premium (4.75%) and country risk premium (2%).  The customary international law standard of full reparation played no part in the ICC tribunal's analysis.

9.99    In parallel with the ICC arbitration, a number of *ExxonMobil* subsidiaries brought an ICSID arbitration against Venezuela under the Netherlands-Venezuela BIT.[542]  As in the ICC case, in the ICSID case there was no evidence of any country risk calculation.  The

---

[539] *Mobil v. PDVSA* (EO-45).
[540] *Mobil v. PDVSA* (EO-45), Paragraph 767.
[541] *Mobil v. PDVSA* (EO-45), Paragraph 774.
[542] *Venezuela Holdings v. Venezuela* (RLA-153).

claimants had argued that country risk is largely comprised of "uncompensated expropriation, which cannot be taken into consideration in order to valuate such an expropriation."   In those circumstances, the Claimants submit that the ICSID award contains no analysis whatsoever of Venezuelan country risk, let alone any analysis of investment-specific risk or any final calculation for country risk.   The ICSID tribunal instead adopted a discount rate of 18% for the purposes of its DCF valuation.

9.100   It follows, so the Claimants contend that, unlike the *ExxonMobil* and *Mobil* cases, the evidence presented in this arbitration involves detailed arguments in support of the Claimants' country risk approach.   In contrast to the *ExxonMobil* and *Mobil* cases, so the Claimants contend, both Parties' experts have advanced arguments focused on country risk and both experts agree that the country risk premium to be adopted by the Tribunal must be investment-specific (that is, using a *lambda*).   The *ExxonMobil* and *Mobil* cases can therefore be of no utility to the Tribunal in its assessment of country risk and *lambda* in this arbitration.

9.101   The Claimants point to another example of a country risk assessment involving Venezuela in the award made in *Flughafen v. Venezuela*.[543]   There, the respondent proposed a country risk premium of 7.9% and a discount rate of 14.4%.[544]   The tribunal adopted the respondent's country risk premium based on the specific facts of the case: specifically, that, when the claimants made their investments in 2004, the country risk already existed, the investors were well aware of it and the risk had not changed by the time of the expropriation soon afterwards, in December 2005.

9.102   Therefore, by way of summary, the Claimants conclude that the ICSID tribunal's award in *Gold Reserve v. Venezuela* is the most relevant legal authority in connection with country risk (and particularly expropriation risk) and *lambda* analysis that the Tribunal is required to undertake in the present case.   That decision endorses the FertiNitro-specific country risk premium adopted by Mr Giles and discredits the generic country risk premium adopted by Dr Flores.   In contrast, so the Claimants say, the awards in the *ExxonMobil* and *Mobil*

---

[543] *Flughafen v. Venezuela* (RLA-154).
[544] *Flughafen v. Venezuela* (RLA-154), Paragraphs 899-902.

cases are clearly distinguishable.  As for *Flughafen* award, it is of relevance to the extent that it endorses the proposition that no respondent should be allowed to benefit from its own expropriatory conduct; but it is otherwise distinguishable on its facts.

*(viii) The Adjusted MOU Price is an Effective Reality Check on the Parties' Valuations; It Demonstrates That Mr Giles' Equity Valuation Is Conservative And That, By Contrast, Dr Flores' Purported Fair Market Valuation Is Less Than 10% Of The Price That Was Agreed By the Parties In 2007 Under Threat of Expropriation.*

9.103    In further support of the application of their proposed valuation, the Claimants point to Mr Giles' adjusted MOU price in 2007 as an effective reality check.  They submit that it demonstrates that Mr Giles' Equity Valuation is conservative and, by contrast, that Dr Flores' purported fair market valuation is less than 10% of the price that was (allegedly) "agreed" by the Parties in 2007 under the threat of expropriation.

9.104    In this regard, the Claimants contend that the evidence confirms that Mr Giles' Equity Valuation (namely, US$ 361.0 million for KOMSA's 25% interest) is almost the same as the MOU price as adjusted in a "but-for" scenario (US$ 360.8 million).[545]    For this comparison, the Claimants contend that Mr Giles has simply calculated the MOU price in the absence of the Respondent's pre-expropriation violations of the Treaty (that is, "but for" the economic impact of the Urea Decree and the unlawful taxes).  As a result, the Claimants contend that the adjusted MOU price confirms that Mr Giles has produced a conservative Equity Valuation that very likely understates the value of KOMSA's equity investment in a "but-for" scenario.

9.105    In contrast, the Claimants point to the fact that Dr Flores has made a series of arbitrary adjustments to the MOU price that have the effect of reducing the enterprise value listed in the 2008 MOU by 55%.  The Claimants describe this approach as a "piece of financial reverse engineering".[546]

---

[545] *See*, for example, Giles ER1, Paragraphs 4.86, 4.88.  The Claimants note that Mr Giles increases the MOU price (namely, US212.5 million) by "25% of the expected impact, over the life of the Plant, of the Urea Decree and unlawful taxes (namely, KOMSA's share of this loss)" – it is this increase that results in an adjusted MOU price of US$ 360.8 million as at 30 September 2010.
[546] Cls. PHB, Paragraph 265.

9.106   The Claimants contend that the evidence of Dr Flores is to the effect that the distortion of the MOU price is based on the fact that the draft MOU of November 2007 was only "a first offer by Koch".[547]   This allows him to assert that the only moment in time that the MOU was "agreed" was almost a year later in October 2008.   The Claimants contend that this evidence is contrived, and that such contrivance is exposed by the contemporaneous evidence.   The Claimants point to the fact that during his cross-examination, Dr Flores was taken to an email from Mr Toro (as a director of Pequiven), to Messrs Parra and Gwaltney (for KOMSA) dated 9 October 2007 (that is, approximately one month prior to the date of the 2007 MOU), which stated:[548]

> *"In accordance with an independent valuation carried out by Boo[z] Allen, hired by Pequiven,[549] and additional valuations carried out and discussed with the rest of the partners, we have estimated a fair amount of one billion, one hundred and seventy-five [million] U.S. dollars […] for 100% of the shares [in FertiNitro]."*

9.107   The Claimants contend that Mr Toro's email message, sent only one month prior to the November 2007 MOU, unequivocally confirms that the "first offer" was, in fact, made by Pequiven.   Thus, the November 2007 MOU (drafted by Koch) contained a price that was agreed between the Parties in November 2007.   The Claimants conclude that Dr Flores' evidence should, therefore, be rejected.[550]

---

[547] Second Expert Report of Daniel Flores (3 March 2014) ("Flores ER2"), Paragraph 169.

[548] Email from F. Toro to B. Gwaltney and T. Parra re: FertiNitro Negotiations (9 October 2007) (C-90).

[549] Later known as Advantis.

[550] In the Tribunal's view, there is no cogent evidence that any MOU price was "agreed" in 2007 between Pequiven and KOMSA. The first offer came via an email of 9 October 2007 from Mr Toro of Pequiven (C-90) with a valuation of US$ 1.175 billion for 100% of the equity of FertiNitro, less the amount outstanding to its banks and bondholders (which he put at US$ 450,000, presumably US$ 450 million). On 7 November 2007, KOMSA came back with its draft MOU with a valuation of US$ 1.210 billion less the debts to the banks and bondholders plus the Excess Cash in FertiNitro. Discussions were halted in early 2008. However, Pequiven came back again in October 2008 with a revised draft MOU (C-93) which provided for a payment of US$ 212.5 million to KOMSA for its share of FertiNitro's equity. Ultimately, no MOU was ever agreed or signed. Pequiven contended that the purchase of the private shareholders of FertiNitro was no longer a priority. However, Mr Parra (of KOMSA) testified in his witness statement (Paragraph 69) that KOMSA's representatives understood that there was no real alternative but to accept Pequiven's proposal (*See also* Cls. Mem., Paragraphs 144-153).

*(ix)  There Are Multiple Additional Reality Checks That Validate The Reasonableness of Mr Giles' Valuations of The Equity Investment and the Offtake Agreement*

9.108  The Claimants also point to "multiple additional reality checks that validate the reasonableness of Mr Giles's valuations of the Equity Investment and the Offtake Agreement,"[551] namely:

9.109  First, the Claimants point to the "project investment" for identical new fertiliser plants at Guiria and the José Complex, whereby Pequiven (in its 2007-2013 Strategic Plan) announced that it intended to invest US$ 2.8 billion to build each plant, each having an equivalent nameplate capacity as FertiNitro's Plant.  Mr Giles' evidence was that "[r]eplacement value must be the minimum that an investor considers the plant to be worth," and that such value is a well-understood economic indicator of value.[552]

9.110  Second, the Claimants point to FertiNitro's 2011 actual net profit of US$ 116.2 million compared to a budgeted 2011 net profit of US$ 117.2 million.  If (as Mr Giles explained) the DCF methodology "involves projecting revenues and costs into the future", these amounts are a simple post-expropriation reality check, which undermines the credibility of Dr Flores' equity valuation and demonstrates the conservativeness of Mr Giles' forecasts.  As to the former, Dr Flores forecasts that FertiNitro would have made net profits in 2011 of US$ 36.3 million, being approximately one third of the net profit that FertiNitro achieved in 2011.  In relation to the latter, Mr Giles forecasts net profits in 2011 of US$ 92.1 million, being 20% less than what FertiNitro's managers expected and then ultimately achieved.

9.111  Third, the Claimants refer to the dividend payment to FertiNitro's shareholders of US$ 150 million in 2008 (of which US$ 37.5 million was distributed to KOMSA).  They note that this dividend was paid out of profits that had already been reduced by the Respondent's pre-expropriation violations but that, nevertheless, the amount is more than Dr Flores' entire Equity Valuation.

---

[551] Cls. PHB, Paragraphs 272-284.
[552] Second (November) Hearing D6.25 (Giles).

9.112   Fourth, the Claimants point to the net present value of the profits foregone by KNI of US$ 172 million if Dr Flores' own calculation of KNI's profits during the period of the *ad hoc* arrangement is applied over the remaining term of the Offtake Agreement.  This reality check rests on the "volumes offtaken" identified by Dr Flores himself at the Second (November) Hearing.  If the profit per month during the period of the *ad hoc* arrangement, namely US$ 2.49 million, is applied over the remaining term of the Offtake Agreement (being 123 months), the total net profit forgone is US$ 306 million.  Applying Mr Giles' discount rate, the net present value of the lost profits is US$ 172.7 million.  That figure is approximately US$ 33.8 million less than Mr Giles' valuation of the Offtake Agreement, and, so the Claimants contend, further corroborates its reasonableness.

9.113   The Claimants contend that these four factors should be considered by the Tribunal as other tribunals have found it instructive to refer to "reality checks" to test the reasonableness of disputed valuations placed before them.

*(x)    There Are Multiple Further "Lower Bound" Reality Checks That Discredit Dr Flores' Valuation as an Unsupportable Outlier*

9.114   In addition to these factors, the Claimants point to further "lower bound" reality checks to discredit Dr Flores' valuations as an unsupportable outlier, namely:

9.115   First, the book value of FertiNitro as at the date of the expropriation equated to US$ 168.1 million for KOMSA's 25% equity in FertiNitro, after deduction for debt.  That figure is five times Dr Flores' Equity Valuation.  Book value is almost always less than fair market value, especially when valuing a profitable going concern.[553]

9.116   Second, the construction costs alone of FertiNitro equated to US$ 273 million for 25% of FertiNitro.  Once again, the Claimants point to the multiple of Dr Flores' valuation, in this case the construction costs being eight times his valuation.

9.117   Third, the Respondent's own post-expropriation position for the purposes of settlement negotiations prepared by Advantis equated to US$ 113 million for 25% of FertiNitro.  The

---

[553] *See ConocoPhillips v. Venezuela* (CLA-155), Paragraphs 400-401.

Claimants again point to this amount as a "reality check," contending that it shows that Dr Flores adopted an inflated discount rate and country risk premium, and an overly pessimistic forecast of future output levels at FertiNitro.  This Advantis valuation was more than three times the figure reached by Dr Flores.

9.118   Fourth, the Respondent's "estimated project investment" for the smaller fertiliser plant located at Móron was US$ 1.55 billion and the construction costs of that plant were US$ 2 billion.  As the Móron plant has a urea output of 726,000 metric tonnes per year, this means that U$ 2,755 of construction costs will give one metric tonne of urea for the foreseeable future.[554]  As Dr Flores' Equity Valuation equates to US$ 355 per metric tonne of urea, Mr Giles explained that no reasonable buyer would consider it possible to purchase FertiNitro for US$ 355 per metric tonne when a commercial entity has plans to build a plant that will cost US$ 2,755 per metric tonne.

9.119   Having regard to all these factors, the Claimants contend that Dr Flores' valuations do not even meet lower bound reality checks.  The Claimants submit that, like *Flughafen v. Venezuela*,[555] the Tribunal should reject any valuation outside those bounds.  In short, so the Claimants conclude, Dr Flores' valuation is an outlier that cannot be supported.  It is, so the Claimants say, "a striking demonstration of the unreasonableness of Dr Flores' depressed valuations."[556]

### *(4)   The Respondent's Quantum Submissions*

9.120   The Respondent contends, primarily, that the Tribunal need not arrive at the point of determining any quantum issues.  Indeed, the Respondent's submissions are explicitly made "solely for reasons of precaution."[557]   However, the Tribunal has confirmed its jurisdiction; and the Respondent is liable to the Claimants under Article 6 of the Treaty, as decided above by the Tribunal in regard to KOMSA and, as regards KNI, by the majority

---

[554] Relying on Tim Giles' presentation, Slide 26.
[555] *Flughafen v. Venezuela* (RLA-154).
[556] Cls. PHB, Paragraph 295.
[557] Resp. PHB, Paragraph 169.

of the Tribunal.  Hence, the Respondent's submissions on quantum must now be considered by the Tribunal.

9.121   In summary, the Respondent's case on quantum is comprised of four principal submissions. These are:

> (a)   *Its general submissions as to the flaws in the Claimants' quantum submissions;*
>
> (b)   *The compensation claimed by KOMSA and KNI are both vastly overstated;*
>
> (c)   *The fair market value of KOMSA's interest in FertiNitro was not more than US$ 34.6 million; and*
>
> (d)   *KNI's valuation of its interest in the Offtake Agreement is overstated.*

> *(i)   The Respondent's General Submissions*

9.122   The Respondent makes, as already indicated, seven general submissions as to the appropriate treatment of the issues of quantum for both KOMSA and KNI.

9.123   First, the Respondent contends that the Claimants have proposed a highly inflated value that far exceeds what the Claimants' claims would be worth in the absence of the disputed acts.  This is not compatible with the fair market value ("FMV") standard that both Parties agree applies to quantum.  The FMV standard is an objective standard that leaves no room for what, so the Respondent contends, is the arbitrary, highly speculative and policy-based valuation that the Claimants ask the Tribunal to conduct in this case.

9.124   Second, as regards KOMSA, the Respondent contends that the Claimants disregard standard DCF valuation principles by "cherry-picking" data that increases their valuation outcome and by using out-dated budgeted data, even where more current actual data is fully available.  The Respondent criticises what it says is the Claimants' only support for its case, namely Mr Sanders' experience with two plants based, respectively, in Oklahoma and Trinidad & Tobago, both of which Mr Sanders himself concedes are not comparable to the FertiNitro Plant.  Moreover, the Respondent contends that the Tribunal should not rely on cost assessments of a witness who is unaware of significant differences in key

Case 1:17-cv-02559-ZMF   Document 1-1   Filed 11/28/17   Page 239 of 622

economic indicators, such as inflation rates, between the three countries relevant to his comparative cost assessment.

9.125   Third, the Respondent contends that the Claimants suggest, wrongly, an entirely unreasonable discount rate.  That suggestion is directly contradicted by three recent international arbitration awards against the Respondent, two of which[558] regard a project located in the exact same industrial complex as FertiNitro and which share other important commonalities with FertiNitro.  Moreover, the Respondent submits that the country risk rate of 2% contained in the Claimants' discount rate is misplaced since it is based, amongst other things, on an admittedly unrepresentative survey, an unprecedented application of a liquidity discount and an arbitrary and unsupported *lambda*.  A country risk rate of 2% is, so the Respondent contends, the rate normally applied to such countries as Italy.  Moreover, such rate finds no support in the award made by the tribunal in *Gold Reserve Inc v. Venezuela*[559] which the Claimants claim – also incorrectly – supports their view.

9.126   Fourth, the Respondent submits that the Claimants' original "reasonableness" checks do not support their valuation.  Further, the additional comparisons that the Claimants introduced for the first time at the Second (November) Hearing, such as FertiNitro's book value or the estimated project investments for new plants at Guiria and José, do not alter that conclusion.

9.127   Fifth, the Respondent submits that KNI's valuation of its interest in the Offtake Agreement uses an incorrect valuation methodology, is based on insufficient evidence and ignores fundamental changes in the USA and global fertilizer industry that were already taking place at the valuation date.

9.128   Sixth, the Respondent contends that the Claimants' expert witness, Mr Giles, has, in various instances, blindly relied on the purported expertise offered by others, such as Mr Sanders or Mr Sorlie, without applying his own critical judgment.  In contrast, the Respondent contends that its expert witness, Dr Flores, has carefully considered the

---

[558] Namely, *Mobil v. PDVSA* (EO-45); *Venezuela Holdings v. Venezuela* (RLA-153).
[559] *Gold Reserve v. Venezuela* (CLA-156).

FertiNitro Plant's history, with its actual operating conditions in Venezuela, in his valuation exercise. The Claimants' repeated attempts to discredit Dr Flores by soliciting his testimony on factual issues related to the valuation should fail before this Tribunal. It is Dr Flores' particular familiarity and personal experience with the conditions and processes in Venezuela that make his valuation especially convincing and, at the same time, distinguishes it from Mr Giles' "blind reliance"[560] on any information provided to him by the Claimants.

9.129    In short, and for the reasons set out more fully below, the Respondent contends that the Claimants' damages claims in the amount of approximately US$ 672.4 million are vastly overstated.

*(ii)    The Compensation Claimed by KOMSA and KNI is Vastly Overstated*

9.130    The Respondent makes three main submissions as to, in its submission, the vast overstatement of compensation by the Claimants. Those submissions are:

(a)    *First, the relevant standard of compensation is found in the Treaty, not in customary international law;*

(b)    *Second, irrespective of the legal standard for compensation, the Parties agree that the quantum experts should apply the FMV standard; and*

(c)    *Third, the Claimants ultimately fail to apply the FMV standard.*

9.131    As to (a) – the relevant standard of compensation: the Respondent, in contrast to the Claimants, contends that the relevant standard of compensation for the Claimants' claims is set out in Article 6 of the Treaty, and not in customary international law. It submits that Article 6 of the Treaty is *lex specialis* to the customary international law standard of full reparation. As such, under the Treaty standard, the Claimants' claims are limited to "the market value of the investment immediately before the expropriatory action was taken or became public knowledge, whichever is earlier." Being an objective standard, the market

---

[560] Resp. PHB, Paragraph 177.

value standard here means that the valuation of KOMSA's share in FertiNitro should not exclude the alleged effects of certain Government measures predating the announcement of the mandatory acquisition.[561]   The Respondent notes that all of the Respondent's measures about which the Claimants complain were of a general nature and not specific to FertiNitro.

9.132   The Respondent contends that the Treaty standard applies irrespective of whether the Respondent's acquisition was lawful or unlawful.

9.133   As to (b) – the Parties' agreement that the FMV standard should apply: the Respondent points to the agreement between Mr Giles and Dr Flores that the Claimants' claims should be valued based on the FMV standard as at the valuation date of 30 September 2010.[562]

9.134   As to the FMV standard, Dr Flores relies on the well-known definition in the World Bank Guidelines that refer to "an amount that a willing buyer would normally pay to a willing seller."[563]  This definition is, so the Respondent contends, essentially identical to the FMV definition Mr Giles provides at the outset of his First Report, in which he referred to "the value at which a willing buyer and willing seller would exchange an asset."[564]  Further, the Respondent contends that it is consistent with the definitions of FMV used by the International Valuation Standards Council.[565]   The Respondent contends that Mr Giles misinterprets the meaning of FMV as meaning a market devoid even of purely commercial sales limitations.  The Respondent adopts Dr Flores' analysis, which it says shows that Mr Giles' interpretation turns the FMV standard "upside down", since it improperly permits a valuation of an asset at a value higher than one in the absence of the disputed acts.

---

[561] These are to be identified by reference to the Second (November) Hearing, Claimants' Opening Statement, slide 31, suggesting that the effects of the Urea Decree, the Municipal tax, the Science & Technology tax, the delay in VAT rebates and the interference by the Respondent with the management and operations of FertiNitro should be excluded.  The Respondent contends that these alleged measures did not violate any international law obligations of the Respondent.

[562] Giles ER1, Paragraph 1.3; Giles ER2, Paragraph 1.9.

[563] Flores ER2, Paragraph 154, citing the World Bank Guidelines, pp. 41-42.

[564] Giles ER1, Paragraph 4.78.

[565] IVS Framework, International Valuation Standards Council (2011), Paragraphs 30, 32.  *See also*, Flores ER2, Paragraphs 155-156.

9.135   As to (c) – the Claimants' failure to apply the FMV standard: the Respondent contends that whilst the Claimants agree on the use of the FMV standard, Mr Giles has ultimately failed to apply that standard.  Indeed, the Respondent submits that Mr Giles' DCF valuation is "entirely one-sided, full of inconsistencies, and – based on arbitrarily cherry-picked data – evidently directed not at establishing the plant's 'fair' market value but rather at creating an 'arbitration value' which impermissibly ignores the troubled realities of the plant."[566] Further, the Respondent contends that Mr Giles arbitrarily deviates from standard valuation practice, including by relying on survey data which he himself recognizes "cannot be considered representative"[567] for his country risk rate calculation.  He also reduces his discount rate through a liquidity discount whereas such discount in standard valuation practice is applied only to increase the discount rate.  The Respondent, instead, relies upon Dr Flores' testimony, to the effect that no prospective sales transaction would ever have been based on projections that are so obviously fabricated.

*(iii)   The Fair Market Value (FMV) of KOMSA's Interest in FertiNitro Was no More Than US$ 34.6 million*

9.136   The Respondent contends that KOMSA's 25% interest in FertiNitro was no more than US$ 34.6 million.  (This figure does not include interest and assumes the Urea Decree would have continued to apply).  On the other hand, so the Respondent submits, Mr Giles' (corrected) valuation at US$ 361 million is vastly overstated and far exceeds the FMV of KOMSA's equity share in FertiNitro.

9.137   The Respondent rests these submissions on flaws in Mr Giles' DCF valuation which are said to be four-fold.

9.138   First, the Claimants' DCF analysis is inconsistent and highly speculative.  It involves the "cherry-picking" of different time periods (that is, 2006-2008, 2006-2010 and the

---

[566] Resp. PHB, Paragraph 183. These matters, according to the Claimants, include a history of construction defects, poor maintenance decisions in the Plant's early years, an above-average number of unplanned shutdowns, persistent gas and electricity supply problems beyond FertiNitro's and the Respondent's control, and high maintenance and turnaround costs as a result of past defects and shutdowns and the Respondent's special economic situation.
[567] Giles ER1, Paragraph B.32.

individual years of 2008 and 2010), as well as actual versus budgeted data.  His valuation depends on which alternative is chosen, thus enabling him to arrive at a higher valuation. In contrast, Dr Flores consistently applies the same data period, namely the data period of 2006-2010, and accordingly ensures consistency.  The Respondent points to the fact that this is appropriate because it encompasses the two turnarounds conducted at the Plant in the five years prior to the mandatory acquisition (that is, 2008 and 2010), consistently with the forecast that turnarounds are to occur every 2½ years.

9.139   Further, the Respondent relies on Dr Flores' demonstration of the inappropriateness of Mr Giles' valuation: First, Mr Giles ignores the interrelatedness of the individual valuation criteria.  That is, maintenance and turnaround costs impact capital expenditures; both, in turn, impact production levels, which, in turn, affect revenue and variable costs and ultimately working capital.  Mr Giles' ignorance of these relationships is one of the factors causing him to overvalue the Claimants' alleged compensation claims.  Second, Mr Giles' approach bases his valuation on very short data periods of only three years of actual data (2006-08) or, in some cases, only one year of actual (or budgeted) data, which contradicts the fundamental principle underlying any DCF valuation to project future income streams based on a reasonable quantity of historic data as available in a going concern.

9.140   Next, the Respondent contends that it is inappropriate to rely on budgeted data in this case due to the inherent uncertainties and flaws in the budgeting process.  As Mr Sanders noted in his evidence, detailed records are necessary to properly prepare budgets, so deficiencies in record keeping would likely affect the accuracy of a budget because it necessarily would not reflect the true state of the equipment or the work to be performed during that year.[568] It is not possible for the Claimants to rely on the ICSID award in *Venezuela Holdings v. Venezuela*[569] to argue that budgets are a reliable basis for forecasting.  Rather, in that award, using budgets for the year in which the expropriation took place was appropriate since

---

[568] Second (November) Hearing D5.156-157 (Sanders).
[569] *Venezuela Holdings v. Venezuela* (RLA-153).  *See* Second (November) Hearing, Claimants' Opening Statement, Slide 39.

actual data was not available for the full year.[570]   Here, however, Mr Giles seeks to use budgets during years when actual data was available.

9.141   Second, the Respondent contends that the Claimants' DCF valuation inappropriately excludes actual production volumes from 2009 and 2010 in projecting future production. Indeed, the Respondent says that the Claimants' approach "represents nothing but a calculated attempt to present a rosier picture of the plant's production volumes than the available actual data indicates."[571]   The Respondent points to several factors showing why this approach is inappropriate, as follows.

9.142   Mr Giles' approach does not comport with FertiNitro's turnaround cycle, since that cycle was less than three years.   His approach is flawed because Mr Sanders (and, in turn, Mr Giles) based his cycle upon an (improper) alleged similarity between the FertiNitro Plant and the plants of Terra OK and Point Lisa.[572]   Rather, the Respondent contends that Dr Flores' turnaround cycle of 2½ years reflects the FertiNitro Plant's actual history of turnaround cycles; and it is conservative in the light of FertiNitro's major construction defects and history of frequent unplanned shutdowns.

9.143   Gas and electricity disruptions, as well as unplanned outages, were not materially higher in 2009 and 2010 than in previous years.[573]

9.144   A hypothetical and realistic buyer in 2010 would not have assumed that FertiNitro could consistently achieve nameplate production in the future.   According to the Respondent, this is because FertiNitro had never consistently achieved nameplate production levels.   The evidence at the Hearings did not provide any basis to assume that this would change in the

---

[570] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraphs 342, 307.
[571] Resp. PHB, Paragraph 192.
[572] cf. Expert Report of Richard Sanders (30 May 2012) ("Sanders ER1"), Paragraphs 9-11, 43-45.
[573] The Respondent points to the following evidence: For the ammonia plant, there were 30 total shutdowns in 2006 (with the plant in production for 332 days); 22 total shutdowns in 2007 (with the plant in production for 309 days); 21 total shutdowns in 2008 (with the plant in production for 299 days); 32 total shutdowns in 2009 (with the plant in production for 308 days); and 17 total shutdowns in 2010 (with the plant in production for 304 days). Likewise, for the urea plant, there was not a significant increase in shutdowns from the 2006-2008 period to the 2009-2010 period; in 2006 the plant was in production for a total of 315 days, in 2007 for 306 days, in 2008 for 289.7 days, in 2009 for 292 days, and in 2010 for 284.25 days. *See* Niveles de Produccion y Dias Operativos 2003-2010 (EO-41).

foreseeable future.  In particular, the Plant's machinery and equipment were not sufficient to produce at nameplate levels consistently.

9.145   The Respondent relies upon Mr Villarroel's evidence that the urea trains could achieve daily nameplate capacity on a consistent basis, but not the ammonia trains.[574]  Mr Sanders' opinion that FertiNitro "should be able to achieve nameplate capacity on a consistent basis"[575] should be rejected because it is, again, based on a comparison of the FertiNitro Plant with the plants at Terra OK and Point Lisa, which (as Mr Sanders admitted on cross examination) are not comparable to FertiNitro.  The Claimants' allegation that FertiNitro's actual nameplate capacity can be assessed based on the 2003 Jacobs Report should be rejected, since that report was evidently overtaken by the 2006 Jacobs Report, the latter suggesting that it was not realistic to expect that FertiNitro would be able consistently to produce at nameplate levels.

9.146   Further, the Respondent points to the Claimants' failure to prove their allegation that annual nameplate production could be achieved through process improvements.  The Respondent describes that allegation as "mere wishful thinking."[576]  The Respondent contends that the FertiNitro Plant's equipment was so degraded that operational fixes could do little to resolve the low reliability of the Plant's machinery and equipment.  The Respondent contends that the reliance on "two short marketing publications" created by Honeywell (which are not, contrary to the Claimants' nomenclature, "position papers") is irrelevant, and, further, those documents are prone to exaggeration and oversimplification.[577]  According to the Respondent, the Claimants' focus on operational errors is also misleading, since the majority of unplanned shutdowns at FertiNitro were caused by mechanical failures, water and gas leaks and fire, in addition to supply disruptions beyond FertiNitro's control.[578]  Furthermore, the 2007 KBC Report, which

---

[574] First (September) Hearing D3.144 (Villarroel).
[575] Sanders ER1, Paragraph 13.
[576] Resp. PHB, Paragraph 201.
[577] Resp. PHB, Paragraph 202.
[578] Indeed, the Respondent contends that an evaluation of the causes of the Plant's shutdowns between 2003 and 2010 does not once cite operational errors as a significant cause of shutdowns in any of the years during this period. (*See* Niveles de Produccion y Dias Operativos 2003-2010 (EO-41)).  Likewise in a section entitled "FertiNitro's Complex History of Unplanned Shutdowns," Jacobs Consultancy does not so much as mention operational errors

examines the origins and consequences of process failures, does not consider unplanned shutdowns to be a consequence of any of the operational or process-based shortcomings it finds.

9.147   As a result, the Respondent contends that, while later process improvements may have reduced the limited number of shutdowns caused by operational mistakes, the far greater number of shutdowns was due to mechanical failures and external outages, which continued to hamper the Plant's productivity.  In any case, the Respondent contends that there is no evidence that the implementation of the recommendations of the KBC Report would have allowed FertiNitro to achieve nameplate production on a consistent basis.  As Mr Villarroel testified, any improvement in production levels would require "strong investment and a not short period of time as well".[579]  After over ten years in operation without sufficient preventative maintenance, simply reforming the Plant's leadership and improving its operational planning would do little to enhance production at FertiNitro given the severely degraded state of the Plant's equipment.  Finally, the valuation exercise must take into account the fact that this case concerns the acquisition of a 25% stake in FertiNitro, and thus only KOMSA's minority share in the business.[580]

9.148   In relation to the exclusion of actual production volumes from 2009 and 2010, the Respondent contends that the Claimants' submission, that such exclusion is justified by law, is unfounded.  The Respondent makes six main arguments why this submission should be rejected.  First, the Claimants have provided no evidence that the stoppages were entirely due to supply disruptions by PVDSA and Pequiven.  Second, Pequiven would not be responsible for any breaches of PVDSA's and Pequiven's supply contracts with FertiNitro.  Third, PVDSA Gas did not breach its supply obligations toward FertiNitro.  Fourth, the Claimants' exclusion of 2009 and 2010 from the valuation is contrary to the basic assumption of DCF valuation methodology.  Fifth, the existence of the Treaty does

---

as a cause for the Plant's historically high rate of unplanned shutdowns. (*See* Jacobs Consultancy Report, Deferred Second Reliability Test Report FertiNitro Complex, Jose Venezuela Reasons for Non-certification (October 2006) (R-57)).

[579] First (September) Hearing D3.148 (Villarroel).

[580] Second (November) Hearing D7.11 (Flores).

not justify excluding the 2009-2010 data.  Sixth, the Respondent is not responsible for FertiNitro's operational difficulties in 2009-2010 which were primarily the result of original construction defects.[581]

9.149  The third matter invoked by the Respondent (in support of its contention that Mr Giles' valuation is flawed) is the Claimants' understated projections of FertiNitro's future costs.

9.150  In this regard, the Respondent points to the Claimants' unreasonable reliance on budgeted, instead of actual, turnaround and maintenance costs.  In contrast, the Respondent contends that Dr Flores' use of FertiNitro's actual cost data, as available on the valuation date, makes sense, since such actual data properly reflects the state of the Plant and its operating conditions in Venezuela.  The Respondent also characterizes his approach as being justifiable, since such data appropriately reflects the state of the Plant and the operating conditions in Venezuela.  Rejecting the Claimants' allegations which, so the Respondent contends, seek to attribute blame to the Respondent for the increased costs, the Respondent submits that these allegations distract from the fact that it is the Claimants who have failed to discharge their burden of proving that they can legitimately ignore FertiNitro's actual costs (and thus deviate from standard valuation practice) and can instead use budgeted data.

9.151  The Respondent points to the reason for these costs, being the need for increased maintenance and turnaround costs arising from the early aging of machinery and equipment.[582]  Contrary to the Claimants' allegations, these initial construction defects were not largely resolved by the Major Maintenance Plan ("MMP") in 2005, as Mr Villarroel's oral evidence proved.[583]  Moreover, the Respondent contends that the Plant suffered from an above-average number of unplanned shutdowns.[584]  Further, the damage suffered from unplanned shutdowns was often magnified by the absence, or

---

[581] Resp. Rej., Paragraphs 414-420.
[582] *See* Jacobs Consultancy Report, Deferred Second Reliability Test Report FertiNitro Complex, Jose Venezuela Reasons for Non-Certification (October 2006) (R-57), pages 10-11; Second (November) Hearing D5.190, 200-201.
[583] First (September) Hearing D3.150 (Villarroel).
[584] *See* Jacobs Consultancy Report, Deferred Second Reliability Test Report FertiNitro Complex, Jose Venezuela Reasons for Non-Certification (October 2006) (R-57), pages 10-11.

malfunctioning, of standard protective systems that automatically take control of operations when power outages occur and that shield the main equipment from damage.[585]

9.152   The Respondent also points to the increasing inflation rates in Venezuela that resulted in increased costs in local currency, which (so it contends) the Claimants have ignored.[586] The Respondent also contends that increasing inflation also significantly impacted FertiNitro's turnaround costs.  In fact, between 2007, when FertiNitro's second major turnaround was budgeted, and 2008, when such turnaround took place, Venezuelan annual inflation increased by as much as 11.7 percentage points, going from 18.7% to 30.4%.[587] Rising inflation inevitably led to a sharp increase in turnaround costs, since turnarounds require the use of hundreds of external local workers, who are paid in Bolivars.

9.153   Turning to Mr Giles' expert evidence, the Respondent contends that Mr Giles is wrong to allege that FertiNitro's exposure to domestic inflation is "extremely low" since only "a very small proportion of its costs are denominated in bolivars."[588]   The Respondent characterises this as a "[h]ighly simplistic assessment of the plant's local costs […] based on an opportunistic choice of cost data (using, e.g., the 2008 budgeted turnaround costs, rather than the much higher actual costs) and is limited to the period 2006-2008 (thus precisely excluding the years in which inflation skyrocketed)."[589]   The Claimants' contention that inflation is a "new purported explanation" for FertiNitro's higher than budgeted costs should, so the Respondent contends, be rejected by the Tribunal.[590]

9.154   Next, the Respondent points to the fact that the high maintenance and turnaround costs are not primarily due to operational mistakes in recent years.  Rather, in reliance on various reports[591] (all of which the Respondent contends show that the processes at the Plant were

---

[585] First (September) Hearing D3.174-175 (Villarroel).
[586] The Respondent points to the acknowledgement of this issue by Mr Villaroel: First (September) Hearing, D4.28, 30.
[587] The Respondent points to the International Monetary Fund Inflation Rates 2004-2011 (R-90).
[588] Second (November) Hearing D6.17 (Giles).
[589] Resp. PHB, Paragraph 218.
[590] *See* Second Witness Statement of Aníbal Villarroel (30 December 2013), Paragraph 13.
[591] Resp. PHB, Paragraph 220, citing Haldor Topsoe, Effect of the Natural Gas Composition on the Production of Ammonia (26 August 2003) (R-54), Jacobs Consultancy Report, FeriNitro Fertilizer Project, Plan Improvement Cost Estimates and Revised Production Forecast (14 March 2003) (C-125) (See the results of the 2006 Thielsch

not ideal from the outset), the evidence of Mr Gwaltney establishes that there was a "breakdown in the organization structure"[592] after KOMSA's exit from the Plant's management in October 2007.   The Respondent also points to the Claimants' own acknowledgement that there had been a frequent change in managerial staff at FertiNitro even in the Plant's early years.[593]   The Respondent concludes that the processes were not ideal from the outset.[594]

9.155  As to the Claimants' understated projections of FertiNitro's future costs, the Respondent points to the understatement of other costs, describing them as not only "clearly understated" but also "highly speculative."[595]   With respect to capital expenditures, after not considering them at all in his first report, Mr Giles projects an amount of US$ 10 million in his second report, based on Mr Sanders' suggestion.[596]   But the Respondent points to the fact that neither Mr Sanders, nor Mr Giles, explain this amount.   Indeed, Mr Sanders ultimately admitted on cross examination that "[d]epending on what […] new pieces of equipment have to be installed" it is "certainly" possible that FertiNitro would require more capital expenditure than the US$ 10 million benchmark he provided, based on his experience at the Terra OK plant.[597]

9.156  With respect to gas costs, Mr Giles based his projection of the base price for natural gas on a single data point: FertiNitro's budgeted natural gas price for 2010, which, the Respondent emphasises, is the lowest base price for all the budget years that he reviewed.[598]   Mr Giles' attempt to defend this choice as "conservative"[599] should be rejected by the Tribunal, as he ignores both FertiNitro's longer historical pricing record and the predictions of well-

---

Engineering report).  Resp. PHB, Paragraph 220 referring to KBC Report, Plant Performance Optimization Assessment Report (18 May 2007) (C-158).

[592] Witness Statement of Brent W. Gwaltney (30 May 2012) ("Gwaltney WS1"), Paragraph 60.

[593] First (September) Hearing D4.8 (Villaroel).

[594] The Respondent contends that the one admitted operational mistake – the failure to establish a cost-effective maintenance plan – was made at the outset of the Plant's history when KOMSA was charged with running the Plant.

[595] Resp. PHB, Paragraph 222.

[596] Giles ER2, Paragraph 7.34; Second Expert Report of Richard Sanders (27 August 2013) ("Sanders ER2"), Paragraph 69.

[597] Second (November) Hearing D5.223-224 (Sanders).

[598] Flores ER2, Paragraph 49.

[599] Giles ER2, Paragraphs 7.2-7.4; Second (November) Hearing D6.47 (Giles).

respected forecasters.  Dr Flores' forecast, based upon three such long-term forecasters, should be preferred by the Tribunal.[600]

9.157   Fourth, the Respondent contends that the Claimants' proposed discount rate of 10.12% is understated, whereas Dr Flores' proposed rate of 20.37% is fully justified.  It contends that Mr Giles' discount calculations are unreasonable in at least the following respects, namely:

9.158   Mr Giles inappropriately uses global market risk premium data.  The market premium is intended to measure the additional return over the risk-free rate required by equity investors in the USA.  (This market risk reflects risks unrelated to Venezuela.)  Mr Giles calculates a rate of 4.75% relying on *global* market risk estimates published in 2006 (that is, four years before the mandatory acquisition).  Mr Giles' market rate is inappropriate because the data he relies on is out-dated and the use of global market risk estimates is incompatible with Mr Giles' additive method of calculating the discount rate.

9.159   Under the additive method, the valuation expert must (as Dr Flores has) calculate the elements of the discount rate, including the market risk rate, as if they applied to a company based in the USA and then apply a country risk premium reflecting the additional risks of operating in any other country, here Venezuela.[601]  Hence, Mr Giles should have used USA market risk data instead of *global* data.  Further, the Fernandez Paper (on which Mr Giles relies) contradicts his very own market risk rate.

9.160   Mr Giles improperly relies on limited survey data to establish Venezuela's country risk premium.  In this regard, the Respondent points to the fact that Dr Flores calculated a country-risk rate of 11.26% based on the average of three well-recognised methods: (i) Morningstar/Ibbotson's country-spread model (12.75%); (ii) Ibbotson/Morningstar's country risk rating model (14.27%); and (iii) Professor Damodaran's estimate (6.75%).[602]  According to the Respondent, Dr Flores did not apply other recognised models, such as JP

[600] Flores ER2, Paragraph 55.
[601] Flores ER2, Paragraph 106.
[602] Flores ER1, Figure 11.

Morgan's Emerging Market Bond Index (EMBI), which would have resulted in a comparatively higher country risk premium for Venezuela of 12.41%.

9.161  The Respondent contends that Mr Giles' reliance on a survey (rather than established premium risk models), such survey suggesting a country risk premium for Venezuela of 5.5%, is entirely unfounded.  Again, the Respondent points to Mr Giles' own evidence that the survey cannot be considered representative.[603]  Further, it points to the fact that the Ibbotson/Morningstar country spread model is identified *by the survey itself* as the primary and preferred source among survey participants for determining country risk.[604]  The Respondent also contends that Mr Giles' reliance on the survey is inappropriate since he has not made any adjustments for potential bias arising from the fact most survey participants assessed country risk for their own countries, with respect to which they were naturally not neutral, and the authors themselves have no methodology to correct for this type of bias in the survey.

9.162  Mr Giles arbitrarily excludes political risk from his country risk rate.  The Respondent contends that, without giving any economic justification, Mr Giles excluded "many of the risks normally associated with the concept of country risk (e.g., expropriation),"[605] "where [he was] instructed that the Treaty offers potential protection."[606]  The Respondent contends that this approach is unreasonable and contrary to recent ICSID decisions, including the award in *ExxonMobil* where the tribunal held that "the confiscation risk remains part of the country risk and must be taken into account in the determination of the discount rate."[607]  The tribunal there decided that:

> *"[I]t is precisely at the time before an expropriation (or the public knowledge of an impending expropriation) that the risk of a potential expropriation would exist, and*

---

[603] Giles ER1, Paragraph B.32.
[604] Resp. PHB, Paragraph 229. Fernandez, Aguirreamolla & Corres, *Market Risk Premium Used in 56 Countries in 2011: A survey with 6,014 Answers* 7 (May 2011) (CRA-27), Table 4.  Ibbotson/Morningstar was the most cited source with 256 responses, while surveys were the tenth most cited source with only 33 responses. In fact, as Dr Flores noted, even though "the surveys tell you everyone is using Ibbotson/Morningstar […] Mr Giles doesn't use it". Second (November) Hearing D6.129 (Flores).
[605] Giles ER1, Paragraph B.8; Second (November) Hearing D6.64 (Giles).
[606] Giles ER1, Paragraph B.77.
[607] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraph 365.

*this hypothetical buyer would take it into account when determining the amount he would be willing to pay in that moment.*"[608]

*The Respondent contends that the risks of expropriation or nationalisation were clearly known from the outset, since they were specifically addressed in the 1998 Offering Circular.*[609] *Further, contrary to the Claimants' approach that BITs lower exposure to country risk (an approach described by the Claimants as "trite")*[610] *the Respondent contends that investors generally do not perceive BITs to lower country risk,*[611] *nor is there any basis for the Claimants' speculation that "surely a buyer would be expected to have BIT protection in a hypothetical arm's length transaction".*[612]

9.163   Mr Giles applies an unreasonable *lambda* factor.  The Respondent contends that it is based on "pure speculation".[613]  The Respondent relies upon Dr Flores' evidence, in which it says that he has considered FertiNitro's exposure to Venezuelan country risk, but (in contrast to Mr Giles) he has concluded that it is not justified to deviate from the standard *lambda* factor of 1 since, in order to do so, "we need to have very convincing evidence that it is really lower than the average and not higher".[614] Dr Flores says that no such evidence exists.  The Respondent characterises Mr Giles' risk assessment as "entirely vague, inaccurate and unbalanced",[615] citing four factors, as listed below.

9.164   First, the Respondent points to the fact that Mr Giles has not provided any calculations or methodology to explain how he arrived at a risk exposure of 40%.  It says that, while Mr Giles has identified 22 risk factors, he has failed to explain their relative importance.[616] The Respondent again points to the fact that Mr Giles' exclusion of risk factors allegedly

---

[608] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraph 365.
[609] Offering Circular – Bond Offering of $250,000,000 between FertiNitro Finance Inc and FertiNitro (8 April 1998) (C-115), page 38.
[610] Second (November) Hearing, Claimants' Opening Statement, Slide 56.
[611] Resp. PHB, Paragraph 232. *See* Lauge Skovgaard Poulsen, "The Importance of BITs for Foreign Direct Investment and Political Risk Insurance: Revisiting the Evidence", Yearbook on International Investment Law and Policy (2010), pages 539-542; Jason Webb Yackee, "Do Bilateral Investment Treaties Promote Foreign Direct Investment? Some Hints from Alternative Evidence", 51(2) *Virginia* Journal of International Law (2010) (EO-49), page 397; Second (November) Hearing D6.64-65 (Flores); Flores ER1, Paragraph 126; Flores ER2, Paragraph 122.
[612] Second (November) Hearing D8.33.
[613] Resp. PHB, Paragraph 233.
[614] Second (November) Hearing D7.161 (Flores).
[615] Resp. PHB, Paragraph 234.
[616] Flores ER2, Paragraph 149.

protected by the Treaty has no economic justification but is based, instead, on the instruction of the Claimants' counsel.[617]

9.165    Second, the Respondent says that Mr Giles has underestimated FertiNitro's risk exposure, including risk factors that are entirely unrelated to expropriation risk.  For example, the Respondent rejects Mr Giles' evidence that FertiNitro be ranked as "low" for all six risk factors associated with social disorder.[618]  Mr Giles makes this ranking because he believes that "it is easy to see how the strategic location of the FertiNitro Plant in a secure industrial complex on the coast would be less risky than a plant located in central Caracas when considering the potential effects of social unrest."[619]  However, Dr Flores points to the facts that the Plant is located in an unsafe area, and that while no FertiNitro personnel live at the Plant, social unrest in nearby communities will directly affect FertiNitro since that is where managers and workers commute to and from the Plant.  He concludes, on the basis of safety alone that, "if you tell an investor, you can make a dollar of profit investing in a fertilizer plant in Wichita or investing in a fertilizer plant in the José Complex, I think that one dollar in the José Complex would be heavily discounted."[620]  Further, due to having all of its production facilities in Venezuela, FertiNitro was inevitably heavily exposed to Venezuelan country risk, despite it receiving most of its revenue from abroad.

9.166    Third, the Respondent points to that the fact that Mr Giles has ignored risk factors that increase FertiNitro's exposure to Venezuelan country risk, including FertiNitro's dependence on a single supplier for natural gas and the fact that, while smaller companies in Venezuela are exempted from certain taxes, as a large company in the formal sector of the economy FertiNitro is exposed to the full range of taxes and hence faces greater risks in the event of tax increases.

9.167    Fourth, the Respondent contends that common sense also speaks against Mr Giles' 0.4 *lambda* factor, which results in an alleged country risk rate for FertiNitro of only 2%.  That

---

[617] Giles ER1, Paragraph B.77.
[618] Second (November) Hearing D7.98 (Giles).
[619] Giles ER 2, Paragraph 1.26.
[620] Second (November) Hearing D6.132 (Flores).

rate corresponds to the rate normally applied to investments in such countries as, for example, Italy.[621]  However, as the Respondent poses the question, if you had one dollar to invest would you really be indifferent to investing it in Venezuela or in Italy for the same expected return?

9.168   Mr Giles deducts a 1% liquidity discount from his country risk rate, which the Respondent contends finds no support in standard valuation practice.  Dr Flores explained that he has "never seen an expert do what Mr Giles has done here".  Indeed, the Respondent contends that Mr Giles' application of a liquidity discount on the country risk rate is based on a misguided interpretation of the market value standard provided in *CMS v. Argentina*, which calls for "an open and unrestricted market."[622]

9.169   However, the requirement of an "open and unrestricted market" does not allow excluding *de facto* restrictions on the sale of the relevant asset that would have existed even irrespective of the disputed acts; and it does not permit the valuation expert to create a world where KOMSA's interest in FertiNitro is worth more than it would be in the absence of the disputed acts.  Further, the Respondent contends that Mr Giles' valuation, and his application of a liquidity discount, ignores the fact that KOMSA's equity in FertiNitro is a minority stake in a closely-held company in a small, developing market.

9.170   Further, and moving beyond the flaws in the rate itself, the Respondent contends that the unreasonableness of the Claimants' discount rate is confirmed by the awards in the *ExxonMobil* and *Mobil* cases[623] and the award in *Flughafen v. Venezuela*.[624]   The Respondent points to these three awards, all of which applied discount rates similar to those proposed by Dr Giles, namely 18% in the case of the *ExxonMobil* and *Mobil* awards[625] and

---

[621] *See* Resp. Rej., Paragraph 458.

[622] *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award (12 May 2005) ("*CMS v. Argentina*") (CLA-130), Paragraph 402.  Further, the Respondent contends that the requirement that the market be "open and unrestricted" is not a standard element of FMV definitions.  For example, it points to *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No ARB/06/11, Award (5 October 2012) ("*Occidental v. Ecuador*") (CLA-129), where the FMV definition (cited by the Claimants on Slide 24 of their Opening Statement on Quantum) does not contain this element.

[623] Namely, *Mobil v. PDVSA* (EO-45); *Venezuela Holdings v. Venezuela* (RLA-153).

[624] *Flughafen v. Venezuela* (RLA-154).

[625] *Mobil v. PDVSA* (EO-45), Paragraphs 768, 777; *Venezuela Holdings v. Venezuela* (RLA-153), Paragraphs 367-368.

a nominal discount rate of 17.28% in the case of the *Flughafen* award.[626]  In addition, as the ICSID tribunal in *ExxonMobil* stated, "[o]ther arbitral tribunals […] in circumstances comparable to the present case […] have used rates ranging from 18.5% to 21%."[627]

9.171   The Respondent then makes submissions on *Gold Reserve v. Venezuela*,[628] noting that a comparatively lower discount rate than the *ExxonMobil* tribunal was there applied.  It explains that "it is not appropriate to increase the country risk premium to reflect the market's perception that a State might have a propensity to expropriate investments in breach of BIT obligations."[629]  In any event, the Respondent contends that the Tribunal should not view the *Gold Reserve* award as relevant to the present case since that award concerns a project that has hardly anything in common with the FertiNitro project.  The *ExxonMobil* project, in contrast, is very comparable, or even identical, to the FertiNitro project.[630]  Due to the similarities of FertiNitro to the project valued in the *ExxonMobil* and *Mobil* awards (and the absence of such similarities with respect to the *Gold Reserve* project), the Respondent submits that the Tribunal should look to the *ExxonMobil* and *Mobil* decisions in determining the reasonableness of the experts' discount rates.

9.172   In contrast to Mr Giles' evidence, the Respondent contends that Dr Flores' approach is straightforward.  It points to the fact that, in calculating his discount rate, he consulted the most broadly-accepted sources and applied them in an objective manner.  It submits that Dr Flores' approach is certainly not arbitrary, nor "merely a tool that Dr Flores uses to

---

[626] *Flughafen v. Venezuela* (RLA-154), Paragraph 839.  The Respondent notes that the tribunal in *Flughafen* ultimately did not apply a nominal discount rate of 17.28%, but a discount rate in real terms of 14.4% (i.e. not counting inflation) to be consistent with the cash flow projections which (in contrast to the present case) were also conducted in real terms.

[627] *Venezuela Holdings v. Venezuela* (RLA-153), Paragraph 367.

[628] *Gold Reserve v. Venezuela* (CLA-156).

[629] *Gold Reserve v. Venezuela* (CLA-156), Paragraph 841.

[630] In this regard, the Respondent relied on the similarity demonstrated by the following common key aspects: (a) production facilities located in the José Complex; (b) production primarily for export; (c) revenues primarily in US dollars; (d) use of an offtake agreement; (e) project started during "Apertura" period; (f) use of bond offering memorandum from 1998; (g) use of project financing; and (h) the existence of multiple shareholders, including PDVSA.

depress the valuation of the Claimants' investments substantially;"[631] rather, it reflects standard valuation practice.

9.173   Next, the Respondent contends that the Claimants' alleged "reasonableness checks" do not support their valuation of KOMSA's 25% share in FertiNitro.   In this regard, the Respondent makes four principal submissions.

9.174   First, the Respondent contends that the October 2008 MOU price, if properly adjusted, confirms Dr Flores' valuation, not Mr Giles' valuation.   That is, the October 2008 MOU price (US$ 212.5 million) for KOMSA's interest in FertiNitro, if properly adjusted for purposes of a FMV valuation as at 30 September 2010 (to US$ 55.3 million), supports the Respondent's valuation.   Since the value of the Plant depends on its future cash flows, any valuation that relies on earlier value determinations in this regard must be adjusted to account for changes in the price of the goods sold, here ammonia and urea.   Thus, the Plant's value in September 2010 cannot be the same as in October 2008, when prices and price projections were significantly higher.

9.175   Second, the Respondent contends that the construction costs of other plants are irrelevant. More specifically, the construction costs of the Morón plant are irrelevant for the valuation of FertiNitro, since these costs say nothing about the value of the FertiNitro Plant.   The same is true for the projected construction costs of the Guiria and José plants, which the Claimants raised at the Second (November) Hearing.[632]   In fact, due to construction delays or market changes, the value of a construction is not infrequently less than what it cost the owner to build.[633]

9.176   Third, the Respondent contends that the two Advantis reports confirm Dr Flores' valuation. At the same time, they show that Mr Giles' valuation of KOMSA's Equity Valuation at US$ 361 million is clearly overstated.   The First Advantis valuation, prepared in the context of settlement negotiations, valued KOMSA's 25% interest at

---

[631] Second (November) Hearing D8.42.
[632] Second (November) Hearing D6.24.
[633] Second (November) Hearing D5.120.

US$ 30-48 million (or US$ 120-194 million for 100%), assuming the Urea Decree continued to apply, and at US$ 99 million (or US$ 398 million for 100%), in the event that domestic Urea Decree sales ended in 2012.[634]

9.177    The second Advantis report calculated a higher value of US$ 113 million for KOMSA's 25% interest in FertiNitro (or US$ 452 million for 100%) in the event the Urea Decree sales ended in 2012.  However, under the assumption that domestic Urea Decree sales would continue (and assuming the same impact as in the First Advantis Valuation), Dr Flores has shown that the second Advantis Valuation decreases to US$ 43.5-62 million (KOMSA's 25% share) or US$ 248-174 million (100% of FertiNitro).[635]

9.178    It follows, so the Respondent contends, that Dr Flores' valuation of KOMSA's interest at US$ 34.6-64.3 million is within the range of, or at least close to, the outcomes of the two Advantis valuations in the range of US$ 30-113 million, whereas Mr Giles' valuation of US$ 361 million is a clear outlier and exceeds the Advantis valuations by approximately three to ten times.  Further, Mr Giles makes the new argument that the applicable discount rate would be 13.1%, using Advantis' market risk premium and country risk premium (which are lower than Dr Flores' respective assumptions), together with Dr Flores' risk free rate and beta (which, in turn, are respectively lower than those used in the Advantis reports).  The Respondent contends that this arbitrary and unexplained approach makes no sense, describing it as "yet another example of Mr Giles' inappropriate cherry-picking approach that considers only those elements that increase his valuation, while excluding elements that decrease his valuation."[636]

9.179    Fourth, the Respondent contends that the Claimants' new argument based on FertiNitro's book value is irrelevant.  The Respondent contends that, at the Second (November) Hearing, the Claimants raised the new argument that Dr Flores' valuation of KOMSA's share in FertiNitro at US$ 34.6 million is understated since the book value of KOMSA's

---

[634] *See* First Advantis *Report* (R-86), pages 5, 9 and 19.
[635] Advantis Report entitled "Valoracín de FertiNitro" (July 2011) (C-157) ("Second Advantis Report").  See Dr Flores' presentation at the Second (November) Hearing, Slide 55.
[636] Resp. PHB, Paragraph 252.

25% of FertiNitro in 2010 allegedly was US$ 168.1 million.[637]  However, the book value is irrelevant when valuing a company based on the FMV standard.  Indeed, the Respondent points to what the Tribunal queried at the Hearing, namely that "the willingness of the seller to sell is not necessarily connected in any causal or existential way with the 'value', understood as an objective factor, of the assets that were taken."[638]

*(iv)   KNI's Valuation of its Interest in the Offtake Agreement Claim is Overstated*

9.180   The Respondent contends primarily that KNI's contractual rights under the Offtake Agreement are not an "investment" and/or that there has been no expropriation of such rights so that no compensation is therefore due to KNI.  The Tribunal has however decided otherwise the issue of jurisdiction and the majority of the Tribunal as regards liability: see above.  In these circumstances, the Respondent here contends that the Tribunal should determine such compensation based on Dr Flores' valuation of US$ 56.2 million and not based on Mr Giles' overstated valuation of US$ 206.5 million.  Neither Dr Flores nor the Respondent contend that, assuming jurisdiction and liability decided in favour of KNI, that KNI has suffered no loss at all from its expropriated interest in the Offtake Agreement.

9.181   First, the Respondent contends that the Claimants make the same inappropriate assumptions regarding sales volumes and the discount rates as in their valuation of KOSMA's interest in FertiNitro.

9.182   Second, the Respondent contends that the Claimants' valuation period improperly includes a sixteen-month period during which KNI suffered no losses.  It says that the valuation of KNI's rights under the Offtake Agreement must necessarily, for reasons of both law and fact, exclude the volumes of production that KNI obtained between October 2010 and February 2012 under the Offtake Agreement.  This is so because (so the Respondent contends) it is undisputed between the Parties that KNI continued purchasing fertilizer product from FertiNitro at Offtake Agreement prices during those sixteen months.  The Respondent points to the fact that Mr Giles performs his valuation as if these purchases

---

[637] Resp. PHB, Paragraph 253, referring to Second (November) Hearing D5.24 (Fietta).
[638] Second (November) Hearing D5.36 (Feliciano).

never happened and hence calculates damages for production volumes that KNI never lost. Such double-compensation must be rejected irrespective of which valuation method is applied.  In contrast, the Respondent submits that Dr Flores looks at "what actually happened" and accordingly excludes KNI's purchases during October 2010 to February 2012 from his valuation.

9.183   Third, the Respondent submits that the Claimants' valuation is based on unrealistic factual assumptions, namely:

(a)   *The Claimants inappropriately calculate KNI's lost profits rather than the value of KNI's alleged rights under the Offtake Agreement;*

(b)   *the Claimants fail to prove that they would never have been able to replace the FertiNitro Offtake through purchases on the open market; and*

(c)   *the Claimants' lost profits calculations are flawed and highly speculative.*

9.184   As to (a), Mr Giles calculates KNI's lost profits, rather than the value of KNI's alleged rights under the Offtake Agreement.  He further assumes that, following the termination of the Offtake Agreement, KNI could then and forever replace its Offtake Agreement quantities only through purchases at NOLA and TAMPA prices, thus losing any and all opportunities to resell ammonia and urea replacement quantities at a profit.   The Respondent contends, however, that Dr Flores properly calculates the value of KNI's alleged rights under the Offtake Agreement as the difference between the mid-Caribbean price for ammonia and urea on the open market, on the one hand, and the more favourable Offtake Agreement Price (namely, low Caribbean price minus 3% urea or 4% ammonia discount), on the other hand.  The Respondent says that the Claimants' attempt to dispute the existence and credibility of a mid-Caribbean price is "astonishing",[639] since it was their own expert witness (Mr Giles) who first discussed this price in his first expert report.[640]

---

[639] Resp. PHB, Paragraph 259.
[640] Giles ER1, Paragraphs 4.14-4.15; D.3.

9.185   As to (b), the Respondent says that developments in the USA and global fertilizer markets known before the valuation date indicate that KNI would have been, and in fact likely was, able to procure ammonia and urea replacement quantities at below NOLA/TAMPA costs. As a consequence of the substantial increase in the USA's domestic supply of inexpensive natural gas (which is the key component of both ammonia and urea) since early 2008, according to the Claimants' own sources, both domestic and foreign companies have started new fertilizer plants, or reactivated plants mothballed earlier, in the USA.  This development results in an increase of both USA and global supply of fertilizer product, as well as a decrease of USA demand for imported (Caribbean) fertilizer, and elsewhere. Indeed, the Respondent contends that the Claimants have recognised the new benefits of producing fertilizer product in the USA.[641]

9.186   In this regard, the Respondent contends that USA and international sources expect that new investments into the USA fertilizer industry will result in between 3 to 7 million tons of additional nitrogen fertilizer capacity in the USA.[642]   The Respondent submits that the significant increase in the USA's domestic fertilizer supply has already begun to impact USA import demand.  It follows, so the Respondent says, that, since the USA was the major importer of Caribbean fertilizer product, a decrease in US importation will result in more Caribbean product being available for purchase in the Caribbean. The Respondent points, amongst other matters, to a report that Trinidad will be "worst affected among them all" by an overall decrease of US import needs.[643]   Further, the Respondent contends that the data it provided regarding the impact of the US shale gas revolution on the global fertilizer markets is reliable.  Finally, Mr Sorlie testified that there is an opportunity to buy ammonia and urea spot tons on the Caribbean market.[644] Even if such opportunity were limited, the Respondent contends that this would contradict the Claimants' allegations that they were not able (now and forever) to replace any of the FertiNitro offtake quantities at Caribbean

---

[641] First (September) Hearing D2.125-126 (Sorlie); Koch Nitrogen Company, LLC, Koch Nitrogen to Build New Urea Plant and Increase Existing Production (15 May 2013) (EO-71), page 1.

[642] CEIFIC Position Paper, The implications of the shale gas revolution for the European chemical industry (15 March 2013) (R-88).

[643] eAmmonia, Is Ammonia Boom in North America Peril for Trinidad Ammonia Plants? (21 May 2013) (R-87).

[644] First (September) Hearing D2.119 (Sorlie).

open market prices.  It follows, so the Respondent submits, that the Claimants, who carry the burden of proof, have failed to provide the required evidence to discharge that burden.

9.187   Third, the Respondent contends that the Claimants' lost profits calculations are "flawed and highly speculative".[645]   In this regard, the Respondent points to the fact that the Claimants simply assume that KNI would have been able to export to the USA the same amounts of fertilizer product at the same prices as in the past.  However, the Respondent submits that this entirely ignores the important changes in the USA fertilizer market, which suggest that the USA's demand for foreign fertilizer product will further decrease and NOLA/TAMPA prices will decline, resulting in reduced profit margins and reduced sales volumes for KNI over the years.  It points to Mr Giles' acknowledgement of "the drastically increased gas reserves in the US and the resulting reduction in price and demand for imported LNG in the US."[646]  The same as with respect to LNG holds true with respect to ammonia and urea.

9.188   Further, the Respondent contends that Mr Giles' lost profits calculations are unreliable since the shipping costs he accounts for are highly speculative.  Mr Sorlie's evidence that Mr Giles' cost estimate is reasonable cannot be relied upon, as he relied only on invoices for two years (2009 and 2010), which is clearly too short a period for any proper assessment.[647]  Instead, as Dr Flores explained, "in the shipping industry, as commodity prices rose, 2006, 2007 and 2008, shipping costs also increased dramatically, and then they fell a lot in 2009 and 2010.  I find it a little bit suspicious that they have only given us a little bit of data for 2010, just one number that they say they have calculated internally for 2009, and no data whatsoever for 2007/2008".[648]   In addition, Mr Giles' calculation of shipping costs is also said to be "sloppy", as he has incorrectly used shipment data to Taft, Louisiana, rather than Tampa, Florida, to calculate cost of transporting ammonia from José to Tampa.

---

[645] Resp. PHB, Paragraph 266.
[646] Giles ER1, Paragraph 2.16.
[647] cf. Second Witness Statement of Jim Sorlie (26 July 2013) ("Sorlie WS2"), Paragraph 23 (Table 1).
[648] Second (November) Hearing D6.139 (Flores).

9.189   Finally, the Respondent contends that Mr Giles ignores any costs associated with the business, such as overhead costs.  The Claimants' allegation that overhead costs were immaterial to their cost calculations remains unproven.

**(5)     *The Tribunal's Analysis and Decisions***

9.190   *Principal Issues*: Having regard to the submissions of the Parties' summarised above, there are, in relation to the question of compensation under Article 6 of the Treaty, three principal issues that arise for the Tribunal's determination, namely:

> *Issue (1):*   What is the appropriate standard of compensation for unlawful expropriation under Article 6 of the Treaty?

> *Issue (2):*   What is the compensation payable to KOMSA in respect of its expropriated interest in FertiNitro?

> *Issue (3):*   What is the compensation payable to KNI in respect of its expropriated interest in the Offtake Agreement?

9.191   Each of these issues raises many sub-issues, the nature of which is plain from the Parties' extensive written and oral submissions, summarised above.  Those sub-issues will be addressed to the extent appropriate below, as part of the three principal issues.

> *Issue (1): What is the Appropriate Standard of Compensation?*

9.192   The Tribunal begins with Article 9(3) of the Treaty.  It requires the Tribunal to limit itself to awarding compensation for damages payable by the Respondent to KOMSA or KNI where the Tribunal has determined that the Respondent has failed to comply with an obligation under the Treaty.  As to such compensation for a failure to comply with Article 6 of the Treaty, that provision refers, for a lawful expropriation, to "effective and adequate compensation" that "shall amount to the market value of the investment expropriated immediately before the expropriatory action was taken or became public knowledge, whichever is the earlier."  Ostensibly, all Parties agree that such a market value, or fair market value (FMV), is the appropriate standard of compensation to be applied to both KOMSA's and KNI's claims for compensation against the Respondent (see the summaries of the Parties' respective submissions above).

9.193   In the circumstances of this case, for both KOMSA and KNI, that date for such valuation is 10 October 2010 immediately prior to the Expropriation Decree and the responsible Minister's public statements (which are to be treated as one composite event) on the 11 of October 2010.  The Parties have used the date of 30 September 2010.  For the Tribunal, the difference is not material for the purpose of this Award.  The date of 10 October 2010 or 30 September 2010 (as used by the Parties) is the relevant date for assessing compensation due to KOMSA and KNI, without the benefit of hindsight based on subsequent factors. The Tribunal has taken cognisance of the unresolved debate in other arbitrations as to whether and, if so, to what extent, factors subsequent to unlawful expropriation (in its different forms) up to the date of the award may be relevant to the assessment of compensation, particularly the decisions in *Quiborax v. Bolivia* and *Burlington v. Ecuador*.[649]  It need not enter that debate here, given the express terms of the Treaty as applied by the Parties.

9.194   In this case, it is unnecessary for the Tribunal to decide upon any difference between an unlawful expropriation in breach of Article 6 of the Treaty and an expropriation under Article 6 that would not be unlawful if the Contracting Party had made provisions "for effective and adequate compensation".  Whilst other tribunals have laboured in deciding this controversial question under international law and treaty wording, the Parties have here agreed that, whatever the correct answer may be, the relevant compensation to KOMSA and KNI should be based on the fair market value of the expropriated investment as at the relevant date absent, or "but for", any violations of the Treaty by the Respondent (the "FMV standard").  Thus, the answer for unlawful expropriation is the same as for lawful expropriation, under Article 6 of the Treaty.  Thus, here, compensation to KOMSA and to KNI should be based on the same FMV.

9.195   For their respective methodologies, as quantum experts, both Mr Giles (for the Claimants) and Dr Flores (for the Respondent) refer to a fair market value (FMV), as being the value

---

[649] *Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award (16 September 2015) (RLA-157); *Burlington Resources, Inc. v. Republic of Ecuador*, ICSID ARB/08/5, Decision on Reconsideration and Award (7 February 2017).

at which a willing buyer and a willing seller would exchange an asset in cash, acting at arms' length in an open and unrestricted market when both have reasonable knowledge of the relevant facts.

9.196   Accordingly, this FMV standard, as thus formulated, is common ground between the Parties and their quantum experts as the methodology for compensation for this case.[650] The Parties' approach is consistent with decisions on quantum methodology, such as *CMS v. Argentina* and *Occidental v. Ecuador*.[651]  In the circumstances, the Tribunal is content to adopt the Parties' common approach for both KOMSA and (by a majority) KNI.

9.197   However, in calculating the FMV for KOMSA's interest in FertiNitro, the Parties' two expert witnesses, Mr Giles and Dr Flores, applied methodologies producing starkly different results, as to which the Tribunal has experienced reservations, as explained below. In calculating the FMV of KNI's interest in the Offtake Agreement, the same two expert witnesses have also employed different assumptions, with Mr Giles calculating lost profits from 2010 onwards (essentially calculating Tampa/Nola resale prices less Offtake Agreement price less transportation costs); and with Dr Flores excluding the period before 28 February 2012 (essentially calculating price differentials with the open Caribbean market).

   *Issue (2): What Compensation is Payable to KOMSA in Respect of Its Expropriated Interest In Fertinitro?*

9.198   In their respective FMV calculations, as summarised above, the Parties' expert witnesses differ significantly, in particular, as to applicable discount rates and FertiNitro's production and costs.  The Tribunal refers to these experts' points of disagreement in Table 2 above.

9.199   As to discount rates, Dr Flores and the Respondent advance a greater market risk rate, country risk rate, *lambda*, "BIT Risks" and liquidity adjustment.  As to the FertiNitro Plant's production and costs, Dr Flores and the Respondent invoke existing defects in the construction of the FertiNitro Plant, poor maintenance in the Plant's early years of

---

[650] Second (November) Hearing D1.34; Third (June) Hearing, Slide 3.4 (Respondent).
[651] *CMS v. Argentina* (CLA-130), Paragraph 402; *Occidental v. Ecuador* (CLA-129).

operation, excessive unplanned shutdowns of the Plant, high costs of maintenance owing to the Plant's defective history and condition; problems with the supply of gas and electricity to the Plant; and Venezuela's generally adverse economic situation.

9.200   The Respondent also accuses Mr Giles of cherry-picking data, in particular as to costs of natural gas, turnarounds, maintenance, capital expenditure and, as to production data, the exclusion of the years 2009 and 2010.  The Respondent rejects Mr Giles' reasonableness checks as to the MOU of October 2008, the construction costs of other plants elsewhere and the book value of FertiNitro.

9.201   As to discount rates, Mr Giles uses different inputs.  As market risk, he uses an "adjusted" historical premium which, with other differences, results in a total discount rate of 10.1%, in contrast to Dr Flores' rate of 20.4%.  As regards figures for production and costs, Mr Giles used actual values but, where these were thought by him to be unreliable, budgeted figures (particularly for 2008, 2009 and 2010).  Mr Giles was clearly troubled by the Plant's historically high level of actual turnaround and maintenance costs.

9.202   As to sanity checks, Mr Giles used a book value for FertiNitro's assets, calculating KOMSA's 25% interest at US$ 168.1 million (but also recognising that a book value of assets alone does not value FertiNitro as a going concern).  As to FertiNitro's historical construction costs, these equated to US$ 273 million for KOMSA (at 2001 prices).  As to the MOU valuations in 2008 for KOMSA's 25% interest, Mr Giles adjusted these figures to exclude the impact of the Urea Decree and reversed the effect of FertiNitro's new and increased taxes, arriving at a figure of US$ 360.8 million.

9.203   In the Tribunal's view, there is no cogent evidence that any MOU price was actually "agreed" in 2007 or 2008 between Pequiven and KOMSA.  The first offer came via an email message of 9 October 2007 from Mr Toro of Pequiven with a valuation of US$ 1.175 billion for 100% of the equity of FertiNitro, less the amount outstanding to its banks and bondholders (which he put at US$ 450,000, presumably US$ 450 million).[652] On 7 November 2007, KOMSA responded with its draft MOU and a valuation of US$1.210

[652] Email from F. Toro to B. Gwaltney and T. Parra re:  FertiNitro Negotiations (9 October 2007) (C-90).

billion less the debts to the banks and bondholders plus the excess cash in FertiNitro.[653] Discussions were halted between these parties in early 2008.  However, Pequiven came back again in October 2008 with a revised draft MOU which provided for a payment of US$ 212.5 million to KOMSA for its share of FertiNitro's equity.[654] Ultimately, no MOU or valuation was ever agreed or signed between KOMSA and Pequiven.  Pequiven declared that the purchase of the private shareholders' shares in FertiNitro was no longer a priority. However, Mr Parra (of KOMSA) testified in his witness statement (paragraph 69) that KOMSA's representatives understood that there was "no real alternative but to accept Pequiven's proposal."[655]  In these circumstances, the only figure equating to any "agreed' valuation was the sum of US$ 212.5 million proposed by Pequiven to KOMSA in October 2008 (which maintained the Urea Decree and the various taxes).  As indicated, however, this figure was never in fact agreed between KOMSA and Pequiven or the Respondent.

9.204  In these circumstances, the Tribunal attaches no weight to these incomplete negotiations in 2007 and 2008 for the purpose of arriving at the appropriate FMV much later in September/October 2010.

9.205  More significantly, by the required valuation date of 10 October 2010 (or 30 September 2010) under Article 6 of the Treaty, the FertiNitro Plant was not what it had been in 2007 and 2008.  It was in a distressed condition operated by a troubled company with a divided board of directors, within a deteriorating national economy.  It was also badly run, poorly maintained, mismanaged and with costs "spiralling out of control" in the words of its board of directors on 5 August 2010.  There were by now high inflation rates in Venezuela; and, with the devaluation of Venezuelan currency, its US$ denominated costs had increased significantly (albeit to an extent reducing local costs). There was also growing industrial and social unrest impacting adversely upon the operation of the FertiNitro Plant, as Mr Gwaltney testified.[656]  The Tribunal does not therefore consider FetiNitro's state on 10

---

[653] KOMSA Draft Memorandum of Understanding (non-dated) (C-92). This draft had earlier been presented by Messrs Parra and Gwaltney (for KOMSA) to Messrs Toro and Lazo (of Pequiven) at a meeting on 7 November 2007 (*see* Gwaltney WS1, Paragraph 112).
[654] Pequiven Draft Memorandum of Understanding (non-dated) (C-93).
[655] *See* Cls. Mem., Paragraphs 144-152.
[656] Gwaltney WS1, Paragraphs 60ff.

October 2010 to be comparable to its earlier state in 2007-2008, thereby making earlier data materially irrelevant, including historical construction costs, higher production levels and (as already decided above) the 2007 or 2008 draft MOU valuations.

9.206   In the circumstances, the Tribunal does not consider that either expert witness, for all their obvious professional skill and industry, has succeeded in establishing a reliable fair market value of KOMSA's interest in FertiNitro.  Overall, the experts' differences can be mostly attributed to wide-ranging disagreements as to the relevance and scope of factual inferences and factual assumptions.  The Tribunal has summarised their approach at length above, from which it can be seen that each severely criticises the other's analysis and conclusions.  Whilst insufficient to establish on firm ground their own approach, parts of that criticism suffice to destroy the Tribunal's confidence in the other's approach as an expert witness on quantum.  It is as if two boxers in the ring knocked each other out simultaneously, with neither winning the contest.

9.207   The Tribunal therefore turns to the two Advantis reports, particularly its second report of July 2011, which contains two scenarios.  The first scenario appears to be a mere revision of the first report of May 2011, as no explanation is given for the figure of US$ 113 million as the value of KOMSA's 25% interest in FertiNitro.[657]  Using a DCF methodology to arrive at a FMV and taking into account several factors not considered in the first report this "second scenario" valued KOMSA's 25% interest in FertiNitro at US$ 140.25 million (being 25% of a total value of US$ 561 million) as at September 2010, based only upon data available up to 2010.  Neither KOMSA nor the Respondent accept any of Advantis' valuations; but the Parties and the Parties' quantum expert witnesses (Mr Giles and Dr Flores) referred to the Advantis reports on numerous occasions for different purposes.

9.208   The Advantis reports take the form of Power Point presentations, prepared in the Spanish language.  Although in part laconic, possibly incomplete and with their authors not made available to the Tribunal as witnesses in this arbitration, the Tribunal considers that these

---

[657] First Advantis Report (R-86).

reports suffice well for present purposes, particularly the "second scenario" in the second report.

9.209   In its first report of May 2011, Advantis valued KOMSA's interest as US$ 30-48.5 million if the Urea Decree continued (on different scenarios), and as US$ 99.5 million if it ceased at the end of 2012.[658]

9.210   In its second report of July 2011, Advantis valued KOMSA's interest on two further scenarios.  Under a first scenario, calculated on a base value of US$ 452 million, Advantis valued that interest at US$ 113 million.[659]  Under the second scenario, Advantis calculated a base value for FertiNitro of US$ 561 million, adjusted from the base value of US$ 452 million to take account of six factors, including higher prices for ammonia and urea (some of these other factors increasing and some decreasing the value of Fertinitro, resulting in a net increase of US$ 109 million).  This second scenario in Advantis' second report valued KOMSA's interest in FertiNitro as US$ 140.25 million, being 25% of US$ 561 million.[660]

9.211   These six factors were: adjusted prices for ammonia and urea as set out in a separate appendix for 2011 to 2016 (+ US$ 125 m); 10%  as  discounts for new investments as set out in a separate appendix for 2011 to 2016 (+ US$ 4m);  tax credits reducing the effective income tax rate for 2007-2010 as set out in a separate appendix (+ US$ 35m); increased depreciation (+ US$ 59m); adjusted exchange rates for PDVSA's and Pequiven's debts as set out in a separate appendix (- US$ 41m); and adjusted inflation rates for income tax (- US$ 68m).  The Tribunal accepts these adjustments.

9.212   The first Advantis report was discussed with FertiNitro's foreign shareholders.  It was received and studied by KOMSA at the time.  Mr Gwaltney (for KOMSA) testified that both Advantis Reports were provided to KOMSA by Pequiven and that the second report followed his letter to Pequiven expressing criticisms of the first report.[661]  It does not appear

---

[658] *First Advantis Report* (R-86), pages 9 and 19, calculated on a base value of FertiNitro of US$ 398 million.
[659] *Second Advantis Report* (C-157) (English version), page 2.
[660] *Second Advantis Report* (C-157) (English version), page 4.
[661] Second Witness Statement of Brent W. Gwaltney (20 August 2013), Paragraph 40.

from the evidence available to the Tribunal that KOMSA discussed the second report with Pequiven or Advantis at the time.

9.213   The Tribunal has considered the different comments on the Advantis Reports made by the Parties and their respective experts, Mr Giles and Dr Flores.

9.214   By reference to the two Advantis' reports, Dr Flores valued KOMSA's interest as US$ 34.6 million if the Urea Decree continued, and at US$ 64.3 million if it ended in 2012. As also submitted by the Respondent at the Third (June) Hearing:

> "[…] the Advantis report is a better sanity check than the MoU prices, simply due to the fact that it contains a valuation as of September 2010, which is the same time that we are looking at for FertiNitro today and under the BIT. The Advantis valuations, both of them – the first one in May 2011 and the second one in July 2011 – both support that Dr Flores's [sic] valuation of $34.6 million is a lot more reasonable than Mr Giles's valuation of $361 million. Here we are speaking about the 25% share of KOMSA in FertiNitro." [662];
> and later
> "Advantis only discussed the discount rate in the May 2011 valuation, not in the July 2011 valuation. However, since both of them refer to the value of FertiNitro as of September 2010, it is reasonable to assume that Advantis used the same discount rate in both of those reports. Advantis calculated the equity and market risk premium as the average of the return on the S&P 500 over the risk-free rate in the previous ten years. This is not a common estimation method. And when discussing, when thinking about Advantis's [sic] equity risk premium, it is important to understand that in carrying out their calculation, Advantis uses a higher beta and a higher risk-free rate, so overall that has an effect on its utility as a point of comparison. But it is more meaningful to compare overall discount rates with those of Mr Giles and Dr Flores than it is to look at any of the single components in isolation, as the Claimants have done. You need to look at it as a whole to figure out whether it is reasonable, rather than cherry-picking individual points from the Advantis report to try and make your position." [663]

9.215   In contrast, Mr Giles (inter alia) valued KOMSA's interest at US$ 361 million, with a separate impact from the Urea Decree calculated as US$ 22.4 million.  In its submissions,

---

[662] Third (June) Hearing D2.8 (Ms Teveni).
[663] Third (June) Hearing D1.280ff (Mr Ryan).

KOMSA compared Dr Flores' calculations unfavourably with those made by Advantis, as to market risk premium (3.5% v. 6.7%), generic country risk premium (7.6% v. 11.26%), and the FertiNitro Plant's daily production of ammonia (96% vs 91.3% of nameplate); and production of urea (98% v. 90.8% of nameplate).  KOMSA finds support in the Advantis reports for Mr Giles' approach; but it rejects the Advantis reports as a 'sanity check'. However, as eventually submitted by KOMSA at the Third (June) Hearing:[664]

> *"The Advantis report [of July 2011] is not really usable as a sanity check. Advantis was retained by Venezuela -- it wasn't retained jointly, it wasn't retained as an independent consultant -- and therefore its work is not indicative of fair market value. [...] There are some interesting features in Advantis that I think bear looking at. The market risk premium that Advantis uses is significantly lower than Dr Flores, and closer to Mr Giles. The generic risk premium, while being higher than Mr Giles's [sic] premium at 6%, is still materially lower and further away from Dr Flores. The production levels here are quite high, much higher than Dr Flores: 96% nameplate for Advantis, and 91.3% for Dr Flores, that's for ammonia; and 98% on urea, 91% for Dr Flores. This is quite telling because Advantis was retained by Venezuela to do a valuation, and on many of these important criteria they have chosen values that are much closer to Mr Giles's [sic] independent valuation than they are to Dr Flores's [sic].  So I think that does bear looking at [...]".*

9.216  The Tribunal considers that it is inappropriate to cherry-pick different parts of the Advantis Reports and thereby seek to adjust, one way or another, the several factors invoked by Mr Giles and Dr Flores.  This exercise would be difficult, if not impossible for the Tribunal, as indeed each expert was criticised for doing so by the opposing Party. Moreover, it would constitute, inevitably, a subjective and self-serving exercise.  In the Tribunal's view, the Advantis reports must be accepted as they stand, with the Tribunal preferring to accept, as a whole, the second scenario in the second Advantis report read with the remainder of the Advantis reports.  At the very least, it is fair to conclude that Pequiven would not have submitted to the other shareholders the second Advantis report if it did not consider that it was proposing a fair market value for FertiNitro.[665]  Moreover, it is worth noting, as stated

---

[664] Third (June) Hearing, D1.236-237 (Mr Beckett),
[665] First (September) Hearing D3.86-87 (Barrientos).

by Mr Barrientos in his oral testimony, that "two of the shareholders accepted that valuation and these were the shareholders with which we were able to reach a friendly settlement."[666]

9.217   The Tribunal can state shortly the result of its analysis of the Parties' respective submissions, together with the expert testimony of their respective witnesses, Mr Giles and Dr Flores.   Both generally (as already indicated above) and ostensibly based on the Advantis Reports, the Tribunal can place no reliance in such divergent testimony and submissions, each producing such extreme and incompatible results based on materially different data, inferences and assumptions.   In brief, the Tribunal regards Dr Flores' valuation as far too low; but it also regards Mr Giles' valuation as too high.   It has also experienced difficulties in adopting at face value either expert's methodologies when, with only slight factual variations between them, the end-result can be skewed so radically one way or the other.

9.218   The Tribunal therefore returns to the second scenario in Advantis' second report of July 2011, as a contemporary, independent professional valuation (albeit by valuation experts retained by Pequiven, in the absence of an agreement with the other shareholders on a joint appointment of a valuator) calculated as at the relevant date without material hindsight.   In the Tribunal's view, this second report's second scenario provides the best available answer to the issue under consideration under Article 6 of the Treaty, namely the (fair) market value of KOMSA's interest in FertiNitro immediately before its unlawful expropriation by the Respondent on 11 October 2010.

9.219   At the Third (June) Hearing, the Tribunal did request the Parties for the software versions of their experts' calculations, in the form of an agreed interactive matrix, so as to attempt to make its own inputs and test differing results.[667]   To the Tribunal's regret, by joint email messages dated 12 July 2016 the Parties declined this request as impracticable.[668]   In

---

[666] First (September) Hearing D3.87 (Barrientos).
[667] Third (June) Hearing D2.110-111.
[668] See the Parties' respective email messages dated 12 July 2016 ("The parties are in agreement that preparing the requested table at a level of detail useful to the Tribunal would be a highly complicated, time consuming, and costly endeavor.").

particular, it has made it impossible for the Tribunal to test the experts' respective conclusions based on different factual assumptions.

9.220   As to sanity checks, the Tribunal acknowledges that its FMV approach based on this second scenario leads to a significant reduction in KOMSA's claim and Mr Giles' valuation. Conversely, it represents a very significant increase from Dr Flores' valuation (US$ 34.6m). The Tribunal has considered other reality checks invoked by the Parties; but it considers none materially helpful. In particular, whilst Mr Giles' book value of US$ 168.1 million might broadly support the Tribunal's approach, the Tribunal recognises that such a book value cannot correspond to the FMV of a going concern. Similarly, the Tribunal accepts the Respondent's criticisms of Mr Giles' other reality checks, including construction costs elsewhere.

9.221   Accordingly, in accordance with Article 6 of the Treaty the Tribunal assesses, as best it can on the available materials, that the fair market value of KOMSA's 25% expropriated interest in FertiNitro as at 10 October 2010 (or 30 September 2010) was US$ 140.25 million.

*Issue (3): What, If Any, Compensation is Payable to KNI In Respect of Its Expropriated Interest in The Offtake Agreement?*

9.222   It is necessary to recall the basis on which this question arises. First, the Tribunal (by a majority) has found the Respondent liable under Article 6 of the Treaty for the unlawful indirect expropriation of KNI's interest in the Offtake Agreement, as claimed by KNI. KNI's claim is a claim advanced exclusively under the Treaty, under the Treaty's provision for ICSID arbitration. It is not advanced as a contractual claim under KNI's Offtake Agreement with FertiNitro. The Respondent is not a party to the Offtake Agreement. The Tribunal has no jurisdiction in regard to any contractual claim by KNI against FertiNitro under the Offtake Agreement by itself. Indeed the Offtake Agreement contains its own provisions for commercial arbitration and municipal (not international) law. Second, the issue of liability under Article 6 is legally distinct from the issue of compensation for such liability. Whilst the former derives from the latter, the issue of compensation is, of course, materially different under the Treaty. Third, the Parties and their respective experts were agreed that KNI's loss was to be assessed by reference to the FMV of its interest in the

256

Offtake Agreement as at the relevant date required under the Treaty, namely 30 September 2010 (or 10 October 2010).  None advocated for a contractual measure of damages; and, significantly, Dr Flores' did not arrive at a figure of zero compensation.  Last but not least, as a matter of procedural fairness to all Parties, it is necessary to limit the issues decided in this Award to those raised by the Parties based on the legal submissions and evidential materials made and adduced by them in this arbitration.

9.223   One major issue between the Parties relates to the exclusion or inclusion of KNI's purchases from the FertiNitro Plant during the period from 11 October 2010 to 28 February 2012.  The other major differences are the Parties' different assumptions regarding markets prices, sales volumes from production from the FertiNitro Plant, discount rates and the relevant cut-off date for ex-post factors.  The Tribunal refers to the Parties' expert witnesses' points of disagreement in Table 3 above.  Their resulting differences are stark: Mr Giles estimating KNI's compensation as US$ 206.5 million; and Dr Flores as US$ 56.2 million.

9.224   At the outset, the Tribunal notes that Mr Giles' expert testimony, as regards factual and market assumptions, was significantly supported by the testimony of Mr Sorlie.  Mr Sorlie was an impressive witness; and the Tribunal found him reliable, both in his written statement and as an oral witness.  There was no equivalent rebuttal factual witness called by the Respondent.  Accordingly, whilst Mr Giles' expert testimony was here supported by the factual evidence, the same cannot be said as regards the expert testimony of Dr Flores.

9.225   As to the issue of the period from October 2010 to February 2012, the Tribunal has found in favour of KNI's case, as decided in Part VII above, in regard to liability.  As to the cut-off date for factual assumptions, the Tribunal likewise decides against the Respondent's use of factors occurring after 10 October (or 30 September) 2010 derived only with the benefit of hindsight, particularly in regard to recent developments of shale gas production in the USA, the increased supply of ammonia and urea in the world market and differential shipping costs.  These are ex-post factors irrelevant to assessing compensation at the relevant date required under the Treaty (30 September or 10 October 2010).

9.226  In the Tribunal's view, KNI's purchases during the period from 11 October 2010 to 28 February 2012 operated to reduce KNI's loss assessed at the relevant date.  It was highly improbable, if not actually impossible, for the FertiNitro Plant to deliver to KNI during this period both those purchases and the offtake to which KNI was entitled under the Offtake Agreement, in addition to its other local commitments.  The FertiNitro Plant did not have that spare reliable capacity for ammonia and urea.  In these circumstances, whilst those purchases did not take the place of such offtakes, they nonetheless operated as a reasonable form of mitigation so as to reduce KNI's loss resulting from its expropriated interest in the Offtake Agreement.  The Tribunal estimates the value of this factor at US$ 21.7 million, based on Mr Giles' testimony at the Second (November) Hearing.[669]  Accordingly, in the Tribunal's view, KNI's claim must be reduced by US$ 21.7 million.

9.227  As to other major issues, the majority of the Tribunal considers that KNI and Mr Giles are correct in identifying the principal replacement supply as US Gulf at US Gulf prices (NOLA for urea and Tampa for ammonia) in a liquid market, rather than a mid-Caribbean market at mid-Caribbean prices in a very limited market.  Hence, the majority of the Tribunal finds, there was no replacement supply available to KNI at prices comparable to the Offtake Agreement for KNI.

9.228  In particular, the majority of the Tribunal accepts the factual testimony of Mr Sorlie, upon which Mr Giles based his expert evidence.  It merits citing at some length.  In his second witness statement, Mr Sorlie testified:

> "12. […] KNI is a committed offtaker from three ammonia production plants in Trinidad and Tobago. Even when KNI was purchasing FertiNitro tons its North American demand for products exceeded its Caribbean supply volumes.  As such, KNI always sought and continues to seek to purchase any profitable nitrogen fertilizer that becomes available on a FOB basis in the Caribbean. However, because of the long-term offtake arrangements described above and the fact that Trinidad and Tobago exporters already have established customer networks, very few Caribbean tons have been available over the years for purchase by KNI.

---

[669] Second (November) Hearing, Tim Giles' presentation, Slide 24.

*13. Since 2006, KNI has been able to purchase only a small amount of Caribbean sourced tons outside of its long term offtake arrangements. The primary example was KNI's ability, between 2006 and 2010, to purchase a total of 211,000 metric tons of ammonia from one Trinidad and Tobago plant partially owned by Terra Industries. This volume equates to approximately 1% of the total Trinidad and Tobago ammonia production during this period. In 2010 CF Industries acquired Terra Industries. This resulted in almost all of the excess ammonia volumes from that plant being transported to the US by CF Industries for use as raw materials in its North American business or for sale to CF customers. As a result, since 2011 KNI has only been able to purchase 3,500 metric tons of ammonia which equates to approximately 0.1% of the total Trinidad and Tobago ammonia production.*

*14. For the aforementioned reasons, it is incorrect for Dr. Flores to assume that KNI can replace lost FertiNitro offtake volumes by purchasing other products on an FOB basis in the Caribbean. Instead KNI's alternative is to purchase ammonia and urea at prices equivalent to NOLA and Tampa prices."*[670]

9.229   At the First (September) Hearing, Mr Sorlie was cross-examined by the Respondent, inter alia, as follows:

*"Q. [...] Am I correct [in] assuming that KNI has continued supplying the US customers that it originally supplied with under the Offtake Agreement?*
*A.  Like I have said previous(ly), we continued to make sales in the United States because we have a very competitive break bulk distribution business that is a profitable business, and so we're going to continue to make those sales with or without the FertiNitro offtake, and without the FertiNitro offtake we have to source those tonnes from other origins to supply that market, to supply that short we have.*
*Q.  So you are saying that you have been able to replace the amounts that you were, in the past, obtaining under the Offtake Agreement, by product from other sources?*
*A.  Yes, at a NOLA and Tampa price structure.*
*Q.  So you're saying you're now purchasing those same products on the NOLA and Tampa prices?*
*A.  Since we do not have the FertiNitro offtake, we have had to go into the market and we have to buy those tonnes in, and we are doing that at a NOLA and a Tampa price equivalent."*[671]

---

[670] Sorlie WS2, Paragraphs 12-14.
[671] First (September) Hearing D2.168ff (Sorlie).

259

9.230   The Respondent did not accept Mr Sorlie's evidence; but it adduced no cogent factual evidence of its own.  As already indicated, the Tribunal accepts Mr Sorlie's testimony, to the effect that whatever alternative supplies were available to KNI to replace offtake under the Offtake Agreement, these were at NOLA and Tampa prices or equivalent.

9.231   Mr Giles and Dr Flores appear to have valued this particular factor as US$ 92.2 million.[672] In the Tribunal's view, given its findings above, KNI's claim does not require any reduction for this factor.

9.232   As to assumed freight costs, the Tribunal accepts KNI's case based on Mr Giles' sample of actual freight costs from José, Venezuela to the US Gulf.  Albeit limited to shipping invoices in 2009/2010, it remains the best evidence of such estimated freight costs as confirmed by Mr Sorlie's testimony.[673]

9.233   As to *lambda* and discount rates, the Tribunal accepts Mr Giles' expert evidence that *lamda* should be reduced because FertiNitro's exposure to country risk was lessened by the access to its own dock facilities for offtakes to be exported to KNI under the Offtake Agreement. In these circumstances, the Tribunal adopts Mr Giles' *lambda* as 0.40 (towards its upper limit) for FertiNitro and not Dr Flores' factor of 1.0.  As to the discount rate, namely the amount by which KNI's lost future cash flows must be discounted to arrive at their value at the relevant date, the Tribunal adopts the approach taken by Mr Giles.  For these issues, it appears that the total difference between Mr Giles and Dr Flores amounts to US$ 36.4 million.[674]  In addition, Dr Flores reduces Mr Giles' valuation by US$ 2 million owing to differences between the two experts regarding production volumes.  In the Tribunal's view, KNI's claim does not require any reductions for these factors invoked by Dr Flores.

9.234   As to the Urea Decree and Urea Resolution, the Tribunal adopts the approach of Advantis in assuming, as at September 2010, that these urea regulations would not have continued. Mr Giles' approach did not take into account for the calculation of KNI's compensation

---

[672] Second (November) Hearing; Tim Giles' presentation, Slide 24.
[673] Sorlie WS2, Paragraph 23.
[674] Second (November) Hearing D6. Tim Giles' presentation, Slide 24.

the effect of the urea regulations after 28 February 2012 (in contrast to his separate assessment of compensation for "Historical Losses").  Dr Flores assumed that the urea regulations would continue beyond 28 February 2012.  In the Tribunal's view, with the assumption reasonably made by Advantis for September 2010, KNI's claim (as calculated by Mr Giles) does not require any reduction for the effect of the Urea Decree and Urea Resolution.

9.235   The resulting arithmetic is relatively straightforward by reference to the figures listed above.  Allocating the difference of US$ 150.3 million between the competing valuations of Mr Giles and Dr Flores, the Tribunal decides as follows: it rejects Dr Flores' reductions of US$ 92.2 million (regarding mid-Carribean pricing) and US$ 36.4 million (regarding lambda and discount rate assumptions); and it rejects Dr Flores' further reduction of US$ 2 million (regarding production assumptions), the whole totalling US$ 128.6 million.  Conversely, the Tribunal reduces the claim by US$ 21.7 million (regarding product delivered to KNI during the period from 10 October 2010 and 28 February 2012), as explained in paragraph 9.226 above.

9.236   Accordingly, doing the best it can on the available materials, the Tribunal (by a majority) assesses under Article 6 of the Treaty, the fair market value of KNI's expropriated interest in the Offtake Agreement as at 10 October 2010 (or 30 September 2010) was US$ 184.8 million (i.e. US$ 206.5 million less US$ 21.7 million).

9.237   *Decisions:*  For these reasons, the Tribunal decides under Article 6 of the Treaty: (i) KOMSA's compensation in the total principal sum of US$ 140.25 million; and (ii), by a majority, KNI's compensation in the total principal sum of US$ 184.8 million, both assessed as at 10 October 2010 (or, being materially the same, 30 September 2010).

# PART X: SUMMARY AND CONCLUSIONS

10.1    The Tribunal summarises below its several conclusions reached in the earlier parts of this Award.

10.2    *Jurisdiction:* The Tribunal rejects the Respondent's jurisdictional objection to KNI's claim in respect of its interest in the Offtake Agreement, as concluded in Part VI above. The Tribunal confirms its jurisdiction to decide all claims advanced by the Claimants against the Respondent in this arbitration, under the Treaty and the ICSID Convention.

10.3    *Liability:* The Tribunal finds the Respondent liable to KOMSA for the unlawful expropriation of its indirect interest in FertiNitro under Article 6 of the Treaty, as concluded in Part VII above.  The Tribunal (by a majority) finds the Respondent liable to KNI for the unlawful expropriation of its interest in the Offtake Agreement, as also concluded in Part VII above.

10.4    The Tribunal dismisses KOMSA's non-expropriation claims advanced as "Historical Losses" under Articles 4 and 11 of the Treaty, as concluded in Part VIII above.

10.5    *Compensation:* The Tribunal decides KOMSA's compensation in the total principal sum of US$ 140.25 million under the Treaty, as concluded in Part IX above.  The Tribunal (by a majority) decides KNI's compensation in the total principal sum of US$ 184.8 million, as also concluded in Part IX above.

10.6    *Principal Issues:*  The Tribunal has used the lists of principal issues set out in Part III above as a checklist, where applicable, for its several conclusions and decisions.  Save as summarised above, the Tribunal does not think it necessary to set out here its approach to each of these principal issues *seriatim.*

## *PART XI: INTEREST AND COSTS*

### *(1)    Introduction*

11.1    As to interest, the Parties completed their respective submissions on interest issues by joint email messages dated 26 July 2016.  The principal issue relates to whether simple or compound interest should be ordered by the Tribunal on the principal sums for which the Respondent is liable to pay to the Claimants.  The lesser issue relates to the use of 3-month Libor (as the Claimants contend) or the use of three-month Libor or 6-month US Treasury bills (as the Respondent contends).

11.2    For the purpose of deciding costs in this Award, in addition to the Parties' written submissions of 13 February 2015, the Tribunal has also taken into account the Parties' subsequent submissions dated 8 and 12 July 2016 as regards the allocation and assessment of costs updated to 12 July 2016.

### *(2)    Interest*

11.3    *The Claimants' Case:* In summary,[675] the Claimants contend that they are entitled to pre-award and post-award compound interest on compensation ordered by the Tribunal.  They make three principal submissions in support of their case.

11.4    First, the Claimants contend that the Treaty confirms that compound interest is payable by the Respondent.  Article 6 of the BIT requires that compensation be paid in the case of expropriation including interest at a normal commercial rate.  That normal commercial rate, so the Claimants contend, must include an element of compounding. That approach is consistent with the tribunal's decision in the *Venezuela Holdings v. Venezuela*[676] case: "[A] normal commercial rate generally includes compounding of interest […] [T]here is a

---

[675] Cls. PHB, Paragraphs 296-310.
[676] *Venezuela Holdings, B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (9 October 2014) (RLA-153), Paragraph 399.

growing tendency of international tribunals to award such interest in order to ensure full compensation of the damage."[677]

11.5    Second, the Claimants submit that ICSID's '*jurisprudence constante*' confirms that compound interest is payable by the Respondent.  In that regard, the Claimants point to the decision in *Gemplus SA v. United Mexican States*:[678]

> "[I]t is clear from the legal materials cited by the Claimants [...] that the current practice of international tribunals (including ICSID) is to award compound and not simple interest. In the Tribunal's opinion, there is now a form of 'jurisprudence constante' where the presumption has shifted from the position a decade or so ago with the result [that] it would now be more appropriate to order compound interest, unless shown to be inappropriate in favour of simple interest, rather than vice-versa."[679]

11.6    Third, the Claimants point to scholarly commentaries confirming that compound interest is payable in current circumstances.[680]

11.7    As to rate, the Claimants propose a Libor 3-month US Dollar rate plus 2% compounded on a quarterly basis.

11.8    *The Respondent's Case:* In summary,[681] the Respondent contends that simple interest and not compound interest is appropriate.  It submits that Article 6 of the Treaty does not permit the award of compound interest, unless (which is not the present case) a claimant can prove

---

[677] *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award (5 October 2012) (CLA-129) ("*Occidental v. Ecuador*"), Paragraph 844.

[678] *Gemplus S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Cases Nos. ARB(AF)/04/3 and ARB(AF)/04/4, Award (16 June 2010) (CLA-54), Paragraphs 16-26.

[679] *See also Joseph Charles Lemire v. Ukraine*, ICSID Case No ARB/06/18, Award (28 March 2011) at Paragraphs 360-361; *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award (31 October 2011) (CLA-52), Paragraphs 743-745; *Occidental v. Ecuador* (CLA129), Paragraph 848; *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 September 2014) (CLA-156), Paragraph 854.

[680] Particularly, S Ripinsky and K Williams, *Damages in International Investment Law* (British Institute of International and Comparative Law, 2008) ("Ripinsky – Damages") (CLA-134), page 387.

[681] Resp. PHB, Paragraphs 271-273; Resp. Rej., Paragraphs 518-524 (citing *i.e. Southern Pacific Properties (Middle East) Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award (20 May 1992) (CLA-12), Paragraph 222; *Autopista Concesionada de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/00/5, Award (23 September 2003) (RLA-60), Paragraphs 366-397; *Desert Line Projects LLC v. The Republic of Yemen*, ICSID Case No. ARB/05/17, Award (6 February 2008) (RLA-79), Paragraphs 292-298.

that it has actually suffered compound interest as damages.  In the event that the Tribunal decided to award compound interest, the Respondent submits that the compounding should be annual and not quarterly (as the Claimants request) or monthly (as Mr Giles proposes).

11.9   As to rate, the Respondent submits that a risk-free rate is appropriate, such as six-month US Treasury bills.  The Claimants' proposal to calculate interest based on the LIBOR three-month U.S. dollar rate plus 2% is inappropriate for calculating interest in an investor-State dispute.  The function of pre-award interest is to compensate a claimant for the time value of money and the lost opportunity to invest money.  However, in contrast to contractual business obligations, there is no commercial risk involved in a monetary award in investor-State arbitration under the ICSID Convention.[682]

11.10   *The Tribunal's Decision:* The Tribunal decides to award compound and not simple interest.  In its view, the reference in Article 6 of the Treaty to "interest" includes compound interest.  The wording clearly does not exclude it.  Indeed, in modern times, it would be 'abnormal' for interest to be limited to simple interest.  In the absence of contrary wording in a BIT, the general approach to interest was confirmed long ago by the decision in *Santa Elena v. Costa Rica:*[683]

> *"In particular, where an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest. It is not the purpose of compound interest to attribute blame to, or to punish, anybody for the delay in the payment made to the expropriated owned; it is a mechanism to ensure that the compensation awarded the claimant is appropriate in the circumstances...".*

---

[682] Resp. Rej., Paragraphs 525-529 (citing *BG Group Plc. v. Republic of Argentina* UNCITRAL, Final Award (24 December 2007) (CLA-37), Paragraph 455; *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award (6 February 2007) (CLA-15), Paragraph 396; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006) (RLA-123), Paragraph 102.

[683] *Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica,* ICSID Case No. ARB/96/1, Award (17 February 2000) (CLA-136), Paragraphs 103ff.

11.11   It would be possible to add references to many other decisions to such effect, in addition to doctrinal writings over many years.  It is unnecessary to do so here.[684]

11.12   As to rate, the Tribunal considers US$ Libor as a more international commercial rate than the rate for US Treasury bills.  It is also more often used in both investor-State and commercial arbitrations.  The Tribunal selects as the appropriate rate in this case US$ 6-month Libor plus 2%, compounded with 6-month rests, for both pre-award and post-award interest.  As to the uplift, this does not reflect the presence or absence of commercial risk, but rather the fact that Libor is calculated for use between financial institutions for relatively short terms – neither of which is applicable here.

11.13   As to the former's starting date, the Tribunal fixes upon 11 October 2010, being the date of expropriation, under Article 6.

11.14   In conclusion, the Tribunal decides to order pre-award interest from 11 October 2010 to the date of this Award on the principal sums payable to the Claimants respectively, calculated at US$ 6-month Libor plus 2%, compounded with 6-month rests.  As to post-award interest from the date of this Award until payment to the Claimants respectively, the Tribunal decides to order on the said principal sums (together with pre-award interest) interest calculated at US$ 6-month Libor plus 2%, compounded with 6-month rests.

*(3)*   *Costs*

11.15   Both the Claimants and the Respondent request an order of costs in respect of both the fees and expenses they incurred ("Legal Costs") and the costs, fees and expenses of the Tribunal and ICSID in connection with this arbitration for which the Parties are jointly and severally liable ("Arbitration Costs").

---

[684] For example, as to doctrinal writings, *see* F. A. Mann, Further Studies in International Law - Compound Interest as an Item of Damage (1990) (CLA-60), page 385;21:3 *U.C. Davis Law Review* 577 at 586; N. Affolder, "Awarding Compound Interest in International Arbitration"(2001), 12 *Am Rev Int'l Arb* 45 at 92; JY Gotanda, Compound Interest In International Disputes (2003) *Law and Policy in International Business* (CLA-61), page 393; J.M. Colón & M.S. Knoll, "Prejudgment Interest in International Arbitration", (2007) 4:6 *TDM* 1 at 7; Ripinsky - Damages (CLA-134), page 387; I. Marboe, Calculation of Compensation and Damages in International Investment *La*w, Oxford University Press, (2009) (CLA-137), Paragraphs 6.102, 6.103 & 6.300; and Dolzer & Schreuer, Principles of International Investment Law (2nd ed; 2012), p. 298.

11.16   *Legal Costs:* As to their own Legal Costs, the Claimant's fees and expenses amount to US$ 23,248,113.56.  As to Arbitration Costs, the Claimant has advanced US$ 650,000.00 to ICSID (as well as a lodging fee of US$ 25,000) of which US$ 628,836.435 has been spent towards ICSID's administrative fees and expenses, and the fees and expenses of the Tribunal.[685]

11.17   As to its own Legal Costs, the Respondent's fees and expenses amount to US$ 11,039,280.39.  As to Arbitration Costs, it has advanced US$ 650,000.00 to ICSID of which US$ 628,836.435 has been spent towards ICSID's administrative fees and expenses, and the fees and expenses of the Tribunal.[686]

11.18   *Schedules:* The Claimants and the Respondent divided their respective Legal Costs into the following categories:

   *(i)   The Claimants' updated statement of costs:*

      a.   Fees and expenses of their lawyers

| Item | Amounts (US$) |
| --- | --- |
| Fees and expenses of their lawyers (paid) | 17, 455,259.46 |
| Fees and expenses of their lawyers (invoiced but unpaid) | 1,063,346.50 |
| Subtotal | 18,518,605.96 |

      b.   Fees and expenses of their expert witnesses

| Item | Amounts (US$) |
| --- | --- |
| Fees and expenses of their experts (paid) | 2,432,898.36 |
| Fees and expenses of their experts (invoiced but unpaid) | 173,095.73 |
| Subtotal | 2,605,994.08 |

      c.   Expenses of their witnesses

| Item | Amounts (US$) |
| --- | --- |
| Expenses of their witnesses (paid) | 425,117.84 |

---

[685] Claimants' Corrected Updated Statement of Costs (12 July 2016).
[686] Respondent's Submission on Costs (8 July 2016).

| | | |
|---|---|---:|
| Expenses of their witnesses (invoiced but unpaid) | | Nil |
| | Subtotal | 425,117.84 |

d.  Other costs

| Item | | Amounts (US$) |
|---|---|---:|
| Client costs apart from the above (paid) | | 1,048,395.68 |
| Client costs apart from the above (invoiced but unpaid) | | Nil |
| Tribunal and ICSID fees (paid) | | 650,000.00 |
| | Subtotal | 1,698,395.68 |

e.  Total

| | |
|---|---:|
| Total costs and expenses of the Claimants in relation to the arbitration | Amount (US$) |
| | 23,248,113.56 |

*(ii)   The Respondent's submission on costs:*

a.  Fees and expenses of its lawyers

| Item | | Amounts (US$) |
|---|---|---:|
| Amounts paid | | Legal fees: 6,786,084.21 |
| | | Expenses: 1,511,651.42 |
| Amounts invoiced but not paid | | Legal fees: 778,491.64 |
| | | Expenses: 102,838.73 |
| | Subtotal | 9,179,066 |

b.  Fees and expenses of its expert witness

| Item | | Amounts (US$) |
|---|---|---:|
| Amounts paid | | Professional fees: 1,012,264.97 |
| | | Expenses: 16,742.73 |
| Amounts invoiced but not paid | | Professional fees: 89,901.03 |
| | | Expenses: 2,450.85 |
| | Subtotal | 1,121,359.58 |

c.  Expenses of witnesses and other internal costs

268

| Item | Amounts (US$) |
|---|---|
| Amounts paid | Witnesses' expenses: 85,344.91 |
| | Other internal costs: 3,509.90 |
| Subtotal | US$ 88,854.81 |

d.  Total

| The Respondent's total costs and expenses | Amount (US$) |
|---|---|
| | 11,039,280.39 |

11.19  *Arbitration Costs*: The total fees and expenses of the Tribunal and ICSID's administrative fees and direct expenses are the following (in US$):[687]

| Arbitrators' fees and expenses: | |
|---|---|
| V.V. Veeder | 199,186.29 |
| Marc Lalonde | 268,828.92 |
| Zachary Douglas | 72,610.72 |
| Judge Feliciano | 145,920.97 |
| ICSID's administrative fees: | 180,000.00 |
| Direct expenses:[688] | 391,125.97 |
| **Total** | **1,257,672.87** |

11.20  The above arbitration costs have been paid out of the advances made to ICSID in equal parts by the Claimants and Respondent.[689]  As a result, their respective share of the costs of arbitration amounts to US$ 628,836.435.

11.21  *The Tribunal's Decision*: Article 61(2) of the ICSID Convention provides that: "[t]he Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the

---

[687] The ICSID Secretariat will provide the parties with a detailed Financial Statement of the case.
[688] This amount includes charges relating to the dispatch of this Award (courier, printing and copying).
[689] Any remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

parties in connection with the proceedings and shall decide how and by whom these expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid.  Such decision shall form part of the award." ICSID Arbitration Rule 47(1) provides that the Tribunal's Award "shall contain […]  (j) any decision […] regarding the cost of the proceeding."

11.22   In the Tribunal's view, the ICSID Convention grants to the Tribunal a broad discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate in the circumstances.  The Tribunal does not understand such a discretion to be contested between the Parties.

11.23   In the Tribunal's view, these circumstances are clear in the present case.  The Claimants' cases have substantially but not completely prevailed over the cases advanced by the Respondent, as regards jurisdiction, liability (save as regard KOMSA's "Historical Losses"), compensation (in part) and interest.  As a general principle, therefore, the Claimants should recover from the Respondent a proportion of their legal costs and such of the arbitration costs as have been borne by the Claimants.  Conversely, the Respondent should bear its own legal costs and the Parties' arbitration costs in full, without any recourse to the Claimants.

11.24   The Tribunal has considered whether the legal costs incurred by the Claimants have been reasonably incurred in reasonable amounts.  There is a marked disparity between the total amounts of the Parties' respective legal costs, even allowing for the legal burden resting on the Claimants to prove their respective cases.  In other circumstances, it would be necessary to undertake further inquiries as to why the Claimants expended almost twice as much on legal costs than the Respondent.  However, this case had from the outset certain unusual, aggravating and special features.  It began, as already indicated, with the principal dispute limited to the amount of compensation due to KOMSA; but it soon became much more complicated and wide-ranging.  These proceedings were also protracted, particularly with the Respondent's two unsuccessful challenges to members of the Tribunal, the consequential suspensions of the arbitration pursuant to ICSID Arbitration Rule 9(6), the untimely death of one of its members and the procedure for replacing that arbitrator.  Moreover, it is a difficult task for any tribunal to second-guess, at a much later date, what

a party felt necessary to spend at the time in pursuit of its claims, with its own money.  For these several reasons, the Tribunal accepts the figures advanced by the Claimants for their legal costs, subject to the following.

11.25   KOMSA did not succeed in regard to its "Historical Claims"; and the claims by KOMSA and KNI for compensation only succeeded in part.  The Tribunal decides that the Claimants incomplete success should be reflected in a reduction in the Claimants' recovery of their legal costs by 25%.  The Tribunal does not consider it possible to separate out legal costs as between KOMSA or KNI.  As regards the Claimants' arbitration costs, the Tribunal decides that these should be borne in full by the Respondent, without any reduction.

11.26   In conclusion, the effect of the Tribunal's decisions can be stated as follows: the Claimants shall recover from the Respondent the total sum of US\$ 17,436,085.10 as Legal Costs and the total sum of US\$ 628,836.435 as Arbitration Costs.  The Tribunal orders such total sums to bear post-award interest from the date of this Award until payment, at the same rate applicable to the amounts of compensation due to the Claimants; but it decides not to award any pre-award interest on these sums.

## PART XII: THE OPERATIVE PART

12.1 For the reasons set out above, the Tribunal decides and awards as follows:

12.2 The Respondent's objection to the jurisdiction of ICSID and the competence of the Tribunal in regard to the claim made by the Second Claimant (KNI) is dismissed;

12.3 The Respondent violated Article 6 of the Treaty in expropriating on 11 October 2010 the interest in FertiNitro of the First Claimant (KOMSA), thereby causing loss to KOMSA in the total principal sum of US$ 140.25 million;

12.4 The Respondent violated Article 6 of the Treaty in expropriating on 11 October 2010 the interest in the Offtake Agreement of the Second Claimant (KNI), thereby causing loss to KNI in the total principal sum of US$ 184.8 million (this decision is by majority of the Tribunal);

12.5 The Respondent shall pay as compensation to the First and Second Claimants respectively the said principal sums together with pre-award compound interest thereon, from 11 October 2010 to the date of this Award calculated at the US$ Libor 6-month rate plus 2%, with six monthly rests (or *pro rata*);

12.6 The Respondent shall pay to the First and Second Claimants jointly the total principal sum of US$ 17,436,085.10 towards their Legal Costs;

12.7 The Respondent shall pay to the First and Second Claimants jointly the total principal sum of US$ US$ 628,836.435 towards their Arbitration Costs;

12.8 The Respondent shall pay to the First and Second Claimants respectively post-award compound interest on: (i) the said four principal sums; and also (ii) the total pre-award interest due on the principal sums of US$ 140.25 million and US$ 184.8 million, from the date of this Award until payment calculated at the US$ 6-month Libor rate plus 2%, with six monthly rests (or *pro rata*); and

12.9 Save as expressly ordered above, all other claims, demands and requests by the Parties are hereby dismissed.

Hon. Marc Lalonde PC, OC, QC
Arbitrator

Zachary Douglas QC*
Arbitrator
(Subject to the attached Dissenting Opinion)

Date: 11 October 2017

Date: 16 October 2017

V.V. Veeder QC
President of the Tribunal

Date: 19 October 2017

*As regards Paragraphs 12.4 above, a dissenting opinion by Arbitrator Douglas is attached hereto, as required by ICSID Arbitration Rules 47(3) and 49(4).

KOCH MINERALS SARL AND KOCH NITROGEN INTERNATIONAL SARL

Claimants

-v-

BOLIVARIAN REPUBLIC OF VENEZUELA

Respondent

ICSID CASE No. ARB/11/19

---

## PARTIALLY DISSENTING OPINION OF

## PROF. ZACHARY DOUGLAS QC

---

## A   INTRODUCTION

1.   I agree with the majority's decision on liability and the assessment of damages and interest in respect of KOMSA's expropriation claim for its interest in FertiNitro. I am also prepared to join the majority in respect of its decision in relation to costs.

2.   I respectfully dissent, however, from the majority's decision on liability and the assessment of damages and interest in relation to KNI's expropriation claim for its interest in the Offtake Agreement for the reasons that follow.

## B   KNI's EXPROPRIATION CLAIM: LIABILITY

3.   KNI's only claim in respect of the Offtake Agreement is for expropriation. An expropriation requires the total and permanent deprivation of a property right. Intangible property rights, such as a chose-in-action created by a contract, can certainly be the object of an expropriation. Intangible property rights obviously do not have a physical existence; they are purely creatures of law.[1]

---

[1]   A valuable discussion of intangible rights as the object of an expropriation can be found in: *Emmis International Holding, B.V. et al v Hungary*, ICSID Case No. ARB/12/2, Award, 16 April 2014, §§ 159-169.

4.  The Offtake Agreement is governed by the law of New York.[2] Any intangible property rights arising out of the Offtake Agreement are thus created and sustained by the law of New York.

5.  The majority has concluded that the Expropriation Decree of 10 October 2010 expropriated KNI's rights under the Offtake Agreement. The Expropriation Decree is a legal act that only has effect within the Venezuelan legal system. It cannot operate to deprive or nullify KNI's intangible property rights that are created and sustained under the law of New York any more than it could deprive or nullify any tangible property rights belonging to KNI and physically situated in New York.[3] KNI's rights under the Offtake Agreement remain valid and binding as against its counterparties to that contract after the Expropriation Decree. KNI can enforce those rights by invoking the arbitration clause in the Offtake Agreement, which provides for ICC arbitration in Miami, Florida.[4]

6.  The Offtake Agreement was evidently designed to be insulated against any sovereign interference on the part of Venezuela. By selecting the law of New York as the governing law, Venezuela cannot use its sovereign powers to modify or nullify the rights and obligations set out in the Offtake Agreement. By selecting ICC arbitration in Miami, Florida, Venezuela cannot use its sovereign powers to interfere with the resolution of any disputes arising out of the Offtake Agreement.

7.  The basic legal proposition underlying this analysis is hardly controversial. In the words of the leading writer on this subject, F.A. Mann:

> If one asks in what circumstances an international wrong committed by a foreign State may involve a breach of contract made by the same State with an alien, the field, properly analysed, is very limited, for the question makes sense only where three conditions coincide.
>
> In the first place the contract must be governed by the law of the State which is a party to the contract and has committed the wrong. If the contract is governed by any other legal system, the breach is most unlikely to be in any sense legally relevant. Thus a contract of concession granted, but wrongfully repudiated or modified, by a given State in law necessarily continues to exist unaffected if it is governed by the law of another State or by international law (assuming the latter alternative to be possible). Discharge or variation of a contract is subject to its proper law. This will not recognize interference by

---

[2]  Offtake Agreement (C-19), §13.1.

[3]  Hence the present case is distinguishable from the international precedents in which a State has been found internationally responsible for annulling a contract subject to its own law by the issuance of a decree that has effect in its own legal system: see, e.g. *Shufeldt Claim* (Award, 1930) 2 RIAA 1079.

[4]  Offtake Agreement (C-19), §12.2.

another legal system except as a fact creating impossibility of performance. Even so, it is hard to imagine any legal system which would allow a party to a contract to rely on self-induced impossibility to get rid of its legal obligations or to bring a contract to an end against the will of the other party to it.[5]

8.    These observations apply with greater force in relation to a contract to which the State itself is not even a party, as is the case in respect of the Offtake Agreement (KNI's counterparty is FertiNitro).

9.    The factual record in this case attests to the fact that the State of Venezuela has not attempted to do what is legally impossible (i.e. purporting to expropriate a contract governed by New York law):

      9.1.   There is no express mention of the Offtake Agreement in the Expropriation Decree.

      9.2.   There is no implicit mention either. The opening sentence of Article 1 refers to the '*mandatory acquisition of movable and real estate assets*', which is a clear reference to tangible property. The link between that property and FertiNitro is described as ownership or possession, which is also consistent with the object of Article 1 being tangible property rather than intangible rights under contracts. Next, Article 3 refers to the '*expropriated goods*' being '*transferred free of encumbrances or limitations*', which again is language apt to describe tangible property but not intangible rights. Finally, Article 6 refers to the '*occupancy of the assets indicated in article 1… with the objective of placing these into operation, administration and capitalization*'. This phrase does not make sense in relation to intangible rights under a contract.

      9.3.   The parties to the Offtake Agreement continued to buy and sell the offtake products (ammonia and urea) at the prices fixed by the Offtake Agreement for some sixteen months after the Expropriation Decree.

      9.4.   FertiNitro sent two separate communications following the Expropriation Decree, on 26 November 2010[6] and 1 December 2010,[7] confirming that it would continue to perform its obligations under the Offtake Agreement.

---

[5]   F.A. Mann, 'The Consequences of an International Wrong in International and National Law', *Further Studies in International Law* (OUP, 1990), pp. 188-189. The learned author made the same point many years earlier in 'State Contracts and State Responsibility', *Studies in International Law* (OUP, 1973), p. 303: 'In the first place the particular problem demanding a solution cannot arise unless the contract in issue, either as a whole or in part, is governed by the law of the State whose responsibility is involved, for, according to established principles of private international law, it is only in such event that the contracting State's act can possibly be relevant at all. If the contract is subject to the law of a country other than that of the contracting State, a defence derived from the proper law cannot be tortious [under international law] (and a defence derived from the law of the defendant State must be immaterial).'

[6]   FertiNitro's Communication of 26 November 2010 (C-111).

[7]   FertiNitro's Communication of 1 December 2010 (C-112).

9.5. FertiNitro eventually repudiated the Offtake Agreement by letter of 28 February 2012,[8] which would have been superfluous if the Offtake Agreement had somehow been expropriated on 10 October 2010 and if the parties had not been performing their obligations under the Offtake Agreement in the interim.

10. The majority relies on two documents for their contrary view. The first is a record of a speech to workers at FertiNitro's plant given by Venezuela's Minister of Energy and Oil (Mr Rafael Ramirez) the day after the Expropriation Decree.[9] The majority considers that that speech makes implicit references to the Offtake Agreement and, on that basis, the majority concludes that the Expropriation Decree must be interpreted as extending in scope to intangible rights under the Offtake Agreement. In relation to this evidence:

10.1. Whether or not the Minster's speech makes implicit references to the Offtake Agreement, the scope of the Expropriation Decree cannot extend to rights that are created and sustained by another State's legal system. If the Minister were to have proclaimed that the Expropriation Decree also expropriated ammonia and urea physically located outside of Venezuela, for instance, this would not have made it so: both public and private international law confine the scope of the Expropriation Decree to the national territory of Venezuela.

10.2. The text of the Expropriation Decree itself does not expressly or implicitly address intangible rights. No submissions have been made to the Tribunal, by experts or otherwise, on whether the Expropriation Decree extended to intangible rights as a matter of Venezuelan law. What a Minister says in a political speech to workers at a plant cannot fill this void.

11. The other document is relied upon by the majority to refute the point made earlier that the parties continued to perform the Offtake Agreement after the Expropriation Decree. It is an email from KNI to FertiNitro dated 3 December 2010 which states that KNI *'agrees to purchase product under terms consistent with the Offtake Agreement'* and for payment for product to be made *'to the same historical bank accounts'*.[10] The same email refers to KNI's expropriation claim and rights under international law. On the basis of this email, KNI and the majority assert that the purchases of urea and ammonia for a period of sixteen months after the Expropriation Decree were made pursuant to *'ad-hoc agreements'* with exactly the same terms as the Offtake Agreement and to the same bank accounts but not in accordance with the Offtake Agreement because, on their view, it had already been expropriated. In relation to this document:

11.1. KNI's email, which was clearly drafted with the assistance of international legal counsel, cannot unilaterally change the legal reality which was that the Offtake

---

[8]   FertiNitro's Communication of 28 February 2012 (C-114).

[9]   Online article entitled: *"Rafael Ramírez presidió la toma de instalaciones de Fertinitro en el estado Anzoátegui,"* Noticias 24, 11 October 2010 (C-107).

[10]   KNI's Communication to FertiNitro of 3 December 2010 (C-113) (emphasis added).

Agreement—governed by New York law—remained in full force and effect after the Expropriation Decree.

11.2. If the parties were not in reality buying and selling urea and ammonia pursuant to the Offtake Agreement over the sixteen months following the Expropriation Decree (there is no dispute that the purchases were made at exactly the same prices fixed by the Offtake Agreement), then FertiNitro's subsequent repudiation of the Offtake Agreement on 28 February 2012 would have made no sense.

11.3. The majority has accepted that KNI should not be entitled to damages during this sixteen month period, which is consistent with the reality that KNI did not suffer any loss because FertiNitro continued to perform its obligations under the Offtake Agreement until the repudiation.

11.4. FertiNitro affirmed on two separate occasions following the Expropriation Decree that it would continue to perform the Offtake Agreement.

12. I conclude that KNI has not established that Venezuela expropriated its rights under the Offtake Agreement. There is no evidence on the record of this arbitration that KNI's rights under a contract governed by New York law have been nullified or abrogated. KNI has offered no reason as to why its rights under the Offtake Agreement cannot be enforced against its counterparties, including FertiNitro, by pursuing ICC arbitration under the *lex arbitri* of Miami, Florida. So long as KNI's rights under the Offtake Agreement remain fully vested and enforceable it is legally impossible to speak of their expropriation. Although loss of value cannot be the exclusive touchstone of an expropriation, the fact that KNI remains entitled to an award of damages for any breach of its rights under the Offtake Agreement demonstrates conclusively that KNI's rights have not been deprived of their entire value.

## C   KNI's EXPROPRIATION CLAIM: ASSESSMENT OF DAMAGES

13. International law does not give a *carte blanche* to valuation experts to determine the amount of compensation that flows from a breach of an international obligation. The law defines the contours of a recoverable loss and how it is to be assessed. Where a intangible property right under a contract has been expropriated, the object of compensation in international law is to put the innocent party in the position that it would have been in if the contract had been performed in the manner provided for by the parties at the time of its conclusion.[11] International law requires that the recoverable loss could have been anticipated or foreseen by the parties at the time of the conclusion of the contract.[12] The loss that could have been foreseen by the parties to the Offtake

---

[11]   *Sapphire International Petroleum v NIOC* (1963) 35 ILR 136, 185-6 ('According to the generally held view the object is to place the party to whom they are awarded in the same pecuniary position they would have been in if the contract had been performed in the manner provided for by the parties at the time of its conclusion.'); *Amco Asia Corp., et al. v Republic of Indonesia*, ICSID Case No. ARB/81/1, Award, 31 May 1990, §§183-6 (*Amco v Indonesia II*).

Agreement in the event that KNI's right to purchase urea and ammonia at the prices and quantities fixed by the contract were to be nullified or abrogated is KNI's loss of profits caused by FertiNitro's failure to supply KNI with the goods in question. The loss of profits of the buyer in the context of a contract for the sale of goods is calculated as the difference between the contract price and the price paid by the buyer for replacement goods[13] or the difference between the contract price and the market price at the time deliveries should have been made if replacement goods are not purchased.[14]

14. In the present case, Mr Sorlie was the principal witness for KNI in relation to the Offtake Agreement and indeed he was the person responsible for managing the purchases of urea and ammonia under that contract from KNI's side. Mr Sorlie did not, in either of his two witness statements, give any evidence as to whether or not KNI purchased replacement goods following the alleged expropriation of the Offtake Agreement on 10 October 2010. This is a surprising omission given it is critical evidence, required by law, to establish KNI's actual loss.

15. It was only under cross-examination that Mr Sorlie gave evidence on this issue. He testified that after the expropriation of the Offtake Agreement, KNI bought replacement goods at the equivalent quantities from the former Soviet Union and Egypt as well as '*other origins*'.[15] No evidence of the prices paid for those replacement goods was introduced onto the record. KNI's valuation expert testified that he had sight of that evidence but elected to '*disregard it*' for the purpose of his calculation of KNI's loss.[16]

16. In summary, KNI has tendered no evidence of the prices that it actually paid for replacement quantities of urea and ammonia following the purported expropriation of the Offtake Agreement and KNI's valuation expert has disregarded this evidence for the purposes of his calculations.

17. This is not a case where the evidence of the investor's actual losses is no longer available due to an act attributable to the host State (such as where the host State's authorities have destroyed or confiscated documentation belonging to the investor). This is a case where the evidence was clearly available but deliberately disregarded by the investor and

---

[12] *Amco Asia Corp. and others v Republic of Indonesia*, ICSID Case No. ARB/81/1, Award, 20 November 1984, § 268 ('[A]ccording to the principles and rules common to the main national legal systems and to international law, the damages to be awarded must cover only the direct and foreseeable prejudice') (emphasis omitted); *Amco v Indonesia II*, §§172, 178. The foreseeability principle is also applied to non-contractual scenarios: *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, §§169-172; *Ioannis Kardassopoulos and Ron Fuchs v Republic of Georgia*, ICSID Case Nos. ARB/05/18 & ARB/07/17, Award, 3 March 2010, §§469. See also the UNIDROIT Principles of International Commercial Contracts (2004) ('UNIDROIT Principles') Art. 7.4.4; United Nations Convention on Contracts for the International Sale of Goods (1980) ('CISG'), Art. 74.

[13] *See, e.g.* CISG, Art. 75; UNIDROIT Principles, Art. 7.4.5.

[14] See, e.g. CISG, Art. 76; UNIDROIT Principles, Art. 7.4.6. There is always a duty to mitigate loss: CISG, Art. 77; UNIDROIT Principles, Art. 7.4.8.

[15] First (September) Hearing D2/P167-68/L2-9 (*Sorlie*).

[16] Second (November) Hearing D6/P87/L11-18 (*Giles*).

- 6 -

its valuation expert. In these circumstances, the only permissible conclusion is that KNI has failed to establish its loss on the balance of probabilities—*i.e.* in satisfaction of the usual standard of proof.

18. What KNI and its valuation expert have done instead is advance a theory of damages that violates the foreseeability of loss principle recognized by international law and that is unsustainable on the facts. KNI claims that its damages should be assessed on the basis of the following counterfactual in order to arrive at the *'fair market value'* of the Offtake Agreement:

    18.1. Before the expropriation: KNI could buy at the offtake price, ship to NOLA/Tampa (United States Gulf Coast) and sell at NOLA/Tampa prices. The profit was therefore NOLA/Tampa price minus shipping costs minus the offtake price.

    18.2. After the expropriation: KNI could only buy at NOLA/Tampa prices and sell at NOLA/Tampa prices. The profit was therefore zero.

19. To be clear: both sides of the counterfactual are not what actually happened but rather are hypotheses based on what plausibly could have happened according to KNI's valuation expert.[17]

20. There are numerous flaws with this approach:

    20.1. It violates the foreseeability principle because no party to the Offtake Agreement could have contemplated such a loss, which is based on a series of hypotheses and follows an approach that is without precedent in the assessment of damages in this scenario.

    20.2. It is impermissible to substitute evidence of actual loss with a theory of hypothetical loss in the assessment of damages.[18] As KNI's actual loss could have been calculated on the basis of simple arithmetic by reference to the evidence available to it, the inescapable inference is that KNI preferred a theory of hypothetical loss because it generated a substantially higher figure. The result is that KNI's pleaded loss is likely to be vastly overstated.

    20.3. The counterfactual makes no sense. An approach that purports to calculate the *'fair market value'* of the Offtake Agreement must be founded on the principle that a third party purchaser would have been prepared to pay a price equivalent to that value at the expropriation date. On KNI's case, this means that a third party would have been prepared to pay USD 206.5 million for its rights under the Offtake Agreement in October 2010 (i.e. significantly more than the value of KOMSA's equity stake in FertiNitro at the same time). But a third party

---

[17] *Second (November) Hearing* D6/P85/ L7-14 (*Giles*).

[18] *Amoco International Financial Corp v Iran* (Partial Award, 14 July 1987) Iran-US Claims Tribunal Case No. 56, §238 '[N]o reparation for speculative or uncertain damage can be awarded'.

purchaser, like KNI, would have been able to purchase the commodities in question—urea and ammonia—in markets throughout the world. Why would a third party purchaser assess the value of the Offtake Agreement in October 2010 on the basis that the commodities could only have been purchased at NOLA/Tampa, where demand is consistently very high and prices are also very high accordingly? A third party purchaser would assess the value of the Offtake Agreement on the basis of the evidence of long term trends in prices for urea and ammonia on the world markets and assess the difference between those market prices and the prices fixed by the Offtake Agreement. A third party purchaser would not assess the value of the Offtake Agreement based upon a non-existent obligation to purchase these commodities exclusively at the very place at which it was most lucrative to sell those commodities.

20.4. The counterfactual's hypothesis contradicts KNI's own evidence of how the international markets for ammonia and urea function. Mr Sorlie testified that: *'Ammonia and urea imported into the US typically come from one of the four main areas of nitrogen fertilizer export production in the world: the Caribbean, North Africa, the Black Sea region and the Arab Gulf.'*[19] Why would a third party purchaser also not look to buying the commodities in those regions for sale to NOLA/Tampa and profit from the price-differential? And as already noted, the counterfactual's hypothesis also contradicts what KNI actually did following the expropriation the Offtake Agreement: according to Mr Sorlie, KNI purchased replacement goods from the former Soviet Union, Egypt and elsewhere. Why would KNI have bothered doing that if it could only have obtained the same prices as at NOLA/Tampa?

21. In relation to this last point, the majority appears to place decisive weight upon Mr Sorlie's evidence in cross-examination that KNI was able to purchase replacement ammonia and urea *'at a NOLA and Tampa price structure'.*[20] The majority states that it *'accepts Mr Sorlie's testimony, to the effect that whatever alternative supplies were available to KNI to replace offtake under the Offtake Agreement, there were at NOLA and Tampa prices or equivalent'* because the Respondent *'adduced no cogent factual evidence of its own'.*[21] I have several difficulties with this conclusion:

21.1. The question, adopting KNI's damages methodology, is not what alternative supplies were available to KNI but what supplies were available to a hypothetical third party purchaser of the Offtake Agreement at the date of expropriation and into the future.

21.2. The **only** evidence on the record in support of the majority's conclusion is Mr Sorlie's statement in cross-examination. That statement is contradicted by Mr Sorlie's testimony to the effect that KNI purchased replacement goods from the former Soviet Union, Egypt and elsewhere (and there would have been no

---

[19]  First Witness Statement of Jim Sorlie (29 May 2012), §17.

[20]  Award, §9.229.

[21]  Award, §9.230.

commercial reason to do so if they could only be obtained at NOLA/Tampa prices). Mr Sorlie's assertion that KNI purchased replacement goods at the same prices as at NOLA/Tampa is not addressed in either of his witness statements and KNI does not provide any evidence in relation to the prices that it did in fact pay for the replacement goods or any evidence in relation to the prices in the different markets throughout the world.  KNI has the burden to establish this critical factual premise for its damages calculation and it has failed to discharge that burden.

21.3.  The Respondent has produced factual evidence of its own and it is more robust than an unsupported statement by a single witness in cross examination. Fertecon is the world's leading provider of market information and analysis on fertilizers and fertilizer raw materials. The Respondent's expert exhibited Fertecon's reports in 2010 for urea and ammonia (together constituting more than 350 pages of analysis).[22] What these reports show, which is hardly surprising, is that the prices for urea and ammonia at the various markets around the world differed significantly both historically and in 2010 and the prices at Nola/Tampa in the United States were almost invariably the highest.

22.  In conclusion, even if Venezuela did expropriate the Offtake Agreement by the issuance of the Expropriation Decree, which I do not accept, I would have concluded that KNI has failed to prove its loss to the requisite standard.  As a result I would also have found that KNI is not entitled to interest.

---

[22]   Expert Reports of Daniel Flores (EO-7 and EO-8).

Zachary Douglas QC
Arbitrator

Date: 8 october 2017

Spanish Version



CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS
A INVERSIONES

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  EE.UU.
TELÉFONO (202) 458 1534  |  FACSÍMIL (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

30 de octubre de 2017

Por mensajería internacional
(*copia adelantada por correo electrónico*)

Koch Minerals Sàrl y
Koch Nitrogen International Sàrl
Attn: Sr. J. Kory Parkhurst
Koch Companies Public Sector, LLC
4111 East 37th Street North
Wichita, Kansas 67220, EE.UU.
 y
Sr. Robert Volterra
Sr. Graham Coop
Sr. Giorgio Mandelli
Sra. Zuzana Morháčová
Sra. Jessica Pineda
Sr. Govert Coppens
Volterra Fietta
1 Fitzroy Square
Londres W1T 5HE, Reino Unido
 y
Sr. Mark Beckett
Cooley LLP
1114 6th Ave #46
New York, NY 10036
EE.UU.

República Bolivariana de Venezuela
Attn: Dr. Reinaldo Enrique Muñoz Pedrosa
Procurador General de la República (E)
Procuraduría General de la República
Av. Los Ilustres, c/c calle Francisco Lazo Martí
Edif. Procuraduría General de la Rep., Piso 8
Urb. Santa Mónica
Caracas 1040, Venezuela
 y
Sr. Christopher Ryan
Sr. Thomas B. Wilner
Shearman & Sterling LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004, EE.UU.
 y
Sra. Anna Tevini
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022, EE.UU.
 y
Sr. Guillermo Salcedo Salas
Shearman & Sterling LLP
114, avenue des Champs-Elysées
75008 Paris, Francia
 y
Sr. José Pertierra
The Law Office of José Pertierra
1010 Vermont Ave. NW
Suite 514
Washington, D.C. 20005, EE.UU.

**Re: Koch Mineral Sarl & Koch Nitrogen International Sarl c. República Bolivariana de Venezuela**
(CASO CIADI NO. ARB/11/19)

Estimados señores y señoras,

Adjunto sírvanse encontrar copias certificadas de las versiones en inglés y español del Laudo del Tribunal de Arbitraje junto con las versiones en inglés y español de la Opinión Parcialmente Disidente del Profesor Zachary Douglas (la "Opinión") de fecha del 30 de octubre de 2017.

1

De acuerdo con la Regla de Arbitraje 48, he autenticado los textos originales del Laudo y la Opinión y los he depositado en los archivos del Centro. De conformidad con la Regla de Arbitraje 48, se considerará que el Laudo junto con la Opinión han sido dictados en la fecha de envío a las partes, la cual se indica en el texto original del Laudo y en todas sus copias.

Según se indica en el párrafo 20.1 Resolución Procesal No. 3, (Minutas de la Primera Sesión), las partes no dieron su consentimiento para la publicación del Laudo. Les agradezco a las partes informarnos si consienten a la publicación del Laudo y de la Opinión en el sitio web del CIADI.

Atentamente,

Gonzalo Flores
Secretario General Interino

Adjunto: lo indicado

cc (con lo adjunto): Miembros del Tribunal

**CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES**

En el procedimiento de arbitraje entre

**KOCH MINERALS SÁRL**
Primera Demandante
("KOMSA")

**KOCH NITROGEN INTERNATIONAL SÁRL**
Segunda Demandante
("KNI")

y

**LA REPÚBLICA BOLIVARIANA DE VENEZUELA**
Demandada

CASO CIADI N.º ARB/11/19

_____

# LAUDO

_____

*Miembros del Tribunal:*
V.V. Veeder, Presidente, QC
Hon. Marc Lalonde PC, OC, QC
Profesor Zachary Douglas QC

*Secretaria del Tribunal de Arbitraje:*
Mairée Uran Bidegain

*Fecha de envío a las Partes:* 30 de octubre de 2017

# ÍNDICE DE CONTENIDOS

**PARTE I:**      **EL ARBITRAJE** ................................................................................. *1*

**PARTE II:**     **LA CONTROVERSIA DE LAS PARTES** ....................................... 23

**PARTE III:**    **LAS CUESTIONES PRINCIPALES** ............................................... 40

**PARTE IV:**     **LOS TEXTOS JURIDICOS ESENCIALES** ................................... 57

**PARTE V:**      **LOS HECHOS PRINCIPALES** ....................................................... 72

**PARTE VI:**     **CUESTIONES DE JURISDICCIÓN** ............................................. 114

**PARTE VII:**    **CUESTIONES DE EXPROPIACIÓN** ............................................ 142

**PARTE VIII:**   **CUESTIONES AJENAS A LA EXPROPIACIÓN** ........................ 163

**PARTE IX:**     **CUESTIONES DE COMPENSACIÓN** .......................................... 185

**PARTE X:**      **SÍNTESIS Y CONCLUSIONES** .................................................... 282

**PARTE XI:**     **INTERESES Y COSTOS** ............................................................... 283

**PARTE XII:**    **LA PARTE OPERATIVA** .............................................................. 293

i

## TÉRMINOS ABREVIADOS

| | |
|---|---|
| *Barrientos DT1* | Declaración de Testigo de Víctor D. Barrientos (28 de febrero de 2013) |
| *Barrientos DT2* | Segunda Declaración de Testigo de Víctor D. Barrientos (30 de diciembre de 2013) |
| *Borrador del MdE de KOMSA* | Borrador de Memorándum de Entendimiento de KOMSA (sin fecha) (C-92) |
| *Borrador del MdE de Pequiven* | Borrador de Memorándum de Entendimiento de Pequiven (sin fecha) (C-93) |
| *C-[#]* | Anexo Documental de las Demandantes |
| *CERTs* | Certificados Especiales de Reembolso Tributario |
| *CIADI o el Centro* | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| *Circular de Oferta - Oferta de Bonos de 1998* | Circular de Oferta - Oferta de Bonos de USD 250.000.000 USD entre FertiNitro Finance Inc y FertiNitro (8 de abril de 1998) (C-115) |
| *CLA-[#]* | Autoridad Legal de las Demandantes |
| *Contrato EPC* | Contrato de Ingeniería, Compras y Construcción entre FertiNitro y Snamprogetti (8 de abril de 1998) (C-24) |
| *Convenio CIADI* | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados (18 de marzo de 1965) |
| *Decreto de Expropiación* | Decreto N.º 7.713 (10 de octubre de 2010) (Gaceta Oficial N.º 380.113 de fecha 11 de octubre de 2010) (C-9) |
| *Decreto de la Urea* | Decreto N.º 5.218 (26 de febrero de 2007) (C-80) |
| *Decreto Municipal* | Decreto D.A.M.S.B.-042-A-2006 (14 de noviembre de 2006) (C-48) |
| *Dúpl. Koch* | Dúplica sobre Jurisdicción de las Demandantes (14 de marzo de 2014) |
| *Dúpl. Ven.* | Dúplica de la República Bolivariana de Venezuela (Fondo) (3 de marzo de 2014) |
| *EPA Koch* | Escrito Post-Audiencia de las Demandantes (30 de enero de 2015) |

| | |
|---|---|
| *EPA Ven.* | Resumen Postaudiencia de la República Bolivariana de Venezuela (30 de enero de 2015) |
| *Esty IP1* | Informe Pericial de Benjamin C. Esty (23 de agosto de 2013) |
| *Esty IP2* | Segundo Informe Pericial de Benjamin C. Esty (14 de marzo de 2014) |
| *Excepciones Preliminares Ven.* | Objeciones Preliminares de la República Bolivariana de Venezuela a la Jurisdicción del Tribunal Arbitral (28 de febrero de 2013) |
| *FertiNitro* | Empresas en participación Fertilizantes Nitrogenados de Oriente, SA; Fertilizantes Nitrogenados de Oriente, CEC; Fertilizantes Nitrogenados de Venezuela, SRL; y Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC |
| *Flores IP1* | Informe Pericial de Daniel Flores (28 de febrero de 2013) |
| *Flores IP2* | Segundo Informe Pericial de Daniel Flores (3 de marzo de 2014) |
| *Flórez DT1* | Declaración de Testigo de Edgar A. Flórez (28 de febrero de 2013) |
| *Giles IP1* | Informe Pericial de Tim Giles (2 de junio de 2012) |
| *Giles IP2* | Segundo Informe Pericial de Tim Giles (30 de agosto de 2013) |
| *Gwaltney DT1* | Declaración Testimonial de Brent W. Gwaltney (30 de mayo de 2012) |
| *Gwaltney DT2* | Segunda Declaración Testimonial de Brent W. Gwaltney (20 de agosto de 2013) |
| *Informe del Comisario* | Informe Resumido del Comisario y Estados Financieros Consolidados de FertiNitro (7 de septiembre de 2006) (C-63) |
| *JIA* | Convenio de Inversionistas Conjuntos entre Pequiven, Koch Oil SA, Snamprogetti Netherlands BV y Polar Uno, CA (8 de abril de 1998) (C-18) |
| *KNI* | Koch Nitrogen International Sàrl |
| *KOMSA* | Koch Minerals Sàrl |
| *Ley de Ciencia y Tecnología* | Ley Orgánica de Ciencia, Tecnología e Innovación (en vigor a partir del 1 de enero de 2006) (C-43) |

| | |
|---|---|
| *Ley de Expropiación* | Ley de Expropiación por Causa de Utilidad Pública o Social (1 de julio de 2002) (Gaceta Oficial de la República N.º 37.475 de fecha 1 de julio de 2002) (R-9, R-53, C-140) |
| *Ley de IVA* | Ley de Reforma Parcial de la Ley que establece el Impuesto al Valor Agregado (11 de agosto de 2004) (C-55) |
| *Ley Petroquímica de 2009* | Ley Orgánica para el Desarrollo de las Actividades Petroquímicas (16 de junio de 2009) (C--8) |
| *Mem. C. Ven.* | Memorial de Contestación de la República Bolivariana de Venezuela (Fondo) (28 de febrero de 2013) |
| *Mem. Koch* | Memorial de las Demandantes (4 de junio de 2012) |
| *Núñez DT1* | Declaración Testimonial de Carolina Núñez (28 de febrero de 2013) |
| *Offtake Agreement* | *Offtake Agreement* entre Pequiven, IPSL y Koch Oil SA en calidad de Compradoras y FertiNitro en calidad de Vendedora (8 de abril de 1998) (C-19). |
| *Ordenanza Municipal* | Ordenanza para Impuestos sobre Actividades Económicas de Industria, Comercio, Servicios o de Índole Similar (29 de diciembre de 2005) (C-45) |
| *Parra DT1* | Declaración Testimonial de Melquíades A. Parra (29 de mayo de 2012) |
| *PDVSA* | Petróleos de Venezuela, S.A. |
| *Primer Informe Advantis* | Informe Advantis intitulado "Valoración de FertiNitro" (mayo de 2011) (R-86) |
| *Primera Audiencia (septiembre)* | Audiencia sobre Jurisdicción, Fondo e interrogatorio de Testigos de Hecho, celebrada el 8 de septiembre de 2014 y desde el 10 hasta el 12 de septiembre de 2014 |
| *R-[#]* | Anexo Documental de la Demandada |
| *Reclamos Históricos* | Reclamos de KOMSA relativas relativos a medidas tributarias y créditos IVA |
| *Reglas de Arbitraje* | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI de 2006 |
| *Répl. Koch* | Réplica sobre Cuestiones de Fondo y Memorial de Contestación sobre Jurisdicción de las Demandantes (2 de septiembre de 2013) |

| | |
|---|---|
| *Réplica de la Demandada sobre Jurisdicción* | Réplica de la Demandada sobre las Objeciones a la Jurisdicción de la República Bolivariana de Venezuela (3 de marzo de 2014) |
| *Resolución de la Urea* | Resolución Conjunta del Ministerio del Poder Popular para la Agricultura y Tierras, del Ministerio del Poder Popular para las Industrias Ligeras y Comercio, y del Ministerio del Poder Popular para la Energía y Petróleo (Gaceta Oficial N.º 38.674) (3 de mayo de 2007) (C-82) |
| *RfA* | Solicitud de Arbitraje de las Demandantes (28 de junio de 2011) |
| *RLA-[#]* | Autoridad Legal de la Demandada |
| *Sanders IP1* | Informe Pericial de Richard Sanders (30 de mayo de 2012) |
| *Sanders IP2* | Segundo Informe Pericial de Richard Sanders (27 de agosto de 2013) |
| *Segunda Audiencia (noviembre)* | Audiencia sobre Fondo y Cuantía de Daños e interrogatorio de Expertos, celebrada desde el 23 hasta el 26 de noviembre de 2014 |
| *Segundo Informe Advantis* | Informe Advantis intitulado "Valoración de FertiNitro" (julio de 2011) (C-157) |
| *Sorlie DT2* | Segunda Declaración Testimonial de Jim Sorlie (26 de julio de 2013) |
| *Tercera Audiencia (junio)* | Audiencia sobre Reconstitución celebrada el 9 y el 10 de junio de 2016 |
| *Tr. Día [#página. línea(s)] (Orador(es))* | Transcripciones de Audiencias |
| *Tribunal o Tribunal de Arbitraje* | Tribunal de Arbitraje constituido el 8 de noviembre de 2011 |
| *Villarroel DT2* | Segunda Declaración de Testigo de Aníbal Villarroel (30 de diciembre de 2013) |

### MATERIALES JURÍDICOS

| | |
|---|---|
| *AAPL c. Sri Lanka* | *Asian Agricultural Products Limited c. República Socialista Democrática de Sri Lanka*, Caso CIADI N.º ARB/87/3, Laudo (27 de junio de 1990) (RLA-42) |
| *Abaclat c. Argentina* | *Abaclat y otros (Caso denominado anteriormente Giovanna A. Beccara y otros) c. La República Argentina*, Caso CIADI N.º ARB/07/5, Decisión sobre Jurisdicción y Admisibilidad (4 de agosto de 2011) (RLA-31) |
| *ADC Affiliate c. Hungría* | *ADC Affiliate Limited y ADC & ADMC Management Limited c. República de Hungría*, Caso CIADI N.º ARB/03/16, Laudo (27 de septiembre de 2006) (CLA-16) |
| *Ambiente c. Argentina* | *Ambiente Ufficio S.p.A. y otros c. República Argentina*, Caso CIADI N.º ARB/08/9 (Caso anteriormente denominado Giordano Alpi y otros c. República Argentina), Decisión sobre Jurisdicción y Admisibilidad (8 de febrero de 2013) (CLA-90) |
| *Autopista c. Venezuela* | *Autopista Concesionada de Venezuela, C.A. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB/00/5, Laudo (23 de setiembre de 2003) (RLA-60) |
| *Azurix c. Argentina* | *Azurix Corp. c. República Argentina*, Caso CIADI N.º ARB/01/12, Laudo (14 de julio de 2006) (CLA-43) |
| *Bayindir c. Pakistan* | *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. República Islámica del Pakistán*, Caso CIADI N.º ARB/03/29, Decisión sobre Jurisdicción (14 de noviembre de 2005) (CLA-11) |
| *BG Group c. Argentina* | *BG Group Plc. c. República Argentina*, CNUDMI, Laudo Definitivo, (24 de diciembre de 2007) (CLA-37) |
| *Biwater c. Tanzania* | *Biwater Gauff (Tanzania) Ltd. c. República Unida de Tanzania*, Caso CIADI N.º ARB/05/22, Laudo (18 de julio de 2008) (CLA-24) |
| *Burlington c. Ecuador* | *Burlington Resources, Inc. c. República de Ecuador*, Caso CIADI N.º ARB/08/5, Decisión sobre Reconsideración y Laudo (7 de febrero de 2017) |
| *Caratube c. Kazajstán* | *Caratube International Oil Company LLP c. La República de Kazajstán*, Caso CIADI N.º ARB/08/12, Laudo (5 de junio de 2012) (RLA-107) |

| | |
|---|---|
| *Caso relativo a la Fábrica de Chorzów* | *Caso relativo a la Fábrica de Chorzów (Alemania c. Polonia)*, PCIJ Series A, No. 17, Decisión sobre el Fondo (13 de septiembre de 1928) (CLA-49) |
| *Caso The Norwegian Shipowners* | *The Norwegian Shipowners (Noruega c. Estados Unidos)*, RIAA (13 de octubre de 1922) |
| *Chevron c. Ecuador* | *Chevron Corporation y Texaco Petroleum Corporation c. La República del Ecuador,* CNUDMI, Laudo Definitivo (31 de agosto de 2011) (CLA-63) |
| *CME c. República Checa* | *CME Czech Republic B.V. c. República Checa*, CNUDMI, Laudo Parcial (13 de septiembre de 2001) (CLA-14) |
| *CMS c. Argentina* | *CMS Gas Transmission Company c. República Argentina*, Caso CIADI N.º ARB/01/8, Laudo (12 de mayo de 2005) (CLA-36) (CLA-130) |
| *ConocoPhillips c. Venezuela* | *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. y ConocoPhillips Gulf of Paria B.V. c. República Bolivariana de Venezuela,* Caso CIADI N.º ARB/07/30, Decisión sobre Jurisdicción y Fondo (3 de septiembre de 2013) (CLA-155) |
| *CSOB c. República Eslovaca* | *Československá Obchodní Banka, A.S. c. República Eslovaca,* Caso CIADI N.º ARB/97/4, Decisión sobre Excepciones a la Jurisdicción (24 de mayo de 1999) (RLA-5) |
| *Daimler c. Argentina* | *Daimler Financial Services A.G. c. República de Argentina*, Caso CIADI No. ARB/05/1, Decisón de Anulación (7 de enero de 2015) |
| *Delaume, ICSID Arbitration* | G. R. Delaume, ICSID and the Transnational Financial Community (1986) (CLA-96) |
| *Deutsche Bank c. Sri Lanka* | *Deutsche Bank AG c. La República Democrática Socialista de Sri Lanka*, Caso CIADI N.° ARB/09/02, Laudo (31 de octubre de 2012) (CLA-100) |
| *EDF c. Rumania* | *EDF (Services) Ltd. c. Rumania*, Caso CIADI N.° ARB/05/13, Laudo (8 de octubre de 2009) |
| *El Paso c. Argentina* | *El Paso Energy International Company c. República Argentina*, Caso CIADI N.° ARB/03/15, Laudo (31 de octubre de 2011) (CLA-52) |
| *Electrabel c. Hungría* | *Electrabel S.A. c. La República de Hungría*, Caso CIADI N.º ARB/07/19, Decisión sobre Jurisdicción, Derecho Aplicable y Responsabilidad (30 de noviembre de 2012) (RLA-110) |

| | |
|---|---|
| *ELSI* | *Elettronica Sicula S.p.A. (ELSI) (Estados Unidos de América c. Italia)*, CIJ, Sentencia, (20 de julio de 1989) (CLA-41) |
| *EnCana c. Ecuador* | *EnCana Corporation c. República de Ecuador*, CNUDMI, Laudo (3 de febrero de 2006) (RLA-71) |
| *Fedax c. Venezuela* | *Fedax N.V. c. La República de Venezuela*, Caso CIADI N.º ARB/96/3, Decisión sobre Jurisdicción (11 de julio de 1997) (CLA-142) |
| *Flughafen c. Venezuela* | *Flughafen Zurich A.G. y Gestión e Ingeniería IDC S.A. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB/10/19, Laudo (18 de noviembre de 2014) (RLA-154) |
| *GAMI c. México* | *GAMI Investments, Inc. c. Estados Unidos Mexicanos*, CNUDMI, Laudo (15 de noviembre de 2004) (RLA-64) |
| *GEA Group c. Ucrania* | *GEA Group Aktiengesellschaft c. Ucrania*, Caso CIADI N.º ARB/08/16, Laudo (31 de marzo de 2011) (RLA-30) |
| *Gemplus c. México* | *Gemplus S.A., SLP, S.A. y Gemplus Industrial, S.A. de C.V. c. Estados Unidos Mexicanos* Casos CIADI Nos. ARB(AF)/04/3 y ARB(AF)/04/4, Laudo (16 junio de 2010) (CLA-54) |
| *Glamis c. EE.UU.* | *Glamis Gold, Ltd. c. Estados Unidos de América*, CNUDMI, Laudo (8 de junio de 2009) (RLA-83) |
| *Global Trading c. Ucrania* | *Global Trading Res. Corp. y Globex Int'l c. Ucrania*, Caso CIADI N.° ARB/09/11, Laudo (1 de diciembre de 2010) (RLA-27) |
| *Gold Reserve c. Venezuela* | *Gold Reserve Inc. c. República Bolivariana de Venezuela*, Caso CIADI N.° ARB(AF)/09/1, Laudo (22 de septiembre de 2014) (CLA-156) |
| *Gotanda – Compound Interest* | John Yukio Gotanda, Compound Interest in International Disputes (2003) (CLA-61) |
| *HICEE c. Eslovaquia* | *HICEE B.V. c. República Eslovaca*, CNUDMI, Laudo Parcial (23 de mayo de 2011). |
| *Hulley c. Rusia* | *Hulley Enterprises Limited (Chipre) c. La Federación Rusa*, Caso CPA N.º AA 226, Laudo Definitivo (18 de julio de 2014) (CLA-152) |
| *ICSID Convention History* | ICSID, Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Documents Concerning the Origin and the Formulation of the Convention, Tomo II, Parte 1 (1968) (RLA-100) |

| | |
|---|---|
| *ICSID Convention: A Commentary* | Christoph H. Schreuer et al., The ICSID Convention: A Commentary (2.ª ed. 2009) (RLA-106) |
| *Inmaris c. Ucrania* | *Inmaris Perestroika Sailing Maritime Services GmbH y otros c. Ucrania*, Caso CIADI N.º ARB/08/8, Decisión sobre Jurisdicción (8 de marzo de 2010) (CLA-91) |
| *Joy Mining c. Egipto* | *Joy Mining Machinery Limited c. República Árabe de Egipto,* Caso CIADI N.º ARB/03/11, Laudo sobre Jurisdicción (6 de agosto de 2004) (RLA-10) |
| *Kardassopolous c. Georgia* | *Kardassopolous c. República de Georgia*, Caso CIADI N.º ARB/05/18, Laudo (28 de febrero de 2010) (CLA-20) |
| *Lauder c. República Checa* | *Ronald S. Lauder c. República Checa*, CNUDMI, Laudo Definitivo (3 de septiembre de 2001) (CLA-45) |
| *Lemire - Laudo* | *Joseph Charles Lemire c. Ucrania*, Caso CIADI No. ARB/06/18, Laudo (28 de marzo de 2011) (RLA-89) |
| *Lemire c. Ucrania* | *Joseph Charles Lemire c. Ucrania*, Caso CIADI N.º ARB/06/18, Decisión sobre Jurisdicción y Responsabilidad (14 de enero de 2010) (CLA-89) |
| *Levi c. Perú* | *Renée Rose Levy de Levi c. La República del Perú*, Caso CIADI N.º ARB/10/17, Laudo (26 de febrero de 2014) (CLA-150) |
| *LG&E c. Argentina* | *LG&E Energy Corp., LG&E Capital Corp. y LG&E International Inc. c. República Argentina*, Caso CIADI N.º ARB/02/1, Decisión sobre Responsabilidad (3 de octubre de 2006) (CLA-39) (RLA-123) |
| *LIAMCO c. Libia* | *Libyan American Oil Company (LIAMCO) c. República Árabe Libia, Laudo*, 20 I.L.M. 1 (12 de abril de 1977) (RLA-37) |
| *Mann – British Treaties* | F.A. Mann, British Treaties for the Promotion and Protection of Investments, 52 British Yearbook of International Law 241 (1981) (CLA-86) |
| *Mann - Further Studies* | F. A. Mann, Further Studies in International Law - Compound Interest as an Item of Damage (1990) (CLA-60) |
| *Mann – Legal Aspect of Money* | F.A. Mann, The Legal Aspect of Money (4th ed, 1982) |

| | |
|---|---|
| *Marboe - Calculation of Compensation* | Irmgard Marboe, Calculation of Compensation and Damages in International Investment Law, (2009) (CLA-137) |
| *Methanex c. EE.UU.* | *Methanex Corporation c. Estados Unidos de América*, CNUDMI, Laudo Definitivo del Tribunal sobre Jurisdicción y Fondo (3 de agosto de 2005) |
| *MHS c. Malasia* | *Malaysian Historical Salvors Sdn Bhd c. Malasia,* Caso CIADI N.° ARB/05/10, Decisión sobre Solicitud de Anulación (16 de abril de 2009) (RLA-23) |
| *Mobil v. PDVSA* | *Mobil Cerro Negro Ltd c. Petróleos de Venezuela, S.A. y PDVSA Cerro Negro, S.A.*, Caso CCI N.° 15416/JRF/CA, Laudo Definitivo (23 de diciembre de 2011) (EO-45) |
| *Mytilineos c. Serbia* | *Mytilineos Holdings SA c. Unión Estatal de Serbia y Montenegro y República de Serbia,* CNUDMI, Laudo Parcial sobre Jurisdicción (8 de septiembre de 2006) (CLA-92) |
| *National Grid c. Argentina* | *National Grid P.L.C. c. República Argentina*, CNUDMI, Laudo (3 de noviembre de 2008) (CLA-32) |
| *Noble Venture c. Rumania* | *Noble Ventures, Inc. c. Rumania*, Caso CIADI N.° ARB/01/11, Laudo (12 de octubre de 2005) (RLA-67) |
| *Occidental c. Ecuador* | *Occidental Petroleum Corporation y Occidental Exploration y Production Company c. La República del Ecuador*, Caso CIADI No. ARB/06/11, Laudo (5 de octubre de 2012) (CLA-129) |
| *Occidental UNCITRAL* | *Occidental Exploration and Production Co. c. República del Ecuador*, CNUDMI (LCIA) Caso N.° UN 3467, Laudo Definitivo (1 de julio de 2004) (CLA-27) |
| *Oostogel c. República Eslovaca* | *Oostogel c. República Eslovaca*, CNUDMI, Decisión sobre Jurisdicción (30 de abril de 2010) (CLA-147) |
| *Pantechniki c. Albania* | *Pantechniki S.A. Contractors & Engineers c. República de Albania*, Caso CIADI N.° ARB/07/21, Laudo (30 de julio de 2009) (CLA-97) |
| *Paushok c. Mongolia* | *Sergei Paushok, CJSC Golden East Co. y CJSC Vostoknefteazgaz Co c. Gobierno de Mongolia*, CNUDMI, Laudo sobre Jurisdicción y Responsabilidad (28 de abril de 2011) (RLA-94) |

| | |
|---|---|
| *Pey Casado c. Chile* | *Víctor Pey Casado y Fundación Presidente Allende c. República de Chile*, Caso CIADI N.º ARB/98/2, Laudo (8 de mayo de 2008) (RLA-102) |
| *Philip Morris - Laudo* | *Philip Morris Brand Sàrl, Philip Morris Products S.A. y Abal Hermanos S.A. c. República Oriental del Uruguay*, Caso CIADI N.° ARB/10/7, Laudo (8 de julio de 2016) |
| *Philip Morris c. Uruguay* | *Philip Morris Brand Sàrl, Philip Morris Products S.A. y Abal Hermanos S.A. c. República Oriental del Uruguay*, Caso CIADI N.º ARB/10/7, Decisión sobre Jurisdicción (2 de julio de 2013) (CLA-144) |
| *Phoenix c. República Checa* | *Phoenix Action c. República Checa*, Caso CIADI N.º ARB/06/05, Laudo (15 de abril de 2009) (RLA-22) |
| *PSEG Global c. Turquía* | *PSEG Global Inc. y Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi c. República de Turquía*, Caso CIADI N.º ARB 02/5, Laudo (19 de enero de 2007) (CLA-40) |
| *Quiborax - Laudo* | *Quiborax S.A. y Non Metallic Minerals S.A. c. Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Laudo (16 de septiembre de 2015) (RLA-157) |
| *Quiborax c. Bolivia* | *Quiborax S.A., Non Metallic Minerals S.A. y Allan Fosk Kaplún c. Estado Plurinacional de Bolivia*, Caso CIADI N.º ARB/06/2, Decisión sobre Jurisdicción (27 de septiembre de 2012) (RLA-33) |
| *Ripinsky - Damages* | Sergey Ripinsky and Kevin Williams, Damages in International Investment Law (2008) (CLA-53) (CLA-134) |
| *Romak c. Uzbekistán* | *Romak S.A. c. República de Uzbekistán*, Caso CPA N.º AA280, Laudo (26 de noviembre de 2009) (RLA-24) |
| *Rosinvest c. Rusia* | *RosInvestCo UK Ltd. c. Federación Rusa*, SCC Arbitration V (079/2005), Laudo Definitivo (12 de septiembre de 2010) (CLA-9) |
| *Saba Fakes c. Turquía* | *Saba Fakes c. República de Turquía*, Caso CIADI N.º ARB/07/20, Laudo (14 de julio de 2010) (RLA-26) |
| *Salini c. Marruecos* | *Salini Costruttori S.P.A. e Italstrade S.P.A. c. Reino de Marruecos*, Caso CIADI N.º ARB/00/4, Decisión sobre Jurisdicción (16 de julio de 2001) (RLA-7) |
| *Saluka c. República Checa* | *Saluka Investments BV (Países Bajos) c. República Checa*, CNUDMI, Laudo Parcial (17 de marzo de 2006) (CLA-19) |

| | |
|---|---|
| *Santa Elena c. Costa Rica* | *Compañía del Desarrollo de Santa Elena S.A. c. República de Costa Rica*, Caso CIADI No. ARB/96/1, Laudo (17 de febrero de 2000) (CLA-136) |
| *SD Myers c. Canada* | *S.D. Myers, Inc. c. Canadá*, CNUDMI, Laudo Parcial (13 de noviembre de 2000) (RLA-52) |
| *SGS c. Paraguay* | *SGS Société Générale de Surveillance S.A. c. República del Paraguay*, Caso CIADI N.º ARB/07/29, Decisión sobre Jurisdicción (10 de febrero de 2010) (RLA-25) |
| *Siemens c. Argentina* | *Siemens A.G. c. República Argentina*, Caso CIADI No. ARB/02/8, Laudo (6 de febrero de 2007) (CLA-15) |
| *Sistem c. Kirguistán* | *Sistem Muhendislik Insaat Sanayi ve Ticaret A.S. c. República Kirguisa*, Caso CIADI N.º ARB(AF)/06/1, Laudo (9 de septiembre de 2009) |
| *Southern Pacific c. Egipto* | *Southern Pacific Properties (Middle East) Ltd. c. República Árabe de Egipto*, Caso CIADI No. ARB/84/3, Laudo (20 de mayo de 1992) (CLA-12) |
| *Standard Chartered c. Tanzania* | *Standard Chartered Bank c. La República Unida de Tanzania*, Caso CIADI N.º ARB/10/12, Laudo (2 de noviembre de 2012) (RLA-109) |
| *Técnicas c. México* | *Técnicas Medioambientales Tecmed, S.A. c. Estados Unidos Mexicanos*, Caso CIADI N.° ARB (AF)/00/2, Laudo (29 de mayo de 2003) (CLA-28) |
| *The Experience of ICSID* | Ibrahim Shihata & Antonio Parra, The Experience of the International Centre for Settlement of Investment Disputes, 14 ICSID Rev.–F.I.L.J. 299 (1999) (RLA-4) |
| *The First 50 Years of ICSID* | The First 50 Years of ICSID, Zachary Douglas, "Property Rights as the Object of an Expropriation" (2016) |
| *Thunderbird c. México* | *International Thunderbird Gaming Corp. c. Estados Unidos Mexicanos*, CNUDMI (TLCAN), Laudo (26 de enero de 2006) (CLA-31) |
| *Tratado* | Acuerdo entre la República de Venezuela y la Confederación Suiza sobre la Promoción y la Protección Recíprocas de las Inversiones (18 de noviembre de 1993) (CLA-1) |
| *Ulysseas c. Ecuador* | *Ulysseas, Inc. c. La República del Ecuador*, CNUDMI, Laudo Definitivo (12 de junio de 2012) (RLA-108) |

| | |
|---|---|
| *Venezuela Holdings Mobil c. Venezuela* | *Venezuela Holdings B.V. y otros c. República Bolivariana de Venezuela*, Caso CIADI N.° ARB/07/27, Laudo (9 de octubre de 2014) (RLA-153) |
| *Vivendi c. Argentina* | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. c. República Argentina*, Caso CIADI N.° ARB/97/3, Laudo (21 de noviembre de 2000) |
| *Waste Management c. México* | *Waste Management, Inc. c. Estados Unidos Mexicanos*, Caso CIADI N.° ARB(AF)/00/3, Laudo (30 de abril de 2004) (CLA-34) |

## PARTE I: EL ARBITRAJE

**(1)     Introducción**

1.1     El presente arbitraje versa sobre una disputa sometida al Centro Internacional de Arreglo de Diferencias Relativas a Inversiones ("CIADI" o el "Centro") sobre la base del Acuerdo entre la Confederación Suiza y el Gobierno de la República de Venezuela sobre la Promoción y la Protección Recíprocas de las Inversiones de fecha18 de noviembre de1993, que entró en vigor el 30 de noviembre de 1994 (el "TBI" o "Tratado"), y del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados de fecha 18 de marzo de 1965, que entró en vigor el 14 de octubre de 1966 (el "Convenio CIADI").

**(2)     Las Partes**

1.2     *La Primera Demandante:* Koch Minerals Sàrl es una sociedad constituida de conformidad con la legislación de Suiza.  Inicialmente se denominaba Koch Oil SA, pero cambió su denominación por Koch Minerals SA el 11 de abril de 2003 y su tipo societario de S.A. a Sàrl el 20 de marzo de 2009[1].  En aras de facilitar la referencia, la Primera Demandante y sus designaciones anteriores se denominan aquí en su conjunto como "KOMSA" o "Koch".

1.3     *La Segunda Demandante:* Koch Nitrogen International Sàrl también es una sociedad constituida de conformidad con la legislación de Suiza.  En aras de facilitar la referencia, la Segunda Demandante se denomina aquí "KNI".

1.4     Ambas, KOMSA y KNI son "nacionales de otro Estado Contratante" tal como se define en el Artículo 25(2)(b) del Convenio CIADI.  Suiza firmó el Convenio el 22 de septiembre de 1967, depositó su instrumento de ratificación el 15 de mayo de 1968, y el Convenio entró en vigor respecto de Suiza el 14 de junio de 1968.

---

[1] Solicitud de Arbitraje de las Demandantes ("RfA") (28 de junio de 2011), n. 22; Extracto del Registre dulll Commerce du Canton de Fribourg correspondiente a Koch Minerals, SA, Datos Históricos desde el 5 de noviembre de 1998 hasta el 1 de abril de 2009, certificado el 6 de mayo de 2011; Extracto del Registre du Commerce du Canton de Fribourg correspondiente a Koch Minerals, Sàrl, fecha de inscripción 24 de enero de 1972, y Extracto con Posibles Supresiones (C-3); Solicitud de inscripción correspondiente al Registre du Commerce du Canton de Fribourg de transformación de Koch Minerals, SA en Koch Minerals, Sàrl, fecha de inscripción 20 de marzo de 2009 (C-16).

1.5   *Los Representantes Legales de las Demandantes:* Las Demandantes fueron representadas en el marco del procedimiento que nos ocupa por el Sr. J. Kory Parkhurst, representante de Koch Companies Public Sector, LLC domiciliadas en Wichita, Estado de Kansas, EE. UU.; por el Sr. Robert Volterra, el Sr. Graham Coop, el Sr. Giorgio Mandelli el Sr. Stephen Fietta (hasta el 7 de diciembre de 2015), el Sr. Ashique Rahman (hasta el 7 de diciembre de 2015), la Sra. Zuzana Morháčová, la Sra Jessica Pineda y el Sr. Govert Coppens de la firma de abogados Volterra Fietta domiciliada en Londres, Reino Unido; y por el Sr. Mark Beckett de la firma de abogados Cooley LLP de Nueva York, NY, EE.UU y la Sra. Christina Hioureas de la firma de abogados Chadbourne & Parke LLP domiciliada en Nueva York, NY, EE. UU (hasta el mes de marzo de 2016).

1.6   *La Demandada:* La Demandada es la República Bolivariana de Venezuela.  En aras de facilitar la referencia, la Demandada se denomina aquí "Venezuela" o la "Demandada".

1.7   La Demandada es un Estado Contratante del Convenio CIADI.  Firmó el Convenio el 18 de agosto de 1993, depositó su instrumento de ratificación el 2 de mayo de 1995, y el Convenio entró en vigor respecto de la Demandada el 1 de junio de 1995.

1.8   *Los Representantes Legales de la Demandada:* La Demandada fue representada en el marco del procedimiento que nos ocupa por el Dr. Reinaldo Enrique Muñoz Pedrosa, Procurador General de la República (E), de la Procuraduría General de la República en Caracas, Venezuela; y por el Sr. Christopher Ryan, el Sr. Thomas B. Wilner y la Sra. Katia Yannaca-Small (hasta abril de 2017) de la firma de abogados Shearman & Sterling LLP domiciliada en Washington D.C., EE. UU., y la Sra. Anna Tevini y el Sr. Guillermo Salcedo Salas de la misma firma de abogados domiciliada en Nueva York, NY y en París, Francia, respectivamente y por el Sr. José Pertierra de The Law Office of José Pertierra domiciliada en Washington, D.C., EE. UU.

1.9   *FertiNitro:* Las Demandantes alegan que, en el mes de marzo de 1998, se formaron una serie de empresas en participación a efectos de la implementación de su inversión en Venezuela.  Estas empresas incluían a Fertilizantes Nitrogenados de Oriente, SA; Fertilizantes Nitrogenados de Oriente, CEC; Fertilizantes Nitrogenados de Venezuela, SRL; y Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC.  Estas empresas en

participación se denominan en su conjunto "FertiNitro" o "las Empresas FertiNitro". Ninguna de estas empresas en participación es parte en el presente arbitraje ni goza de representación legal ante este Tribunal.

1.10 *Koch José Cayman Limited*: Koch José Cayman Limited es una sociedad constituida de conformidad con la legislación de las Islas Caimán, en calidad de subsidiaria de Koch ("Koch José").  KOMSA era titular de su derecho respecto de las Empresas FertiNitro a través de Koch José.  Koch José no es parte en el presente arbitraje ni goza de representación legal ante este Tribunal.

1.11 *Petroquímica de Venezuela, SA:* La sociedad venezolana Petroquímica de Venezuela, SA (también conocida como "Pequiven") es una subsidiaria de titularidad exclusiva de PDVSA, la empresa petrolera estatal de la Demandada.  Ninguna de estas dos empresas es parte en el presente arbitraje ni goza de representación legal ante este Tribunal.

### (3)   La Solicitud de Arbitraje

1.12 El 28 de junio de 2011, las Demandantes presentaron una solicitud de arbitraje ante el CIADI (la "Solicitud" o "Solicitud de Arbitraje").

1.13 El 19 de julio de 2011, la Secretaría General del CIADI registró la Solicitud de conformidad con el Artículo 36(3) del Convenio CIADI y notificó a las Partes del acto de registro. En la Notificación del Acto de Registro, la Secretaría General invitó a las Partes a que procedieran, lo antes posible, a constituir un Tribunal de Arbitraje conforme a la Regla 7(d) de las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje del CIADI (las "Reglas de Arbitraje CIADI").

### (4)   El Tribunal de Arbitraje

1.14 El 19 de agosto de 2011, las Demandantes le informaron al Secretariado que mantenían su propuesta realizada en la Solicitud de que el Tribunal se constituyera con tres árbitros, uno a ser nombrado por cada Parte y el tercero, que presidiría el Tribunal, nombrado de común acuerdo por las Partes.  En esta carta, las Demandantes también nombraron árbitro al Hon. Marc Lalonde, nacional de Canadá, y solicitaron que el Presidente del Consejo Administrativo nombrara a los árbitros que aún no hubieren sido designados de

conformidad con el Artículo 38 del Convenio CIADI y la Regla 4(1) de las Reglas de Arbitraje CIADI.

1.15   El 23 de septiembre de 2011, el Secretariado confirmó que, en ausencia de acuerdo entre las Partes dentro del plazo de 60 días posteriores al acto de registro de la Solicitud, el Tribunal se constituiría con arreglo al Artículo 37(2)(b) del Convenio CIADI y a la Regla 2(3) de las Reglas de Arbitraje CIADI.

1.16   El 27 de septiembre de 2011, el Secretariado les informó a las Partes que el Sr. Lalonde había aceptado su nombramiento en calidad de árbitro.

1.17   El 13 de octubre de 2011, la Demandada nombró árbitro al Juez Florentino Feliciano, nacional de Filipinas.

1.18   Mediante una carta de fecha 18 de octubre de 2011,el Secretariado les informó a las Partes que el Sr. Feliciano había aceptado su nombramiento en calidad de árbitro y confirmó que, con referencia a la solicitud de las Demandantes y en ausencia de la constitución del Tribunal dentro del plazo de 90 días posteriores al acto de registro de la Solicitud, el Presidente del Consejo Administrativo, conforme al Artículo 38 del Convenio CIADI, nombraría al Presidente del Tribunal previa consulta a las Partes.

1.19   El Presidente del Consejo Administrativo del CIADI, a través de la Secretaria General del CIADI, propuso tres árbitros a consideración de las Partes mediante una carta de fecha 28 de octubre de 2011.

1.20   El 31 de octubre de 2011, las Demandantes le informaron al Secretariado que las Partes habían acordado nombrar Presidente del Tribunal al Sr. V.V. Veeder, nacional del Reino Unido.  El 4 de noviembre de 2011, el Sr. Veeder aceptó su nombramiento en calidad de Presidente del Tribunal.

1.21   El 8 de noviembre de 2011, la Secretaria General notificó a las Partes de que los tres árbitros habían aceptado sus nombramientos y de que, por ende, el Tribunal se había constituido en esa fecha, de conformidad con la Regla 6(1) de las Reglas de Arbitraje CIADI.  La Sra. Mairée Uran-Bidegain, Consejera Jurídica del CIADI, fue designada para actuar como Secretaria del Tribunal.

1.22    *Primera Propuesta de Recusación:* El 24 de diciembre de 2013, la Demandada presentó una propuesta de recusación del Sr. Feliciano en calidad de miembro del Tribunal (la "Primera Propuesta de Recusación").  Este fue el primero de dos intentos separados de recusar a miembros del Tribunal.

1.23    El 29 de diciembre de 2013, el Secretariado del CIADI notificó a las Partes de que el procedimiento se suspendía conforme a la Regla 9(6) de las Reglas de Arbitraje CIADI y les transmitió un calendario a fin de que las Partes presentaran observaciones adicionales acerca de la Primera Propuesta de Recusación.  En esa misma carta, se destacó que, con arreglo a la Resolución Procesal N.° 6, la Dúplica de la Demandada debía presentarse, a más tardar, el 30 de diciembre de 2013.  Por lo tanto, el Tribunal invitó a la Demandada a proceder a su presentación escrita en la fecha programada anteriormente a efectos de minimizar cualquier perturbación del arbitraje.

1.24    Mediante una carta de fecha 30 de diciembre de 2013, la Demandada afirmó que no estaba en condiciones de aceptar la invitación descripta *supra*.

1.25    Las Demandantes presentaron observaciones acerca de la Primera Propuesta de Recusación el 26 de diciembre de 2013 y el 15 de enero de 2014.  La Demandada presentó comentarios adicionales acerca de su propuesta el 8 de enero de 2014.  El 1 de febrero de 2014, el Sr. Feliciano ofreció explicaciones escritas de conformidad con la Regla 9(3) de las Reglas de Arbitraje CIADI.  El 1, el 6 y el 7 de febrero de 2014, las Demandantes y la Demandada presentaron comentarios adicionales.

1.26    El 10 de febrero de 2014, el Sr. Veeder y el Sr. Lalonde (los "Árbitros No Recusados") notificaron al Secretariado del CIADI de que había "empate de votos" en los términos del Artículo 58 del Convenio CIADI y de la Regla 9(4) de las Reglas de Arbitraje CIADI, por razones "ajenas a [los] méritos o deméritos" [Traducción del Tribunal] de la Primera Propuesta de Recusación. En la misma fecha, la Secretaria General del CIADI les transmitió la notificación de los Árbitros No Recusados a las Partes y les informó que el Presidente del Consejo Administrativo adoptaría la decisión sobre la Primera Propuesta de Recusación conforme al Artículo 58 del Convenio CIADI y a la Regla 9 de las Reglas de Arbitraje CIADI.

1.27　El 24 de febrero de 2014, luego de considerar las presentaciones escritas realizadas por las Partes y las observaciones del Sr. Feliciano, el Presidente del Consejo Administrativo decidió rechazar la Propuesta de la Demandada de Recusar al Sr. Feliciano. La decisión escrita del Presidente fue transmitida tanto a las Partes como al Tribunal.  El procedimiento de arbitraje que nos ocupa se reanudó ese mismo día.

1.28　*Segunda Propuesta de Recusación:* El 29 de marzo de 2014, poco tiempo antes de la audiencia fijada para que tuviera lugar en París, la Demandada propuso la recusación de los tres Miembros del Tribunal (la "Segunda Propuesta de Recusación").  En esa misma fecha, el Secretariado del CIADI notificó a las Partes de que el procedimiento de arbitraje se suspendía conforme a la Regla 9(6) de las Reglas de Arbitraje CIADI.  También transmitió un calendario a efectos de que las Partes presentaran observaciones adicionales acerca de la Segunda Propuesta de Recusación.

1.29　Las Demandantes presentaron sus observaciones acerca de la Segunda Propuesta de Recusación el 1 y el 15 de abril de 2014. La Demandada presentó comentarios adicionales acerca de su Segunda Propuesta de Recusación el 16 de abril de 2014.

1.30　El 8 de abril de 2014, el Secretariado les transmitió a las Partes las declaraciones respectivas del Sr. Veeder, del Sr. Lalonde y del Sr. Feliciano acerca de la Segunda Propuesta de Recusación (las "Declaraciones de los Árbitros").

1.31　El 30 de abril de 2014, después de considerar las observaciones de las Partes y las declaraciones de los Árbitros, el Presidente del Consejo Administrativo emitió una Decisión en la que rechazaba la Segunda Propuesta de Recusación de la Demandada. El Presidente decidió (*inter alia*) lo siguiente:

> "[E]n el centro del argumento de la Demandada se encuentra su descontento con un fallo provisional adoptado por el Tribunal a fin de pronunciarse respecto de una cuestión procesal. El mecanismo establecido en virtud del Artículo 57 del Convenio CIADI y de la Regla 9 de las Reglas de Arbitraje que pretendía salvaguardar la integridad del procedimiento no es un mecanismo de reconsideración de fallos adversos. En ausencia de circunstancias objetivas, la mera existencia de un fallo adverso en sí misma no es suficiente para probar la carencia manifiesta de

*imparcialidad o independencia, tal como requieren los Artículos 14 y 57 del Convenio CIADI"[2].[Traducción del Tribunal]*

1.32   El procedimiento de arbitraje que nos ocupa se reanudó ese mismo día, a saber, el 30 de abril de 2014.

**(5)   *El Procedimiento de Arbitraje***

1.33   *Primera Reunión:* El 21 de diciembre de 2011, el Tribunal celebró su Primera Sesión con las Partes por vía de conferencia telefónica.  Las Partes confirmaron que los Miembros del Tribunal habían sido nombrados en forma válida.  Se acordó (*inter alia*) que las Reglas de Arbitraje CIADI aplicables serían las que entraron en vigor el 10 de abril de 2006, que los idiomas del procedimiento serían español e inglés, que el lugar del procedimiento de arbitraje que nos ocupa sería Washington, DC, EE. UU. y que se dejaría constancia de todas esas cuestiones en una resolución procesal ulterior que incluiría el Acta de la Primera Sesión.  Las Partes también acordaron que este procedimiento de arbitraje comprendería una fase escrita y una fase oral. En ese momento, las Partes no lograron llegar a un acuerdo respecto de un calendario íntegro a efectos de la(s) fase(s) jurisdiccional/de fondo del procedimiento que nos ocupa.

1.34   El 2 de enero de 2012, el Tribunal emitió su Resolución Procesal N.º 1 en la que requería que las Demandantes presentaran un memorial completo de su postura el 2 de abril de 2012.

1.35   El 16 de febrero de 2012, en respuesta a la solicitud escrita de la Demandada de fecha 2 de febrero de 2012, el Tribunal emitió su Resolución Procesal N.º 2, en la que suspendía este procedimiento de arbitraje durante un período de dos meses (comenzando el 2 de febrero de 2012 y terminando el 2 de abril de 2012), debido al lamentable fallecimiento en enero de 2012 del Procurador General de Venezuela, el Dr. Carlos Escarrá.  La resolución procesal del Tribunal también disponía que el Memorial de las Demandantes debía entonces presentarse el 2 de junio de 2012.

1.36   El 18 de mayo de 2012, el Tribunal les envió a las Partes su borrador de Resolución Procesal N.º 3, Acta de la Primera Sesión y Calendario de Presentaciones Escritas, y

---

[2] Decisión sobre la Propuesta de Recusación del Tribunal de Arbitraje (30 de abril de 2014), Párrafo 100.

solicitó los comentarios escritos de las Partes acerca de estos borradores. Entre el 31 de mayo de 2012 y el 28 de junio de 2012, las Partes presentaron comentarios escritos acerca del borrador de calendario del Tribunal.

1.37   El 3 de julio de 2012, tras considerar las presentaciones de las Partes, el Tribunal emitió su Resolución Procesal N.º 3, Acta de la Primera Sesión y Calendario de Presentaciones Escritas, en los que fijaba el calendario procesal para efectos del arbitraje.

1.38   El calendario del Tribunal correspondiente a la fase escrita fue modificado posteriormente el 15 de agosto de 2012 previo acuerdo de las Partes, así como el 22 de noviembre de 2012, el 18 de diciembre de 2012, el 29 de mayo de 2013 y el 26 de febrero de 2014, de conformidad con las Resoluciones Procesales N.ᵒˢ 4, 5, 6 y 7, respectivamente del Tribunal, a petición de una Parte o como consecuencia de las dos propuestas de recusación de la Demandada (descriptas *supra*).

1.39   *Bifurcación*. En vista de las diversas peticiones por parte de la Demandada de prórrogas del plazo para presentar su memorial de contestación, el Tribunal también resolvió en la Resolución Procesal N.º 4 de fecha 22 de noviembre de 2012, que las excepciones preliminares se decidirían junto con el fondo conforme a la Regla 41 de las Reglas de Arbitraje CIADI.

1.40   El calendario correspondiente a la fase oral fue fijado originalmente por el Tribunal en la Resolución Procesal N.º 6 de fecha 29 de mayo de 2013 y modificado posteriormente por el Tribunal luego de una petición conjunta de las Partes, en la que las Partes acordaron modificar las fechas de audiencia originales, pero no lograron llegar a un acuerdo respecto de las nuevas fechas de audiencia.

1.41   El 13 de marzo de 2014, el Tribunal resolvió que la Audiencia se celebraría en París, Francia, en dos sesiones separadas: la primera audiencia comenzando el 31 de marzo de 2014 y terminando a más tardar el 4 de abril de 2014 (mediodía); y la segunda sesión comenzando el 19 de mayo de 2014 y terminando a más tardar el 23 de mayo de 2014.

1.42   El 29 de marzo de 2014, la primera parte de la audiencia que estaba programada para comenzar en París el 31 de marzo de 2014 fue aplazada como consecuencia de la Segunda

Propuesta de Recusación de la Demandada.  El Tribunal fijó, en forma oral, nuevamente las fechas definitivas correspondientes a la fase oral del procedimiento que nos ocupa, el 19 de mayo de 2014 y también las confirmó posteriormente en la Resolución Procesal N.º 9 del Tribunal de fecha 4 de agosto de 2014.

1.43    *Las Presentaciones de las Demandantes:* En cuanto a la fase escrita del arbitraje, las Demandantes presentaron (i) su Memorial el 4 de junio de 2012, (ii) su Réplica sobre Cuestiones de Fondo y Memorial de Contestación sobre Jurisdicción el 2 de septiembre de 2013 y (iii) su Dúplica sobre Jurisdicción el 14 de marzo de 2014.

1.44    *Las Presentaciones de la Demandada:* La Demandada presentó (i) su Memorial de Contestación sobre el Fondo y sus Excepciones Preliminares a la Jurisdicción del Tribunal Arbitral el 28 de febrero de 2013, y (ii) su Dúplica sobre el Fondo y su Réplica sobre Jurisdicción el 3 de marzo de 2014.

1.45    *El Testimonio de las Demandantes:* Las Demandantes rindieron declaraciones escritas firmadas de los siguientes testigos de hecho:

- Brent W. Gwaltney, declaraciones de fechas 30 de mayo de 2012, 20 de agosto de 2013 y 23 de mayo de 2014;

- Jim Sorlie, declaraciones de fechas 29 de mayo de 2012, 26 de julio de 2013 y 28 de mayo de 2014; y

- Melquíades A. Parra, declaraciones de fechas 29 de mayo de 2012 y 12 de agosto de 2013.

1.46    Las Demandantes también rindieron informes periciales firmados de los siguientes expertos:

- Benjamin Esty, informes periciales de fechas 23 de agosto de 2013 y 14 de marzo de 2014;

- Tim Giles, informes periciales de fechas 2 de junio de 2012 y 30 de agosto de 2013; y

- Richard S. Sanders, informes periciales de fechas 30 de mayo de 2012 y 27 de agosto de 2013.

1.47   *El Testimonio de la Demandada:* La Demandada rindió declaraciones escritas firmadas de los siguientes testigos de hecho:

- Aníbal Villarroel, declaraciones de fechas 28 de febrero de 2013 y 30 de diciembre de 2013;

- Carolina Núñez, declaraciones de fechas 28 de febrero de 2013 y 30 de diciembre de 2013;

- Edgar Flórez, declaraciones de fechas 28 de febrero de 2013 y 30 de diciembre de 2013;

- Víctor Barrientos, declaraciones de fechas 28 de febrero de 2013 y 30 de diciembre de 2013; y

- Francisco Toro, declaración de fecha 30 de diciembre de 2013 (retirada posteriormente por la Demandada, tal como se explicará *infra*).

1.48   La Demandada también rindió informes periciales firmados de Daniel Flores (de la firma Econ One) de fechas 28 de febrero de 2013 y 3 de marzo de 2014.

1.49   *Reuniones Procesales:* Con referencia a la Resolución Procesal N.º 5 del Tribunal, el Tribunal celebró una conferencia telefónica procesal con las Partes el 6 de marzo de 2013 a fin de discutir la necesidad, el alcance y la oportunidad de cualquier exhibición de documentos, al igual que las fechas de la audiencia de dos semanas propuesta.

1.50   El 19 de mayo de 2014, luego de la reanudación de este procedimiento de arbitraje (después del rechazo de la Segunda Propuesta de Recusación de la Demandada), el Tribunal celebró una reunión procesal con las Partes en París, en las oficinas del Banco Mundial ("la Reunión Procesal de París").  El Sr. Veeder, el Sr. Lalonde y los representantes legales de las Partes asistieron a la reunión procesal en persona, mientras que el Sr. Feliciano asistió por vía de enlace de video desde las oficinas del Banco Mundial ubicadas en Manila. (El Sr. Feliciano había sufrido un accidente recientemente y sus médicos le habían prohibido viajar a París).  La Reunión Procesal de París se desarrolló sin objeciones de las Partes. Fue

grabada, y la transcripción literal (corregida) se puso a disposición de las Partes el 20 de mayo de 2014.

1.51   Asimismo, el Presidente del Tribunal, con las Partes, y la Secretaria del Tribunal celebraron reuniones organizativas preliminares por vía de conferencia telefónica el 24 de marzo de 2014 y el 25 de agosto de 2014.

1.52   *La Primera Audiencia (septiembre):* En cuanto a la fase oral del presente arbitraje, la primera audiencia sobre jurisdicción y fondo, incluido el interrogatorio de testigos, tuvo lugar en la sede del Banco Mundial ubicada en París, Francia, el 8 de septiembre y posteriormente desde el 10 hasta el 12 de septiembre de 2014 (la "Primera Audiencia (septiembre)").

1.53   Además del Tribunal y su Secretaria, las siguientes personas estuvieron presentes en esta Primera Audiencia (septiembre):

1.54   *Por las Demandantes:* El Sr. J. Kory Parkhurst, representante legal de KOMSA & KNI; el Sr. Robert Volterra, el Sr. Stephen Fietta, el Sr. Ashique Rahman, el Sr. Ernesto J. Féliz De Jesús, la Sra. Zuzana Morháčová, la Sra. Jessica Pineda y la Sra. Zsófia Young, de la firma de abogados Volterra Fietta; y el Sr. Mark Beckett, la Sra. Christina Hioureas, el Sr. Christian Urrutia y el Sr. Ariel Meyerstien de la firma de abogados Chadbourne & Parke LLP.  Los testigos y expertos de las Demandantes también estuvieron presentes: el Sr. Brent Gwaltney, el Sr. Melquíades A. Parra, el Sr. Jim Sorlie y el Sr. Richard Sanders. (El Sr. Gwaltney, el Sr. Parra y el Sr. Sorlie fueron interrogados en ocasión de la Primera Audiencia (septiembre)).

1.55   *Por la Demandada:* El Sr. Christopher Ryan, la Sra. Katia Yannaca-Small, la Sra. Anna Tevini, el Sr. Peik Mäkelä, el Sr. Guillermo Salcedo Salas, el Sr. Agustín Acosta Cárdenas, la Sra. Evelyn Wiese, el Sr. Ricardo Alarcón Sierra y la Sra. Victoria Cádiz (todos de la firma de abogados Shearman & Sterling); y el Sr. Isaías Medina (PDVSA).  Los testigos de la Demandada también estuvieron presentes: el Sr. Aníbal Villarroel, el Sr. Edgar Flórez (FertiNitro) y el Sr. Víctor Barrientos (Pequiven).  Los Sres. Villaroel, Flórez y Barrientos fueron interrogados durante la Primera Audiencia (septiembre), tal como se describirá *infra*.

1.56    Los testigos interrogados durante la Primera Audiencia (septiembre) fueron, por orden alfabético, los siguientes:

- Víctor Barrientos, Día 3 (11 de septiembre de 2014), en 09:03:19 y *ss*

- Edgar Flórez, Día 4 (12 de septiembre de 2014), en 10:55:18 y *ss*

- Brent Gwaltney, Día 2 (10 de septiembre de 2014), en 09:17:20 y *ss*

- Melquíades A. Parra, Día 2 (10 de septiembre de 2014), en 11:08:13 y *ss*

- Jim Sorlie, Día 2 (10 de septiembre de 2014), en 12:48:22 y *ss*

- Aníbal Villarroel, Días 3 & 4 (11 y 12 de septiembre de 2014), en 14:24:06 y *ss* y 09:00:12 y *ss*.

1.57    *La Segunda Audiencia (noviembre):* Una segunda audiencia sobre fondo y cuantía de daños, incluido el interrogatorio de los expertos de las Partes, tuvo lugar en el Centro Internacional de Resolución de Diferencias, ubicado en Londres, Reino Unido, desde el 23 hasta el 26 de noviembre de 2014 (la "Segunda Audiencia (noviembre)").

1.58    Además del Tribunal y su Secretaria, las siguientes personas estuvieron presentes en esta Segunda Audiencia (noviembre):

1.59    *Por las Demandantes:* El Sr. J. Kory Parkhurst; los Sres. Jeff Brenner y Kevin Barb de KOMSA & KNI; el Sr. Robert Volterra, el Sr. Stephen Fietta, el Sr. Giorgio Mandelli, el Sr. Ashique Rahman, la Sra. Zuzana Morháčová, la Sra. Jessica Pineda y la Sra. Zsófia Young, de la firma de abogados Volterra Fietta; el Sr. Mark Beckett, la Sra. Christina Hioureas y el Sr. Christian Urrutia de la firma de abogados Chadbourne & Parke LLP.  Los expertos de las Demandantes también estuvieron presentes: el Sr. Richard Sanders, el Sr. Tim Giles y la Sra. Jessica Resch. (El Sr. Sanders y el Sr. Giles fueron interrogados durante la Audiencia de Noviembre).

1.60    *Por la Demandada:* El Sr. Thomas Wilner, el Sr. Christopher Ryan, la Sra. Katia Yannaca-Small, la Sra. Anna Tevini y la Sra. Evelyn Wiese de la firma de abogados Shearman & Sterling.  Los expertos de la Demandada también estuvieron presentes: el Sr. Daniel Flores,

el Sr- Ettore Komi y el Sr. Mark Khouzam. (El Sr. Flores fue interrogado durante la Audiencia de noviembre).

1.61   Los testigos interrogados durante la Segunda Audiencia (noviembre) fueron, por orden alfabético, los siguientes:

- Daniel Flores, Días 2 & 3 (24 y 25 de noviembre de 2014), en12:51:02 y *ss* y 09:28:03 y *ss*

- Tim Giles, Día 2 (24 de noviembre de 2014), en 09:30:03 y *ss*

- Richard Sanders, Día 1 (23 de noviembre de 2014), en 14:09:03 y *ss.*

1.62   Tanto la Primera Audiencia (septiembre) como la Segunda Audiencia (noviembre) fueron grabadas mediante una transcripción literal en español e inglés, que se puso a disposición de las Partes[3].

*(6)*   ***Otras Cuestiones Procesales***

1.63   *La Presentación de Documentos Adicionales:* Mediante una carta de fecha 12 de marzo de 2014, las Demandantes solicitaron que el Tribunal le ordenara a la Demandada que exhibiera lo siguiente: (a) una declaración testimonial y un informe pericial presentados por la Demandada en el marco del caso *Gambrinus Corp. c. República Bolivariana de Venezuela* (Caso CIADI N.° ARB/11/31) (el "Arbitraje Gambrinus"), preparados por un testigo y un perito que también presentaron una declaración y un informe en nombre y representación de la Demandada en el presente caso; y (b) una decisión jurisdiccional emitida en el contexto del caso *Longreef Investments A.V.V. c. República Bolivariana de Venezuela* (Caso CIADI N.° ARB/11/5). Las Demandantes también le pidieron autorización al Tribunal para incorporar al expediente probatorio diez documentos nuevos (los "Documentos Adicionales"), que les enviaron al Tribunal y a la Demandada junto con su solicitud.

1.64   El 14 de marzo de 2014, la Demandada se opuso a la solicitud de las Demandantes y pidió en respuesta a ello que, si el Tribunal accedía a la solicitud de las Demandantes, la primera

---

[3] Las referencias a todas las transcripciones de las audiencias *infra* se hacen del siguiente modo: "Primera Audiencia (septiembre) D1.10" denota Día 1, página 10 de la transcripción.

semana de la audiencia (tal como estaba programada) se trasladara al 19 de mayo de 2014 de manera de darle a la Demandada tiempo suficiente para preparar una respuesta. Las Demandantes se opusieron a la solicitud de la Demandada el 16 de marzo de 2014. La Demandada respondió el 17 de marzo de 2014, reiterando su solicitud de que la primera semana de la audiencia programada se pospusiera hasta el mes de mayo de 2014 y alegando que la negativa a conceder ese tiempo adicional vulneraría los derechos de debido proceso y procedimiento de la Demandada. La Demandada también aseveró que hacía reserva de todos sus derechos en este aspecto.

1.65   El 18 de marzo de 2014, el Tribunal se pronunció respecto de la solicitud de las Demandantes de fecha 12 de marzo de 2014 (la "Decisión del 18 de marzo"). En esta decisión, el Tribunal rechazó la petición de las Demandantes relativa a la documentación del caso *Gambrinus* y la decisión del caso *Longreef*.

1.66   Con respecto a los Documentos Adicionales, que se trataba de la tercera petición contenida en la solicitud de las Demandantes, el Tribunal resolvió (*inter alia*) lo siguiente:

> "*En cuanto a la tercera petición, dado que las Demandantes afirman que esta documentación refuta directamente la (demorada) Dúplica de la Demandada de fecha 3 de marzo de 2014, el Tribunal ordena su incorporación de bene esse al sólo efecto de permitirle al Tribunal leer la documentación a fin de pronunciarse respecto de la petición de las Demandantes y la oposición de la Demandada (es decir, no como 'prueba').*
> *El Tribunal también ordena que la tercera petición de las Demandantes (con la oposición de la Demandada) se argumente en mayor profundidad durante los alegatos orales de apertura de las Partes al comienzo de la audiencia de la primera semana en París que empezará el lunes 31 de marzo de 2014.*
> *En el supuesto (que no debería asumirse aquí) de que el Tribunal decidiera incorporar al expediente probatorio cualquier parte de esta documentación, las Partes deberían estar preparadas para cualquier orden emitida en consecuencia, incluida cualquier respuesta de la Demandada en cuanto a presentaciones adicionales y pruebas de refutación*". [Traducción del Tribunal]

1.67   El 21 de marzo de 2014, las Demandantes realizaron ante el Tribunal una segunda solicitud de autorización para incorporar seis documentos adicionales al expediente probatorio (los "Documentos Nuevos").

1.68   El 24 de marzo de 2014, el Tribunal, representado por su Presidente, celebró una reunión organizativa preliminar con las Partes y la Secretaria del Tribunal por vía de conferencia telefónica.  La Demandada reiteró que participaba en esta conferencia con "plena reserva de sus derechos" [Traducción del Tribunal].  El Presidente resaltó (*inter alia*) que él no podía por sí mismo pronunciarse respecto de la cuestionada admisibilidad de la petición de las Demandantes de fecha 21 de marzo de 2014 sin sus co-árbitros y que el Tribunal esperaba que la Demandada realizara comentarios acerca de la petición de las Demandantes relativa al Sr. Toro el primer día de la audiencia programada.

1.69    El 25 de marzo de 2014, la Demandada se opuso a la petición de las Demandantes del 21 de marzo de 2014 y a la Decisión del 18 de marzo, argumentando que perjudicaban sus derechos de debido proceso.  La Demandada también alegó que la Resolución Procesal N.º 3 del Tribunal obligaba a las Demandantes a argumentar la relevancia de cada documento antes de presentarlo ante el Tribunal y que a la Demandada se le debería conceder tiempo suficiente para proporcionar argumentos en contrario y pruebas acerca de la relevancia de cada documento cuestionado.  La Demandada solicitó una vez más que la fase de fondo de la Audiencia se pospusiera hasta el 19 de mayo de 2014 y también hizo reserva de todos sus derechos con respecto a los hechos en torno a las peticiones de las Demandantes y las decisiones del Tribunal.  Las Demandantes se opusieron a la solicitud de la Demandada el 26 de marzo de 2014.

1.70   *La Admisibilidad de la Declaración Escrita del Sr. Toro*: El 19 de marzo de 2014, las Demandantes solicitaron que la declaración escrita del Sr. Francisco Toro (la "Declaración de Toro") fuera eliminada del expediente probatorio, sobre la base del fundamento de que, *inter alia*, el Sr. Toro había fallecido antes de que su declaración se presentara ante el Tribunal y, por ende, él no estaba disponible para ser sometido a contrainterrogatorio durante la Audiencia.  El Tribunal invitó a la Demandada a realizar comentarios acerca de esta petición, a más tardar, el 24 de marzo de 2014.

1.71   El jueves 27 de marzo de 2014, el Tribunal emitió la Resolución Procesal N.º 8, en la que decidía (*inter alia*) lo siguiente:

> *"Requerir que todas las peticiones procesales pendientes de resolución se planteen ante el Tribunal durante los alegatos de apertura de las Partes el 31 de marzo de 2014, incluidas [...]: (i) la incorporación de documentos adicionales al expediente probatorio; (ii) el calendario de audiencia y la última petición por parte de las Demandantes de interrogatorio directo de 15 minutos; (iii) la petición por parte de la Demandada de aplazamiento de la audiencia; y (iv) la admisibilidad de la declaración testimonial del Sr. Francisco Toro; y [s]in que el Tribunal prejuzgue cualquiera de estas peticiones, las Partes deberán prepararse para la audiencia de cinco días en la mayor medida posible, incluidos todos los preparativos en el supuesto provisional de que el Tribunal rechace todas estas peticiones o cualquiera de ellas el 31 de marzo de 2014".* [Traducción del Tribunal]

1.72   El 29 de marzo de 2014, tal como ya se resumiera *supra*, la Demandada presentó su Segunda Propuesta de Recusación, que fue rechazada posteriormente por el Presidente del Consejo Administrativo el 30 de abril de 2014.  Tal como también se resumiera *supra*, el efecto de esta Segunda Propuesta de Recusación consistió en procurar el abandono de la audiencia programada en París.

1.73   La Demandada presentó anexos y correspondencia adicionales relativos a la Declaración de Toro el 28 de mayo de 2014, seguidos de las declaraciones testimoniales complementarias de Brent Gwaltney y Jim Sorlie presentadas por las Demandantes el 29 de mayo de 2014.  Las Demandantes también presentaron correspondencia relativa a la Declaración de Toro el 9 de junio de 2014, a la que la Demandada respondió el 13 de junio de 2014, seguida de la petición de las Demandantes el 26 de julio de 2014.

1.74   El 5 de septiembre de 2014, el Tribunal emitió su Resolución Procesal N.º 10, en la que decidió (*inter alía*) lo siguiente:

> *"a. Autorizar a la Demandada a retirar del expediente probatorio la declaración testimonial ofrecida del Sr. Toro de fecha 30 de diciembre de 2013 (como consecuencia de lo cual no será tratada como prueba en el marco del procedimiento de arbitraje que nos ocupa); y*
> *b. Reservar su decisión por el momento respecto de cualquier deducción adversa que se haga a partir del retiro de la Declaración de Toro y la ausencia de exhibición por parte de la Demandada de la(s) declaración(es) testimonial(es) del Sr. Toro en el contexto del arbitraje Gambrinus en virtud de la Resolución Procesal N.° 9".* [Traducción del Tribunal]

1.75   El 19 de diciembre de 2014, la Demandada le transmitió al Secretariado las eliminaciones acordadas por las Partes respecto de la Dúplica de la Demandada y del Segundo Informe Pericial Econ One que derivaban del retiro por parte de la Demandada de la Declaración de Toro del expediente, tal como se señalara *supra*.   El 22 de diciembre de 2014, las Demandantes confirmaron su acuerdo con las eliminaciones transmitidas y afirmaron en esa misma comunicación que consideraban apropiado y necesario realizar eliminaciones adicionales, a lo que la Demandada respondió el 29 de diciembre de 2014.

1.76   Tras la reconstitución del Tribunal tal como se indicara *infra*, el 17 de mayo de 2016, las Demandantes presentaron otra petición ante el Tribunal en la que reiteraban su solicitud de que las eliminaciones adicionales se aplicaran a la Dúplica de la Demandada y al Segundo Informe Pericial Econ One del Dr. Flores. Esta fue seguida de la respuesta de la Demandada de fecha 1 de junio de 2016 y la Resolución Procesal N.º 11 del Tribunal de fecha 8 de junio de 2016 que se pronunciaba respecto de esta cuestión, tal como se explicará *infra*.

1.77   *El Informe Advantis:* Mediante una carta de fecha 12 de marzo de 2014, las Demandantes le pidieron al Tribunal autorización para incorporar al expediente probatorio un informe valuatorio de Advantis (conocido como el Segundo Informe Advantis). La carta de las Demandantes establecía, en su parte pertinente, lo siguiente[4]:

> "*Informe valuatorio Advantis de FertiNitro por parte de la Demandada: Este documento fue mencionado en la Réplica de las Demandantes [párrafo 105] y la Segunda Declaración Testimonial del Sr. Brent Gwaltney en el párrafo 40, y es claramente relevante para la valuación de FertiNitro por parte de la Demandada en el marco del procedimiento que nos ocupa. En su Dúplica [párrafo 228], la Demandada hace referencia a las supuestas negociaciones de buena fe, en el curso de las cuales presentó el documento (sobre una base no sin efecto de cosa juzgada y confidencial) ante las Demandantes. Puesto que ya se menciona en las presentaciones de las Demandantes, fue creado para la Demandada y, por consiguiente, ya se encuentra en poder de la Demandada, incorporar el anexo en esta etapa no puede tener efecto perjudicial alguno. Asimismo, dicha prueba de las valuaciones anteriores de FertiNitro por parte de la Demandada claramente deberían ser relevantes para la evaluación por parte del Tribunal de la presunta*

---

[4] Carta de las Demandantes al Tribunal de Arbitraje de fecha 12 de marzo de 2014, página 4.

*valuación de la Demandada en el contexto de este procedimiento" (Nota al pie omitida). [Traducción del Tribunal]*

1.78    La petición de las Demandantes fue disputada mediante la carta de la Demandada de fecha 14 de marzo de 2014, a la que las Demandantes respondieron mediante una carta de fecha 16 de marzo de 2014 y a que la Demandada respondió, a su vez, mediante una carta de fecha 17 de marzo de 2014.

1.79    Mediante su carta de instrucciones de fecha 18 de marzo de 2014, el Tribunal decidió examinar el documento cuestionado por sí mismo, por el momento *de bene esse* solamente. (El Tribunal también indicó allí que la diferencia entre las Partes se analizaría en más profundidad con las Partes durante la próxima audiencia, entonces programada para comenzar el 31 de marzo de 2014, pero luego suspendida después de la Segunda Propuesta de Recusación de la Demandada).

1.80    Posteriormente, durante la Reunión Procesal de París celebrada el 19 de mayo de 2014, las Partes llegaron a un acuerdo respecto de la incorporación de este documento al expediente probatorio, junto con otros[5]. Este Segundo Informe Advantis fue designado C-157 y comprendía tres páginas bajo el título "Documento Especial" con cinco páginas de anexos, presentados en idioma español del original con una traducción al inglés. [Traducción del Tribunal.] La Demandada presentó, previo acuerdo de las Demandantes, el Primer Informe Advantis designado R-86, que comprendía 22 páginas del informe, los correos electrónicos de Advantis a Pequiven y de Pequiven a los accionistas de FertiNitro de fechas 18 y 19 de mayo de 2011, respectivamente, que transmitían el informe, y cinco páginas de anexos en el español original.

1.81    *Escritos Posteriores a la Audiencia y Presentaciones sobre Costos:* Las Partes presentaron escritos posteriores a la audiencia simultáneos el 30 de enero de 2015. Las Partes realizaron sus presentaciones sobre costos el 13 de febrero de 2015.

1.82    El Sr. Feliciano lamentablemente falleció en el mes de diciembre de 2015, en un momento en el que las deliberaciones del Tribunal no se habían completado totalmente.

---

[5]*Véanse* Resolución Procesal N.º 9, Párrafos 17 y 18; mensaje de correo electrónico de las Demandantes de fecha 28 de mayo de 2014; mensaje de correo electrónico de la Demandada de fecha 28 de mayo de 2014.

**(7)    *La Reanudación del Procedimiento en Virtud de la Regla 12***

1.83    Mediante una carta dela Secretaría del CIADI de fecha 16 de diciembre de 2015, como consecuencia del fallecimiento del Sr. Feliciano y de la vacante en el Tribunal, este procedimiento de arbitraje fue suspendido de conformidad con la Regla 10(2) de las Reglas de Arbitraje CIADI.

1.84    Mediante una carta de fecha 1 de febrero de 2016, la Secretaría del CIADI notificó a las Partes de que la vacante que se había generado  en el Tribunal como consecuencia del fallecimiento del Sr. Feliciano se había cubierto con el nombramiento del Profesor Zachary Douglas en calidad de co-árbitro realizado por la Demandada y, además, que, conforme a la Regla 12 de las Reglas de Arbitraje CIADI, el procedimiento que nos ocupa se reanudaba a partir del 1 de febrero de 2016 desde el punto a que había llegado al momento en que ocurrió la vacante.

1.85    Mediante su Resolución Procesal N.º 11 de fecha 8 de junio de 2016, el Tribunal abordó la petición de las Demandantes de fecha 17 de mayo de 2016, objetada mediante la carta de la Demandada de fecha 1 de junio de 2016, de eliminar ciertas referencias al Sr. Toro en la Dúplica de la Demandada y su Segundo informe pericial Econ One del Dr. Flores rendido por la Demandada.  El Tribunal decidió ordenar parte de las eliminaciones solicitadas de la Dúplica y del informe, en la forma allí establecida, con sujeción a una resolución adicional.

1.86    Con anterioridad a la Tercera Audiencia (junio), el Tribunal les envió a las Partes listas no taxativas de cuestiones y temas que habían de abordarse durante esa Audiencia.  Estas listas se exponen en la Parte III *infra*.

1.87    *La Tercera Audiencia (junio):*  De conformidad con la Regla 12 de las Reglas de Arbitraje CIADI, se celebró una audiencia oral en el IDRC ubicado en Londres, Reino Unido, el 9 y el 10 de junio de 2016, que fue grabada mediante una transcripción literal, que se puso a disposición de las Partes.   El procedimiento aplicable a esta Audiencia sobre Reconstitución fue establecido mediante la carta del Tribunal a las Partes de fecha 29 de abril de 2016.

1.88    Además del Tribunal y su Secretaria, las siguientes personas estuvieron presentes en esta Tercera Audiencia (junio):

1.89    *Por las Demandantes:* El Sr. Jeff Brenner y el Sr. J. Kory Parkhurst (representantes legales de KOMSA & KNI); el Sr. Robert Volterra, el Sr. Graham Coop, el Sr. Govert Coppens, la Sra. Jessica Pineda, la Sra. Zuzana Morháčová, la Sra. Isabella Sif y la Sra. Chiara Atzeni de la firma de abogados Volterra Fietta; y el Sr. Mark Beckett de la firma de abogados Chadbourne & Parke.

1.90    *Por la Demandada:* El Sr. Christopher Ryan, el Sr. Thomas Wilner, la Sra. Anna Tevini, el Sr. David Earnest, el Sr. Guillermo Salcedo Salas y la Sra. Evelyn Wiese (todos de la firma de abogados Shearman & Sterling).

1.91    La Tercera Audiencia (junio) fue grabada mediante una transcripción literal en español e inglés, que se puso a disposición de las Partes.

1.92    El 30 de junio de 2016, las Partes completaron sus respectivas respuestas a las Tablas 1 a 4 de las Demandantes de acuerdos y desacuerdos entre el Sr. Giles y el Dr. Flores, sus expertos en materia de cuantía de daños, tal como solicitara el Tribunal durante la Tercera Audiencia (junio)[6]. Las Partes presentaron sus respectivos reclamos de costos actualizadas mediante escritos de fechas 8 y 12 de julio de 2016. Mediante varios mensajes de correo electrónico de fechas 12 y 26 de julio de 2016, las Partes presentaron sus respectivas tablas sobre intereses.

1.93    Mediante una carta de fecha 7 de julio de 2016, la Demandada se opuso a la admisibilidad de ciertas partes de las diapositivas de presentación utilizadas por las Demandantes durante sus alegatos orales de cierre en la Audiencia sobre Reconstitución. A instancia del Tribunal, las Demandantes respondieron a la objeción de la Demandada mediante una carta de fecha 22 de julio de 2016. El Tribunal decidió reservar su decisión sobre la objeción de la Demandada hasta el presente Laudo. Ha decidido rechazar dicha objeción, consciente también de que estas partes cuestionadas no desempeñan un rol sustancial en los motivos o el resultado del presente Laudo.

---

[6] Tercera Audiencia (junio) D2.412-413.

1.94   *Cierre:*  El procedimiento que nos ocupa se declaró cerrado el 31 de agosto de 2017, de conformidad con la Regla 38(1) de las Reglas de Arbitraje CIADI.

**(8)   *Los Petitorios de las Partes***

1.95   *Las Solicitudes de las Demandantes:* Las Demandantes le reclaman, tal como fuese argumentado finalmente en la Sección VI de su Escrito Post-Audiencia (también confirmado en la Réplica sobre Cuestiones de Fondo y Memorial de Contestación sobre Jurisdicción de las Demandantes, Párrafo 601), al Tribunal emita un Laudo:

   a.   En el que se declare que la Demandada ha violado los Artículos 4, 6 y 11 del Tratado;

   b.   en el que se ordene que la Demandada le pague a KOMSA una compensación por la expropiación de su inversión y pérdidas históricas equivalentes a 444,6 millones USD (al 30 de enero de 2015, sujeto a cambios según la fecha del Laudo)[7];

   c.   en el que se ordene que la Demandada le pague a KNI una compensación por la expropiación de su inversión por el monto de 227,8 millones USD (al 30 de enero de 2015, sujeto a cambios según la fecha del Laudo)[8];

   d.   en el que se declare que la expropiación de las inversiones de las Demandantes por parte de la Demandada fue ilícita;

   e.   en el que se establezca cualquier otro daño o compensación que el Tribunal considere apropiado por la expropiación ilícita y otras violaciones al TBI cometidas por la Demandada;

   f.   en el que se ordene que la Demandada pague los intereses que el Tribunal le otorga a las Demandantes (incluidos los costos y los intereses) a la tasa LIBOR trimestral en dólares estadounidenses más 2 % capitalizado trimestralmente, a partir de la

---

[7] Cifra actualizada tal como se incluye en el Escrito Post-Audiencia de las Demandantes.  La compensación solicitada en la Réplica sobre Cuestiones de Fondo y Memorial de Contestación sobre Jurisdicción de las Demandantes correspondiente a KOMSA asciende a USD 432,7 millonesal 31 de agosto de 2013.

[8] Cifra actualizada tal como se incluye en el Escrito Post-Audiencia de las Demandantes.  La compensación solicitada en la Réplica sobre Cuestiones de Fondo y Memorial de Contestación sobre Jurisdicción de las Demandantes correspondiente a KNI asciende a USD 220,8 millones al 31 de agosto de 2013.

fecha del Laudo y hasta que la Demandada termine de pagar el monto total otorgado en el Laudo;

g.  en el que se ordene que la Demandada pague los costos del arbitraje, incluidos todas las tasas y gastos del CIADI y del Tribunal y todos los costos legales y gastos en que incurrieron las Demandantes, distribuidos entre las Demandantes en la misma proporción en que se les otorgó la compensación, con intereses que se calculan de acuerdo con el párrafo [f] que aparece más arriba; y

h.  en el que se ordene cualquier otra compensación que el Tribunal considere apropiada.

1.96   En su Dúplica sobre Jurisdicción[9], las Demandantes solicitaron que el Tribunal "desestime en su totalidad las objeciones de la Demandada a la jurisdicción del Tribunal y que los costos de los procedimientos jurisdiccionales, sea cual fuere el resultado de las cuestiones de fondo, les sean reembolsados a las Demandantes."

1.97   *Las Solicitudes de la Demandada:*  La Demandada, tal como fuese argumentado finalmente en su Dúplica sobre el Fondo[10] y en su Escrito Post-audiencia[11], le reclama el siguiente resarcimiento al Tribunal:

> "(i) que declare que los derechos de KNI en el Offtake Agreement no constituyen una inversión a efectos del Artículo 25 del Convenio CIADI y/o el Artículo 1(2) del TBI entre Venezuela y Suiza, y, por lo tanto, no están dentro de la jurisdicción del Tribunal Arbitral;
> (ii) que desestime las reclamaciones de KNI en su totalidad por falta de jurisdicción;
> (iii) que declare que la República no ha violado ninguno de los estándares de protección del TBI entre Venezuela y Suiza;
> (iv) que desestime todas las reclamaciones de los Demandantes;
> (v) que conceda a la República todos los costos y honorarios incurridos en el presente arbitraje, que incluyen los honorarios razonables de abogados y peritos;
> (vi) que conceda a la República cualquier otra reparación que el Tribunal Arbitral considere apropiada".

---

[9]  Dúpl. Koch, Párrafo 93.
[10]  Dúpl. Ven., Párrafo 531.
[11]  EPA Ven., Párrafo 273.

## PARTE II: LA CONTROVERSIA DE LAS PARTES

**(1)   Introducción**

2.1   Indefectiblemente, a medida que transcurrió el presente procedimiento de arbitraje, las cuestiones que surgieran de la controversia original de las Partes devinieron más complejas y significativamente más numerosas, extendiéndose lo que fuera originalmente una aparente controversia en gran parte relacionada con la cuantificación de daños (en el marco del reclamo de expropiación de KOMSA durante la Primera Sesión) a una controversia importante en materia de jurisdicción, responsabilidad, compensación, intereses y costas al momento del presente Laudo.

2.2   En esta sección, el Tribunal resume los argumentos respectivos de las Partes en lo que se refiere a la jurisdicción, la responsabilidad y la cuantificación de daños. Otras secciones de los respectivos argumentos de las Partes se abordan más adelante en el presente Laudo.

**(2)   El Argumento de las Demandantes**

2.3   *Jurisdicción:* En resumen, en lo que respecta a la jurisdicción, las Demandantes sostienen que el Tribunal goza de competencia en el fondo de la controversia de las Partes en materia de inversiones en el presente arbitraje.  Las Demandantes sostienen que la controversia surge a partir de diversas violaciones por parte de la Demandada de sus obligaciones en virtud del Tratado y de los derechos pertinentes de las Demandantes (incluidos los derechos de las Demandantes al amparo del derecho internacional consuetudinario) que confieren a las Demandantes el derecho a recibir una compensación íntegra por las pérdidas que las Demandantes han soportado como consecuencia directa de las violaciones del Tratado por parte de la Demandada.

2.4   Las Demandantes sostienen que tanto las Demandantes como la Demandada han dado su consentimiento por escrito para someter a arbitraje esa controversia en materia de inversiones de conformidad con el Convenio CIADI, tal como se establece en el Artículo 25 del Convenio CIADI y el Artículo 9 del Tratado.  Las Demandantes sostienen que el consentimiento por escrito de la Demandada devino efectivo en el momento de entrada en

vigor del Tratado el 30 de noviembre de 1994, debidamente aceptado por las Demandantes con su Solicitud de Arbitraje de fecha 28 de junio de 2011.

2.5 Las Demandantes sostienen que la controversia de las Partes implica una "controversia sobre inversiones" entre una Parte Contratante e inversores de otra Parte Contratante y se encuentra dentro del ámbito de consentimiento de la Demandada en virtud del Artículo 25 del Convenio CIADI y el Artículo 1(1) (que define el término "inversor"), el Artículo 1(2) (que define el término "inversión") y el Artículo 9(5) del Tratado[12].

2.6 Las Demandantes sostienen que tanto KOMSA como KNI son sociedades constituidas de acuerdo a la legislación de Suiza y, por consiguiente, son "inversores" según la definición del Artículo 1(1)(b) del Tratado.  Las Demandantes sostienen asimismo que KOMSA y KNI poseían "inversiones" en Venezuela, según la definición del Artículo 1(2) del Tratado. En particular, las Demandantes sostienen que: (i) KOMSA, a través de Koch José, era titular de una participación accionaria en FertiNitro, lo que constituía una "inversión" en virtud del Tratado; y (ii) KNI detentaba una participación en el Offtake Agreement celebrado entre KNI y FertiNitro[13], lo que constituía derechos de ejecución en virtud de un contrato y de esa manera una "inversión" en virtud del Tratado.

2.7 Las Demandantes sostienen que existe una "controversia" entre las Demandantes y la Demandada en lo que se refiere al incumplimiento por parte de la Demandada de sus obligaciones con arreglo al Tratado en relación con las inversiones de las Demandantes en Venezuela, incluida la expropiación por parte de la Demandada de la participación de KOMSA en FertiNitro y la participación de KNI en el *Offtake Agreement*, conjuntamente con la falta de compensación a las Demandantes por parte de la Demandada.

2.8 Por consiguiente, las Demandantes llegan a la conclusión, de que existe una "controversia sobre inversiones" entre una Parte Contratante e inversores de la otra Parte Contratante que se encuentra dentro del ámbito del consentimiento de la Demandada al arbitraje en virtud del Tratado y del Convenio CIADI.

---

[12] Acuerdo entre la República de Venezuela y la Confederación Suiza sobre la Promoción y la Protección Recíprocas de las Inversiones (18 de noviembre de 1993) ("Tratado") (CLA-1).
[13] *Offtake Agreement* entre Pequiven, IPSL, y Koch Oil SA en calidad de Compradoras y FertiNitro en calidad de Vendedora, de fecha 8 de abril de 1998 ("*Offtake Agreement*") (C-19).

2.9    Las Demandantes sostienen que solicitaron consultas con la Demandada – sin éxito alguno. El 9 de noviembre de 2010, el Sr. Steve Packebush (de la firma KOMSA) envió una carta al Sr. Saúl Ameliach (Presidente de Pequiven), con copia a Su Excelencia Rafael Ramírez (el Ministro de Energía y Petróleo de la Demandada) para notificar formalmente a la Demandada de la controversia sobre inversiones entre las Demandantes y la Demandada con relación (según sostienen las Demandantes) a las violaciones del Tratado por parte de la Demandada[14]. En esa carta las Demandantes proponían que los representantes de las Demandantes se reunieran con los representantes de la Demandada "para iniciar discusiones y consultas en cuanto a la manera en la cual Venezuela compensaría a Koch por la pérdida de su inversión en Venezuela". [Traducción del Tribunal]. Las Demandantes afirman que Pequiven no les ofreció compensación alguna por las violaciones del Tratado por parte de la Demandada. Posteriormente, las Demandantes dieron instrucciones a sus representantes legales (Latham & Watkins) de presentarle a la Demandada otra solicitud de consultas, mediante carta de fecha 20 de enero de 2011 al Presidente de la Demandada, con copia (*inter alios*) al Procurador General de la Demandada[15]. Ulteriormente, según las Demandantes, se celebraron reuniones entre los representantes de las Demandantes y la Demandada, que no mostraron resultados satisfactorios para ninguna de las dos Demandantes.

2.10   Por consiguiente, las Demandantes concluyen que efectivamente solicitaron y celebraron consultas con la Demandada en pos de arribar a una resolución amistosa de la controversia de las Partes, según lo exige el Tratado. Las Demandantes concluyen asimismo que también esperaron hasta el vencimiento del período de reflexión (*cooling-off period*) conforme lo exige el Artículo 9(2) del Tratado, adquiriendo así el derecho a someter la controversia de las Partes al arbitraje del CIADI, como lo hicieran con su Solicitud de Arbitraje de fecha 28 de junio de 2011 y, además, que este Tribunal goza de competencia para pronunciarse sobre la controversia de las Partes.

---

[14] Carta del Sr. Steve Packebush, KOMSA al Sr. Saúl Ameliach, Pequiven SA (9 de noviembre de 2010) (SdA, Exh. 6).

[15] Carta de Robert Volterra, Latham & Watkins al Presidente Hugo Rafael Chávez Frías (20 de enero de 2011) (SdA, Exh. 7).

2.11   *Responsabilidad*: En resumen, en lo que respecta a la responsabilidad, las Demandantes sostienen que la Demandada violó sus obligaciones en el Tratado ocasionándoles pérdidas y daños a cada una de las Demandantes y a sus inversiones.

2.12   Las Demandantes sostienen que, durante la década de 1990, Venezuela impulsó de manera activa una política de fomento de inversiones extranjeras, en particular en sus industrias hidrocarburíferas y petroquímicas. En este momento, Pequiven (en calidad de compañía petroquímica estatal de la Demandada) procuró conseguir socios extranjeros para participar en el desarrollo de una planta de fertilizantes en José en el estado venezolano de Anzoátegui.

2.13   En 1997, se seleccionó a KOMSA como socio extranjero con el conocimiento y experiencia necesarios para participar en el desarrollo de la planta de fertilizantes propuesta y para comercializar el fertilizante que fabricaría la planta propuesta. KOMSA y Pequiven procedieron a constituir una empresa conjunta para la construcción de dos plantas de amoníaco y dos plantas de urea granular en José (la "Planta FertiNitro") y para la comercialización y venta del amoníaco y la urea producidos en la Planta.

2.14   En marzo de 1998, se formó una serie de empresas en participación a los fines de implementar el proyecto.  Estas eran las Empresas FertiNitro (denominadas aquí, en su conjunto, "FertiNitro").  Se aseguró el financiamiento externo para el desarrollo de la Planta FertiNitro en el presupuesto de que se les vendería el rendimiento de la Planta a KNI, Pequiven e International Petrochemical Sales Limited (una subsidiaria de Pequiven) en los términos comprendidos en el *Offtake Agreement*.  Según las Demandantes, desde el comienzo, el *Offtake Agreement* fue fundamental para las inversiones de las Demandantes.

2.15   Una vez asegurado el financiamiento externo para el desarrollo de la Planta, Pequiven, KOMSA, Snamprogetti Netherlands BV ("Snamprogetti") y Polar José Investments, Limited ("Polar") celebraron una serie de acuerdos relativos al proyecto.  Estos acuerdos incluían: (i) el "Convenio de Inversionistas Conjuntos" de fecha 8 de abril de 1998 entre Pequiven, KOMSA, Snamprogetti y Polar[16], que disponía (*inter alia*) que FertiNitro sería

---

[16] Convenio de Inversionistas Conjuntos suscripto entre Pequiven, Koch Oil SA, Snamprogetti Netherlands BV, y Polar Uno, CA (8 de abril 1998) ("JIA") (C-18).

35% de titularidad de Koch José, 35% de titularidad de Pequiven, 20% de titularidad de Snamprogetti y 10% de titularidad de Polar; (ii) el "*Offtake Agreement*" de fecha 8 de abril de 1998[17], que concedía  a KOMSA el derecho de adquirir una cantidad garantizada del amoníaco y la urea producidos por FertiNitro a un precio con descuento durante un período de 20 años (KOMSA, a través de Koch José, posteriormente ostentó la titularidad del 25% de la participación de FertiNitro; y posteriormente se confirieron a KNI los derechos de KOMSA en virtud del *Offtake Agreement*) y (iii) el "Contrato EPC" de fecha 8 de abril de 1998[18], para la construcción de la Planta entre FertiNitro, CEC y Snamprogetti como contratista principal.

2.16   La construcción de la Planta comenzó en el mes de mayo de 1998 y se completó en el mes de diciembre de 2001, cuando FertiNitro le otorgó el certificado de aceptación provisional a Snamprogetti.  Anteriormente, en mayo de 2001, FertiNitro había iniciado la producción comercial en la Planta.  Las Demandantes alegan que, salvo determinados períodos de interrupción (por ejemplo, cuando PDVSA no le proporcionó gas metano o Pequiven no le proporcionó electricidad a la Planta) la producción comercial en la Planta continuó hasta que la Demandada expropió FertiNitro el 11 de octubre de 2010, tal como se sintetiza *infra*.

2.17   Las Demandantes sostienen que la Demandada adoptó medidas ilícitas contra las inversiones de las Demandantes en violación del Tratado, que han redundado en que las Demandantes sufrieran pérdidas significativas.  Estas medidas culminaron el 11 de octubre de 2010 en la expropiación de la participación de KOMSA en FertiNitro y la expropiación de la participación de KNI en el *Offtake Agreement*.  La Demandada no les proporcionó a las Demandantes compensación alguna por la expropiación de sus inversiones.  En síntesis, las Demandantes enumeran las medidas ilícitas de la Demandada contra las inversiones de las Demandantes, en violación de los Artículos 4(1), 4(2), 6, y 11(2) del Tratado, de la siguiente manera.

---

[17] *Offtake Agreement* (C-19).
[18] Contrato de Ingeniería, Compras y Construcción suscripto entre FertiNitro y Snamprogetti (8 de abril de 1998) (C-24).

2.18   *Nuevos impuestos e incrementos fiscales:* La Demandada le impuso a FertiNitro una serie de nuevos impuestos e incrementos fiscales con el objeto y el efecto de desviar sus utilidades a la Demandada. Esta es la primera de las "Pérdidas Históricas" de KOMSA.

2.19   Estos nuevos impuestos erosionaron la rentabilidad de FertiNitro y privaron a KOMSA de los beneficios económicos de su inversión. Estos impuestos e incrementos fiscales fueron directamente contrarios a las expectativas legítimas de KOMSA en las que se basó en el momento de adoptar la decisión de invertir en FertiNitro.  Por ejemplo, en el mes de diciembre de 2005, la Demandada impuso un impuesto a las Sustancias Narcóticas y Psicotrópicas a FertiNitro que obligó a FertiNitro a asignar fondos a programas sociales determinados o a proporcionarle a la Demandada el 1% del ingreso neto anual de FertiNitro.  Alrededor de esa misma época, la Demandada promulgó además la Ley Orgánica de Ciencia, Tecnología e Innovación[19].  Esta obligó a FertiNitro, a partir del 1 de enero de 2006, a asignar fondos a determinados programas de desarrollo científico o a proporcionarle a la Demandada el 0,5% de sus ingresos brutos generados en Venezuela. Además, en 2006, se incrementó el impuesto municipal aplicable a FertiNitro del 1% al 2% y en 2007 al 2,4% de las ventas de FertiNitro.  Estas medidas, en particular cuando se la considera de manera acumulativa, impactaron negativamente en la rentabilidad de FertiNitro a expensas de KOMSA y en beneficio de la Demandada.

2.20   *IVA:* La Demandada no le proporcionó prontamente o en lo absoluto a FertiNitro reembolsos de IVA a los cuales tenía derecho. Esta es la segunda de las "Pérdidas Históricas" de KOMSA.

2.21   En el mes de mayo de 1999, la Demandada promulgó la Ley que establece el Impuesto al Valor Agregado ("IVA**"**)[20]. Esta ley previó una tasa tributaria de cero para exportadores y otorgó a esos exportadores el derecho a recuperar Certificados Especiales de Reembolso Tributario ("CERT") en lo que se refiere al IVA sufragado sobre la compra o importación de bienes y servicios.  En virtud de la ley de IVA, el contribuyente presentaría una solicitud a la administración tributaria de la Demandada, el "SENIAT" (abreviatura de "Servicio

---

[19] Ley Orgánica de Ciencia, Tecnología e Innovación (en vigor desde el 1 de enero 2006) ("Ley de Ciencia y Tecnología") (C-43).

[20] Ley de Reforma Parcial de la Ley que establece el Impuesto al Valor Agregado (11 de agosto de 2004) (C-55).

Nacional Integrado de Administración Aduanera y Tributaria"); y posteriormente, el SENIAT emitiría un "CERT" (abreviatura de "Certificados Especiales de Reembolso Tributario").   Posteriormente, el contribuyente podría utilizar sus CERT para pagar cualquier impuesto nacional (incluidos el impuesto sobre la renta y el IVA) o cedérselos a terceros para fines similares.   FertiNitro pagó montos significativos de IVA a la Demandada durante el curso de sus operaciones.   En lo que se refiere a estos pagos, FertiNitro presentó debidamente sus solicitudes al SENIAT.

2.22   Sin embargo, desde alrededor de 2005 en adelante, el SENIAT demoró de manera injustificada y arbitraria la emisión de los CERT para FertiNitro.  Esta demora redundó en pérdidas para FertiNitro, en particular cuando se pagaron los CERT después de una demora significativa durante la cual aumentó la inflación local y se devaluó el Bolívar venezolano frente a las monedas fuertes (incluido el Dólar estadounidense).  La Demandada tampoco proporcionó a FertiNitro una cantidad significativa de reembolsos de IVA a pesar de su obligación de hacerlo.  Esta conducta arbitraria por parte de la Demandada erosionó aún más la rentabilidad de FertiNitro a expensas de KOMSA (y sus demás accionistas no estatales), en beneficio de la Demandada.

2.23   *Decreto de la Urea y Resolución de la Urea:* La Demandada dictó un Decreto de la Urea y posteriormente la Resolución de la Urea que obligaron a FertiNitro a vender urea a la Demandada (a través de Pequiven) a precios significativamente inferiores al costo de producción y a los valores de mercado, tal como se sintetiza *infra*.  Esta es la tercera de las "Pérdidas Históricas" de KOMSA.

2.24   El 26 de febrero de 2007 el Presidente de la Demandada firmó el Decreto 5.218 (el "Decreto de la Urea")[21].  El Decreto de la Urea fue publicado en la Gaceta Oficial N.° 38.638 el 6 de marzo de 2007 y entró en vigor ese mismo día. El Artículo 2 del Decreto de la Urea disponía que: "Los fabricantes, proveedores […] exportadores de fertilizantes nitrogenados […] quedan obligados a suministrarlos prioritariamente en el mercado nacional, de acuerdo a la regulación de precios establecida para su venta".  El Artículo 3 disponía que los precios

---

[21] Decreto 5.218 (26 de febrero de 2007) ("Decreto de la Urea") (C-80).

serían establecidos mediante resoluciones conjuntas de los Ministerios para la Agricultura y Tierra, para las Industrias Ligeras y Comercio y para la Energía y Petróleo.

2.25   De conformidad con el Artículo 3 del Decreto de la Urea, los Ministerios para la Agricultura y Tierra, para las Industrias Ligeras y Comercio y para la Energía y Petróleo dictaron una resolución conjunta (la "Resolución de la Urea")[22].  Fue publicada en la Gaceta Oficial N.° 38.674 el 2 de mayo de 2007.  La Resolución de la Urea disponía (*inter alia*) que Pequiven únicamente estaba autorizada para administrar la entrega de urea de conformidad con el Decreto de la Urea y que Pequiven podría comprar "la urea que requiera para cubrir las necesidades de la Nación, a cualquier fabricante establecido en el país, al precio máximo de venta a granel a puerta de planta, de 155.200 Bs./MT (Bolívares por Tonelada Métrica)"[23].

2.26   Los precios de venta a los cuales FertiNitro estaba obligado a venderle urea a Pequiven eran sustancialmente inferiores al costo de producción de urea incurrido por FertiNitro. Además de Pequiven, FertiNitro era el único fabricante y exportador de urea en Venezuela. Por consiguiente, el Decreto de la Urea y la Resolución de la Urea estuvieron dirigidos por la Demandada directamente a FertiNitro y obligaron a FertiNitro a desviar urea a la Demandada (a través de Pequiven) a precios inferiores a los costos de producción.  La cantidad de urea que la Demandada (a través de Pequiven) podría comprarle a FertiNitro al precio establecido en la Resolución de la Urea era ilimitada.

2.27   Ulteriormente, tal como lo exigieran el Decreto de la Urea y la Resolución de la Urea, FertiNitro vendió cantidades sustanciales de urea a Pequiven a precios significativamente inferiores a sus costos de producción.  Estas medidas discriminatorias y arbitrarias por parte de la Demandada erosionaron la rentabilidad de FertiNitro a expensas de las Demandantes (y los demás accionistas no estatales), en beneficio de la Demandada.

2.28   *Interferencia - FertiNitro:* La Demandada (actuando a través de Pequiven) interfirió de manera progresiva en la administración y gestión de FertiNitro.

---

[22] Resolución Conjunta del Ministerio del Poder Popular para la Agricultura y Tierra, el Ministerio del Poder Popular para las Industrias Ligeras y Comercio, y el Ministerio del Poder Popular para la Energía y Petróleo (3 de mayo de 2007) ("Resolución de la Urea") (C-82).

[23] Resolución de la Urea (C-82), Art. 10.

2.29   KOMSA invirtió en FertiNitro con la expectativa legítima de que su inversión constituía un emprendimiento comercial en el que KOMSA y Pequiven serían socios en igualdad. KOMSA tenía una expectativa legítima de que cualquier control que Pequiven pudiera ostentar sobre FertiNitro sería equilibrado por el control de KOMSA sobre FertiNitro. KOMSA tenía una expectativa legítima de que FertiNitro sería operada como empresa comercial para la generación de beneficios para todos sus accionistas.

2.30   Desde alrededor de 2006, la Demandada, actuando a través de Pequiven, procedió a interferir en la administración y gestión de FertiNitro y en definitiva asumió el control sobre FertiNitro.  La estrategia de la Demandada culminó en la expropiación de FertiNitro por parte de la Demandada el 11 de octubre de 2010.

2.31   *Expropiación - FertiNitro:* La Demandada expropió FertiNitro el 11 de octubre de 2010 sin compensación alguna, en violación del Artículo 6 del Tratado.

2.32   El 10 de octubre de 2010, el Presidente de la Demandada anunció la expropiación de FertiNitro en su teledifusión semanal "Aló Presidente".  Durante esta transmisión, el Presidente firmó lo que parecía tratarse de un decreto que disponía la expropiación de FertiNitro[24].  El 11 de octubre de 2010, se publicó en la Gaceta Oficial N.° 380.113.34 el Decreto Número 7713 de fecha 10 de octubre de 2010.  Dispuso la expropiación de FertiNitro (el "Decreto de Expropiación")[25].

2.33   El Decreto de Expropiación incluye las siguientes disposiciones: el Artículo 1 prevé la adquisición forzosa de los bienes de FertiNitro por parte de la Demandada; los Artículos 2, 3 y 5 le asignan específicamente a Pequiven la función de llevar adelante la expropiación de FertiNitro e identifican a Pequiven como "ente expropiante"; y el Artículo 6 ordena a Pequiven la ocupación de los bienes.  El Decreto de Expropiación no dispuso el pago de compensación alguna a KOMSA de conformidad con el Tratado.

2.34   El 11 de octubre de 2010, la televisión estatal venezolana informó que el Ministro para la Energía y Petróleo de la Demandada había visitado la Planta en persona con el fin de

---

[24] Transcripción en idioma español del archivo de video, "El Ministro Ramírez preside la toma de FertiNitro" (11 de octubre de 2010) (C-107).
[25] Decreto 7.713 (10 de octubre de 2010) ("Decreto de Expropiación") (C-9).

expropiarla.  En su discurso público en la Planta de FertiNitro, se informó que el Ministro había declarado, "[Y]a [estamos] en el control de la Planta y haciendo una inspección de nuestras instalaciones"[26].  También el 11 de octubre de 2010, el Sr. Clark Inciarte (quien fuera en ese momento tanto Presidente de FertiNitro como empleado de Pequiven) indicó durante una llamada telefónica con los dos directores de FertiNitro designados por KOMSA que FertiNitro estaba bajo completo control del Estado y que su junta directiva había dejado de funcionar[27].  Tras el anuncio del Decreto de Expropiación, FertiNitro no convocó a ninguna asamblea de la junta directiva ni del Comité de Finanzas de FertiNitro.

2.35   KOMSA no había recibido preaviso alguno de que el Presidente de la Demandada haría este anuncio ni de que la Demandada expropiaría FertiNitro. KOMSA no tuvo oportunidad de objetar esta expropiación de su inversión en FertiNitro. Por el contrario, la expropiación fue anunciada por el Presidente de la Demandada como un '*fait accompli*'.

2.36   *Expropiación - KNI:* El 11 de octubre de 2010, la Demandada expropió asimismo la participación de KNI en el *Offtake Agreement*, sin compensación alguna, en violación del Artículo 6 del Tratado. Declaraciones contemporáneas de los representantes de Pequiven, en calidad de ente expropiante de la Demandada que había expropiado FertiNitro al amparo del Decreto de Expropiación, les confirmaron a las Demandantes que la participación de KNI en el *Offtake Agreement* también había sido expropiada por la Demandada.

2.37   *Compensación:* En resumen, las Demandantes sostienen que las diversas violaciones del Tratado por parte de la Demandada les han ocasionado a las Demandantes pérdidas significativas. Por consiguiente, la Demandada está obligada a proporcionarles a las Demandantes compensación íntegra por dichas pérdidas, de conformidad con los principios aplicables del derecho internacional consuetudinario.

2.38   Las Demandantes reclaman compensación íntegra, incluidos, (pero no limitado a) los beneficios que KOMSA ha perdido como consecuencia de la expropiación por parte de la Demandada de su inversión en el capital accionario de FertiNitro, sus Pérdidas Históricas

---

[26] Transcripción en idioma español del archivo de video, "El Ministro Ramírez preside la toma de FertiNitro" (11 de octubre de 2010) (C-107).

[27] Declaración Testimonial de Brent W. Gwaltney (30 de mayo de 2012) ("Gwaltney DT1"), Párrafo 122.

y la expropiación por parte de la Demandada de la participación de KNI en el Offtake Agreement.

2.39   Tal como enunciaran posteriormente las Demandantes, la compensación reclamada por KOMSA por la expropiación ilícita de su participación en FertiNitro y sus Pérdidas Históricas asciende a la suma de USD 444,6 millones (al 30 de enero de 2015); y la compensación reclamada por KNI por la expropiación de su participación en el *Offtake Agreement* asciende a la suma de USD 227,8 millones (también al 30 de enero de 2015)[28].

### *(3)*   *El Argumento de la Demandada*

2.40   *Jurisdicción:* En resumen, la Demandada objeta la competencia o jurisdicción del Tribunal y del CIADI para abordar los reclamos de KNI en lo que se refiere al *Offtake Agreement*. La Demandada sostiene que es "un principio fundamental del derecho internacional de inversión" que la jurisdicción de los tribunales de arbitraje se limita a las "inversiones" según el significado dado por el Convenio CIADI y el tratado de inversión, la ley o el acuerdo aplicable.  Por lo tanto, en el presente arbitraje, KNI podría oponer un reclamo si el Offtake Agreement (un simple contrato de compraventa comercial) constituyera una "inversión" según el sentido tanto del Artículo 25(1) del Convenio CIADI como del Artículo 1(2) del Tratado.  La carga de la prueba recae sobre KNI, quien debe demostrar que ha realizado una inversión cubierta en virtud del Convenio CIADI y del Tratado.  La Demandada sostiene que KNI no lo ha hecho en tanto no existe tal inversión respecto del Offtake Agreement.

2.41   El significado de "inversión" tiene un significado intrínseco y objetivo tanto en virtud del Convenio CIADI como del Tratado.  Ese significado requiere a la vez la realización de una "contribución", durante una determinada "duración", con un elemento de "riesgo" y sujeto a "territorialidad".  Un simple contrato de compraventa comercial no constituye una "inversión".  El hecho de que KNI no pueda ajustar el Offtake Agreement a la definición de "inversión" despoja tanto al CIADI como al presente Tribunal de toda competencia y jurisdicción en lo que respecta a la supuesta expropiación del *Offtake Agreement* en el mes

---

[28] Escrito Post-Audiencia de las Demandantes (30 de enero de 2015) ("EPA Koch"), pág. 110 (Sección VI, (b)(c)).

de octubre de 2010 y más aún en lo que respecta a la resolución del Offtake Agreement por parte de FertiNitro en el mes de febrero de 2012.

2.42   *Responsabilidad:* En resumen, la Demandada niega toda responsabilidad para con cualquiera de las dos Demandantes en virtud del Tratado.  La Demandada es un estado soberano y garante del interés público dentro de Venezuela.  La Demandada sostiene que, como tal, tiene la obligación y la autoridad tanto en virtud del derecho nacional como del derecho internacional de actuar en el interés del pueblo de Venezuela y su bienestar general, incluyendo el dictado de leyes y regulaciones y la adquisición forzosa de intereses privados. Este derecho se encuentra encarnado en la Constitución de la Demandada[29] y su Ley de Expropiación por Causa de Utilidad Pública o Social de fecha 1 de julio de 2002 (la "Ley de Expropiación")[30]. Estos textos proporcionan el marco jurídico para la expropiación por causa de utilidad pública, así como también en virtud del derecho internacional consuetudinario y del Tratado.

2.43   La Demandada confirmó de manera reiterada que el control soberano sobre la producción nacional de alimentos y productos relacionados con la alimentación era de importancia nacional en Venezuela. A tal fin, en 2007, la Demandada dictó el Decreto de la Urea[31]. Este Decreto declaró que la producción de alimentos era de "interés nacional", "fundamental para el desarrollo económico y social de la Nación", y "un elemento esencial de la seguridad y soberanía nacional".  En consecuencia, el Decreto de la Urea declaró a los fertilizantes nitrogenados como bienes de "primera necesidad" fundamentales para la protección del interés nacional de Venezuela.

2.44   En 2008, la Demandada dictó el Decreto N.° 5.835 ("Decreto 5.835") [32] en pos de garantizar que el suministro de productos necesarios para la producción de alimentos pudiera continuar de forma ininterrumpida.  Este Decreto declaró a los bienes necesarios para la producción de alimentos y a los productos de "primera necesidad" como bienes de utilidad pública e interés social.

---

[29] Constitución de la República Bolivariana de Venezuela (15 de febrero de 2009) (R-3) (C-47).
[30] Ley de Expropiación por Causa de Utilidad Pública o Social (1 de julio de 2002) (R-9, R-53, C-140).
[31] Decreto de la Urea (C-80).
[32] Decreto 5.835 (28 de enero de 2008) (R-23).

2.45    Mediante estas medidas, y la promulgación de diversos planes nacionales diseñados para impulsar la productividad agropecuaria, la Demandada articuló el fin público de garantizar un suministro suficiente de fertilizantes nitrogenados para lograr su objetivo de soberanía alimentaria dentro de Venezuela.

2.46    *Pérdidas Históricas*: KOMSA asevera, de manera equivocada, que la Demandada violó los Artículos 4(1), 4(2), y 11(2) del Tratado en relación con sus reclamos por "Pérdidas Históricas".   Estos reclamos se relacionan principalmente con lo siguiente: (i) la promulgación de la Ley Orgánica de Ciencia, Tecnología e Innovación (la "Ley de Ciencia y Tecnología")[33]; (ii) el dictado de la Ordenanza Municipal por parte del Municipio Simón Bolívar que incrementara un impuesto municipal preexistente (la "Ordenanza Municipal")[34]; (iii) la supuesta negativa de la Demandada a proporcionarle a FertiNitro determinados créditos de IVA; y (iv) el Decreto de la Urea y la Resolución de la Urea.  La Demandada sostiene que estos reclamos por "Pérdidas Históricas" son infundados según se describe *infra*.

2.47    *Nuevos impuestos e incrementos fiscales:* La Ley de Ciencia y Tecnología constituyó una medida de aplicación general que exigía que las compañías invirtieran un porcentaje menor de sus ingresos en la compañía mediante la investigación y el desarrollo con enfoque científico. Nada en esa ley se opone a las obligaciones de la Demandada en virtud del Tratado. El incremento en los impuestos municipales preexistentes, de 1% a 2% y definitiva a 2,4%, no violó ninguna de las obligaciones de la Demandada en virtud del Tratado.  Este impuesto municipal es aplicable de manera general a entes que operan en el Municipio Simón Bolívar; no estuvo dirigido a FertiNitro; y no era de carácter punitivo.

2.48    *IVA:* En lo que respecta al reclamo de las Demandantes en materia de créditos de IVA, las pruebas de hecho demuestran que todos los créditos de IVA solicitados por FertiNitro fueron, en efecto, otorgados por la Demandada.

2.49    *El Decreto de la Urea y la Resolución de la Urea*: El Decreto de la Urea y la Resolución de la Urea fueron medidas vitales y necesarias que pretendieron llevar a efecto la política

---

[33] Ley de Ciencia y Tecnología (C-43).
[34] Ordenanza de Impuestos sobre Actividades Económicas de Industria, Comercio, Servicios o de Índole Similar (29 de diciembre de 2005) (C-45).

de la Demandada de garantizar el acceso a materiales fundamentales para la producción de alimentos en Venezuela. Estas medidas demandaron que FertiNitro vendiera cantidades limitadas de urea a Pequiven para cubrir la demanda interna que no podría satisfacerse mediante la propia producción de Pequiven.  La Demandada se vio obligada a promulgar estas medidas tras la negativa de FertiNitro a realizar voluntariamente estas ventas en base a la necesidad.

2.50   *Interferencia – FertiNitro*: No existe prueba alguna de que la Demandada interfiriese en la administración y gestión de FertiNitro. Por el contrario, la prueba demuestra que la Demandada no adoptó acción alguna para interferir en la administración o gestión de FertiNitro.  La junta directiva de FertiNitro estaba compuesta por nueve directores, de los cuales sólo tres fueron designados por Pequiven, los seis restantes habiendo sido designados por KOMSA y los demás accionistas de FertiNitro.  Según el Convenio de Inversionistas Conjuntos de fecha 8 de abril de 1994 (el "JIA" por su abreviatura en idioma inglés), no podía adoptarse decisión alguna sin la aceptación de KOMSA[35].

2.51   *Expropiación - FertiNitro*: La Demandada niega esta pretensión. FertiNitro era una sociedad venezolana y, como tal, operaba en Venezuela dentro del marco jurídico, político, social y económico de Venezuela. Pequiven era una compañía petroquímica estatal venezolana y la titular del 35% de FertiNitro y, como tal, pasó años intentando persuadir sin éxito a que FertiNitro desplegara voluntariamente actividades comerciales que fomentaran los objetivos estratégicos legítimos y razonables de la Demandada relacionados con la seguridad alimentaria en Venezuela. Cuando esos esfuerzos fracasaron, Pequiven intentó adquirir FertiNitro en forma directa, pero Pequiven fue rechazada por KOMSA.

2.52   Después de que quedó claro que FertiNitro no emprendería voluntariamente actividades comerciales diseñadas para adaptarse a los intereses de la Demandada, a la Demandada no le quedó otra opción más que poner en marcha procedimientos para adquirir FertiNitro de conformidad con la legislación venezolana.  Por consiguiente, el 11 de octubre de 2010, la Demandada publicó el Decreto de Expropiación, que dispuso la adquisición forzosa de los bienes de FertiNitro. Este Decreto de Expropiación declaró que la adquisición era parte de

---

[35] JIA (C-18).

una política de larga data para proteger a Venezuela de los efectos nocivos de las fluctuaciones en el mercado alimentario mundial al garantizar el control interno y soberano sobre las industrias fundamentales para la producción de alimentos dentro de Venezuela.

2.53   Si bien el Decreto de Expropiación inició el proceso de adquisición, no operó en sí mismo como una transferencia de titularidad de los bienes de FertiNitro.  Conforme al derecho venezolano, tal transferencia sólo ocurre tras una sentencia de los tribunales venezolanos. Pequiven, en calidad de ente adquirente designado, inició el procedimiento necesario en los tribunales venezolanos el 26 de julio de 2011, después de que KOMSA se retirara de las negociaciones sobre el monto de la compensación adeudada tras la adquisición de FertiNitro[36].

2.54   Las acciones de la Demandada en relación con la adquisición forzosa de los bienes de FertiNitro fueron lícitas y no constituyeron violación alguna del Tratado. Las pruebas demuestran que las acciones de la Demandada en torno al dictado del Decreto de Expropiación y su aplicación fueron lícitas y llevadas a cabo por la Demandada de conformidad con el debido proceso.  Por lo tanto, los esfuerzos de las Demandantes en procurar obtener compensación, deben fracasar como una cuestión de responsabilidad en virtud del Tratado.  Además, la legislación venezolana brinda procesos más que adecuados para compensar a KOMSA.  Por todos estos motivos, el Tribunal debería desestimar el reclamo de KOMSA

2.55   *Expropiación – KNI:* La Demandada niega esta pretensión (además de su objeción jurisdiccional).  KNI afirma, de manera equivocada, que la participación de KNI en el *Offtake Agreement* fue expropiada por la Demandada. El *Offtake Agreement* era un contrato de compraventa comercial, mediante el cual Pequiven, IPSL y KNI acordaron comprar el 100% de la producción de FertiNitro; no se trató de una "inversión" por parte de KNI; y no fue expropiada por la Demandada.

2.56   Tal como expresara la Demandada en su objeción jurisdiccional, el reclamo de KNI atenta contra el principio bien arraigado de que los contratos de compraventa no constituyen

---

[36] Decisión aceptando la jurisdicción para entender la Solicitud de Arbitraje, Juzgado de Primera Instancia de la Circunscripción Judicial del Estado Anzoátegui (29 de julio de 2011) (R-63).

"inversiones" de conformidad con el Artículo 25 del Convenio CIADI; y un contrato de compraventa comercial, tal como el *Offtake Agreement*, no responde a la definición de "inversión" en el Tratado.

2.57   El Decreto de Expropiación no abordó ni cubrió el Offtake Agreement.  Las pruebas de hecho demuestran que el *Offtake Agreement* se mantuvo en vigor durante más de 16 meses después de la fecha en que la Demandada dictó el Decreto de Expropiación.  En definitiva, los directores de FertiNitro (no la Demandada) decidieron resolver el Offtake Agreement el 28 de febrero de 2012.  Esa decisión se tomó por razones comerciales y fue adoptada únicamente por FertiNitro.  En estas circunstancias, el reclamo de las Demandantes de que la participación de KNI en el *Offtake Agreement* fue expropiada por la Demandada debe fracasar conforme al Tratado.

2.58   *Compensación:* En resumen, en el supuesto de que el Tribunal determine que las acciones de la Demandada con relación a la adquisición forzosa de los bienes de FertiNitro violó en efecto el Artículo 6 del Tratado, las Demandantes tienen derecho sólo al "valor justo de mercado" de la participación de KOMSA en FertiNitro, según lo disponen tanto el derecho venezolano como el derecho internacional.  A pesar de la claridad del derecho venezolano e internacional, las Demandantes pretenden obtener sustancialmente más que un "valor justo de mercado" en el presente arbitraje.

2.59   Además, las Demandantes han presentado diversos reclamos adicionales en el presente arbitraje, por los que alegan tienen derecho a sumas extraordinarias, excesivas e infundadas por la participación de KNI en el *Offtake Agreement* y sumas adicionales como "Pérdidas Históricas" de KOMSA por las supuestas violaciones de los Artículos 4(1), 4(2), 6 y 11(2) del Tratado.   No existe sustento alguno para estas sumas que se reclaman; y las Demandantes no han podido justificar ninguna pérdida asociada con esas presuntas violaciones del Tratado.

2.60   La Demandada concluye que el monto de compensación que las Demandantes reclaman en el presente arbitraje se encuentra obscenamente sobreestimado.  El Tratado establece un estándar de compensación preciso y exhaustivo. Conforme a este estándar, las Demandantes tienen derecho sólo al "valor justo de mercado" de la participación de

KOMSA en FertiNitro inmediatamente anterior a que se dictara el Decreto de Expropiación el 11 de octubre de 2010.  No existe fundamento legal para sustentar la postura de las Demandantes de que ambas tienen derecho a alguna medida de daños punitivos en virtud de la naturaleza supuestamente ilícita de los actos de la Demandada.  En particular, la suma que pretenden las Demandantes en relación con el Decreto de Expropiación se encuentra exageradamente sobreestimada; y los cálculos del "valor justo de mercado" de las Demandantes se establecen de manera equivocada sobre supuestos insostenibles.

## PARTE III: LAS CUESTIONES PRINCIPALES

**(1)    Introducción**

3.1    El Tribunal enumera a continuación las seis cuestiones principales de relevancia para el presente Laudo. Esta lista no es exhaustiva de todas las cuestiones planteadas por las Partes en el marco del presente arbitraje.

**(2)    Las Cuestiones Principales**

3.2    *Cuestión 1 – Jurisdicción: KNI y el Offtake Agreement (no KOMSA):* Esta cuestión en materia de jurisdicción surge en virtud de los Artículos 1(2) y 2 del Tratado y del Artículo 25(1) del Convenio CIADI. Esta cuestión jurisdiccional es analizada en la Parte VI del Laudo *infra*.

3.3    *Cuestión 2 – Antecedentes de hecho:* Estas cuestiones de hecho son analizadas principalmente en la Parte V del presente Laudo *infra*, así como cuando se analizan cuestiones en materia de jurisdicción, responsabilidad y compensación en las Partes VI, VII, VIII y IX.

3.4    *Cuestión 3: Responsabilidad:* Las cuestiones en materia de responsabilidad surgen en virtud de los Artículos 4(1), 4(2), 6 y 11(2) del Tratado, tal como se citan en la Parte IV del presente Laudo.  La responsabilidad por la expropiación en virtud del Artículo 6 del Tratado, en lo que se refiere a KOMSA y KNI respectivamente, se analiza en la Parte VII del presente Laudo *infra*.  La responsabilidad en virtud de los Artículos 4(1), 4(2) y 11(2) del Tratado, en lo que se refiere a KOMSA, se analiza en la Parte VIII del presente Laudo *infra*.

3.5    *Cuestión 4 – Compensación:* Esta cuestión surge en virtud del Tratado y, tal como lo afirmaran las Demandantes, del derecho internacional consuetudinario.  En lo que se refiere al primero, el Artículo 6 del Tratado prevé, en su parte relevante: "… Dicha compensación representará el valor de mercado de la inversión expropiada inmediatamente antes de que las medidas expropiatorias fueren tomadas o se hicieren del conocimiento público, si ocurriere antes; incluirá intereses desde la fecha de expropiación, será pagada sin demora

en moneda de libre convertibilidad a las personas autorizadas para ello y será libremente transferible".  La compensación se analiza en la Parte IX del presente Laudo *infra*.

3.6    ***Cuestión 5*** *– Intereses:* Esta cuestión surge en virtud del Tratado y, tal como lo afirmaran las Demandantes, en virtud del derecho internacional consuetudinario.  En cuanto al primero, el Artículo 6 del Tratado, prevé, en su parte relevante que, con arreglo al Tratado, la compensación "incluirá intereses desde la fecha de expropiación".  Los intereses se abordan en la Parte XI del presente Laudo *infra*.

3.7    ***Cuestión 6*** *– Costas*: La cuestión de los costos legales y de arbitraje surge en virtud del Artículo 61(2) del Convenio CIADI y la Regla 47(1)(j) de las Reglas de Arbitraje CIADI.  Las costas se analizan asimismo en la Parte XI del presente Laudo *infra*.

**(3)**    ***Cuestiones Detalladas, Interrogantes y Asuntos Relacionados***

3.8    Durante el presente arbitraje, las Partes y (para la Tercera Audiencia) también el Tribunal desarrollaron listas consecutivas de cuestiones, interrogantes y comentarios secundarios sobre asuntos relacionados.  Estas son extensas, reiterativas y duplican mucho de lo que ya aparece de forma diferente en otra parte del presente Laudo.  Sin embargo, la lista a continuación sirvió como lista de verificación de asuntos que el Tribunal abordara durante las Audiencias y para arribar a sus diversas decisiones en el presente Laudo.  No obstante, no ha sido necesario que el Tribunal se pronuncie sobre todas estas cuestiones. Nuevamente, la lista no es exhaustiva de todas las cuestiones detalladas, interrogantes y asuntos relacionados planteados por las Partes durante el curso del arbitraje.

*\* Lista de cuestiones detalladas, interrogantes y asuntos relacionados*

*Cuestión 1 – Jurisdicción: KNI y el Offtake Agreement*

3.9    Según la Demandada, tal como se resumiera brevemente *supra*, el Tribunal carece de competencia para abordar el reclamo efectuado por KNI en lo que se refiere al *Offtake Agreement*.  Según las Demandantes, el *Offtake Agreement* era parte integral del Proyecto FertiNitro; y la participación de KNI en el *Offtake Agreement* califica como "inversión" tanto en virtud del Convenio CIADI como del Tratado.  Por consiguiente, las Demandantes discrepan con la objeción jurisdiccional de la Demandada.

41

***Cuestión 2** – Antecedentes de hecho*

3.10    Según las Demandantes, tres hechos esenciales fueron y siguen siendo completamente incuestionables en el expediente probatorio que se aduce en el marco del presente arbitraje. Primero, la política de 'Apertura'de la Demandada, y sus demás garantías, apresuraron las inversiones de las Demandantes en Venezuela. Segundo, a partir de 2005, la Demandada interfirió de manera progresiva en las inversiones de las Demandantes. Tercero, el 11 de octubre de 2010, sin notificación formal alguna, la Demandada expropió de manera abierta e inequívoca tanto la participación accionaria de KOMSA en FertiNitro como la participación de KNI en el *Offtake Agreement*. Existen, por tanto, según las Demandantes, pocos (si es que los hubiere) cuestiones principales en lo que respecta a los antecedentes de hecho de la controversia de las Partes.

3.11    Según la Demandada, ninguno de los hechos alegados por las Demandantes establece violación alguna de sus obligaciones en virtud del Tratado. Se les exige a las Demandantes que acrediten sus alegaciones de hecho en contrario.

***Cuestión 3:** Responsabilidad*

3.12    *Expropiación:* Según las Demandantes, la Demandada violó el Artículo 6 del Tratado al expropiar de manera ilícita la participación de KOMSA en FertiNitro y la participación de KNI en el *Offtake Agreement* el 11 de octubre de 2010; y, hasta la fecha, la Demandada no ha compensado a las Demandantes por su expropiación de las inversiones de las Demandantes.

3.13    Según la Demandada, su adquisición forzosa de los bienes de FertiNitro fue lícita ya que la Demandada cumplió con los requisitos del Artículo 6 del Tratado. También según la Demandada, no adquirió de manera forzosa el *Offtake Agreement*; FertiNitro resolvió el *Offtake Agreement* en febrero de 2012 por motivos comerciales; y la decisión de FertiNitro de resolver el *Offtake Agreement* no es atribuible a la Demandada en virtud del derecho internacional.

3.14    *TJE*: Esta cuestión de responsabilidad surge en virtud del Artículo 4(1) del Tratado. Prevé, en su parte relevante, que la Demandada "acordará, de conformidad con las normas y criterios del Derecho Internacional, a las inversiones en su territorio de inversores de la otra Parte Contratante un trato justo y equitativo [...]" (el "estándar TJE").

3.15    Según las Demandantes, la Demandada violó su obligación de acuerdo al Artículo 4(1) de otorgarles a las inversiones de las Demandantes un trato justo y equitativo. Según la Demandada, no violó el estándar TJE del Artículo 4(1) del Tratado. La Demandada sostiene que el estándar TJE está ligado al estándar mínimo del derecho internacional consuetudinario; y que las Demandantes no han logrado demostrar sus pretensiones.

3.16    *SPP*: Esta cuestión surge en virtud del Artículo 4(1) del Tratado. Prevé, en su parte relevante, que la Demandada: "acordará, de conformidad con las normas y criterios del Derecho Internacional, a las

inversiones en su territorio de inversores de la otra Parte Contratante [...] seguridad y protección plenas [...]" (el "estándar SPP").

3.17    Según las Demandantes, la Demandada violó su obligación en virtud del Artículo 4(1) de otorgarles a las inversiones de las Demandantes seguridad y protección plena.  Según la Demandada, cumplió con su obligación en virtud del Artículo 4(1) de otorgarles seguridad y protección plena: este estándar SPP se refiere únicamente a perjuicios físicos; y la Demandada no incumplió su obligación de proteger la inversión de KOMSA.

3.18    *Interferencia:* Esta cuestión surge también en virtud del Artículo 4(1) del Tratado. Prevé, en su parte relevante, que la Demandada "[no] obstaculizará con medidas arbitrarias o discriminatorias, la administración, gestión, mantenimiento, uso, disfrute, ampliación, venta o liquidación de dichas inversiones".

3.19    Según las Demandantes, la Demandada violó su obligación en virtud del Artículo 4(1) al aplicar medidas arbitrarias y discriminatorias que obstaculizaron a KOMSA la administración, gestión, uso y disfrute de su inversión.  Según la Demandada, no obstaculizó la administración, gestión, uso y disfrute de FertiNitro a través de medidas arbitrarias o discriminatorias.  La Demandada afirma que las Demandantes han aplicado de manera errónea el estándar aplicable; y las Demandantes han proporcionado un recuento engañoso de las acciones de la Demandada para alegar una violación del Artículo 4(1) del Tratado.

3.20    *Trato Nacional*: Esta cuestión surge en virtud del Artículo 4(2) del Tratado. Prevé, en su parte relevante que: "El trato que cada Parte Contratante acuerde a las inversiones de inversores de la otra Parte Contratante en su territorio, o a los inversores mismos en lo que se refiere a sus inversiones, no será menos favorable que el que se acuerde a las inversiones de sus propios inversores [...], o a los respectivos inversores en lo que se refiere a sus inversiones" (el "estándar de Trato Nacional").

3.21    Según las Demandantes, la Demandada violó su obligación en virtud del Artículo 4(2) de otorgarles a las Demandantes y a sus inversiones un trato de conformidad con el estándar de Trato Nacional.  Según la Demandada, no violó el estándar de Trato Nacional en el Artículo 4(2) del Tratado.  La Demandada afirma que las Demandantes han aplicado de manera errónea el estándar aplicable; y que no trató a Pequiven de manera más favorable que a KOMSA.

3.22    *Cláusula Paraguas:* Esta cuestión surge en virtud del Artículo 11(2) del Tratado.  Prevé que: "Cada una de las Partes Contratantes observará cualquier obligación que haya asumido en relación al trato de las inversiones hechas en su territorio por inversores de la otra Parte Contratante" (la "Cláusula Paraguas").

3.23   Según las Demandantes, la Demandada no observó las obligaciones asumidas en el Artículo 11(2) en lo que se refiere al trato de las inversiones de las Demandantes. Según la Demandada, no ha violado el Artículo 11(2) del Tratado, en particular porque no existían estas "obligaciones".

***Cuestión 4 – Compensación***

3.24   En síntesis, las Demandantes afirman que la Demandada debe pagar compensación íntegra en virtud del Artículo 6 del Tratado y el derecho internacional por todas las pérdidas ocasionadas por las violaciones expropiatorias y demás violaciones no expropiatorias del Tratado por parte de la Demandada (es decir, las "Pérdidas Históricas" de KOMSA). Esta compensación para KOMSA asciende a una suma total de capital de USD 444,6 millones (calculada al 30 de enero de 2015). En cuanto a KNI, esta compensación asciende a una suma total de capital de USD 227,8 millones (calculada al 30 de enero de 2015).

3.25   En síntesis, la Demandada afirma que la cuantificación de daños de las Demandantes debe ser rechazada por el Tribunal, por diversas razones. En primer lugar, la Demandada sostiene que la compensación reclamada por KOMSA y KNI se encuentra enormemente sobrevaluada. En segundo lugar, afirma que el estándar de compensación relevante ha de hallarse en el Tratado (no el derecho internacional consuetudinario). En tercer lugar, la Demandada sostiene que las supuestas "Pérdidas Históricas" de KOMSA son infundadas.

***Cuestión 5 – Intereses***

3.26   Las Demandantes afirman que tienen derecho a intereses compuestos sobre cualquier suma adjudicada por el Tribunal. La Demandada sostiene que los reclamos de las Demandantes de intereses compuestos son infundados.

***Cuestión 6 – Costas***

3.27   Las Demandantes procuran obtener una orden que le exija a la Demandada pagar las costas del arbitraje, incluidos todos los honorarios y gastos del CIADI y del Tribunal y todos los costos y gastos legales incurridos por las Demandantes, distribuidos entre las Demandantes en la proporción en la cual se les adjudique la compensación. La Demandada procura obtener una orden que les exija a las Demandantes que soporten todos los costos y gastos incurridos en el presente arbitraje, incluidos los honorarios razonables de los abogados y los honorarios de los expertos de la Demandada.

***La Tercera Audiencia (junio)***

3.28   A los fines de la Tercera Audiencia (junio) ante el Tribunal reconstituido, en aras de permitirles a las Partes que se preparen por completo en sus respectivas presentaciones orales, el 16 de mayo de 2016, el Tribunal les envió a las Partes una lista no taxativa de verificación de cuestiones y, posteriormente, el 2 de junio de

2016, otra lista de cuestiones, tomadas de los propios escritos de las Partes. Estos documentos se establecen en forma consecutiva *infra*, en su parte relevante.

*\* La lista de verificación de fecha 16 de mayo de 2016 (en tres partes)*

**\* Parte I (del argumento alegado por las Demandantes):**

3.29    **Cuestión 1 de las Demandantes** - Jurisdicción:

3.30    La jurisdicción del Tribunal sobre el reclamo de KNI es clara, debido a que:

**A.** El *Offtake Agreement* era parte integral del Proyecto FertiNitro;

**B.** Los derechos de KNI en el *Offtake Agreement* califican como "inversión" tanto en virtud del Convenio CIADI como del Tratado (y cumple con los indicios no jurisdiccionales), debido a que:

(i) El *Offtake Agreement* constituye una "inversión" en virtud del Convenio CIADI;

(ii) El *Offtake Agreement* constituye una "inversión" en virtud del Tratado; y

(iii) En cualquier caso, el *Offtake Agreement* también cumple con los indicios no jurisdiccionales.

3.31    **Cuestión 2 de las Demandantes** - Los hechos principales: El testimonio oral durante la Primera Audiencia (septiembre) confirmó las afirmaciones principales del argumento de las Demandantes y menoscabó de manera sustancial el argumento de la Demandada, debido a que:

**A.** Los hechos esenciales siguen siendo completamente incuestionables en el expediente probatorio del presente arbitraje, tal como se enumerará en B, C y D *infra*.

**B.** La política de 'Apertura' de la Demandada, con sus demás garantías, apresuraron la inversión de las Demandantes en Venezuela.

**C.** A partir de 2005, la Demandada interfirió de manera progresiva en las inversiones de las Demandantes.

**D.** El 10 de octubre de 2010, sin notificación formal alguna, la Demandada expropió de manera abierta e inequívoca tanto la participación de KOMSA en FertiNitro como los derechos de KNI en virtud del *Offtake Agreement*.

**E.** La Primera Audiencia (septiembre) demostró que la afirmación de la Demandada (de que nunca expropió el *Offtake Agreement*) es una observación incoherente, ya que:

(i) Si la Demandada no expropió el *Offtake Agreement,* como afirma, entonces no podría haber tenido un propósito legítimo para la expropiación de FertiNitro;

(ii) La Demandada siempre planeó confiscarlos derechos de comercialización(*offtake*) de KNI; y

(iii) El Decreto de la Urea y la Resolución de la Urea ya garantizaban el acceso de la Demandada al producto de FertiNitro a un precio significativamente inferior al costo de producción.

**F.** La Primera Audiencia (septiembre) confirmó que Pequiven fue, en todos los momentos relevantes, un representante de la Demandada.

3.32    *Cuestión 3 de las Demandantes* - Responsabilidad: La conducta de la Demandada violó el Tratado:

**A.** Expropiación: La Demandada violó el Artículo 6 del Tratado al expropiar de manera ilícita la participación de KOMSA en FertiNitro y los derechos de KNI en virtud del *Offtake Agreement:*

(i) La expropiación de las inversiones de las Demandantes por parte de la Demandada no se realizó por causa de utilidad pública;

(ii) La expropiación de las inversiones de las Demandantes por parte de la Demandada se realizó de manera discriminatoria;

(iii) La expropiación de las inversiones de las Demandantes por parte de la Demandada no se realizó de conformidad con el debido proceso del derecho; y

(iv) Hasta la fecha, la Demandada no ha compensado a las Demandantes por su expropiación directa de las inversiones de las Demandantes.

**B.** TJE: La Demandada violó su obligación en virtud del Artículo 4(1) del Tratado de otorgarles a las inversiones de las Demandantes un trato justo y equitativo.

**C.** SPP: La Demandada violó su obligación en virtud del Artículo 4(1) del Tratado de otorgarles a las inversiones de las Demandantes seguridad y protección plena.

**D.** Menoscabo: La Demandada violó el Artículo 4(1) del Tratado al aplicar medidas arbitrarias y discriminatorias que menoscabaron la administración, gestión, uso y disfrute por parte de las Demandantes de sus inversiones.

**E.** Trato Nacional: La Demandada violó su obligación en virtud del Artículo 4(2) del Tratado de otorgarles a las inversiones de las Demandantes un trato nacional.

**F.** Cláusula Paraguas: La Demandada violó sus obligaciones asumidas en virtud del Artículo 11(2) del Tratado en lo que se refiere al trato de las inversiones de las Demandantes.

3.33 ***Cuestión 4 de las Demandantes*** - Compensación:

**A.** Las Demandantes han demostrado que la Demandada debe pagar compensación íntegra en virtud del derecho internacional:

(i) Jurisprudencia reciente confirma que la Demandada debe pagar compensación íntegra a las Demandantes en un escenario contrafáctico por la expropiación ilegal de sus inversiones;

(ii) KOMSA tiene asimismo derecho a compensación íntegra en virtud del derecho internacional por las pérdidas ocasionadas por las demás violaciones (no expropiatorias) del Tratado por parte de la Demandada; y

(iii) KOMSA tiene derecho a compensación por sus 'Pérdidas Históricas'.

**B.** El testimonio de la Primera Audiencia (septiembre) demostró que los expertos en cuantificación de daños de las Partes han adoptado criterios fundamentalmente diferentes para el ejercicio de valoración:

(i) La valoración del Sr. Giles (para las Demandantes) está sustentada por prueba documental contemporánea y por el testimonio del único experto independiente en la industria de fertilizantes de este arbitraje (el Sr. Sanders); y

(ii) La valoración del Dr. Flores (para la Demandada) se trata de una coalescencia de (i) una serie de afirmaciones que se encuentran fuera del expediente probatorio o están más allá de su pericia; y (ii) una promediación mecánica de datos y fuentes sin reconocimiento alguno de la prueba contemporánea y de la industria.

**C.** Aunque los expertos en cuantificación de daños de las Partes coinciden en una serie de parámetros de compensación, sus diferencias sobresalientes de hecho y de pericia sobre las cuestiones de cuantificación de daños siguen siendo significativas.

3.34 ***Cuestión 5 de las Demandantes*** - Intereses compuestos: Las Demandantes han demostrado que tienen derecho a intereses compuestos.

**A.** El Tratado confirma que los intereses compuestos resultan pagaderos;

**B.** Los últimos cinco años de jurisprudencia del CIADI (en el expediente del presente procedimiento) confirman que los intereses compuestos resultan pagaderos; y

**C.** Comentarios destacados confirman que los intereses compuestos resultan pagaderos.

*\* Parte II (del argumento alegado por la Demandada):*

3.35     *Cuestión 1 de la Demandada* - Jurisdicción: El Tribunal carece de jurisdicción sobre los reclamos en lo que se refiere al *Offtake Agreement*, ya que:

**A.** El *Offtake Agreement* es un contrato de compraventa y no constituye una "inversión" dentro del significado del Tratado o del Artículo 25 del Convenio CIADI:

(i) Los Contratos de compraventa no constituyen inversiones en virtud del derecho internacional; y

(ii) La complejidad, duración, implicaciones financieras del proyecto o la unidad general del concepto de inversión no transforman al *Offtake Agreement* en una inversión.

**B.** KNI no ha efectuado aporte alguno ni ha incurrido en la clase de riesgo necesario para calificar como inversión en virtud del Tratado o en virtud del Artículo 25 del Convenio CIADI, ya que:

(i) El Término "inversión" tiene un significado intrínseco y objetivo tanto en virtud del Tratado como del Convenio CIADI, que demanda la asunción de un riesgo de inversión y la realización de un aporte; y

(ii) KNI no ha incurrido en riesgo de inversión alguno en relación con el *Offtake Agreement*.

**C.** El *Offtake Agreement* carece de un nexo de territorialidad con la República de Venezuela para gozar de protección en virtud del Tratado.

3.36     *Cuestión 2 de la Demandada* - Expropiación: La Demandada no adquirió de manera forzosa el *Offtake Agreement*, ya que:

**A.** El *Offtake Agreement* le otorgó a KNI un derecho a adquirir el producto de FertiNitro;

**B.** El Decreto 7713 no ordenó la adquisición forzosa de los derechos del KNI en virtud del *Offtake Agreement* ni del propio *Offtake Agreement*;

**C.** KNI continuó adquiriendo los derechos de comercialización (*offtake*) en virtud del *Offtake Agreement* hasta febrero de 2012;

**D.** FertiNitro resolvió el *Offtake Agreement* en febrero de 2012 por motivos comerciales; y

**E.** La decisión de FertiNitro de resolver el *Offtake Agreement* no es atribuible a la Demandada.

3.37     *Cuestión 3 de la Demandada* - Expropiación: La adquisición forzosa de los bienes de FertiNitro fue lícita; y la Demandada cumplió con los requisitos del Artículo 6 del Tratado, puesto que:

**A.** La adquisición de FertiNitro por parte de la Demandada obedeció a causas de interés público:

(i) Se le debería conceder a la Demandada una gran deferencia en lo que respecta a sus políticas de interés público; y

(ii) La adquisición forzosa de los bienes de FertiNitro se llevó a cabo de conformidad con la política pública de seguridad alimentaria.

**B.** La adquisición forzosa de los bienes de FertiNitro se llevó a cabo de manera no discriminatoria, ya que:

(i) Pequiven/IPSL y KOMSA/KNI no se encontraban en posiciones similares;

(ii) KOMSA no recibió un trato diferencial; y

(iii) Cualquier trato diferencial no fue inadecuado en tanto se fundó en una justificación razonable.

**C.** Las acciones de la Demandada se llevaron a cabo en virtud del proceso legal, ya que:

(i) El "Preaviso" no constituye un requisito del debido proceso en virtud del Tratado ni del derecho internacional; y

(ii) La Demandada de manera reiterada cursó notificación a KOMSA de que planeaba asumir el control de FertiNitro.

**D.** La Demandada cumplió (y sigue cumpliendo) con sus obligaciones de pago en virtud del Artículo 6 del Tratado, ya que:

(i) El Artículo 6 del Tratado exige que la Demandada realice una oferta de compensación razonable − no el pago inmediato;

(ii) La Demandada efectuó una oferta de compensación razonable, que KOMSA rechazó; y

(iii) La Demandada compensará a KOMSA mediante el Procedimiento de Adquisición Forzosa.

3.38    *Cuestión 4 de la Demandada* - TJE: La Demandada no violó el estándar TJE del Artículo 4(1) del Tratado, porque:

**A.** El estándar aplicable se encuentra ligado al estándar mínimo del derecho internacional consuetudinario;

**B.** Las Demandantes no han logrado demostrar sus pretensiones; ya que:

(i) Las Demandantes no han podido establecer que tenían expectativas legítimas en lo que se refiere al régimen fiscal de la Demandada;

(ii) La Demandada le ha proporcionado a FertiNitro Créditos de IVA en consonancia con las obligaciones de la Demandada;

(iii) La Demandada no interfirió en la administración y gestión de FertiNitro;

(iv) La Demandada no frustró ninguna expectativa legítima al dictar el Decreto de la Urea y la Resolución de la Urea; y

(v) La Demandada proporcionó un entorno jurídico y comercial estable y predecible; trató a las Demandantes con transparencia y justicia procesal y no abusó de su autoridad.

3.39    **Cuestión 5 de la Demandada** - SPP: La Demandada cumplió con su obligación en virtud del Artículo 4 del Tratado de otorgar seguridad y protección plenas, ya que:

**A.** El estándar SPP se relaciona con el perjuicio físico.

**B.** La Demandada no incumplió su obligación de proteger la inversión de KOMSA.

3.40    **Cuestión 6 de la Demandada** - Interferencia/Menoscabo: La Demandada no menoscabó la administración, gestión, uso o disfrute de FertiNitro a través de medidas arbitrarias o discriminatorias de conformidad con el Artículo 4(1) del Tratado, ya que:

**A.** Las Demandantes han aplicado de manera incorrecta el estándar aplicable; y

**B**. Las Demandantes han proporcionado asimismo un recuento engañoso de las acciones de la Demandada que supuestamente violaron el Artículo 4(1) del Tratado.

3.41    **Cuestión 7 de la Demandada** - Trato Nacional: La Demandada no violó el estándar de Trato Nacional en virtud del Artículo 4(2) del Tratado, ya que:

**A.** Las Demandantes han aplicado de manera incorrecta el estándar aplicable; y

**B.** La Demandada no trató a Pequiven más favorablemente que a KOMSA.

3.42    **Cuestión 8 de la Demandada** - Cláusula Paraguas: La Demandada no violó el Artículo 11(2) del Tratado.

3.43    **Cuestión 9 de la Demandada** - Compensación: El Tribunal debe rechazar la cuantificación de daños de las Demandantes, debido a que:

**A.** La compensación que reclaman KOMSA y KNI se encuentra enormemente sobrevaluada:

(i) El estándar relevante de compensación se halla en el Tratado, no en el derecho internacional consuetudinario;

(ii) Independientemente del estándar jurídico de compensación, las Partes coinciden en que los expertos en materia de compensación deberían aplicar el estándar de Valor Justo de Mercado (VJM); y

(iii) En definitiva, las Demandantes no aplicaron el estándar VJM.

**B.** El Valor Justo de Mercado (VJM) del interés económico de KOMSA en FertiNitro no superaba USD 34,6 millones:

(i) Aunque la valoración FCD del Dr. Flores sea razonable, el análisis FCD del Sr. Giles se encuentra sobrevaluado y no refleja el VJM de FertiNitro porque:

a. El análisis FCD de las Demandantes es inconsistente y sumamente especulativo;

b. La valoración FCD de las Demandantes excluye indebidamente los volúmenes reales de producción de 2009 y 2010 para proyectar la producción futura:

(1) Las Demandantes proyectan indebidamente un ciclo de entrega de tres años para FertiNitro;

(2) El número de interrupciones de gas y electricidad y paradas no programadas en 2009 y 2010 no fueron sustancialmente superiores que en años anteriores recientes;

(3) La postura de las Demandantes de que un comprador hipotético creería que FertiNitro podría lograr de manera consistente los niveles de producción de placa carece de fundamento;

(4) La postura de las Demandantes de que la exclusión del período 2009-2010 se encuentra justificada por ley es completamente infundada;

c. Las proyecciones de las Demandantes de los costos futuros de FertiNitro se encuentran subvaluadas:

(1) Las Demandantes se basaron de manera indebida en el plazo de entrega y los costos de mantenimiento presupuestados en lugar de reales;

(2) Las demás estimaciones de costos de las Demandantes se encuentran asimismo subvaluadas.

d. La tasa de descuento propuesta de las Demandantes se encuentra subvaluada:

(1) La invocación de las Demandantes de información de primas de riesgo del mercado mundial no vigentes es irrazonable e inapropiada;

(2) Las Demandantes se basaron indebidamente en datos de encuestas limitados para determinar su índice de riesgo país de base;

(3) Las Demandantes excluyeron indebidamente el riesgo político del índice de riesgo país;

(4) El cálculo de las Demandantes de un factor *lambda* de 0,40 para FertiNitro es completamente arbitraria e irrazonable;

(5) La aplicación por parte de las Demandantes de un descuento de liquidez de 1% es contraria a los principios básicos de valoración; y

(6) La irracionalidad de la tasa de descuento de las Demandantes queda confirmada por los dos laudos de *ExxonMobil* y el laudo de *Flughafen Zürich*.

(ii) Las "Verificaciones de Razonabilidad" de las Demandantes no sustentan su valoración del 25% de participación de KOMSA en FertiNitro:

a. El Precio del MdE de octubre de 2008, si se lo ajusta correctamente, confirma la valoración del Dr. Flores;

b. Los costos de construcción de otras plantas son irrelevantes;

c. Los Informes Advantis confirman la valoración del Dr. Flores;

d. El 'nuevo argumento' de las Demandantes con base en el valor contable de FertiNitro es irrelevante.

**C.** La valoración del *Offtake Agreement* por parte de las Demandantes se encuentra sobrevaluado, porque:

(i) Las Demandantes formulan las mismas hipótesis inapropiadas en lo que se refiere a volúmenes de venta y tasa de descuento que en su valoración de la participación accionaria de KOMSA en FertiNitro.

(ii) El período de valoración de las Demandantes incluye indebidamente un período de 16 meses durante el cual KNI no sufrió pérdida alguna.

(iii) Las Demandantes utilizan la metodología de valoración equivocada basada en supuestos de hecho poco realistas, ya que:

a. Las Demandantes calculan de manera inadecuada el lucro cesante de KNI en lugar del valor de los supuestos derechos de KNI en virtud del *Offtake Agreement*;

b. Las Demandantes no demuestran que no habrían podido reemplazar los derechos de comercialización (*Offtake*) de FertiNitro a través de la compra en el mercado abierto;

c. Los cálculos de lucro cesante de las Demandantes son erróneos y sumamente especulativos.

**D.** Las supuestas "Pérdidas Históricas" de las Demandantes son infundadas.

3.44   ***Cuestión 10 de la Demandada*** - Intereses: Las pretensiones de intereses compuestos de las Demandantes son infundadas.

3.45   ***Cuestión 11 de la Demandada*** - Costas: Se rechazan las pretensiones de las Demandantes en materia de costas.

*** Parte III: Otras consultas específicas (del Tribunal)*

3.46    El Tribunal invitó a las Partes a resumir durante la Tercera Audiencia (junio) sus respectivos argumentos sobre la relación entre el *Offtake Agreement* y el Proyecto FertiNitro.

3.47    Se les solicitó a las Partes que resumieran sus respectivos argumentos en cuanto a si el *Offtake Agreement* cumple con las características jurídicas y económicas de una inversión en virtud del Tratado.

3.48    Se les solicitó a las Partes que resumieran las pruebas respecto de la incidencia del Decreto 7713 en los derechos de KNI en virtud del *Offtake Agreement*.

3.49    Se les solicitó a las Partes que resumieran sus respectivos argumentos acerca de la atribución en virtud del Tratado o de otro modo a la Demandada de la decisión de FertiNitro de resolver el *Offtake Agreement*.

3.50    Además, se invitó a las Partes a abordar las siguientes cuestiones:

3.50.1    ¿Qué medidas, en su caso, adoptó cualquiera de las Demandantes para oponerse al Decreto de la Urea?

3.50.2    ¿Qué ha ocurrido con el precio real y proyectado del gas natural, desde las últimas presentaciones de las Partes sobre esta materia?

3.50.3    ¿Por qué motivo debería utilizarse sobre los valores la "tasa de rendimiento esperada" en lugar de la "tasa de rendimiento exigida" para la determinación de la prima de riesgo de mercado?

3.50.4    Teniendo en cuenta que las ventas de producto a KNI, tras una interrupción entre octubre de 2010 y enero de 2011, comenzaron nuevamente en enero de 2011 hasta la resolución del *Offtake Agreement* en febrero de 2012, ¿cuánto dinero, si acaso algo, perdió KNI en comparación con la operación ininterrumpida de ese *Offtake Agreement*?

3.50.5    ¿Explicarían las Partes en mayor grado de detalle sus visiones respectivas en lo que se refiere a la relevancia para el presente caso (si existiere) de las tasas de descuento utilizadas en los dos laudos de *ExxonMobil* y en los laudos de *Flughafen* y *Gold Reserve* y el Informe Advantis de mayo de 2011, a los que las Partes hacen alusión en sus respectivas presentaciones?

3.50.6    ¿Cuál es la relevancia, en su caso, de la valoración de FertiNitro por parte de Booz Allen realizada en 2007?

*Temas Adicionales del Tribunal para las Partes de fecha 2 de junio de 2016*

A. *Offtake Agreement*

3.51     Tema A1: Suponiendo, hipotéticamente, que el *Offtake Agreement* estuviera incluido en el ámbito del Decreto de Expropiación, ¿cuál es el efecto jurídico de un decreto venezolano en los derechos y obligaciones en virtud del *Offtake Agreement*, que se encuentra regido por las leyes del Estado de Nueva York?

3.52     Tema A2: Suponiendo, hipotéticamente, que el *Offtake Agreement* no estuviera incluido en el ámbito del Decreto de Expropiación, ¿constituyó la resolución del *Offtake Agreement* el 28 de febrero de 2012 una violación del *Offtake Agreement*?

3.53     Tema A3: ¿Existió algún ejercicio de facultades soberanas involucrado en la resolución del *Offtake Agreement* el 28 de febrero de 2012 (suponiendo, hipotéticamente, que no hubiese resuelto anteriormente mediante el Decreto de Expropiación, etc.)? En caso afirmativo, ¿qué facultades soberanas fueron invocadas y por quién?

3.54     Tema A4: ¿Respondió KNI a la carta del Sr. Betulio Hernandez de fecha 28 de febrero de 2012 (Anexo C-114)? ¿Hubo alguna correspondencia ulterior entre las Partes del *Offtake Agreement*? De ser así, ¿en qué parte del expediente ha de hallarse esa correspondencia?

B. *Negociaciones y procesos locales relacionados con la compensación*

3.55     Tema B1: ¿Están de acuerdo las Demandantes con el resumen proporcionado en el párrafo 111 del Escrito Post-Audiencia de la Demandada? De no ser así, ¿qué modificaciones específicas desearían realizar?

3.56     Tema B2: ¿Han existido avances relacionados con los procesos en los juzgados locales (el "Procedimiento de Adquisición Forzosa") desde que los Escritos Posteriores a la Audiencia fueran presentados por las Partes?

C. *Cuestiones de cuantificación de daños*

3.57     Tema C1: ¿Está de acuerdo la Demandada con la presentación de los puntos de consenso y disenso entre el Sr. Giles y el Dr. Flores en las tablas de las páginas 55-60 del Escrito Post-Audiencia de las Demandantes? De no ser así, ¿qué modificaciones específicas desearía realizar la Demandada?

*Proyección de flujos de caja futuros*

3.58     Tema C2: ¿Hay ejemplos de tribunales que hayan adoptado previsiones presupuestarias para producción y/o costos a los fines de calcular los flujos de caja de una empresa para una valoración FCD en lo que se refiere al período que antecede a la violación de obligaciones de un tratado de inversión en circunstancias en las que se encontraban disponibles datos reales para la producción y/o costos?

3.59    Tema C3. ¿Cuál es el impacto general en los costos de FertiNitro de la inflación y el congelamiento de la tasa de cambio en Venezuela entre 2008-2010?

*Offtake Agreement*

3.60    Tema C4: ¿Es el cálculo de daños en lo que respecta al *Offtake Agreement* por parte de cualquiera de los expertos coherente con la manera en la cual se calcularían los daños en el supuesto de una violación del *Offtake Agreement* en virtud de las leyes del Estado de Nueva York?  De no ser así, ¿en qué difieren?

*Prima de riesgo de mercado y de riesgo país*

3.61    Tema C5: ¿Acepta la Demandada la definición de las Demandantes de riesgo de mercado y riesgo país en el párrafo 198 de su Escrito Post-Audiencia?

3.62    Tema C6: Explíquese el fundamento para las primas de riesgo de mercado y de riesgo país en los informes de valoración Advantis de mayo y julio de 2011.

3.63    Tema C7: ¿Cuál debería ser el umbral probatorio para la aplicación del factor *lambda* a una empresa que opera en un país particular?  En otras palabras, ¿cuán frecuente es en la práctica de valoración aplicar un factor lambda para tener en cuenta una mayor o menor exposición de una empresa particular al riesgo país y qué grado de certeza se requiere?

3.64    Tema C8: ¿Hay ejemplos de tribunales que hayan adoptado un descuento de liquidez en el marco del arbitraje en materia de inversiones?

3.65    Tema C9: Compárense y contrástense las primas de riesgo de mercado y de riesgo país adoptadas por otros tribunales en laudos públicos disponibles en materia de tratados de inversión que involucren a Venezuela.

3.66    Tema C10: ¿Un bien que pueda ser objeto de protección de un Tratado es análogo a contar con "cobertura similar a un seguro" [Transcripción, D6/P66 (Giles)]?  ¿Sería apropiado descontar el riesgo país respecto de una expropiación lícita en contraposición a una expropiación ilícita?

*Comprobaciones de validez en materia de valoraciones*

3.67    Tema C11: ¿Proporciona el valor contable del 25% de la participación de KOMSA en FertiNitro a la fecha de valoración una comprobación de validez adecuada en las valoraciones FCD en el presente caso?

3.68    Tema C12: ¿Qué ajustes, si alguno, sería necesario realizar a las valoraciones del MdE en 2007 y 2008 para que sean relevantes como comprobación de validez en una valoración FCD realizada en la fecha de valoración en 2010?

3.69    Tema C13: ¿Qué ajustes, de haber alguno, serían necesario realizar a las valoraciones de Advantis en mayo y julio de 2011 para que sean relevantes como comprobación de validez en una valoración FCD realizada en la fecha de valoración en 2010?

## PARTE IV: LOS TEXTOS JURIDICOS ESENCIALES

### (1)    Introducción

4.1    Resulta necesario citar íntegramente algunos de los textos jurídicos relevantes al comienzo de este Laudo, con el fin de facilitar las referencias en otras secciones. Esto no quiere decir que para decidir las cuestiones legales que las Partes disputan, el Tribunal esté limitado a las fuentes aquí identificadas o a las que de otra forma hayan sido invocadas por las Partes. Al contrario, el Tribunal está de acuerdo con la siguiente afirmación del Comité *ad-hoc* en *Daimler c. Argentina*:[37]

> *"Este Comité considera que un tribunal arbitral no se limita a referirse o basarse únicamente en las autoridades citadas por las partes. Puede, por iniciativa propia, basarse en otras autoridades públicamente disponibles, aun si no han sido citadas por las partes, siempre que la cuestión haya sido planteada ante el tribunal y que se haya conferido a las partes la oportunidad de tratarlas. […]. Una vez que se brindó la oportunidad el Tribunal no estuvo obligado a limitarse solo a esas autoridades, que habían sido citadas por las Partes. Ninguna norma de derecho, de procedimiento o requisito de debido proceso evitó que se refiriera o basara en otras autoridades que estaban en el dominio público. Dicha fundamentación no violó ninguna norma de justicia natural, incluido el derecho a ser escuchado."*

4.2    Tal como se indica, en los casos en que el texto original se encuentra en idioma español el Tribunal aquí cita la versión al idioma [español].

### (2)    El Tratado Suiza-Venezuela[38]

4.3    A los efectos del Tratado, el Artículo 1(1) define a los "inversores" de la siguiente manera:

> *"El término "inversor" designa en relación a cualquiera de las Partes Contratantes a:*
> *a) Las personas naturales, que de acuerdo con la legislación de esa Parte Contratante, son consideradas nacionales de la misma;*

---

[37] *Daimler Financial Services A.G. c. República de Argentina*, Caso CIADI No. ARB/05/1, Decisón de Anulación (7 de enero de 2015), párrafo 295.
[38] Acuerdo entre la República de Venezuela y la Confederación Suiza sobre la Promoción y la Protección Recíprocas de las Inversiones (18 de noviembre de 1993) (CLA-1).

*b) Las entidades jurídicas, incluyendo sociedades, corporaciones, asociaciones comerciales o cualquier entidad constituida o efectivamente organizada de conformidad con la legislación de esa Parte Contratante;*

*c) Las entidades jurídicas no constituidas conforme a la legislación de esa Parte Contratante, pero efectivamente controladas por personas naturales, definidas en el literal a) anterior o por entidades jurídicas definidas en el literal b) anterior".*

4.4   El Artículo 1(2) del Tratado define el término "inversión" del siguiente modo:

*"El término "inversiones" incluye todo tipo de bienes y particularmente, aunque no exclusivamente:*

*a) La propiedad mueble o inmueble así como los demás derechos reales;*

*b) Las acciones, cuotas sociales o cualquier forma de participación en compañías;*

*c) Los derechos al pago de dinero o a cualquier prestación contractual;*

*d) Los derechos de propiedad intelectual, conocimientos y procesos técnicos, el prestigio y la clientela;*

*e) Las concesiones y otros derechos otorgados de conformidad con el Derecho Público."*

4.5   El Artículo 2 del Tratado establece lo siguiente:

*"El presente Acuerdo se aplicará a las inversiones efectuadas en el territorio de una Parte Contratante, de conformidad con sus leyes y reglamentos, por inversores de la otra Parte Contratante antes o después de su entrada en vigor. No será sin embargo, aplicable a divergencias o controversias  cuyas causas hubieren surgido con anterioridad a su entrada en vigor".*

4.6   El Artículo 4(1) del Tratado establece lo siguiente:

*"Cada Parte Contratante acordará, de conformidad con las normas y criterios del Derecho Internacional, a las inversiones en su territorio de inversores de la otra Parte Contratante un trato justo y equitativo y seguridad y protección plenas; ninguna de ellas obstaculizará con medidas arbitrarias o discriminatorias, la administración, gestión, mantenimiento, uso, disfrute, ampliación, venta o liquidación de dichas inversiones".*

4.7   El Artículo 4(2) del Tratado establece lo siguiente:

*"El trato que cada Parte Contratante acuerde a las inversiones de inversores de la otra Parte Contratante en su territorio, o a los inversores mismos en lo que se refiere a sus inversiones, no será menos favorable que el que se acuerde a las inversiones*

*de sus propios inversores o a las de inversores de cualquier tercer Estado, o a los respectivos inversores en lo que se refiere a sus inversiones".*

4.8     El Artículo 6 del Tratado establece lo siguiente:

*"Ninguna de las Partes Contratantes tomará directa o indirectamente medida alguna de expropiación o nacionalización ni ninguna otra medida que tuviere la misma naturaleza o efecto, contra las inversiones de inversores de la otra Parte Contratante, salvo que dichas medidas se tomen por causa de interés público, que no sean discriminatorias, se ajusten a la Ley, y den lugar a una compensación efectiva y adecuada. Dicha compensación representará el valor de mercado de la inversión expropiada inmediatamente antes de que las medidas expropiatorias fueren tomadas o se hicieren del conocimiento público, si ocurriere antes; incluirá intereses desde la fecha de expropiación, será pagada sin demora en moneda de libre convertibilidad a las personas autorizadas para ello y será libremente transferible".*

4.9     El Artículo 9 del Tratado establece lo siguiente:

*"(1) Con miras a una Solución amistosa de cualquier controversia entre una Parte Contratante y un inversor de la otra Parte Contratante, se celebrarán consultas entre las partes afectadas.*
*(2) De no lograrse una solución amistosa dentro de los seis meses desde la fecha de solicitud para celebrar las consultas, el inversor podrá someter las disputas al Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (CIADI) creado por el Convenio de Washington del 18 de marzo de 1965, sobre Arreglo de Diferencias Relativas a las Inversiones entre Estados y nacionales de otros Estados.*
*(3) Las partes en la controversia podrán por mutuo acuerdo y como alternativa al arbitraje de CIADI, recurrir a un tribunal arbitral ad hoc, que, salvo que las partes en la controversia acuerden otra cosa, será regido por las Reglas para Arbitraje de la Comisión de las Naciones Unidas para el Derecho Comercial Internacional (UNCITRAL). Dicho arbitraje se efectuará en cualquier caso si por cualquier motivo no estuviere disponible el arbitraje de CIADI.*
*(4) El laudo arbitral se limitará a determinar si la Parte Contratante de que se trate ha incumplido una obligación establecida en el presente Acuerdo, si tal incumplimiento ha causado daños al inversionista y, si tal fuere el caso, la suma que deberá pagar la Parte Contratante al inversor como indemnización por tales daños.*
*(5) Por medio del presente Acuerdo, cada una de las Partes Contratantes se compromete a someter cualquier controversia sobre inversiones al arbitraje internacional de conformidad con lo previsto en este artículo.*
*(6) La Parte Contratante que sea parte en una controversia no hará valer, como defensa, en ningún momento del procedimiento, su inmunidad o el hecho de que el*

*inversor haya recibido en razón de un contrato de seguro compensación total o parcial por el daño o pérdida sufridos.*

*(7) El laudo arbitral será definitivo y obligatorio para las partes envueltas en la controversia".*

4.10   El Artículo 11(2) del Tratado establece lo siguiente:

*"Cada una de las Partes Contratantes observará cualquier obligación que haya asumido en relación al trato de las inversiones hechas en su territorio por inversores de la otra Parte Contratante".*

**(3)    *El Offtake Agreement*[39]**

4.11   El Artículo 2.2 del *Offtake Agreement* establece lo siguiente:

*"<u>Asignación de Productos</u>. Con sujeción a lo dispuesto por los Artículos 11.4 y 11.5, las Partes acuerdan que tienen previsto que la asignación de Productos a cada uno de los Compradores en virtud del presente contrato sea del cincuenta por ciento (50%) de la Producción total real de las Plantas [sic], aplicándose las disposiciones descriptas a continuación a la asignación de Productos suponiendo una producción plena en un determinado Año de vigencia del Contrato:*

*(a) Koch tendrá el derecho exclusivo y la obligación de comprarle al Vendedor ya sea para reventa o para su consumo propio (i) el setenta y cinco por ciento (75%) de la Producción de amoníaco de las Plantas [sic] que se encuentre disponible para la venta durante cada uno de los Años de vigencia del Contrato (el cual se estima será aproximadamente de 270.000 toneladas anuales, suponiendo una producción plena de su Capacidad Nominal) y (ii) el cuarenta y cuatro por ciento (44%) de la Producción de urea de las Plantas [sic] que se encuentre disponible para venta durante cada uno de los Años de vigencia del Contrato (el cual se estima será aproximadamente  640.000 toneladas anuales, suponiendo una producción plena de su Capacidad Nominal) y*

*(b) Pequiven Offtaker tendrá el derecho exclusivo y la obligación de comprarle al Vendedor ya sea para reventa o para su consumo propio (i) el veinticinco por ciento (25%) de la Producción de amoníaco de las Plantas [sic] que se encuentre disponible para  la venta durante cada uno de los Años de vigencia del Contrato (el cual se estima será aproximadamente de 90.000 toneladas anuales, suponiendo una producción plena de su Capacidad Nominal) y (ii) el cincuenta y seis por ciento (56%) de la Producción de urea de las Plantas [sic] que se encuentre disponible para su venta durante cada uno de los Años de vigencia del*

---

[39] *Offtake Agreement* entre Pequiven, IPSL y Koch Oil S.A. como compradores y FertiNitro como Vendedor (8 de abril de 1998) (C-19).

*Contrato (el cual se estima será aproximadamente de 820.000 toneladas anuales, suponiendo una producción plena de su Capacidad Nominal)".[Traducción del Tribunal]*

4.12    El Artículo 2.3. del *Offtake Agreement* establece lo siguiente:

*"Asignación de Mercados. Cada Comprador acepta que las restricciones geográficas mencionadas a continuación se aplicarán durante todo el Período Inicial con relación a la comercialización y venta de los Productos:*

*(a) Koch tendrá el derecho exclusivo para la comercialización y venta de los Productos para su entrega y consumo final en el territorio de América del Norte.*

*(b) Pequiven Offtaker tendrá el derecho exclusivo para la comercialización y venta de los Productos para su entrega y consumo final en los territorios de América del Sur, América Central y el Caribe.*

*(c) Cada Comprador acuerda además no vender los Productos en caso de que tengan conocimiento o cuenten con motivos para creer que serán revendidos en última instancia y esencialmente en su forma original en alguno de los países que han sido reservados para el otro Comprador de conformidad con los incisos (a) y (b) supra respectivamente.*

*(d) Sin perjuicio de las disposiciones en contrario contenidas en este Artículo 2.3., Koch podrá, a su exclusiva discrecionalidad, solicitarle a Pequiven Offtaker que comercialice en el territorio de América del Sur, América Central y/o en el Caribe, en representación de Koch, la totalidad o una porción de los Productos asignados a Koch en virtud del presente contrato. Del mismo modo, Pequiven Offtaker podrá, a su exclusiva discrecionalidad, solicitarle a Koch que comercialice en el territorio de América del Norte en representación de Pequiven Offtaker, la totalidad o una porción de los Productos asignados a Pequiven Offtaker en virtud del presente contrato.  Cada Comprador podrá optar por aceptar o rechazar la solicitud efectuada por el otro Comprador en virtud de este Articulo 2.3(d) a su exclusiva discrecionalidad. En el supuesto de que uno de los Compradores ("Mandatario Pasivo") aceptara la solicitud del otro Comprador ("Mandante Activo") de conformidad con lo establecido por este Artículo 2.3.(d), los Compradores compartirán de un modo equitativo la diferencia (ya sea ésta positiva o negativa) entre: (i) el precio obtenido de parte de un Tercero por el Mandatario Pasivo habiendo realizado sus mejores esfuerzos (neto de todos los gastos, honorarios y costos en que el Mandatario Pasivo hubiera incurrido razonablemente  a fin de llevar a cabo la comercialización, venta y/o transporte de los Productos del Mandante Principal) y (ii) el  Precio FOB Jose aplicable mencionado en el Artículo 3.1. infra.*

*(e) Sin perjuicio de las disposiciones en contrario contenidas en este Artículo 2.3., Koch podrá, a su exclusiva discrecionalidad, emitir una solicitud para*

*comercializar en representación de Pequiven Offtaker en el territorio de América del Norte, la totalidad o una porción de los Productos asignados a Pequiven Offtaker en virtud del presente contrato. Del mismo modo, Pequiven Offtaker podrá, a su exclusiva discrecionalidad, emitir una solicitud para comercializar en representación de Koch en los territorios de América del Sur, América Central y/o el Caribe, la totalidad o una porción de los Productos asignados a Koch en virtud del presente contrato. Cada Comprador podrá optar por aceptar o rechazar la solicitud efectuada por la otra parte en virtud de este Artículo 2.3(e) a su exclusiva discrecionalidad. En el supuesto de que un  Comprador ("Mandante Pasivo") aceptara la solicitud del otro Comprador ("Mandatario Activo"), los Compradores compartirán de un modo equitativo la diferencia (ya sea ésta positiva o negativa) entre: (i) el precio obtenido de parte de un Tercero por el Agente Activo, habiendo realizado sus mejores esfuerzos (neto de todos los gastos, honorarios y costos en que el Mandatario Activo hubiera incurrido razonablemente  a fin de llevar a cabo la comercialización, venta y/o transporte de los Productos del Mandante Pasivo) y (ii) el  Precio FOB Jose aplicable mencionado en el Artículo 3.1."[Traducción del Tribunal]*

4.13   El Artículo 3.1 del *Offtake Agreement* establece lo siguiente:

*"Precio de compra. El precio de compra de los Productos que serán vendidos en América del Norte, América Central, América del Sur y el Caribe será calculado de conformidad con las fórmulas establecidas en los Artículos 3.1(a) y (b). El precio de compra de los Productos que serán vendidos para entregar en otros mercados ("Mercados Alternativos") será determinado de conformidad con lo dispuesto en los Artículos 3.1(d) y (e): […]". [Traducción del Tribunal]*

4.14   Los Artículos 3.2. y 3.3 del *Offtake Agreement* establecen lo siguiente:

*"3.2. Falta de aceptación de la entrega de los Productos. Las disposiciones de los incisos (a) y (b) que se describen infra, serán aplicables durante el plazo en que los préstamos se encuentren pendientes de cancelación en virtud de los Contratos de Préstamo. Una vez que se hayan cancelado por completo los préstamos al Vendedor en virtud de los Contratos de Préstamo, serán aplicables las disposiciones del inciso (c) infra.*

*(a) Toma o Paga en caso de cumplimiento de la Obligación de Oferta. En el supuesto de que el Vendedor se encuentre preparado y dispuesto para cumplir con su obligación de ofrecer el Producto a un Comprador y éste no acepte la entrega de su asignación de Productos en virtud de los Capítulos II, V o VI (" Comprador No Tomador") dentro del plazo de treinta (30) días posteriores a la fecha de entrega programada para ello, el Comprador No Tomador deberá no*

obstante pagarle al Vendedor (i) el precio correspondiente, determinado de conformidad con la fórmula aplicable descripta en el Artículo 3.1(a) o en el Artículo 3.1(b) (sin la reducción del descuento por el honorario de comercialización pertinente), por todos los Productos ofrecidos por el Vendedor y que no fueron tomados por el Comprador No Tomador y (ii) todos los costos y gastos del Vendedor en caso de que la falta de toma de los Productos contribuya a una reducción de la producción de la Planta. Sin perjuicio de las disposiciones precedentes, no se le requerirá a ningún Comprador el pago de (y) cantidades de Productos no ofrecidos o que no hayan sido tomados por cuestiones de Fuerza Mayor y (z) cantidades de Productos no ofrecidos por el incumplimiento del Vendedor de conformidad con las disposiciones de este Contrato salvo en la medida que dicho incumplimiento sea atribuible al Comprador No Tomador.

(b) <u>Productos No Tomados</u>. El Vendedor deberá informar inmediatamente al otro Comprador acerca de cualquier falta en la toma de cualquier producto de un Comprador No Tomador siempre que ese otro Comprador se encuentre tomando la entrega de su asignación de Productos de conformidad con los Capítulos II, V o VI ("Comprador Tomador"). El Comprador Tomador tendrá derecho de preferencia para comprar cualquier Producto que no haya sido tomado por el Comprador No Tomador, para reventa o [sic] para su consumo propio, al precio del Producto correspondiente, establecido de conformidad con el Artículo 3.1.(a) o (b), según sea el caso, y luego de la aceptación, las obligaciones de comprar y tomar la entrega de tal Producto serán obligatorias para el Comprador Tomador. En el supuesto de que el Comprador Tomador declinara o no ejerciera el derecho de preferencia mediante notificación de ello al Vendedor dentro del plazo de cinco (5) días posteriores a la recepción de la notificación del Vendedor por parte del Comprador Tomador, el Vendedor tendrá derecho a vender ese Producto a un Tercero al precio que fuere. Sin perjuicio de la venta de los Productos correspondientes de conformidad con este Artículo 3.2.(b), el Comprador No Tomador deberá pagarle al Vendedor los importes establecidos en el Artículo 3.2(a) (sin la reducción del Descuento de Honorarios por la Comercialización de Amoníaco o por el Descuento de Honorarios por la Comercialización de Urea, según corresponda), junto con cualquier costo en el que hubiera incurrido el Vendedor para vender el Producto. El Vendedor le otorgará al Comprador No Tomador un crédito por el valor de los importes recibidos por el Vendedor de parte del Comprador Tomador o de un Tercero en virtud de este Artículo 3.2(b) en el caso de que el Comprador No Tomador ya ha pagado al Vendedor los importes adeudados en virtud del Artículo 3.2(a)(junto con cualquier costo en el que hubiera incurrido el Vendedor para vender el Producto), dicho crédito será aplicado por el Vendedor para compensar facturas futuras emitidas por el Vendedor al Comprador pertinente.

(c) *Modificación de Algunas Disposiciones al Momento de la Cancelación de los Préstamos. Sin perjuicio de las disposiciones en contrario contenidas en este contrato, luego de la cancelación por completo de los préstamos realizados por los prestatarios al Vendedor en virtud de los Contratos de Préstamo, con inclusión de toda refinanciación de los mismos, las obligaciones de los Compradores de tomar o pagar por Producto ofrecido en virtud del Artículo 3.2.(a) supra finalizarán y las modificaciones a este Contrato establecidas en el Anexo B serán efectivas para todos los propósitos en virtud del presente desde esa fecha .*

3.3. *Impuestos a los Ingresos. A excepción de lo se ha establecido específicamente en el Artículo 3.1.(f), cada Comprador deberá indemnizar y mantener indemne al Vendedor por cualquier impuesto determinado o reclamado contra tal Comprador que se fundamente en sus ingresos o se calcule en base a los mismos (incluyendo penalidades, intereses y gastos) impuestos por cualquier jurisdicción o subdivisión política (que no se trate de la República de Venezuela, algún estado venezolano, autoridad gubernamental o impositiva de ese lugar) surgida o relacionada con la venta de Productos en virtud del presente contrato o con el cumplimiento del Comprador de su obligación en virtud del presente contrato, ya sea que esos impuestos hubieran sido o no determinados de manera correcta o legal.*"[Traducción del Tribunal]

4.15   El Artículo 11.1 del *Offtake Agreement* establece lo siguiente:

"*Vigencia del Contrato – De conformidad con los términos y condiciones del presente, este Contrato entrará en vigor desde la primera fecha escrita supra y estará vigente por un período inicial de veinte (20) Años Contractuales a partir de ese momento ("Período Inicial"); no obstante, en el supuesto de que los Bonos no fueran pagados en su totalidad o reembolsados y permanezcan adeudados en virtud de su cronograma de cancelación original al momento de finalización del Periodo Inicial, ninguno de los Compradores ni el Vendedor cancelarán este Contrato y el Período Inicial se extenderá por el período de tiempo en que los Bonos se encuentren adeudados en virtud de su cronograma de cancelación original. Este Contrato se renovará automáticamente luego del Período Inicial por uno o más períodos sucesivos de cinco (5) Años Contractuales (cada uno denominado "Período Secundario") a menos que una de las Partes notificará lo contrario por escrito a las otras Partes al menos con seis (6) meses de anticipación a la finalización del Período Primario o del entonces vigente Período Secundario, según corresponda. En el supuesto de que este Contrato sea renovado por uno o más Períodos Secundarios, las Partes realizarán consultas entre ellas con una anticipación no menor a tres (3) meses previos al comienzo de cualquier Período Secundario a fin de determinar si*

*en virtud de las circunstancias que prevalezcan en ese momento deben aplicarse las disposiciones del Artículo 2.3". [Traducción del Tribunal]*

4.16    El Artículo 12.2 del *Offtake Agreement* establece lo siguiente:

*"(a) <u>Arbitraje de Conformidad con las Reglas de la CCI</u>. En el supuesto de que una Controversia no hubiera sido resuelta por medio de la negociación dentro del plazo de noventa (90) días posteriores a la fecha de notificación de la Controversia recibida en virtud del Artículo 12.1, la Controversia será resuelta de manera definitiva, mediante arbitraje de conformidad con las Reglas de la CCI, salvo en lo que respecta a las modificaciones a dichas Reglas de la CCI conforme lo dispuesto en el presente Artículo XII.*

*"(c) <u>Sede e Idioma</u>. El procedimiento de arbitraje se llevará a cabo en la Ciudad de Miami, Estado de Florida, Estados Unidos de América, o en cualquier otro lugar que acuerden las partes del procedimiento de arbitraje, en idioma inglés. [...]"*

*"(f) <u>Ley Aplicable</u>. Deberá requerirse a los árbitros que apliquen la ley de fondo de Nueva York al decidir sobre cualquier Controversia de conformidad con la intención de las Partes expresada en el Artículo 13.1." [Traducción del Tribunal]*

4.17    El Artículo 13.1 del *Offtake Agreement* establece lo siguiente (impreso en mayúsculas):

*"[...] El presente Contrato se regirá, interpretará y ejecutará de conformidad con las leyes del Estado de Nueva York, Estados Unidos de América, sin consideración de sus normas de derecho internacional privado." [Traducción del Tribunal]*

**(4)    El Decreto Urea**[40]

4.18    Comenzando por su Preámbulo el Decreto Urea establece lo siguiente:

*"CONSIDERANDO que la producción de alimentos es de interés nacional y fundamental para el desarrollo económico y social de la Nación, elemento esencial de la seguridad y soberanía nacional, [...]"*

4.19    El Artículo 1 del Decreto Urea establece lo siguiente:

*"Se declaran como bienes de primera necesidad en todo el territorio nacional, los fertilizantes nitrogenados y los insumos necesarios para su elaboración en sus distintos formatos y presentaciones, destinados a satisfacer la demanda nacional."*

4.20    El Artículo 2 del Decreto Urea establece lo siguiente:

---

[40] Decreto 5218 (26 de febrero de 2007) (C-80).

> *"Los fabricantes, proveedores, comercializadores, distribuidores, importadores y exportadores de fertilizantes nitrogenados y de los insumos necesarios para su elaboración quedan obligados a suministrarlos prioritariamente en el mercado nacional, de acuerdo a la regulación de precios establecida para su venta."*

4.21    El Artículo 3 del Decreto Urea establece lo siguiente:

> *"La actividad de comercialización de los fertilizantes nitrogenados y de los insumos necesarios para su elaboración, realizada por personas naturales y jurídicas, queda sometida a los precios, volúmenes, controles, regulaciones y fiscalizaciones que mediante Resoluciones conjuntas establezcan los Ministerios del Poder Popular para la Agricultura y Tierra, para las Industrias Ligeras y Comercio y para la Energía y Petróleo, las cuales deberán comenzar a dictarse dentro de los treinta días siguientes a la publicación del presente Decreto."*

**(5)    *La Resolución Urea*[41]**

4.22    Comenzando con el Artículo 1 la Resolución Urea establece lo siguiente:

> *"La presente Resolución tiene por objeto la regulación, control e inspección de la producción, comercialización, distribución y venta de urea, a fin de garantizar el abastecimiento del mercado nacional. Igualmente regula la exportación de la misma, una vez cubierta la demanda interna."*

4.23    El Artículo 10 de la Resolución Urea establece lo siguiente:

> *"La Empresa del Estado, Petroquímica de Venezuela S.A. (Pequiven S.A.) podrá comprar la urea que requiera para cubrir las necesidades de la Nación, a cualquier fabricante establecido en el país, al precio máximo de venta a granel a puerta de planta, de 155.200/TM (Bolívares por Tonelada métrica).*

**(6)    *El Decreto 5.835*[42]**

4.24    En el Artículo 4 el Decreto 5.835 establece lo siguiente:

> *"Se declaran, y por lo tanto son de utilidad pública e interés social, todos los bienes necesarios para desarrollar las actividades de producción, fabricación, importación, acopio, transporte, distribución y comercialización de alimentos o productos declarados de primera necesidad o sometidos a control de precios.*

---

[41] Resolución Conjunta del Ministerio del Poder Popular Para La Agricultura y Tierras, el Ministerio Del Poder Popular Para Las Industrias Ligeras y Comercio y el Ministerio Del Poder Popular Para La Energía y Petróleo (3 de mayo de 2007) (C-82).

[42] Decreto 5.835 (28 de enero de 2008) (R-23).

*El Ejecutivo Nacional podrá, sin mediar otra formalidad, iniciar la expropiación mediante decreto por razones de seguridad y soberanía alimentaria."*

**(7)     *El Decreto de Expropiación*** [43]

4.25    Comenzando con el Artículo 1 el Decreto de Expropiación establece lo siguiente:

*"Se ordena la adquisición forzosa de los bienes muebles e inmuebles, incluyendo bienhechurías, instalaciones, plantas, equipos industriales, de oficina y demás activos requeridos o necesarios para la actividad de producción, procesamiento, transporte y almacenamiento de fertilizantes (urea y amoníaco), que pertenezcan o se encuentren en posesión de las sociedades mercantiles Fertilizantes Nitrogenados de Oriente, S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. y Fertilizantes Nitrogenados de Venezuela, C.E.C., o cualesquiera empresas o personas relacionadas, a fin de lograr la cabal y efectiva realización de los planes nacionales de siembra y producción formulados por el Ejecutivo Nacional y que sean necesarios para la ejecución de la obra 'Plan Socialista de Soberanía Agroalimentaria'."*

4.26    El Artículo 2 del Decreto de Expropiación establece lo siguiente:

*"La obra "Plan Socialista de Soberanía Agroalimentaria", será ejecutada por la Petroquímica de Venezuela, S.A. (PEQUIVEN), adscrita al Ministerio del Poder Popular para La Energía y Petróleo, como ente expropiante, o la filial que esta designe."*

4.27    El Artículo 3 del Decreto de Expropiación establece lo siguiente:

*"Los bienes expropiados pasarán libres de gravámenes o limitaciones al Estado venezolano, a través de la empresa Petroquímica de Venezuela, S.A. (PEQUIVEN), como ente expropiante, o la filial que esta designe, de conformidad con lo dispuesto en el artículo 11 de la Ley de Expropiación por Causa de Utilidad Pública o Social."*

4.28    El Artículo 4 del Decreto de Expropiación establece lo siguiente:

*"De conformidad con lo previsto en el artículo 12 de la Ley de Expropiación por Causa de Utilidad Pública o Social, se autoriza a la Petroquímica de Venezuela, S.A. (PEQUIVEN), a fin que realice los trámites necesarios para la adquisición de los inmuebles y demás bienes a que se contrae el artículo 1 del presente Decreto,*

---

[43] Decreto 7.713 (de fecha 10 de octubre de 2010) (C-9).

*subrogándose en todos los derechos y obligaciones que correspondan a la República Bolivariana de Venezuela por tales conceptos."*

4.29    El Artículo 5 del Decreto de Expropiación establece lo siguiente:

*"Petroquímica de Venezuela, S.A. (PEQUIVEN), iniciará y tramitará el procedimiento de expropiación previsto en la Ley de Expropiación por Causa de Utilidad Pública o Social, hasta la transferencia total y definitiva de la propiedad de los bienes indicados en el artículo 1º del presente Decreto."*

4.30    El Artículo 6 del Decreto de Expropiación establece lo siguiente:

*"De conformidad con lo dispuesto en el artículo 3º del Decreto con Rango, Valor y Fuerza de Ley Orgánica de Seguridad y Soberanía Agroalimentaria, se ordena la ocupación de los bienes indicados en el artículo 1º del presente Decreto, por parte de la sociedad mercantil Petroquímica de Venezuela, S.A. (PEQUIVEN), a los fines de su puesta en operatividad, administración y aprovechamiento."*

**(8)    La Ley de Expropiación**[44]

4.31    Comenzando con el Artículo 2 la Ley de Expropiación establece lo siguiente:

*"**Concepto de expropiación**. La expropiación es una institución de Derecho Público, mediante la cual el Estado actúa en beneficio de una causa de utilidad pública o de interés social, con la finalidad de obtener la transferencia forzosa del derecho de propiedad o algún otro derecho de los particulares, a su patrimonio, mediante sentencia firme y pago oportuno de justa indemnización."*

4.32    El Artículo 7 de la Ley de Expropiación establece lo siguiente:

*"**Requisitos de la expropiación**. Solamente podrá llevarse a efecto la expropiación de bienes de cualquier naturaleza mediante el cumplimiento de los requisitos siguientes:*
*1.    Disposición formal que declare la utilidad pública.*
*2.    Declaración de que su ejecución exige indispensablemente la transferencia total o parcial de la propiedad o derecho.*
*3.    Justiprecio del bien objeto de la expropiación.*
*4.    Pago oportuno y en dinero efectivo de justa indemnización."*

---

[44] Ley de Expropiación Por Causa De Utilidad Pública o Social (1 de julio de 2002) (C-140). *Véase también* R-53, el cual contiene otra traducción de la Ley de Expropiación.  Las Partes no plantearon la cuestión de las diferentes traducciones durante el procedimiento.

4.33    El Artículo 31 de la Ley de Expropiación establece lo siguiente:

> "***Derechos del Poseedor***. *El poseedor tiene derecho a hacerse parte en el juicio de expropiación, a fin de solicitar del precio del bien expropiado, la cuota que le corresponda por el valor de sus mejoras y por los perjuicios que se le causen.*"

4.34    El Artículo 35 de la Ley de Expropiación establece lo siguiente:

> "***Procedimiento si no hay avenimiento***. *De no lograrse el avenimiento, el Juez convocará a una hora del tercer día de despacho siguiente para el nombramiento de una Comisión de Avalúos designada, según lo establecido en el artículo 19 de esta Ley, que efectuará el justiprecio del bien, observándose las reglas del Código de Procedimiento Civil.*"

4.35    El Artículo 36 de la Ley de Expropiación establece lo siguiente:

> "***Elementos de obligatoria apreciación.***  *En el justiprecio de todo bien que se trate de expropiar, total o parcialmente, se especificará su clase, calidad, situación, dimensiones aproximadas, su probable producción y todas las otras circunstancias que influyan en las operaciones y cálculos que se hayan hecho para fijar su justo valor. En todo caso, el justiprecio deberá representar el valor equivalente que corresponda al bien expropiado. Cuando se trate de inmuebles, entre los elementos del avalúo, se tomará en cuenta obligatoriamente:*
> *1.    El valor fiscal del inmueble declarado o aceptado tácitamente, por el propietario.*
> *2.    El valor establecido en los actos de transmisión, realizados por lo menos seis (6) meses antes del decreto de expropiación.*
> *3.    Los precios medios a que se hayan vendido inmuebles similares, en los últimos doce (12) meses contados a partir de la fecha de elaboración del avalúo.*
> *En caso de ausencia de cualquiera de estos elementos de obligatoria apreciación, los peritos deberán razonarlo expresamente en el informe de avalúo. En ningún caso puede ser tomado en cuenta el mayor valor de los inmuebles, en razón de su proximidad a las obras en proyecto.*"

## *(9)    Carta del Sr. Hernández de Fecha 28 de Febrero de 2012*[45]

4.36    El presente documento no es un texto jurídico, pero amerita que sea citado de manera completa aquí. Se trata de la carta de Betulio Hernández, Presidente de la Junta de

---

[45] Carta de B. Hernández a Koch Oil SA y Koch Nitrogen Company re: *Offtake Agreement* (28 de febrero de 2012) (C-114).

Administradores Temporales *ad-hoc*, dirigida a KNI y que versa sobre el impacto causado en el *Offtake Agreement* por el Decreto de Expropiación (Decreto 7.713):

> *"Por medio de la presente cumplo con notificarles que según Resolución emitida por la Junta de Administradores Temporales Ad-Hoc de Fertilizantes Nitrogenados de Venezuela, FertiNitro, C.E.C., ("FertiNitro") según se evidencia de designación efectuada por Decretos emanados del Juzgado Segundo de Primera Instancia en lo Civil, Mercantil, Agrario y Tránsito de la Circunscripción Judicial del Estado Anzoátegui de fecha 08 y 09 de agosto de 2011 y 22 de septiembre de 2011, Asunto BP02-V-2011-000998, inscritos los dos primeros en el Registro Mercantil Primero del Estado Anzoátegui el 11 de agosto de 2011 bajo el Nº 09, Tomo 1, efectivo a partir de la fecha de la presente comunicación, FertiNitro no venderá más fertilizantes nitrogenados (urea y amoníaco) a Koch Oil, S.A. según el contrato de comercialización suscrito entre Petroquímica de Venezuela S.A., International Petrochemical Sales Limited, Koch Oil S.A., y Fertilizantes Nitrogenados de Venezuela, C.E.C. de fecha 8 de abril de 1998; todo en cumplimiento de lo establecido en el Decreto 7.713 publicado en Gaceta Oficial de la República Bolivariana de Venezuela Nº 39.528 de fecha 11 de octubre de 2010 mediante la cual se ordena la adquisición forzosa de los bienes muebles e inmuebles, incluyendo bienhechurías, instalaciones, plantas, equipos industriales, de oficina y demás activos, requeridos o necesarios para la actividad de producción, procesamiento, transporte y almacenamiento de fertilizantes (urea y amoníaco), que pertenezcan o se encuentren en posesión de las sociedades Fertilizantes Nitrogenados de Oriente, S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. y Fertilizantes Nitrogenados de Venezuela, C.E.C., o cualesquiera empresas o personas relacionadas."*

**(10)   El Convenio CIADI**

4.37   El Artículo 25 del Convenio CIADI establece lo siguiente:

> *"(1) La jurisdicción del Centro se extenderá a las diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado Contratante (o cualquiera subdivisión política u organismo público de un Estado Contratante acreditados ante el Centro por dicho Estado) y el nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro. El consentimiento dado por las partes no podrá ser unilateralmente retirado.*
>
> *(2) Se entenderá como "nacional de otro Estado Contratante":*
>
> *(a)  toda persona natural que tenga, en la fecha en que las partes consintieron*

*someter la diferencia a conciliación o arbitraje y en la fecha en que fue registrada la solicitud prevista en el apartado (3) del Artículo 28 o en el apartado (3) del Artículo 36, la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia; pero en ningún caso comprenderá las personas que, en cualquiera de ambas fechas, también tenían la nacionalidad del Estado parte en la diferencia; y*

*(b) toda persona jurídica que, en la fecha en que las partes prestaron su consentimiento a la jurisdicción del Centro para la diferencia en cuestión, tenga la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia, y las personas jurídicas que, teniendo en la referida fecha la nacionalidad del Estado parte en la diferencia, las partes hubieren acordado atribuirle tal carácter, a los efectos de este Convenio, por estar sometidas a control extranjero.*

*(3) El consentimiento de una subdivisión política u organismo público de un Estado Contratante requerirá la aprobación de dicho Estado, salvo que éste notifique al Centro que tal aprobación no es necesaria.*

*(4) Los Estados Contratantes podrán, al ratificar, aceptar o aprobar este Convenio o en cualquier momento ulterior, notificar al Centro la clase o clases de diferencias que aceptarían someter, o no, a su jurisdicción. El Secretario General transmitirá inmediatamente dicha notificación a todos los Estados Contratantes. Esta notificación no se entenderá que constituye el consentimiento a que se refiere el apartado (1) anterior."*

4.38    El Artículo 41 del Convenio CIADI establece lo siguiente:

*"(1) El Tribunal resolverá sobre su propia competencia.*
 *(2) Toda alegación de una parte que la diferencia cae fuera de los límites de la jurisdicción del Centro, o que por otras razones el Tribunal no es competente para oírla, se considerará por el Tribunal, el que determinará si ha de resolverla como cuestión previa o conjuntamente con el fondo de la cuestión."*

4.39    El Artículo 42(1) del Convenio CIADI establece lo siguiente:

*"El Tribunal decidirá la diferencia de acuerdo con las normas de derecho acordadas por las partes. A falta de acuerdo, el Tribunal aplicará la legislación del Estado que sea parte en la diferencia, incluyendo sus normas de derecho internacional privado, y aquellas normas de derecho internacional que pudieren ser aplicables."*

***PARTE V: LOS HECHOS PRINCIPALES***

**(1)    *Introducción***

5.1    La principal controversia entre las Partes se relaciona con la supuesta expropiación por parte de la Demandada de lo siguiente: (i) el derecho de participación indirecto del veinticinco por ciento (25 %) de KOMSA en FertiNitro, proyecto de empresa en participación que comprende varias personas jurídicas, establecido por tres accionistas privadas (incluida KOMSA) y Pequiven, la empresa petroquímica Estatal venezolana; y (ii) el derecho de KNI en el *Offtake Agreement* entre (*inter alios*) FertiNitro, Pequiven y KNI.   FertiNitro se encarga de la producción y venta de fertilizantes nitrogenados (amoniaco y urea) a través de la operación y del mantenimiento de cuatro plantas petroquímicas ubicadas en José, Venezuela (también descriptas, en su conjunto, como la "Planta FertiNitro").

5.2    El proyecto FertiNitro se originó en el año 1998; y las plantas iniciaron sus operaciones comerciales en el año 2001.  Las plantas de FertiNitro enfrentaron varias dificultades técnicas y operativas.   Estas derivaron en un arbitraje comercial internacional entre FertiNitro y la contratista EPC y accionista minoritaria del proyecto, Snamprogetti.  Las Partes disienten de las causas y consecuencias de las dificultades técnicas y operativas de las Plantas.

5.3    Tanto la producción alimentaria como la agricultura de Venezuela han estado marcadas por el subdesarrollo desde la década de 1990.  En respuesta, la Demandada desarrolló una política a fin de obtener mayor seguridad alimentaria para el pueblo de Venezuela, que incluía, entre otras cuestiones, leyes y regulaciones destinadas a garantizar el control estatal sobre la producción interna de alimentos y productos relacionados con alimentos, lo que incluye fertilizantes para la agricultura interna.

5.4    El 11 de octubre de 2010, entró en vigor el Decreto de Expropiación N.º 7.713 de la Demandada de fecha 10 de octubre de 2010, que declaraba la adquisición forzosa de los bienes de FertiNitro.  KOMSA no recibió compensación alguna por la expropiación de su derecho de participación indirecto en FertiNitro.

5.5     El Tribunal incluye *infra* por orden cronológico ciertos hechos principales que son relevantes para sus decisiones con respecto a los dos reclamos de expropiación de las Demandantes en virtud del Artículo 6 del Tratado y a los "Reclamos Históricos" de KOMSA en virtud de los Artículos 4 y 11 del Tratado.  Por consiguiente, sin perjuicio del elemento de repetición que aparece posteriormente en este Laudo, esta cronología no constituye un relato taxativo de todas las cuestiones de hecho en disputa entre las Partes. No obstante, el Tribunal ha considerado las pruebas en su totalidad, tal como las rindieran las Partes en el marco de este extenso arbitraje.

5.6     Esta cronología aborda, tal como concluyera el Tribunal sobre la base de los materiales rendidos por las Partes: (i) el desarrollo del proyecto FertiNitro; (ii) la construcción y operación de la Planta FertiNitro; (iii) las negociaciones de Pequiven destinadas a adquirir la totalidad de las accionistas privadas de FertiNitro (incluida KOMSA); (iv) el marco jurídico y regulatorio de Venezuela que derivó en el Decreto de Expropiación de fecha 10 de octubre de 2010; (v) los sucesos posteriores al Decreto de Expropiación; y (vi) ciertas medidas adicionales adoptadas por la Demandada que, tal como alegan las Demandantes, han interferido en sus inversiones en violación del Tratado.

## *(2)     Cronología de los Hechos*

### *(i)     El Desarrollo del Proyecto FertiNitro*

5.7     En la década de 1990, Venezuela (al igual que otros países de Latinoamérica) perseguía políticas económicas que pretendían, entre otras cuestiones, atraer inversión extranjera y reducir el control estatal sobre importantes sectores económicos.  En el caso de Venezuela, dichas políticas comprendían el sector petroquímico e hidrocarburífero[46].

---

[46] Daniel Yergin, *The Quest: Energy, Security, and the Remaking of the Modern World* (Penguin Books 2011), (C-10).  *Véanse también* Mem. Koch, Párrafo 25; Mem. C. Ven., Párrafo 31, que cita R-44. Como parte de su esfuerzo por atraer inversión extranjera a Venezuela, PDVSA y Pequiven participaron en conferencias promocionales del Sector petroquímico: *Véase Industria Petroquímica en Venezuela: Oportunidad de Inversión* (Caracas, Venezuela, 8, 9 y 10 de abril de 1997, Hotel Tamanaco Intercontinental (C-15), pág. 6.

5.8    A fines de la década de 1990, Venezuela importaba más del 64 % de sus productos alimenticios y agrícolas[47]; tenía un superávit de gas natural no comercializado, derivado de sus reservas petroleras; y pretendía desarrollar su sector petroquímico[48].

5.9    Pequiven, KOMSA[49], Snamprogetti Netherlands BV, sociedad constituida de conformidad con la legislación de los Países Bajos ("Snamprogetti"), y Polar Uno CA, sociedad constituida de conformidad con la legislación de Venezuela ("Polar"), celebraron una serie de acuerdos en calidad de "Propietarias" a efectos del desarrollo, de la construcción y de la operación de dos plantas de amoniaco y dos plantas de urea, que habrían de ubicarse en un complejo industrial en el estado venezolano de Anzoátegui, en el noreste del país (el "proyecto FertiNitro").  El amoniaco y la urea son fertilizantes nitrogenados que se utilizan para incrementar la productividad y el rendimiento de los cultivos en la agricultura[50].  El amoniaco se requiere para producir urea; y, por lo tanto, "[e]l amoniaco es la piedra angular de la industria de los fertilizantes nitrogenados"[51].

5.10   El 8 de abril de 1998, las Propietarias celebraron el ("*Joint Investors Agreement*") (Convenio de Inversionistas Conjuntos) (el "JIA"), que preveía la constitución y capitalización de cuatro sociedades venezolanas interrelacionadas[52], organizadas en una estructura de inversión a través de la cual las Propietarias serían titulares del proyecto

---

[47] Christina Schiavoni & William Camacaro, *The Venezuelan Effort to Build a New Food and Agricultural System*, en 61 Monthly Review (1 de julio de 2009) (R-29), pág. 3.

[48] Global Forum, Flaring Reduction & Gas Utilisation: *"Venezuelan Experiences and Perspectives about Natural Gas Flaring and Venting in the Oil Industry"* Arcangelo Sena D'Anna & Janeth Lopez de Morena (C-11); *véase también* Circular de Oferta - Oferta de Bonos de USD 250.000.000 entre FertiNitro Finance Inc y FertiNitro (8 de abril de 1998) ("Circular de Oferta - Oferta de Bonos de 1998") (C-115), pág. 7.

[49] Koch Oil S.A fue constituida en Suiza el 24 de enero de 1972. El 11 de abril de 2003, Koch Oil S.A. cambió su denominación por Koch Minerals S.A. *Véase* Extracto del Registro de Comercio del Cantón de Friburgo, Informe (30 de junio de 1999) (C-2); y, en 2009, la sociedad cambió su tipo societario por Koch Minerals Sàrl, una de las Demandantes en el contexto del presente caso. *Véase* Solicitud de Inscripción en el Registro de Comercio del Cantón de Friburgo (20 de marzo de 2009) (C-3). En aras de facilitar la referencia, la sociedad, bajo sus distintas denominaciones y tipos societarios, se denomina "KOMSA" en este Laudo.

[50] Declaración de Testigo de Edgar Alonso Flórez (28 de febrero de 2013) ("Flórez DT1"), Párrafo 6.

[51] Flórez DT1, Párrafo 6. Según la Demandada, "Aproximadamente el 67 % del amoniaco producido por FertiNitro se emplea para hacer urea".  "El amoniaco se obtiene al combinar nitrógeno e hidrógeno con el uso de catalizadores, altos niveles de calor y de presión. El aire es la principal fuente de nitrógeno.  El gas natural es la fuente más común de hidrógeno que se utiliza".  *Véase también* Mem. C. Ven., Párrafos 52, 54.

[52] A saber: (i) Fertilizantes Nitrogenados de Oriente S.A.; (ii) Fertilizantes Nitrogenados de Oriente CEC; (iii) Fertilizantes Nitrogenados de Venezuela, SRL; y (iv) Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC (esta última sociedad era la "Empresa Operadora").

FertiNitro, lo construirían y operarían[53].  Tal como se indicara *supra*, estas cuatro sociedades venezolanas interrelacionadas se describen como las "Empresas FertiNitro" o, en su conjunto, como "FertiNitro".

5.11   Ese mismo día, con arreglo al JIA[54], FertiNitro Venezuela CEC, Pequiven, International Petrochemical Sales Limited ("IPSL", subsidiaria de Pequiven) y KOMSA (posteriormente sucedida por KNI tal como se describirá *infra*) celebraron el *Offtake Agreement*[55]. Conforme al *Offtake Agreement*, Koch y Pequiven/IPSL (las "compradoras" (*Offtakers*)) se comprometieron a adquirir sobre la base de un contrato de compra que implica adquirir o pagar (*take or pay*) una cantidad garantizada de amoniaco y urea producida por FertiNitro a un precio fijo descontado[56], para el consumo propio de las *Offtakers* o su reventa en los mercados tanto local como de exportación, por un plazo de 20 años[57].  El *Offtake Agreement* podía ser luego "renova[do] automáticamente" por plazos de cinco años, excepto que mediara notificación en contrario de cualquiera de las partes en el *Offtake Agreemen*t[58].

5.12   El 30 de junio de 2000, KOMSA le cedió sus derechos y obligaciones en virtud del *Offtake Agreement* a Koch Oil Marketing S.A.  El 3 de abril de 2003, Koch Oil Marketing S.A. le cedió sus derechos en virtud del *Offtake Agreement* a KNI[59].

5.13   El *Offtake Agreement* le otorgaba a Pequiven/IPSL el derecho exclusivo de comercializar y vender amoniaco y urea tanto en el mercado interno como en Sudamérica, Centroamérica y el Caribe. Las ventas de Pequiven al mercado interno local no debían superar el 10 % de

---

[53] Convenio de Inversionistas Conjuntos entre Pequiven, Koch Oil SA, Snamprogetti Netherlands BV y Polar Uno, CA (8 de abril de 1998) ("JIA") (C-18), Anexo A, Estructura de Inversión.
[54] Conforme al JIA, los inversionistas conjuntos reconocieron y acordaron que ciertos acuerdos eran "necesarios para poner en vigor [el JIA] y se suscribir[ían] en la Fecha de Entrada en Vigor o con posterioridad a ella" incluidos, entre otros, el Contrato EPC, los acuerdos de financiamiento, el Acuerdo de Aporte de Capital y el *Offtake Agreement*. [Traducción del Tribunal] JIA (C-18), Artículo IV.
[55] *Véase Offtake Agreement* entre Pequiven, IPSL y Koch Oil SA en calidad de Compradoras y FertiNitro en calidad de Vendedora (8 de abril de 1998) ("*Offtake Agreement*") (C-19).
[56] La fijación de precios era ventajosa para los *Offtakers*. El precio de compra correspondiente al amoniaco se basaba en los precios publicados del amoniaco menos un "Descuento de la Tarifa de Comercialización del Amoniaco" del 4 %, mientras que el precio de compra correspondiente a la urea se basaba en los precios publicados de la urea menos un "Descuento de la Tarifa de Comercialización de la Urea" del 3 %.
[57] *Offtake Agreement* (C-19), Art. 11.1.
[58] *Íd*.
[59] *Véanse* Cesión (30 de junio de 2000) (C-33), y Contrato de Cesión y Asunción (3 de abril de 2003) (C-34).

su volumen total del producto adquirido con FertiNitro.  Ese porcentaje aumentó al 15 % en el año 2004 y otro 1 % por año a partir de ese momento[60].  KOMSA (posteriormente KNI) tenía los derechos de venta exclusivos para Norteamérica, incluido México.  Cada una de KOMSA/KNI y Pequiven/IPSL compraron aproximadamente el 50 % de la producción total de urea y amoniaco de FertiNitro en cualquier mes determinado[61].

5.14    Además del JIA y del *Offtake Agreement*, se celebraron numerosos contratos en relación con el proyecto FertiNitro[62].  Estos incluían el Contrato de Ingeniería, Compras y Construcción entre FertiNitro (*EPC*, por sus siglas en inglés), CEC, y Snamprogetti a efectos de la construcción "llave en mano" por parte de Snamprogetti de las plantas de amoniaco y urea (el "Contrato EPC")[63], al igual que contratos para el suministro de gas, electricidad y agua, entre muchos otros[64].  En virtud de estos contratos de gas, FertiNitro recibía gas de PDVSA a precios preferenciales.

5.15    Tal como ya se indicara, FertiNitro era propiedad de KOMSA en un 35 %, propiedad de Pequiven, en un 35 %, propiedad de Snamprogetti, en un 20 % y propiedad de Polar en un 10 %, con arreglo a los términos JIA[65].  KOMSA era titular de su derecho en FertiNitro a través de Koch José, sociedad constituida de conformidad con la legislación de las Islas Caimán[66].  KOMSA le transfirió el 28,571 % de su participación en Koch José a Latin American Infrastructure Fund ("LAIF") el 18 de febrero de 1998[67].  En consecuencia, KOMSA y LAIF eran propietarias indirectas del 25 % y del 10 % de FertiNitro, respectivamente.

---

[60] *Offtake Agreement* (C-19), Art. 2.5.

[61] *Offtake Agreement* (C-19), Art. 2.2. El amoniaco se dividía alrededor del 75 % para KNI y el 25 % para Pequiven/IPSL; en cuanto a la urea, la distribución era del 43 % para KNI y del 57 % para Pequiven/IPSL. Véase Circular de Oferta - Oferta de Bonos de 1998 (C-115), pág. 5. *Véanse también* Mem. C. Ven., Párrafo 85; Répl. Koch, Párrafo 11.

[62] Para una lista de los acuerdos del proyecto, véase el Contrato de Garantía Común (21 de abril de 1998) (C-137), Apéndice G.

[63] Contrato de Ingeniería, Compras y Construcción entre FertiNitro y Snamprogetti (8 de abril de 1998) ("Contrato EPC") (C-24).

[64] *Véanse,* p.ej., Contrato de Suministro de Gas Metano entre PDVSA Gas SA y FertiNitro (8 de abril de 1998) (C-25); Contrato de Suministro de Energía Eléctrica entre Pequiven y FertiNitro (8 de abril de 1998) (C-26); Contrato Industrial de Suministro de Agua Industrial entre Pequiven y FertiNitro (8 de abril de 1998) (C-27); y otros contratos de suministro de energía y servicios técnicos relacionados.

[65] JIA (C-18), Párrafos 2.1.1 a 2.1.4; *véase también* Circular de Oferta - Oferta de Bonos de 1998 (C-115), pág. 3.

[66] JIA (C-18), Párrafo 2.4 y Considerandos.

[67] Registro de Socios correspondiente a Koch Jose Cayman Limited (13 de mayo de 2011) (C-21).

5.16   El proyecto FertiNitro incluía una estructura de financiamiento del proyecto en la que los prestamistas "recib[ía]n un derecho de garantía sobre los activos y el flujo de caja del proyecto"[68]; y dichos prestamistas y bonistas recurrían a los activos y al flujo de ingresos del proyecto para el reembolso.   Bajo esta estructura, "la deuda del proyecto [estaba] garantizada por las cuentas por cobrar que Koch [KOMSA] y Pequiven le adeudaban a FertiNitro en virtud del *Offtake Agreement*"[69]. [Traducción del Tribunal] Conforme a esta estructura de financiamiento, el *Offtake Agreement* había de permanecer en vigencia durante un período equivalente a la duración de las obligaciones financieras de FertiNitro y al menos durante 20 años[70].

5.17   FertiNitro estaba organizada como empresa comercial; y su gestión estaba a cargo de una junta directiva de nueve miembros de las Empresas FertiNitro[71].   Luego de la transferencia de acciones a LAIF, la junta directiva de FertiNitro estaba integrada por tres directores nombrados por Pequiven, dos directores nombrados por KOMSA, dos directores nombrados por Snamprogetti, un director nombrado por LAIF y un director nombrado por Polar[72].   El presidente de la junta directiva (que también se desempeñaba como Presidente de FertiNitro) alternaba entre una persona nombrada por KOMSA o Pequiven, durante un plazo de dos años o por cualquier otro período acordado por KOMSA y Pequiven[73].   Con arreglo a las Cláusulas 5.4.1 y 5.4.2 del JIA, las decisiones de la junta directiva de FertiNitro y las decisiones de sus accionistas podían adoptarse exclusivamente con la aprobación mayoritaria de cada uno de los representantes de Pequiven, KOMSA y Snamprogetti.

*(ii)   La Construcción y el Funcionamiento de la Planta FertiNitro*

5.18   *1998-2001:* La construcción de la Planta FertiNitro se inició en el año 1998, y la Planta comenzó la producción comercial en el mes de mayo de 2001[74].

---

[68] Declaración de Testigo de Brent W. Gwaltney (30 de mayo de 2012) ("Gwaltney DT1"), Párrafo 20.
[69] Memorándum de Davis Polk & Wardwell (18 de mayo de 2005) (C-118), pág. 2.
[70] *Offtake Agreement* (C-19), Art. 11.1.
[71] JIA (C-18), Párrafo 5.2.1.
[72] JIA (C-18), Párrafo 5.2.1*;* Mem. C. Ven., Párrafo 30.
[73] JIA (C-18), Párrafo 5.2.4.
[74] FertiNitro, Estado Financiero correspondiente al Ejercicio Finalizado el 31 de diciembre de 2004 y 2003 (sin fecha) (R-14), Nota 1, pág. 8. *Véanse también* Mem. Koch, Párrafos 52-53; Mem. C. Ven., Párrafo 27.

5.19   De conformidad con el Contrato EPC, cada una de las plantas de amoniaco estaba construida para tener una capacidad "nominal" mínima de 1.800 toneladas métricas ("MT"); y cada una de las plantas de urea tenía una capacidad nominal de 2.200 MT[75]. El costo total del proyecto ascendía a USD 1.100 millones, de los cuales más de USD 740 millones estaban financiados por bonos y préstamos provenientes de un consorcio de bancos[76].

5.20   *2001-2004:* Entre 2001 y 2002, FertiNitro planteó reclamos de garantía en contra de Snamprogetti en virtud del Contrato EPC, relativas a "defectos, deficiencias y fallas" de los equipos y operaciones de la Planta[77]. [Traducción del Tribunal]A partir del año 2002, FertiNitro experimentó cierres por reparaciones y problemas de mantenimiento. FertiNitro comenzó a retener pagos adeudados a Snamprogetti en su calidad de contratista EPC.

5.21   En el año 2002, Snamprogetti inició un arbitraje en virtud del Contrato EPC ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, en contra de FertiNitro (el "Arbitraje de Construcción CCI"), a fin de reclamar el pago de las sumas retenidas por FertiNitro. FertiNitro planteó reconvenciones sobre la base del supuesto incumplimiento por parte de Snamprogetti de las garantías contenidas en el Contrato EPC en relación con el diseño, la construcción y la ingeniería de la Planta. FertiNitro y Snamprogetti llegaron a un acuerdo transaccional en el marco del arbitraje el 14 de diciembre de 2004. El acuerdo incluía (*inter alia*) la remisión de ciertas deudas de FertiNitro frente a Snamprogetti y un pago en efectivo de Snamprogetti a FertiNitro de USD 6,5 millones[78].

5.22   *2004-2009:* Las Partes disienten de las condiciones operativas de la Planta FertiNitro luego del acuerdo transaccional en el contexto del Arbitraje de Construcción CCI y las reparaciones pertinentes de la Planta por parte de FertiNitro. Las Demandantes afirman

---

[75] Contrato EPC (C-24), Art. 1, Párrafo 1.97, pág. 12. Capacidad "nominal" es la capacidad sostenible proyectada de un equipo bajo condiciones operativas específicamente definidas. *Véase* Mem. C. Ven., Párrafo 56, que cita Declaración de Testigo de Aníbal José Villarroel García (28 de febrero de 2013) ("Villarroel DT1"), Párrafo 11.

[76] *Véanse* Informe de Contadores Independientes y Estados Financieros de FertiNitro al 31 de diciembre de 2000 y 1999 (2 de febrero de 2001) (C-61); FertiNitro, Estados Financieros correspondientes a los Ejercicios Finalizados el 31 de diciembre de 1999 y 1998 (sin fecha) (R-4); Mem. C. Ven., Párrafo 28.

[77] FertiNitro, Estado Financiero correspondiente al Ejercicio Finalizado el 31 de diciembre de 2004 y 2003 (sin fecha) (R-14), Nota 9, pág. 16. Las Partes difieren en cuanto a la cantidad de reclamos de garantía, aunque al menos 77 reclamos diferentes se remitieron al Arbitraje CCI. *Véanse* Mem. C. Ven., Párrafo 58; Répl. Koch, Párrafo 34.

[78] FertiNitro, Estado Financiero correspondiente al Ejercicio Finalizado el 31 de diciembre de 2004 y 2003 (sin fecha) (R-14), Nota 9, pág. 16; Gwaltney DT1, Párrafo 40; Villarroel DT1, Párrafo 17.

que "después del acuerdo […] a finales de 2004 y luego de que se realizaran las reparaciones necesarias de la construcción, el rendimiento de la planta mejoró de forma significativa"[79]; y que "para 2006, alcanzaba el 98 por ciento de los niveles de producción anticipados previamente"[80]. La Demandada alega que muchas reparaciones críticas quedaron pendientes, dado que más de un tercio de los asuntos cruciales identificados por el Informe de los ingenieros independientes del proyecto (Jacobs Consultancy) del año 2013[81] no podrían haberse resuelto completamente para el año 2005[82].

5.23    Los niveles de producción de la Planta en el período comprendido entre los años 2003 y 2009, según lo reportado por los Informes Mensuales de FertiNitro correspondientes a los ejercicios pertinentes, se exhiben en la tabla *infra*[83]. La tabla muestra la producción de la planta como porcentaje de la capacidad nominal. Según la Demandada, sobre la base de los informes de Jacobs Consultancy, "anualmente, FertiNitro nunca en su historia ha tenido éxito en el logro de los niveles de producción nominal"[84]. Las Demandantes alegan que estos cálculos asumen erróneamente que la planta operaría los 365 días del año[85].

| Año | Amoniaco | Urea |
|-----|----------|------|
| 2003 | 66 % | 58 % |
| 2004 | 84 % | 77 % |

---

[79] Mem. Koch, Párrafo 153, Répl. Koch, Párrafo 33.

[80] Répl. Koch, Párrafo 36, que cita Informe Mensual de diciembre de 2006 de FertiNitro (5 de febrero de 2007) (C-97); y Circular de Oferta - Oferta de Bonos de 1998 (C-115).

[81] El 12 de marzo de 2003, Jacobs Consultancy, el ingeniero independiente del Proyecto, emitió un primer informe. *Véase* Informe de Jacobs Consultancy, Proyecto de fertilizantes FertiNitro, estimaciones de costos de mejora de la planta y pronósticos de producción revisados (marzo de 2003) (C-125) (Estos informes se dirigían a los Prestamistas*Senior* del Proyecto con el propósito de "identificar cada una de las reparaciones y mejoras que serían necesarias en aras de permitir que la planta alcance los niveles de producción que se habían anticipado al inicio del proyecto" [Traducción del Tribunal]. Con arreglo al Informe de Jacobs de 2003, en ese momento se requerían tanto como USD 66,7 millones para que FertiNitro alcanzara sus niveles de producción proyectados. Jacobs Consultancy emitió un segundo informe en 2006.

[82] *Véase* Dúpl. Ven., Párrafo 44, que cita Informe de Jacobs Consultancy intitulado "Revisión de plan principal de mantenimiento y plan organizacional para el trimestre que terminó el 31 de diciembre de 2004" (febrero de 2005) (C-132), que indicaba que el 57 % de los 51 asuntos críticos identificados en el informe de 2003 habían sido resueltos para fines de 2004.

[83] FertiNitro, Informe Mensual, diciembre de 2003 (R-12), pág. 7; FertiNitro, Informe Mensual, diciembre de 2004 (R-13), pág. 12; FertiNitro, Informe Mensual, diciembre de 2005 (C-95), pág. 15; FertiNitro, Informe Mensual, diciembre de 2006 (C-97), pág. 14; FertiNitro, Informe Mensual, diciembre de 2007 (C-98), pág. 14; FertiNitro, Informe Mensual, diciembre de 2008 (C-83), pág. 14; FertiNitro, Informe Mensual, diciembre de 2009 (C-102), p. 14; Gráfico proporcionado por la Demandada. *Véanse también* Mem. C. Ven., Párrafo 75, n. 139; Dúpl. Ven., Párrafo 59.

[84] Dúpl. Ven., Párrafo 45, que invoca la Segunda Declaración de Testigo de Aníbal Villarroel, Párrafo 4. *Véase también* Mem. C. Ven., Párrafo 75.

[85] Segunda Audiencia (noviembre) D5. 84.1-3 (Fietta).

| | | |
|---|---|---|
| 2005 | 72 % | 71 % |
| 2006 | 91 % | 86 % |
| 2007 | 83 % | 81 % |
| 2008 | 77 % | 74 % |
| 2009 | 78 % | 74 % |

5.24   A partir del año 2006, hubo una clara disminución en los niveles de producción[86]. Las Partes, sin embargo, disienten en cuanto a las causas.   Según las Demandantes, los problemas operativos se relacionan con "los incumplimientos repetidos de PDVSA Gas y Pequiven en el suministro de los niveles contratados de gas y electricidad a la planta, combinados con la mayor interferencia por parte de la Demandada en la administración de la planta"[87].   Por su parte, la Demandada admite que hubo problemas con el suministro de materias primas[88]; pero agrega que los problemas operativos de FertiNitro "tienen su origen" en fallas en la construcción y el diseño de la planta atribuibles a la Contratista EPC[89].

5.25   FertiNitro también fue sometida a una "prueba de confiabilidad", la cual no aprobó, y, posteriormente, continuó experimentando cierres planificados y no planificados, vinculados, entre otras cosas, a fallas mecánicas[90].   En el periodo entre estas pruebas, FertiNitro sufrió "paradas de planta". Una "parada de planta" es un período programado de tiempo de inactividad en el que toda la producción de la planta se detiene; y los catalizadores y las materias primas son removidos.   FertiNitro tuvo su primera parada de planta en 2005. Luego, hubo paradas de planta en 2008, 2009 y 2010.   El costo de las paradas de planta, así como los costos de mantenimiento anuales, superaron

---

[86] Informe Pericial de Tim Giles (2 de junio de 2012) ("Giles IP1"), Párrafo 4.21 ("el rendimiento desde 2006 a 2008 estuvo por debajo de lo que podría esperarse de una Planta de este tipo").  Répl. Koch, Párrafo 36; Mem. Koch, Párrafo 158; Mem. C. Ven., Párrafo 75.
[87] Répl. Koch, Párrafo 36.
[88] Mem. C. Ven., Párrafos 75, 80, 83.
[89] Mem. C. Ven., Párrafo 76; Dúpl. Ven., Párrafos 61-67.
[90] Reunión de Junta Directiva de Fertinitro N.º 75 (31 de octubre de 2006) (R-58), pág. 2; Reunión de Junta Directiva de Fertinitro N.º 81 (24 de mayo de 2007) (R-61), pág. 4.  Según la Demandada, las fallas mecánicas también crearon riesgos de seguridad para los trabajadores de la planta. Mem. C. Ven., Párrafos 64-76.

considerablemente el presupuesto asignado en un principio y también se incrementaron considerablemente con posterioridad a 2008[91].

*(iii)   Las Negociaciones de Pequiven Para Adquirir La Totalidad de las Acciones de los Accionistas Privados de FertiNitro*

5.26    *2005-2006:* Entre los meses de junio de 2005 y octubre de 2006, los directores nombrados por Pequiven presentaron ante la junta directiva de FertiNitro las propuestas de Pequiven a fin de comprarle cantidades adicionales de urea a FertiNitro, anuales a un precio reducido durante un período comprendido entre los años 2005 y 2007[92].   La cantidad de urea que Pequiven estaba autorizada a adquirir en virtud de sus propuestas se limitaba a 75.000 toneladas[93].   Según la declaración del Sr. Gwaltney, el precio reducido propuesto era inferior a los costos de producción de FertiNitro[94].

5.27    Durante las reuniones de la junta directiva de FertiNitro, los directores nombrados por Pequiven explicaron que la urea adicional había de utilizarse para la reventa en el mercado interno y, de ese modo, apoyar los planes agrícolas del Gobierno[95].   Los directores nombrados por Pequiven agregaron que las propuestas de Pequiven entrarían en vigor

[91] El 5 de agosto de 2010, la Junta Directiva de FertiNitro analizó los crecientes costos de funcionamiento de la Planta y señaló que, a partir del año 2008, los costos se habían aumentado en más de "dos veces" en términos de USD. Todas las paradas de planta excedían el presupuesto. La parada de planta del año 2005 costó USD 21,4 millones, aproximadamente USD 10 millones por arriba del presupuesto. La segunda parada de planta correspondiente al año 2008 costó USD 40,4 millones. Se requirió trabajo de mantenimiento adicional en los años 2009 y 2010, y una tercera parada de planta no programada tuvo lugar en 2010, a un costo de USD 40 millones. Acta de Reunión de Junta Directiva de FertiNitro N.º 111 (5 de agosto de 2010) (C- 105). *Véase también* Mem. C. Ven., Párrafos 70-74.
[92] Acta de Reunión de Junta Directiva de FertiNitro N.º 57 (21 de junio de 2005) (C-74), punto 3; Presentación de Pequiven a la Junta Directiva de FertiNitro, "Precio Especial para la Urea dirigida al mercado nacional, por un período determinado" (junio de 2005) (C-75); Acta de Reunión de Junta Directiva de FertiNitro N.º 59 (20 de septiembre de 2005) (C-77), págs. 3-4; Acta de Reunión de Junta Directiva de FertiNitro N.º 65 (5 de abril de 2006) (C-51), pág. 17.
[93] Presentación de Pequiven a la Junta Directiva de FertiNitro, "Precio Especial para la Urea dirigida al mercado nacional, por un período determinado" (junio de 2005) (C-75).
[94] Segunda Declaración de Testigo de Brent Gwaltney (20 de agosto de 2013) ("Gwaltney DT2"); *véase también* Répl. Koch, Párrafo 74.
[95] Presentación de Pequiven ante la Junta Directiva de FertiNitro, "Precio Especial de la Urea destinada al mercado nacional, por un período determinado" (junio de 2005) (C-75), págs. 10-12; *véanse también* Acta de Reunión de Junta Directiva de FertiNitro N.º 57 (21 de junio de 2005) (C-74), pág. 4; Acta de Reunión de Junta Directiva de FertiNitro N.º 59 (20 de septiembre de 2005) (C-77), pág. 4.

exclusivamente "en caso de que Pequiven no pueda cubrir la demanda con su propia producción" de las plantas ubicadas en El Morón y El Tablazo[96].

5.28   La junta directiva de FertiNitro (con su dirección general) analizó, consideró y finalmente rechazó la solicitud de Pequiven[97].

5.29   Durante este mismo período, se creó una comisión a fin de analizar el *Offtake Agreement*[98]. Recomendó lo siguiente: (i) que la distribución del mercado entre loa Offtakers se eliminara; (ii) que el límite aplicable a las ventas internas se modificara; y (iii) que los límites de precios del *Offtake Agreement* se enmendarán[99]. La junta directiva de FertiNitro no adoptó dichas recomendaciones.

5.30   En el año 2005, se presentó un proyecto de reforma de la Ley Petroquímica ante la Asamblea Nacional de la Demandada. Sus efectos respecto de FertiNitro fueron analizados en varias reuniones de la junta directiva de FertiNitro, celebradas entre los años 2005 y 2007[100].

5.31   En ocasión de dichas reuniones, el Sr. Toro, director nombrado por Pequiven, les informó a los directores nombrados por las otras accionistas que, con arreglo al texto de la propuesta de reforma de ley: (i) FertiNitro debería abastecer la demanda interna de urea antes de exportar urea; y (ii) la Demandada debía tener una participación controlante de al menos el 51 % de FertiNitro[101], de manera de tomar el control del negocio, y "el tiempo [se estaba] acaba[ndo]"[102]. El Sr. Toro también aseveró que "Pequiven sometería propuestas

---

[96]   *Véase* Acta de Reunión de Junta Directiva de FertiNitro N.° 57 (21 de junio de 2005) (C-74), pág. 4. *Véanse también* Mem. Koch, Párrafos 118-119; Mem. C. Ven., Párrafos 45, 99. Según las Demandantes, "[l]a información de FertEcon sobre las importaciones y exportaciones de fertilizante de Venezuela desmiente todo tipo de escasez de fertilizante o emergencia de éste en Venezuela" (Répl. Koch, Párrafo 86). Las cifras de exportación de Venezuela correspondientes a Latinoamérica fueron más elevadas en 2006 que en 2007. *Véase* Importaciones de urea de Venezuela, Perspectivas de FertEcon para la urea, Apéndice (C-138).

[97]   FertiNitro les pidió a la "Gerencia General" y a los "Comités de Finanzas y Comercialización" que consideraran la propuesta y presentaran ante la junta directiva todas las consecuencias jurídicas, operativas y económicas de aceptar la propuesta y modificar el *Offtake Agreement*. *Véanse* Acta de Reunión de Junta Directiva de FertiNitro N.° 57 (21 de junio de 2005) (C-74), pág. 4 (ESP), pág. 16 (ING); Acta de Reunión de Junta Directiva de FertiNitro N.° 58 (21 de julio de 2005) (C-76), págs. 18-19 (ING) (que rechazaba la propuesta).

[53]   *Véanse* Acta de Reunión de Junta Directiva de FertiNitro N.° 57 (21 de junio de 2005) (C-74), págs. 17-18; Acta de Reunión de Junta Directiva de FertiNitro N.° 69 (29 de junio de 2006) (C-52), pág. 19.

[99]   *Véase* Acta de Reunión de Junta Directiva de FertiNitro N.° 57 (21 de junio de 2005) (C-74), págs. 17-18.

[100]   Gwaltney DT1, Párrafos 64-66.

[101]   Gwaltney DT1, Párrafo 65.

[102]   Correo electrónico de T. Parra a F. Toro *in re*: FertiNitro – Iniciativas Futuras (18 de enero de 2007) (C-79).

específicas a consideración de todos los accionistas" y que "todos los derechos y acuerdos de los accionistas serían respetados"[103]. [Traducción del Tribunal]

5.32    *2007:* Con referencia a esas conversaciones, desde 2007 en adelante, Pequiven inició negociaciones de adquisición con todas las accionistas privadas en FertiNitro.  El 7 de noviembre de 2007, los representantes de KOMSA presentaron un borrador de Memorándum de Entendimiento para la venta a Pequiven de las acciones de los accionistas ajenos a Pequiven en FertiNitro (el "Borrador del MdE de KOMSA")[104].

5.33    Con arreglo al párrafo 2.1 del Borrador del MdE de KOMSA:

> "*Las Partes por el presente acuerdan que el precio de compra total que ha de abonar Pequiven por las Acciones estará compuesto por (a) USD1.210.000.000,00, menos el saldo restante de capital e intereses devengados respecto del financiamiento bancario y en bonos existente de FertiNitro a la Fecha de Cierre, más (b) el Excedente de Efectivo (el 'Precio de Compra'). 'Excedente de Efectivo' se definiría como el saldo en efectivo de FertiNitro a la Fecha de Cierre, incluidas todas las cuentas de reserva necesarias, menos USD 25.000.000[105]" (Énfasis en el original).* [Traducción del Tribunal]

5.34    *2008:* Las conversaciones vinculadas a las negociaciones de adquisición se suspendieron entre los meses de enero y abril de 2008[106].  En octubre de 2008, Pequiven presentó un borrador de Memorándum de Entendimiento revisado (el "Borrador del MdE de Pequiven")[107]. De conformidad con el párrafo 1 del Borrador del MdE de Pequiven:

> "*(a) El precio de compra ("Precio de Compra") que Pequiven ha de pagarle a la Accionista Koch por las Acciones Adquiridas asciende a USD 297.500.000,00, que será pagadero en efectivo al cierre de la Transacción Propuesta (el "Cierre").*
> *(b) Para efectos de referencia solamente y con el acuerdo de Pequiven y la Accionista Koch de que el Precio de Compra es un monto fijo y no se encuentra sujeto a ajuste, el Precio de Compra se determinó tomando un valor inicial correspondiente al 100 % de las Empresas de USD 1.200.000.000,00, y (i) restando el saldo restante de capital y todos los intereses devengados respecto del financiamiento bancario y en*

---

[103] *Íd.*

[104] Correo electrónico de T. Parra a F. Toro y J. Lazo *in re*: Borrador MdE (que adjunta el Borrador MdE KOMSA) (12 de noviembre de 2007) (C-92).

[105] Borrador MdE KOMSA (C-92), Párrafo 2.1.

[106] Gwaltney DT1, Párrafo 115.

[107] Borrador de Memorándum de Entendimiento de Pequiven (C-93).

*bonos existente de las Empresas al 6 de octubre de 2008, (ii) sumando el excedente de efectivo, con exclusión de las reservas, a tal fecha, y (iii) multiplicando el valor neto acordado resultante de USD 850.000.000,00 por los derechos de participación totales del 35 % en las Empresas de propiedad directa o indirecta de la Accionista Koch y LAIF[108]" (Énfasis en el original). [Traducción del Tribunal]*

5.35  Ni el Borrador del MdE de KOMSA ni el Borrador del MdE de Pequiven llegaron a firmarse. Las Partes disienten en cuanto a la causa de dicha ausencia de suscripción.  Según las Demandantes, los borradores no se concretaron, puesto que Pequiven indicó que la venta ya no era una prioridad para la Demandada[109].  Según la Demandada, las "[n]egociaciones fueron interrumpidas en noviembre de 2008 debido a problemas de financiación"[110].

5.36  En los meses de abril y octubre de 2008, FertiNitro les pagó dividendos a sus accionistas por una suma total de USD 150 millones[111].

5.37  *2009:* A fines de diciembre de 2009, FertiNitro se encontraba en déficit, en tanto sus pasivos superaban sus activos[112].

(iv)  *Las Medidas de la Demandada y el Marco Jurídico Relevante*

5.38  *1998:* El 6 de diciembre de 1998, el Presidente Chávez fue electo como Jefe de Estado de la Demandada. Asumió el cargo en el mes de febrero de 1999. Durante el período que condujo a su elección, Venezuela importaba el 64% de sus alimentos y era un "importador neto" de productos agrícolas[113]. El Artículo 305 de la Constitución de Venezuela de 1999, promulgada bajo el Gobierno del Presidente Chávez, consagraba los objetivos políticos de

---

[108]  Borrador de Memorándum de Entendimiento de Pequiven (C-93), Párrafo 1(a)–(b), págs. 2-3.  El precio mencionado en el inciso (b), en tanto corresponde a Koch, habría representado USD 212,5 millones por su participación del 25 % de Fertinitro, luego del pago de aproximadamente USD 37,5 millones en concepto de dividendos en los meses de abril y octubre de 2008.

[109]  Mem. Koch, Párrafo 151.

[110]  Mem. C. Ven., Párrafo 92, y Dúpl. Ven., Párrafo 100, que cita Gwaltney DT1, Párrafo 118 (que afirma que "PDVSA iba a suspender de forma indefinida el financiamiento de Pequiven para la compra de las acciones de FertiNitro").

[111]  *Véase* FertiNitro, Estados Financieros correspondientes al Ejercicio Finalizado el 31 de diciembre de 2009 y 2008 (30 de abril de 2010) (R-30), nota 16.

[112]  *Véase* FertiNitro, Estados Financieros correspondientes al Ejercicio Finalizado el 31 de diciembre de 2009 y 2008 (30 de abril de 2010) (R-30).

[113]  Christina Schiavoni & William Camacaro, *The Venezuelan Effort to Build a New Food and Agricultural System*, en 61 Monthly Review (1 de julio de 2009) (R-29), pág. 3.

procurar la seguridad alimentaria y la soberanía alimentaria[114].  A partir de ese momento, la Demandada emprendió un proceso destinado a incrementar la capacidad de producción agrícola.

5.39   *2001:* En septiembre de 2001, la Demandada emitió un "Plan para el Desarrollo Económico y Social de la Nación"[115]para el período comprendido entre los años 2001-2007. Según el párrafo 1.1.3.1-4 del Plan, el Gobierno debía priorizar la mejora de la productividad agrícola para satisfacer las demandas internas de alimentos.  En 2002, la Demandada desarrolló un programa nacional de tres años para desarrollar la seguridad alimentaria y desarrollo rural, con la asistencia de la Organización de las Naciones Unidas para la Alimentación y la Agricultura[116].

5.40   *2002:* El 1 de julio de 2002, entró en vigor la Ley de Expropiación por causa de utilidad pública o social[117].  De conformidad con el Artículo 2 de la Ley de Expropiación, la expropiación es una "institución de Derecho Público mediante la cual el Estado actúa en beneficio de una causa de utilidad pública o de interés social".  El Artículo 7 establece los requisitos obligatorios para cualquier expropiación, que incluyen: (i) una "disposición formal que declare la utilidad pública; (ii) una declaración de que su ejecución exige indispensablemente la transferencia total o parcial de la propiedad o derecho; (iii) un justiprecio del bien objeto de la expropiación; y (iv) pago oportuno y en dinero efectivo de justa indemnización".  El Artículo 5 de la Ley prevé lo siguiente:

> "*El Decreto de Expropiación consiste en la declaración de que la ejecución de una obra requiere la adquisición forzosa de la totalidad de un bien o varios bienes, o de parte de los mismos. […]   El Decreto de Expropiación requerirá la previa declaratoria de utilidad pública de conformidad con lo establecido en los Artículos 13 y 14 de esta Ley*".

5.41   El 2 de diciembre de 2002, organizaciones políticas y cívicas comenzaron un paro cívico nacional en Venezuela.  Este "Afectó seriamente a muchas de las actividades económicas

---

[114] Constitución de la República Bolivariana de Venezuela (sin fecha) (R-3).
[115] Plan para el Desarrollo Económico y Social de la Nación (septiembre de 2001) (R-5).
[116] Organización de las Naciones Unidas para la Alimentación y la Agricultura, *Feature: FAO in Venezuela* (2002) (R-7).
[117] Ley de Expropiación por causa de utilidad pública o social ("Ley de Expropiación") (1 de julio de 2002) (R-53) y (R-9).

del país, en especial a la industria del petróleo"[118]. [Traducción del Tribunal]. Empleados de PDVSA participaron en el paro[119].   Afectó a Pequiven, cuyas operaciones se detuvieron[120].  El paro también introdujo cambios importantes en la plantilla de Pequiven, y en consecuencia en el personal de FertiNitro[121].   Según las Demandantes, con posterioridad al paro, la Demandada reemplazó a la gerencia de PDVSA, Pequiven y FertiNitro con personas que eran consideradas leales al Gobierno, independientemente de sus competencias técnicas[122].

5.42   *2004:* En 2004, Pequiven debió importar urea para satisfacer la demanda local[123].  En ese momento, Pequiven y FertiNitro eran las únicas compañías en Venezuela que producían urea. Las instalaciones de producción de Pequiven, "El Tablazo" y "Morón", sufrieron problemas significativos.   Según la Demandada, las plantas de Pequiven no podían satisfacer la demanda local.

5.43   *2005:* En 2005, la Demandada adoptó un "Plan Nacional de Semillas"de cuatro años[124]. En ese momento, la Demandada importaba más de 70% de sus alimentos, 100% de sus semillas vegetales y más de 60%-70% de sus semillas de maíz[125].   El plan nacional procuraba reducir la dependencia de las importaciones y aumentar la producción alimentaria interna, mediante (*inter alia*) la producción y desarrollo alimentarios[126].

---

[118] FertiNitro, Estados Financieros para los Ejercicios Económicos finalizados el 31 de diciembre de 2004 y 2003 (10 de febrero de 2005) (R-14), pág. 9.

[119] ICIS News, Venezuela Strike, crisis enter third and crucial week (16 de diciembre de 2002) (C-36).

[120] *Íd.*

[121] Entre otros trabajadores, su Presidente fue despedido, supuestamente como consecuencia de su apoyo al paro (*Venezuela's Pequiven boss sacked for backing strike*, ICIS News (16 de diciembre de 2002) (C-37). *Véase también Venezuela Strike, crisis enter third and crucial week*, ICIS News (16 de diciembre de 2002) (C-36).

[122] Mem. Koch, Párrafos 99-100.

[123] *Véase* Declaración de Testigo de Víctor Daniel Barrientos (28 de febrero de 2013) ("Barrientos DT1"), Párrafo 23. Según las Demandantes, "la información de FertEcon sobre las importaciones y exportaciones de fertilizante de Venezuela desmiente todo tipo de escasez de fertilizante o emergencia de éste en Venezuela" (Répl. Koch, Párrafo 86). Las Demandantes alegan además que las cifras de exportación de Venezuela para América Latina eran superiores en 2006 que en 2007 (Répl. Koch, Párrafo 87).

[124] Plan Nacional de Semillas: Cultivando la Sustentabilidad Alimentaria,2005-2009 (abril de 2005) (R-15) ("Plan Nacional de Semillas").

[125] Plan Nacional de Semillas (R-15) pág. 5 (ESP), pág. 15 (ING).

[126] Plan Nacional de Semillas (R-15) pág. 8 (ESP).

5.44   *2006:* El 28 de julio de 2006, entró en vigor la "Ley de Reforma Parcial de la Ley de Estímulo al Desarrollo de las Actividades Petroquímica, Carboquímica y similares"[127]. De conformidad con los Artículos 2 y 3 de esta ley, Pequiven "cumplirá y ejecutará las políticas que dicte el Ejecutivo Nacional […] y "serán de la exclusiva propiedad de […] Venezuela".

5.45   En diciembre de 2006, el Presidente Chávez fue reelecto a un tercer mandato presidencial.

5.46   *2007:* El 6 de marzo de 2007, entró en vigor el Decreto 5.218 de fecha 26 de febrero de 2007 (el "Decreto de la Urea")[128]. De conformidad con los Artículos 1 y 2, los fertilizantes nitrogenados y los insumos necesarios para su elaboración se "declaraban como bienes de primera necesidad en todo el territorio nacional", y los fabricantes, proveedores, y exportadores de fertilizantes nitrogenados quedaban "obligados a suministrar [urea] prioritariamente en el mercado nacional". De conformidad con los Artículos 3 y 5 del Decreto de la Urea el precio y producción de fertilizantes debían estar regulados por resoluciones conjuntas del Ministerio del Poder Popular para la Agricultura y Tierra, el Ministerio para las Industrias Ligeras y Comercio y el Ministerio del Poder Popular para la Energía y Petróleo.

5.47   En virtud del Decreto de la Urea, se adoptó una resolución conjunta, que entró en vigor el 2 de mayo de 2007 (la "Resolución de la Urea")[129]. La Demandada consultó a Pequiven durante el proceso de redacción del Decreto de la Urea y de la Resolución de la Urea[130].

5.48   La Resolución de la Urea estableció el precio máximo al que los fabricantes de urea podrían venderle urea a Pequiven. Esta autorizaba a Pequiven a comprarle a cualquier fabricante en Venezuela las cantidades necesarias de urea para satisfacer la demanda nacional[131]. Además, los fabricantes de urea en Venezuela debían informarle al ministerio relevante de

---

[127] Ley de Reforma Parcial de la Ley de Estímulo al Desarrollo de las Actividades Petroquímica, Carboquímica y similares (1 de noviembre de 2005) (C-7).
[128] Decreto 5.218 (26 de febrero de 2007) ("Decreto de la Urea") (C-80).
[129] Resolución Conjunta del Ministerio del Poder Popular para la Agricultura y Tierra, el Ministerio del Poder Popular para las Industrias Ligeras y Comercio y el Ministerio del Poder Popular para la Energía y Petróleo (3 de mayo de 2007) ("Resolución de la Urea") (C-82).
[130] Mem. C. Ven., Párrafo 295; Répl. Koch, Párrafo 52.
[131] Resolución de la Urea (C-82), Art. 10.

la Demandada la cantidad de urea producida por ellos, conjuntamente con los porcentajes de urea destinada para el consumo interno e internacional[132].

5.49    En este momento, como bien sabían las Demandantes y la Demandada, sólo Pequiven y FertiNitro producían urea en Venezuela[133].  Por lo tanto, además de las instalaciones de producción de Pequiven, "El Tablazo" y "Morón", que habían experimentado dificultades desde el año 2004, el Decreto de la Urea y la Resolución de la Urea, en la práctica sólo eran aplicables a la Planta de FertiNitro (La Demandada siendo propietaria en un 100% de FertiNitro).

5.50    De conformidad con el Decreto de la Urea y la Resolución de la Urea, se le exigía a FertiNitro venderle urea a Pequiven a precios inferiores al costo de producción e inferiores al precio especificado en el *Offtake Agreement*[134].  Tras la devaluación del Bolívar venezolano en el año 2010, aumentó la diferencia de valor entre el precio de producción y el precio regulado.

5.51    Durante el mismo período, la otra planta de Pequiven, El Tablazo, exportaba urea a otros mercados, incluido Ecuador, lo que podía afectar los niveles de urea que se le exigían a FertiNitro para satisfacer la demanda local de urea[135].  El Sr. Toro, el entonces director designado de Pequiven, explicó que se exportaba urea por "motivos geopolíticos" y que esas cantidades eran independientes de aquellas destinadas al mercado local[136].

5.52    *2008:* El 31 de enero de 2008, entró en vigor el Decreto Ley 5.835 de Venezuela. De conformidad con el Artículo 4 del Decreto:

> "*Se declaran, y por lo tanto son de utilidad pública e interés social, todos los bienes necesarios para desarrollar las actividades de producción, fabricación, importación, transporte, distribución y comercialización de alimentos o productos declarados de primera necesidad o sometidos a control precios.*

---

[132] *Íd.*, Art. 11.

[133] Mem. Koch, Párrafo 131; Mem. C. Ven., Párrafo 50; Barrientos DT1, Párrafos 16, 23.

[134] Informe Mensual de FertiNitro correspondiente a marzo de 2007 (13 de abril de 2007) (C-86), pág.13; Informe Mensual de FertiNitro correspondiente a enero de 2010 (25 de febrero de 2010) (C-87), pág. 13; *Véase también* Mem. Koch, Párrafo 136.

[135] Parra DT1, Párrafo 66; Gwaltney DT1, Párrafo 104.

[136] Acta de Reunión de Junta Directiva de FertiNitro N.° 83 (30 de julio de 2007) (C-88), pág. 7.

*El Ejecutivo Nacional podrá, sin mediar otra formalidad, iniciar la expropiación mediante decreto por razones de seguridad y soberanía alimentaria*"[137].

5.53   El 31 de julio de 2008, entró en vigor la Ley de Seguridad y Soberanía Alimentaria[138].  El Artículo 3 de la ley disponía que "[s]e declaran de utilidad pública e interés social, las actividades que aseguren la disponibilidad y acceso oportuno a los alimentos, de calidad y en cantidad suficiente a la población, [...]"y que "[e]l Ejecutivo Nacional, cuando existan motivos de seguridad agroalimentaria podrá decretar la adquisición forzosa, mediante justa indemnización y pago oportuno, de la totalidad de un bien o de varios bienes necesarios para la ejecución de obras o el desarrollo de actividades de producción, [...] de alimentos". Además, el Artículo 20 le otorgaba al Ejecutivo la facultad, entre otras cuestiones, para "dictar medidas económicas y financieras necesarias para la ejecución de los planes de producción nacional".

5.54   *2009:* El 18 de junio de 2009, entró el vigor la Ley Orgánica para el Desarrollo de las Actividades Petroquímicas de fecha 16 de junio de 2009 (la "Ley Petroquímica de 2009")[139]. El Artículo 5 de esta Ley dispone lo siguiente:

"*Se reserva al Estado la actividad petroquímica básica e intermedia, así como las obras, bienes e instalaciones que su manejo requiera. Esta reserva será ejercida, directamente por el Ejecutivo Nacional o mediante empresas de su exclusiva propiedad. Igualmente podrá hacerlo mediante empresas mixtas donde tenga control de sus decisiones y una participación no menor al cincuenta por ciento (50%) del capital social.*

*Las empresas mixtas, estarán sujetas a la previa autorización de la Asamblea Nacional, a cuyo efecto el Ejecutivo Nacional, por órgano del Ministerio del Poder Popular con competencia en materia de Energía y Petróleo, deberá informarla de las circunstancias y condiciones pertinentes a dicha constitución*".

5.55   El 15 de julio de 2009, el Sr. C. Inciarte, Presidente de FertiNitro y de Pequiven, le informó a la junta directiva de FertiNitro que, conforme la política oficial del Viceministro de Petroquímica de la Demandada (con la que Pequiven estuvo de acuerdo), la Ley

---

[137] Decreto 5.835 (28 de enero de 2008) (R-23), Art. 4.
[138] Decreto 6.071 (14 de mayo de 2008), Ley Orgánica de Seguridad y Soberanía Agroalimentaria (R-27).
[139] Ley Orgánica para el Desarrollo de las Actividades Petroquímicas (16 de junio de 2009) (C-8).

Petroquímica de 2009, y en particular su Artículo 5, no sería aplicable a FertiNitro, en tanto no debía ser aplicada de manera retroactiva por parte de la Demandada[140].

5.56    *2010:* El 10 de octubre de 2010, el Presidente Chávez parece firmar el Decreto 7.713, frente a las cámaras de televisión durante su show semanal denominado "*Aló Presidente*." ("Decreto 7.713"; o el "Decreto de Expropiación").  Mientras el Presidente Chávez firmaba el Decreto de Expropiación, se lo grabó declarando:

> "*A fin de lograr la cabal y efectiva realización de los planes nacionales de siembra y producción formulados por el ejecutivo nacional y que sean necesarios para la ejecución de la obra Plan Socialista de Soberanía Alimentaria... Aprobado, exprópiese, y pásese a propiedad, a propiedad patria*"[141].

5.57    Este Decreto de Expropiación de fecha 10 de octubre de 2010, que fuera publicado en la Gaceta Oficial de la Demandada el 11 de octubre de 2010 bajo la firma del Presidente Chávez, disponía, (*inter alia*)[142]:

> "*Artículo 1. Se ordena la adquisición forzosa de los bienes muebles e inmuebles, incluyendo bienhechurías, instalaciones, plantas, equipos industriales, de oficina y demás activos, requeridos o necesarios para la actividad de producción, procesamiento, transporte y almacenamiento de fertilizantes (urea y amoníaco), que pertenezcan o se encuentren en posesión de las sociedades mercantiles Fertilizantes Nitrogenados de Oriente, S.A., Fertilizantes Nitrogenados de Venezuela, S.R.L., Fertilizantes Nitrogenados de Oriente, C.E.C. y [sic] Fertilizantes Nitrogenados de Venezuela C.E.C., o cualesquiera empresas o personas relacionadas, a fin de lograr la cabal y debida realización de los planes nacionales de siembra y producción formulados por el Ejecutivo Nacional y que sean necesarios para la ejecución de la obra 'Plan Socialista de Soberanía Agroalimentaria'.*
>
> *Artículo 2. La obra 'Plan Socialista de Soberanía Agroalimentaria', será ejecutada por la Petroquímica de Venezuela, S.A. (PEQUIVEN), adscrita al Ministerio del Poder Popular para La Energía y Petróleo, como expropiante, o la filial que esta designe.*
>
> *Artículo 3. Los bienes expropiados pasarán libres de gravámenes o limitaciones al Estado venezolano, a través de la empresa Petroquímica de Venezuela,*

---

[140] Acta de Reunión de Junta Directiva de FertiNitro N.° 101 (15 de julio de 2009) (C-72), pág. 6 (ESP), pág. 15 (ING).
[141] Transcripción de la transmisión de la VTV (11 de octubre de 2010) (R-33), pág. 6.
[142] Decreto 7.713 (10 de octubre de 2010) ("Decreto de Expropiación") (C-9).

*S.A.(PEQUIVEN), como ente expropiante, o la filial que esta designe, de conformidad con lo dispuesto en el artículo 11 de la Ley de Expropiación por Causa de Utilidad Pública o Social.*

*Artículo 4. De conformidad con lo previsto en el artículo 12 de la Ley de Expropiación por Causa de Utilidad Pública o Social, se autoriza a la empresa Petroquímica de Venezuela S.A. (PEQUIVEN), a fin de que realice los trámites necesarios para la adquisición de los inmuebles y demás bienes a que se contrae el artículo 1 del presente Decreto, subrogándose en todos los derechos y obligaciones que correspondan a la República Bolivariana de Venezuela por tales conceptos.*

*Artículo 5. Petroquímica de Venezuela, S.A. (PEQUIVEN), iniciará y tramitará el procedimiento de expropiación previsto en la Ley de Expropiación por Causa de Utilidad Pública o Social, hasta la transferencia total y definitiva de la propiedad de los bienes indicados en el artículo 1° del presente Decreto.*

*Artículo 6. De conformidad con lo dispuesto en el artículo 3° del Decreto con Rango, Valor y Fuerza de Ley Orgánica de Seguridad y Soberanía Agroalimentaria, se ordena la ocupación de los bienes indicados en el artículo 1° del presente Decreto, por parte de la sociedad mercantil Petroquímica de Venezuela, S.A.–(PEQUIVEN), a los fines de su puesta en operatividad, administración y aprovechamiento.*
*[…]*

*Artículo 8. El Ministerio del Poder Popular para la Energía y Petróleo queda encargado de la ejecución del presente Decreto*"[143].

5.58    Existe disenso entre las Partes respecto de la cuestión de si se notificó a las Demandantes (o a KOMSA) del Decreto de Expropiación.  Las Demandantes sostienen que la Demandada no proporcionó aviso anticipado del Decreto de Expropiación[144].  La Demandada sostiene, a su vez, que "Venezuela proporcionó avisos tanto reales como implícitos de que FertiNitro podría ser objeto de una adquisición forzosa" mediante una serie de acciones que comenzaron tempranamente ya en el año 2005[145].

---

[143] El Artículo 11 de la Ley de Expropiación (citado en el Decreto de Expropiación) se refiere a la "Liberación de gravámenes del bien expropiado" y el Artículo 12 a la Subrogación de Derechos. *Véase* Ley de Expropiación (1 de julio de 2002) (R-53).

[144] Gwaltney DT1, Párrafo 120; Mem. Koch, Párrafo163; Répl. Koch, Párrafo 90.

[145] Mem. C. Ven., Párrafo 168 y *ss*.

5.59   El 11 de octubre de 2010, el día posterior a la firma televisada del Decreto de Expropiación por parte del Presidente Chávez, el Ministro de Energía y Petróleo de la Demandada (Sr. Rafael Ramírez) viajó en persona a la Planta de FertiNitro.   Allí realizó la siguiente declaración durante una entrevista de periodistas transmitida en la televisión pública, dirigida asimismo a los empleados de FertiNitro, Pequiven y PDVSA reunidos en la Planta. Este discurso público merece ser citado casi en su totalidad, con números de párrafos agregados aquí para facilitar su posterior consulta[146]:

> "*[1]… [Ministro Rafael Ramírez no documentado] …el mandato de nuestras leyes, nuestro gobierno, nuestra revolución, porque esta es una planta fundamental para el desarrollo agrícola del país, nuestra soberanía alimentaria. Esta es una planta que hemos estado durante mucho tiempo en conversaciones sin éxito alguno para tratar de que se adaptara a lo que son nuestros requerimientos en el plan de desarrollo nacional.  Para que veamos la importancia que esta planta [es decir, FertiNitro][147]tiene en el sistema agrícola nacional... bueno, lo primero es informar que nosotros a nivel nacional producimos unas 380.000 toneladas al año de fertilizantes, en particular urea, pero esta sola planta produce 1.500.000 toneladas al año de urea. Es decir, es una planta muy grande, la más grande que tenemos en el país.*
>
> *[2] Ahora bien, esta es una planta que, recibiendo gas que produce el Estado venezolano a un precio subsidiado, es decir, de 0,5 a 1,5 dólares el millón de BTU; hay que considerar que en el exterior el gas ha llegado a venderse entre 3 y 12 dólares el millón de BTU, sin embargo, aunque damos este precio subsidiado, ha sido imposible que esta planta, en la cual Pequiven tenía una posición minoritaria, se ajustara a los requerimientos de suministro de fertilizantes para el desarrollo nacional.*
>
> *[3] Nosotros actualmente tenemos un consumo de 600.000 toneladas de urea, pero estamos ahora en nuestros planes de desarrollo con todo el plan de siembra que tiene diseñado el gobierno nacional de llegar hasta cinco millones de hectáreas. Estamos haciendo un requerimiento de más de 1.300.000 toneladas. Con el control que el Estado venezolano va a tomar de esta planta [es decir, la Planta de FertiNitro],*

---

[146] Transcripción de la Transmisión de la VTV de la entrevista del Ministro Ramírez en idioma español (11 de octubre de 2010) (R-33 & C-107). Traducción de la versión citada en el Laudo en inglés se tomó de la traducción de la Demandada en R-33. No contó con el acuerdo de las Demandantes, quienes presentaron su propia traducción al idioma inglés (C-107). *Véase también* el archivo de vídeo en formato mp4 "Ministro Ramírez encabeza toma de control de FertiNitro" (11 de octubre de 2010) (C-139).

[147] La interpretación del Tribunal se agrega aquí entre corchetes, como también los agregados entre corchetes *infra*.

*entonces tenemos garantizado toda la urea que necesiten nuestros campesinos, toda la urea que necesite nuestro sector productivo para sostener este plan extraordinario de siembra y para sostener el desarrollo de la nación.*

*[4] Por otra parte, esta planta, que tenía un conjunto de socios privados, teníamos serios problemas para la comercialización. Siendo un fertilizante producido con gas venezolano, bueno, nosotros teníamos un tope donde solamente podíamos adquirir hasta el 10% de su producción para el mercado interno, y, cuando nos lo vendían, nos lo vendían a un precio que era 2,5 a 3 veces por encima del precio al cual Pequiven vende sus fertilizantes. [Estas parecen ser referencias al Offtake Agreement].*

*[5] De tal manera que, estamos acá muy satisfechos, porque sabemos que este paso es un paso más a garantizar nuestra soberanía. Estamos con los trabajadores, que son los actores fundamentales de este proceso y, por supuesto, atendiendo a los lineamientos de nuestro Comandante Chávez, del Presidente Chávez, en la profundización de nuestra revolución [B]olivariana".*
*[…]*
*[6] Bueno, aquí tenemos una plantilla de cerca de 400 trabajadores. Por supuesto, que los privados tenían la figura de la terciarización. Nosotros vamos a eliminar la terciarización, vamos a iniciar un proceso de absorción de trabajadores, regularizar toda la relación con nuestros obreros, porque el socialismo se trata de un sistema económico donde la base, las relaciones de producción, tienen que estar en el marco de la ética del socialismo. No podemos tener aquí obreros que estén explotados por empresas transnacionales mientras ellas son las que hacen las ganancias en el exterior. [Estas parecen ser referencias (inter alia) a las accionistas extranjeras de FertiNitro, incluida KOMSA].*

*[7] Entonces ahora se inicia todo un proceso, por supuesto hay todo un procedimiento legal, se inician todos los mecanismos para completar los pasos legales de la expropiación. Pero nosotros estamos aquí con nuestros trabajadores, con trabajadores de Pequiven, trabajadores de FertiNitro, y trabajadores de PDVSA. Bueno, ya en el control de la planta y haciendo una inspección de nuestras instalaciones porque, por supuesto tenemos que garantizar que se preserven todos los activos, que de aquí en adelante son de la República.*

*[8] Periodista: … ¿Los beneficios a los países del ALBA, que tendrá FertiNitro también? Ministro Rafael Ramírez: Bueno, mire. Primero que todo, nosotros con esto garantizamos nuestro suministro al mercado interno. Y luego, vamos a poder tener el control de la comercialización. Hasta este momento, la transnacional que*

*operaba aquí era la que manejaba los volúmenes de cotización de acuerdo a sus criterios, de acuerdo a su política comercial. Nosotros, como ustedes saben, en el seno del ALBA en América Latina y en nuestro propio mercado interno, tenemos una visión distinta. Nosotros disponemos de gente y recursos naturales como el gas, el gas natural, que es el que se usa en este caso, para convertirlo en insumos para la producción de alimentos. En ese sentido, esta planta nos va a permitir poder asegurar el desempeño de esa política hacia el futuro. [Estas parecen ser referencias (inter alia) al Offtake Agreement].*

*[9] Periodista: (Incomprensible). Ministro Rafael Ramírez: Bueno, ya, estamos primero tomando acá, estamos garantizando. Fíjate que se ha iniciado una parada de planta, en este mismo momento, va a iniciar sus trabajos. Por eso hay mucho movimiento porque siempre estamos pendientes de, bueno, mantener nuestras instalaciones en óptimas condiciones.*

*[10] Periodista: Ministro, ¿cuál va a ser el impacto de la nacionalización de FertiNitro hacia el pueblo? Ministro Rafael Ramírez: Bueno, muy positivo, porque entonces ahora nos va a permitir disponer de los volúmenes de fertilizantes que necesitemos de la urea al precio nacional. Fíjate que Pequiven vende el saco de 50 kilos de urea a 19 [B]olívares, y aquí FertiNitro nos lo vendía a nosotros a 50 Bolívares. Es decir, una diferencia de más de 2,5 veces. Ahora nosotros vamos a poder disponer al precio que está regulado por el estado, de 19,5, y vamos a poder disponer toda la urea que se requiera para el mercado nacional. En ese sentido, entre esta operación y la nacionalización de AgroIsleña, que ahora es AgroPatria, nosotros vamos a tener toda la cadena para poder abastecer a nuestro sector campesino allá en los Andes para que produzcan café, allá en los llanos para que produzcan maíz, para que produzcan sorgo, es decir, todo lo que hemos visto que es un elemento fundamental para nosotros superar el modelo rentista petrolero y es un modelo fundamental para garantizar la seguridad, la alimentación en nuestro pueblo. En la medida en que tengamos los insumos de toda la cadena controlados por el estado, lo cual garantiza que no se especule con ello, es decir, con los fertilizantes, con los químicos, los agroquímicos, nuestro pueblo va a poder seguir disponiendo de alimentos, va a haber más trabajo en el campo y, nuestra población, a través de las redes de distribución, sobre todo, las redes socialistas de distribución, va a poder, entonces, tener alimentos seguros a bajo precio, en abundancia para todo nuestro país. [Nuevamente, estas parecen ser referencias (inter alia) al Offtake Agreement].*

*[11] Periodista: ¿Otro paso para nuestra soberanía nacional? Ministro Rafael Ramírez: Así es, yo también quiero resaltar y quiero agradecer el apoyo permanente*

*de nuestros trabajadores, el apoyo de nuestra FUTEP, que es la [F]ederación [U]nitaria de los trabajadores, [V]anguardia [O]brera [S]ocialista, todas las organizaciones populares, las organizaciones obreras, quienes desde ayer mismo que el Presidente hizo los anuncios, estamos acá, salvaguardando estas instalaciones, tanto acá en FertiNitro, como en paralelo, están nuestros trabajadores allá en el Estado de Carabobo, garantizando, salvaguardando las instalaciones de [I]ndustria Venoco que también ha sido nacionalizada por la revolución. Ambos pasos son muy importantes, porque es un sector en los cuales nosotros hemos garantizado la soberanía. En el caso de Venoco se trata de un sector fundamental para toda la producción de químicos, lubricantes, grasas, necesarias para el sector eléctrico y para el sector industrial, donde nuevamente se repite la misma situación. Siendo PDVSA, siendo el Estado venezolano quien suministra la materia prima, bueno, ellos tienen una política de comercialización que, de manera clara, impedía que se cumplieran los planes de disponer de nuestros recursos naturales para servicio del pueblo.*

*[12] Periodista: ¿Cuánta gente? Ministro Rafael Ramírez: En FertiNitro, 400 personas. En Venoco tenemos unas 360 personas. Sí, FertiNitro, FertiNitro. A nivel nacional tienen como unas 450 personas, es más o menos el número, que es la mayor concentración de personas.*
*[…]*
*[13] Estas son acciones muy importantes porque estas empresas como ustedes bien saben eran empresas y negocios que venían remanentes de la Cuarta República. Eran empresas y negocios donde el capital privado transnacional y nacional se aprovechaba de los suministros de materia prima que de forma barata hace el Estado Venezolano a través de PDVSA en esta planta en particular.*

*[14] Y quiero saludar a todas las organizaciones sociales y políticas. Quiero saludar a los trabajadores de la FUTEC. Quiero saludar a los trabajadores de la vanguardia obrera socialista. Quiero saludar a todos nuestros obreros quienes desde ayer mismo vinieron acá para asegurar y garantizar las operaciones de estos activos que son desde hoy del Estado venezolano. Nosotros sabemos que siempre contamos con los trabajadores petroleros, siempre contamos con los trabajadores de la industria petroquímica, que contamos con la clase obrera, que contamos con los trabajadores, los ingenieros, los técnicos que hacen posible que día a día acá se produzca una buena parte de nuestros insumos energéticos. Ustedes saben que nosotros hemos dado la batalla por la plena soberanía petrolera. Esa batalla el gobierno Bolivariano la impulsó y la consolidó y hoy gracias al Presidente Chávez podemos decir que somos soberanos en el manejo de nuestros recursos petroleros.*

*[15] Ahora estamos en ofensiva para profundizar la soberanía alimentaria. Hace apenas unos días el Comandante Chávez anuncio la nacionalización de la empresa Agro Isleña y hoy es la empresa Agro Patria, es una empresa que permite disponer para nuestros campesinos, para nuestro pueblo, de los insumos agrícolas que se producen en el país y que los privados tenían como una herramienta de especulación y llevar pobreza al campo. Eso está bajo control del Estado.*

*[16] El día de ayer se anunció la nacionalización de FertiNitro. Para que veamos la importancia de esta planta, nosotros con nuestra industria petroquímica, con Pequiven, producimos a nivel nacional 380.000 toneladas año de urea, que como ustedes saben es fundamental para la producción de alimentos. Esta sola planta, FertiNitro, produce por sí sola 1.500.000 toneladas año de urea, es decir 5 veces más que lo que se produce en todas las plantas a nivel nacional.*

*[17] Pero cuál era el problema? que siendo esta planta, esta planta recibe gas producido por Petróleos de Venezuela, gas de todos los venezolanos. Nosotros se lo vendemos a un precio subsidiado ente 0[,]5 y 1[,]5 dólares la tonelada, el millón de BTU. Hay que considerar que a nivel mundial el gas se vende entre 3 y ha llegado hasta 12 dólares el millón de BTU.  Es decir que aquí hay un precio subsidiado: 12 veces menos que lo que se vende en el exterior.  Pero entonces estos señores, estos capitales privados extranjeros y nacionales, con ese gas producen urea, fertilizantes en grandes cantidades, que la mayoría de ellos se exporta.  Es decir no viene a abastecer las necesidades nacionales. [Estas parecen ser referencias (inter alia) a las accionistas extranjeras de FertiNitro, incluida KOMSA, y KNI y al Offtake Agreement].*

*[18] A nosotros nos costó mucho, nos ha costado mucho lograr que estos señores vendieran algo de fertilizantes al país y luego de muchas discusiones se pudo lograr que nos vendieran solo el 10% de su producción, y saben a qué precio nos lo vendían? Al triple del precio de cuando Pequiven vende fertilizantes a nivel nacional. De manera tal que todo el fertilizante que aquí se producía, lo disponían las empresas comercializadoras, en este caso una empresa norteamericana, la empresa Koch, que agarraba todos nuestros fertilizantes y los vendía en el exterior a precios de especulación. [Estas parecen ser referencias (inter alia) a KNI y al Offtake Agreement].*

*[19] Con esta acción de nacionalización nosotros estamos garantizando en primera instancia, que todo el fertilizante que necesiten nuestros campesinos, todo el fertilizante que necesite nuestro plan de siembra nacional, todo el fertilizante que*

necesitamos para producir alimentos para nuestro pueblo esté abundante, de manera barata y segura para todo nuestro pueblo, ese es, ese sería, esa es la única razón.

[20] Esto es lo que ha indicado el Comandante Chávez. Estas grandes instalaciones industriales que ocupan territorio nacional, que explotan a los trabajadores, que especulan con nuestros propios recursos, deben pasar a manos del Estado venezolano, deben pasar a manos del pueblo. Con la adquisición, con la nacionalización de esta planta, nosotros lo que estamos haciendo es fortalecer la propiedad patria, la propiedad de todos los hombres y mujeres que habitan nuestro territorio nacional, pero además, y lo más importante, el control de plantas como ésta de FertiNitro nos va a permitir garantizar el plan de siembra nacional, la soberanía alimentaria del país. Va a permitir que el gas que producen nuestros obreros allá en PDVSA Gas, que producen en Anaco, con tanto esfuerzo y que tanto nos cuesta haber controlado nuestra industria petrolera se convierta entonces en fertilizante para nuestro pueblo, para que nuestros hombres, nuestras mujeres y nuestros niños tengan alimento seguro.

[21] Igualmente, así como estamos hoy aquí en el Estado Anzoátegui, en el complejo José Antonio Anzoátegui, están nuestros compañeros trabajadores en el Estado Carabobo asegurando las instalaciones nacionalizadas de la empresa Venoco...

[22] Finalmente, quiero decir en nombre de nuestro presidente, garantizarles a los trabajadores que todas las figuras oprobiosas capitalistas, como la tercerización y la explotación de los obreros se van a acabar en esta empresa. No puede haber tercerización alguna, no puede haber explotación alguna de nuestros trabajadores.

[23] Vamos a construir el socialismo y en este sentido el Estado venezolano y la clase obrera tienen un extraordinario rol que jugar. Compañeros trabajadores, de ustedes es el futuro, para ustedes se construye el socialismo, para los hombre y mujeres que trabajan todos los días en nuestras industrias nacionales, para poder garantizar a nuestro pueblo, a nuestras comunidades las comunidades que habitan en todos nuestros complejos industriales, las comunidades del Viñedo, las comunidades de Barcelona, las comunidades de Puerto Espíritu y todo nuestro pueblo venezolano recibirá los beneficios de que el Estado venezolano y sus trabajadores controlen una empresa tan importante como esta que estamos controlando en FertiNitro. Compañeros y compañeras, trabajadores y trabajadoras, el llamado es a profundizar el combate, a seguir profundizando nuestra revolución y bajo la guía y la orientación del Comandante Chávez estamos seguros que vamos a vencer. Patria socialista o muerte, venceremos! Gracias compañeros.

5.60  El Tribunal determina los siguientes hechos establecidos por los sucesos de 10 y 11 de octubre de 2010, tal como se hacen constar *supra*. Primero, la visita del Ministro a la Planta de FertiNitro y el discurso en dicha planta tuvieron lugar en el contexto del Decreto de Expropiación, en particular el Artículo 1 sobre la "adquisición forzosa de los bienes muebles e inmuebles"[148] de FertiNitro y el Artículo 6 sobre la "ocupación" de los bienes de FertiNitro. En virtud del Artículo 8 del Decreto, el Ministro era responsable de su ejecución, y el Ministro se refirió expresamente a los "anuncios" del Presidente Chávez de fecha 10 de octubre de 2010: véanse los párrafos [11] y [16] *supra*. Segundo, de conformidad con el Decreto de Expropiación, el Ministro estaba llevando a cabo o confirmando el "control" por parte de la Demandada de la Planta de FertiNitro: véanse los párrafos [3], [7], [20] y [23] *supra*. Tercero, ese control, en palabras del Ministro, tenía su origen en la "nacionalización" y "expropiación" por parte de la Demandada al amparo del Decreto de Expropiación: véanse los párrafos [7], [10], [16] y [20] *supra*. Cuarto, ese control se extendía necesariamente más allá de los bienes físicos y demás bienes de la Planta de FertiNitro, para incluir la derogación de cualquier restricción contractual existente en el producto de FertiNitro que no se vendiera al mercado interno de Venezuela, o según pudiera decidir de otro modo la Demandada: véanse los párrafos [3], [4], [8], [10], [17], [18] y [19]. El Decreto de Expropiación en sí nada decía expresamente respecto de la derogación de los contratos existentes de FertiNitro, pero su efecto, que se interpreta junto con el discurso del Ministro, no deja lugar a dudas de las intenciones de la Demandada para con el *Offtake Agreement*. Quinto, como uno de los motivos del Decreto de Expropiación, el Ministro hizo alusión en términos peyorativos a empresas "transnacionales" y capitalistas "extranjeros": véanse los párrafos [6], [8], [13 y [17] *supra*.  Por último, y no por eso menos importante, el Ministro fue cuidadoso al describir las acciones de la Demandada dentro del marco del derecho venezolano: véase su referencia a "procedimiento legal" y "pasos legales de la expropiación" en el párrafo [7] *supra*.

5.61  Según la Demandada, no hubo una ocupación física de la Planta en ese momento por parte de los empleados de Pequiven u otros empleados.  En cambio, el Sr. Ramírez, en carácter

---

[148] *Véase* Decreto de Expropiación (C-9), Art. 1: "Se ordena la adquisición forzosa de los bienes muebles e inmuebles, incluyendo bienhechurías, instalaciones, plantas, equipos industriales, de oficina y demás activos, requeridos o necesarios para la actividad de producción, procesamiento, transporte y almacenamiento de fertilizantes […]"

de Ministro a cargo "[asumió] el control de la planta e inspeccionaba las instalaciones con el fin de garantizar que todos los activos de FertiNitro se habían incautado"[149]. El Tribunal no considera que esta descripción sea completa en cuanto a los hechos. En este momento, la Planta de FertiNitro se encontraba ocupada por personas que respondían a la Demandada (a diferencia de FertiNitro) y cuya conducta en la toma y control físico de la Planta de FertiNitro fue aprobada y ratificada por el Ministro de la Demandada, tal como lo demuestran los términos de su discurso público el 11 de octubre de 2010 y el Decreto de Expropiación citado *supra*.

5.62    *Año 2011:* El 26 de julio de 2011, Pequiven (representada por el Sr. Barrientos) dio curso a la petición de órdenes para "solicitar la expropiación de los bienes" [de FertiNitro] ante el Juzgado Segundo de Primera Instancia en lo Civil, Mercantil, Agrario y Tránsito de la Circunscripción Judicial del Estado Anzoátegui[150]. Tal como lo explicaran los abogados de la Demandada durante la Tercera Audiencia (junio), de ese modo, Pequiven procuró obtener órdenes respecto de (*inter alia*) el nombramiento de una Junta de Administradores Judiciales (Temporales) *Ad Hoc* para asumir la dirección de FertiNitro con facultad jurídica de control de todos los aspectos del negocio[151].

5.63    En lo que se refiere a su facultad para solicitar estas órdenes, ante el Juzgado de Anzoátegui, la solicitud de Pequiven rezaba lo siguiente[152]:

> *"En virtud del Decreto de Expropiación[…], se autoriza a PEQUIVEN, a realizar los trámites necesarios para la adquisición de los bienes muebles e inmuebles propiedad de FertiNitro, subrogándose en todos los derechos y obligaciones que correspondan a la República Bolivariana de Venezuela por tales conceptos. Asimismo, se autoriza a PEQUIVEN a iniciar y tramitar el procedimiento de expropiación previsto en la Ley de Expropiación por Causa de Utilidad Pública o Social, publicada en la Gaceta Oficial de la República Bolivariana de Venezuela N.° 37.475 de fecha 1 de julio de 2002 (en lo sucesivo "Ley de Expropiación") hasta la transferencia total y definitiva de la propiedad de los bienes allí indicados a la*

---

[149] Dúpl. Ven., Párrafo 158.
[150] Petición de Reparación Provisional y de Expropiación ante el Juzgado de Primera Instancia en lo Civil, Mercantil, Agrario y Tránsito de la Circunscripción Judicial de Anzoátegui (26 de julio de 2011). Cada una de las Partes proporcionó su propia traducción en los anexos documentales R-36 y C-141 (la "Petición de Expropiación").
[151] Tercera Audiencia (junio), D1.158.2-8.
[152] *Véase* Petición de Expropiación (C-141), pág. 84.

*República Bolivariana de Venezuela, a través de PEQUIVEN o la filial que esta designe".*

5.64    El 29 de julio y el 8, 9 y 10 de agosto de 2011, según lo solicitara Pequiven, el Juzgado de Anzoátegui dictó órdenes de conformidad con el Artículo 6 del Decreto de Expropiación, en las que se trataba a Pequiven como ente expropiante en virtud del Decreto[153].  Estas órdenes del juzgado derogaron los estatutos de administración de FertiNitro al amparo del derecho venezolano[154].  Sin embargo, mucho tiempo antes, de hecho, ya no se aplicaban estos estatutos dentro de FertiNitro ni a esta última.

*(v)    Otros Acontecimientos que Siguieron al Decreto de Expropiación*

5.65    *2010*: Según la Demandada, al momento del Decreto de Expropiación (de fecha 10 de octubre de 2010), el personal de KOMSA en FertiNitro ya no desempeñaba sus tareas[155].Se había interrumpido el control que ejerciera la junta directiva de FertiNitro, ya que "se le concedió a Pequiven el control sobre las operaciones, la administración y la capitalización de FertiNitro"[156].

5.66    Con posterioridad al Decreto de Expropiación no se convocaron más reuniones de la junta directiva ni de los comités de FertiNitro[157]. El 9 de noviembre de 2010, los directores de FertiNitro designados por KOMSA renunciaron formalmente a sus cargos[158]. Los directores de FertiNitro designados por Polar renunciaron formalmente unos días más tarde, el 22 de noviembre de 2010[159].

5.67    El 26 de noviembre de 2010, el Sr. Flores (de FertiNitro) le envió una carta al Sr. Strand (de KNI), en la que afirmaba lo siguiente:

---

[153] Expedientes Judiciales ante el Juzgado Segundo de Primera Instancia en lo Civil, Mercantil, Agrario y Tránsito de la Circunscripción Judicial del Estado Anzoátegui, Resoluciones de fecha 8, 9, 10 de agosto de 2010 (C-141), págs. 38 y *ss.* (ESP), págs. 116 y *ss.* (ING).

[154] Expedientes Judiciales ante el Juzgado Segundo de Primera Instancia en lo Civil, Mercantil, Agrario y Tránsito de la Circunscripción Judicial del Estado Anzoátegui, Resoluciones de fecha 8, 9 y 10 de agosto de 2010 (C-141), págs. 24, 52-55 (ESP), págs. 122, 130-133 (ING).

[155] Mem. C. Ven., Párrafo 69, Dúpl. Ven., Párrafo 159; Villarroel DT1, Párrafo 27.

[156] Dúpl. Ven., Párrafo 159.

[157] Parra DT1, Párrafo 73; Mem. Koch, Párrafo 167.

[158] Cartas de renuncia de Koch (9 de noviembre de 2010) (C-109).

[159] Cartas de Renuncia de Polar (22 de noviembre de 2010) (C-110).

*"De conformidad con nuestra conversación de esta tarde, FertiNitro confirma la continuidad del Offtake Agreement en virtud del cumplimiento de cada cláusula, tales como: precio, asignación de productos, cesiones de mercados, y todas las demás cláusulas correspondientes en ese contrato.*

*Con base en ello FertiNitro enviará el FNSTOCK antes del término de la jornada laboral de modo tal que cada uno de los [offtakers] pueda conocer los volúmenes disponibles en diciembre"*[160]. *[Traducción del Tribunal]*

5.68    El 1 de diciembre de 2010, el Sr. Jorge Perdomo, Gerente General de FertiNitro, envió una carta al Sr. Strand (de KNI) en los siguientes términos:

*"Tras el anuncio del gobierno venezolano de la nacionalización de FertiNitro. Por la presente, FertiNitro confirma la continuidad y cumplimiento del Offtake Agreement celebrado el 8 de abril de 1998 […]*

*Sobre la base de la puesta en marcha actual de las plantas, FertiNitro ha enviado la asignación de productos de diciembre y enero a cada uno de los Compradores y se espera cumplir con el cincuenta por ciento (50%) de la producción total real de las plantas, tal como se estipula en el contrato. Sírvanse observar que el volumen total para Koch en diciembre es el siguiente:*
*Amoníaco: 23,000MT +/- 10%*
*Urea: 34,345 MT +/- 10%*
*Sírvanse hacernos saber el programa de diciembre de modo tal que FertiNitro pueda adoptar las medidas necesarias con las autoridades, tales como permisos aduaneros, de exportación, etc."*[161]. *[Traducción del Tribunal]*

5.69    El 3 de diciembre de 2010, el Sr. Gwaltney (de KNI) envió un correo electrónico al Sr. Perdomo (de FertiNitro) respondiendo en los siguientes términos:

*"He recibido su carta de fecha 1 de diciembre de 2010 dirigida a Jacob Strand de KNI reconociendo la nacionalización de FertiNitro y KNI me ha autorizado a contestar en su representación. Como es de su conocimiento, la reciente acción del gobierno constituye una expropiación de la participación de KNI y sus empresas vinculadas en FertiNitro, incluido, a título enunciativo, el Offtake Agreement.*

---

[160] Correo electrónico de E. Flores a J. Strand *in re*: *Offtake Agreement* de FertiNitro (26 de noviembre de 2010) (C-111).
[161] Carta de J. Perdomo a J. Strand (1 de diciembre de 2010) (C-112).

*El Sr. Francisco García me informó recientemente que ha sido designado por Pequiven para liderar un equipo comercial para negociar y compensar a los accionistas de KNI y FertiNitro por la expropiación. Entiendo asimismo que Pequiven ha confirmado que han tomado el offtake en su totalidad, como parte de la expropiación, y que compensarán a KNI por eso. Entiendo además que Pequiven ha solicitado que KNI compre el producto conforme a términos y condiciones similares a las del Offtake Agreement durante un período de tiempo limitado mientras que Pequiven negocia con los prestamistas, de modo tal de garantizar un flujo de caja constante, en gran parte en beneficio de los prestamistas. Aunque aún estamos analizando el impacto total y las ramificaciones de las acciones del gobierno, entendemos que existe el deseo por parte de Pequiven y FertiNitro de continuar la relación comercial con KNI a pesar de haber expropiado sus bienes y los de sus empresas vinculadas.*

*En este contexto, y entendiendo que Pequiven pretende compensar a KNI, y sus empresas vinculadas, según el derecho que las asiste por la expropiación de sus bienes al amparo del derecho internacional, durante un período limitado hasta nuevo aviso, KNI acuerda comprar el producto conforme a términos consistentes con el Offtake Agreement. El pago por el producto se realizará a las mismas cuentas bancarias históricas. KNI espera asimismo que FertiNitro lleve adelante sus asuntos comerciales de manera consistente con todas y cada una de las obligaciones crediticias y en pleno cumplimiento de la legislación pertinente.*

*Esta comunicación y la actuación de KNI al acordar la adquisición del producto de FertiNitro es estrictamente sin perjuicio y sujeto a reservas. Por la presente, KNI y sus empresas vinculadas, se reservan expresamente todos y cada uno de los derechos que pudieran existir en virtud del Offtake Agreement, incluidos, a título enunciativo, derechos en virtud de cualquier legislación interna o internacional, que sean resultado de acciones gubernamentales, o que se vinculen de alguna forma a estas"*[162]. *[Traducción del Tribunal]*

5.70    *2011:* A partir del año 2010, Pequiven celebró acuerdos con los ejecutivos bancarios y tenedores de bono del proyecto FertiNitro para saldar las deudas de FertiNitro. Aparentemente, este ejercicio se completó hacia el mes de enero de 2012[163].

---

[162] Correo electrónico de B. Gwaltney a J. Perdomo, con copia a J. Strand, M. Parra, F. García *in re*: Comercialización de KNI (3 de diciembre de 2010) (C-113).
[163] Barrientos DT1, Párrafo 44.

5.71   Durante el año 2011, representantes de Pequiven y de los otros accionistas de FertiNitro se reunieron en diversas ocasiones para discutir el monto de la compensación adeudada a estos otros accionistas (incluida KOMSA) por parte de la Demandada. Estas reuniones se celebraron el 16 de febrero de 2011 en Nueva York[164];el 6 de abril y el 23 de mayo de 2011 en Caracas y el 1 de septiembre de 2011 en Miami[165].Un tema esencial entre Pequiven y estos accionistas fue el análisis y la metodología de valoración de FertiNitro.

5.72   Las negociaciones entre Pequiven y los accionistas de FertiNitro finalmente redundaron en acuerdos de resolución amigables con LAIF (en carácter de accionista titular del 10% de participación). Snamprogetti (en carácter de accionista titular del 20% de participación y Contratista de EPC) también arribó a un acuerdo incipiente con Pequiven[166].Parece que no existió acuerdo suscripto alguno con Polar. No se celebró acuerdo alguno con KOMSA, mucho menos con KNI que no estaba al tanto de estas negociaciones.

5.73   El 28 de junio de 2011, es decir con anterioridad a la última reunión en el mes de septiembre de 2011, las Demandantes presentaron su Solicitud de Arbitraje ante el CIADI.

5.74   Como se indicó anteriormente, el 26 de julio de 2011, Pequiven presentó una Petición ante el Juzgado de Primera Instancia de la Circunscripción Judicial de Anzoátegui con el fin de llevar a cabo la adquisición forzosa y solicitando que se estableciera una Junta de Administradores Judiciales Temporales *Ad Hoc* para dirigir FertiNitro, en relación con la legislación venezolana sobre el procedimiento local de expropiación[167]. Poco tiempo después, el Juzgado designó a la Junta *Ad Hoc* conforme lo solicitado[168]. El 29 de julio de 2011, el Juzgado de Primera Instancia de la Circunscripción Judicial de Anzoátegui dictó una decisión aceptando la jurisdicción para entender de la Solicitud de Adquisición Forzosa[169]. Con posterioridad, estos procesos legales continuaron y, aparentemente, aún

---

[164] *Véase* Carta de Betulio Hernández, Director Ejecutivo, Pequiven, a los Accionistas (28 de febrero de 2011) (R-35).
[165] Gwaltney DT2, Párrafo 39; Barrientos DT1, Párrafos 35-37; Segunda Declaración de Testigo de Víctor Daniel Barrientos Casanova (30 de diciembre de 2013) ("Barrientos DT2"), Párrafos 37 y *ss*.
[166] Barrientos DT2, Párrafo 41; Dúpl. Ven., Párrafo 151.
[167] Petición de Expropiación (R-36).
[168] Medidas Provisionales del Juzgado de Primera Instancia de la Circunscripción Judicial de Anzoátegui (11 de agosto de 2011) (R-37) (C-141).
[169] Juzgado de Primera Instancia de la Circunscripción Judicial de Anzoátegui, Decisión de aceptar la jurisdicción para entender la Solicitud de Adquisición Forzosa (29 de julio de 2011) (R-63). Posteriormente, el 28 de noviembre de 2013, el Juzgado de Primera Instancia, "recibió el certificado de gravámenes de la Oficina de Registros"; y el 12 de diciembre de 2013, "el juez emitió el Edicto ordenando su publicación en dos periódicos importantes de

continúan, sin pago de compensación alguna a las Demandantes en virtud del Decreto de Expropiación.

5.75   En el verano de 2011, durante sus negociaciones, Pequiven presentó a los accionistas de FertiNitro (incluida KOMSA) informes de valoración confeccionados por los consultores financieros denominados Advantis (también denominado en forma incorrecta en las pruebas "Adventis"). Advantis había sido creada por ex funcionarios de Booz Allen en Venezuela[170].   Hubo dos informes escritos de mayo y julio de 2011, ambos de fecha "septiembre de 2010"[171].Esa no era la fecha de exhibición de los documentos, sino (presuntamente) la fecha de cierre de los cálculos realizados por Advantis.  Advantis eran consultores independientes contratados por Pequiven para valuar FertiNitro en sus negociaciones con (*inter alios*) KOMSA.  Advantis no prestaba asesoramiento ni actuaba en manera alguna en representación de las Demandantes.  Sus informes no eran "informes conjuntos", tampoco se aceptaron como correctas las valoraciones por parte de KOMSA o (así parece) por parte de la propia Demandada.  Ninguna valoración fue declarada por Pequiven como una oferta de la Demandada pasible de aceptación por parte de KOMSA, sin otras negociaciones.  Además, Pequiven les había indicado a los accionistas que no tenía la autoridad ni los fondos - para perfeccionar por sí misma - acuerdo alguno en representación de la Demandada.[172]

5.76   Las circunstancias por las cuales estos dos informes fueron transmitidos a KOMSA en el año 2011 se mantienen poco claras con base a las pruebas aducidas en el presente arbitraje. En cuanto al primer informe Advantis de mayo de 2011 titulado "Valoración de FertiNitro", surge de mensajes de correos electrónicos contemporáneos de fecha 18 y 19 de mayo de 2011 que fueran enviados por Advantis a Pequiven y por Pequiven a KOMSA en carácter de accionista en FertiNitro[173],presuntamente para la reunión que tuviera lugar

---

conformidad con la Ley de Expropiación". Véase Oficina de Registros, Certificado de cargas y gravámenes (28 de noviembre de 2013) (R-70); y Edictos emitidos por el Juzgado de Primera Instancia de la Circunscripción Judicial de Anzoátegui (13 de diciembre de 2013) (R-72). Posteriormente KOMSA debía comparecer ante el juzgado y, posteriormente se establecería el comité de valuación. *Véase* Dúpl. Ven., Párrafo 152.

[170] Segunda Audiencia (noviembre) D.6. 432-433 (Flores).

[171] Informe Advantis de Valoración de FertiNitro (julio de 2011) (C-157); Informe Advantis de Valoración de FertiNitro (mayo de 2011) (R-86).

[172] Gwaltney DT2, Párrafo 41.

[173] *Véase* correo electrónico de fecha 18 de mayo de 2011, de Ignacio Pulido de Advantis (Director), a Francisco García de Pequiven, presuntamente transmitiendo el Primer Informe Advantis a Pequiven ("correo electrónico de

entre sus representantes el 23 de mayo de 2011 en Caracas[174].El Sr. Gwaltney (de KOMSA) le envió una carta de fecha 19 de mayo de 2011 a Pequiven criticando esta primera valoración de Advantis[175].En cuanto al segundo informe Advantis de julio de 2011 también titulado "Valoración de FertiNitro", las Demandantes aceptaron que, al igual que el primer informe, fue transmitido por Pequiven a KOMSA en su carácter de accionista en FertiNitro[176].

5.77   El Sr. Barrientos (de Pequiven) explicó los antecedentes de estos informes Advantis en su testimonio oral durante la Primera Audiencia (septiembre)[177]:

> *"En la primera reunión que tuvimos en febrero de 2011 una de las solicitudes que hizo Pequiven fue que, de común acuerdo con los socios que habían sido expropiados, contratáramos un tercero que fungiera como valuador y que, en virtud de esa evaluación, comenzáramos las discusiones de compensación. Esa solicitud no fue aceptada por ninguno de los accionistas expropiados, y eso trajo como resultado que Pequiven contratara por su parte una empresa para hacer una evaluación […] Adventis ha sido una empresa que ha prestado servicios a diferentes empresas mixtas y a Pequiven en valoraciones en otros asuntos. Es una empresa bastante reconocida y, por supuesto, que esto se tomaba con mucha seriedad. Era un mandato de la República por un Decreto en donde nos nombraba a Pequiven como ente expropiante, no podíamos tomarlo a la ligera. Se escogió a Adventis. Como le dije, nosotros tratamos de buscar un consenso con los socios expropiados para tener su consentimiento y su participación en la escogencia de un valuador único, y bueno, como ellos no estuvieron de acuerdo, nosotros nos sentimos en libertad de escoger a la empresa que nos pareció más competente, la cual fue Adventis, y tiene suficientes credenciales para respaldar su competencia en hacer este tipo de evaluaciones. Y, bueno, por eso fue que se tomó esa decisión […] como parte del grupo negociador me reuní con ellos, como todo el grupo […] le puedo decir que Adventis es una empresa bastante reconocida y no creo que ellos se hayan prestado, en el supuesto negado de que eso haya sido así, no creo que ellos se hayan prestado para ese tipo de requerimiento".*

---

[174] Correo electrónico de fecha 18 de mayo de 2011 (R-86), véase asimismo Párrafo 5.71 *supra*.

[175] Gwaltney DT2, Párrafo 40.

[176] Tercera Audiencia (junio), D2. 312-313.

[177] Primera Audiencia (septiembre), D3. 77 y *ss*.

Se le había preguntado al testigo si Pequiven le había dado instrucciones a Advantis de "que realizara una valuación lo más baja posible"[178].

5.78    El Tribunal retoma el contenido de estos dos Informes Advantis más adelante, en la Parte IX del presente Laudo. A los fines presentes, basta con dejar constancia de que  el primer informe valuó a FertiNitro en la suma de USD 398 millones al 30 de septiembre de 2010[179] (valuando así la participación de KOMSA del 25% en la suma de USD 99,5 millones); y el segundo informe valuó a FertiNitro en la suma de USD 452 millones al 30 de septiembre de 2010 bajo un primer escenario[180];ese informe contenía asimismo un escenario alternativo que contenía elementos que aumentaban y otro que reducían el valor de FertiNitro con un valor total de USD 561 millones (valuando así la participación de KOMSA del 25% en la suma de USD 113 millones bajo un primer escenario y en la suma de USD 140,25 millones bajo el segundo)[181]. Ambos emplearon una metodología FCD.

5.79    *2012:* Para enero de 2012, como ya se ha indicado, FertiNitro había saldado las deudas con sus tenedores de bonos y bancos.  Tal como lo confirmaran los abogados de la Demandada durante la Tercera Audiencia (junio):

> *"En diciembre 2011 FertiNitro pudo satisfacer sus obligaciones frente a los bonistas y bancos. En ese punto, una vez que aquellas obligaciones fueron satisfechas, ya no existía un requerimiento comercial de que se mantuviese en pie el acuerdo offtake. Como parte de su obligación de operar con el fin comercial para FertiNitro, la junta de administradores judiciales ad hoc tomo la decisión de que al deshacerse del acuerdo offtake, tendría la oportunidad de buscar acuerdos de ventas más lucrativos con otros clientes; o, en la medida necesaria, utilizar su producción para satisfacer necesidades nacionales"*[182]

5.80    El 28 de febrero de 2012, el Presidente de la junta de administradores fiduciarios *ad hoc* de FertiNitro envió una carta a KOMSA y a KNI, a la atención del Sr. Gwaltney y del Sr. Parra, afirmando (*inter alia*):

> *"Por medio de la presente cumplo con notificarles que según Resolución emitida por la Junta de Administradores Temporales Ad-Hoc de Fertilizantes Nitrogenados de*

---

[178] La inserción entre corchetes le pertenece al Tribunal.
[179] Informe Advantis de Valoración de FertiNitro (mayo de 2011) (R-86), pág. 11.
[180] Informe Advantis de Valoración de FertiNitro (julio de 2011); (C-157), pág. 3.
[181] Informe Advantis de Valoración de FertiNitro (julio de 2011); (C-157), pág. 5.
[182] Tercera Audiencia (junio), D1. 168.6-15.

*Venezuela, FertiNitro, C.E.C ('FertiNitro') según se evidencia de designación efectuada por Decretos emanados por Decretos emanados del [Juzgado de Anzoategui] […]; efectivo a partir de la fecha de la presente comunicación. FertiNitro no venderá más fertilizantes nitrogenados (urea y amónico) a Koch Oil, S.A. según el contrato de comercialización suscrito entre Petroquímica de Venezuela S.A., International Petrochemical Sales Limited, Koch Oil S.A., y Fertilizantes Nitrogenados de Venezuela, C.E.C. de fecha 8 de abril de 1998; todo en cumplimiento de lo establecido en el Decreto 7.713 publicado en Gaceta Oficial de la República Bolivariana de Venezuela N.º 39.528 de fecha 11 de octubre de 2010 mediante la cual se ordena la adquisición forzosa de los bienes muebles e inmuebles […]"*[183].

5.81   Las Partes disienten de la naturaleza de las operaciones de venta de amoníaco y urea de FertiNitro a KNI realizadas desde la fecha del Decreto de Expropiación (de fecha 10 de octubre de 2010) hasta el envío de la carta de FertiNitro *supra* (28 de febrero de 2012).

5.82   Según la Demandada, todo el amoniaco y la urea de FertiNitro eran vendidos de conformidad con el *Offtake Agreement*; y, hasta el mes de febrero de 2012, FertiNitro siguió "[cumpliendo] con los porcentajes permitidos en virtud del *Offtake Agreement* para atender el mercado nacional"[184]. No fue sino hasta después de febrero de 2012 que el porcentaje asignado al mercado nacional aumentó sustancialmente para atender las necesidades de la Demandada[185]. De modo similar, "KNI y Pequiven recibieron su cuota de urea y amoníaco, al mismo precio descontado"[186]. Asimismo, el Sr. Barrientos (en calidad de Gerente de Proyectos y Gerente General de Pequiven) declaró que, con posterioridad a la emisión del Decreto N.º 7.713, FertiNitro celebró un *Stand Still Agreement* con sus bancos y tenedores de bonos que preveía la continuación del *Offtake Agreement*; y que solo fue rescindido posteriormente por motivos comerciales[187].

5.83   El Tribunal nota que este *Stand Still Agreement* aparentemente fue preparado en el mes de diciembre de 2010 por Pequiven para FertiNitro.  La Demandada no presentó como prueba en el marco del presente arbitraje. Las Demandantes no fueron partes de este *Stand Still*

---

[183] Carta del Sr. Betulio Hernández (de FertiNitro) a Koch Oil SA y Koch Nitrogen Company *in re*: *Offtake Agreement* (28 de febrero de 2012) (C-114). Esta carta se cita de forma más exhaustiva en la Parte 4 *supra*.
[184] Mem. C. Ven., Párrafos 15, 84.
[185] Dúpl. Ven., Párrafo 125.
[186] Dúpl. Ven., Párrafo 126.
[187] Barrientos DT1, Párrafo 43.

*Agreement*. No hay pruebas de que KNI conociera sus términos en ese momento, excepto en la medida en que Pequiven eligió describirle su efecto a las Demandantes.

5.84  En respuesta a los argumentos de la Demandada, las Demandantes alegan que las "compras de productos hechas por KNI a FertiNitro luego de la expropiación fueron realizadas en virtud de un nuevo acuerdo *ad hoc*"[188]. Afirman que "después de la expropiación, los tenedores de bonos y los acreedores continuaron esperaban [sic] las compras de productos y los ingresos que generaban, siguieron teniendo poder, a través del fideicomisario ('*trustee*'), sobre las Cuentas en el Exterior, y podrían haber tomado acciones reparatorias, incluyendo al asumir al control de la planta en caso [de impago]"[189].

5.85  El Tribunal concluye, sobre la base de las limitadas pruebas rendidas en el contexto del presente arbitraje, que la conducta de la Demandada fue ambigua, en tanto dependía de distintas perspectivas. Incluso desde la propia perspectiva de Pequiven, tal como el Sr. Barrientos reconociera en su testimonio: "Sin duda alguna, inmediatamente después del Decreto [N.º 7.713], se generó mucha incertidumbre"[190]. Frente a los bancos y tenedores de bonos de FertiNitro, se tornó importante que la Demandada mantuviera ostensiblemente la eficacia permanente del *Offtake Agreement*, lo que en apariencia se había logrado mediante el *Stand Still Agreement*, de manera de evitar un incumplimiento cruzado en virtud del Contrato de Garantía Común y otros acuerdos con los bancos y tenedores de bonos. Desde la perspectiva de la Demandada frente a KNI, dicha necesidad no existió. El Tribunal retoma la postura de KNI en la Parte VII *infra*.

*(vi)  Los "Reclamos Históricos" (con respecto a Impuestos e IVA)*

5.86  Tal como se sintetizará en la Parte II *supra*, KOMSA plantea reclamos vinculados a tres medidas tributarias y créditos IVA, como parte de sus "Reclamos Históricos".

5.87  *Impuestos Nuevos:* En el mes de agosto de 2005, la Demandada promulgó la Ley Orgánica de Ciencia, Tecnología e Innovación ("Ley de Ciencia y Tecnología")[191]. Con arreglo a

---

[188] Répl. Koch, Párrafos 17, 92.
[189] Répl. Koch, Párrafo 17.
[190] Barrientos DT1, Párrafo 41.
[191] Ley Orgánica de Ciencia, Tecnología e Innovación, 3 de agosto de 2005, en vigor a partir del 1 de enero de 2006 (C-43).

los Artículos 35 y 42 de esta Ley, "[l]as grandes empresas del país que se dediquen a las actividades establecidas en las Leyes Orgánicas de Hidrocarburos e Hidrocarburos Gaseosos" deberán aportar el dos por ciento de sus ingresos brutos obtenidos en el territorio venezolano, a actividades que serían "consideradas inversión en ciencia, tecnología, innovación y sus aplicaciones"[192].   Según la Demandada, el Artículo 39 de la Ley de Ciencia y Tecnología prevé que los aportes pueden deducirse de los impuestos[193].

5.88   Esta Ley de Ciencia y Tecnología, ley de aplicación general, se estaba implementando antes de que FertiNitro comenzara a funcionar y, tras el inicio de operaciones de FertiNitro, también se tornó aplicable a ella.   Luego de promulgarse la Ley Petroquímica de 2009, la tasa de aporte de FertiNitro en virtud de la Ley de Ciencia y Tecnología se disminuyó del 2 % al 0,5 %, dado que las actividades petroquímicas dejaron de ser categorizadas como una actividad dentro del sector hidrocarburífero[194].

5.89   Según las Demandantes, la suma total con la cual FertiNitro contribuyó en cumplimiento de la Ley de Ciencia y Tecnología, en el período 2006 a 2010, fue de aproximadamente USD 22,35 millones[195].   Según la Demandada, "[l]os aportes de FertiNitro fueron invertidos casi exclusivamente de manera interna"[196] y, "en raras ocasiones, [FertiNitro] hizo aportes a un proyecto público"[197].

5.90   *Impuestos Más Elevados:* El 30 de diciembre de 2005, el municipio Simón Bolívar, en el estado de Anzoátegui (donde se encuentra ubicada la Planta FertiNitro), emitió una ordenanza que establecía o modificaba la tasa impositiva aplicable a todas las empresas que se consideraban comprendidas en las "actividades económicas de industria, comercio, servicios o de índole similar" en el municipio (la "Ordenanza Municipal")[198].   La

---

[192] Ley Orgánica de Ciencia, Tecnología e Innovación, 3 de agosto de 2005, en vigor a partir del 1 de enero de 2006 (C-43), Arts. 35 y 42 (10).
[193] Mem. C. Ven., Párrafo 123.
[194] FertiNitro, Declaraciones 2006-2012 (R-40); FertiNitro, Declaraciones 2006-2013 (R-74); Dúpl. Ven., Párrafo 165. *Véase también* FertiNitro, Cuadro sobre Aportes (R-47).
[195] Mem. Koch, Párrafo 78, que cita Giles IP1, Párrafo 3.23.
[196] Mem. C. Ven., Párrafo 122.
[197] Mem. C. Ven., Párrafo 120.
[198] Ordenanza para Impuestos sobre Actividades Económicas de Industria, Comercio, Servicios o de Índole Similar (30 de diciembre de 2005) (C-45).

Ordenanza Municipal, aplicable a FertiNitro durante el ejercicio fiscal 2006, estableció un incremento en la tasa del impuesto municipal del 1 % al 4 %[199].

5.91   Conforme a la Ordenanza Municipal, "[t]oda actividad económica de industria ejercidas [sic]por Consorcios o cualquier otro tipo de asociaciones […] del Sector Energético, Producción de Gas Natura[sic] y toda actividad relacionada con la industria petrolera y petroquímica […] vinculada con la actividad que se ejerce directa o indirectamente con el Complejo Petroquímico de José" estaría sujeta a una tasa impositiva del 4 % respecto de los ingresos brutos de la empresa[200].  Las Partes disienten en cuanto a los tipos de empresas que se encuentran ubicadas en el Complejo Petroquímico de José y se verían afectadas por la Ordenanza[201].

5.92   En el 2006, antes de que FertiNitro comenzara a pagar los impuestos a la tasa más elevada, Pequiven inició negociaciones con el municipio en aras de disminuir el impuesto municipal respecto de todas las empresas mixtas en que Pequiven tenía inversiones de capital, incluidas FertiNitro, Metor, Superoctoanos y Supermetanol[202].   La Junta Directiva de FertiNitro aceptó encomendarles dichas negociaciones a Pequiven[203].

5.93   En relación con estas negociaciones, el 14 de noviembre de 2006, el Municipio emitió un decreto en virtud del cual a FertiNitro se le aplicaría un impuesto municipal del 2 % para 2006 y del 2,4 % para 2007, y no del 4 % (el "Decreto Municipal")[204].   FertiNitro fue notificada formalmente del Decreto el 6 de diciembre de 2006[205].

---

[199] *Véase* Informe de Auditores Independientes y Estados Financieros de FertiNitro al 31 de diciembre de 2005 y 2004, de fecha 1 de marzo de 2006 (C-49), pág. 22.   *Véase también* Mem. Koch, Párrafo 82, que cita "Cuadro de Impuestos Municipales para 2005" (C-46).

[200] Ordenanza para Impuestos sobre Actividades Económicas de Industria, Comercio, Servicios o de Índole Similar (30 de diciembre de 2005) (C-45), Grupo 1-D, pág. 14.

[201] Según las Demandantes, todas las empresas que se encuentran ubicadas en el Complejo Petroquímico de José son de propiedad parcialmente extranjera y, por lo tanto, eran las afectadas por la Ordenanza Municipal (Mem. Koch, Párrafo 82). La Demandada rechaza esta caracterización y afirma que la Ordenanza era aplicable a "todas las compañías que operan en el Municipio Simón Bolívar", lo que incluye a las empresas mixtas, ubicadas en el Complejo de José (Mem. C. Ven., Párrafo 125; Dúpl. Ven., Párrafo 177).

[202]*Véanse* Correo electrónico de Oswaldo Parilli, consejero jurídico de Pequiven, a Saúl Ameliach y otros representantes de Pequiven (28 de noviembre de 2006) (C-48), págs. 3-4; y Correo electrónico de Oswaldo Parilli a los representantes de Pequiven *in re*: Impuestos Municipales (28 de noviembre de 2006) (C-53) págs. 5-6.

[203] Acta de Reunión de Junta Directiva de FertiNitro N.° 65 (5 de abril de 2006) (C-51).

[204] Decreto D.A.M.S.B.-042-A-2006 (14 de noviembre de 2006) (C-48), págs. 20-22.

[205] *Véase* Notificación N.° 1093-06 de SABAT/Alcaldía del Municipio Simón Bolívar a FertiNitro (6 de diciembre de 2006) (C-48), pág. 5 (ESP), pág. 19 (ING).

5.94   El 14 de diciembre de 2006, la Junta Directiva de FertiNitro emitió una Resolución que "ratificó la decisión de la Gerencia General de aceptar la alícuota del 2% para el 2006 y […] aprobó aceptar la alícuota del 2,4% para el 2007"[206].

5.95   *IVA:* En calidad de exportadora proveniente de Venezuela, FertiNitro tenía el derecho en virtud de la legislación venezolana de recuperar los créditos IVA soportados por la adquisición e importación de bienes y servicios utilizados en la fabricación de bienes a efectos de exportación[207].   Dichos créditos fiscales se proporcionaban en forma de Certificados Especiales de Reintegro Tributario ("CERT", por sus siglas en español) y se regían por la Ley de mayo de 1999 de Reforma Parcial de la Ley que establece el Impuesto al Valor Agregado (la "Ley de IVA")[208].   Los CERT podían "ser cedidos o utilizados para el pago de tributos nacionales […] obligación tributaria, sanciones tributarias y costas procesales"[209].   Los CERT se emiten en Bolívares, y el impuesto a las ganancias también está gravado en Bolívares.   La Demandada no le hizo "pagos reales" a FertiNitro de conformidad con las solicitudes de créditos IVA.

5.96   La Sra. Carolina Núñez, ex empleada del SENIAT, declaró lo siguiente: "[e]ntre 2007 y 2012, el proceso se demoraba entre dos y tres años desde la presentación de una solicitud hasta la emisión final de un CERT" (aunque la Ley prescribe un período de 30 días); y afectaba a todos los contribuyentes por igual[210].

5.97   En el curso de sus operaciones, FertiNitro presentaba en forma periódica solicitudes de reintegro ante las autoridades competentes de la Demandada.   En 2007, o alrededor de ese año, y a partir de ese momento, las autoridades tributarias de la Demandada no emitieron

---

[206] Acta de Reunión de Junta Directiva de FertiNitro N.º 76 (14 de diciembre de 2006) (C-54) (*véase también* Dúpl. Ven., Párrafo 179).   Según las Demandantes, Pequiven celebró este acuerdo sin consultar a las otras accionistas de FertiNitro y sin la autoridad para hacerlo.   (*Véase* Mem. Koch, Párrafo 84).

[207] Ley de Reforma Parcial de la Ley que establece el Impuesto al Valor Agregado (29 de julio de 2004) (C-55) ("Ley de IVA"), Art. 43.

[208] Ley de IVA.

[209] *Íd.*, Art. 43.

[210] Declaración de Testigo de Carolina Núñez (28 de febrero de 2013) ("NúñezDT1"), Párrafo 16 (*véase* Mem. C. Ven., Párrafo 131). Según los Reglamentos de IVA, la solicitud de CERT había de dirigirse al "Servicio Nacional Integrado de Administración Aduanera y Tributaria" (SENIAT, por sus siglas en español), que decidiría aprobarla o rechazarla.   Luego, todas las solicitudes aprobadas son revisadas por el Ministerio deFinanzas, a cargo de emitir los CERT para los contribuyentes (lo que agrega más tiempo). *Véase* Reglamento Parcial N.º 1 de la Ley que establece el Impuesto al Valor Agregado en materia de Recuperación de Créditos Fiscales para Contribuyentes Exportadores (16 de septiembre de 2003) (C-59), Arts. 8-16, págs. 14-19.

algunos de los CERTs solicitados para FertiNitro oportunamente[211]. FertiNitro presentó sus quejas ante las autoridades tributarias pertinentes[212].

5.98 Las Partes disienten de si los créditos IVA solicitados se le otorgaron finalmente a FertiNitro. Según la Demandada, "cada uno de los créditos tributarios en razón del IVA reclamados por los Demandantes en este procedimiento arbitral fueron entregados a FertiNitro"[213]. Agrega que los montos emitidos para FertiNitro podían diferir del monto solicitado inicialmente; y que FertiNitro nunca presentó quejas por esas diferencias[214].

5.99 *El Informe del Comisario:* Con arreglo al derecho venezolano, se exigía que FertiNitro obtuviera informes auditados anuales de un Comisario. Las Partes coinciden en que "[un] Comisario" es un "auditor exigido en virtud de la legislación venezolana para revisar las auditorías efectuadas por auditores privados"[215].

5.100 Conforme al Código de Comercio de Venezuela, los Comisarios son nombrados por los accionistas de la sociedad; y tienen que responder a los accionistas de la sociedad auditada. Junto con el informe en que explican los resultados de su evaluación de los balances y prácticas de gestión, los Comisarios pueden incluir propuestas, sugerencias y observaciones. Dichas recomendaciones no son vinculantes para la sociedad auditada.

5.101 El 7 de septiembre de 2006, el Comisario de FertiNitro emitió su informe que contenía determinadas recomendaciones y críticas (el "Informe del Comisario")[216]. Se trata de un documento de aproximadamente cuatro páginas, con apéndices adicionales. Las Demandantes alegan que este Comisario tenía una relación previa con Pequiven, y, por lo tanto, el Informe del Comisario está sesgado en favor de Pequiven[217]. El Tribunal no acepta

---

[211] Carta de Ikbal Samad (en nombre y representación de FertiNitro) al Ministro del Poder Popular de Economía y Finanzas *in re*: Solicitud de Otorgamiento de Certificados de Reintegro y Órdenes Administrativas para Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC. (21 de diciembre de 2009) (C-60), págs. 11-12.
[212] Carta de Ikbal Samad (en nombre y representación de FertiNitro) al Ministro del Poder Popular de Economía y Finanzas *in re*: Solicitud de Otorgamiento de Certificados de Reintegro y Órdenes Administrativas para Fertilizantes Nitrogenados de Venezuela, FertiNitro, CEC. (21 de diciembre de 2009) (C-60), págs. 8-10.
[213] Dúpl. Ven., Párrafo 21.
[214] Declaración de Testigo de Carolina Núñez (28 de febrero de 2013), Párrafo 17 y Anexo A; Mem. C. Ven., Párrafo 132.
[215] Mem. Koch, Párrafo 103; Dúpl. Ven., Párrafo 75.
[216] Informe Resumido del Comisario y Estados Financieros Consolidados de FertiNitro (7 de septiembre de 2006) ("Informe del Comisario") (C-63).
[217] Mem. Koch, Párrafos 103-110.

que esta crítica afecte el contenido pertinente del informe (que retoma posteriormente en este Laudo).

## PARTE VI: CUESTIONES DE JURISDICCIÓN

### (1)   Introducción

6.1   La Demandada se opone a la jurisdicción del CIADI y a la competencia *ratione materiae* del Tribunal, al alegar que el *Offtake Agreement* no constituye una "inversión" en virtud del Tratado y del Convenio CIADI y que, por lo tanto, el Tribunal carece de competencia o jurisdicción para dirimir los reclamos de KNI contra la Demandada en este arbitraje.  Tal como ya fuera indicado, la Demandada no presenta ninguna excepción preliminar ante los reclamos de KOMSA.

6.2   A los efectos del presente, los argumentos  principales de la Demandada se pueden resumir de la siguiente manera: (i) hay un significado inherente del término "inversión", tanto en el Artículo 25(1) del Convenio CIADI como en el Artículo 1(2) del Tratado, que exige, entre otras cosas, una contribución y un riesgo; (ii) KNI no realizó contribuciones ni asumió el tipo de riesgo necesario para que hubiera "inversión"; (iii) el *Offtake Agreement* es un simple contrato de compraventa y la complejidad, la duración, las implicancias financieras del proyecto o el concepto general de unidad de la inversión no lo convierten en una "inversión"; (iv) el *Offtake Agreement* no cumple el requisito de territorialidad del Artículo 2 del Tratado ya que no aportó ningún tipo de beneficio a Venezuela; y (v) el  reclamo de KNI se encuentra cubierto por las disposiciones sobre resolución de controversias del Artículo 12 del *Offtake Agreement*, que contempla la solución de "cualquier conflicto" relacionado con ese contrato, incluso su extinción.

6.3   Los principales argumentos en respuesta de KNI, en las cuales sostenía la jurisdicción y competencia del CIADI y del Tribunal, también se pueden resumir de la siguiente manera: (i) es sujeto a controversia que un significado "objetivo e inherente" de "inversión" conforme al Convenio CIADI puede suplantar el alcance del consentimiento de las partes del tratado en cuanto al significado del término "inversión" en el tratado; (ii) ni el Tratado ni el Convenio CIADI contienen requisito alguno de  realización de contribuciones para el desarrollo de Venezuela; estos factores relacionados con la contribución y el riesgo no son requisitos jurisdiccionales estrictos, sino meros indicios o "marca distintiva" de las

inversiones conforme al Convenio CIADI; (iii) en cualquier caso, el *Offtake Agreement* satisface estos factores de contribución y riesgo; (iv) el derecho internacional establece que las transacciones en materia de inversiones se deben considerar en su totalidad; y, por ende, el *Offtake Agreement* no se puede considerar como un contrato comercial aislado de todo el proyecto FertiNitro, sino como parte esencial y crítica de la financiación, estructura, rentabilidad y finalidad de dicho proyecto; (v) el Artículo 2 del Tratado es una cláusula estándar que "se limita a establecer el alcance temporal y el objeto del Tratado" y, por lo tanto, no se puede interpretar en el sentido de que incorpora requisitos de que el Tratado deba contribuir al desarrollo del Estado receptor; y (vi) los derechos de KNI en virtud del *Offtake Agreement* y del Tratado son conceptualmente distintos; y las disposiciones sobre resolución de controversias del Artículo 12 del *Offtake Agreement* no cubren el reclamo de KNI contra la Demandada en relación con el Tratado conforme al derecho internacional.

6.4     A continuación, se desarrollarán algunos de estos argumentos en relación con la Demandada y KNI, por separado.  El Tribunal examinó todo el material fáctico y jurídico que presentaron las Partes con respecto a las excepciones preliminares de la Demandada. El Tribunal se limitará a abordar sólo aquel material que considere determinante para resolver esa excepción al reclamo de KNI.

*(2)*     **El Argumento de la Demandada**

6.5     *"Inversión":* La Demandada aduce que el término "inversión" tiene un significado objetivo e inherente en virtud del (i) Tratado y del (ii) Convenio CIADI.  La carga de la prueba recae sobre el supuesto inversionista que alega la supuesta inversión, quien debe demostrar que ha realizado la supuesta inversión en los términos del Tratado y del Convenio CIADI[218].

6.6     Con respecto al Artículo 25(1) del Convenio CIADI, la Demandada afirma que los tribunales de arbitraje en varios casos, como *Global Trading c. Ucrania*, *Joy Mining c. Egipto* y *Saba Fakes c. Turquía,* han reconocido que el término "inversión" tiene un significado objetivo en virtud del Convenio CIADI o, según la redacción del Artículo 31(1) de la Convención de Viena sobre el Derecho de los Tratados ("CVDT"), un "sentido corriente" que no se puede establecer solo por referencia al Tratado, como instrumento de

---

[218] Excepciones Preliminares de la Demandada, Párrafo 14.

consentimiento[219]. Cita la decisión del tribunal en *GEA Group c. Ucrania*, para alegar que "no es tanto el término 'inversión' en el Convenio del CIADI, sino el término 'inversión' *per se* al que se considera a menudo tener un significado objetivo en sí mismo, bien sea que se mencione en el Convenio del CIADI o en un TBI"[220].

6.7   En cuanto al significado objetivo del Artículo 1(2) del Tratado, la Demandada asevera que: "[e]l argumento que 'todo tipo de activo' constituye una 'inversión protegida' en virtud del [Tratado] es insostenible".  Y concluye: "[la] lista indicativa de los tipos de activos que el término puede cubrir […] [no fue realizada] con el objetivo de indicar que todos los tipos de activos listados son una inversión en todas las circunstancias. Esta es la razón por la cual la definición usa la frase 'inversión incluye' en vez de 'inversión significa'"[221].

6.8   La Demandada sostiene que KNI no ha "realizado una contribución" o asumido algún "riesgo de inversión" en relación con el *Offtake Agreement*.  El término "inversión" tiene el mismo significado inherente y objetivo según el Convenio CIADI y el Tratado[222]. Ese significado requiere una contribución, una duración y un riesgo, cada uno de los cuales constituye un requisito *sine qua non* para que haya "inversión"[223]. La Demandada alega,

---

[219] Excepciones Preliminares de la Demandada, Párrafos 20-27.

[220] Excepciones Preliminares de la Demandada, Párrafo 34, con cita de *GEA Group Aktiengesellschaft c. Ucrania*, Caso CIADI N.° ARB/08/16, Laudo (31 de marzo de 2011) ("*GEA Group c. Ucrania*") (RLA-30), Párrafo 141.

[221] Réplica de la Demandada sobre Jurisdicción, Párrafos 49, 50.

[222] Excepciones Preliminares de la Demandada, Párrafo 38; Réplica de la Demandada sobre Jurisdicción, Párrafo 27. De modo similar, la Demandada invoca *Romak c. Uzbekistán*—en cuyo caso el tribunal tuvo que analizar una disposición sobre resolución de controversias supuestamente idéntica en el Tratado entre Suiza y Uzbekistán—y alega que "el término 'inversión' en el Artículo 1(2) del [Tratado] tiene un significado objetivo e inherente". (Excepciones Preliminares de la Demandada, Párrafos 32-33, con cita de *Romak S.A. c. República de Uzbekistán*, Caso CPA N.° AA280, Laudo (26 de noviembre de 2009) ("*Romak c. Uzbekistán*") (RLA-24), Párrafo 207)).

[223] Excepciones Preliminares de la Demandada, Párrafo 38; Réplica de la Demandada sobre Jurisdicción, Párrafos 51-55, con cita de *Ulysseas, Inc. c. La República de Ecuador*, CNUDMI, Laudo Definitivo (12 de junio de 2012) (RLA-108), Párrafos 251-252; *Abaclat y otros (anteriormente, Giovanna A. Beccara y otros) c. La República Argentina*, Caso CIADI N.° ARB/07/5, Decisión sobre Jurisdicción y Admisibilidad (4 de agosto de 2011) ("*Abaclat c. Argentina*") (RLA-31), Párrafo 371, con respecto a la afirmación de que el Artículo 1 del Tratado requiere estos tres elementos, y *Saba Fakes c. República de Turquía*, Caso CIADI N.° ARB/07/20, Laudo (14 de julio de 2010) (RLA-26), Párrafo 110; *Deutsche Bank AG c. La República Socialista Democrática de Sri Lanka*, Caso CIADI N.° ARB/09/02, Laudo (31 de octubre de 2012) ("*Deutsche Bank c. Sri Lanka*") (CLA-100), Párrafos 294-295, con respecto al argumento de que el Artículo 25(1) requiere efectuar una contribución y asumir un riesgo.

asimismo, que estos requisitos mínimos han sido identificados tanto por Tribunales del CIADI[224] como por Tribunales ajenos al CIADI[225].

6.9    La Demandada reconoce, como un hecho, que KOMSA fue parte original del *Offtake Agreement*.  No obstante, la Demandada sostiene que la cesión de derechos y obligaciones en virtud del *Offtake Agreement* de KOMSA a KNI fue parte de una restructuración interna de la compañía, y que ni KOMSA ni su cesionario, KNI, realizaron una "contribución" o asumieron un "riesgo" con respecto al *Offtake Agreement*, a los fines del Artículo 25(1) del Convenio CIADI y el Artículo 1(2) del Tratado[226].

6.10   *Contribución:* En cuanto a la "contribución" pertinente, la Demandada asevera que KNI se creó principalmente para vender y distribuir el rendimiento de la Planta de FertiNitro a Norteamérica, pero que KNI no realizó ningún tipo de "contribución" ni "desplegó la acción de invertir" cuando se le cedieron los derechos contractuales de KOMSA en el *Offtake Agreement*[227]. La inversión de KOMSA, por su parte, estaba relacionada con la formación de la empresa mixta que comprendía el proyecto FertiNitro; y el *Offtake Agreement* fue un contrato de compraventa complementario que celebraron la empresa mixta y KOMSA para la compra de urea y amoníaco.  Nunca hubo una contribución por parte de KOMSA en relación con el *Offtake Agreement* que se pudiera haber transferido a KNI junto con los derechos de KOMSA en ese contrato de compraventa[228]. La Demandada alega que el cumplimiento del *Offtake Agreement* no califica como contribución, la cual se debe realizar en su comienzo y no en retrospectiva[229].

6.11   La Demandada cita la decisión de *Standard Chartered c. Tanzania* para alegar que "el tratado protege inversiones "realizadas" por un inversionista de cierta forma activa, en

---

[224] EPA Ven., Párrafo 19, con cita de *Electrabel S.A. c. La República de Hungría*, Caso CIADI N.º ARB/07/19, Decisión sobre Jurisdicción, Derecho Aplicable y Responsabilidad (30 de noviembre de 2012) ("*Electrabel c. Hungría*") (RLA-110), Párrafo 5.43.

[225] Réplica de la Demandada sobre Jurisdicción, Párrafo 43, con cita de *Caratube International Oil Company LLP c. La República de Kazajstán*, Caso CIADI N.° ARB/08/12, Laudo (5 de junio de 2012) (RLA-107), Párrafo 360, en el que se indica que tanto los tribunales del CIADI como aquellos ajenos al CIADI exigen los mismos requisitos mínimos.

[226] Excepciones Preliminares de la Demandada, Párrafo 8; Réplica de la Demandada sobre Jurisdicción, Párrafo 57.

[227] Excepciones Preliminares de la Demandada, Párrafo 68.

[228] Réplica de la Demandada sobre Jurisdicción, Párrafo 60.

[229] Réplica de la Demandada sobre Jurisdicción, Párrafos 63-64.

lugar de simplemente tratarse de una propiedad pasiva"[230]. Concluye que la mera aceptación de derechos y obligaciones contractuales, activos y titularidad de acciones resulta insuficiente para constituir una inversión o probar una contribución de dinero o activos[231].

6.12   *Riesgo:* Con respecto al "riesgo" pertinente, la Demandada afirma que los riesgos que alegan las Demandantes, como el riesgo de demanda, el riesgo de precio, el riesgo de contraparte y el riesgo de incumplimiento no son más que los riesgos ordinarios del incumplimiento de la contraparte de un contrato comercial.   Son riesgos puramente comerciales relacionados, por lo general, con el hecho de hacer negocios[232].

6.13   La Demandada sostiene también que estos riesgos comerciales se encontrarían cubiertos y mitigados, en gran medida, por las disposiciones del *Offtake Agreement*[233]. Además, dado que KNI tenía garantizado el *Offtake* a un descuento significativo predeterminado, "[e]l riesgo de precio total permanecía sobre el productor, FertiNitro". Por otra parte, conforme el *Offtake Agreement*, KOMSA garantizó la obligación de KNI en virtud de dicho contrato y todo riesgo relacionado con ella[234]. La Demandada señala que en el caso improbable de la desaparición total de la "demanda internacional" para los productos del proyecto FertiNitro, "el mecanismo de precios privaría de cualquier efecto a la disposición de 'compra obligatoria' del *Offtake Agreement*"[235].

---

[230] EPA Ven., Párrafo 23, con cita de *Standard Chartered Bank c. La República Unida de Tanzania*, Caso CIADI N.° ARB/10/12, Laudo (2 de noviembre de 2012) (RLA-109), Párrafo 225.

[231] EPA Ven., Párrafo 24; Excepciones Preliminares de la Demandada, Párrafos 65-68, con cita de *Quiborax S.A., Non Metallic Minerals S.A. y Allan Fosk Kaplún c. Estado Plurinacional de Bolivia,* Caso CIADI N.° ARB/06/2, Decisión sobre Jurisdicción (27 de septiembre de 2012) (RLA-33), Párrafos232-233 ("[s]i bien una inversión puede materializarse jurídicamente en acciones u otros títulos, la mera propiedad de una acción en sí misma resulta insuficiente para probar una contribución en dinero o en especie"); Réplica de la Demandada sobre Jurisdicción, Párrafo 61. La Demandada también afirma que, sin perjuicio de si los términos "contribución" o "realizar" están incluidos en el Tratado o en el Convenio CIADI, "una contribución" es un requisito fundamental que "no solo es consistente con la mayoría de la doctrina, sino que también obedece al uso común del término 'inversión'". Excepciones Preliminares de la Demandada, Párrafo 41.

[232] EPA Ven., Párrafo 21; Excepciones Preliminares de la Demandada, Párrafos 71-74, con cita de *Romak c. Uzbekistán* (RLA-24), Párrafo 229; *Véase, también,* Excepciones Preliminares de la Demandada, Párrafos 43-44, con cita de *Joy Mining Machinery Limited c. República Árabe de Egipto*, Caso CIADI N.° ARB/03/11, Laudo sobre Jurisdicción (6 de agosto de 2004) ("*Joy Mining c. Egipto*") (RLA-10), Párrafo 57.

[233] EPA Ven., Párrafo 21.

[234] Réplica de la Demandada sobre Jurisdicción, Párrafos 65-68.

[235] Réplica de la Demandada sobre Jurisdicción, Párrafo 68.

6.14   La Demandada sostiene que el *Offtake Agreement* fue un simple contrato comercial de compraventa y que la complejidad, la duración, las implicancias financieras del proyecto o el 'concepto de unidad de la inversión' no transforman el *Offtake Agreement* en una "inversión". El *Offtake Agreement* fue y siguió siendo un clásico contrato de compraventa, en el sentido de que KNI pagó un precio rebajado (fijado a través de una fórmula del precio de compra) por la compra de amoníaco y urea[236], y los pagos se realizaban de conformidad con los términos comerciales habituales[237].

6.15   Según la Demandada, numerosas fuentes jurídicas, incluso los *travaux préparatoires* del Convenio CIADI y comentarios magistrales confirman que los meros contratos de compraventa, como tipo de transacción comercial, no constituyen "inversiones" dentro del significado del Artículo 25(1) del Convenio CIADI[238]. La Demandada también cita las decisiones de *SGS c. Paraguay* y *MHS c. Malasia,* que confirmaron que los contratos de compraventa no constituyen inversiones en el derecho internacional[239], y la decisión del Secretariado del CIADI de negarse a registrar una disputa sobre la base de que la operación subyacente no podía considerarse como una inversión ya que "se originó de una operación de compraventa de bienes"[240].

6.16   *Unidad de la inversión:* La Demandada también afirma que la aplicación del concepto de 'unidad de la inversión' en este caso ampliaría indebidamente el alcance de la jurisdicción del CIADI. La Demandada invoca las decisiones de *ATA Constructions c. Jordania* y *CSOB c. República Eslovaca*, para sustentar su posición de que para formar parte de una

---

[236] Excepciones Preliminares de la Demandada, Párrafo 9.

[237] Excepciones Preliminares de la Demandada, Párrafo 61.

[238] EPA Ven., Párrafo 13, con cita de Primera Audiencia (septiembre) D1. 11; CIADI, Convention on the Settlement of Investment Disputes between States and Nationals of Other States: Documents Concerning the Origin and the Formulation of the Convention, Tomo II, Parte 1, Documentos 1-43, 54 (1968) (segunda impresión 2001) (RLA-6), Párrafo 54; y Christoph H. Schreuer et al., The ICSID Convention: A Commentary 117 (2d ed. 2009) ("ICSID Convention: A Commentary") (citas omitidas) (RLA-21).

[239] EPA Ven., Párrafo 13, con cita de *SGS Société Générale de Surveillance S.A. c. República de Paraguay*, Caso CIADI N.° ARB/07/29, Decisión sobre Jurisdicción (10 de febrero de 2010) *("SGS c. Paraguay"*) (RLA-25), Párrafo 93; y *Malaysian Historical Salvors Sdn Bhd c. Malasia*, Caso CIADI N.° ARB/05/10, Decisión sobre la Solicitud de Anulación (16 de abril de 2009) ("*MHS c. Malasia*") (RLA-23), Párrafo 69; *véase, también.* Excepciones Preliminares de la Demandada, Párrafos 48-50, en los que también se hace referencia a *Global Trading Res. Corp. y Globex Int'l c. Ucrania*, Caso CIADI N.° ARB/09/11, Laudo (1 de diciembre de 2010) (RLA-27), Párrafo 45.

[240] Excepciones Preliminares de la Demandada, Párrafo 46, en el que se hace referencia a Ibrahim Shihata & Antonio Parra, *The Experience of the International Centre for Settlement of Investment Disputes*, 14 ICSID Rev.–F.I.L.J. 299 (1999) (RLA-4)

"inversión", la transacción específica "no puede ser disociada de [todas las otras transacciones que involucran el propósito económico de la inversión]" y debe ser "inseparable de [las] otras o comparativamente independiente"[241].

6.17   Según la Demandada, el *Offtake Agreement* está relacionado con las actividades de la Planta de FertiNitro, pero no es un elemento inseparable.  El objetivo del JIA era totalmente alcanzable sin el *Offtake Agreement*.  El *Offtake Agreement* no fue imprescindible para ningún objetivo económico, y el Tribunal puede "analizar por separado cada parte componente de toda la transacción" y evaluar si cumpliría los requisitos jurisdiccionales del Tratado y del Convenio CIADI[242].

6.18   La Demandada asevera que la participación accionaria de KOMSA y otros accionistas de FertiNitro en FertiNitro no se vio afectada por la extinción del *Offtake Agreement*, lo que demuestra que el *Offtake Agreement* es complementario y separable del proyecto FertiNitro—a diferencia de la situación reflejada en las decisiones de *Inmaris* y *Ambiente Ufficio*[243]. El *Offtake Agreement* se puede disociar fácilmente de la inversión de capital: aun si FertiNitro no hubiese rescindido el *Offtake Agreement*, KOMSA podría incoar su reclamo de inversión en este arbitraje[244]. El *Offtake Agreement* fue crítico para el proyecto FertiNitro, pero no fue crítico que el contrato se celebrara justamente con KOMSA. Lo que era critico era que hubiera un *Offtake Agreement* a largo plazo para garantizar la cancelación de los préstamos solicitados para financiar el proyecto.  El *Offtake Agreement* no constituyó un incentivo para persuadir a KOMSA de que se convirtiera en accionista de FertiNitro[245].

6.19   *Artículo 2:* La Demandada arguye que el Artículo 2 del Tratado contiene un requisito de territorialidad que el *Offtake Agreement* no cumplió.  El Artículo 2 del Tratado establece que el Tratado sólo es aplicable a "inversiones efectuadas en el territorio de una Parte Contratante".  También se resaltó el nexo territorial en los Artículos 1, 3, 4, 7 y 8, y en el Preámbulo del Tratado, en el que se menciona la intención de los signatarios de "crear y

---

[241] Réplica de la Demandada sobre Jurisdicción, Párrafo 17.
[242] Réplica de la Demandada sobre Jurisdicción, Párrafo 22.
[243] EPA Ven., Párrafo 15.
[244] *Id*.
[245] Dúpl. Ven., Párrafo 29.

mantener condiciones favorables para las inversiones [...] *en el territorio* de la otra Parte Contratante". (Énfasis agregado)

6.20   La Demandada alega, asimismo, que los tribunales arbitrales han evaluado el nexo de territorialidad al escudriñar el beneficio de la inversión en el Estado anfitrión[246]. Dado que el *Offtake Agreement* "permitió que a nivel doméstico solo se llevaran a cabo menos de un 5 % de las reventas totales y la mayor parte de lo obtenido se designó para reventa en el extranjero"[247], el beneficio del *Offtake Agreement* para Venezuela fue mínimo.  Por ende, no cumplió el requisito de territorialidad del Tratado.

6.21   *Artículo 12:* La Demandada alega que el *Offtake Agreement* contiene una cláusula de selección de foro de varios niveles para la resolución de "cualquier Controversia" relacionada con el *Offtake Agreement*, incluso el presente reclamo controvertido de KNI. Según el Artículo 12 del *Offtake Agreement*, "toda controversia", incluso los reclamos por rescisión del *Offtake Agreement*, "estaría inicialmente sujeta a negociación […] [seguida de] arbitraje de conformidad con las Normas de la CCI" si las negociaciones no prosperan[248]. Y agrega que el Tratado no prevalece sobre el Artículo 12.

6.22   La Demandada afirma que fue la Junta de Directores Temporales *Ad Hoc* de FertiNitro la que tomó la decisión de rescindir el *Offtake Agreement* por razones comerciales.  KNI tiene, a lo sumo, una controversia comercial con FertiNitro con respecto a la supuesta rescisión ilícita de un contrato de compraventa, que KNI no interpuso con arreglo a la cláusula de resolución de controversias del Artículo 12 del *Offtake Agreement*[249]. Por lo tanto, concluye la Demandada, este Tribunal carece de jurisdicción para resolver el reclamo de KNI[250]. Si bien KNI presentó un reclamo por incumplimiento de contrato bajo la apariencia de un reclamo por expropiación, dicha demanda sigue siendo una controversia comercial

---

[246] Réplica de la Demandada sobre Jurisdicción, Párrafo 72.
[247] EPA Ven., Párrafo 28 (citas omitidas).
[248] Excepciones Preliminares de la Demandada, Párrafo 62.
[249] Excepciones Preliminares de la Demandada, Párrafos 83 y *ss*.
[250] Excepciones Preliminares de la Demandada, Párrafos 86-87; Réplica de la Demandada sobre Jurisdicción, Párrafo 12.

que debería ser resuelta exclusivamente conforme a la cláusula de resolución de controversias del Artículo 12 del *Offtake Agreement*[251].

### *(3)   El Argumento de las Demandantes*

6.23   *"Inversión":* KNI acepta que la tarea de interpretación del Tribunal en relación con el Tratado y el Convenio CIADI debería regirse por el Artículo 31 de la CVDT.  Con respecto al Tratado, según KNI, "el sentido corriente del artículo 1(2) del [Tratado] establece claramente y sin ambigüedades que los derechos contractuales, como los otorgados por el *Offtake Agreement*, eran contemplados como inversiones por las Partes Contratantes"[252]. En consecuencia, explica KNI, los derechos de KNI de suministro de urea y amoníaco conforme al *Offtake Agreement* están contemplados en párrafo introductorio no exhaustivo del Artículo 1(2) del Tratado: "[e]l término 'inversiones' incluye todo tipo de bienes". También corresponde al tipo de inversión definida en el Artículo 1(2)(c) del Tratado: "[l]os derechos al pago de dinero o a cualquier prestación contractual"[253]. *A fortiori,* concluye KNI, "si un 'reclamo de ejecución' en virtud de un contrato es una inversión, se deduce […] que los derechos contractuales son también una forma de inversión"[254].

6.24   KNI asevera que toda interpretación que restrinja el alcance de la definición tan amplia y no exhaustiva de "inversión" del Artículo 1(2) del Tratado sería contraria al lenguaje simple del Tratado, y socavaría el objeto y fin de este, que es promover la inversión[255]. Esto se lograba, según KNI, aun si se consideraba la Comercialización por separado:

> "*Fue un componente crítico que permitió que FertiNitro recaudara aproximadamente USD 750 millones en deuda. Esto a su vez permitió la construcción de una planta de fertilizantes sustancial, que a su vez permitió a la Demandada monetizar el gas natural que de otro modo hubiera quemado. Aun suponiendo a efectos de argumentación que se tratara de un "simple" acuerdo de venta, el Contrato de Comercialización fue un acuerdo a largo plazo, de veinte años (o más) que significó desembolsos y riesgos significativos para KNI, ya que requería que KNI*

---

[251] EPA Ven., Párrafo 16.
[252] Répl. Koch, Párrafo 338.
[253] Mem. Koch, Párrafo 182.
[254] Répl. Koch, Párrafo 340; EPA Koch, Párrafo 29.
[255] Répl. Koch, Párrafo 341; EPA Koch, Párrafo 30.

> *adquiriera o pagara la mitad de la producción de la planta, independientemente de la necesidad real* [como comprador]"[256].

6.25 En cuanto al Convenio CIADI, KNI afirma que no hay una definición objetiva e inherente del término "inversión" en el Artículo 25(1) del Convenio CIADI, y que el Convenio CIADI deja que las partes, a través de su consentimiento, definan el alcance de las inversiones del Tratado[257]. Según KNI:

> *"[J]urisprudencia reciente confirma la prioridad de un [Tratado] sobre un Convenio CIADI al determinar el alcance del consentimiento aplicable en el arbitraje CIADI y confirma además que una demandante no debe acordar la existencia de una 'inversión' según un tratado de inversiones relevante y el Artículo 25(1) del Convenio CIADI"[258].*

6.26 KNI señala asimismo que:

> *"[E]n ausencia de restricciones al consentimiento del artículo 25(4) [que ofrece a los Estados la posibilidad de limitar la jurisdicción ratione materiae del CIADI a ciertos tipos de inversiones], el alcance del término 'inversión' debe interpretarse dentro de los contornos definidos por [los Estados correspondientes en el instrumento pertinente]"[259].*

6.27 Es por eso que, alega KNI, a falta de restricciones en virtud del Artículo 25(4) del Convenio CIADI y teniendo en cuenta la supremacía de la definición de "inversión" en el Tratado, los derechos contractuales de KNI caen claramente dentro de la definición de "inversión" en el marco del Convenio CIADI[260]. KNI rechaza el argumento de que la definición de inversión en virtud del Artículo 25 del Convenio CIADI pueda confinarse a ciertos "límites

---

[256] Répl. Koch, párrafo 344 (citas omitidas).

[257] EPA Koch, Párrafo 26; Répl. Koch, Párrafo 305.

[258] EPA Koch, Párrafo 25, con cita de *SGS c. Paraguay* (RLA-25), Párrafo 93 (el tribunal sostiene que "en la mayoría de los casos—incluido, a juicio del Tribunal, el caso de que aquí se trata—será apropiado dejar librada a los Estados Partes del instrumento de consentimiento (por ejemplo el [Tratado]) la determinación del contenido del término inversión"; *Inmaris Perestroika Sailing Maritime Services GmbH y otros c. Ucrania*, Caso CIADI N.° ARB/08/8, Decisión sobre Jurisdicción (8 de marzo de 2010) ("*Inmaris c. Ucrania*") (CLA-91), Párrafo 130. *Véase, también,* Répl. Koch, Párrafo 352; Dúpl. Koch, Párrafos 51-55.

[259] Répl. Koch, Párrafo 350. *Véase, también,* EPA Koch, Párrafo 28. Esta interpretación, según las Demandantes, se apoya también en los trabajos preparatorios de la Convención a los que el Tribunal podrá recurrir de conformidad con el Artículo 32 de la CVDT. El Informe de los Directores citado a menudo vincula expresamente la falta de una definición del término 'inversión', en primer lugar, con el 'requisito esencial del consentimiento de las partes' y, en segundo lugar, al 'mecanismo' del Art. 25(4) del Convenio CIADI (*Véase* Répl. Koch, Párrafo 349 (cita omitida)).

[260] Répl. Koch, Párrafo 350.

exteriores", ya que dicho concepto no sería fiel al sentido corriente, al contexto inmediato o al objeto y fin de esta disposición[261]. De modo similar, sostiene KNI, la definición de inversión que brinda Artículo 1(2) del Tratado no se puede sustituir por una definición presuntamente "objetiva e inherente," como lo alega la Demandada.  Esto sería contrario a las normas de interpretación del derecho internacional consuetudinario codificadas en los Artículos 31 y 32 de la CVDT[262]. KNI alega por ende que sus derechos en virtud del *Offtake Agreement* califican como una "inversión" de conformidad con el Convenio CIADI y el Tratado, y que tales derechos cumplen también con los indicios que son no-jurisdiccionales[263].

6.28   KNI afirma que el sentido corriente del término "inversión" también debe interpretarse en el contexto más amplio de la disposición en la que se encuentra y el resto del texto del tratado[264]. Aun si se considerase el *Offtake Agreement* de manera independiente del resto del proyecto FertiNitro, y no como parte integrante de este, igual calificaría como inversión de conformidad con el Convenio CIADI y con el Tratado.  Según KNI, los criterios de *Salini* no son requisitos jurisdiccionales, sino meros indicios o 'marcas distintivas' de las inversiones según el Artículo 25(1) del Convenio CIADI, a los que los tribunales les han atribuido diferentes grados de importancia[265]. Además, es bien sabido que los elementos de *Salini* "deben considerarse colectivamente bajo una prueba de equilibrio, en lugar de requerir que todos los elementos se cumplan o que cualquiera de los criterios sea más importante que otro"[266]. KNI concluye que realizó una "inversión" en los términos del Artículo 25(1) del Convenio CIADI, y que su inversión cumplió con los criterios de *Salini* de duración, riesgo, contribución, desarrollo económico, nexo territorial, y regularidad de ganancias y rentabilidad.

---

[261] Répl. Koch, Párrafos 351-364.
[262] Dúpl. Koch, Párrafos 56-57.
[263] EPA Koch, Párrafo 14.
[264] Répl. Koch, Párrafo 347.
[265] EPA Koch, Párrafos 31-32; Répl. Koch, Párrafos 367-371, con cita de *Biwater Gauff (Tanzania) Ltd. c. República Unida de Tanzania*, Caso CIADI N°. ARB/05/22, Laudo (18 de julio de 2008) ("*Biwater c. Tanzania*") (CLA-24), Párrafos 312, 314; *Abaclat c. Argentina* (RLA-31), Párrafo 364; y *SGS c. Paraguay* (RLA-25), Párrafo 98; Dúpl. Koch, Párrafos 3, 54.
[266] Répl. Koch, Párrafo 373.

6.29  *Contribución:* Con respecto a la "contribución" pertinente, KNI afirma que KOMSA realizó una contribución inicial sustancial de patrimonio al proyecto FertiNitro, de la cual la participación proporcional en el capital de KOMSA fue de treinta y cinco por ciento[267], y que luego KOMSA cedió sus derechos y obligaciones en virtud del *Offtake Agreement* a KNI en abril de 2003. De esta manera, el mismo inversionista inicial (KOMSA) hizo la contribución inicial tanto con respecto a la inversión de capital como al *Offtake Agreement*, y todo lo que ocurrió luego fue una cesión de derechos y obligaciones como parte de una estructuración interna de la inversión, a KNI[268].

6.30  KNI señala que la cesión, como parte esencial de la restructuración, es totalmente aceptable en el derecho internacional en materia de inversiones y no menoscaba la protección sustantiva y procesal del posterior titular en virtud del tratado, siempre que haya un *continuum* ininterrumpido en la nacionalidad[269]. KNI alega asimismo que el compromiso jurídico de KOMSA (y posteriormente de KNI) de tomar la mitad de la producción de la Planta de FertiNitro en virtud del *Offtake Agreement* fue una contribución por sí misma, que KNI acordó la compra de grandes cantidades de la producción durante dos décadas y que fue este compromiso lo que permitió financiar, construir y operar la planta de FertiNitro con el apoyo de crédito internacional de bancos y entidades crediticias.

6.31  KNI rechaza la invocación por parte de la Demandada de la decisión de *Deutsche Bank c. Sri Lanka* para alegar que la existencia de una inversión debe ser valorada "al momento de su concepción y no en retrospectiva". Según KNI, la cuestión de si el inversionista realizó una contribución debe evaluarse "al momento de iniciar el juicio", al igual que otros criterios jurisdiccionales. Es irrelevante si la contribución existió desde el inicio, ya que se puede extender durante un cierto período de tiempo[270].

6.32  KNI también alega que: "no hay ningún requisito según el Convenio CIADI o el [Tratado] que obligue a KNI a realizar la 'acción de invertir' [o realizar una 'nueva inversión'] para

---

[267] Répl. Koch, Párrafo 9.
[268] Répl. Koch, Párrafos 385-386 (citas omitidas).
[269] Répl. Koch, Párrafo 388.
[270] Dúpl. Koch, Párrafos 79-82.

que sus derechos en el *Offtake Agreement* se consideren una 'inversión'"[271]. Dicha interpretación sería contraria a las disposiciones del Tratado y del Convenio: "Por lo tanto, una vez que el Tribunal haya establecido a su satisfacción de que existe un 'activo' en consonancia con las definiciones del Artículo 1 del TBI entre Suiza y Venezuela, no le resultará necesario seguir indagando que los sucesores interesados en dichos activos hayan realizado 'contribuciones' adicionales"[272].

6.33   KNI sostiene asimismo que, tal como decidieron los tribunales de *Salini c. Marruecos*, *Deutsche Bank c. Sri Lanka* y *Jan Ooestergetel c. República Eslovaca*, las contribuciones no se limitan a términos financieros, sino que pueden adoptar diversas formas, entre ellas, *know-how*, equipos, personal y servicios.   Teniendo en cuenta esto, "KNI y su personal hicieron una contribución inestimable al proyecto FertiNitro a través de su actuación en el Contrato de Comercialización"[273].

6.34   *Riesgo:* En cuanto al "riesgo" pertinente, KNI alega que los riesgos de KNI en virtud del *Offtake Agreement* no se circunscribían al riesgo de incumplimiento identificado en los casos *SGS c. Paraguay* y *Romak c. Uzbekistán* que citó la Demandada.   Los riesgos de KNI en virtud del *Offtake Agreement* incluyeron el "riesgo de inversión" que definió el tribunal de *Romak* de la siguiente manera: "una situación en la que el inversor no puede estar seguro del retorno de su inversión, y no puede saber la cantidad que va a terminar gastando, incluso si todas las contrapartes pertinentes cumplen sus obligaciones contractuales"[274].

6.35   KNI procura tener soporte adicional en la declaración testimonial del Sr. Sorlie que se adujo en este arbitraje, quien declaró lo siguiente:

---

[271] EPA Koch, Párrafo 33 ("Los tribunales han sostenido que existe:a) una continuidad de inversión aun cuando cambia la identidad de un inversor; b) una "inversión" aun cuando resulta de la adquisición de acciones sin cargo; y c) una "inversión" aun cuando los bienes o fondos no han sido una contribución del mismo inversor"; con cita de *Fedax N.V. c. República de Venezuela*, Caso CIADI N.° ARB/96/3, Decisión sobre Jurisdicción (11 de julio de 1997)(CLA-142), Párrafo 40; *Víctor Pey Casado y Fundación Presidente Allende c. La República de Chile*, Caso CIADI N.° ARB/98/2, Laudo (8 de mayo de 2008) (RLA-102), Párrafo 542; *Renée Rose Levy de Levi c. República del Perú*, Caso CIADI N.° ARB/10/17, Laudo (26 de febrero de 2014) (CLA-150), Párrafo 146; y (c) *CME Czech Republic B.V. c. República Checa*, CNUDMI, Laudo Parcial (13 de septiembre de 2001) (CLA-14), Párrafo 418. *Véase, también*, Répl. Koch, Párrafos 382-392; Primera Audiencia (septiembre) D1.35-36.
[272] Dúpl. Koch, Párrafos 67-71.
[273] Répl. Koch, Párrafo 392; *Oostergetel c. República Eslovaca*, CNUDMI, Decisión sobre Jurisdicción (30 de abril de 2010) (CLA-147), Párrafos 170-171.
[274] Répl. Koch, Párrafo 379, con cita de *Romak c. Uzbekistán* (RLA-24), Párrafo 230.

> *"KNI asumió ciertos riesgos económicos con respecto al Offtake Agreement; riesgos que de otro modo hubiera tenido que asumir FertiNitro (e, indirectamente, los accionistas) de no existir el Offtake Agreement. Por ejemplo, KNI asumió el riesgo de mercado relacionado con la aceptación de una obligación firme de compra ("take-or-pay"). Esto implicó que, siempre que FertiNitro pudiera producir y ofrecer productos, KNI tenía la obligación de tomar posesión o pagar, o no tomar posesión, pero igualmente pagar por el producto independientemente de las condiciones de mercado. Estos riesgos de mercado incluían: riesgo de demanda (el riesgo de que la demanda del mercado para el producto pueda ser muy bajo, lo que daría como resultado dificultades para encontrar una contraparte interesada en tomar posesión del producto), riesgo de precio (muy relacionado con el riesgo de demanda, KNI enfrentó el riesgo de las fluctuaciones de precios de mercado) y riesgo de contraparte (esto se refiere al riesgo de que la contraparte principal de KNI no cumpla con su compromiso, como por ejemplo, que no pague el producto en tiempo y forma). Estos riesgos de mercado se aplican también al flete, que incluirían los riesgos adicionales relacionados con el transporte de bienes más los riesgos mayores relacionados con el transporte de amoníaco"[275].*

6.36   KNI también alude a que KOMSA garantiza las obligaciones de KNI en virtud del *Offtake Agreement*, la cual anulaba todos los riesgos en relación con dicho contrato ya que KNI seguiría siendo responsable en el supuesto de insolvencia de KOMSA.   Además, si KOMSA hubiera tenido que cumplir las obligaciones de KNI en cualquier momento, KOMSA podría haber reclamado indemnización a KNI[276]: "Una vez que se haya identificado el riesgo relativo a esa inversión, […] no resulta necesario buscar riesgos adicionales que deban afrontar los cesionarios subsiguientes ya que los riesgos que implica la inversión original no se han atenuado"[277].

6.37   *Unidad de la inversión:* Si el *Offtake Agreement* no se considerase una "inversión" por separado (contrariamente al argumento principal de KNI), KNI señala que el *Offtake Agreement* era parte integral de la inversión y de la estructura global del proyecto FertiNitro, y no puede desestimarse como si se tratara de un simple contrato de compraventa que no califica como inversión[278]. El *Offtake Agreement* no fue un contrato

---

[275] Répl. Koch, Párrafo 380, con cita de la Segunda Declaración Testimonial de Jim Sorlie (26 de julio de 2013), Párrafo 15.
[276] Dúpl. Koch, Párrafo 86.
[277] Dúpl. Koch, Párrafo 84.
[278] Répl. Koch, Párrafo 7; *véase, también,* EPA Koch, Párrafo 13.

de compraventa "única", sino que—al igual que todos los contratos de comercialización en financiación de proyectos—fue un contrato con obligación firme de compra (*take or pay*) a largo plazo en relación con la producción de una planta específica, suscrito con el objeto de garantizar la financiación del proyecto FertiNitro[279].

6.38   Conforme al Convenio CIADI y al Tratado, toda operación en materia de inversiones debe considerarse en su totalidad, sin analizar cada transacción específica que compone "la operación total"[280]. KNI invoca las decisiones de *Inmaris c. Ucrania* y *Ambiente Ufficio c. Argentina* para alegar que, a efectos jurisdiccionales, las inversiones deben evaluarse de "manera holística", considerando su "contenido económico" y su "contexto más amplio"[281].

6.39   Según KNI, la teoría de la "unidad de la inversión" no requiere que todos los contratos subyacentes compartan los mismos objetivos económicos y derechos, sino el hecho de si la controversia surge directamente de la totalidad de la inversión[282]. Es irrelevante que el objeto del *Offtake Agreement* fuera la compraventa de amoníaco y urea, en lugar de la construcción, titularidad y operación de la Planta de FertiNitro (objeto del JIA).  KNI asevera que "el objetivo del proyecto no fue simplemente construir la planta sino operarla y vender su producción, un objetivo que KNI ayudó a FertiNitro a conseguir a través del *Offtake Agreement*"[283]. En el presente caso, la controversia surge de la totalidad de la inversión, de la cual el *Offtake Agreement* constituye una parte inseparable. KNI cita las decisiones de *Mytilineos*, *Electrabel* y *CSOB*, y alega que el Tribunal debería adoptar una "perspectiva holística" con respecto a la inversión de las Demandantes[284].

---

[279] Dúpl. Koch, Párrafos 45-47.
[280] Répl. Koch, Párrafos 310-311, con cita de Schreuer *et al*, *The ICSID Convention: A Commentary* (CLA-108), Art. 25, Párrafo 104.
[281] Répl. Koch, Párrafos 306-308, con cita, *inter alia*, de *Ambiente Ufficio S.p.A. y otros c. República Argentina*, Caso CIADI N.° ARB/08/9 (anteriormente, *Giordano Alpi y otros c. República Argentina*), Decisión sobre Jurisdicción y Admisibilidad (8 de febrero de 2013) ("*Ambiente Ufficio c. Argentina*") (CLA-90), Párrafos 422-34; e *Inmaris c. Ucrania* (CLA-91).
[282] Dúpl. Koch, Párrafo 37, con cita de *Inmaris c. Ucrania* (CLA-91), Párrafo 98.
[283] Dúpl. Koch, Párrafo 35.
[284] Dúpl. Koch, Párrafos 38-39, con cita de *Mytilineos Holdings SA c. Unión Estatal de Serbia y Montenegroy República de Serbia*, CNUDMI, Laudo Parcial sobre Jurisdicción (8 de septiembre de 2006*)* (CLA-92), Párrafos 123-125; *Electrabel c. Hungría* (RLA-110), Párrafo 5.44; y *Československá Obchodní Banka, A.S. (ČSOB) c. República Eslovaca*, Caso CIADI N.° ARB/97/4, Decisión sobre Excepciones a la Jurisdicción (24 de mayo de 1999) ("*CSOB c. República Eslovaca*") (RLA-5), Párrafo 80.

6.40   KNI afirma que "[l]a inversión de capital de KOMSA y el compromiso offtake de KOMSA (posteriormente KNI) eran interdependientes e inseparables. […] [T]odas las partes consideraron las inversiones *offtake y de capital* como un 'paquete'"[285]. Dado que KOMSA y Pequiven siguieron un modelo de financiamiento de proyecto, "el *Offtake Agreement* era esencial para distribuir de la forma adecuada el riesgo total del proyecto y, por extensión, para asegurar el financiamiento de los prestamistas internacionales"[286]. KOMSA estaba interesada en FertiNitro no sólo como una inversión de capital, sino también como una nueva fuente de amoníaco y urea para sus propias ventas y operaciones comerciales de fertilizante[287]. Uno de los principales objetivos de la inversión de KOMSA radicaba en obtener la producción a un precio inferior al de mercado, junto con la capacidad de comercializar ese producto en determinadas áreas geográficas[288]. Por ende, "además de mitigar el riesgo del proyecto, sin el valor económico del *Offtake Agreement*, 'KOMSA no habría realizado su inversión en FertiNitro'"[289], "ni el proyecto [FertiNitro] hubiera recibido la financiación necesaria de los mercados internacionales necesarios para su finalización y consecuente éxito"[290].

6.41   KNI afirma que el proyecto FertiNitro consistió de un conjunto de contratos integrados y entrelazados, firmados el mismo día y definidos como los "Documentos del Proyecto", ninguno de los cuales era autónomo, tal como surge de las pruebas documentales, las pruebas periciales y las declaraciones de testigos[291]. KNI invoca el testimonio pericial del Profesor Esty, quien consideró el *Offtake Agreement* como una parte "crucial, integrada y económicamente inseparable" del proyecto FertiNitro global[292]. De cualquier manera,

---

[285] Dúpl. Koch, Párrafo 13.

[286] Répl. Koch, Párrafos 12-16; EPA Koch, Párrafos 18-19.

[287] El *Offtake Agreement* contenía un compromiso de compra por un plazo de 20 años, prorrogable, con respecto al 50 por ciento de la producción de la Planta de FertiNitro para KNI y Pequiven; *véanse* EPA Koch, Párrafo 19; Répl. Koch, Párrafos 315-316.

[288] *Véanse* EPA Koch, Párrafos 16, 21.

[289] Répl. Koch, Párrafos 18; *véase, también,* Répl. Koch, Párrafo 315; EPA Koch, Párrafo 16.

[290] Répl. Koch, Párrafo 8; *véase, también,* EPA Koch, Párrafo 20, con cita de la Declaración Testimonial go de Brent W. Gwaltney (30 de mayo de 2012) ("Gwaltney DT1"), Párrafo 33.

[291] EPA Koch, Párrafos 13, 23, nota al pie 4 y Párrafo 24, con cita de Circular de Oferta – Oferta de Bonos de USD 250.000.000 entre FertiNitro Finance Inc y FertiNitro (8 de abril de 1998) ("Circular de Oferta de Bonos") (C-115), Página 5; y Declaración de Testigo de Víctor D. Barrientos (28 de febrero de 2013), Párrafos 41-44; Répl. Koch, Párrafos 321-325; Dúpl. Koch, Párrafos 17-25.

[292] *Véase* Répl. Koch, Párrafos 300-320, con cita de Dictamen Pericial de Benjamin C. Esty (23 de agosto de 2013) ("Esty IP1"), Párrafos 25, 37.

según KNI, KNI no necesita demostrar que el *Offtake Agreement* fue esencial para la realización del proyecto FertiNitro para que sea parte integral de la transacción económica general[293].

6.42    En la financiación de proyectos, explica KNI, como no hay otro recurso más allá que el proyecto en sí, el prestamista y los tenedores de bonos "ven principalmente al flujo de caja del proyecto como fuente de fondos para cubrir sus préstamos"[294]. Como tales, los contratos de comercialización suelen ser la principal fuente de ingresos del proyecto.  Este *Offtake Agreement* garantizaba el flujo de ingresos del proyecto FertiNitro y los pagos de los *Offtakers* se remitían a una cuenta de depósito en garantía administrada por los prestamistas[295]. En particular, "[l]os prestamistas confiaron en que el Contrato de Comercialización estableciera un canal de distribución asegurado para la producción de la planta al igual que el respaldo crediticio, la liquidez y la mitigación del riesgo de la moneda inherentes en las obligaciones de los *Offtakers* de tomar y pagar un producto ofertado por las plantas [de FertiNitro]"[296]. El propio *Offtake Agreement* contempla "conexiones fundamentales entre los documentos del proyecto y sirven para integrar el *Offtake Agreement* con derechos y obligaciones clave de otras partes, especialmente los patrocinadores y los prestamistas, según los otros documentos centrales del proyecto"[297]. Así lo confirman, *inter alia*, los Artículos 11.4 y 11.5 del *Offtake Agreement*[298]. Conforme al Artículo 11.4, si la participación accionaria en FertiNitro por parte de un comprador caía por debajo de 20%, FertiNitro tenía derecho a renegociar los términos y condiciones del *Offtake Agreement* con respecto a dicho comprador.  Según el Artículo 11.5, si la participación accionaria caía por debajo del 5%, los respectivos derechos y obligaciones de dicho comprador en virtud del *Offtake Agreement* se extinguirían[299] . Además, la duración de las obligaciones de KNI en virtud del *Offtake Agreement* estaba directamente vinculada

---

[293] Dúpl. Koch, Párrafos 26-32.
[294] Répl. Koch, Párrafo 319.
[295] *Véase* EPA Koch, Párrafos 16-18; *véase, también,* Dúpl. Koch, Párrafos 10-12.
[296] Cita de Memorándum del *Offtake Agreement* del Comité de Revisión de la Junta Directiva de FertiNitro (18 de mayo de 2005) (C-118), página 2; Répl. Koch, Párrafos 326.
[297] Dúpl. Koch, Párrafo 22.
[298] EPA Koch, Párrafo 22.
[299] Répl. Koch, Párrafo 325; Dúpl. Koch, Párrafo 14.

al estado de la deuda del proyecto.  El plazo original de 20 años con arreglo al *Offtake Agreement* debía prorrogarse si los bonos aún estaban pendientes de pago[300].

6.43    KNI hace una distinción entre los hechos de este caso y los de los casos *Joy Mining* y *Global Trading c. Ucrania*, y alega que el *Offtake Agreement* fue una parte mucho más importante de todo el proyecto FertiNitro que el contrato en cuestión en *Joy Mining*. En *Global Trading*, el tribunal adoptó un criterio pragmático al considerar si la venta de aves de corral podía ser una inversión; y no excluyó categóricamente de la definición de inversión, todas las transacciones comerciales puras[301].

6.44    *Artículo 2:* KNI arguye que el *Offtake Agreement* fue una "[inversión efectuada] en el territorio de una Parte Contratante, de conformidad con sus leyes y reglamentos, por inversionistas de la otra Parte Contratante", de acuerdo con el Artículo 2 del Tratado. Según KNI, el Artículo 2 del Tratado es una cláusula estándar de los tratados bilaterales de inversión que "se limita a establecer el alcance temporal y el objeto del Tratado"[302]. Esta disposición no se puede interpretar en el sentido de que incorpora requisitos de que la inversión deba contribuir al desarrollo económico del Estado receptor.  Además, muchos tribunales descartaron la existencia de dicho requisito de desarrollo, dada su naturaleza tan subjetiva[303]. Por otra parte, los casos en los que la Demandada pretende apoyarse "se focalizan en las *conexiones geográficas* en las cuales la inversión dejó un impacto", y no en el hecho de si la inversión benefició al estado receptor[304].

6.45    En cualquier caso, alega KNI, el argumento de la Demandada debe desestimarse porque "se pronosticaba que el proyecto traería y de hecho ha traído considerables beneficios para la población local y del país a gran escala, en particular a través de la monetización a precios considerables de gas natural que de otro modo hubiera sido quemado y por el pago de diversos impuestos nacionales"[305]. Además:

---

[300] Dúpl. Koch, Párrafo 16.
[301] Répl. Koch, Párrafos 355-361.
[302] Répl. Koch, Párrafo 394.
[303] *Id*.
[304] Dúpl. Koch, Párrafos 90-92.
[305] Répl. Koch, párrafo 395 (citas omitidas).

> *"Luego de pasar por las cuentas en el extranjero y la cascada del proyecto, una porción de las ganancias del offtake, el ingreso neto, llegaría a FertiNitro en Venezuela. También existían ventas internas derivadas en Venezuela. El Offtake Agreement claramente tuvo un impacto en Venezuela que cumplió con creces todo requisito territorial"[306].*

6.46   *Artículo 12:* KNI asevera que las disposiciones en materia de resolución de controversias del Artículo 12 del *Offtake Agreement* no impiden al Tribunal resolver el reclamo de KNI contra la Demandada en virtud del Tratado.  El Artículo 41 del Convenio CIADI permite a este Tribunal determinar su propia jurisdicción.

6.47   KNI sostiene que los derechos de KNI en virtud del *Offtake Agreement* y en virtud del Tratado son conceptualmente distintos.  El Artículo 12 del *Offtake Agreement* se refiere únicamente al arbitraje comercial de controversias contractuales entre sus partes contratantes, es decir, FertiNitro, Pequiven, IPSL y KNI.  En cambio, esta controversia comprende reclamos en virtud del derecho internacional formulados por KNI contra la Demandada sobre la base del consentimiento de la Demandada a la jurisdicción del CIADI reflejada en el Tratado, en relación con la expropiación ilícita de la inversión de KNI por parte de la Demandada al amparo del Tratado.  Por lo tanto, la cláusula de arbitraje del *Offtake Agreement* no afecta a la jurisdicción de este Tribunal[307].

### *(4)   La Decisión y el Análisis del Tribunal*

6.48   El Tribunal comienza con el Artículo 41 del Convenio CIADI.  No es objeto de controversia ni podría serlo que el Tribunal "resolverá sobre su propia competencia". Como ya se indicó, esta cuestión sobre jurisdicción concierne a KNI y a la Demandada, con respecto al reclamo de KNI por la supuesta expropiación ilícita de su supuesta inversión que comprende su interés en el *Offtake Agreement,* en virtud del Artículo 6 del Tratado[308].

6.49   Las excepciones preliminares de la Demandada sólo guardan relación con el reclamo de KNI.  En opinión del Tribunal, la Demandada actuó correctamente al no plantear ninguna excepción preliminar similar con respecto a los reclamos de KOMSA en este arbitraje: está

---

[306] Dúpl. Koch, Párrafo 92.
[307] Répl. Koch, Párrafo 397.
[308] *Offtake Agreement* entre Pequiven, IPSL y Koch Oil SA en calidad de Compradoras y FertiNitro en calidad de Vendedora (8 de abril de 1998) (C-19).

claro que KOMSA realizó una "inversión" como accionista indirecto en FertiNitro desde el comienzo del proyecto FertiNitro, en los términos del Artículo 25(1) del Convenio CIADI y el Artículo 1(2) del Tratado.

6.50   El Tribunal acepta el alegato de la Demandada de que KNI debe satisfacer las definiciones de "inversión" del Tratado y del Convenio CIADI, con respecto a lo cual KNI tiene la carga legal de fundamentar sus alegatos sobre la jurisdicción del Tribunal.  Es un test doble que KNI debe demostrar, sujeto a las normas del derecho internacional consuetudinario sobre interpretación de tratados codificadas en la CVDT, en particular, el Artículo 31 (1), conforme con el cual "[u]n tratado deberá interpretarse de buena fe conforme al sentido corriente que haya de atribuirse a los términos del tratado en el contexto de estos y teniendo en cuenta su objeto y fin.

6.51   Este test doble se describió en el párrafo 25 del Informe de los Directores Ejecutivos acerca del Convenio CIADI:

> *"Aunque el consentimiento de las partes constituye un requisito previo esencial para dar jurisdicción al Centro, el mero consentimiento no es suficiente para someter una diferencia a su jurisdicción. En concordancia con la finalidad del convenio, la jurisdicción del Centro resulta además limitada por la naturaleza de la diferencia y de las partes"*[309].

Más recientemente, los editores de *Schreuer* comentaron:

> *"Si la jurisdicción se establece en función de un tratado que contenga una oferta de consentimiento, la definición de inversión del tratado será relevante. Además, el tribunal deberá establecer que la actividad representa una inversión según el sentido del Convenio [CIADI]. Este test doble se ha denominado a veces como el enfoque de 'doble cerrojo' o como el test 'compuesto'"*[310]. [Traducción del Tribunal]

El Tribunal procederá a ocuparse del Tratado, como primera parte de este test doble.

6.52   *El Tratado:* El Tribunal acepta el alegato de KNI de que la definición de "inversión" del Artículo 1(2) del Tratado es muy amplia.  Sus palabras de apertura definen sucintamente

---

[309] Informe de los Directores Ejecutivos acerca del Convenio sobre Arreglos de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, páginas 43-44. *Véase, también,* Georges R. Delaume, *ICSID and the Transnational Financial Community*, (1986) (CLA-96), página 104.
[310] ICSID Convention: A Commentary (CLA-3)**,** página 117.

"inversión" como incluyendo "todo tipo de bienes".  En opinión del Tribunal, esta expresión no permite requisitos adicionales que no estén implícitos en el significado del término "inversión". Sin embargo, a continuación, brinda una lista de cinco ejemplos específicos, no exhaustivos, de tales bienes que satisfacen la definición de "inversión". KNI se basa en los Artículos 1(2)(b) y (c) del Tratado que mencionan "acciones, cuotas sociales o cualquier forma de participación en compañías" y "derechos […] a cualquier prestación contractual".

6.53   Para el caso que nos ocupa, según el Artículo 2 del Tratado y el Convenio CIADI (analizado *infra*), el Tribunal considera que su jurisdicción respecto de la "inversión" cubierta conforme al Tratado queda establecida con arreglo a los Artículos 1(2)(b) y (c) del Tratado. El Tratado define expresamente las acciones o participación en compañías y las prestaciones contractuales como bienes que se ajustan a su propia definición de "inversión".  El sentido corriente de estas palabras, en su contexto y a la luz del objeto y fin del Tratado en virtud del Artículo 31 de la CVDT, no presente ambigüedad alguna.

6.54   Tal como se decidió en *Rosinvest c. Rusia* sobre la interpretación de una definición similarmente amplia de inversión:

> *"La amplia redacción de esa definición no contiene ningún término que limite 'inversión' a algo creado de conformidad con el derecho nacional vigente. Según la definición, 'inversión' incluye todo tipo de bienes. Luego, brinda una lista no taxativa de tipos de bienes que comprenden 'acciones, bonos y debentures o cualquier otra forma de participación en compañías o empresas'. Al redactar esta simple y tan amplia definición, los Estados partes del IPPA [el TBI entre el Reino Unido y la URSS] expresaron claramente la intención de incluir todo tipo de bienes y el Tribunal considere como tales las acciones Yukos de titularidad de las Demandantes"*[311]. [Traducción del Tribunal]

6.55   En estas circunstancias, sería inapropiado, conforme al Artículo 31 de la CVDT o cualquier otra disposición, agregar otros requisitos a esta definición expresa y estos ejemplos específicos. Sin embargo, aunque este resultado no sea el adecuado para tratar la "inversión" de KNI por separado, se obtendría el mismo resultado conforme al Artículo

---

[311] *RosInvestCo UK Ltd. c. Federación Rusa*, Arbitraje CCE V (079/2005), Laudo Definitivo (12 de septiembre de 2010) (CLA-9), Párrafo 388. (Este laudo fue anulado por los tribunales suecos por motivos jurisdiccionales no relacionados).

1(2) del Tratado si aplicamos el concepto de "unidad de la inversión", tal como se analiza *infra* conforme al Artículo 25(1) del Convenio CIADI.

6.56  *El Convenio CIADI:* El Tribunal interpreta el Artículo 1(2) del Tratado independientemente del Artículo 25(1) del Convenio CIADI, teniendo en cuenta la admonición en la decisión sobre anulación de *MHS c. Malasia*:

> *"Son esos tratados bilaterales y multilaterales que hoy en día representan el motor de la jurisdicción eficaz del CIADI. Ignorar o menospreciar la importancia de la jurisdicción que otorgan al CIADI y, en cambio, formular interpretaciones controvertidas del término 'inversión', tal como se lo define en el Artículo 25(1) del Convenio, pone en riesgo la integridad de la institución"*[312]. [Traducción del Tribunal]

Por ende, la cuestión sobre la jurisdicción del Tribunal debe centrarse ahora en el significado del Artículo 25(1) del Convenio CIADI, como segunda parte de este 'test doble'.

6.57  El Tribunal acepta el argumento jurídico de la Demandada de que un "contrato de compraventa puro" no puede, por sí, satisfacer el significado de "inversión" del Artículo 25(1) del Convenio CIADI. Sin embargo, tal como se decidió en *Pantechniki c. Albania*: ese alegato "puede perder terreno rápidamente ante la realidad económica"[313] [Traducción del Tribunal].

6.58  En opinión del Tribunal, el *Offtake Agreement* no fue un "contrato de compraventa puro" desde el punto de vista jurídico o económico.  A la luz de las pruebas presentadas, es imposible separarlo como si se tratase de una transacción independiente sin relación alguna con el proyecto FertiNitro que, bajo cualquier punto de vista, fue un gigante jurídico y económico.  Tal como se decidiera en *CSOB c. Eslovaquia*:

> *"Por lo general, una inversión es una operación bastante compleja, compuesta por varias transacciones interrelacionadas, cada elemento de las cuales podría, de manera independiente, no calificar como inversión en todos los casos. Por lo tanto, una diferencia sometida a la jurisdicción del Centro debe considerarse surgida*

---

[312] *MHS c. Malasia* (RLA-23), Párrafo 73.
[313] *Pantechniki S.A. Contractors & Engineers c. República de Albania*, Caso CIADI N.º ARB/07/21, Laudo (30 de julio de 2009) (CLA-97), Párrafo 44.

*directamente en una inversión, aunque se base en una transacción que, por sí sola, no califique como inversión conforme al Convenio, en tanto la transacción específica forme parte de una operación global que sí califique como inversión […] El análisis precedente indica que el término 'directamente', tal como se utiliza en el Artículo 25(1) del Convenio, no se debe interpretar de modo restrictivo para concluir que el reclamo de CSOB se encuentra fuera del ámbito de jurisdicción del Centro y de competencia del Tribunal simplemente porque se basa en una obligación de la República Eslovaca que, por sí sola, no califica como inversión"*[314]. [Traducción del Tribunal]

6.59    Otros tribunales arbitrales han adoptado el mismo enfoque holístico con respecto al significado de "inversión" del Artículo 25(1) del Convenio CIADI, sin necesariamente utilizar ese término o la expresión similar "unidad de la inversión".  El Tribunal hace referencia a las decisiones de *Inmaris c. Ucrania*[315], en cuyo caso el tribunal consideró las "supuestas inversiones como parte de una operación de inversión integral más grande" [Traducción del Tribunal]; *Ambiente Ufficio c. Argentina*[316], en el cual el tribunal resolvió que "cuando el tribunal se encuentra en presencia de una operación compleja, debe concentrarse en el fundamento económico de la operación en cuestión en forma holística"; *ADC Affiliate c. Hungría*[317], en el cual el tribunal consideró "la totalidad de la transacción comprendida en los Acuerdos del Proyecto" [Traducción del Tribunal]; *Electrabel c. Hungría*[318], en el cual el tribunal decidió que "se deben considerar todos los elementos de la operación de la Demandante a fines de determinar si hay inversión conforme al Artículo 25"; y *Chevron c. Ecuador*[319], en el cual se afirmó que "[l]as inversiones también deben examinarse en su integridad y no separadas en sus componentes".  Es por eso que no está permitido dividir una transacción en sus distintas partes constitutivas, como una salchicha, con el fin de argüir que una parte, por sí sola, no es una "inversión", mientras que como parte integral de la transacción entera sí lo es.

---

[314] *CSOB c. República Eslovaca* (RLA-5), Párrafos 72, 74.
[315] *Inmaris c. Ucrania* (CLA-91), Párrafo 92.
[316] *Ambiente Ufficio c. Argentina* (CLA-90), Párrafos 428, 453.
[317] ADC Affiliate Ltd. c. República de Hungría, Caso CIADI N.° ARB/03/16, Laudo (27 de septiembre de 2006) (CLA-16), Párrafo 331.
[318] *Electrabel c. Hungría* (RLA-110), Párrafo 5.44.
[319] *Chevron Corp. (EE. UU.) c. República de Ecuador*, CNUDMI, Laudo Definitivo (31 de agosto de 2011) (CLA-63), Párrafo 19.

6.60   La pregunta sigue siendo si el *Offtake Agreement* fue parte integral de la inversión original de KOMSA en el proyecto FertiNitro en general.  El Tribunal advierte, de nuevo, que la Demandada no alega que KOMSA no fuera inversionista con una inversión conforme al Artículo 25(1) del Convenio CIADI, en relación con su participación accionaria en el proyecto FertiNitro.  (El Tribunal procederá a analizar la postura de KNI en carácter de cesionaria de KOMSA nuevamente *infra*).

6.61   Según la opinión del Tribunal, las pruebas económicas son abrumadoras.  El Profesor Esty (de la Universidad de Harvard y experto en economía empresarial) declaró que "un *offtake agreement* constituye una parte crucial, integrada y económicamente inseparable de una compañía de proyecto, y así es considerado por todos los participantes del proyecto, entre otros, los prestamistas, promotores y analistas de crédito"[320]; este *Offtake Agreement* "era una parte crucial, integrada y económicamente inseparable de la compañía del proyecto FertiNitro"; también fue crucial "para el éxito del proyecto y su capacidad para pagar gastos, cumplir con obligaciones de deuda, y generar rentabilidad para los promotores"[321]; y "[n]o considero que este proyecto [el proyecto FertiNitro] pudiera haberse financiado sin un *contrato de comercialización*. De hecho, el *Offtake Agreement* es precisamente el que proporcionó el respaldo crediticio necesario para financiar el proyecto"[322] [Traducción del Tribunal]. El Tribunal advierte que el proyecto FertiNitro requirió respaldo crediticio de prestamistas para financiar USD 700 millones (USD 250 millones como Bonos y USD 450 millones como Préstamos Bancarios), garantizado (*inter alia*) con el flujo de ingresos de FertiNitro en virtud del *Offtake Agreement*.  Como resultado, en ese entonces, la calificación de Moody del proyecto FertiNitro se vio influenciada, en gran medida, por el *Offtake Agreement*[323].

6.62   El *Offtake Agreement* también estuvo integrado legalmente con el proyecto FertiNitro.  Su preámbulo aludía expresamente al JIA; el Artículo 11.1 contemplaba un plazo de 20 años o hasta tanto FertiNitro hubiera cancelado los Bonos; y los Artículos 11.4 y 11.5 establecían que la producción disponible para los compradores dependía de los niveles continuos de

---

[320] Esty IP1, Párrafo 27 (énfasis omitido).
[321] Esty IP1, Párrafos 28-29.
[322] Segundo Informe Pericial de Benjamin C. Esty (14 de marzo de 2014) ("Esty IP2"), Párrafo 4.
[323] P. List, *A Chemical Storm*, 8 Proj. Fin. 35 (junio de 1998) (C-17), página 36.

participación accionaria de tales compradores en FertiNitro[324]. El *Offtake Agreement* también mencionaba otros Documentos del Proyecto: véanse los Artículos 3.2 y 4.2.  A su vez, el Artículo IV del JIA hacía referencia al *Offtake Agreement*, en el cual las partes acordaron que el *Offtake Agreement* era "necesario para dar efecto a este [JIA] […]" y "[…] necesario y apropiado para dar efecto a la intención de los Propietarios, expresada en este [JIA], y permitir la construcción de las Plantas y el desarrollo de la Actividad". [Traducción del Tribunal]

6.63  La Sección 3.01(b) y (c) del Contrato de Garantía Común con los Bancos Sénior dejó asentada la declaración de FertiNitro de que estaba facultada para celebrar el *Offtake Agreement* y que el *Offtake Agreement* era vinculante para FertiNitro; las Secciones 5.01(b) y 5.03(b) exigían a FertiNitro impartir instrucciones irrevocables a los *Offtakers* (incluso KOMSA y, posteriormente, KNI) de realizar pagos a cuentas en el exterior en USD en virtud del *Offtake Agreement*, en beneficio de los bancos prestamistas (tal como se indicara previamente en la Circular de Oferta de Bonos)[325]; la Sección 6.01(a)(iii) contemplaba la prenda de FertiNitro frente a los bancos prestamistas de todos sus derechos en el *Offtake Agreement*; la Sección 9.01(c) convertía el *Offtake Agreement* en condición suspensiva del Contrato de Garantía Común; y la Sección 10.01(g) establecía que el incumplimiento de KOMSA (posteriormente, KNI) en virtud del *Offtake Agreement* constituía un hecho de incumplimiento por parte de FertiNitro en virtud del Contrato de Garantía Común[326].

6.64  Las pruebas de hecho de los testigos contemporáneos coinciden con este análisis económico y jurídico.  El Sr. Barrientos (de Pequiven) declaró que el propósito del *Offtake Agreement*, si bien (en su dictamen jurídico) se trataba de un contrato de compraventa separado, "era el de proporcionar un flujo continuo de ingresos a FertiNitro.  Eso permitía a FertiNitro cumplir sus obligaciones, sobre todo con los bancos y tenedores de bonos […]. Fue bajo este concepto que se implementó el *Offtake Agreement*, no para asegurar ingresos a KOMSA o a ningún accionista en particular"[327].  En ese entonces, los abogados

---

[324] Convenio de Inversionistas Conjuntos entre Pequiven, Koch Oil SA, Snamprogetti Netherlands BV y Polar Uno, CA (8 de abril de 1998) (C-18).
[325] Circular de Oferta de Bonos (C-115).
[326] Contrato de Garantía Común (21 de abril de 2008) (C-137).
[327] Segunda Declaración de Testigo de Víctor D. Barrientos (30 de diciembre de 2013), Párrafo 28.

estadounidenses de FertiNitro, Davis Polk & Wardwell, aconsejaron a su junta directiva, mediante carta de fecha 18 de mayo de 2005, lo siguiente[328]:

> *"Como sabrá la Junta, los términos del Offtake Agreement vigente son el producto de amplias negociaciones entre los offtakers, los accionistas de FertiNitro y los acreedores de FertiNitro, son jurídicamente vinculantes y reflejan no sólo las condiciones del mercado de fertilizantes, actuales o previstas en el momento, sino también todo el marco contractual […] del proyecto y su impacto financiero esperado sobre las partes. Por lo tanto, cualquier modificación del Offtake Agreement no puede considerarse de forma aislada como una negociación entre los accionistas de FertiNitro y los offtakers, sino que también debe contemplar a los acreedores, así como los roles previos y actuales de los participantes, que no sean accionistas y offtakers (por ejemplo, Pequiven y sus afiliadas como proveedoras de materia prima y otros servicios del proyecto y Snamprogetti como contratista constructor para el proyecto).*
> *En particular, los prestamistas se apoyaron en el Offtake Agreement para establecer un canal de distribución asegurado para la producción de la planta al igual que el respaldo crediticio, la liquidez y la mitigación del riesgo de la moneda inherentes en las obligaciones de los offtakers de tomar y pagar un producto ofertado por las plantas. La deuda del proyecto es asegurada por las cuentas por cobrar debidas por Koch y Pequiven a FertiNitro en virtud del Offtake Agreement (lo que incluye un compromiso de IPSL de sus propias cuentas por cobrar de las ventas de exportación). Los atributos del Offtake Agreement eran fundamentales para los prestamistas y los prestamistas ven a la fortaleza financiera del proyecto vinculada a la fortaleza financiera y comercial de los offtakers y sus respectivos compromisos con el proyecto".* [Traducción del Tribunal]

6.65    El Sr. Gwaltney (de Koch, y director suplente de FertiNitro, designado por KOMSA) declaró que el *Offtake Agreement* era "una parte integral de la inversión general y la estructura del proyecto FertiNitro.  Se trataba de un 'paquete'. KOMSA obtendría una participación en el capital de las Compañías FertiNitro y también se comprometería a adquirir los productos a largo plazo y de forma obligatoria". Asimismo, declaró:

> *"El Offtake Agreement era un elemento esencial de la inversión de Koch. Sin estos valiosos derechos, KOMSA no habría realizado su inversión en FertiNitro. Aún más, considerando que el Offtake Agreement obligaba a KNI a comprar producto a*

---

[328] Memorándum del *Offtake Agreement* del Comité de Revisión de la Junta Directiva de FertiNitro (18 de mayo de 2005) (C-118), página 2.

> *FertiNitro y durante un período prolongado de tiempo, cumplía con un requisito crítico de los prestamistas de financiamiento del proyecto"*[329].

6.66    A la luz de este material, el Tribunal considera que el *Offtake Agreement* fue parte integral y esencial de la inversión global realizada por KOMSA.  No fue una parte única o separada que deba considerarse como si se tratase de una transacción diferente. Tampoco fue un 'contrato de compraventa puro', ya sea desde el punto de vista económico, jurídico o de manera más amplia comercial.   Por lo tanto, el hecho de si la participación de KOMSA en el *Offtake Agreement* fue una inversión conforme al Convenio CIADI depende de la transacción entera de KOMSA en relación con el proyecto FertiNitro.

6.67    En síntesis, el Tribunal concluye que la transacción de KOMSA en su totalidad, con su correspondiente aporte de capital y los derechos y obligaciones con respecto a la producción, formaban parte de una única inversión integral según la definición del Artículo 25(1) del Convenio CIADI.   Además del *Offtake Agreement* (aun si se tratase de una transacción separada, hipótesis que el Tribunal descartó), la Demandada no alega otra cosa. En cuanto a esta transacción (incluido el *Offtake Agreement*), el Tribunal resuelve que cumple con todos los indicios de las inversiones en cuanto a contribución, riesgo, duración y desarrollo económico conforme al test de *Salini*, independientemente del modo en que se lo aplique[330].

6.68    *Artículo 2 del Tratado:* Como parte integral de una transacción entera, el Tribunal acepta el alegato de KNI de que el *Offtake Agreement* fue una "[inversión efectuada] en el territorio de una Parte Contratante, de conformidad con sus leyes y reglamentos, por inversores de la otra Parte Contratante", de conformidad con el Artículo 2 del Tratado.

6.69    *Artículo 12:* El Tribunal también puede considerar brevemente la invocación por parte de la Demandada de las disposiciones sobre resolución de controversias del Artículo 12 del *Offtake Agreement*.   Si bien quizá resulta relevante para cuestiones de responsabilidad

---

[329] Gwaltney DT1, Párrafo 33.

[330] *Salini Costruttori S.P.A. e Italstrade S.P.A. c. Reino de Marruecos,* Caso CIADI N.° ARB/00/4, Decisión sobre Jurisdicción (16 de julio de 2001) (RLA-7), Párrafos 50-58. *Véanse, también,* Phoenix Action c. República Checa, Caso CIADI N.° ARB/06/05, Laudo (15 de abril de 2009) (RLA-22), Párrafos 82-85; y *Philip Morris Brand Sàrl y otros c. República Oriental del Uruguay,* Caso CIADI N.° ARB/10/7, Decisión sobre Jurisdicción (2 de julio de 2013) (CLA-144), Párrafo 200.

conforme al Artículo 6 del Tratado (de lo cual el Tribunal se ocupará *infra*), el Tribunal resuelve que estas disposiciones no respaldan la excepción jurisdiccional de la Demandada. El reclamo de KNI en este arbitraje es contra la Demandada y no contra FertiNitro. KNI invoca las obligaciones de la Demandada en virtud del Tratado y del derecho internacional (como su derecho aplicable), no las obligaciones de FertiNitro establecidas en el *Offtake Agreement* y la legislación de Nueva York (como su derecho aplicable).  Todos los derechos de acción, textos jurídicos, leyes aplicables y partes contendientes son sustancialmente diferentes.

6.70    Por último, ¿tiene algún impacto sobre el análisis el hecho de que KOMSA haya cedido (o novado) posteriormente su participación en el *Offtake Agreement* a KNI, por lo cual (se podría decir) el *Offtake Agreement* dejó de ser parte de una transacción integrada en su totalidad?  Esta cuestión también pudo haber presentado dificultades aquí, si no fuera por un factor importante.  La cesión de KOMSA a KNI fue una reorganización interna entre empresas asociadas dentro del mismo grupo societario Koch.  No introdujo terceros no relacionados ni modificó sustancialmente la transacción.  Tampoco podría haberlo hecho teniendo en cuenta lo dispuesto por los Artículos 11.4 y 11.5 del *Offtake Agreement*.  La Demandada no cuestiona la eficacia de la cesión en virtud del *Offtake Agreement*. Por ende, si bien difiere en la forma, dadas las diversas personerías jurídicas de KOMSA y KNI, la cesión no generó ninguna diferencia económica, jurídica o comercial importante.

6.71    ***Decisión****:* En conclusión, por todos los motivos expuestos *supra*, el Tribunal desestima la excepción preliminar de la Demandada respecto del reclamo de KNI en este arbitraje, en conformidad con los Artículos 1(2) y 2 del Tratado y el Artículo 25(1) del Convenio CIADI.

*PARTE VII: CUESTIONES DE EXPROPIACIÓN*

*(1)       Introducción*

7.1     Tal como ya fuera indicado, las Demandantes sostienen que la Demandada podría incurrir responsabilidad en virtud de seis disposiciones del Tratado; a saber: (1) Artículo 6 ("Expropiación"), (2) Artículo 4(1) ("TJE"), (3) Artículo 4(1) ("SPP") (4) Artículo 4(1) ("Medidas Arbitrarias y Discriminatorias"); (5) Artículo 4(2) ("Trato Nacional"); y (6) Artículo 11(2) ("Cláusula Paraguas").  En esta Parte VII del Laudo, el Tribunal procede a analizar la cuestión de la responsabilidad relativa a los reclamos de las Demandantes por expropiación ilícita en virtud del Artículo 6 del Tratado.  Las cuestiones de responsabilidad relativas a los reclamos no expropiatorios se analizan en la Parte VIII *infra*.

7.2     Resulta nuevamente necesario sintetizar los argumentos respectivos de las Partes sobre las cuestiones de expropiación.  Al igual que con las cuestiones jurisdiccionales y, de hecho, con todas las demás cuestiones, el Tribunal ha examinado los argumentos sobre responsabilidad de las Partes en su totalidad; no debe asumirse que una omisión en estos resúmenes de cualquier escrito u otro material invocado por cualquiera de las Partes ha pasado inadvertido por parte del Tribunal.

*(2)       El Argumento de las Demandantes*

7.3     En síntesis, las Demandantes afirman que la redacción del Artículo 6 del Tratado recoge cualquier apropiación de bienes, tangibles o intangibles, lo cual incluye así las acciones, la participación de capital y los derechos contractuales; y que prohíbe la expropiación a menos que se cumpla con una prueba de cuatro puntos, a saber: (I) la medida debe ser tomada por causa de interés público, (ii) de manera no discriminatoria, (iii) sujeta al debido proceso legal, y (iv) mediante el pago de una compensación[331].  Las Demandantes abordan luego las dos presuntas expropiaciones ilícitas por parte de la Demandada; a saber: La participación de KOMSA en FertiNitro y los derechos de KNI respecto del *Offtake Agreement*[332].

---

[331] Mem. Koch, Párrafos 200-214.
[332] Mem. Koch, Párrafos 215-220.

7.4 *KOMSA:* Respecto de la participación de KOMSA en FertiNitro, KOMSA aduce que la medida de la Demandada, el Decreto 7713 (Decreto de Expropiación) considerada en conjunto con las declaraciones públicas del Ministro, constituyó una expropiación ilícita indirecta. En primer lugar, la Demandada no puede demostrar la arista del interés público debido a que no había una escasez de fertilizantes que impactara su producción nacional de alimentos, y la apropiación fue, en todo caso, desproporcionada[333]. En segundo lugar, la medida fue discriminatoria porque promovió la participación de Pequiven en detrimento de todos los demás accionistas de FertiNitro. KOMSA rechaza el argumento de la Demandada de que Pequiven y KOMSA no estaban posicionadas de manera similar porque operaban en diferentes mercados y, por lo tanto, no eran competidoras[334]. En tercer lugar, la medida violó el debido proceso dado que no se brindó preaviso a KOMSA, puesto que la expropiación fue notificada en el programa semanal de televisión del Presidente durante el cual el Presidente firmó el Decreto de Expropiación. KOMSA rechaza el argumento de la Demandada de que varios canales de información, incluidas las amenazas anteriores o acciones gubernamentales no relacionadas, podrían haber constituido un preaviso adecuado para KOMSA en virtud del derecho internacional[335]. En cuarto lugar, no se ha proporcionado compensación efectiva alguna a KOMSA[336]. KOMSA afirma que el Artículo 6 requiere una compensación efectiva para que la Demandada cumpla con sus obligaciones, no meras negociaciones o un procedimiento judicial extenso a nivel nacional[337].

7.5 *KNI:* Respecto de los derechos de KNI en virtud del *Offtake Agreement*, KNI arguye que el Decreto 7713 constituye una expropiación indirecta ilícita por las mismas razones que aquellas presentadas por KOMSA. KNI sostiene que la Demandada anuló los derechos de KNI a la ejecución por FertiNitro del *Offtake Agreement*[338]. Según KNI, el hecho de que el *Offtake Agreement* fuera rescindido exclusivamente por FertiNitro en febrero de 2012 (tal como afirma la Demandada), varios meses después del Decreto de Expropiación y de

---

[333] Répl. Koch, Párrafos 133-146; EPA Koch Párrafo 86.
[334] Répl. Koch, Párrafos 147-161; EPA Koch Párrafos 87-91.
[335] Répl. Koch, Párrafos 162-177; EPA Koch Párrafos 92-94.
[336] Mem. Koch, Párrafos 221-235.
[337] Répl. Koch, Párrafos 120-132; 178-179; EPA Koch Párrafos 95-100.
[338] Mem. Koch, Párrafos 236-241; Répl. Koch, Párrafos 180-186.

las declaraciones del Ministro, es irrelevante debido a que el objeto del *Offtake Agreement* ya había sido afectado negativamente el 11 de octubre de 2010 y, en cualquier caso, su terminación posterior fue atribuible a la Demandada (por su control de Pequiven y, en consecuencia, de FertiNitro)[339]. Además, KNI rechaza el argumento de la Demandada de que no expropió los derechos de KNI respecto del *Offtake Agreement* porque dicho argumento es incompatible con su defensa de la causa de interés público que sustenta la expropiación de FertiNitro. Tal defensa se basa en la supuesta crisis de producción alimentaria de Venezuela, que sólo podía ser mitigada si la Demandada también se apropiaba, es decir expropiaba, el cumplimiento por parte de FertiNitro de sus obligaciones contractuales respecto de KNI de adquirir urea[340]. Al igual que en el caso de KOMSA, la Demandada no ha pagado ninguna compensación a KNI, a la fecha de este laudo.

*(3)*   *El Argumento de la Demandada*

7.6   En síntesis, la Demandada afirma que el Decreto 7713 ordenó la adquisición obligatoria de los bienes de FertiNitro, de conformidad con la legislación nacional de Venezuela y tal como lo autoriza expresamente el Artículo 6 del Tratado. Niega cualquier responsabilidad en virtud del Artículo 6 respecto de KOMSA o KNI.

7.7   *KOMSA:* La Demandada sostiene que esta adquisición se llevó a cabo por causa de interés público y para un fin público, respecto de lo cual los Estados gozan de amplia libertad en virtud del derecho internacional. Específicamente, la Demandada deseaba asegurar el control soberano sobre los medios de producción nacional de alimentos. La Demandada argumenta que existe un vínculo directo entre el sector de los fertilizantes y la producción de alimentos. Señala la crisis alimentaria venezolana del año 1998 y el potencial impacto general de la malnutrición respecto de la paz social de un país.

7.8   La Demandada rechaza el elevado test de las Demandantes según el cual la Demandada también debe probar las dificultades subyacentes que dieron lugar a la política y demostrar que la nueva política no está influenciada por motivos políticos. Arguye que el criterio de proporcionalidad alegado por las Demandantes es erróneo. Sólo resulta pertinente

---

[339] Répl. Koch, Párrafos 187-199.
[340] EPA Koch, Párrafo 85.

144

determinar si ciertas medidas pueden alcanzar el nivel de una expropiación. No tiene nada que ver con la evaluación de la política alimentaria de la Demandada (que, según la Demandada, era en cualquier caso razonable y proporcionada)[341].

7.9   La Demandada sostiene que su adquisición de FertiNitro se llevó a cabo de manera no discriminatoria debido a que Pequiven y KOMSA no estaban situadas de manera similar. No operaban en los mismos mercados, particularmente respecto del *Offtake Agreement*. La Demandada sostiene que la mera actuación en el mismo sector no resulta suficiente para estar en una situación similar. Además, Pequiven es una entidad estatal que se encargaba de promover la seguridad alimentaria (incluso antes de la promulgación del Decreto 7713), mientras que KOMSA es una empresa suiza privada. Además, existía una justificación razonable para tratar a Pequiven y KOMSA de manera diferente, dada la política de garantizar la seguridad alimentaria de Venezuela. Además, Pequiven no se benefició de la adquisición de FertiNitro. Dicha adquisición meramente facilitó el proceso administrativo; y (en última instancia) Pequiven también tuvo que renunciar a su propia participación accionaria en FertiNitro, al igual que todos los demás accionistas de FertiNitro. Por lo tanto, la Demandada no tenía ninguna intención de ir específicamente en contra de los extranjeros. Pequiven no fue en última instancia titular de los activos de FertiNitro; y KOMSA no recibió ningún trato adverso diferenciado.[342]

7.10   La Demandada sostiene que la adquisición de FertiNitro se llevó a cabo en virtud del debido proceso. KOMSA había recibido múltiples notificaciones de la futura adquisición. Ante la ausencia de tal redacción en el Artículo 6, la Demandada objeta al argumento de KOMSA de que en toda instancia se requiere un preaviso sujeto a un estándar de debido proceso en virtud del derecho internacional. La Demandada había manifestado anteriormente un fuerte interés por el sector de los fertilizantes; y KOMSA había recibido notificación a través de diversos canales (incluida la prensa, empleados de Pequiven y otras leyes o decretos) que demostraban el interés de la Demandada relativo al sector. Además, existían

---

[341] Mem. C. Ven., Párrafos 144-148; Dúpl. Ven., Párrafos 196-203; EPA Ven., Párrafos 66-80.
[342] Mem. C. Ven., Párrafos 149-164; Dúpl. Ven., Párrafos 204-216; EPA Ven., Párrafos 83-97.

vías de recurso jurídico a disposición de KOMSA en virtud de las leyes nacionales, incluidas las negociaciones amistosas, para impugnar la adquisición de FertiNitro[343].

7.11   La Demandada aduce que cumplió con sus obligaciones en virtud del derecho internacional y del Artículo 6 porque ofreció negociar una compensación efectiva y adecuada para KOMSA.   Sólo el importe de la compensación, no el principio de compensación, fue disputado entre la Demandada y KOMSA en ese momento. Asimismo, según la Demandada, el Artículo 6 no exige el pago inmediato de una compensación por parte de la Demandada.   La Demandada también sostiene que Pequiven (para la Demandada) siempre negoció de buena fe y ofreció una oferta razonable de compensación, hasta que la propia KOMSA puso fin a las negociaciones.   En virtud del derecho internacional, según sostiene la Demandada, sólo cuando la valoración del activo permanece controvertida, la oferta de compensación es suficiente para que el Estado cumpla con su obligación de compensación en virtud del tratado.   La Demandada también sostiene que el litigio pendiente de resolución ante los tribunales venezolanos en relación con el monto de la compensación dará lugar a que la Demandada pague a la Demandante una compensación a su debido tiempo[344].

7.12   *KNI:* La Demandada sostiene que no expropió el derecho contractual de KNI respecto del *Offtake Agreement*, aun suponiendo (de manera contraria a su excepción preliminar) que tal interés era una "inversión" en virtud del Tratado.

7.13   Según la Demandada, el Decreto 7713 no incluye ninguna disposición con respecto a los derechos contractuales de KNI de comprar urea y amoníaco de conformidad con el *Offtake Agreement*; los derechos contractuales de KNI no fueron afectados por el Decreto; y tales derechos no constituían un "activo" en virtud del Decreto.

7.14   Además, KNI continuó comprando dichos productos en virtud del *Offtake Agreement* después de octubre de 2010.  Ello no se hizo (tal como afirma KNI) en virtud de un acuerdo *ad hoc* conformado por un intercambio de cartas posterior a la promulgación del Decreto de Expropiación 7713.  Por consiguiente, los derechos de KNI en el *Offtake Agreement* no fueron expropiados por el Decreto 7713.   La Demandada objeta las declaraciones

---

[343] Mem. C. Ven., Párrafos 165-175; Dúpl. Ven., Párrafos 217-224; EPA Ven., Párrafos 98-104.
[344] Mem. C. Ven., Párrafos 176-177; Dúpl. Ven., Párrafos 225-232; EPA Ven., Párrafos 105-115.

testimoniales de los testigos de las Demandantes según las cuales KNI se vio confundida por el Decreto y entendió que el *Offtake Agreement* fue expropiado, por lo que se exigía que los productos fueran entregados conforme a un nuevo acuerdo *ad hoc* para el futuro. La Demandada señala que no existen pruebas convincentes que respalden la posición de KNI. En última instancia, conforme las afirmaciones de la Demandada, FertiNitro (y no la Demandada) rescindió el *Offtake Agreement* por sus propias razones comerciales claramente manifestadas en el mes de febrero de 2012[345].

7.15   En cualquier caso, la Demandada sostiene además que el alegado tratamiento de los derechos de KNI respecto del *Offtake Agreement* no puede atribuirse a la Demandada en virtud del derecho internacional porque FertiNitro no formaba parte de la estructura orgánica de la Demandada, no ejercía facultades gubernamentales ni estaba bajo el control efectivo de la Demandada.  Pequiven fue la única entidad que gestionó administrativamente la adquisición de FertiNitro, sin ser en última instancia tenedora de los activos[346].

7.16   La rescisión del *Offtake Agreement* por parte de FertiNitro en el mes de febrero de 2012 constituyó una decisión comercial que no puede calificarse de expropiación en virtud del Artículo 6 del Tratado; ni puede dar lugar a ninguna responsabilidad en virtud del derecho internacional, ya que sería, a lo sumo, una violación contractual ordinaria por parte de FertiNitro que no puede equivaler a una "apropiación" de la Demandada de conformidad con el Tratado[347].

### *(4)    Análisis del Tribunal*

7.17   El punto de partida del Tribunal es necesariamente las políticas estatales de la Demandada sobre la seguridad alimentaria y la producción nacional de alimentos para el pueblo venezolano, anteriores al Decreto 7713 (Decreto de Expropiación de fecha 10 octubre de 2010).   Estas políticas son ostensiblemente loables, con orígenes que anteceden las inversiones de las Demandantes.  Según el Tribunal, salvo por el Decreto de Expropiación del 10 de octubre de 2010, no hay aspectos en estas políticas gubernamentales que, por sí mismas, constituyan una violación de los derechos de las Demandantes en virtud del

---

[345] Mem. C. Ven., Párrafos 181-184; Dúpl. Ven., Párrafo 237; EPA Ven., Párrafos 30-63.
[346] Mem. C. Ven., Párrafos 185-194; Dúpl. Ven., Párrafos 238-249; EPA Ven., Párrafos 64-65.
[347] Mem. C. Ven., Párrafos 195-200; Dúpl. Ven., Párrafos 250-251.

Artículo 6 del Tratado.  El Tribunal acepta que estas políticas fueron adoptadas por la Demandada de buena fe, con el fin público de alimentar al pueblo de Venezuela, de acuerdo con la ley venezolana y dentro de los límites de la racionalidad.

7.18   Además, no es función de este Tribunal cuestionar el diseño o la existencia de dichas políticas en virtud del Tratado, a menos que su ejecución por parte de la Demandada viole los derechos de KOMSA o KNI relativos al Tratado.  En tal sentido, en su carácter de Demandantes, KOMSA y KNI tienen la carga jurídica de probar sus respectivas alegaciones con respecto al Decreto de Expropiación y las declaraciones del Ministro.

7.19   Por lo tanto, la vara relativa a los reclamos de la Demandante es elevada en virtud del derecho internacional, tal como lo confirma la '*jurisprudence constante*' establecida a lo largo de muchos años.  Como fuera resuelto por el tribunal del TLCAN en el caso *Methanex c. EE.UU.*[348], una norma intencionalmente discriminatoria contra un inversionista extranjero puede satisfacer un requisito clave para establecer la expropiación.  Sin embargo, también concluyó:

> "[C]omo cuestión de derecho internacional general, una norma no discriminatoria para un fin público, promulgada de conformidad con el debido proceso y, que afecta, *inter alia*, a un inversionista o inversión extranjera no se considera expropiatoria y compensable a menos que se hubieran asumido compromisos específicos por parte del gobierno regulador al entonces inversionista extranjero putativo que contemplara la inversión con respecto a que el gobierno se abstendría de dicha norma". [Traducción del Tribunal]

Más recientemente, el tribunal del caso *Philip Morris c. Uruguay* decidió[349]:

> "Tal como indicaran decisiones anteriores al amparo de tratados de inversión, para que las acciones de un Estado en el ejercicio de sus potestades regulatorias no conformen una expropiación indirecta, las acciones deben cumplir ciertas condiciones. Entre aquellas mencionadas con mayor frecuencia se encuentra la condición de que las acciones se tomen de buena fe en aras de proteger el bienestar público, y deban ser no discriminatorias y proporcionadas".

---

[348] *Methanex Corporation c. Estados Unidos de América*, CNUDMI, Laudo Definitivo del Tribunal sobre Jurisdicción y Fondo (3 de agosto de 2005), Parte IV, Capítulo D, Página 4, Párrafo 7.

[349] *Philip Morris Brand Sàrl, Philip Morris Products S.A. y Abal Hermanos S.A. c. República Oriental del Uruguay*, Caso CIADI N.° ARB/10/7, Laudo (8 de julio de 2016), Párrafo 305.

7.20    En consecuencia, el estándar de revisión de la conducta de un Estado que ha de adoptar un
        tribunal internacional incluye una deferencia de hacia el Estado que formula la medida
        impugnada de medidas significativas.  Tal tribunal no puede ponerse simplemente en la
        posición del Estado y ponderar la medida desde cero, particularmente en retrospectiva.  En
        el caso *Lemire c. Ucrania*[350], el tribunal del CIADI se refirió al "derecho legítimo de
        Ucrania a sancionar legislación y adoptar medidas para proteger *lo que, como soberano,*
        *percibe como* su interés público" (Énfasis agregado).  También resolvió:

> *"Como Estado soberano, Ucrania posee el derecho inherente de regular sus asuntos*
> *y adoptar leyes en aras de proteger el bien común de su pueblo, tal como lo define el*
> *Parlamento y el Gobierno. La prerrogativa se extiende a la promulgación de normas*
> *que definen la propia política cultural del Estado [...]. La 'gran medida de deferencia*
> *que el derecho internacional generalmente extiende al derecho de las autoridades*
> *nacionales a regular las cuestiones dentro de sus propias fronteras' se refuerza en*
> *los casos en que el propósito de la legislación afecta los rasgos culturales o*
> *lingüísticos de la comunidad más arraigados".  (Énfasis omitido). [Traducción del*
> *Tribunal]*

El pasaje citado allí fue tomado del laudo del tribunal TLCAN en el caso *SD Myers c.*
*Canadá*[351].

7.21    Ese mismo pasaje sobre la deferencia fue adoptado por el tribunal en el laudo del caso
        *Saluka*[352]:

> *"Ningún inversionista puede razonablemente esperar que las circunstancias que*
> *prevalecen al momento en que se realiza la inversión permanezcan completamente*
> *sin cambios. A fin de determinar si la frustración de las expectativas del inversionista*
> *extranjero era justificada y razonable, también debe subsiguientemente tenerse en*
> *cuenta el derecho legítimo del Estado receptor de regular las cuestiones nacionales*
> *por causa del interés público. Tal como lo resolviera el tribunal del caso S.D. Myers,*
> *la determinación de un incumplimiento de la obligación de 'trato justo y equitativo'*
> *por parte del Estado receptor 'debe realizarse a la luz de la gran medida de*

---

[350] *Joseph Charles Lemire c. Ucrania*, Caso CIADI N.° ARB/06/18, Decisión sobre Jurisdicción y Responsabilidad (14 de enero de 2010) (CLA-89), Párrafos 273, 505.

[351] *S.D. Myers, Inc. c. Canadá*, CNUDMI, Laudo Parcial (13 de noviembre de 2000) (RLA-52), Párrafo 263.

[352] *Saluka Investments BV (Países Bajos) c. República Checa*, CNUDMI, Laudo Parcial (17 de marzo de 2006) (CLA-19), Párrafo 305.

*deferencia que el derecho internacional generalmente extiende al derecho de las autoridades nacionales a regular las cuestiones dentro de sus propias fronteras".*

7.22   La Demandada también citó pasajes de las decisiones correspondientes a los casos *Kardassopolous c. Georgia* y *LIAMCO c. Libia*. El primer caso registró la opinión del tribunal de que "la Demandada tiene derecho a una medida de deferencia" con respecto a la expropiación de los derechos del demandante "por causa del interés público georgiano"[353] [Traducción del Tribunal]. El segundo caso registró la decisión del tribunal de que "los motivos son indiferentes al derecho internacional, siendo cada Estado libre 'de juzgar por sí mismo lo que considera útil o necesario para el bien público [...]'"[354] [Traducción del Tribunal]. El Tribunal acepta esta declaración general como la línea máxima de la '*jurisprudence constante*' en materia de deferencia. En este caso, el Tribunal prefiere una marca inferior. Los motivos no son totalmente irrelevantes y pueden ser importantes para determinar si el acto de un Estado es ilícito. Si bien es inapropiado cuestionar los procesos de toma de decisiones de un Estado, por ejemplo, en lo que respecta a cuestiones de interés público, resulta pertinente analizar si tales procesos tomaban en cuenta esas cuestiones en el momento pertinente.

7.23   Según el Tribunal, incluso con esta marca inferior, las Demandantes (tanto KOMSA como KNI) no han probado la primera parte de su prueba de cuatro aristas, a saber, que las medidas en litigio no fueron tomadas por causas de interés público. En cuanto a los aspectos segundo y tercero relacionados con la discriminación y el debido proceso, los Demandantes también tienen la carga legal de la prueba. El Tribunal decide que las Demandantes no han probado sus alegaciones fácticas relacionadas con la discriminación. En cuanto al debido proceso, el Tribunal no considera que aquí se requirió notificación anticipada del Decreto de Expropiación - no bajo el Tratado, el derecho internacional consuetudinario o el derecho venezolano.

7.24   *KOMSA:* En lo que respecta a la cuarta arista, el Decreto de Expropiación 7713 y sucesos posteriores hablan en gran medida por sí mismos. El Decreto dispuso la adquisición

---

[353] *Kardassopolous c. República de Georgia*, Caso CIADI N.° ARB/05/18, Laudo (28 de febrero de 2010) (CLA-20), Párrafo 391.

[354] *Libyan American Oil Company (LIAMCO) c. República Árabe Libia*, Laudo, 20 I.L.M. 1 (12 de abril de 1977) (RLA-37), Párrafo 114.

inmediata de todos los activos de FertiNitro por parte de la Demandada el 11 de octubre de 2010. En caso de que existiera alguna ambigüedad en cuanto a sus términos o efectos (que el Tribunal descarta en cuanto a la participación de KOMSA en FertiNitro), las declaraciones públicas del Ministro de Energía y Petróleo de la Demandada, realizadas en la Planta FertiNitro también el 11 de octubre de 2010, confirmaron que la Demandada estaba adquiriendo, nacionalizando y tomando el control forzoso de todos los bienes de FertiNitro: el Tribunal se remite a sus conclusiones de la Parte V *supra*.  En ese momento, ninguna compensación fue pagada a KOMSA por la Demandada.  A pesar de las sugerencias de la Demandada en sentido contrario, todavía no se ha pagado ninguna compensación a KOMSA, más de 7 años más tarde.

7.25    En tales circunstancias, el Tribunal decide que la Demandada expropió indirectamente la participación de KOMSA en FertiNitro el 11 de octubre de 2010. A esa fecha, la Demandada debía haber cumplido con la condición expresa del Artículo 6, la cual le exigía (*inter alia*) tomar "medidas […] [para que una] compensación efectiva y adecuada" fuera pagada "sin demora" a KOMSA por su participación expropiada respecto de FertiNitro, en ese momento o subsiguientemente.  La Demandada no lo hizo.  No objeta a la declaración de que no se ha pagado en ningún momento una compensación a KOMSA, incluso a la fecha de este Laudo.  A partir del 11 de octubre de 2010, la participación de KOMSA en FertiNitro quedó completamente extinguida a todos los efectos prácticos: ninguno de los derechos asociados a su tenencia de acciones en FertiNitro (vía Koch José) podía ejercerse debido al control que ejercía la Demandada sobre la gestión de FertiNitro y a su toma de todos los activos de FertiNitro.

7.26    El Tribunal no considera que las posteriores ofertas de la Demandada de negociar una compensación con KOMSA (a través de Pequiven) cumplieran con la condición del Artículo 6, y menos cuando se recuerda que la Demandada no ha ofrecido ni pagado ni una pequeña parte de lo que consideraba indudablemente debido a KOMSA.  El Tribunal tampoco considera que la condición fuera cumplida por la oportunidad otorgada a KOMSA de involucrarse en procedimientos legales extensos e inciertos ante los tribunales de la Demandada en Venezuela, de conformidad con la legislación venezolana.  Tales procesos jurídicos fueron iniciados por Pequiven el 26 de julio de 2011 y no han llegado a ninguna

conclusión en relación con la compensación pagadera a KOMSA[355].  El Tribunal recuerda la sincera declaración realizada por la Demandada en la primera sesión de este arbitraje: "[...] como Estado, somos conscientes de que existe una expropiación y que toda expropiación requiere una compensación, una compensación justa [...]"[356] [Traducción del Tribunal]. Para KOMSA, la cuestión se entendía correctamente como el importe adecuado de compensación debido a KOMSA, no como la determinación de si existía o no una responsabilidad por parte de la Demandada de pagar una compensación a KOMSA en virtud del Artículo 6 del Tratado. Aun así, la Demandada no ofreció ninguna compensación a KOMSA.

7.27    La Demandada citó un pasaje del laudo CIADI en el caso *Venezuela Holdings, B.V. et al* (caso anteriormente conocido como *"Mobil Corporation, Venezuela Holdings B.V. et al"*), *c. Venezuela*, en el cual el tribunal resolvió:

> *"[…] el mero hecho de que un inversor no haya recibido compensación no convierte en sí mismo a una expropiación en ilegal. Pudo haberse realizado una oferta de compensación al inversor y, en tal caso, la legalidad de la expropiación dependerá de los términos de esa oferta.  Para decidir si una expropiación fue ilegal* [sic] *o no ante la ausencia del pago de una compensación, un tribunal debe considerar los hechos del caso"*[357].

Este Tribunal no rechaza dicho enfoque de la redacción del Artículo 6 del Tratado en cuestión en este arbitraje.  Sin embargo, en base a los hechos de este caso en particular, no existió tal oferta firme de compensación hacia KOMSA por parte de la propia Demandada, sino solamente negociaciones tardías, limitadas e infructuosas con diferentes cifras presentadas por Pequiven sujetas a mayor análisis y aprobación previa por parte de la Demandada.    Tales negociaciones no constituyeron "medidas […] [para que una] compensación efectiva y adecuada" fuera pagada "sin demora" a KOMSA, tal como lo exige el Artículo 6 del Tratado.

---

[355] Solicitud por Expropiación y Petitorio Provisional al Juzgado de Primera Instancia de la Circunscripción Judicial del Estado Anzoátegui (26 de julio de 2011) (R-36).

[356] Primera Sesión (21 de diciembre de 2011), Transcripción, pág. 103.

[357] *Venezuela Holdings, B.V. y otros c. República Bolivariana de Venezuela,* Caso CIADI N.° ARB/07/27, Laudo (9 de octubre de 2014) (RLA-153), Párrafo 301. (Este laudo fue parcialmente anulado por diferentes motivos; véase Decisión Sobre Anulación (9 de marzo de 2017), Párrafo 196.4)

7.28    En estas circunstancias de hecho, conforme al enfoque adoptado por el tribunal del caso *Mobil*, el Tribunal concluye que la Demandada no ha presentado una oferta significativa de compensación ni ha brindado ningún procedimiento significativo de compensación a KOMSA tal como exige el Artículo 6 del Tratado.

7.29    Por tales motivos, el Tribunal decide que la Demandada expropió ilícitamente e indirectamente la participación de KOMSA en FertiNitro el 11 de octubre de 2010 en violación del Artículo 6 del Tratado, tal como demuestran el Decreto de Expropiación 7713 y las declaraciones públicas del Ministro, de fecha 11 de octubre de 2010, atribuibles a la Demandada. En virtud de lo dispuesto en el Artículo 9(4) del Tratado (descripto en la Parte IV *supra*), el Tribunal confirma que dicha expropiación, según lo resuelto por el Tribunal, es ilícita debido a que la Demandada no cumplió con sus obligaciones en virtud del Artículo 6 del Tratado. Era una expropiación indirecta puesto que, como lo acepta el Tribunal, no había una transferencia formal de la propiedad de los bienes de FertiNitro hasta julio de 2011, conforme con el derecho venezolano, pero tenía, en tanto era una medida expropiatoria, el mismo efecto que una expropiación directa el 11 de octubre de 2010.

7.30    *KNI:* El Decreto de Expropiación 7713 dictado el 11 de octubre de 2010 no contó con una referencia expresa al *Offtake Agreement* ni a KNI. Sin embargo, el mismo día, el Ministro responsable de la ejecución del Decreto explicó su efecto inmediato en declaraciones públicas incompatibles con la ejecución futura del *Offtake Agreement* por parte de FertiNitro, conforme con sus términos existentes. Según lo explicara el Ministro, el efecto del Decreto se extendía más allá de los activos físicos de FertiNitro e incluía la derogación de cualquier restricción contractual existente sobre la entrega de los productos de FertiNitro en Venezuela por fuera del control total de la Demandada, principalmente en el caso del mercado nacional venezolano. De hecho, ese fue el motivo por el que la Demandada se apoderó de FertiNitro. En palabras del Ministro: "Con el control que el Estado venezolano va a tomar de esta planta, entonces tenemos garantizado toda la urea que necesiten nuestros campesinos, toda la urea que necesite nuestro sector productivo para sostener este plan extraordinario de siembra y para sostener el desarrollo de la nación" (véase Parte V *supra*). No tenía sentido que la Demandada se apoderara de los bienes de FertiNitro sin que la Demandada asumiera el control total y efectivo de toda su producción futura en Venezuela.

Por lo tanto, el Decreto 7713 y el discurso del Ministro deben tomarse en conjunto, como un acto compuesto.

7.31   En ese momento, ese fue el entendimiento de los funcionarios de Pequiven y de KNI. En su declaración testimonial oral, el Sr. Barrientos (de Pequiven) sostuvo que las referencias del Ministro, el 11 de octubre de 2010, al nuevo suministro de la Demandada de 1,5 millones de toneladas de fertilizantes para la Demandada, se referían a la producción total de FertiNitro de 1,5 millones de toneladas[358]. El Sr. Gwaltney (testigo de KNI) también entendió, tal como lo confirmara el 12 de octubre de 2010 el Sr. Inciarte (entonces Presidente de FertiNitro y Presidente de Pequiven), que la Demandada había tomado el completo control de FertiNitro[359]. El Sr. Parra (de KNI) también entendió del Sr. Inciarte "que el offtake de KNI también seria expropiado por el Gobierno"[360]. El Sr. Inciarte no fue ofrecido por la Demandada como testigo en este arbitraje.

7.32   Sin embargo, la Demandada se enfrentaba ahora a un problema significativo con los tenedores de bonos y los bancos prestamistas de FertiNitro, para quienes el producto de la venta pagado por KNI conforme al *Offtake Agreement* operaba como garantía. Para evitar un incumplimiento, con posibles amplias ramificaciones para FertiNitro y la Demandada en ese momento, la Demandada (a través de Pequiven) invitó a KNI a continuar comprando el producto de FertiNitro.

7.33   El primer intercambio pertinente entre FertiNitro y KNI fue la carta de fecha 26 de noviembre de 2010 remitida por el Sr. Edgar Alonso Flóres (gerente comercial de FertiNitro) al Sr. Strand (en nombre de KNI) en la que se confirmaba "la continuación del *Offtake Agreement* en virtud del cumplimiento de cada cláusula [...]"[361] [Traducción del Tribunal].Fue seguido por la carta de fecha 1 de diciembre de 2010 del Sr. Perdomo (gerente general de FertiNitro) también al Sr. Strand (testigo para KNI), confirmando "la

---

[358] Primera Audiencia (septiembre), D3.99-101.
[359] Declaración Testimonial de Brent W. Gwaltney (30 de mayo de 2012) ("Gwaltney DT1"), Párrafo 122.
[360] Declaración Testimonial de Melquíades A. Parra (29 de mayo de 2012) ("Parra WS1"), Párrafo 73.
[361] Correo electrónico de E. Flores a J. Strand in re:  FertiNitro (26 de noviembre de 2010) (C-111).

continuación y el cumplimiento del *Offtake Agreement*"[362] [Traducción del Tribunal]. (Ambas cartas se citan en mayor grado de detalle en la Parte V *supra*).

7.34 En cuanto a esta primera carta, el Sr. Flóres declaró que FertiNitro no tenía ningún producto disponible para su entrega a KNI en octubre de 2010 debido a que la Planta de FertiNitro estaba cerrada: y que el Sr. Perdomo le había solicitado enviar su carta al KNI[363]. En cuanto a esta segunda carta, el Sr. Perdomo no fue presentado por la Demandada como testigo en este arbitraje.

7.35 El próximo intercambio relevante se produjo con la visita del Sr. García (de Pequiven y miembro del consejo de administración *ad hoc* de FertiNitro) a los Sres. Gwaltney y Parra (de KNI) el 2 de diciembre de 2010. El Sr. Gwaltney declaró: "[El Sr. García] [r]ecalcó que su tarea principal era mantener la estabilidad en FertiNitro mientras que se gestaban las negociaciones de Pequiven con los prestamistas para repagar la deuda pendiente. Dijo que Pequiven quería que KNI tomara producto de FertiNitro hasta que Pequiven hubiera llegado a algún acuerdo con los prestamistas para prevenir el caer en una situación de impago. Agregó que una vez que se llegara a un acuerdo con los prestamistas, Pequiven trabajaría para compensar a los accionistas y asumiría la obligación de KNI de comprar el producto"[364]. El Sr. Parra declaró en términos similares: "Nos dijo que Pequiven quería que KNI siguiera llevándose el producto de FertiNitro hasta que Pequiven hubiese llegado a una resolución con los prestamistas y los tenedores de bonos. Agregó que una vez que se avanzara un acuerdo con los prestamistas y tenedores de bonos, Pequiven se dedicaría a compensar a los accionistas y compraría la parte del offtake correspondiente a KNI"[365]. El Sr. García no fue ofrecido por la Demandada como testigo en este arbitraje.

7.36 En respuesta a la correspondencia de Pequiven y la visita de García, el Sr. Gwaltney escribió el mensaje de correo electrónico de KNI, de fecha 3 de diciembre de 2010, al Sr. Perdomo (de FertiNitro), que fue citado nuevamente en la Parte V *supra*[366]. Se puede

[362] Carta de J. Perdomo a J. Strand (1 de diciembre de 2010) (C-112).
[363] Primera Audiencia (septiembre), D4.74 y *ss*.
[364] Gwaltney DT1, Párrafo 126.
[365] Parra DT1, Párrafo 75.
[366] Correo electrónico de B. Gwaltney a J. Perdomo, con copia a J. Strand, T. Parra, F. Garcia re: KNI Offtake (3 de diciembre de 2010) (C-113).

suponer que, para ambas partes, los abogados estaban ahora involucrados activamente en la redacción o el control de toda la correspondencia entre Pequiven y KNI. Las palabras ahora importaban para todas las partes; sin embargo, conforme la opinión del Tribunal, la conducta contemporánea de las partes es más significativa, vista objetivamente.

7.37    El Sr. Flóres (de FertiNitro) vio el correo electrónico enviado por el Sr. Gwaltney al Sr. Perdomo "[d]ías después que lo recibió el Sr. Perdomo"[367].Confirmó que ni él ni nadie en FertiNitro respondió al Sr. Gwaltney ni formuló ninguna objeción a KNI con respecto a su correo electrónico[368]. Si FertiNitro no estaba de acuerdo con el entendimiento de KNI respecto a la posición después de los acontecimientos del 11 de octubre de 2010, FertiNitro debería haberlo dicho en ese momento antes de que las entregas a KNI se reiniciaran al final del 2010. No se presentaron pruebas ante este Tribunal de que la omisión de FertiNitro derivara de cualquier inadvertencia o error. En estas circunstancias, KNI podía razonablemente entender, como lo hizo, que FertiNitro compartía la comprensión de KNI de la situación.

7.38    En los casos en que sus relatos difieren en relación con estos diversos hechos, la mayoría del Tribunal considera más convincente la declaración testimonial del Sr. Gwaltney y el Sr. Parra convocados por KNI sobre los testigos de hecho llamados por la Demandada.

7.39    A partir del 3 de diciembre de 2010, la mayoría del Tribunal observó que KNI retiró una cantidad de producto de FertiNitro bajo los términos del mensaje de correo electrónico del Sr. Gwaltney, de fecha 3 de diciembre de 2010, durante unos 15 meses, y alcanzó un total de aproximadamente 333.000 toneladas de amoniaco y 650.000 toneladas de urea. Dicha repartición del producto cesó con la carta de FertiNitro de fecha 28 de febrero de 2012, firmada por el Sr. Hernández (en su carácter de presidente del consejo de administración *ad hoc* de FertiNitro)[369].  Esta carta fue redactada con el asesoramiento jurídico del Sr. Barrientos, tal como confirmara en su declaración testimonial[370]. El Sr. Barrientos también declaró, algo descontento, que FertiNitro hubiera continuado vendiendo productos a KNI,

---

[367] Primera Audiencia (septiembre), D4.76.
[368] Primera Audiencia (septiembre), D4.76-77.
[369] Carta de B. Hernández a Koch Oil SA y Koch Nitrogen Company re: *Offtake Agreement* (28 de febrero de 2012) (C-114).
[370] Primera Audiencia (septiembre), D3.69.

de no haber sido por el Decreto de Expropiación y la renuncia del directorio de FertiNitro[371]. El Sr. Hernández no fue ofrecido por la Demandada como testigo en este arbitraje. (Los términos relevantes de esta carta también se recitan en la Parte V *supra*).

7.40   La carta de FertiNitro de fecha 28 de febrero de 2012 no fue expresada como una rescisión del *Offtake Agreement*. Anunciaba que FertiNitro ya no vendería su producto a KNI en virtud del *Offtake Agreement*, "todo en cumplimiento de lo establecido en el [Decreto de Expropiación] mediante el cual se ordena la adquisición forzosa de los bienes muebles e inmuebles […]". Al parecer, en dicho momento, FertiNitro y la Demandada ya no corrían el riesgo de incumplimiento respecto de los tenedores de bonos y los bancos, ya que FertiNitro aparentemente había satisfecho la deuda con sus prestamistas para el mes de diciembre de 2011, siguiendo el Acuerdo *Stand Still* de diciembre de 2010 (no presentado por la Demandada en este arbitraje). Por lo tanto, pareciera que los ingresos de venta de KNI ya no eran necesarios para evitar un acto de incumplimiento por parte de FertiNitro. No queda claro para la mayoría del Tribunal, en base a las pruebas disponibles en este arbitraje, que el *Offtake Agreement* fuera rescindido en febrero de 2012, ya sea por FertiNitro, Pequiven o la Demandada (no fue rescindido por KNI). Lo que se extinguió fue el arreglo *ad hoc* descrito en el mensaje de correo electrónico del Sr. Gwaltney de fecha 3 de diciembre de 2010.

7.41   A juicio de la mayoría del Tribunal, existe una diferencia sustancial entre la posición de las partes bajo el *Offtake Agreement* antes de la expropiación el 11 de octubre de 2010 y su posición posterior al 28 de febrero de 2012 en los términos del correo electrónico del Sr. Gwaltney de fecha 3 de diciembre de 2010.

7.42   El Sr. Parra (del grupo de empresas Koch y ex director de FertiNitro) declaró respecto de esta diferencia para el período iniciado el 11 de octubre de 2010[372]:

> "Ya no había Contrato Offtake. Comprábamos según el Mercado Spot. Para mí las cosas estaban ya clarísimas. Esto era un acuerdo estilo Spot, y ya no un Contrato de Offtake. Si Ud. quiere, se lo explico. Las condiciones de compra eran muy distintas de las condiciones de compra anteriores, que correspondían, por supuesto, al

---

[371] Primera Audiencia (septiembre), D3.76-77.
[372] Primera Audiencia (septiembre), D2.80-81.

*Contrato Offtake. Ahora, teníamos la obligación de comprar según el Mercado Spot. El suministrador no tenía la menor obligación de suministro efectivo del producto. El mecanismo de precio, las dos partes, se pusieron de acuerdo para que fuese el mismo mecanismo, pero fue esta una cuestión sencillamente práctica, porque la fórmula había funcionado hasta ese entonces, y se decidió continuar con la misma fórmula. Pero las ventas no eran en absoluto lo mismo que antes de la expropiación. No había periodos específicos en juego, no había obligación de compra, no había obligación de tomar el producto. Era un contratado de naturaleza totalmente distinta a la del Contrato Offtake".*

7.43    El cambio significó que, con el control pleno de FertiNitro y su producción por parte de la Demandada, KNI perdió toda garantía contractual de suministro de FertiNitro. Así pues, KNI no pudo optimizar las futuras ventas de productos ni optimizar los futuros acuerdos de transporte de mercancías.  Tal como declarara el Sr. Parra, la modificación exigía que KNI actuara, efectivamente, en el mercado *spot*. Esta operación disminuida mitigó las pérdidas resultantes de KNI, hasta el 28 de febrero de 2012; no obstante, si bien es pertinente para la evaluación de la compensación (que se aborda en la Parte IX *infra*), no puede afectar la cuestión de la responsabilidad al 11 de octubre de 2010.  Conforme la opinión de la mayoría del Tribunal, los derechos de KNI relativos al *Offtake Agreement* fueron anulados a partir del 11 de octubre de 2010.

7.44    Independientemente de las numerosas sugerencias en sentido contrario, incluida la oferta provisional de compensación del Sr. García de fecha 2 de diciembre de 2010 (tal como sea describiera *supra*), la Demandada no ha presentado ninguna oferta significativa de compensación ni proporcionado ningún procedimiento significativo de compensación a KNI conforme lo exige el Artículo 6 del Tratado.

7.45    Así como el *Offtake Agreement* formaba parte integral de la inversión única de las Demandantes en el proyecto FertiNitro (inicialmente ambas realizadas por KOMSA), también fue objeto de la expropiación de la Demandada, que comprendía tanto la participación de KOMSA en FertiNitro como los derechos de KNI relativos al *Offtake Agreement*. A partir del 11 de octubre de 2010, FertiNitro estuvo completamente controlada y permanentemente impedida por la Demandada para cumplir con sus obligaciones respecto de KNI en virtud del *Offtake Agreement*, salvo y en la medida en que la Demandada pudiera permitir a FertiNitro vender productos a KNI en términos

sustancialmente diferentes de los proporcionados por el *Offtake Agreement*; es decir, en los términos del correo electrónico del Sr. Gwaltney de fecha 3 de diciembre de 2010. A raíz de los sucesos del 11 de octubre de 2010, FertiNitro, su producción y ventas quedaron sujetas al pleno y efectivo control de la Demandada debido a la nacionalidad venezolana de FertiNitro y su ubicación en Venezuela, con el lugar de ejecución del *Offtake Agreement* por parte de FertiNitro también ubicado en Venezuela.

7.46   El 28 de febrero de 2012, mediante una referencia expresa al Decreto de Expropiación, la Demandada (a través de Pequiven y FertiNitro) dejó de permitir tales ventas a KNI. FertiNitro permaneció plena y efectivamente controlada por la Demandada, por lo que la Demandada no le permitió a FertiNitro realizar nuevas ventas *ad hoc* a KNI a partir del 28 de febrero de 2012, de la misma manera en que se le había impedido ejecutar el *Offtake Agreement* a partir del 11 de octubre de 2010.   A lo largo de todo esto, por lo tanto, FertiNitro (con Pequiven) actuaron bajo la "dirección o control" de la Demandada en el sentido del Artículo 8 de los Artículos de la CDI sobre la Responsabilidad del Estado.

7.47   El Tribunal no considera que el *Offtake Agreement* pueda ser tratado como un mero acuerdo de venta *offshore* no relacionado con la participación de KOMSA en FertiNitro. Es necesario considerar las medidas de la Demandada de fecha 11 de octubre de 2010 como la expropiación indirecta de una sola inversión integrada. Tal como resolviera el tribunal CIADI del caso *Electrabel c. Hungría*[373]:

> *"Si fuera posible analizar con facilidad una inversión en varias partes componentes, cada una formando una inversión [...] separada, se convertiría en insignificante el enfoque del tribunal [en el caso Tecmed] relativo a la expropiación indirecta basada en la 'privación radical' y la 'privación de cualquier objeto real' por ser similar en efecto a una expropiación directa o nacionalización. También significaría, absurdamente, que un inversionista siempre podría cumplir la prueba de la expropiación indirecta dividiendo su inversión en tantas partes como las circunstancias particulares lo requiriesen, sin que la inversión en su conjunto pudiera cumplir jamás esa misma prueba". [Traducción del Tribunal]*

---

[373] *Electrabel S.A. c. República de Hungría*, Caso CIADI N.° ARB/07/19, Decisión sobre Jurisdicción, Derecho Aplicable y Responsabilidad (30 de noviembre de 2012) (RLA-110) Párrafo 6.57.

7.48    La mayoría del Tribunal considera tanto la inversión original de KOMSA como el *Offtake Agreement* como un paquete unitario.  Al igual que la inversión original no habría tenido lugar sin el *Offtake Agreement*, la expropiación del 11 de octubre de 2010 no se limitaba a los activos físicos ni a los accionistas de FertiNitro, tal como expresan las declaraciones públicas del Ministro al explicar el efecto previsto del Decreto de Expropiación.  La inversión de KNI no puede ser cortada y aislada, como un trozo de salchicha.

7.49    Por otra parte, la mayoría del Tribunal no considera que se trate de un caso en el que los derechos de KNI relativos al *Offtake Agreement* (por razón de su legislación aplicable extranjera y sede arbitral extranjera) no podrían ser objeto de ningún reclamo con arreglo al Artículo 6 del Tratado contra la Demandada debido a que cualquier reclamo de KNI sólo podría ser un reclamo contractual contra FertiNitro, sujeto a una ley sustantiva extranjera y, en teoría, con un recurso arbitral en un país extranjero.  Tal como KNI ha puesto de manifiesto desde el inicio de este arbitraje, su reclamo es presentado contra la Demandada en virtud del Tratado y el derecho internacional y no como un reclamo contractual contra su co-contratista, FertiNitro, en virtud de cualquier ley nacional.  La Demandada nunca fue parte del *Offtake Agreement*; los procedimientos nacionales e internacionales resultan de diferentes causas de acción con diferentes formas de reparación bajo diferentes sistemas jurídicos aplicables; y en este caso no existe satisfacción de una triple prueba de identidad. En este caso, tal recurso contractual (si es que en la práctica existía) no extingue el recurso de KNI contra la Demandada por la expropiación indirecta de sus derechos relativos al *Offtake Agreement* conforme al Artículo 6 del Tratado, conforme lo alegado por KNI.

7.50    En tal sentido, no es necesario enumerar aquí la larga lista de laudos desde *Vivendi Anulación I* en adelante, que distingue consistentemente entre un reclamo contractual y un reclamo al amparo de un tratado en un arbitraje CIADI u otro arbitraje internacional inversionista-Estado[374].  El reclamo de KNI basado en el Artículo 6 es manifiestamente un reclamo al amparo de un tratado formulado en virtud del Tratado contra la Demandada y no un reclamo contractual en virtud del *Offtake Agreement* contra FertiNitro.  Es igualmente innecesario enumerar los materiales jurídicos que establecen que el derecho

---

[374] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. c. República Argentina*, Caso CIADI N.° ARB/97/3, Laudo (21 de noviembre de 2000); *véase también* Christoph H. Schreuer et al, The ICSID Convention: A Commentary (2nd ed., 2009), 73 y *ss*.

internacional general prohíbe la expropiación ilícita de derechos contractuales, tanto directa como indirectamente, como así también lo hace el Tratado[375].  En virtud del Tratado, por ende, no existen motivos para anular los derechos del inversionista extranjero respecto de la ejecución de su contrato por su contraparte, cuando dicha ejecución ha sido deliberadamente frustrada y despojada de valor por el Estado receptor en el lugar de ejecución mediante el ejercicio ilícito de una facultad *iure imperii* dentro del propio territorio del Estado.

7.51    En estas circunstancias, el Tribunal decide (por mayoría) que la Demandada expropió ilícita e indirectamente los derechos de KNI relativos al *Offtake Agreement* el 11 de octubre de 2010 en violación del Artículo 6 del Tratado, tal como demuestran el Decreto de Expropiación 7713 y las declaraciones públicas del Ministro, ambos de fecha 11 de octubre de 2010, atribuibles a la Demandada.  Así lo confirmó la carta de FertiNitro de fecha 28 de febrero de 2012, en la que se hacía referencia al "cumplimiento de lo establecido en el [Decreto de Expropiación] mediante el cual se ordena la adquisición forzosa de los bienes muebles e inmuebles"[376].  Al igual que en el caso de KOMSA, en virtud de lo dispuesto en el Artículo 9(4) del Tratado, el Tribunal (por mayoría) confirma que dicha expropiación es ilícita porque la Demandada violó las obligaciones que le incumben en virtud del Artículo 6 del Tratado.

7.52    Es evidente, pero es preferible confirmarlo expresamente, que el Tribunal ha hecho todo lo posible para comprender, quizás durante demasiado tiempo, el razonamiento diferente de sus miembros, tanto en lo que respecta a la responsabilidad de la Demandada por el reclamo de KNI como también (como se verá en la Parte IX *infra*) la cuantía del reclamo de KNI, si se asume dicha responsabilidad.  Aunque la discrepancia de la minoría plantea factores que no se encuentran en la primera línea de los argumentos respectivos de las Partes, lamentablemente estas diferencias persisten entre la mayoría y la minoría del Tribunal; y,

---

[375] *Véase, por ejemplo*, Caso *The Norwegian Shipowners (Noruega c. Estados Unidos)*, RIAA (13 de octubre de 1922), Volumen I, Página 307 (1948), 325; *Southern Pacific Properties (Middle East) Limited c. República Árabe de Egipto*, Caso CIADI N.° ARB/84/3, Laudo (20 de mayo de 1992), Párrafo 165; y *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. c. República Islámica de Pakistán*, Caso CIADI N.° ARB/03/29, Decisión sobre Jurisdicción (14 de noviembre de 2005) (CLA-11), Párrafo 255.

[376] Carta de B. Hernández a Koch Oil SA y Koch Nitrogen Company re: *Offtake Agreement* (28 de febrero de 2012) (C-114).

como es su derecho, la minoría ha asentado su desacuerdo con la mayoría en una opinión disidente adjunta a este Laudo, tal como lo requiere la Regla 47(3) de las Reglas de Arbitraje CIADI[377].

**(5)    Decisiones del Tribunal**

7.53    *KOMSA:* El Tribunal decide que la Demandada es responsable ante KOMSA respecto de su reclamo por la violación por parte de la Demandada del Artículo 6 del Tratado el día 11 de octubre de 2010.

7.54    *KNI:* El Tribunal (por mayoría) decide que la Demandada es responsable ante KNI respecto de su reclamo por la violación por parte de la Demandada del Artículo 6 del Tratado el día 11 de octubre de 2010.

---

[377] La génesis de la disidencia del árbitro disidente puede encontrarse en A. Mann 'State Contracts and State Responsibility' in *Studies in International Law* (OUP, 1973), citado en la disidencia de la minoría.

*PARTE VIII: CUESTIONES AJENAS A LA EXPROPIACIÓN*

**(1)    Introducción**

8.1    Las "Pérdidas Históricas" de KOMSA se presentan como reclamos contra la Demandada en virtud del Artículo 4(1), del Artículo 4(2) y del Artículo 11(2) del Tratado. Comprenden las pérdidas supuestamente sufridas por KOMSA resultantes de las pérdidas supuestamente sufridas originalmente por FertiNitro, a causa de: (i) impuestos nuevos y más altos, (ii) el incumplimiento con el pago (o pago tardío) de créditos tributarios en razón del IVA, (iii) el efecto del Decreto de la Urea y la Resolución de la Urea y (iv) la interferencia en la actividad comercial de FertiNitro.

8.2    La compensación total reclamada por KOMSA en concepto de sus "Pérdidas Históricas" asciende a USD 42 millones. Para KOMSA, el Sr. Giles calcula el desglose de este importe total de la siguiente manera: (i) USD 4,7 millones para el aumento de los impuestos nacionales y USD 5,4 millones para el nuevo Impuesto de Ciencia y Tecnología; (ii) USD 7,7 millones para el IVA; (iii) USD 22,4 millones como resultado para el Decreto de la Urea y la Resolución de la Urea; y (iv) en cuanto a la interferencia en la actividad comercial de FertiNitro, el Sr. Giles no ofrece ninguna cifra específica[378].

8.3    Para la Demandada, el Dr. Flores no ofrece ninguna cifra específica de "Pérdidas Históricas". Sin embargo, en relación con el IVA, el Dr. Flores declaró que incluyó los créditos del IVA, de FertiNitro, que estaban pendientes, como capital circulante dentro de sus cálculos de FCD para la participación expropiada de KOMSA en FertiNitro (sin llegar a una cifra específica individual). El Dr. Flores también testificó que KOMSA no tuvo pérdida alguna a partir de la devaluación de la moneda de Venezuela con respecto a créditos del IVA porque FertiNitro utilizó sus créditos del IVA con el fin de abonar impuestos locales en moneda venezolana[379].

---

[378] EPA Koch, Tabla 4, "Puntos de Desacuerdo - Pérdidas Históricas" (descriptos a continuación en la Parte IX).

[379] Informe Pericial de Daniel Flores (28 de febrero de 2013) ("Flores IP1"), Párrafo 168; Segundo Informe Pericial de Daniel Flores (3 de marzo de 2014) ("Flores IP2"), Párrafo 240.

8.4     El Tribunal resume a continuación los argumentos respectivamente planteados por KOMSA y la Demandada, en cuanto a la ley aplicable y los hechos. A continuación, aborda a su vez el fondo de cada reclamo. Existe una superposición significativa en cuanto a las bases legales y fácticas de los reclamos de KOMSA.

**(2)     *El Estándar de TJE - Artículo 4(1) del Tratado***

8.5     ***El argumento de KOMSA****: En síntesis, en cuanto al derecho, KOMSA aduce que el estándar de TJE de conformidad con el Artículo 4(1) protege las expectativas legítimas de los inversionistas en relación con su inversión[380], mediante cita del caso *Tecmed c. México*[381]. Concluye que los Estados no deben frustrar las expectativas legítimas de un inversionista de que no actuará de manera arbitraria o inconsistente con su marco legal y, más en general, que las modificaciones del marco jurídico, regulatorio y comercial en el que confió el inversionista constituyen una violación del estándar de TJE, y cita además los casos *Thunderbird c. México*[382],*Occidental c. Ecuador*[383],y *National Grid c. Argentina*[384]. KOMSA aduce también que, de conformidad con el estándar de TJE, el requisito de transparencia y equidad procesal incluye la apertura en el proceso de toma de decisiones de un Estado en relación con las inversiones, así como la participación de los inversionistas en ese proceso[385], y cita a tal efecto los casos *Tecmed c. México* y *Waste Management c. México*[386].

8.6     KOMSA invoca también, en virtud del estándar de TJE, el requisito de mantener un entorno jurídico y empresarial estable y predecible, lo cual se superpone con los requisitos relativos a la expectativa legítima y la transparencia[387], al citar los casos *CMS c. Argentina*[388], *LG&E*

---

[380] Mem. Koch, Párrafos 242-253.

[381] *Técnicas Medioambientales Tecmed, S.A. c. Estados Unidos Mexicanos*, Caso CIADI N.° ARB (AF)/00/2, Laudo (29 de mayo de 2003) (CLA-28).

[382] *International Thunderbird Gaming Corp. c. Estados Unidos Mexicanos*, CNUDMI (TLCAN), Laudo (26 de enero de 2006) (CLA-31).

[383] *Occidental Exploration and Production Co. c. República del Ecuador*, CNUDMI (LCIA) Caso N.° UN 3467, Laudo Definitivo (1 de julio de 2004) (CLA-27).

[384] *National Grid P.L.C. c. República Argentina*, CNUDMI, Laudo (3 de noviembre de 2008) ("*National Grid c. Argentina*") (CLA-32).

[385] Répl. Koch, Párrafos 242-245; 278-283; Répl. Koch, Párrafos 232-233.

[386] *Waste Management, Inc. c. Estados Unidos Mexicanos,* Caso CIADI N.° ARB(AF)/00/3, Laudo (30 de abril de 2004) (CLA-34).

[387] Mem. Koch, Párrafos 293-299.

[388] *CMS Gas Transmission Co c. República Argentina,* Caso CIADI N.º ARB/01/8, Laudo (12 de mayo de 2005) (CLA-36), Párrafo 276 (anulado parcialmente).

*c. Argentina*[389], *PSEG c. Turquía*[390] y *Bayindir c. Pakistán*[391]. KOMSA invoca el requisito de coherencia, al citar el caso *Tecmed*, siendo aplicable a todas las partes constitutivas del Estado[392]; y el requisito de que los Estados no deben abusar de su autoridad[393].

8.7    En cuanto a los hechos, KOMSA alega las siguientes violaciones del estándar de TJE del Tratado[394]:

8.8    *Impuestos:* La Demandada impuso una serie de impuestos nuevos y más altos a FertiNitro que perjudicaron su rentabilidad en perjuicio de KOMSA, a saber, el nuevo Impuesto de Ciencia y Tecnología (2% de los ingresos brutos que en última instancia causó que FertiNitro pagara USD 22,35 millones desde el año 2006 hasta el mes de  octubre 2010) y el aumento de los impuestos municipales (del 1 al 4%, lo que eventualmente generó que FertiNitro abonara USD 18,82 millones también desde el año 2006 al mes de octubre de 2010)[395].

8.9    *IVA:* La Demandada repetidamente no otorgó, ya sea prontamente o en absoluto, créditos del IVA a FertiNitro desde el año 2005, lo que eventualmente resultó en una deuda por parte de la Demandada en favor de FertiNitro de USD 28,3 millones en créditos del IVA[396].

8.10    *Decreto de la Urea y Resolución de la Urea:* Estas nuevas normas relativas a la urea afectaron a FertiNitro desde el año 2007.La Demandada había dado garantías a un tercero (METOR) de que estas nuevas normas no se aplicarían a las empresas existentes, tales como FertiNitro. Dicha imposición interfirió con la fijación de precios de los productos de FertiNitro y, también, con la asignación de los mercados de exportación entre FertiNitro y Pequiven en virtud del *Offtake Agreement*[397].

---

[389] *LG&E Energy Corp., LG&E Capital Corp. y LG&E International Inc. c. República Argentina*, Caso CIADI N.º ARB/02/1, Decisión sobre Responsabilidad (3 de octubre de 2006) (CLA-39), Párrafo. 131.
[390] *PSEG Global Inc. y Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi c. República de Turquía*, Caso CIADI N.º ARB 02/5, Laudo (19 de enero de 2007) (CLA-40) Párrafo 254.
[391] *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. República Islámica del Pakistán,* Caso CIADI N.º ARB/03/29, Decisión sobre Jurisdicción (14 de noviembre de 2005) (CLA-11), Párrafo 240.
[392] Mem. Koch, Párrafos 311-313.
[393] Mem. Koch, Párrafo 316.
[394] EPA Koch, Párrafos 103-108.
[395] Mem. Koch, Párrafos 256-260.256-260, 285, 315, 318; Répl. Koch, Párrafos 220-225; 236-240.
[396] Mem. Koch, Párrafos 261-267, 285, 286-288, 300-304, 315, 318; Répl. Koch, Párrafos 226-227; 241-242.
[397] Mem. Koch, Párrafos 268-277, 305-310, 315, 319-324; Répl. Koch, Párrafos 228-231, 243-244; EPA Koch, Párrafo 103.

8.11   *Interferencia:* La Demandada interfirió progresivamente con la gestión, las operaciones y la rentabilidad de FertiNitro, si bien KOMSA había recibido garantías de que Pequiven actuaría exclusivamente en carácter de "socio comercial". Como ejemplo, los Demandantes se refieren al Informe del Comisario del 7 de septiembre de 2006[398], como prueba de la interferencia indebida en la actividad comercial de FertiNitro. La Demandada expropió en última instancia la participación de KOMSA en FertiNitro de manera ilícita en el mes de octubre de 2010[399]. (El Tribunal ya ha analizado este reclamo de expropiación con arreglo al Artículo 6 del Tratado, en la Parte VII *supra*, por lo cual no es necesario volver a hacerlo aquí).

8.12   ***El argumento de la Demandada:*** En síntesis, en cuanto al derecho, la Demandada aduce que KOMSA se basa en una definición demasiado general del estándar de TJE, ignorando así tanto el texto del Tratado como el derecho internacional[400]. La Demandada hace hincapié en la redacción "de conformidad con las normas y criterios del Derecho Internacional" del Artículo 4(1) del Tratado. También cita las decisiones[401] de los casos *Lauder c. República Checa*[402], *Glamis Gold c. EE.UU.*[403] *y El Paso c. Argentina*[404]. Afirma que los estándares de TJE redactados de la misma forma en estos casos se interpretaron correctamente como el estándar mínimo bajo derecho consuetudinario internacional. La Demandada también se basa en la decisión del caso *Flughafen c. Venezuela* (en el cual se analizó el mismo Tratado), y alega que el tribunal de dicho caso interpretó el Artículo 4(1) del Tratado como el estándar mínimo en virtud del derecho internacional consuetudinario[405].

8.13   La Demandada cuestiona que KOMSA se base en la formulación general del estándar de TJE del caso *Tecmed*. Afirma que el laudo del caso *Tecmed* ha sido ampliamente criticado

---

[398] Informe del Comisario (C-63).
[399] Mem. Koch, Párrafos 289-292, 315; EPA Koch, Párrafo 103.
[400] Mem. C. Ven., Párrafo 202.
[401] Mem. C. Ven., Párrafos 204-207.
[402] *Ronald S. Lauder c. República Checa*, CNUDMI, Laudo Definitivo (3 de septiembre de 2001) ("*Lauder c. República Checa*") (CLA-45).
[403] *Glamis Gold, Ltd. c. Estados Unidos de América*, CNUDMI, Laudo (8 de junio de 2009) (RLA-83).
[404] *El Paso Energy International Company c. República Argentina*, Caso CIADI N.° ARB/03/15, Laudo (31 de octubre de 2011) ("*El Paso c. Argentina*") (CLA-52).
[405] *Flughafen Zurich A.G. y Gestión e Ingeniería IDC S.A. c. República Bolivariana de Venezuela*, Caso CIADI N.° ARB/10/19, Laudo (18 de noviembre de 2014) ("*Flughafen c. Venezuela*") (RLA-154).

y que contradice la redacción expresa del Artículo 4(1) del Tratado. Rechaza también otras decisiones citadas por KOMSA como inapropiadas debido a que los estándares de TJE en dichos casos no se refieren expresamente al derecho internacional consuetudinario, como en el presente caso. La Demandada concluye que, incluso al adoptar una interpretación amplia del estándar de TJE, KOMSA no articula las fuentes probatorias relativas a sus expectativas ni respecto de cómo esas expectativas eran, de hecho, legítimas[406].

8.14    Generalmente, al igual que con todas las "Pérdidas Históricas" de KOMSA, la Demandada sostiene que las supuestas pérdidas de KOMSA no son posibles de ser recuperadas bajo el Tratado, a menos que KOMSA pruebe que las acciones presuntamente ilícitas de la Demandada afectaron la propia situación financiera de KOMSA (como "daños trasladados"), y que no sólo afectaron a FertiNitro (lo cual, respecto de ambos, es negado por la Demandada). La Demandada arguye que KOMSA no ha podido probar que sufrió pérdidas propias, tales como la pérdida de dividendos en su carácter de accionista minoritario indirecto en FertiNitro.

8.15    La Demandada niega las alegaciones de hecho presentadas por KOMSA, de la siguiente manera:

8.16    *Impuestos*: La Demandada afirma que las medidas tributarias nuevas e incrementadas no violan el estándar de TJE debido a que KOMSA no podía tener ninguna expectativa legítima de que las tasas de impuestos permanecerían sin cambios a falta de declaraciones o compromisos específicos de la Demandada. No existieron tales declaraciones ni garantías; tampoco ningún acuerdo de estabilización celebrado entre KOMSA (o FertiNitro) y la Demandada[407]. Además, la Demandada sostiene que el aumento de esos impuestos no fue ni flagrante ni alarmante. La Demandada se refiere a las decisiones de los

---

[406] Mem. C. Ven., Párrafos 204-217; Dúpl. Koch, Párrafos 252-274; EPA Ven., Párrafos 116-121.
[407] Dúpl. Ven., Párrafos 279, 515.

casos *Paushok c. Mongolia*[408], *EnCana c. Ecuador*[409]*, EDF c. Rumania*[410] y *El Paso c. Argentina*[411].

8.17   La Demandada sostiene además que las medidas fiscales eran transparentes y que no eran procesalmente injustas; asimismo, KOMSA no señaló ninguna prueba que pudiera demostrar lo contrario. Además, la Demandada sostiene que el estándar de TJE conforme al derecho internacional consuetudinario no impone un requisito tal en cuanto a transparencia[412].

8.18   *IVA:* La Demandada arguye que su tratamiento de los créditos del IVA de FertiNitro no violó el estándar de TJE porque: (a) se emitieron créditos del IVA por cada solicitud presentada por FertiNitro, aunque sujetas a demoras comunes en Venezuela; (b) el procesamiento de la devolución de créditos fue transparente y procesalmente justo, de conformidad con la legislación venezolana; (c) las demoras de la Demandada relativas al tratamiento de los créditos del IVA no crearon un marco jurídico incoherente, inestable o impredecible, ya que dichos retrasos se aplicaban generalmente a cualquier solicitante en Venezuela, incluido FertiNitro. Además, según lo alegado por la Demandada, FertiNitro contaba con recursos legales para objetar a las demoras ante los tribunales venezolanos, lo cual FertiNitro optó por no hacer[413]. La Demandada también rechaza la afirmación de KOMSA de que los créditos del IVA podían ser reembolsados directamente a KOMSA, en su carácter de accionista minoritario de FertiNitro (el contribuyente del IVA)[414].

8.19   La Demandada también sostiene que KOMSA se equivoca al señalar que parte del IVA pendiente posible de recuperación fue 'cancelado' por la Demandada durante el período comprendido entre los años 2006-2010.En su lugar, tal como la Demandada alega, FertiNitro simplemente tomó las provisiones contables (o asignaciones) de su balance conforme a las normas de presentación de informes. La Demandada sostiene que la

---

[408] *Sergei Paushok, CJSC Golden East Co. y CJSC Vostokneftegaz Co c. Gobierno de Mongolia*, CNUDMI, Laudo sobre Jurisdicción y Responsabilidad (28 de abril de 2011) ("*Paushok c. Mongolia*") (RLA-94).

[409] *EnCana Corporation c. República de Ecuador*, CNUDMI, Laudo (3 de febrero de 2006) ("*EnCana c. Ecuador*") (RLA-71).

[410] *EDF (Services) Ltd. c. Rumania*, Caso CIADI N.° ARB/05/13, Laudo (8 de octubre de 2009) (RLA-85).

[411] Mem. C. Ven., Párrafos 225-235; Dúpl. Koch, Párrafos 276-287; EPA Ven., Párrafos 124-129.

[412] Mem. C. Ven., Párrafos 236-239; Dúpl. Koch, Párrafo 291; EPA Ven., Párrafo 144.

[413] Dúpl. Ven., Párrafo 107.

[414] Mem. C. Ven., Párrafos 240-248; Dúpl. Koch, Párrafo 287; EPA Ven., Párrafos 133-139.

documentación financiera demuestra que los créditos fueron de hecho recuperados, de manera que ningún daño fue eventualmente sufrido por FertiNitro. La Demandada aduce que, en cambio, el enfoque del Sr. Giles es defectuoso, ya que da lugar a un cómputo doble, triple y cuádruple.

8.20   *Decreto de la Urea y Resolución de la Urea:* Las nuevas normas de urea no frustraron ninguna de las expectativas legítimas de KOMSA porque no tenían derecho a ninguna estabilización reglamentaria en ausencia de un compromiso contractual específico asumido por parte de la Demandada hacia KOMSA. En cualquier caso, las normas fueron promulgadas para promover una política legítima de la Demandada relacionada con la seguridad de los alimentos; y podían ser impugnadas ante los tribunales venezolanos si FertiNitro (junto con KOMSA) así lo deseaba; pero no fueron objetadas de tal manera[415].

8.21   *Interferencia:* La Demandada afirma que la participación de Pequiven en la administración y las operaciones de FertiNitro no violó el estándar de TJE debido a que Pequiven era administrada como una entidad comercial, no política; Pequiven era accionista de FertiNitro; era una parte del *Offtake Agreement*; y FertiNitro no estaba controlada por Pequiven. Asimismo, KOMSA contaba con los recursos jurídicos, en virtud del derecho societario venezolano, para impugnar ciertas medidas tales como la designación de nuevos directores por parte de Pequiven, los cuales decidió no utilizar.

8.22   La Demandada sostiene que el Informe del Comisario (el cual KOMSA alega que constituye una prueba de la interferencia de la Demandada en la actividad comercial de FertiNitro) es irrelevante para dicha cuestión. Dicho Comisario fue designado auditor legal de FertiNitro por todo el directorio de FertiNitro y, por lo tanto, tal como sostiene la Demandada, con el apoyo de KOMSA. Asimismo, la propuesta de Pequiven de adquirir más fertilizantes (presuntamente bajo las instrucciones de la Demandada) cumplía con un procedimiento normal conforme al derecho societario venezolano; y fue rechazada por FertiNitro. Además, las presuntas garantías dadas a un tercero (METOR) de que las nuevas leyes no se aplicarían a las empresas extranjeras son irrelevantes. No son atribuibles a la Demandada. También se derivan de una carta enviada una década después del suceso y

---

[415] EPA Ven., Párrafos 140-143; Dúpl. Ven., Párrafo 107.

dependen de una interpretación errónea de dicha carta. Por último, conforme sostiene la Demandada, Pequiven sólo participó en la redacción de las normas de la urea en capacidad consultiva sobre la base de su experiencia en fertilizantes, sin interferir ilícitamente en la actividad comercial de FertiNitro[416].

**(3)    El Estándar de SPP - Artículo 4(1)**

8.23    **El argumento de KOMSA***: En síntesis, KOMSA sostiene que el estándar de SPP protege a las inversiones contra las interferencias tanto físicas como no físicas de la Demandada[417], y cita las decisiones de los casos *ELSI*[418] y *Azurix c. Argentina*[419].El estándar SPP, según KOMSA, obliga al Demandado, como Estado receptor, a garantizar que ofrece al inversionista un entorno legal y regulatorio seguro y estable, es decir, a KOMSA[420].

8.24    KOMSA señala que (i) el incumplimiento del pago de créditos del IVA, (ii) las normas que forzaban la venta de urea por parte de FertiNitro a Pequiven, y (iii) la progresiva interferencia en la gestión y la operación de FertiNitro que finalmente condujo a la expropiación de derechos contractuales, constituyen individualmente un incumplimiento del estándar SPP por parte de la Demandada[421].

8.25    **El argumento de la Demandada:** En síntesis, la Demandada afirma, al igual que con el estándar TJE, que el estándar de SPP del Artículo 4 del Tratado se refiere al estándar mínimo bajo derecho internacional consuetudinario[422].La Demandada interpreta dicho estándar como referente a la seguridad física, y cita[423] la decisión de los casos *Saluka c. República Checa*[424], *Lauder c. República Checa*[425], *Noble Ventures c. Rumania*[426], y *Paushok c. Mongolia*[427]. Sostiene que este estándar sólo impone "un nivel de diligencia

[416] Mem. C. Ven., Párrafos 249-254; Dúpl. Koch, Párrafos 288-290; EPA Ven., Párrafos 130-132.
[417] Mem. Koch, Párrafos 325-330.
[418] *Elettronica Sicula S.p.A. (ELSI) (Estados Unidos de América c. Italia)*, CIJ, Sentencia, (20 de julio de 1989) (CLA-41).
[419] *Azurix Corp. c. República Argentina*, Caso CIADI N.° ARB/01/12, Laudo (14 de julio de 2006) (CLA-43).
[420] Mem. Koch, Párrafos 256-261; Répl. Koch, Párrafos 253-261; EPA Koch, Párrafo 109.
[421] Mem. Koch, Párrafos 331-339; Répl. Koch, Párrafos 262-265.
[422] Mem. C. Ven., Párrafo 257.
[423] Mem. C. Ven., Párrafos 256-258.
[424] *Saluka Investments BV (Países Bajos) c. República Checa*, CNUDMI, Laudo Parcial (17 de marzo de 2006) ("*Saluka c. República Checa*") (CLA-19).
[425] *Lauder c. República Checa* (CLA-45).
[426] *Noble Ventures, Inc. c. Rumania*, Caso CIADI N.° ARB/01/11, Laudo (12 de octubre de 2005) (RLA-67).
[427] *Paushok c. Mongolia* (RLA-94).

para tratar de asegurar que las inversiones extranjeras no se vean perjudicadas durante el período de conflictos o violencia". La Demandada también invoca[428]*Gold Reserve c. República Bolivariana de Venezuela*[429], en el que el tribunal interpretó una cláusula idéntica en el TBI Canadá-Venezuela y encontró que el estándar SPP se limitaba al daño físico a personas y bienes[430].Por consiguiente, la Demandada rechaza el argumento de KOMSA de que el estándar se extiende a la protección jurídica, sostiene que, si lo hiciera, ello confundiría erróneamente el estándar SPP con el estándar de TJE.

8.26    La Demandada procede luego a abordar las presuntas violaciones del estándar SPP. Sostiene que el tratamiento de los créditos del IVA no podía infringir el estándar SPP porque las solicitudes de reembolso fueron finalmente aprobadas; y que cualquier demora en el procesamiento (que se aplicaba a todos los contribuyentes de Venezuela) no puede constituir un incumplimiento del estándar SPP. La promulgación del Decreto de la Urea y las Resoluciones de la Urea no violó el estándar SPP porque fueron razonablemente creadas en virtud de las políticas de seguridad y alimentación de la Demandada y podían ser impugnadas en los tribunales venezolanos, si así lo hubiera deseado KOMSA (lo cual no fue así).La Demandada no interfirió en ningún momento con la gestión y la operación de la actividad comercial de FertiNitro; y su conducta no podría equivaler a ningún incumplimiento del estándar de SPP[431].

### *(4)    "Medidas Arbitrarias y Discriminatorias" - Artículo 4(1)*

8.27    ***El argumento de KOMSA***: En síntesis, KOMSA aduce que el estándar para las medidas arbitrarias y discriminatorias en virtud del Artículo 4(1) del Tratado impone a la Demandada el requisito de no tratar a los inversionistas de manera arbitraria o discriminatoria, incluida aquella medida que es "incoherente y suscita confusiones"[432]. Tales medidas pueden constituir una violación del Artículo 4(1) si son arbitrarias *o* (no "y") discriminatorias[433].

---

[428] EPA Ven., Párrafo 148.
[429] *Gold Reserve Inc. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB(AF)/09/1, Laudo, (22 de septiembre de 2014) (CLA-156).
[430] Mem. C. Ven., Párrafos 255-261; Dúpl. Ven., Párrafos 292-310.
[431] Mem. C. Ven., Párrafos 262-266; Dúpl. Ven., Párrafos 311-324; EPA Ven., Párrafos 149-150.
[432] Mem. Koch, Párrafos 340-343.
[433] Répl. Koch, Párrafos 266-274.

8.28   KOMSA afirma que: (i) la imposición de las medidas fiscales sobre FertiNitro tuvo un impacto discriminatorio en KOMSA debido a que los impuestos nuevos y más altos se dirigían a entidades mayoritariamente detenidos por intereses extranjeros o que eran grandes empresas (a la inversa, estas medidas fiscales eximían a las entidades del sector público tales como Pequiven o aplicaban tasas más bajas a otras empresas); (ii) el Decreto de la Urea y la Resolución de la Urea obligaron a FertiNitro a vender urea a Pequiven a precios por debajo del valor de mercado (dichas medidas eran medidas discriminatorias porque KNI no se beneficiaba de precios preferenciales, ni KOMSA (o KNI) participaba en la redacción de estas regulaciones sobre la Urea, a diferencia de Pequiven; y (iii) el Decreto de Expropiación N.° 7713 fue discriminatorio porque promovió los intereses de Pequiven en detrimento de KOMSA[434].

8.29   ***El argumento de la Demandada:*** En síntesis, la Demandada arguye que la prueba de conducta arbitraria consiste en determinar si las medidas constituían un desprecio deliberado del debido proceso bajo la ley que sacude o sorprende el sentido de lo que es adecuado legalmente. También se extiende a si las medidas pueden ser defendidas como razonables, es decir, cuando las acciones del Estado pueden vincularse a una política razonable. La prueba de discriminación consiste en determinar si el Estado ofreció un trato diferente, sin justificación, a las entidades que de alguna forma se encontraban en situaciones similares. La Demandada rechaza la prueba de KOMSA de medidas inconsistentes o confusas ante la ausencia de prejuicio maligno o sobre la base de preferencias[435].

8.30   La Demandada sostiene que las medidas fiscales no fueron ni arbitrarias ni discriminatorias, ya que se aplicaban a todas las entidades situadas en situaciones similares, tanto nacionales como extranjeras. Uno de los impuestos fue una contribución destinada a ser reinvertida en FertiNitro con fines de investigación y desarrollo, beneficiando así a FertiNitro y sin causar perjuicio a KOMSA en absoluto[436]. Además, las normas sobre la urea no podían ser discriminatorias porque KOMSA y Pequiven no estaban en posiciones similares. Operaban en distintos mercados y no eran competidores, aunque estuvieran

---

[434] Mem. Koch, Párrafos 344-356; Répl. Koch, Párrafos 275-280; EPA Koch, Párrafos 110-111.
[435] Mem. C. Ven., Párrafos 267-277; Dúpl. Ven., Párrafos 326-331; EPA Ven., Párrafos 151-153.
[436] Mem. C. Ven., Párrafos 278-281; Dúpl. Ven., Párrafos 332-335.

involucrados en el mismo sector de la economía venezolana. En cualquier caso, las medidas fueron adoptadas de conformidad con la política alimentaria de la Demandada y no fueron discriminatorias[437].

**(5)** *Trato Nacional – Artículo 4(2)*

8.31 *El argumento de KOMSA:* En síntesis, KOMSA señala que el estándar de Trato Nacional presente en el Artículo 4(2) del Tratado habilita a los inversionistas a recibir un trato no menos favorable que el concedido por el Estado a sus propios nacionales. Afirma que esta cuestión gira en torno a los hechos particulares del caso, por lo cual es necesario tener en cuenta todas las circunstancias[438]. KOMSA sostiene que al intentar añadir el texto "en circunstancias similares" que no se encuentra en el Artículo 4(2), la Demandada erróneamente genera que dicho estándar sea menos protector para el inversionista[439].

8.32 KOMSA argumenta que las medidas discriminatorias de la Demandada constituyen violaciones del estándar de Trato Nacional. KOMSA arguye que: (i) las medidas fiscales favorecieron a Pequiven, una entidad nacional, debido a que estaba exenta, y las regulaciones sobre la urea, redactadas para aparentar ser neutrales, apuntaban a las empresas extranjeras y, a su vez, a KOMSA; (ii) las regulaciones sobre la urea concedieron a Pequiven condiciones de compra ventajosas, ya que podía comprar urea por debajo del precio de mercado, una opción que no estaba disponible para KNI; y (iii) la expropiación del mes de octubre de 2010 transfirió activos y bienes a Pequiven, una entidad nacional que disfrutó de beneficios en detrimento de KOMSA[440].

8.33 *El argumento de la Demandada:* En síntesis, la Demandada determina que el estándar es necesariamente una comparación entre el trato otorgado a los extranjeros y el trato otorgado a los nacionales en posiciones similares, en consideración de la totalidad de las circunstancias. La Demandada se opone a la prueba de KOMSA según la cual no sería necesario encontrar un comparador nacional situado de manera similar. La Demandada señala que la prueba de "circunstancias similares" siempre se aplica en virtud del derecho

---

[437] Mem. C. Ven., Párrafos 382-384; Dúpl. Ven., Párrafos 337; EPA Ven., Párrafos 154-158.
[438] Mem. Koch, Párrafos 357-359.
[439] Répl. Koch, Párrafos 281-286.
[440] Mem. Koch, Párrafos 360-366; Répl. Koch, Párrafos 287-291; EPA Koch, Párrafo 112.

internacional, independientemente de que se encuentre o no un lenguaje a dicho efecto en el TBI. Añade que los Estados siempre pueden recurrir a los derechos discrecionales soberanos para implementar determinadas políticas[441].

8.34   La Demandada sostiene que ningún nacional venezolano se benefició de un trato más favorable debido a que Pequiven, a pesar de estar exenta de ciertos impuestos, fue afectada de manera similar a KOMSA, en su carácter de accionista directo de FertiNitro (el real contribuyente). En cuanto a las regulaciones sobre la urea, eran de naturaleza racional en lo relativo a la promoción de la política alimentaria de la Demandada. Por último, el Decreto de Expropiación N.° 7713 no favoreció a Pequiven porque, en última instancia, Pequiven no era tenedor de los activos adquiridos en virtud del mismo[442].

**(6)    Cláusula Paraguas – Artículo 11(2)**

8.35   *El argumento de KOMSA:* En síntesis, KOMSA sostiene que la Demandada se comprometió a cumplir cualquier obligación, ya sea contractual o derivada de su derecho interno[443]. KOMSA afirma entonces que la violación de su derecho local por parte de la Demandada (con respecto a las devoluciones del IVA a FertiNitro) constituye una violación de dicho estándar por parte de la Demandada[444].

8.36   *El argumento de la Demandada:* En síntesis, la Demandada sostiene que no se violó ninguna obligación en relación con los créditos del IVA, ya que estos últimos fueron emitidos y en última instancia pagados[445].

**(7)    El Análisis y las Decisiones del Tribunal**

8.37   Tal como se sintetizara *supra*, los reclamos ajenos a la expropiación por parte de KOMSA con relación a las "Pérdidas Históricas" en virtud de los Artículos 4 y 11 del Tratado derivan de impuestos nuevos y más altos, la falta de pago (o los pagos tardíos) de los créditos del IVA, los efectos del Decreto de la Urea y la Resolución de la Urea y la interferencia con la actividad comercial de FertiNitro. Si bien fueron presentadas en virtud

---

[441] Mem. C. Ven., Párrafos 285-290; Dúpl. Ven., Párrafos 338-347; EPA Ven., Párrafos 159-163.
[442] Mem. C. Ven., Párrafos 291-296; Dúpl. Ven., Párrafos 350-358; EPA Ven., Párrafos 164-165.
[443] Mem. Koch, Párrafos 367-369; Répl. Koch, Párrafos 292-295.
[444] Mem. Koch, Párrafos 370-374; EPA Koch, Párrafo 113.
[445] Mem. C. Ven., Párrafos 297-301; Dúpl. Ven., Párrafos 359-363; EPA Ven., Párrafos 166-168.

de cinco disposiciones diferentes del Tratado, cada reclamo está sujeto a ciertos factores fácticos comunes.

8.38  **Artículo 1(1) y (2):** El daño alegado fue sufrido por FertiNitro de manera directa y como consecuencia de ello por KOMSA, en su carácter de accionista minoritario indirecto de FertiNitro. En este arbitraje, KOMSA presenta su propio reclamo por sus propias pérdidas y no como un reclamo derivado de las pérdidas sufridas exclusivamente por FertiNitro. De no ser así, el reclamo de KOMSA se enfrentaría a evidentes dificultades de jurisdicción en virtud del Artículo 1(1) y 1(2) del Tratado y del Artículo 25 del Convenio CIADI.KOMSA es legalmente distinto de FertiNitro (como también lo es Koch José). FertiNitro es una persona jurídica de nacionalidad venezolana; y no es un inversionista cubierto por el Tratado con inversiones protegidas en virtud del Tratado[446].

8.39  En consecuencia, KOMSA sólo puede reclamar una compensación por la pérdida efectivamente sufrida por dicha entidad, derivada de su propia inversión minoritaria indirecta en FertiNitro. En principio, un accionista minoritario, incluso que cuente con acciones detenidas indirectamente por una empresa asociada, puede reclamar una compensación por pérdidas indirectas comprobadas. Tal como se resolviera en el caso *Rosinvest c. Rusia*: "[e]l arbitraje moderno sobre tratados de inversión no determina que un accionista sólo pueda reclamar protección respecto de medidas que afecten directamente a las acciones por derecho propio, sino que el inversionista también puede reclamar protección respecto del efecto sobre sus acciones generado por medidas tomadas por el Estado receptor contra la empresa"[447] [Traducción del Tribunal].Sin embargo, el inversionista debe probar aún la pérdida efectiva cristalizada por el efecto indirecto sobre su participación accionaria, independiente de la pérdida sufrida por la empresa.

---

[446] *Véase HICEE B.V. c. República Eslovaca*, CNUDMI, Laudo Parcial (23 de mayo de 2011).

[447] *RosInvestCo UK Ltd. c. Federación Rusa*, SCC Arbitration V (079/2005), Laudo Definitivo (12 de septiembre de 2010) (CLA-9), Párrafo 608. (Este laudo, tal como se indicara *supra*, fue anulado por los tribunales suecos por causales jurisdiccionales no relacionadas). Para analizar un enfoque más moderado, véase el caso *GAMI Investments, Inc. c. Estados Unidos Mexicanos*, CNUDMI, Laudo (15 de noviembre de 2004) (RLA-64). Un miembro del Tribunal no acepta que la amplia declaración sobre la admisibilidad de los reclamos de los accionistas en *RosInvestCo* sea correcta, sin embargo, dada la conclusión final del Tribunal sobre estos reclamos, el mismo no ve ninguna utilidad en expandirse sobre el punto de desacuerdo en este Laudo.

8.40   Según la opinión del Tribunal, no existen pruebas convincentes de que KOMSA, respecto de su participación indirecta como accionista minoritario en FertiNitro, sufriera una pérdida suficientemente cuantificable en términos monetarios por cualesquiera de sus "Reclamos Históricos". No se presentaron pruebas suficientes de un simple "traslado" de la pérdida sufrida por FertiNitro, de modo tal que se convierta en una pérdida prorrateada de KOMSA en su carácter de accionista indirecto parcial de FertiNitro. KOMSA también presentó pruebas insuficientes de sus propias pérdidas directas reales, diferenciadas de las pérdidas sufridas por FertiNitro. La posición podría ser diferente si KOMSA fuera titular pleno de FertiNitro; pero nunca lo fue.

8.41   Este enfoque sería suficiente para que el Tribunal desestime los reclamos de KOMSA "por Pérdidas Históricas" *in limine*. No obstante, el Tribunal considera que este enfoque podría imponer injustamente un obstáculo probatorio demasiado elevado para KOMSA en este caso; y, debido a los esfuerzos realizados por las Partes y sus expertos sobre la cuantificación de daños, sería descortés detener el análisis aquí. Por ende, a los efectos actuales, el Tribunal está dispuesto a asumir que parte de las supuestas pérdidas de FertiNitro "se trasladaron" a KOMSA en lo que respecta a impuestos, IVA, el Decreto de la Urea y la Resolución de la Urea. Sin embargo, ante la ausencia de una cifra individual y cuantificable para la interferencia en la actividad comercial de FertiNitro, el Tribunal no asume ninguna suposición sobre la pérdida. Asimismo, si y en la medida en que KOMSA estuviera promoviendo un reclamo por pérdidas sufridas por KNI (no cuantificadas) como resultado de "Pérdidas Históricas", independientemente del reclamo de KNI por expropiación, el Tribunal desestima dicho reclamo por falta de justificación probatoria.

8.42   ***Artículo 4(1):*** Los estándares de TJE y de SPP que asisten a las inversiones cubiertas por el Artículo 4(1) del Tratado están precedidas por las palabras: "de conformidad con las normas y criterios del Derecho Internacional". En opinión del Tribunal, como se explica *infra*, tal redacción importa los estándares mínimos de derecho internacional consuetudinario, en lugar de estándares autónomos más elevados, mediante la aplicación de la regla de interpretación codificada en el Artículo 31.1 de la CVDT conforme al "sentido corriente que haya de atribuirse a los términos del tratado en el contexto de estos".

8.43    El Tribunal no necesita aquí debatir sobre la jurisprudencia o los textos de doctrina, tan perfectamente capturados por el Dr. Mann hace mucho tiempo. Como es sabido, en su publicación de 1982, el Dr. Mann concluyó que un estándar de TJE es: "[...] en esencia, es un deber impuesto por el derecho internacional consuetudinario [...] que en la ley es poco probable que sea más que una confirmación de la obligación de actuar de buena fe, o abstenerse de abusos o de la arbitrariedad"[448] [Traducción del Tribunal]. Fue quizás una conclusión más considerada que su anterior opinión en sentido contrario:

> *"Los términos" 'trato justo y equitativo' contemplan comportamientos que van mucho más allá del estándar mínimo y otorgan protección en mayor medida y de acuerdo con un estándar mucho más objetivo que cualquier forma de palabras empleada anteriormente. Un tribunal no debe preocuparse por un estándar mínimo, máximo o promedio. Tendrá que decidir si en todas las circunstancias la conducta en cuestión es justa y equitativa o injusta e inequitativa. Ningún estándar definido por otras palabras es probable que sea relevante. Los términos deben ser entendidos y aplicados de forma independiente y autónoma"[449].[Traducción del Tribunal]*

Este debate ha continuado en decisiones arbitrales posteriores, tal como se citan en los escritos de las Partes con diferentes fines; pero tal debate no es relevante en el presente caso.

8.44    Los estándares de TJE y de SPP de este Tratado están precedidos por la condición expresa: "de conformidad con las normas y criterios del Derecho Internacional". Según la opinión del Tribunal, esta formulación expresa adicional es concluyente para confirmar el significado de los estándares de TJE y SPP como obligaciones impuestas por el derecho internacional consuetudinario y para impedir que se le otorgue un significado independiente o autónomo. En el caso *AAPL c. Sri Lanka*, fue la "falta de referencia al derecho internacional" lo que llevó a ese tribunal a adoptar un estándar de SPP autónomo; y (dada la disidencia), está claro que el tribunal habría decidido de manera diferente con la redacción adicional expresa en este Tratado[450]. [Traducción del Tribunal]

---

[448] F.A. Mann, *The Legal Aspect of Money* (4th ed, 1982), pág. 510.

[449] F.A. Mann, British Treaties for the Promotion and Protection of Investments, 52 *British Yearbook of International Law* 241 (1981) (CLA-86), pág. 244.

[450] *Asian Agricultural Products Limited c. República Socialista Democrática de Sri Lanka*, Caso CIADI N.° ARB/87/3, Laudo (27 de junio de 1990) (RLA-42), Párrafo 52.

8.45    El Tribunal adopta también el razonamiento de la decisión del caso *Flughafen c. Venezuela*, citada por la Demandada, con la misma redacción que el Artículo 4(1) del Tratado[451].Ese caso también se refería (*inter alia*) al mismo TBI Suiza-Venezuela, en el cual la condición adicional expresa fue traducida al inglés como: "*in accordance with the norms and criteria of international law*". El tribunal de dicho caso decidió:

> "*Si los AAPRI se deben interpretar de acuerdo con el Derecho internacional consuetudinario, y si el trato mínimo forma parte de ese conjunto de usos y costumbres, se impone la conclusión que un intérprete, a la hora de dilucidar si una determinada actuación viola o no los artículos 4 de los AAPRI, deberá tomar en cuenta cómo define el Derecho internacional consuetudinario el TJE. Por ello, el Tribunal estima que la previsión contenida en los AAPRI, exigiendo que el TJE se defina de conformidad con el Derecho internacional, necesariamente incorpora una referencia al nivel de protección que el Derecho internacional otorga a los extranjeros, es decir a lo que se conoce como estándar mínimo consuetudinario*".

8.46    La interpretación del Tribunal basta para desestimar el reclamo de KOMSA en virtud del estándar de SPP sobre los hechos alegados por KOMSA. En su sentido bien establecido en el derecho internacional consuetudinario, el estándar de SPP se limita a la protección física de los extranjeros contra los actos de terceros no imputables al Estado receptor[452].Como tal, puede dar lugar a una forma limitada de responsabilidad en circunstancias de hecho en las que el Estado receptor no ha ejercido una diligencia razonable para impedir tales actos. Eso claramente no ocurre en este caso.

8.47    Respecto del estándar de TJE conforme al derecho internacional consuetudinario, las pruebas fácticas siguen siendo pertinentes, y se analizarán *infra*. No obstante, en cuanto a tales pruebas, el Tribunal no considera que el resultado en este caso sería sustancialmente diferente en virtud de un estándar autónomo de TJE. No se presentaron pruebas convincentes de las expectativas legítimas de KOMSA inducidas por alguna acción o declaración específica presentada a KOMSA por la Demandada para generar la inversión de KOMSA. Está bien establecido que las disposiciones de la legislación general o las

---

[451] *Flughafen c. Venezuela* (RLA-154), Párrafo 573 (traducción no oficial proporcionada por los abogados).
[452] *BG Group Plc. c. República Argentina*, CNUDMI, Laudo Definitivo (24 de diciembre de 2007) (CLA-37), Párrafos 326 a 328; *El Paso c. Argentina* (CLA-52), Párrafo 522.

políticas estatales aplicables a una pluralidad de personas no bastan en general para establecer las expectativas legítimas requeridas por un estándar autónomo de TJE.

8.48   En cuanto a la tercera parte del Artículo 4(1) del Tratado, a saber, la protección contra "medidas arbitrarias o discriminatorias", surge la cuestión de si se trata de lo que dice *tout court*; o si, debido a la utilización de un punto y coma (a diferencia de un punto final o de una subcláusula separada), esta última parte también debe leerse con sujeción a la redacción adicional expresa. En la opinión del Tribunal, esta tercera parte debe leerse por separado, sin referencia a un estándar mínimo de derecho internacional consuetudinario (si existiera). No obstante, su significado está claramente dirigido a "la administración, gestión, mantenimiento, uso, disfrute, ampliación, venta o liquidación" de las "inversiones" de KOMSA, a saber, la participación minoritaria indirecta de KOMSA en FertiNitro, de manera separada a FertiNitro mismo. KOMSA no está aquí promoviendo un reclamo por cualquier interferencia directa con su propia participación accionaria en FertiNitro, como tal. Según la opinión del Tribunal, el reclamo de KOMSA en relación con esta parte del Artículo 4(1) es mejor (o no peor) presentada en virtud del estándar de TJE, respecto del cual su reclamo prospera o fracasa sobre la base de las pruebas pertinentes. En consecuencia, el Tribunal procede sobre dicho fundamento *infra*.

8.49   ***Artículo 4(2):*** El Tribunal no considera que Pequiven, en carácter de sociedad estatal local y controlada por el Estado, sea un 'comparador' apropiado para KOMSA con arreglo al Artículo 4(2) del Tratado. Es cierto que ambas eran accionistas de FertiNitro; y que ambas sociedades estaban involucradas, directa o indirectamente, en el negocio de fertilizantes en Venezuela; pero las semejanzas cesan allí. Pequiven era un participante directo y activo en esa actividad comercial local, mientras que KOMSA era un inversionista extranjero indirecto. KOMSA no puede, en ese sentido, asimilarse a FertiNitro. En consecuencia, ante la ausencia de un comparador adecuado, el Tribunal desestima los reclamos de KOMSA relativos al "Trato Nacional" en virtud del Artículo 4(2) del Tratado.

8.50   ***Artículo 11(2):*** KOMSA no plantea ninguna cláusula de "estabilización" con respecto a su inversión en FertiNitro; y, como testificara el Sr. Parra (de KOMSA), KOMSA no recibió de la Demandada ninguna "ninguna garantía por escrito ni ninguna carta, sólo lo que se

plasmaba en la política de apertura"[453].El Tribunal no ha visto ninguna prueba convincente de ninguna declaración relevante, garantía o compromiso por parte de la Demandada hacia KOMSA en relación con su interés en FertiNitro, ya sea de manera explícita o incluso necesariamente implícita, en ningún documento o acuerdo contemporáneo. Por consiguiente, el Tribunal desestima el reclamo de KOMSA con arreglo al Artículo 11(2), la "Cláusula Paraguas" del Tratado.

8.51    *El estándar de TJE:* El Tribunal comienza con algunas observaciones generales. En primer lugar, desde el inicio, todos los participantes, incluido KOMSA, sabían que el proyecto FertiNitro estaba sujeto a importantes incertidumbres políticas, económicas y de otra índole en Venezuela. Tal como se registra en el Memorándum de Oferta de Bonos de 1998 del proyecto FertiNitro[454], tales incertidumbres incluyen "cambios en las políticas tributarias", por lo que se espera que los resultados de FertiNitro "se vean afectados en general por […] cambios en el liderazgo gubernamental venezolano, las políticas y los factores impositivos [...]" [Traducción del Tribunal].También se sabía que las próximas elecciones presidenciales en Venezuela tendrían lugar más tarde en el mes de diciembre de 1998.En esas elecciones, el Sr. Chávez fue elegido Presidente de Venezuela y posteriormente reelegido hasta su fallecimiento  en el año 2013.

8.52    En segundo lugar, las protecciones concedidas a los inversionistas y a sus inversiones en virtud del Tratado no funcionan como un seguro contra riesgos comerciales normales, modificaciones en las leyes locales o medidas reglamentarias adoptadas por parte del Estado receptor. Como se decidiera en el caso *Saluka c. República Checa* (ya citado en la parte VI *supra*): "[H]a quedado establecido en el derecho internacional que los Estados no son responsables de pagar indemnizaciones a los inversionistas extranjeros cuando, en el ejercicio normal de sus facultades regulatorias, adoptan en forma no discriminatoria regulaciones de buena fe en aras del bienestar general" [Traducción del Tribunal][455].Dichos facultades regulatorias se extienden a la tributación. Tal como se decidiera en el caso *EnCana*; "[e]n ausencia de un compromiso especifico del Estado anfitrión, el inversionista

---

[453] Primera Audiencia (septiembre), D2.75-76 (Parra).
[454] Circular de Oferta - Oferta de Bonos de USD 250.000.000 entre FertiNitro Finance Inc y FertiNitro (8 de abril de 1998) (C-115), página 50.
[455] *Saluka c. República Checa* (CLA-19), Párrafos 255 y ss.

extranjero no tiene ningún derecho ni expectativa legítima de que el régimen fiscal no cambie, quizá para su desventaja, durante el periodo de la inversión"[456].Tal como se manifestara expresamente en el Memorándum de la Oferta de Bonos (citado *supra*), esto no es más que sentido común comercial, como habría sido bien entendido por KOMSA en ese momento.

8.53    Por lo tanto, lo que debe determinarse no es si la Demandada ha ejercido sus facultades regulatorias o de otra naturaleza causando pérdidas a KOMSA, sino si al hacerlo, la Demandada ha violado sus obligaciones respecto de KOMSA en virtud del Tratado. En cuanto a esa cuestión, como ya se explicara *supra*, las medidas de la Demandada deben ser sopesadas, con la debida deferencia, en base a la prueba objetiva ofrecida en este arbitraje.

8.54    En tercer lugar, FertiNitro fue, mucho antes de los acontecimientos del mes de octubre de 2010, una empresa problemática y poco satisfecha (o más bien, "empresas"). El Tribunal se remite al Informe del Comisario de fecha 7 de septiembre de 2006, presentado por el auditor legal designado de FertiNitro a todos sus accionistas. Este identificó "conflictos de intereses entre los directores [que] dificultan la toma de decisiones con rapidez"; "excesivas controversias en especial los problemas relacionados con las Plantas y el contrato OFFTAKE"; "incertidumbre sobre la seguridad y continuidad operacional de las Plantas"; "el reclamo sindical por beneficios laborales [que] […]no se han solucionado"; una "[f]alta de manuales aprobados por La Junta Directiva sobre las políticas, normas y procedimientos de funciones y actividades técnicas, operativas, administrativas y contables"; y la necesidad de "[a]justar el organigrama de la Compañía a la realidad de las necesidades"[457].Luego de 2006 y para 2010, la situación de FertiNitro empeoró significativamente. En tales circunstancias, confirmadas por otras pruebas contemporáneas, las dificultades comerciales de FertiNitro no pueden atribuirse ligeramente a efectos por los cuales la Demandada podría ser legalmente responsable en virtud del Tratado o del derecho internacional.

---

[456] *EnCana c. Ecuador* (RLA-71) Párrafos 173.
[457] Informe del Comisario y Estados Financieros Consolidados de FertiNitro (7 de septiembre de 2006) (C-63).

8.55   **Impuestos:** Por lo menos al parecer, los impuestos impugnados eran de aplicación general. En cuanto a los impuestos nacionales, el clasificador para el Grupo 1-D identificó[458]: "[t]oda actividad económica de industria ejercidas por […] entidades […] jurídicas […]del Sector Energético, Producción de Gas Natura[l], toda actividad relacionada con la industria petrolera y petroquímica que esté vinculada con la actividad que se ejerce directa o indirectamente con el Complejo Petroquímico de José [...]".En cuanto al impuesto sobre Ciencia y Tecnología, el Artículo 37 de la Ley se dirigió en general "[l]as grandes empresas del país que se dediquen a otros sectores de producción de bienes y de prestación de servicios [...]"[459]. Por otra parte, esta Ley le otorgó a FertiNitro beneficios directos.

8.56   El Tribunal no considera que KOMSA, sobre la base de la prueba de hecho, haya demostrado una violación del estándar de TJE por parte de la Demandada (o la tercera arista del Artículo 4(1)). En particular, estas no fueron medidas fiscales tomadas fehacientemente de mala fe, de manera arbitraria, irracional o con la intención inadecuada de discriminar directamente contra FertiNitro (o indirectamente contra KOMSA). Habida cuenta de los sucesos posteriores ocurridos en el mes de octubre de 2010, podría resultar tentador utilizar la retrospectiva para evaluar estas medidas fiscales; pero el Tribunal lo considera inapropiado. Tales medidas deben ser evaluadas en el momento de su promulgación, cuando imperaban circunstancias diferentes.

8.57   **IVA:** En lo relativo al IVA, la Demandada sostiene que todos los créditos del IVA solicitado por FertiNitro han sido pagados, tal como lo demuestran sus tablas del IVA desde 2001 a 2010[460]. Durante la Tercera Audiencia (junio), la Demandada reconoció que los créditos del IVA fueron pagados con retraso, como también lo demuestran sus propias tablas del IVA.

8.58   No existen pruebas convincentes de ninguna pérdida monetaria específica sufrida por FertiNitro debido a las demoras de la Demandada, menos aún de cualquier pérdida monetaria específica resultante para KOMSA. El Sr. Giles, si bien no es un testigo de

---

[458] Ordenanza de impuestos sobre actividades económicas de industria, comercio, servicios, o de índole similar (29 de diciembre de 2005) (C-45), página 14.

[459] Ley Orgánica de Ciencia, Tecnología e Innovación (en vigor a partir del 1 de enero de 2006) (C-43), página 8.

[460] FertiNitro, Créditos del IVA 2001-2010 (actualizado a diciembre de 2010) (R-73).

hecho, declaró que por cada año transcurrido en el período comprendido entre los años 2006 y 2010, "parte del IVA pendiente y recuperable fue cancelado" por la Demandada. El Dr. Flores testificó que esto era incorrecto; y que las previsiones contables de FertiNitro no tenían "efectos reales sobre el flujo de caja" [Traducción del Tribunal], como sugiriera el Sr. Giles[461]. El Dr. Flores tampoco fue un testigo de hecho.

8.59   El Tribunal lamenta la escasez de pruebas convincentes sobre esta cuestión. Está claro que la Demandada emitió créditos del IVA con demora a FertiNitro; pero esa era la práctica habitual en Venezuela sufrida por todos los contribuyentes del IVA con derecho a créditos fiscales. La prueba fue unidireccional en cuanto a tales retrasos regulares. En dichas circunstancias, el Tribunal no considera que KOMSA, sobre la base de la prueba de hecho, haya demostrado la existencia de una violación del estándar de TJE por parte de la Demandada (o la tercera arista del Artículo 4(1)). En particular, no se demostró que tales retrasos se hubieran cometido de mala fe, arbitrariamente, irracionalmente o con la intención indebida de discriminar directamente contra FertiNitro (o indirectamente contra KOMSA).

8.60   ***Decreto de la Urea y Resolución de la Urea:*** El Decreto de la Urea y la Resolución de la Urea se publicaron en los meses de marzo y mayo de 2007, respectivamente[462].La Demandada arguye que el Decreto de la Urea y la Resolución de la Urea fueron emitidos por la Demandada como parte de su función regulatoria en aras de asegurar el suministro de alimentos y la seguridad alimentaria para el pueblo venezolano[463].En ese momento, KOMSA no se opuso activamente al Decreto de la Urea o a la Resolución de la Urea mediante litigios o acciones administrativas similares dentro del ordenamiento jurídico venezolano; ni fue el caso del propio FertiNitro[464].

8.61   Tal como ya se ha señalado en la Parte VII *supra*, el Tribunal, en ejercicio de la deferencia debida a la Demandada, considera que tales normas sobre la urea han sido adoptadas en

---

[461] Informe Pericial de Tim Giles (2 de junio de 2012), Párrafo 3.14; Flores IP1, Párrafos 165-168; Flores IP2, Párrafos 229 y *ss*.
[462] Decreto 5.218 (26 de febrero de 2007) (C-80); Resolución Conjunta del Ministerio del Poder Popular para la Agricultura y Tierras, del Ministerio del Poder Popular para las Industrias Ligeras y Comercio, y del Ministerio del Poder Popular para la Energía y Petróleo (Gaceta Oficial N.º 38.674) (3 de mayo de 2007) (C-82).
[463] Resp Rej., Párrafos 319-320.
[464] Mem. Koch, Párrafo 85.

cumplimiento de las políticas de la Demandada sobre seguridad y suministro alimentario para el pueblo venezolano. Evidentemente, aunque ello genera una pérdida directa a FertiNitro, el Tribunal no considera que KOMSA,  sobre la base de la prueba de hecho, haya demostrado la existencia de una violación del estándar de TJE por parte de la Demandada (o la tercera arista del Artículo 4(1)).En particular, no se demostró que estas normas relativas a la urea hubiesen sido promulgadas de mala fe, arbitrariamente, irracionalmente o con la intención indebida de discriminar directamente contra FertiNitro (o indirectamente contra KOMSA).Del mismo modo, habida cuenta de los sucesos posteriores ocurridos en el mes de octubre de 2010, si bien podría resultar tentador utilizar la retrospectiva para evaluar estas normas relacionadas con la urea (como sugiere KOMSA), el Tribunal  nuevamente lo considera  inapropiado. Estas regulaciones de la urea también deben ser evaluadas dentro del momento de su promulgación.

8.62    *Decisiones:* Por tales motivos, en relación con la responsabilidad, el Tribunal decide desestimar los reclamos de KOMSA contra la Demandada por "Pérdidas Históricas" en virtud de los Artículos 4(1), 4(2) y 11(2) del Tratado.

## *PARTE IX: CUESTIONES DE COMPENSACIÓN*

**(1)     *Introducción***

9.1     A la luz de las decisiones del Tribunal en materia de jurisdicción y responsabilidad mencionadas *supra*, ahora, es necesario considerar el monto de compensación adecuado, pagadero por la Demandada a cada una de las Demandantes, es decir, a KOMSA por la expropiación de su participación en FertiNitro y a KNI por la expropiación de sus derechos respecto del *Offtake Agreement*. El Tribunal comienza con una breve descripción de su enfoque general en materia de compensación y, posteriormente, procede a exponer una síntesis de los intentos de las Partes de negociar la compensación adeudada por la Demandada a KOMSA, que ya ha sido abordada en mayor detalle en la cronología presentada en la Parte V *supra*. A continuación, es pertinente resumir las alegaciones en materia de cuantificación de daños de las Demandantes y las alegaciones de la Demandada en respuesta a ellas, antes de que el Tribunal proceda a considerar esas presentaciones contrapuestas y se pronuncie en lo que respecta a las sumas adecuadas de compensación.

9.2     Dado el desarrollo evolutivo de los argumentos respectivos de las Partes en materia de compensación durante el presente arbitraje, las diferencias sumamente significativas entre el testimonio de sus respectivos expertos (el Sr. Giles y el Dr. Flores) y las complejidades de las cuestiones relacionadas con la compensación (tanto para KOMSA como para KNI), el Tribunal ha determinado que es necesario resumir en detalle las alegaciones consecutivas de las Partes en materia de compensación. Esa síntesis podría proporcionar también una referencia útil en cuanto a lo que fue y lo que no fue alegado por las Partes respecto de dichas cuestiones durante el presente arbitraje, lo que ha de leerse conjuntamente con las listas de cuestiones expuestas en la Parte III *supra*. Aun así, indefectiblemente, algunas partes de esta síntesis son redundantes y (dada la evolución de los argumentos de las Partes) no son completamente consistentes.

9.3     En cuanto a su enfoque general, el Tribunal tiene muy en cuenta, tal como afirmara la Demandada, que normalmente les corresponde a las Demandantes la carga jurídica de probar sus respectivos argumentos en materia de compensación. Este principio general se

encuentra bien consolidado en virtud del derecho internacional: *onus probandi actori incumbit*.

9.4    El Tribunal también tiene en cuenta que las cuestiones complejas en materia de compensación, que dividen a las partes contendientes y a sus expertos, pueden requerir un margen de apreciación por parte de un tribunal de arbitraje que aplica el texto de un TBI y el derecho internacional.  Por lo tanto, el ejercicio que se requiere puede ser menos que una ciencia exacta.  El Tribunal recurre al enfoque adoptado por tribunales internacionales de arbitraje, tales como aquellos que dictaron los laudos en los casos *Sistem c. República Kirguisa*[465] y *ADC c. Hungría*[466].

9.5    Tal como se decidiera en *Sistem c. República Kirguisa*:

> *"154. El Tribunal es consciente de la conveniencia de claridad conceptual en la valoración de activos a los fines de calcular la compensación adeudada y es consciente de la crítica de los métodos de 'triangulación', que seleccionan una cifra que se encuentra más o menos en un punto medio de las estimaciones planteadas por las partes.*
> *155. El Tribunal también es consciente de que, en ausencia de una venta real, todas las valoraciones constituyen proyecciones y es consciente de su deber legal de dictar un laudo en virtud de un proceso que la Demandada ha acordado libremente establecer y que la Demandante ha optado libremente por impulsar, y de hacerlo sobre la base del material que las partes han decidido presentar ante él. Eso es, necesariamente, un ejercicio en el arte de lo posible; y el Tribunal ha procurado arribar a una estimación racional y justa, conforme al TBI, de la pérdida afrontada por la Demandante en lugar de involucrarse en una búsqueda de la quimera de una suma que constituya una determinación única e indiscutiblemente correcta del valor de aquello que la Demandante perdió. El Tribunal obtiene algo de alivio en la observación de Immanuel Kant de que 'Con un leño torcido como aquel del que ha sido hecho el ser humano nada puede forjarse que sea del todo recto'". [Traducción del Tribunal]*

9.6    En *ADC c. Hungría*, el tribunal de manera similar decidió que:

---

[465] *Sistem Muhendislik Insaat Sanayi ve Ticaret A.S. c. República Kirguisa*, Caso CIADI N.º ARB(AF)/06/1, Laudo (9 de septiembre de 2009) ("*Sistem c. Kirguistán*").
[466] *ADC Affiliate Limited y ADC & ADMC Management Limited c. República de Hungría*, Caso CIADI N.º ARB/03/16, Laudo (2 de octubre de 2006) (CLA-16), Párrafo 521. *Véase también Gold Reserve Inc. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB(AF)/09/1, Laudo (22 de septiembre de 2014) ("*Gold Reserve c. Venezuela*") (CLA-156), Párrafo 832.

> *"[E]l cálculo de daños no es una ciencia. Es cierto que los expertos utilizan una variedad de metodologías y herramientas para intentar arribar a la cifra correcta. Pero, al fin y al cabo, el Tribunal puede tomar distancia y observar el resultado del trabajo y llegar a una cifra con la que se sienta cómodo en todas las circunstancias del caso". [Traducción del Tribunal]*

9.7    Al amparo del derecho internacional, existe hasta la fecha una *'jurisprudence constante'* arraigada al efecto de que, por difícil que sea, un tribunal internacional debe esforzarse al máximo para cuantificar una pérdida, siempre y cuanto esté convencido de que la ofensa de la demandada le ha ocasionado alguna pérdida a la demandante[467].  Según el Tribunal, no hay duda de que ambas Demandantes han experimentado pérdidas a causa de las violaciones de la Demandada del Artículo 6 del Tratado.

9.8    Las dificultades en este caso surgen de la cuantificación de los daños pecuniarios que se requieren de la Demandada al efecto de compensar a cada una de las dos Demandantes. Como ya se ha indicado, tradicionalmente, los tribunales internacionales han resuelto estas dificultades aplicando un criterio razonable, en lugar de una norma que exija certeza para calcular la compensación sobre la base de cifras calculadas con precisión.  Casi invariablemente, este enfoque exige que ahora los tribunales rechacen el alcance total de los argumentos principales de las partes en materia de cuantificación de daños y los resultados a menudo extremadamente diferentes de las metodologías, los supuestos y las instrucciones de sus respectivos expertos.  Por razones tácticas, una demandante tal vez prefiera no aplicar un descuento al monto total del reclamo invocado; y una demandada que niega la pérdida, de manera similar, tal vez prefiera no ofrecer una metodología que tenga como resultado el otorgamiento de una indemnización por daños significativa en favor de la demandante.  Así, un tribunal deberá trabajar por sí solo, de la mejor manera posible, en lo que es, racionalmente "una tierra de nadie" que dejan vacío las partes y sus expertos.  En el presente caso, el Tribunal ha enfrentado serias dificultades para comprender cómo las Partes y sus respectivos expertos en daños han podido presentar cifras tan disímiles.

---

[467] *Véase, por ejemplo*, *Sistem c. Kirguisia*, Párrafos 154 y 155.

*(2)    Las Negociaciones de la Compensación*

9.9    En síntesis, tal como se describiera en la Parte V *supra*, se llevaron a cabo negociaciones entre Pequiven, en representación de la Demandada (en calidad de entidad expropiadora designada en virtud del Decreto de Expropiación) y los accionistas extranjeros de FertiNitro, incluida KOMSA, entre febrero y septiembre de 2011.  Estas negociaciones no incluyeron a KNI, a quien se le había hecho suponer un tratamiento separado, aunque no distinto.  En ese momento, Pequiven (en representación de la Demandada) describió que estas negociaciones con los accionistas de FertiNitro incluyeron conversaciones al efecto de un acuerdo amistoso en materia de compensación "contemplado tanto por la legislación venezolana aplicable como por los Tratados Bilaterales de Protección de Inversiones"[468] [Traducción del Tribunal].

9.10   En las cuatro reuniones estuvo presente el Sr. Barrientos (en representación de Pequiven).  El Sr. Barrientos declaró durante la Primera Audiencia (septiembre) que estaba al tanto de la decisión de Pequiven de contratar a Advantis, en calidad de consultores para brindar asesoramiento respecto del monto de la compensación adeudada a los accionistas extranjeros de FertiNitro[469].  El Sr. Barrientos no pudo explicarle al Tribunal la diferencia entre la valoración que realizara Advantis de la participación de KOMSA en FertiNitro en la suma de alrededor de USD 113 millones (a la que consideró en ese momento una valoración justa y una "estimación genuina de lo que valía la compañía" y la valoración del Dr. Flores (en calidad de experto de la Demandada en el presente arbitraje) de USD 34,6 millones[470].  Sin embargo, tal como confirmara el Sr. Barrientos, la persona que trabajó con Advantis fue el Sr. García (que no fue citado como testigo por la Demandada en el presente arbitraje)[471].

9.11   El Tribunal retomará los dos Informes Advantis de mayo y julio de 2011 *infra*.

---

[468] Carta de Betulio Hernández, Director Ejecutivo, Pequiven, a los Accionistas (28 de febrero de 2011) (R-35), Párrafo 1.
[469] Primera Audiencia (septiembre) D3.77-78.
[470] Primera Audiencia (septiembre) D3.80-81.
[471] Primera Audiencia (septiembre) D3.79.

188

**(3)     Las Alegaciones de las Demandantes en Materia de Cuantificación de Daños**

9.12    En resumen, el argumento de las Demandantes en materia de cuantificación de daños consta de diez alegaciones principales, cada una de las cuales es abordada por separado en las sub-secciones *infra*.  Estas son:

(a)     Primero, las Demandantes han demostrado que la Demandada debe pagar compensación íntegra en virtud del derecho internacional;

(b)     Segundo, el testimonio de la Segunda Audiencia (noviembre) demostró que los expertos en daños de las Partes han adoptado criterios fundamentalmente diferentes respecto del ejercicio de valoración;

(c)     Tercero, los expertos en daños de las Partes coinciden en varios parámetros de compensación, pero sus diferencias de hecho y de experiencia con respecto a asuntos de daño siguen siendo significativas;

(d)     Cuarto, se han identificado los puntos centrales de acuerdo y desacuerdo relacionados con los flujos de caja futuros en FertiNitro;

(e)     Quinto, se han identificado los puntos centrales de acuerdo y desacuerdo relacionados con la valoración del *Offtake Agreement*;

(f)     Sexto, se han identificado los puntos centrales de acuerdo y desacuerdo relacionados con la tasa de descuento y la prima de riesgo país;

(g)     Séptimo, el laudo dictado en el contexto del caso *Gold Reserve c. Venezuela*[472] respalda la prima de riesgo país específica de FertiNitro adoptada por el experto en daños de las Demandantes, el Sr. Giles, y desacredita la prima de riesgo país general adoptada por el experto en daños de la Demandada, el Dr. Flores.  Por el contrario, los laudos dictados en los casos *ExxonMobil* y *Mobil*[473] no identifican ninguna prima de riesgo país para Venezuela y se distinguen claramente;

(h)     Octavo, el precio ajustado del MdE de USD 360 millones para la participación de capital de KOMSA al 30 de septiembre de 2010 (según las presentaciones del Sr. Giles en su primer informe y sobre la base del borrador del MdE de Pequiven de octubre de 2008)[474] constituye una verificación de la razonabilidad de las valoraciones de las Partes para la participación de KOMSA en FertiNitro, demuestra que la valoración de capital del Sr. Giles es conservadora y, por

---

[472] *Gold Reserve c. Venezuela* (CLA-156).

[473] A saber, *Mobil Cerro Negro Ltd c. Petróleos de Venezuela, S.A. y PDVSA Cerro Negro, S.A.*, Caso CCI N.º 15416/JRF/CA, Laudo Definitivo (23 de diciembre de 2011) ("*Mobil c. PDVSA*" o "*Mobil*") (EO-45); *Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd. Mobil Venezolana De Petróleos Holdings, Inc. Mobil Cerro Negro, Ltd. y Mobil Venezolana De Petróleos, Inc. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB/07/27, Laudo (9 de octubre de 2014) ("*Venezuela Holdings c. Venezuela*" o "*ExxonMobil*") (RLA-153).

[474] Informe de Experto de Tim Giles (2 de junio de 2012) ("Giles IP1"), Párrafos 4.88-4.89; *véase también* Mem. Koch, Párrafo 150.

contraste, que la supuesta valoración justa de mercado del Dr. Flores es menos del 10 % del precio que fuera acordado por las Partes en 2007/2008 bajo amenaza de expropiación;

(i) Noveno, hay varias comprobaciones de la realidad adicionales que validan la razonabilidad de las valoraciones del Sr. Giles de la inversión de capital de KOMSA y la participación de KNI en el *Offtake Agreement*; y

(j) Décimo, existen muchas otras verificaciones de razonabilidad para el "límite inferior" que desacreditan la valoración del Dr. Flores, como un caso atípico sin fundamentos.

*(i) Las Demandantes Han Demostrado que la Demandada Debe Pagar Compensación Íntegra en Virtud Del Derecho Internacional*

9.13 Tal como afirmaran las Demandantes, la cuestión fundamental es la determinación del estándar adecuado mediante el cual el Tribunal ha de calcular la compensación.

9.14 Las Demandantes afirman que, como cuestión de derecho internacional consuetudinario, el estándar de reparación íntegra articulado en el *Caso relativo a la Fábrica de Chorzów*[475] es el estándar de compensación adecuado para la conducta ilícita de la Demandada.

9.15 Por otro lado, tal como se explicará en mayor detalle *infra*, la Demandada sostiene que debería aplicarse el estándar de compensación previsto en el Artículo 6 del Tratado en lo que se refiere a su supuesta expropiación ilícita de las inversiones de las Demandantes y sus demás violaciones del tratado.

9.16 En respuesta, las Demandantes sostienen que el estándar previsto en el Artículo 6 del Tratado es inaplicable cuando una expropiación se ha realizado en forma ilícita, tal como en este caso. En consecuencia, las Demandantes afirman que tienen derecho a una compensación íntegra en virtud del estándar del derecho internacional consuetudinario en pos de eliminar todas las consecuencias de la conducta ilícita de la Demandada.

9.17 Las Demandantes aceptan que, en principio, existe una distinción entre el estándar de compensación para una expropiación "lícita" y el estándar de compensación para una expropiación "ilícita". Es decir, tal como afirman, el estándar de compensación para una

---

[475] *Caso relativo a la Fábrica de Chorzów (Alemania c. Polonia)*, PCIJ Series A, No. 17, Decisión sobre el Fondo (13 de septiembre de 1928) (CLA-49).

expropiación lícita está previsto en el Artículo 6 del Tratado, pero el estándar de compensación para una expropiación ilícita es la reparación íntegra en virtud del derecho internacional consuetudinario.

9.18    Sin perjuicio de esta distinción, las Demandantes aceptan que, en el presente caso, no existe una diferencia sustancial en el resultado entre el estándar aplicable en virtud del derecho internacional consuetudinario para una "expropiación ilícita" y el estándar aplicable en virtud del Tratado para una "expropiación lícita".  En efecto, tal como afirman las Demandantes, ambos estándares derivan en el cálculo del "valor justo de mercado" de las inversiones expropiadas en ausencia de las violaciones múltiples de la Demandada.

9.19    Las Demandantes sostienen que la aplicación del estándar correcto sustenta sus tres alegaciones en lo que se refiere a la compensación adecuada.  Estas incluyen, a título enunciativo, decisiones arbitrales recientes que confirman que la Demandada debe pagar una compensación íntegra a las Demandantes en un escenario "contrafáctico" por la expropiación ilícita de las inversiones de las Demandantes.

9.20    Las Demandantes afirman que decisiones recientes sustentan el principio de compensación íntegra en un escenario "contrafáctico" por la expropiación ilícita de sus inversiones.  Las Demandantes citan *Hulley Enterprises Limited (Chipre) c. La Federación Rusa*[476]*,* donde el tribunal, haciendo referencia al Artículo 35 de los Artículos de la CDI sobre Responsabilidad del Estado, explicó que un "Estado responsable de una expropiación ilegal, en primer lugar, se encuentra obligado a la restitución, colocando a la parte damnificada en la posición en la que se encontraría en el caso de que el hecho ilícito no hubiese ocurrido" [Traducción del Tribunal].   De manera similar, mencionan *ConocoPhillips c. Venezuela*[477], donde el tribunal decidió lo siguiente:

> *"El Tribunal, volviendo a los términos del TBI, no considera que la medida de la compensación adeudada con respecto a una expropiación ilícita de una inversión, por ejemplo porque resulta violatoria de un 'compromiso' en los términos del*

---

[476] *Hulley Enterprises Limited (Chipre) c. La Federación Rusa*, Caso CPA N.º AA 226, Laudo Definitivo (18 de julio de 2014) (CLA-152), Párrafo 1766 (anulado por el Tribunal de Distrito de La Haya por otras causales, aunque en la actualidad en fase de apelación).

[477] *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. y ConocoPhillips Gulf of Paria B.V. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB/07/30, Decisión sobre Jurisdicción y Fondo (3 de septiembre de 2013) ("*ConocoPhillips c. Venezuela*") (CLA-155), Párrafo 342.

*Artículo 6(b), deba estar determinada en virtud del Artículo 6(c): esa disposición establece una condición que debe cumplirse en el supuesto de que la expropiación sea de conformidad con el Artículo 6 en todos los demás aspectos.  Así, en el caso Chorzów, el Tribunal no determinó una reparación de conformidad con las disposiciones de la Convención ante sí, porque correspondía a una confiscación en violación de esas disposiciones.  Decidió de conformidad con el "principio esencial" citado anteriormente, que es un principio del derecho internacional consuetudinario, que no está subordinado a las disposiciones de la Convención".*

9.21    En consecuencia, las Demandantes sostienen que la jurisprudencia arbitral confirma que KOMSA tiene derecho a una compensación íntegra en virtud del derecho internacional por las pérdidas causadas por las violaciones no expropiatorias del Tratado por parte de la Demandada.

*(ii)    El Testimonio de la Segunda Audiencia (noviembre) Demostró Que Los Expertos en Daños de las Partes Han Adoptado Criterios Fundamentalmente Diferentes Respecto del Ejercicio de Valoración*

9.22    Las Demandantes observan que existe una diferencia de más de USD 518 millones entre la prueba de los expertos de las Partes en relación con la valoración de capital, la valoración de *offtake* y las Pérdidas Históricas de KOMSA (las últimas de las cuales ya han sido abordadas en la Parte VIII *supra*).  Las Demandantes sostienen que la brecha entre las dos valoraciones de los expertos en daños puede explicarse, en gran medida, por la adopción de criterios fundamentalmente diferentes respecto del ejercicio de valoración.  Las Demandantes se basan en su experto en daños, el Sr. Giles, quien, según las afirmaciones de las Demandantes, ha adoptado un enfoque forense para la determinación de sus parámetros de valoración en contraposición al Dr. Flores.

9.23    Específicamente, las Demandantes afirman que la valoración del Sr. Giles refleja la prueba documental contemporánea disponible relacionada con las ganancias que se obtuvieron y los costos en los que se incurrió en la Planta FertiNitro.  Así, tal como afirman las Demandantes, el Sr. Giles pudo determinar si las ganancias y los costos que aparecen en las cuentas de FertiNitro son confiables a los fines de proyectar ganancias y costos futuros en la Planta en un "escenario contrafáctico".

9.24   Las Demandantes sostienen además que fue correcto que el Sr. Giles ignorara las graves irregularidades y una falta de transparencia con respecto a ciertos datos importantes de costos registrados en las cuentas de FertiNitro para llegar a una valoración justa de mercado.  Ese enfoque, tal como se afirma, es coherente con lo que harían un comprador dispuesto y un vendedor dispuesto, a saber, analizarían la producción histórica de la Planta FertiNitro para determinar si esos datos son una fuente confiable para proyectar la producción a largo plazo de la Planta.

9.25   Según las Demandantes, la prueba del Sr. Giles también se encuentra sustentada por la prueba del Sr. Sanders, quien, en la Segunda Audiencia (noviembre), confirmara que, en octubre de 2010, un comprador dispuesto habría considerado a FertiNitro una planta con importantes oportunidades de mejoras tanto en los costos como en la producción.  Las Demandantes describen al Sr. Sanders como "el único experto independiente de la industria en este arbitraje"[478].  Las Demandantes sostienen que la prueba del Sr. Sanders es coherente con aquello de lo que la propia Demandada se ha dado cuenta mediante la supervisión de varias mejoras a la Planta FertiNitro, desde la expropiación.  En efecto, las Demandantes señalan específicamente la prueba del Sr. Sanders que su análisis de los documentos contemporáneos reveló[479]:

> *"Antes de la expropiación la junta de FertiNitro expresó su preocupación por estos costes descontrolados y pidieron documentación adicional que pudiera comparar y explicar los costes y permitiera ver de manera transparente en que se estaba gastando el dinero.  Estos costes sin embargo no están apoyados por la menor documentación.  Los documentos solicitados que deberían explicar la ventilación de los costes para el mantenimiento han sido solicitados.  Sin embargo jamás han sido facilitados por Venezuela.*

9.26   Según las Demandantes, la prueba pericial del Sr. Giles, en tanto demuestra que la Planta FertiNitro no era una "planta con errores", está sustentada no sólo por el Sr. Sanders, sino por las declaraciones del testigo de la Demandada, el Sr. Aníbal Villarroel.  En particular, las Demandantes señalan que los trenes de amoniaco en la Planta FertiNitro habían operado

---

[478] EPA Koch, Párrafo 136.
[479] Segunda Audiencia (noviembre) D5.165 (Sanders).

casi al 100 % de su capacidad nominal sobre una base anualizada en 2006[480] y el hecho de que los trenes de urea en FertiNitro eran capaces de producir 2200 toneladas diarias[481].

9.27 Las Demandantes concluyen que los elementos de flujos de caja adoptados por el Sr. Giles se encuentran sustentados por documentos contemporáneos, el testimonio experto independiente del Sr. Sanders y las declaraciones del testigo de la Demandada, el Sr. Villarroel, en el contrainterrogatorio.

9.28 Las Demandantes señalan asimismo varias deficiencias en la prueba de la Demandada. En particular, las Demandantes sostienen que la Demandada no ha proporcionado ninguna cuenta creíble de los costos de mantenimiento e inspección general y recorrida irregulares y en aumento en los que se incurrió en FertiNitro desde 2008. En el contrainterrogatorio, el Dr. Flores declaró que había confiado en la cuenta del Sr. Villarroel de costos de mantenimiento e inspección general y recorrida de la planta[482]:

> *"P. […] [Le] citaba al señor Villarroel porque usted [creía] que él comprendía muy bien todos los temas que tenían que ver con estos gastos de mantenimiento y de mantenimiento mayor. ¿No?*
> *R. Sí. O sea, yo suponía que él conocía bien estos temas de costos de mantenimiento porque trabajaba en FertiNitro".*

9.29 Sin embargo, las Demandantes señalan que el Sr. Villarroel admitió que, como Gerente de Operaciones, no era responsable de los costos de FertiNitro ni los conocía[483]:

> *"Yo me refiero a la parte técnica y la realidad que vivo en el día a día de la empresa. Pero, obviamente, este tipo de cosas, de costos, a ese grado de detalle, y si están o no están autorizados, eso no nos compete. Y, realmente, en el día a día no tenemos contacto con esa información".*

9.30 Las Demandantes sostienen que no se puede invocar la prueba pericial del Dr. Flores porque es una combinación errónea de:

---

[480] Primera Audiencia (septiembre) D3.129 (Villarroel).
[481] Primera Audiencia (septiembre) D3.130 (Villarroel).
[482] Segunda Audiencia (noviembre) D6.475-476 (Flores).
[483] Primera Audiencia (septiembre) D4.33 (Villarroel). Las Demandantes señalan también el reconocimiento del Sr. Villarroel de que "no [tenía] ningún tiempo para dedicárselo a los costos": Primera Audiencia (septiembre) D4.31 (Villarroel).

(a) una serie de afirmaciones que están al margen del expediente probatorio o fuera de su experiencia; y

(b) un promedio de datos y fuentes, realizado mecánicamente sin consideración de la prueba contemporánea e industrial.

9.31 En cuanto a (a), la crítica de las Demandantes es de gran alcance. Sostienen que el Dr. Flores pretendió testificar sobre asuntos, tales como: la seguridad de las calles de Venezuela; el procedimiento legal en Venezuela; y el mercado laboral y los procesos de contratación de Venezuela. Durante su testimonio, también asumió lo que las Demandantes describen como:

*"la responsabilidad de la planta de fertilizante, la comercialización de los productos y la experiencia legal y opinó sobre problemas como (1) inspección general y recorrida, mantenimiento y operaciones de la planta; (2) ingeniería y construcción de plantas de fertilizante; (3) costos incurridos en las plantas de fertilizantes; (4) procedimientos y decisiones de arbitrajes; y (5) comercialización de amoníaco y materias primas"*[484].

9.32 En cuanto a (b), las Demandantes afirman que, en contraposición al Sr. Giles, el Dr. Flores ha "adoptado un promedio mecánico de datos de costos y producción sin considerar si un comprador dispuesto y un vendedor dispuesto adoptarían esos datos para proyectar flujos de caja futuros en la planta FertiNitro"[485]. En particular, las Demandantes señalan que el Dr. Flores no analizó los documentos contemporáneos disponibles ni investigó los costos excepcionalmente altos de mantenimiento e inspección general y recorrida en los que se incurrió en FertiNitro desde 2008. Surge, según afirman las Demandantes, que, debido a que no se investigaron las irregularidades, su valoración "se reduce de la peor manera"[486].

*(iii) Los Expertos en Daños de las Partes Coinciden en Varios Parámetros De Compensación; Sin Embargo, Las Notables Diferencias De Hecho Y De Experiencia Con Respecto A Asuntos De Daño Siguen Siendo Significativas*

9.33 En la Segunda Audiencia (noviembre), se les solicitó a las Partes, que en sus presentaciones posteriores identificaran cualquier punto de acuerdo y desacuerdo entre sus respectivos expertos en daños; y, en relación con cada uno de los puntos de desacuerdo, que indicaran

---

[484] EPA Koch, Párrafo 144 (citas omitidas).
[485] EPA Koch, Párrafo 146.
[486] EPA Koch, Párrafo 148.

si los expertos en daños estaban en desacuerdo debido a un hecho o debido a una diferencia de experiencia.

9.34    Las presentaciones ulteriores de las Demandantes adoptaron esa estructura. Sus Tablas 1 a 4 en el Párrafo 149 de su Escrito Post-Audiencia identifican, respectivamente:

(a)    las cuestiones relevantes objeto de acuerdo entre el Sr. Giles y el Dr. Flores, así como la naturaleza de su acuerdo (Tabla 1);

(b)    los puntos de desacuerdo relacionados con la Valoración de Capital (Tabla 2);

(c)    los puntos de desacuerdo relacionados con la Valoración de Offtake (Tabla 3); y

(d)    los puntos de desacuerdo relacionados con las Pérdidas Históricas (Tabla 4).  (El Tribunal ya ha abordado y desestimado estas "Pérdidas Históricas" en la Parte VIII supra).

9.35    Estas Tablas se reproducen en las páginas siguientes[487]. Posteriormente, la Demandada agregó sus comentarios a las Tablas 1 a 3 de las Demandantes durante la Tercera Audiencia (junio)[488], a las cuales, a su vez, las Demandantes agregaron sus respuestas vía mensaje de correo electrónico de fecha 30 de junio de 2016.  Estos comentarios y respuestas se incluyen en las Tablas aledañas, como "Comentario de la Demandada" y "Comentario de las Demandantes", respectivamente [Traducción del Tribunal].  En la medida que sea necesario, a pesar de las controversias procesales de las Partes, el Tribunal de todos modos ha tenido en cuenta sus contenidos, que decidió admitir en el expediente del arbitraje como parte de los respectivos escritos de las Partes, pero no como testimonio pericial del Sr. Giles ni del Dr. Flores[489].

---

[487] En aras de la integridad, aquí se incluye la Tabla 4 sobre "Pérdidas Históricas", aunque el Tribunal ya haya abordado estas pretensiones de KOMSA en la Parte VIII supra.
[488] Tercera Audiencia (junio) D2.339 y ss.
[489] Tercera Audiencia (junio) D2.413 y ss.

*TABLA 1: Puntos de acuerdo entre el Sr. Giles (para las Demandantes) y el Dr. Flores (para la Demandada)*

| Problema | Sr. Giles | Dr. Flores | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|
| Estándar del valor justo de mercado | Segundo Informe de Experto de T. Giles, §1.9 | Segundo Informe de Experto del Dr. Flores, §157 | Los expertos concuerdan en que el valor justo de mercado es el estándar adecuado para usar en este caso. | Aunque los expertos concuerdan en la aplicabilidad del valor justo de mercado en el presente caso, existe desacuerdo respecto de la interpretación en tanto el Sr. Giles formula hipótesis que son incompatibles con la definición de valor justo de mercado (tales como, la utilización de una prima de liquidez al efecto de reducir la tasa de descuento). Segundo Informe de Experto del Dr. Flores, párrs. 159-160. | La relación entre el valor justo de mercado y la liquidez ya ha sido abordada por el Sr. Giles. Véanse: Segundo Informe de Experto de T. Giles, párrs. 5.21-5.28. Audiencia sobre Cuantificación de Daños, Día 6, página 282, líneas 4-5; página 306, líneas 9-20. Audiencia sobre Reconstitución, Día 1, página 217, línea 22 a página 218, línea 14. |
| Metodología de valoración de capital | Primer Informe de Experto de T. Giles, §4.73 | Primer Informe de Experto del Dr. Flores, §94 | Los dos expertos emplean un análisis de flujo de caja con descuento para proyectos de flujos de caja libres para la firma (o flujos de caja de capital) para llegar al valor empresarial y luego deducir la deuda a fin de determinar el valor de capital. | | |
| Vida útil de la planta | Primer Informe de Experto de T. Giles, §4.70 | Primer Informe de Experto del Dr. Flores, §136 | Los flujos de caja para la valoración de capital se proyectan sin límite de tiempo. | | |
| Exclusión del período 2001 a 2005 | N/C | N/C | A pesar de que la producción comercial comenzó en mayo de 2001, los expertos de las Partes no usan la producción ni los datos de costos de 2001 a 2005 para proyectar la producción y los costos futuros de FertiNitro. | | |

| Problema | Sr. Giles | Dr. Flores | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|
| Ganancias sobre los bienes usados como tasa de descuento | Primer Informe de Experto de T. Giles, §4.46 | Primer Informe de Experto del Dr. Flores, §94 | La fórmula de la tasa de descuento se acuerda entre los dos expertos. La ganancia sobre los bienes se usa como tasa de descuento tanto en la valoración de capital como en la de *Offtake Agreement*. A pesar de que, por lo tanto, se concuerda con la metodología y la fórmula, no sucede lo mismo con los datos (ver Tablas 2 y 3 a continuación) | | |
| Inclusión de la prima de riesgo país en la tasa de descuento | Primer Informe de Experto de T. Giles, §4.50 | Primer Informe de Experto del Dr. Flores, §94 | Los dos expertos agregan una prima de riesgo país a las ganancias sobre los bienes para representar el riesgo país, a pesar de que los expertos no concuerdan en el monto adecuado de la prima de riesgo país (ver Tablas 2 y 3 a continuación). | | |
| Aplicación del factor *lambda* a la prima de riesgo país | Primer Informe de Experto de T. Giles, §§4.54-4.55 | Primer Informe de Experto del Dr. Flores, §96 y Gráfico 10 | Los dos expertos aplican un factor *lambda* a la prima de riesgo país para representar la exposición de FertiNitro al riesgo país en Venezuela, si bien los expertos no concuerdan con el nivel adecuado de *lambda* (ver Tablas 2 y 3 a continuación). | El Dr. Flores aplica un factor *Lambda* de uno, lo que significa que el factor *Lambda* no afecta sus cálculos, en tanto el factor *Lambda* del Sr. Giles disminuye sustancialmente la prima de riesgo país. Presentación de D. Flores, diapositiva 18. | La relación entre el riesgo país promedio y el factor *lambda* (la medida de exposición de una empresa a ese riesgo país) ya ha sido abordada por el Sr. Giles. Véanse: Primer Informe de Experto de T. Giles, Anexo B. párrs. B.43-B.46 y párrs. 4.64-4.66. Segundo Informe de Experto de T. Giles, párrs. 5.29-5.61. Audiencia sobre Cuantificación de Daños, Día 6, página 281, líneas 15-22; página 286, línea 6 a página 286, línea 4. Audiencia sobre Reconstitución, Día 1, página 211, línea 12 a página 217, línea 21; Día 2, página 370, línea 11 a página 371 línea 21 y Día 2, página 383, línea 13 a página 384, línea 2. |

| Problema | Sr. Giles | Dr. Flores | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|
| Proyecciones del precio de amoníaco y urea que se usan en la valoración del capital y del *Offtake Agreement* | Primer Informe de Experto de T. Giles, §4.14 | Primer Informe de Experto del Dr. Flores, §18 | Proyecciones de FertEcon para precios de Tampa, NOLA y el Caribe. | | |
| Aplicación de la fórmula del Acuerdo de Suministro de Gas Metano en la valoración del capital. | Primer Informe de Experto de T. Giles, §§2.13 y 4.26 | Primer Informe de Experto del Dr. Flores, §37 | Los expertos concuerdan en la fórmula de gas que especifica el Acuerdo de Suministro de Gas Metano, aunque difieren en sus proyecciones sobre el precio base (respecto a los cuales, ver Tablas 2 y 3). | | |
| Fórmula de precios del *Offtake Agreement* | Primer Informe de Experto de T. Giles, §5.1 | Primer Informe de Experto del Dr. Flores, §154 | Los expertos concuerdan en la fórmula de precios que se usó para determinar el precio al cual KNI podría comprarle *offtake* a FertiNitro. | | |
| Volúmenes históricos del Decreto de la Urea | Primer Informe de Experto de T. Giles, Tabla 3 | N/C | Los volúmenes históricos que afectó el Decreto de la Urea, incluidos en el análisis del Sr. Giles de las pérdidas históricas por el Decreto de la Urea, no han sido contradichos por el Dr. Flores. | | |

*TABLA 2: Puntos de desacuerdo – Valoración de capital*

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Período histórico sobre el cual se basan las proyecciones de volumen de producción | Producción real de 2006 a 2008: Primer Informe de Experto de T. Giles, §2.11 | Producción real de 2006 a 2010: Primer Informe de Experto del Dr. Flores, §32 | Experiencia | - USD 25,7 millones | | El Sr. Giles utiliza diferentes períodos de tiempo para proyectar diferentes variables. Esta inconsistencia tiene como resultado una sobrestimación del valor de FertiNitro. Presentación de D. Flores, Diapositiva 6. | La selección de datos/períodos de tiempo por parte del Sr. Giles ya ha sido abordada. Segundo Informe de Experto de T. Giles, párr. 1.13, párrs. 2.11-2.22 y párrs. 6.6-6.11. Audiencia sobre Reconstitución Día 1, página 197, líneas 2-19; Día 1, página 200, líneas 4-10; Día 2, página 375, línea 14 a página 378, línea 2. |
| Costos de mantenimiento | Montos presupuestados de administración de FertiNitro entre 2006 y 2008: Primer Informe de Experto de T. Giles, §4.34 | Promedio histórico de 2006 a septiembre de 2010 y proyección de octubre de 2010 a diciembre de 2010. Primer Informe de Experto del Dr. Flores, §58 | Experiencia | - USD 35 millones | - | | |

---

[490] La columna intitulada "Impacto en la valoración" es la reducción independiente en la Valoración de capital de FertiNitro del Sr. Giles cuando cambia su suposición por aquella del Dr. Flores para cada punto de desacuerdo.

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Costos de inspección general y recorrida | Presupuesto de administración de FertiNitro de 2008 y cálculos del Sr. Sanders: Primer Informe de Experto de T. Giles, §4.33 | Promedio anualizado del costo real de 2008 y presupuesto para 2010 de la administración de FertiNitro: Primer Informe de Experto del Dr. Flores, §54 | Experiencia | - USD 13,3 millones | El impacto no incluye la diferencia entre los expertos en relación con la frecuencia de la inspección general y recorrida. | | |
| Frecuencia de la inspección general y recorrida | Inspección general y recorrida cada tres años según el Acuerdo de EPC y testimonio del Sr. Sanders: Primer Informe de Experto de T. Giles, §2.10; Segundo Informe de Experto de T. Giles, §6.11 | Inspección general y recorrida cada 2 años y medio sobre la base de la frecuencia histórica entre 2006 y 2010: Primer Informe de Experto del Dr. Flores, nota al pie 45 | Experiencia | - USD 2,5 millones | - | | |
| Gastos de capital | USD 10 millones por año después de los diez primeros años de operación según el Sr. Sanders: Segundo Informe de Experto de T. Giles, §7.34 | USD 10,6 millones por año basado en un promedio histórico de 2006 a septiembre de 2010 y una proyección para octubre de 2010 a diciembre de 2010: Primer Informe de Experto del Dr. Flores, §89 | Experiencia | - USD 4,4 millones | - | El supuesto del Sr. Giles se contrapone al registro histórico, aun para los períodos en los que se basa para otros supuestos. Primer Informe de Experto del Dr. Flores, párr 89, Gráfico 7. | El nivel de gastos de capital ya ha sido abordado por el Sr. Giles. Véanse: Segundo Informe de Experto de T. Giles, párr. 7.34. Audiencia sobre Cuantificación de Daños Día 6, página 323, línea 17 a página 325, línea 12. Audiencia sobre Reconstitución Día 2, página 378, línea 3 a página 379, línea 14. |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Costo base del gas | Presupuesto de FertiNitro para 2010 comparado con la curva del futuro del mercado: Segundo Informe de Experto de T. Giles, §§7.3, y 7.13. | Promedio de las tres proyecciones: Primer Informe de Experto del Dr. Flores, §42. | Experiencia | - USD 17,0 millones | El costo base del gas representa sólo alrededor de 25 % de los costos totales de gas: Primer Informe de Experto de T. Giles, Tabla 26. Como se mencionó en la Tabla 1 anteriormente, los dos expertos concuerdan en la fórmula del gas propuesta por el Acuerdo de Suministro de Gas Metano. | | |
| Costo del gas – factores de eficiencia | Sr. Giles: 40,0 mmbtu de gas natural / 1MT de amoníaco, 2,2 mmbtu / 1 MT de urea. Primer Informe de Experto del Dr. Flores, párr. 46. | Dr. Flores: 40,7 mmbtu de gas natural / 1MT de amoníaco, 242 mmbtu / 1 MT de urea. Primer Informe de Experto del Dr. Flores, párr. 46. | Experiencia | - USD 4,5 millones | | | El Sr. Giles ya ha explicado el motivo para elegir supuestos de eficiencia de gas que sean consistentes con otros supuestos de producción. Véanse: Segundo Informe de Experto de T. Giles, párr. 7.16. Audiencia sobre Cuantificación de Daños, Día 6, página 280, línea 1 a página 281, línea 12. |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Efecto del Decreto de la Urea posterior a la expropiación | No se tienen en cuenta volúmenes del Decreto de la Urea: Primer Informe de Experto de T. Giles, §1.3; Segundo Informe de Experto de T. Giles, §6.4. | Supone volúmenes del Decreto de la Urea que continúan basados en volúmenes promedio de 2006 a 2010 vendidos según el Decreto de la Urea: Primer Informe de Experto del Dr. Flores, §35. | Instrucción jurídica | - USD 72,0 millones | El Dr. Flores supone que el Decreto de la Urea se adoptará indefinidamente, mientras que el Sr. Giles supone que no se implementará el Decreto de la Urea a los fines de proyectar los flujos de caja futuros. | | |
| Efecto del Impuesto Municipal posterior a la expropiación | 1 %: Primer Informe de Experto de T. Giles, §1.3. | 2,4 %: Primer Informe de Experto del Dr. Flores, §67. | Instrucción jurídica | - USD 13,9 millones | El Sr. Giles tiene en cuenta una tasa por Impuesto municipal del 1 % posterior a la expropiación. El Dr. Flores tiene en cuenta una tasa por Impuesto municipal del 2,4 % posterior a la expropiación. | | |
| Efecto del Impuesto de Ciencia y Tecnología posterior a la expropiación | No se incluye el Impuesto de Ciencia y Tecnología en la valoración: Primer Informe de Experto de T. Giles, §1.3. | 0,5 %: Primer Informe de Experto del Dr. Flores, §67. | Instrucción jurídica | - USD 4,8 millones | El Sr. Giles no tiene en cuenta el Impuesto de Ciencia y Tecnología posterior a la expropiación. El Dr. Flores tiene en cuenta la tasa del Impuesto de Ciencia y Tecnología de 0,5 % posterior a la expropiación. | | |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Impuestos distintos del impuesto sobre la renta (IVA, Impuesto Municipal e impuesto farmacológico) | IVA: 12 % sobre la totalidad de los gastos que no correspondan al gas/personal y posteriormente sustrayendo una suma recuperable estimada; Impuesto Municipal: 1 % de las ganancias; Impuesto Farmacológico: 1 % del ingreso anterior a impuestos. Primer Informe de Experto de T. Giles, párrs. 4.38, 4.39. | IVA: N/C; Impuesto Municipal: 2,4 % de las ganancias; Impuesto Farmacológico: 1 % del ingreso anterior a impuestos. Primer Informe de Experto del Dr. Flores, párr. 67. | Instrucción jurídica | - USD 10,1 millones | | | |
| **Suposiciones de tasas de descuento:** | | | | | | | |
| Tasa sin riesgos | 3,42 % basado en un bono de los EE. UU. de 20 años - 10/10/10: Primer Informe de Experto de T. Giles, §4.57. | 3,38 % basado en un bono de los EE. UU. de 20 años - 30/09/2010: Primer Informe de Experto del Dr. Flores, §98. | De hecho/ Experiencia | +USD 2,3 millones | - | | |
| Beta (ajustado) | 0,99 basado en empresas comparables: Primer Informe de Experto de T. Giles, §4.58. | 0,86 basado en empresas comparables: Primer Informe de Experto del Dr. Flores, §§105-108. | Experiencia. | +USD 39,1 millones | - | | |
| Prima de riesgo de mercado | 4,75 % basado en los cálculos de Dimson, Marsh y Staunton sobre las ganancias esperadas futuras: Segundo Informe | 6,7 % basado en los datos históricos de Ibbotson: Primer Informe de Experto del Dr. Flores, §§102-103. | Experiencia | - USD 87,3 millones | La Demandada sugiere que esta es una diferencia de hecho, pero el Sr. Giles argumenta que la fuente del Dr. Flores no es adecuada para el | La prima de riesgo de mercado del Sr. Giles está desactualizada y es inconsistente con su prima de riesgo país basada en el tipo | El Sr. Giles ya ha explicado que: (1) Su prima de riesgo de mercado es coherente con la fecha de valoración y no está "desactualizada". |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| | de Experto de T. Giles, §§4.5-4.6. | | | | cálculo de las ganancias esperadas. . | estadounidense. Primer Informe de Experto del Dr. Flores, párr. 100; Segundo Informe de Experto del Dr. Flores, párr. 106. | Véase: Segundo Informe de Experto de T. Giles, párrs. 4.4 - 4.14. (2) Su estimación se encontraba en la mitad de una escala de estimaciones posibles, Interrogatorio Directo de T. Giles, Diapositiva 15. (3) Por qué no es adecuada una prima que utiliza el tipo estadounidense: Segundo Informe de Experto de T. Giles, párrs. 4.6-4.8. Audiencia sobre Reconstitución, Día 1, página 190, línea 21 a página 195, línea 21. |
| Prima de riesgo país general | 6 % basado en el cálculo del Profesor Damodaran y como punto de referencia en los resultados de las encuestas: Primer Informe de Experto de T. Giles, §B.36. | 11,26 %: Primer Informe de Experto del Dr. Flores, §117. Sobre la base del promedio de dos cálculos (clasificación del riesgo país Ibbotson y Damodaran) y un cálculo ajustado (diferencial del país de Ibbotson aumentado en un 150 %). | Experiencia | - USD 93,4 millones | - USD 93,4 millones es la diferencia entre una prima genérica de riesgo país a un 6 % y a un 11,26 %. | El Sr. Giles ajusta a la baja el método del Profesor Damodaran para arribar a esta prima de riesgo país, mientras que el Dr. Flores promedia tres estimaciones. Primer Informe de Experto del Dr. Flores, párrs. 111, 114-117. | El Sr. Giles ya ha explicado que se basó en datos proporcionados por el Profesor Damodaran y los comparó con datos relevados que ilustran las primas de riesgo país efectivamente aplicadas por profesionales para estimar qué tasa sería aplicable en |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| | | | | | | | una operación de mercado y, por consiguiente, es coherente con el estándar de valor justo de mercado. Véanse: Segundo Informe de Experto de T. Giles, párrs. 1.21 - 1.22 y 5.14 - 5.19. Audiencia sobre Cuantificación de Daños, Día 6, página 281, líneas 15-22. Audiencia sobre Reconstitución, Día 2, página 363, línea 10 a página 372, línea 18. |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Ajuste de liquidez | Reducción del 1 % de la prima de riesgo país para excluir el impacto de una menor liquidez en mercados financieros emergentes, lo cual no es relevante para el valor justo de mercado: Primer Informe de Experto de T. Giles, §B.38. | N/C | Experiencia | - USD 21,5 millones | Una reducción del 1 % en la prima genérica de riesgo país aumenta la valoración del Sr. Giles en USD 21,5 millones. | En contraposición al descuento del Sr. Giles, la literatura respalda universalmente una prima de liquidez para las empresas privadas. En otras palabras, en lugar de incrementar la valoración en USD 21,5 millones, una prima de liquidez reduciría la valoración (un ajuste que el Dr. Flores no realiza). Primer Informe de Experto del Dr. Flores, párrs. 120-122. | Tal como se estableciera en la primera fila de la Tabla 1, ya se ha abordado la relación entre el valor justo de mercado y la liquidez. Véanse: Segundo Informe de Experto de T. Giles, párrs. 5.21 - 5.28. Audiencia sobre Cuantificación de Daños, Día 6, página 282, líneas 4-5; página 306 líneas 9-20. Audiencia sobre Reconstitución, Día 1, página 217, línea 22 a página 218, línea 14. |
| *Lambda* | 0,25-0,40: Primer Informe de Experto de T. Giles, §§B.39-B.82. | 1,0: Primer Informe de Experto del Dr. Flores, Gráfico 10. | Experiencia | - USD 122,1 millones | El Sr. Giles aplica un *lambda* de 0,40 a la valoración. El impacto de la valoración de USD 122,1 millones es consecuencia de la sustitución del *lambda* del Sr. Giles del 0,4 por el *lambda* del Dr. Flores de 1,0. | El Dr. Flores aplica un factor *Lambda* de uno, lo que significa que el factor *Lambda* no afecta sus cálculos, en tanto que el factor *Lambda* del Sr. Giles disminuye sustancialmente la prima de riesgo país. Presentación de D. Flores, diapositiva 18. | La relación entre el riesgo país *promedio* y el factor *lambda* (la medida de exposición de una empresa a ese riesgo país) ya ha sido abordada por el Sr. Giles. Véanse: Primer Informe de Experto de T. Giles, Anexo B. párrs. B.43-B.46 y párrs. 4.64 - 4.66. |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[490] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Segundo Informe de Experto de T. Giles, párrs. 5.29-5.61. Audiencia sobre Cuantificación de Daños, Día 6, página 281, líneas 15-22; página 285, línea 6 a página 286, línea 4. Audiencia sobre Reconstitución, Día 1, página 211, línea 12 a página 217, línea 21; Día 2, página 370, línea 11 a página 371 línea 21 y Día 2, página 383, línea 13 a página 384, línea 2. |
| Riesgos que cubre el TBI que se excluirán de la prima de riesgo país en las valoraciones de capital de FertiNitro y *Offtake* | Algunos riesgos país pueden excluirse de la valoración dada la existencia de protecciones del TBI: Primer Informe de Experto de T. Giles, Tabla 23. | La protección del TBI es irrelevante al riesgo país a los fines de la valoración: Segundo Informe de Experto del Dr. Flores, §124. | Instrucciones jurídicas | No hay un impacto en la valoración, dado que el 0,4 de lambda que usa el Sr. Giles no tiene en cuenta específicamente los riesgos protegidos por el TBI: Presentación de diapositivas de T. Giles, Diapositiva 20. | El factor *lambda* del Sr. Giles se reduciría a 0,25 si se considerara que los riesgos se encuentran cubiertos por las protecciones del TBI[491]: §B.39 | | |

---

[491] La valoración de capital del Sr. Giles aumentaría a USD 408,1 millones si usara un *lambda* de 0,25 en lugar de 0,4. ("*Lambda*" es un factor que mide la exposición al riesgo país de una empresa particular).

*TABLA 3: Puntos de desacuerdo – Valoración de offtake*

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[492] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Base de la valoración | Valoración del *Offtake Agreement* a la fecha de valoración del 10 de octubre de 2010: Primer Informe de Experto de T. Giles, §5.4. | Modelo de daños basado en el reemplazo de volúmenes de offtake después de la expropiación: Primer Informe de Experto del Dr. Flores, §157. | Instrucciones jurídicas/Experiencia | N/C | - | | |

---

[492] Se trata de la reducción independiente en la Valoración de *offtake* del Sr. Giles cuando cambia su suposición por aquella del Dr. Flores para cada punto de desacuerdo.

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[492] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Mercado para toneladas de reemplazo | El único mercado viable en el cual el producto podría reemplazarse es la costa estadounidense del Golfo a precios de esa zona. | Cálculo basado en las toneladas de reemplazo a precios de la zona media del Caribe: Primer Informe de Experto del Dr. Flores, §157. | De hecho | N/C | El Dr. Flores se funda en su suposición injustificada de que KNI podría comprar toneladas de reemplazo a precios de la zona media del Caribe, pero las Demandantes niegan la existencia de tal mercado: Día 6.2. | Las Demandantes y el Sr. Giles no han presentado datos ni documentos para sustentar el argumento de que KNI no ha podido y no podrá de ninguna manera reemplazar con las cantidades que utilizara para el *offtake* de FertiNitro. Por el contrario, el cambio fundamental en el mercado de fertilizantes en América del Norte en los años recientes (precios de gas bajos y ningún costo de transporte) ha tornado la producción extranjera menos atractiva. Segundo Informe de Experto del Dr. Flores, párrs. 198, 210-211. | El Sr. Giles ya ha explicado que: (1) no había tonelaje de reemplazo disponible a precios comparables, y (2) si hubiese habido tonelaje de reemplazo disponible, KNI lo habría adquirido sea que el *Offtake Agreement* se encontrara o no operativo. Segundo Informe de Experto de T. Giles, párr. 10.6. Audiencia sobre Cuantificación de Daños, Día 6, página 82, líneas 11-19. Esto también fue abordado por J. Sorlie en su segunda declaración testimonial, párr. 12. Audiencia sobre Reconstitución, Día 2, página 380, línea 10 a página 383, línea 12. |
| Volúmenes de producción de FertiNitro | Iguales a la valoración de capital | Iguales a la valoración de capital | Experiencia | - USD 9,2 millones | Ver referencias en la Tabla 2 anterior. | | |

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[492] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Datos de tasas de descuento | Iguales a la valoración de capital | Iguales a la valoración de capital | Experiencia | - USD 67,3 millones (solo valoración de offtake) | Ver referencias en la Tabla 2 anterior. En este caso, el impacto de la valoración se relaciona con el efecto combinado de todos los desacuerdos sobre tasas de descuento entre los expertos respecto de la valoración de *offtake*[493]. | | |
| *Lambda* aplicado a la tasa de descuento de *Offtake* | *Lambda* de 0,25 a 0,40, igual a la valoración de capital. | *Lambda* de 1, igual a la valoración de capital. | Experiencia | - USD 23,1 millones. | Si el *lambda* fuera evaluado únicamente para el *Offtake Agreement*, el Sr. Giles sostiene que sería menos de 0,25 a 0,40 lo aplicable a la valoración de capital porque el *Offtake Agreement* está aún menos expuesto al riesgo país de Venezuela. Segundo Informe de Experto de T. Giles, §5.62. | | |

---

[493] La valoración de *offtake* del Sr. Giles aumentaría a USD 213,0 millones si usara un *lambda* de 0,25 en lugar de 0,4.

| Problema | Sr. Giles | Dr. Flores | Índole del desacuerdo | Impacto en la valoración[492] | Comentario | Comentario de la Demandada | Comentario de las Demandantes |
|---|---|---|---|---|---|---|---|
| Costos de transporte | Basados en los costos de transporte reales de KNI tomados como muestra: Primer Informe de Experto de T. Giles, §5.7. | N/C. | Experiencia/De hecho | N/C | El análisis del Dr. Flores no incluye los costos de transporte. | El enfoque de las Demandantes gira en torno a una estimación confiable de los costos de envío, que las Demandantes no han proporcionado. Presentación del Dr. Flores, diapositivas 40-42. | El Sr. Giles ya ha explicado que se basó en los costos de envío reales incurridos en 2010 y los datos fueron proporcionados a la Demandada. Véanse: Primer Informe de Experto de T. Giles, párr. 5.7. Audiencia sobre Cuantificación de Daños, Día 6, página 89, línea 7 a página 93, línea 6. |
| Toneladas *ad hoc* de octubre de 2010 a febrero de 2012 | La valoración del Sr. Giles es de octubre de 2010, por lo que los envíos posteriores, según un arreglo *ad hoc* nuevo, se ignoran a los fines de valoración de esa fecha. | El Dr. Flores trata a las toneladas *ad hoc* como toneladas de reemplazo y, por ende, reduce su valoración de *offtake*: Primer Informe de Experto del Dr. Flores, §158. | Experiencia/Instrucciones jurídicas | N/C | Si se considera que la expropiación del *Offtake Agreement* ha ocurrido después de la extinción del arreglo *ad hoc* de febrero de 2012, la valoración de *offtake* del Sr. Giles se reduciría a 190,9 millones de dólares: Segundo Informe de Experto de T. Giles, §10.9. | | |

*TABLA 4: Puntos de desacuerdo: "Pérdidas históricas" [con las notas al pie de las Demandantes]*

| Problema | Giles | Flores | Índole del desacuerdo | Impacto en la valoración[494] |
|---|---|---|---|---|
| Decreto de la Urea | Calcula pérdidas históricas debido al Decreto de la Urea[495] | n/c | Instrucciones jurídicas | USD 22,4 millones |
| Impuesto Municipal | Calcula las pérdidas debido a la aplicación histórica de un impuesto municipal superior al 1 %[496] | n/c | Instrucciones jurídicas | USD 4,7 millones |
| Impuesto de Ciencia y Tecnología | Calcula las pérdidas debido a la aplicación histórica de un impuesto de ciencia y tecnología[497] | n/c | Instrucciones jurídicas | USD 5,4 millones |
| IVA | Incluye las pérdidas de IVA no recuperable antes de la expropiación[498] | n/c | Instrucciones jurídicas/Experiencia | USD 7,7 millones |

[494] El Impacto en la valoración de esta tabla muestra cada elemento de pérdida histórica como lo calculó el Sr. Giles.
[495] CRAIEF: Resumen de los cambios en la valoración de las Demandantes luego del Segundo Informe de Econ One.
[496] *Íd.*
[497] *Íd.*
[498] *Íd.*

9.36   Las Demandantes identificaron los puntos de desacuerdo entre las Partes más significativos, en relación con lo siguiente: las proyecciones de los expertos en daños para flujos de caja futuros en FertiNitro (sub-sección (d) *infra*); el *Offtake Agreement* (sub-sección (e) *infra*); y la tasa de descuento y la prima de riesgo país aplicables a las Valoraciones de capital y de *offtake* (sub-sección (f) *infra*).

   (iv)   *Puntos Centrales de Acuerdo y Desacuerdo Relacionados con los Flujos de Caja Futuros en FertiNitro*

9.37   Según las Demandantes, tal como se indicara *supra*, los expertos en daños de las Partes concuerdan en que el cálculo de la producción futura en la Planta de FertiNitro debe basarse en los niveles reales de producción de amoníaco y urea que se lograron en la Planta durante cierto período.   Sin embargo, más allá de este simple acuerdo, los expertos disienten respecto del período de tiempo histórico que debe usarse para proyectar la producción futura en FertiNitro.  Ese desacuerdo es significativo, tal como afirmaran las Demandantes.

9.38   Tal como se estableciera en la Tabla 2 *supra*, el Sr. Giles usa el promedio de producción logrado en FertiNitro entre 2006 y 2008.  El Dr. Flores, por otra parte, usa el promedio de producción logrado en FertiNitro entre 2006 y 2010.  La diferencia entre los expertos en daños en este punto reduce la valoración de capital del Sr. Giles en USD 25,7 millones y la valoración de *offtake* en otros USD 9,2 millones.

9.39   En tanto que ambos expertos concuerdan en que el período comprendido entre 2006 y 2008 es un punto de referencia adecuado para proyectar la producción futura de FertiNitro, su desacuerdo principal cuestiona en gran medida si la reducción de la producción de FertiNitro durante 2009 y 2010 también debe incluirse en el período de referencia o no.

9.40   La explicación del Sr. Giles durante la Segunda Audiencia (noviembre) acerca de la disfuncionalidad de 2009 y 2010 fue la siguiente:

   *"[E]l [período] 2009-2010 ese es el mal momento para basarse en eso [para calcular la producción futura de FertiNitro], porque había costos únicos, porque empezó el proyecto 2, y esto no se puede incluir en un presupuesto constante de rendimiento, en una estimación de rendimiento. Y h[ubo] casos graves de descontrol*

*y de mala gestión. Pienso que el 2006 a 2008 da una idea equilibrada, no idealizada y tampoco tremendista"* [499].

9.41   El Sr. Giles declaró que el período 2006 a 2008 (que él usa) estuvo lejos de ser un escenario de producción "ideal", ya que la Planta FertiNitro logró una producción que estuvo "10 por ciento por debajo de la capacidad prevista en el contrato". Surge, tal como afirman las Demandantes, que su prueba es conservadora: la Planta había demostrado la capacidad de lograr la producción nominal. En este sentido, las Demandantes nuevamente señalan la prueba del Sr. Villarroel en el contrainterrogatorio de que podría esperarse que la planta de urea en FertiNitro lograra el 100 % del nivel del EPC[500].

9.42   En relación con la prueba pericial del Dr. Flores, las Demandantes sostienen que no hace más que adherir mecánicamente a su enfoque de promedio. Específicamente, ignora los factores que debilitaron los resultados en 2009 y 2010. Proyectó un nivel de resultados futuros que es, de hecho, incluso más bajo que la propia proyección de la Demandada posterior a la expropiación. En cambio, las Demandantes señalan la valoración preparada por Advantis a los fines de las negociaciones para llegar a un acuerdo, la que demostró que la Demandada esperaba que, en el futuro, FertiNitro produjera cifras más elevadas[501]. (El Dr. Flores, por otra parte, proyectó sólo 1730 TM/día de amoníaco y 2150 TM/día de urea)[502]. Las Demandantes sostienen que el hecho de que la valoración de Advantis a los fines de las negociaciones posteriores a la expropiación sea mayor que las proyecciones de producción del Dr. Flores socava fatalmente la credibilidad de su prueba.

9.43   Según las Demandantes, la segunda fuente principal de desacuerdo entre los expertos en daños de las Partes gira en torno a los costos de mantenimiento e inspección general y recorrida de la Planta FertiNitro. Las Demandantes, por una parte, afirman que el Sr. Giles ha evaluado los registros documentales y ha determinado que la fuente más confiable para

---

[499] Segunda Audiencia (noviembre) D6.280.
[500] Primera Audiencia (septiembre) D.3.128-129 (Villarroel) (para una explicación del concepto de "nominal", *véase* Segunda Audiencia (noviembre) D5.81-82 (El Alegato de Apertura de las Demandantes sobre Cuantificación de daños).
[501] Informe Advantis intitulado "Valoración de FertiNitro" (mayo de 2011) ("*Primer Informe Advantis*") (R-86), página 4.
[502] Modelo de Econ One Actualizado. A modo de comparación, las Demandantes señalan las proyecciones de producción del Sr. Giles de amoníaco de 1708 MT/día y de urea de 2058 MT/día. Las Demandantes sostienen que las proyecciones de producción del Sr. Giles son más conservadoras que las propias proyecciones de la Demandada en la valoración preparada por Advantis.

proyectar los costos futuros de mantenimiento son los presupuestos preparados por la administración de la planta de FertiNitro entre 2006 y 2008. El Sr. Giles declaró que la fuente más confiable para proyectar los costos futuros de inspección general y recorrida es el presupuesto preparado por la administración de la planta de FertiNitro respecto de la inspección general y recorrida de 2008. Por otra parte, las Demandantes afirman que el Dr. Flores ha adherido a su promedio mecánico de los costos de mantenimiento reales incurridos en FertiNitro entre 2006 y septiembre de 2010. Más específicamente, con respecto a su proyección del costo futuro de inspección general y recorrida, el Dr. Flores ha promediado: (1) los costos de inspección general y recorrida de 2008; y (2) los costos presupuestados preparados por la administración de la planta de FertiNitro respecto de la inspección general y recorrida de 2010.

9.44    Las Demandantes realizan cuatro alegaciones principales en sustento de su postura:

(a)    *Primero, alegan que los presupuestos de FertiNitro representan la única fuente confiable para la proyección de los costos futuros de mantenimiento e inspección general y recorrida de la Planta;*

(b)    *Segundo, existen lo que el Sr. Giles describe como "graves irregularidades" con los importes reales que les restan confiabilidad en cuanto a las proyecciones de los costos futuros de mantenimiento e inspección general y recorrida en FertiNitro;*

(c)    *Tercero, las suposiciones sobre los costos de mantenimiento e inspección general y recorrida del Dr. Flores se basan en un enfoque mecánico que ignora la prueba contemporánea de "graves irregularidades" con los costos de mantenimiento e inspección general y recorrida de FertiNitro; y*

(d)    *Cuarto, la supuesta teoría de la "inflación" de la Demandada no explica los altos costos de mantenimiento e inspección general y recorrida incurridos en la Planta.*

9.45    Nuevamente es necesario describir en mayor detalle cada una de estas alegaciones.

9.46    En cuanto a (a) – la "confiabilidad de los presupuestos de FertiNitro": El Sr. Giles explica que los presupuestos de administración proporcionan el indicador más confiable respecto

de los costos futuros de mantenimiento e inspección general y recorrida de la Planta[503].  En efecto, afirman las Demandantes, los tribunales del CIADI a menudo han adoptado dichos presupuestos para proyectar los costos futuros.  Señalan el caso *Venezuela Holdings c. Venezuela* (al que también se hace alusión como el caso *ExxonMobil*)[504], donde, tras habérsele presentado una serie de opciones (una de las cuales incluyó el plan de negocios de 2006 que detallaba los gastos operativos presupuestados para 2007), Venezuela argumentó que el presupuesto de 2007 requería "varios ajustes para desarrollar las proyecciones de costos operativos"[505].  El tribunal rechazó este argumento y sostuvo que "[los gastos presupuestados fueron] el mejor indicador de lo que los participantes del Proyecto esperan en el futuro en ausencia de medidas adversas tomadas por las autoridades venezolanas"[506].

9.47   Las Demandantes afirman que aquí se aplica exactamente el mismo fundamento.  Surge que las razones de la utilización de presupuestos de administración para la proyección de los costos futuros en FertiNitro son abrumadoras.  Esto es así particularmente en lo que se refiere al carácter poco fiable de los supuestos costos reales de FertiNitro previo a la expropiación en octubre de 2010.

9.48   En cuanto a (b) – las "graves irregularidades": las Demandantes sostienen que los presupuestos representan la única fuente confiable para el Tribunal a los efectos de la proyección de los costos futuros de mantenimiento e inspección general y recorrida de la Planta.

9.49   Las Demandantes señalan, en particular, el Acta de la reunión de la Junta Directiva de FertiNitro de agosto de 2010.  Allí se describió que los costos escalaban "fuera de control"[507].  Las Demandantes sostienen que, para 2010, la Junta tenía en claro que los costos en FertiNitro se habían inflado burdamente a través de la adjudicación de contratos

---

[503] Segunda Audiencia (noviembre) D6.277-278 (Giles).
[504] *Venezuela Holdings c. Venezuela* (RLA-153).
[505] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafo 343.
[506] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafo 342 (cita omitida).
[507] Acta de la reunión de la Junta Directiva de FertiNitro No. 111 (5 de agosto de 2010) (C-105), página 4.

no autorizados por parte del personal de administración de la planta de Pequiven.  En efecto, el Acta de esa reunión de la Junta Directiva registra lo siguiente[508]:

> *"[…] cinco (5) contratos que en conjunto implicaban obligaciones para FertiNitro de aproximadamente 56 millones USD, y que la nueva Gerencia procedió a rescindir, pues los mismos no cumplieron con procesos licitatorios adecuados y carecían algunos de los contratistas calificados que justificaran su selección.  Igualmente se informó que en todos esos Contratos, el Gerente General actuó en violación de los límites de autorización y delegación financiera aprobados por la Junta Directiva".*

9.50   Las Demandantes sostienen que estos contratos no autorizados sin duda contribuyeron a los costos excepcionalmente altos de mantenimiento e inspección general y recorrida incurridos en la Planta.

9.51   Aunque durante la reunión de la Junta Directiva de FertiNitro de agosto de 2010 se adoptaron resoluciones que establecieron procedimientos específicos y una línea de tiempo para la selección de auditores externos y la designación de un departamento de auditoría interna, no se llevaron a cabo ninguna de estas resoluciones o solicitudes de la junta directiva, ya que (tal como afirman las Demandantes) la Demandada expropió FertiNitro en octubre de 2010.

9.52   En cuanto a (c) – ignorancia de las "graves irregularidades": las Demandantes afirman que el propio Dr. Flores aceptó que existían irregularidades que deberían haberse contemplado al emprender el ejercicio de valoración.  En particular, hacen alusión a su reconocimiento de que "si uno estuviera muy preocupado, posiblemente se puedan excluir"[509].  Independientemente de estas cuestiones, el Dr. Flores calculó los costos sobre un simple promedio.  Las Demandantes afirman que estas cuestiones son importantes y exigen el rechazo de su prueba.

9.53   En cuanto a (d) – la teoría de la "inflación": las Demandantes afirman que la Demandada no ha brindado ninguna explicación creíble en cuanto a los costos de mantenimiento e inspección general y recorrida incurridos en la Planta.  En lo que las Demandantes

---

[508] Acta de la reunión de la Junta Directiva de FertiNitro No. 111 (5 de agosto de 2010) (C-105), página 5.
[509] Segunda Audiencia (noviembre) D7.567 (Flores).

describieron como un "último intento desesperado de explicar estos costos"[510], la Demandada planteó la explicación de que los considerables costos de mantenimiento e inspección general y recorrida eran el resultado de la inflación.  El Dr. Flores adoptó esa teoría por primera vez en la Audiencia.  Las Demandantes sostienen que debe rechazarse, señalando el rechazo de la inflación del Sr. Giles[511], conjuntamente con la ausencia de documentos contemporáneos[512].

9.54   Según las Demandantes, el tercer punto importante de desacuerdo se refiere a los períodos de inspección general y recorrida.  Las Demandantes sostienen que, de conformidad con la prueba del Sr. Giles, la base de la propuesta de EPC confirmó que los patrocinadores del proyecto esperaban que hubiera una inspección general y recorrida en FertiNitro cada tres años.  Las Demandantes critican el enfoque adoptado por la Demandada, sobre la base de la prueba del Dr. Flores, a saber, que debería aplicarse un promedio simple.  Es decir, en lugar de adoptar una inspección general y recorrida de tres años, la utilización por parte del Dr. Flores de una inspección general y recorrida de 2,5 años es errónea, en tanto se basa en la ocurrencia de dos inspecciones generales y recorridas en el período comprendido entre 2006 y 2010.  Surge, según afirman las Demandantes, que la evaluación del Sr. Giles es la única que está respaldada por la prueba contemporánea, los puntos de referencias internacionales y la opinión independiente del Sr. Sanders.

   *(v)   Puntos centrales de acuerdo y desacuerdo relacionados con la valoración del Offtake Agreement*

9.55   Las Demandantes identifican el punto central de desacuerdo entre los expertos en daños de las Partes en relación con el *Offtake Agreement* como la metodología que debe usarse para la valoración de la participación de KNI en el *Offtake Agreement*.

9.56   Las Demandantes señalan lo que afirman constituye el enfoque más deseable del Sr. Giles, es decir, tres pasos, de la siguiente manera:

---

[510] EPA Koch, Párrafo 173.

[511] Segunda Audiencia (noviembre) D6.287-288 (Giles).

[512] Las Demandantes se basan particularmente en el acta de la reunión de la Junta Directiva de fecha 5 de agosto de 2010, que omite cualquier referencia a la "inflación". Acta de la reunión de la Junta Directiva de FertiNitro No. 111 (5 de agosto de 2010) (C-105)

(a)   *cálculo del precio de venta de la urea y el amoníaco en los Estados Unidos (según las proyecciones de FertEcon de octubre de 2010);*

(b)   *el precio de compra del amoníaco y la urea conforme al Offtake Agreement (nuevamente, según las proyecciones de FertEcon de octubre de 2010); y*

(c)   *el costo de envío entre FertiNitro y los Estados Unidos.*

9.57   El Sr. Giles posteriormente aplica su tasa de descuento para calcular el valor actual neto del *Offtake Agreement*.

9.58   Las Demandantes señalan el sustento probatorio para este enfoque del Sr. Jim Sorlie, quien declarara acerca del mercado de fertilizantes del Caribe. Dicha prueba habiendo sido "irrefutada" por parte de la Demandada y desacreditando la suposición del Dr. Flores de un mercado al contado de productos fertilizantes al supuesto precio "medio del Caribe".

9.59   Las Demandantes sostienen que el Dr. Flores no ha realizado una valoración del *Offtake Agreement* a octubre de 2010.  En cambio, las Demandantes afirman que la utilización del valor de reemplazo empleado por el Dr. Flores contradice el estándar de compensación conforme al derecho internacional consuetudinario.  Dicho enfoque exige una determinación del valor justo de mercado (no del valor de reemplazo) a la fecha de la expropiación.

9.60   En relación con el enfoque del Dr. Flores, las Demandantes señalan también una serie de cuestiones que lo debilitan, a saber (tal como afirman las Demandantes):

(a)   *Su suposición sin fundamento de que KNI podía reemplazar las toneladas perdidas a un "precio medio del Caribe". Esta suposición contradice la prueba irrefutable del Sr. Sorlie de que prácticamente no hay productos disponibles para que KNI compre en el mercado del Caribe*[513];

---

[513] Primera Audiencia (septiembre) D2.105-106 (Sorlie).

(b) *Sus suposiciones de hecho sin fundamento, incluida su afirmación de que "el amoníaco producido en Venezuela no tiene ninguna diferencia respecto al que se produce en el Mar Negro"[514]; y*

(c) *No mencionar que casi todos los artículos en los que se basó corresponden a una fecha posterior a la expropiación de octubre de 2010.*

9.61    Por último, en relación con la afirmación de la Demandada de que el descubrimiento y explotación de gas de esquisto en los Estados Unidos tiene un impacto, las Demandantes sostienen que los desarrollos de gas de esquisto de los Estados Unidos posteriores a 2010 no pueden influir en el valor justo de mercado del *Offtake Agreement* de octubre de 2010. En realidad, tal como afirman las Demandantes invocando la prueba del Sr. Sorlie, incluso en 2014 (cuatro años después de la expropiación), se esperaba que los Estados Unidos se mantuvieran como un importador neto muy importante de fertilizantes[515]. Por otra parte, la prueba del Sr. Sorlie confirmó que la explotación de gas de esquisto en los Estados Unidos no afectaría considerablemente la valoración del *Offtake Agreement* del Sr. Giles, incluso en 2014. Esa prueba, tal como afirman las Demandantes, no es refutada por la Demandada.

9.62    Por consiguiente, en resumen, las Demandantes sostienen que la Valoración de *Offtake* del Sr. Giles cumple con el estándar jurídico aplicable, se basa en prueba documental y testimonial confiable, y refleja una clara comprensión del mercado de fertilizantes del Caribe. Esto debe contrastarse, afirman las Demandantes, con la Valoración de *Offtake* del Dr. Flores, que es errónea tanto desde el punto de vista de hecho como de derecho, revela una interpretación equivocada del mercado de fertilizantes del Caribe y se ve debilitada por prueba documental y testimonial.

---

[514] Segunda Audiencia (noviembre) D7.687 (Flores).
[515] Primera Audiencia (septiembre) D2.153-154 (Sorlie).

<ul><li>(vi) <i>Puntos Centrales de Acuerdo y Desacuerdo Relacionados Con la Tasa de Descuento y La Prima De Riesgo País</i></li></ul>

9.63    En este momento es necesario proceder a tratar otras dos cuestiones de desacuerdo entre las Partes, es decir, los componentes tasa de descuento y prima de riesgo país del modelo FCD.

9.64    En cuanto a la tasa de descuento, las Demandantes se basan en la tasa del Sr. Giles del 10,1 % en lugar de la tasa del Dr. Flores del 20,4 %.

9.65    Observando que cada perito ha incorporado una prima de riesgo de mercado y una prima de riesgo país en su tasa de descuento, las Demandantes señalan que la Tabla 5 en el Párrafo 197 de su Escrito Post-Audiencia (que se reproduce a continuación) demuestra el efecto a la baja de sus evaluaciones del riesgo país y del mercado con respecto a sus respectivas valoraciones:

*TABLA 5: Escenarios de valoración*

| Escenarios de valoración | Valoración de capital del Sr. Giles | Valoración de capital del Dr. Flores |
|---|---|---|
| Valoración sin riesgo de mercado ni riesgo país | USD 3445,8 millones | USD 2615,4 millones |
| Valoración con riesgo de mercado, pero sin riesgo país de Venezuela agregado (como si FertiNitro estuviera en los EE. UU.) | USD 514,1 millones | USD 250,0 millones |
| Valoración con riesgo de mercado y riesgo país de Venezuela agregado | USD 361,0 millones | USD 34,6 millones |

9.66    Las Demandantes hacen hincapié en que el Sr. Giles ha incorporado tanto el riesgo de mercado como el riesgo país a su Valoración de Capital y Valoración de *Offtake*. En consecuencia, sostienen, por lo tanto, que el Sr. Giles ha adoptado una tasa de descuento que tiene en cuenta todos los riesgos de mercado y país que afectan potencialmente las inversiones de las Demandantes en Venezuela, aunque esto derive en una reducción sumamente considerable de su valoración.

9.67   Por otra parte, las Demandantes describen la tasa de descuento del Dr. Flores como una tasa de descuento más elevada "artificial"[516] [Traducción del Tribunal].   En resumen, las Demandantes critican al Dr. Flores por seleccionar una prima de riesgo de mercado exagerada y una prima de riesgo país general inflada que no tiene en cuenta la exposición específica de FertiNitro al riesgo país de Venezuela.   Según las Demandantes, existen diversos elementos en esa crítica.

9.68   Primero, las Demandantes sostienen que el Dr. Flores ha adoptado una prima de riesgo de mercado inflada que debilita su valoración de las inversiones de las Demandantes.   Esa prima de riesgo de mercado era del 6,7 %.   Durante la Segunda Audiencia (noviembre), el Sr. Giles explicó que, de 12 posibles fuentes de primas de riesgo de mercado en el expediente de este arbitraje (del 3 % al 6,7 %), el Dr. Flores seleccionó la fuente que produce la prima de riesgo de mercado más elevada posible[517].   Las Demandantes aseveran que esto establece un claro contraste con la prima de riesgo de mercado del Sr. Giles, que se ubica en el punto medio del rango de fuentes posibles de prima de riesgo de mercado. Las Demandantes sostienen que la selección de una prima de riesgo de mercado exagerada es una "demostración evidente de ingeniería financiera inversa por parte del Dr. Flores"[518]. En este sentido, las Demandantes señalan que la prima de riesgo de mercado seleccionada por el Dr. Flores es casi el doble de la prima de riesgo de mercado del 3,5 % adoptada por la Demandada en su propia valoración de capital posterior a la expropiación encargada a Advantis a los efectos de las negociaciones para llegar a un acuerdo[519].   En síntesis, las Demandantes afirman que el enfoque del Dr. Flores no representa de manera realista lo que un comprador dispuesto y un vendedor dispuesto habrían acordado en una transacción a octubre de 2010.

9.69   Segundo, a pesar de comenzar en el mismo punto de partida general (a saber, la prima de riesgo país general del Profesor Damodaran para Venezuela), las Demandantes afirman que el análisis del Dr. Flores toma tres medidas respecto del riesgo país de Venezuela, las promedia y luego se abstiene de analizar los atributos individuales de FertiNitro para

---

[516]  EPA Koch, Párrafo 200.
[517] Segunda Audiencia (noviembre) D6.282-283 (Giles).
[518] EPA Koch, Párrafo 203.
[519] Primer Informe Advantis (R-86), página 23.

determinar la exposición al riesgo país.  Las Demandantes se concentran en el hecho de que el Dr. Flores no ha explicado por qué el promedio de varias fuentes (cada una de las cuales redundaba en una diferencia importante en las tasas de riesgo país) ofrece una metodología precisa para calcular la tasa de riesgo país de Venezuela.

9.70    Surge, tal como afirman las Demandantes, que debe preferirse la metodología del Sr. Giles. El Sr. Giles utilizó una prima de riesgo país general del 6 %, que luego ajustó: (1) para eliminar el impacto de iliquidez (dado que el estándar de valor justo de mercado requiere que uno asuma que no existen problemas de liquidez) y (2) para reflejar la exposición específica de FertiNitro al riesgo país de Venezuela, es decir, el factor *lambda*.

9.71    Las Demandantes sostienen que debe preferirse el análisis del Sr. Giles porque reconoce que FertiNitro, como toda inversión, es única.  Basó su prima de riesgo país general en la proyección del Profesor Damodaran del 6,75 % para el riesgo país general en Venezuela. Posteriormente redujo el cálculo del Profesor Damodaran un 0,75 % para considerar los datos de encuestas que son representativos de lo que los participantes del mercado utilizan en lo que denomina transacciones "reales".

9.72    Surge, tal como afirman las Demandantes, que el Tribunal debe usar la única fuente que acuerdan ambos expertos en este arbitraje como una fuente adecuada para evaluar el riesgo país genérico de Venezuela; es decir, el cálculo proporcionado por el Profesor Damodaran - con los ajustes realizados por el Sr. Giles.

9.73    Sobre este último punto, las Demandantes concluyen que la tasa apropiada debería ajustarse por vía de referencia a un ajuste de liquidez.  Esto es, debe reducirse el riesgo país genérico para eliminar el riesgo de un mercado con problemas de liquidez.  Esto deriva, tal como declara el Sr. Giles, en una reducción del 1 % (del 6 % al 5 %).

9.74    Tercero, las Demandantes señalan que los expertos acuerdan, en principio, la aplicación de un ajuste del riesgo país específico de FertiNitro mediante un factor *lambda*.  Los expertos acuerdan que, en principio, se debe aplicar un factor *lambda* para determinar una prima de riesgo país específica de la inversión.  Tal como explicara el Sr. Giles[520]:

---

[520] Segunda Audiencia (noviembre) D6.285 (Giles).

> *"Creo que todos aceptan, incluso el doctor Flores, que un inversor va a pagar más por una inversión más aislada del riesgo país de lo que lo puede estar una empresa cualquier en Venezuela. Eso está claro. También lo vemos en la obra del doctor Damodaran. Así que hay que formarse una opinión sobre la exposición relativa de FertiNitro al riesgo país venezolano".*

9.75   Las Demandantes se quejan de que el Dr. Flores, en realidad, no ha calculado un factor *lambda*.  El resultado final, tal como aseveran las Demandantes, es que el Dr. Flores está de acuerdo con la aplicación de un factor *lambda*, aunque no llevó a cabo el análisis detallado específico de la inversión que este enfoque requiere.

9.76   Cuarto, las Demandantes concluyen que el Sr. Giles es el único experto en daños que ha aplicado efectivamente el enfoque *lambda* acordado y evaluado así la medida en la que FertiNitro está expuesto al riesgo país venezolano.

9.77   Las Demandantes sostienen que, aunque el Dr. Flores posteriormente afirmó haber aplicado un factor *lambda*, la prueba aportada durante la Segunda Audiencia (noviembre) confirmó que sólo el Sr. Giles ha realizado un examen adecuado de la exposición de FertiNitro al riesgo país venezolano.  Señalan el análisis detallado del Sr. Giles de la medida en la cual FertiNitro está expuesto a 22 factores de riesgo distintos que comprenden el riesgo país de Venezuela.  En definitiva, el Sr. Giles determinó que debía aplicarse un factor *lambda* adecuado de 0,4.  Tal como explicara el Sr. Giles[521]:

> *"Primero del lado de los ingresos, no hay riesgos de precios específicos en Venezuela. Sin decreto urea todos los precios se fijan a escala internacional según el off-take, así que pase lo que pase en la economía venezolana los precios se fijan a escala internacional.*
> *La demanda es internacional, el mercado internacional e, el precio internacional y aceptan todos los volúmenes que puede producir FertiNitro, así que pase lo que pase en Venezuela FertiNitro puede vender su producto. Lo que no es lo mismo que una empresa tipo, no sé un hotel, una panadería. Una empresa tipo está muy expuesta a las condiciones económicas del lugar".*

9.78   Las Demandantes señalan que el Sr. Giles ha implementado un enfoque forense que analiza un conjunto de factores de riesgo país.  Las Demandantes señalan también que el Sr. Giles

---

[521] Segunda Audiencia (noviembre) D6.286 (Giles).

hace hincapié en que la Planta FertiNitro está ubicada en un lugar seguro y tiene una baja exposición a riesgos asociados al disturbio social, las huelgas políticas y el crimen organizado.  Tiene acceso a un muelle dedicado para exportar sus productos; y FertiNitro no requiere financiación externa para operar.  Además, tiene una exposición baja a los riesgos de transporte e infraestructura venezolanos.

9.79   Las Demandantes sostienen que debe contrastarse al Sr. Giles con el Dr. Flores, quien admitiera durante el contrainterrogatorio en la Segunda Audiencia (noviembre) que no había analizado de manera independiente cada uno de los 22 elementos de riesgo país analizados por el Sr. Giles cuando se calculó el factor *lambda*[522].

9.80   Las Demandantes sostienen además que la evaluación del Sr. Giles y las conclusiones acerca del factor *lambda* son coherentes con aquellas de la agencia de calificación crediticia internacional, Moody's, en su determinación contemporánea de los riesgos asociados con la deuda corporativa de FertiNitro.  Al comienzo del proyecto, Moody's llevó a cabo un análisis comparativo de las calificaciones de riesgo de Venezuela y el proyecto FertiNitro. El enfoque analítico llevado a cabo por Moody's en la determinación de la calificación de los bonos corporativos de FertiNitro es, afirman las Demandantes, similar al enfoque adoptado por el Sr. Giles en la determinación del factor *lambda*.  Además, las agencias de calificación crediticia internacionales calificaron los bonos de FertiNitro como menos riesgosos que la deuda soberana de Venezuela.

9.81   En cambio, las Demandantes sostienen que las evaluaciones contemporáneas de las agencias de calificación crediticia internacionales contradicen la implementación *ad hoc* del Dr. Flores de un *lambda* de 1,0.  En el contrainterrogatorio, el Dr. Flores estuvo de acuerdo en que el informe de Moody's (Anexo BE-19) confirma la posición aceptada de que se debe medir el riesgo país con respecto a los bienes específicos o la inversión en cuestión.  En este sentido, explicó lo siguiente[523]:

> *"Así que Moody's dice: En este tipo de evaluación hay que examinar cada proyecto por sí solo. ¿Correcto? R Sí".*

---

[522] Segunda Audiencia (noviembre) D7.604-606 (Flores).
[523] Segunda Audiencia (noviembre) D7. 643 (Flores).

9.82   Las Demandantes sostienen que, notablemente, el Dr. Flores reconoció que, al comienzo del proyecto FertiNitro, Moody's había confirmado que FertiNitro estaba menos expuesta al riesgo país venezolano que otras empresas que operaban en Venezuela[524].   Las Demandantes señalan criterios analíticos similares utilizados por otras agencias, por ejemplo, Fitch[525] y Duff & Phelps[526].   Así, surge tal como afirman las Demandantes, que estas conclusiones contemporáneas corroboran las conclusiones a las que arribó el Sr. Giles acerca del *lambda* e igualmente, confirman que la conclusión del Dr. Flores es fuera de lo común.

9.83   Además, las Demandantes destacan que Moody's observó que los inversionistas extranjeros pueden disminuir la exposición al riesgo país mediante la estructuración de las transacciones a fin de beneficiarse de las protecciones otorgadas en tratados de inversión. Sin embargo, el Dr. Flores asumió lo opuesto, suponiendo que la existencia del Tratado no mitiga, de ninguna forma, el riesgo país con respecto a las inversiones de las Demandantes. Esto demuestra lo que, según las Demandantes, se trata de otra falla con la suposición del Dr. Flores de que un comprador y vendedor dispuestos considerarían que FertiNitro y el *Offtake Agreement* están expuestos al riesgo país venezolano al igual que el activo promedio ubicado en Venezuela, lo que ocasiona un *lambda* de 1,00.

9.84   Las Demandantes alegan que la arbitrariedad del *lambda* del Dr. Flores de 1,00 es ilustrada aún más por el hecho de que omitió por completo el *Offtake Agreement* en su análisis.   El Sr. Giles confirmó en su segundo informe que "el *Offtake Agreement* es inmune a los cambios de los costos locales en Venezuela; por lo tanto, lo hace aún menos similar a una firma típica en Venezuela"[527].   Y, sin embargo, tal como confirmara en la Segunda Audiencia (noviembre), el Dr. Flores simplemente ha aplicado el mismo *lambda* de 1,00 a la Valoración de *Offtake* sin una evaluación separada de la exposición del *Offtake Agreement* al riesgo país venezolano[528].

[524] Segunda Audiencia (noviembre) D7. 623-624 (Flores).
[525] Comunicado de prensa de calificación de Fitch (30 de marzo de 1998) (C-119).
[526] Duff & Phelps Credit Rating Co., FertiNitro Finance Inc. – Credit Analysis Update (septiembre de 1998) (BE-23), página 188.
[527]  Segundo Informe de Experto de Tim Giles (30 de agosto de 2013) ("Giles IP2"), Párrafo 1.26.
[528] Segunda Audiencia (noviembre) D7. 682-683 (Flores).

9.85   Las Demandantes señalan nuevamente que el análisis del Dr. Flores entra en conflicto con el registro contemporáneo y la práctica de valoración de la vida real.  Las agencias de calificación internacional, por ejemplo, han confirmado que la existencia de un *Offtake Agreement* mitiga la exposición al riesgo país[529].

9.86   Por eso, en resumen, las Demandantes afirman que la exposición turbia, superficial e interesada del Dr. Flores sobre el tema *lambda* es flagrante dado el efecto dramático que tiene el *lambda* en las Valoraciones de Capital y de *Offtake*.

   *(vii)  El laudo dictado en el contexto del caso <u>Gold Reserve c. Venezuela</u> respalda la prima de riesgo país específica de FertiNitro adoptada por el experto en daños de las Demandantes, el Sr. Giles, y desacredita la prima de riesgo país general adoptada por el experto en daños de la Demandada, el Dr. Flores; por el contrario, los laudos dictados en los casos de ExxonMobil y Mobil no identifican ninguna prima de riesgo país para Venezuela y se distinguen claramente*

9.87   En relación con la cuestión del riesgo país, las Demandantes sostienen que el laudo dictado en el contexto del caso *Gold Reserve c. Venezuela*[530] respalda la prima de riesgo pías específica de FertiNitro adoptada por el Sr. Giles y desacredita la prima de riesgo país general adoptada por el Dr. Flores.  Además, las Demandantes sostienen que los dos laudos dictados en el marco de los casos *ExxonMobil y Mobil*[531] no identifican ningún riesgo país para Venezuela y se distinguen claramente.

9.88   Las Demandantes sostienen que el laudo de *Gold Reserve* es de importancia central debido a su tratamiento de la tasa de descuento y el riesgo país venezolano.  El tribunal en ese caso adoptó una tasa de descuento según un costo de capital promedio ponderado ("CCPP") del 10,09 %[532]  (que es casi idéntico a la tasa de descuento comparable del Sr. Giles del 10,1 %).  Al hacerlo, el tribunal incorporó una prima de riesgo país del 4 % al costo del capital.

9.89   Las Demandantes presentan cuatro argumentos en este sentido que (según argumentan) sustentan su enfoque, a saber:

---

[529] *Véanse, por ejemplo*, Duff & Phelps Credit Rating Co. – Rating Approach to Project Finance (BE-18), página 13; Thomas Coleman, Moody's Investors Service – Piercing the Sovereign Ceiling: Issues in Oil and Gas Project Financing – (23 de febrero de 1998) (BE-11), página 9.
[530] *Gold Reserve c. Venezuela* (CLA-156).
[531] Es decir, *Mobil c. PDVSA* (EO-45); *Venezuela Holdings c. Venezuela* (RLA-153).
[532] *Gold Reserve c. Venezuela* (CLA-156), Párrafo 842.

9.90   En primer lugar, el tribunal del caso *Gold Reserve* concluyó que una prima de riesgo país del 4 % "considera adecuadamente riesgos políticos, junto con otros riesgos, pero no se infla en exceso a causa de riesgos de expropiación"[533]. Según ese tribunal, "no es adecuado aumentar la prima de riesgo país para reflejar la percepción del mercado acerca de que un estado podría tener una tendencia a expropiar inversiones en incumplimiento de las obligaciones del TBI"[534].  Las Demandantes sostienen además que este aspecto del razonamiento del tribunal concuerda con el principio de derecho internacional establecido de *nullus commodum capere de sua injuria propria*[535].

9.91   Este principio ha sido reafirmado por el tribunal en *Flughafen c. Venezuela*, donde el tribunal explicó lo siguiente: "El estado que aumenta el riesgo país a través de la adopción de nuevas actitudes políticas, adoptadas después de que se haya materializado la inversión, no puede beneficiarse de un acto ilícito que se le atribuya para reducir la compensación que se pagará"[536].

9.92   En segundo lugar, la prima de riesgo país adoptada por el tribunal en *Gold Reserve* confirma que se requiere un enfoque específico de la inversión para medir el riesgo país a los fines de la valoración.  El tribunal rechazó específicamente el cálculo de riesgo país "general" de Venezuela debido a que se "basó en el riesgo país completo y 'general' para una inversión en Venezuela"[537].  En cambio, se refirió a una valoración de mercados de capital de RBC que fue específica de la inversión de *Gold Reserve* con el fin de llegar a su prima de riesgo país del 4 %.

9.93   En tercer lugar, en el laudo de *Gold Reserve*, la prima de riesgo país del 4 % se relacionó con el costo del capital.  Esto ocasionó un costo total de capital del 11,92 % y un CCPP del 10,09 %.  El elemento de la prima de riesgo país del CCPP fue en consecuencia <u>menor</u> que el 4 %, ya que el CCPP es una medida no solo de capital, sino también de deuda (que tendría una prima de riesgo país más baja o nula adjunta a este).  Las Demandantes alegan que los

---

[533] *Id.*
[534] *Gold Reserve c. Venezuela* (CLA-156), Párrafo 841.
[535] Ningún Estado puede beneficiarse de sus propios actos ilícitos.
[536] *Flughafen Zürich A.G. y Gestión e Ingeniería IDC S.A. c. República Bolivariana de Venezuela*, Caso CIADI N.º ARB/10/19, Laudo (18 de noviembre de 2014) ("*Flughafen c. Venezuela*") (RLA-154), Párrafo 905.
[537] *Gold Reserve c. Venezuela* (CLA-156), Párrafo 840.

expertos de las Partes aceptan que la tasa de descuento adecuada que ha de aplicarse en este caso es el retorno sobre los bienes.  Esta tasa es efectivamente idéntica al CCPP (con la excepción del tratamiento de escudos fiscales de deuda).  El retorno sobre los bienes es, al igual que el CCPP, el retorno sobre los acreedores y los accionistas.  Como tal, al efecto de comparar la prima de riesgo país aplicada en el laudo de *Gold Reserve* con la prima del riesgo país que se aplicará a FertiNitro, no es necesario observar el 4 % agregado por el tribunal de *Gold Reserve* al costo del capital, sino la prima que se aplicó al CCPP.  Aunque el laudo no especifica qué prima se aplicó al CCPP en el caso de *Gold Reserve*, debe ser menor al 4 % que el tribunal aplicó al costo del capital.

9.94    En cuarto lugar, tal como explicara el Sr. Giles (véase *supra*) FertiNitro está mucho menos expuesto al riesgo país de Venezuela que la mina de oro en cuestión en el caso de *Gold Reserve*.  La mina se ubicaba en la "Reserva Forestal de Imataca, frágil desde el punto de vista ecológico" en el interior de Venezuela[538].  No se puede acceder fácilmente a esta área del sudeste de Venezuela y tiene vías de transporte deficientes, incluso en comparación con otras ubicaciones remotas de Venezuela.

9.95    A diferencia del caso *Gold Reserve*, las Demandantes afirman que los casos de *ExxonMobil y Mobil* se distinguen claramente del presente arbitraje y los laudos resultantes no ofrecen un precedente significativo sobre la evaluación del riesgo país y la tasa de descuento.  *ExxonMobil* obtuvo estos laudos en dos arbitrajes separados contra Venezuela y sus empresas estatales.  Estos laudos se relacionan con la expropiación de Venezuela de un proyecto de petróleo extra pesado y otras inversiones llevadas a cabo formalmente por el grupo de *ExxonMobil* en Venezuela.

9.96    En relación con el arbitraje CCI, Mobil Cerro Negro ("*Mobil*") inició un procedimiento de arbitraje contra PDVSA Cerro Negro SA ("PDVSA-CN") y Petróleos de Venezuela SA ("PDVSA") conforme a dos acuerdos interrelacionados: (1) el "Acuerdo de Asociación" y (2) la "garantía de PDVSA"[539].  La tarea del tribunal CCI fue "aplicar la intención común de las Partes reflejada en el [Acuerdo de Asociación]"[540].  En particular, se le solicitó al

---

[538] *Gold Reserve c. Venezuela* (CLA-156), Párrafo 283.
[539] *Mobil c. PDVSA* (EO-45).
[540] *Mobil c. PDVSA* (EO-45), Párrafo 767.

tribunal CCI que otorgara una compensación de acuerdo con una fórmula de indemnización prevista en el Acuerdo de Asociación. En esas circunstancias, el tribunal CCI no respaldó ningún cálculo de riesgo país particular para Venezuela. En cambio, el tribunal CCI analizó la valoración de flujos de caja futuros en virtud de la fórmula de indemnización proporcionada en el Acuerdo de Asociación. Cuando analizó este asunto, el tribunal CCI enfatizó que "hay una diferencia entre valorar flujos de caja futuros en virtud de una fórmula de indemnización y valorar flujos de caja futuros de un proyecto"[541].

9.97 En estas circunstancias, las Demandantes sostienen que los factores considerados por el tribunal CCI al efecto de determinar la tasa de descuento apropiada que ha de aplicarse a los daños contractuales no son relevantes de manera demostrable para el cálculo de la tasa de descuento de una valoración de FCD de una inversión. Las Demandantes alegan que ninguna Parte ni experto en el presente caso ha propuesto un análisis de tasa de descuento comparable con el que se llevó a cabo en el laudo de la CCI.

9.98 Las Demandantes señalan asimismo el hecho de que otra característica de distinción de los casos *ExxonMobil y Mobil* es que la demandante había argumentado consistentemente a favor de una tasa libre de riesgos (es decir, una tasa de descuento que excluyera cualquier prima de riesgo de mercado y cualquier prima de riesgo país). Por el contrario, la fórmula de tasa de descuento de las Demandantes incluye una prima de riesgo de mercado sustancial (4,75 %) y una prima de riesgo país (2 %). El estándar del derecho internacional consuetudinario de reparación íntegra no desempeñó papel alguno en el análisis del tribunal CCI.

9.99 Paralelamente al caso CCI, varias subsidiarias de *ExxonMobil* incoaron un arbitraje CIADI en contra de Venezuela en virtud del TBI Países Bajos-Venezuela[542]. Como en el caso CCI, en el caso CIADI no existió prueba alguna de cálculo de riesgo país. Las demandantes habían argumentado que el riesgo país está conformado en gran parte por "una expropiación no compensada, que no se puede tener en cuenta para valorar dicha expropiación". En esas circunstancias, las Demandantes sostienen el laudo del CIADI no contiene ningún análisis del riesgo país venezolano, y menos aún un análisis del riesgo

---

[541] *Mobil c. PDVSA* (EO-45), Párrafo 774.
[542] *Venezuela Holdings c. Venezuela* (RLA-153).

específico de la inversión ni ningún cálculo final para el riesgo país.  En cambio, el tribunal CIADI adoptó una tasa de descuento del 18 % a los fines de su valoración de FCD.

9.100   Así, según afirman las Demandantes, a diferencia de los casos *ExxonMobil y Mobil*, la prueba aportada en el presente arbitraje conlleva argumentos detallados en sustento del enfoque de riesgo país de las Demandantes.  A diferencia de los casos *ExxonMobil y Mobil*, tal como afirman las Demandantes, los expertos de ambas Partes han propuesto argumentos enfocados en el riesgo país y ambos expertos aceptan que la prima de riesgo país que será adoptada por el Tribunal debe ser específica de la inversión (es decir, utilizando un factor *lambda*).   Por lo tanto, los casos *ExxonMobil y Mobil* no pueden ser de utilidad para el Tribunal en su evaluación de riesgo país ni de *lambda* en el presente arbitraje.

9.101   Las Demandantes señalan otro ejemplo de una evaluación de riesgo país que involucra a Venezuela en el laudo dictado en *Flughafen c. Venezuela*[543].  En ese caso, la demandada propuso una prima de riesgo país del 7,9% y una tasa de descuento del 14,4%[544].  El tribunal adoptó la prima de riesgo país de la demandada sobre la base de los hechos específicos del caso: en particular, que, cuando las demandantes realizaron sus inversiones en 2004, el riesgo país ya existía, los inversionistas estaban muy conscientes de este y el riesgo no se había modificado para el momento de la expropiación poco tiempo después, en diciembre de 2005.

9.102   Por lo tanto, a modo de resumen, las Demandantes concluyen que el laudo del tribunal CIADI en el caso *Gold Reserve c. Venezuela* es la autoridad legal más importante en relación con el riesgo país (y particularmente el riesgo de expropiación) y el análisis *lambda* que se le requiere al Tribunal que lleve a cabo en el presente caso.  Esa decisión respalda la prima de riesgo país específica de FertiNitro adoptada por el Sr. Giles y desacredita la prima de riesgo país general adoptada por el Dr. Flores.  Por el contrario, tal como afirman las Demandantes, los laudos dictados los casos *ExxonMobil y Mobil* se distinguen claramente.  En lo que respecta al laudo de *Flughafen*, es de importancia en la medida en que respalde la proposición de que no se le debe permitir a ninguna demandada

---

[543] *Flughafen c. Venezuela* (RLA-154).
[544] *Flughafen c. Venezuela* (RLA-154), Párrafos 899-902.

beneficiarse de su propia conducta expropiatoria, pero de otro modo se diferencia en los hechos.

*(viii) El precio ajustado del MdE constituye una comprobación eficaz de la realidad respecto de las valoraciones de las Partes; demuestra que la Valoración de Capital del Sr. Giles es conservadora y, por contraste, que la supuesta valoración justa de mercado del Dr. Flores es menos del 10 % del precio que fuera acordado por las Partes en 2007 bajo amenaza de expropiación.*

9.103   También en sustento de la aplicación de la valoración propuesta, las Demandantes señalan el precio ajustado del MdE en 2007 del Sr. Giles como comprobación eficaz de la realidad. Afirman que demuestra que la Valoración de Capital del Sr. Giles es conservadora y, por contraste, que la supuesta valoración justa de mercado del Dr. Flores es menos del 10% del precio que fuera (supuestamente) "acordado" por las Partes en 2007 bajo amenaza de expropiación.

9.104   En este sentido, las Demandantes afirman que la prueba confirma que la Valoración de Capital del Sr. Giles (es decir, USD 361,0 millones para la participación del 25% de KOMSA) es casi la misma que el precio del MdE ajustado en un escenario "contrafáctico" (USD 360,8 millones)[545].  Para esta comparación, las Demandantes sostienen que el Sr. Giles ha calculado simplemente el precio del MdE en ausencia de las violaciones del Tratado anteriores a la expropiación por parte de la Demandada (es decir, "contrafáctico" al impacto económico del Decreto de la Urea y los impuestos ilícitos).  En consecuencia, las Demandantes sostienen que el precio ajustado del MdE confirma que el Sr. Giles ha producido una Valoración de Capital conservadora que minimiza muy probablemente el valor de la inversión de capital de KOMSA en un escenario "contrafáctico".

9.105   En contraposición, las Demandantes señalan que el Dr. Flores ha realizado una serie de ajustes arbitrarios al precio del MdE que tiene el efecto de reducir el valor empresarial

---

[545] *Véase, por ejemplo*, Giles IP1, Párrafos 4.86, 4.88.  Las Demandantes observan que el Sr. Giles aumenta el precio del MdE (es decir, USD 212,5 millones) en un "25 % del impacto esperado durante la vida útil de la planta, del Decreto de la Urea y los impuestos ilícitos (es decir, uso compartido de esta pérdida de KOMSA)" –este aumento es el que tiene como resultado un precio del MdE ajustado de USD 360,8 millones al 30 de septiembre de 2010.

enumerado en el MdE de 2008 en un 55 %.  Las Demandantes describen este enfoque como una "pieza de ingeniería inversa financiera"[546].

9.106   Las Demandantes sostienen que la prueba del Dr. Flores es en el sentido de que la distorsión del precio del MdE se basa en que el borrador MdE de noviembre de 2007 fue sólo "una primera oferta de Koch"[547].  Esto le permite afirmar que el único momento en el tiempo en que el MdE se "acordó" fue casi un año después, en octubre de 2008.  Las Demandantes sostienen que esta prueba es artificial, y que ese artilugio queda expuesto en virtud de la prueba contemporánea.  Las Demandantes señalan que, durante su contrainterrogatorio, el Dr. Flores fue remitido a un mensaje de correo electrónico del Sr. Toro (en calidad de director de Pequiven), a los Sres. Parra y Gwaltney (por KOMSA) de fecha 9 de octubre de 2007 (es decir, aproximadamente un mes antes de la fecha del MdE de 2007), que afirmaba[548]:

> *"Hemos estimado a partir de una valoración independiente de Boo[z] Allen, contratado por Pequiven[549], y de valoraciones adicionales hechas y discutidas con el resto de los socios, un justiprecio de mil ciento setenta y cinco millones de USD para el 100 % de las acciones [en FertiNitro]".*

9.107   Las Demandantes sostienen que el mensaje de correo electrónico del Sr. Toro, enviado sólo un mes antes del MdE de noviembre de 2007, confirma de manera inequívoca que la "primera oferta" fue, de hecho, realizada por Pequiven.  Por lo tanto, el MdE de noviembre de 2007 (redactado por Koch) contenía un precio que fue acordado entre las Partes en noviembre de 2007.  Las Demandantes concluyen que, por consiguiente, la prueba del Dr. Flores debería rechazarse[550].

---

[546] EPA Koch, Párrafo 265.

[547] Segundo Informe de Experto de Daniel Flores (3 de marzo de 2014) ("Flores IP2"), Párrafo 169.

[548] Correo electrónico de F. Toro a B. Gwaltney y T. Parra Asunto: Negociaciones de FertiNitro (9 de octubre de 2007) (C-90).

[549] Posteriormente conocido como Advantis.

[550] Según el Tribunal, no existe prueba convincente de que se "acordara" algún precio del MdE en 2007 entre Pequiven y KOMSA. La primera oferta tuvo lugar vía correo electrónico de fecha 9 de octubre de 2007 del Sr. Toro de Pequiven (C-90) con una valoración de USD 1175 millones por el 100% del capital de FertiNitro, menos la suma pendiente a sus bancos y tenedores de bonos (que coloca en USD 450.000, presuntamente USD 450 millones). El 7 de noviembre de 2007, KOMSA regresó con su borrador MdE con una valoración de USD 1210 millones menos las deudas a los bancos y tenedores de bonos más el Superávit de Efectivo en FertiNitro. Las conversaciones se interrumpieron a comienzos de 2008. Sin embargo, Pequiven regresó nuevamente en octubre de 2008 con un borrador MdE revisado (C-93) que disponía un pago de USD 212,5 millones a KOMSA por su participación de

*(ix)   Hay varias comprobaciones de la realidad adicionales que validan la razonabilidad de las valoraciones del Sr. Giles de la inversión del capital y el Offtake Agreement*

9.108   Las Demandantes señalan asimismo "varias comprobaciones de la realidad adicionales que validan la razonabilidad de las valoraciones del Sr. Giles de la inversión del capital y el *Offtake Agreement*"[551], a saber:

9.109   En primer lugar, las Demandantes señalan la "inversión de proyectos" para plantas de fertilizantes nuevas idénticas en Guiria y en el Complejo José por medio de la cual Pequiven (en su Plan Estratégico 2007-2013) anunció que pretendía invertir USD 2800 millones para construir cada planta, cada una con una capacidad nominal equivalente a la Planta FertiNitro.  La prueba que aportó Sr. Giles fue que "[e]l valor de reemplazo por ello ha de ser la cifra mínima que considera un inversor que vale la pena" y que ese valor es un indicador económico de valor bien conocido[552].

9.110   En segundo lugar, las Demandantes hacen referencia a la ganancia neta real de FertiNitro de USD 116,2 millones para 2011, comparada con una ganancia neta presupuestada de USD 117,2 millones para 2011.  Si (tal como explicara el Sr. Giles) la metodología FCD "supone la proyección de las ganancias y los costos a futuro", estos montos constituyen una simple comprobación de la realidad posterior a la expropiación, que debilita la credibilidad de la valoración de capital del Dr. Flores y demuestra el conservadurismo de las proyecciones del Sr. Giles.  En cuanto al primero, el Dr. Flores proyecta que FertiNitro habría obtenido ganancias netas en 2011 en la suma de USD 36,3 millones, aproximadamente un tercio de la ganancia neta que lograra FertiNitro en 2011.  En lo que respecta al último, el Sr. Giles proyecta ganancias netas en 2011 en la suma de USD 92,1 millones, 20 % menos de lo que esperaban los gerentes de FertiNitro y de lo que en definitiva se logró.

capital en FertiNitro. En definitiva, nunca se acordó ni se firmó MdE alguno. Pequiven afirmó que la compra de los accionistas privados de FertiNitro ya no era una prioridad. Sin embargo, el Sr. Parra (de KOMSA) testificó en su declaración testimonial (Párrafo 69) que los representantes de KOMSA comprendieron que no existía alternativa real más que aceptar la propuesta de Pequiven (*Véase también* Mem. Koch, Párrafos 144-153).
[551] EPA Koch, Párrafos 272-284.
[552] Segunda Audiencia (noviembre) D6.293 (Giles).

9.111   En tercer lugar, las Demandantes hacen alusión al pago de dividendos a los accionistas de FertiNitro en la suma de USD 150 millones en 2008 (USD 37,5 millones de los cuales fueron distribuidos a KOMSA).  Observan que dicho dividendo se pagó con las ganancias que ya habían disminuido debido a las violaciones anteriores a la expropiación cometidas por la Demandada pero que, sin embargo, el monto es superior a toda la Valoración de Capital del Dr. Flores.

9.112   En cuarto lugar, las Demandantes señalan el valor neto actual de las ganancias no percibidas por KNI de USD 172 millones si se aplica el propio cálculo del Dr. Flores de las ganancias de KNI durante el período del acuerdo *ad hoc* durante el resto del plazo del *Offtake Agreement*.  Esta comprobación de la realidad se basa en los "volúmenes extraídos" identificados por el propio Dr. Flores durante la Segunda Audiencia (noviembre).  Si la ganancia mensual durante el período del acuerdo *ad hoc*, es decir, USD 2,49 millones, se aplica durante el resto del plazo del *Offtake Agreement* (a saber, 123 meses), la ganancia neta total no percibida asciende a la suma de USD 306 millones.  Aplicando la tasa de descuento del Sr. Giles, el valor neto actual del lucro cesante asciende a la suma de USD 172,7 millones.  Esa cifra es aproximadamente USD 33,8 millones menos que la valoración del *Offtake Agreement* del Sr. Giles y, tal como afirman las Demandantes, corrobora aún más su razonabilidad.

9.113   Las Demandantes sostienen que estos cuatro factores deberían ser considerados por el Tribunal en tanto otros tribunales han considerado aleccionador hacer referencia a "comprobaciones de la realidad" para probar la razonabilidad de las valoraciones controvertidas presentadas ante ellos.

*(x)   Existen muchas otras comprobaciones de la realidad para el "límite inferior" que desacreditan la valoración del Dr. Flores como un caso atípico sin fundamentos*

9.114   Además de estos factores, las Demandantes señalan otras comprobaciones de la realidad para el "límite inferior" para desacreditar las valoraciones del Dr. Flores por considerarlas un caso atípico sin fundamentos, a saber:

9.115   Primero, el valor contable de FertiNitro a la fecha de la expropiación ascendía a USD 168,1 millones para la participación del 25 % de KOMSA en FertiNitro, tras la

deducción de deuda.  Esa cifra equivale a cinco veces la Valoración de Capital del Dr. Flores.  El valor contable casi siempre es inferior al valor justo de mercado, especialmente cuando de valora una empresa en marcha rentable[553].

9.116   Segundo, sólo los costos de construcción de FertiNitro ascendían a USD 273 millones para el 25% de FertiNitro.  Una vez más, las Demandantes señalan las múltiples valoraciones del Dr. Flores. En este caso, los costos de construcción son ocho veces su valoración.

9.117   Tercero, la propia posición de la Demandada con posterioridad a la expropiación preparada por Advantis al efecto de entablar negociaciones para llegar a un acuerdo fue equivalente a USD 113 millones para el 25 % de FertiNitro.  Las Demandantes señalan nuevamente este monto como una "comprobación de la realidad", afirmando que demuestra que el Dr. Flores adoptó una tasa de descuento y una prima de riesgo país infladas, y una proyección extremadamente pesimista de los niveles futuros de producción de FertiNitro.  La valoración de Advantis fue más de tres veces la cifra a la que arribó el Dr. Flores.

9.118   Cuarto, la "inversión estimada del proyecto" de la Demandada para la planta de fertilizantes más pequeña ubicada en Morón fue de USD 1550 millones, y los costos de construcción de la planta ascendieron a USD 2000 millones.  Como la planta de Móron tiene una producción de urea de 726.000 toneladas métricas por año, esto significa que USD 2755 del costo de construcción producirán una tonelada métrica de urea en el futuro inmediato[554].  En tanto la Valoración de Capital del Dr. Flores equivale a USD 355 por tonelada métrica de urea, el Sr. Giles explicó que ningún comprador razonable consideraría que puede comprar FertiNitro por USD 355 por tonelada métrica cuando una entidad comercial tiene planes de construir una planta que costará USD 2755 por tonelada métrica.

9.119   Teniendo en cuenta todos estos factores, las Demandantes sostienen que las valoraciones del Dr. Flores ni siquiera cumplen las comprobaciones de la realidad para el límite inferior. Las Demandantes afirman que, al igual que en el caso *Flughafen c. Venezuela*[555], el Tribunal debería rechazar cualquier valoración fuera de esos límites.  En síntesis, tal como concluyen las Demandantes, la valoración del Dr. Flores es un caso atípico que no puede

---

[553] *Véase ConocoPhillips c. Venezuela* (CLA-155), Párrafos 400-401.
[554] Que invoca la presentación de Tim Giles, Diapositiva 26.
[555] *Flughafen c. Venezuela* (RLA-154).

sustentarse. Se trata, tal como afirman las Demandantes, de "una demostración sorprendente de lo poco razonable que son las valoraciones reducidas del Dr. Flores"[556].

**(4)    Las Alegaciones de la Demandada en Materia de Cuantificación de años**

9.120    La Demandada afirma, en primer lugar, que el Tribunal no necesita llegar al punto de determinar ninguna cuestión en materia de cuantificación de daños. En efecto, las alegaciones de la Demandada se realizan en forma expresa "solamente por razones de precaución"[557]. Sin embargo, el Tribunal ha ratificado su jurisdicción; y la Demandada es responsable ante las Demandantes conforme al Artículo 6 del Tratado, tal como fuera decidido *supra* por el Tribunal, en lo que respecta a KOMSA y, por la mayoría del Tribunal, en lo que respecta a KNI. Por lo tanto, el Tribunal debe ahora considerar las alegaciones de la Demandada en materia de cuantificación de daños.

9.121    En resumen, el argumento de la Demandada en materia de cuantificación de daños consta de cuatro alegaciones principales. Estas son:

(a)    Sus alegaciones generales en cuanto a los errores en las alegaciones en materia de cuantificación de daños de las Demandantes;

(b)    Las compensaciones que tanto KOMSA como KNI reclaman son enormemente exageradas;

(c)    El valor justo de mercado de la participación de KOMSA en FertiNitro no era mayor a USD 34,6 millones; y

(d)    La valoración de KNI de su participación en el *Offtake Agreement* es exagerada.

*(i)    Las alegaciones generales de la Demandada*

9.122    La Demandada realiza, tal como ya se indicara, siete alegaciones generales en cuanto al tratamiento apropiado de las cuestiones en materia de cuantificación de daños tanto para KOMSA como para KNI.

---

[556] EPA Koch, Párrafo 295.
[557] EPA Ven., Párrafo 169.

9.123   Primero, la Demandada afirma que las Demandantes han propuesto un valor sumamente inflado que supera por mucho lo que valdrían los reclamos de las Demandantes en ausencia de los hechos controvertidos.  Esto no es compatible con el estándar de valor justo de mercado ("VJM") que ambas Partes coinciden que es aplicable a la cuantificación de daños. El VJM constituye un estándar objetivo que no deja lugar para lo que, según la Demandada, es la valoración arbitraria, sumamente especulativa y basada en argumentos artificiales que las Demandantes solicitan al Tribunal realizar en el presente caso.

9.124   Segundo, en lo que se refiere a KOMSA, la Demandada sostiene que las Demandantes ignoran los principios convencionales de valoración de FCD al "seleccionar a la carta" datos que incrementan el resultado de su valoración y al utilizar datos presupuestados desactualizados, incluso cuando datos mucho más actuales se encuentran absolutamente disponibles.  La Demandada critica lo que considera el único sustento de las Demandantes para su argumento, a saber, la experiencia del Sr. Sanders con dos plantas ubicadas, respectivamente, en Oklahoma y Trinidad y Tobago, las cuales el propio Sr. Sanders reconoce que no son comparables con la Planta FertiNitro.  Además, la Demandada afirma que el Tribunal no debería basarse en las evaluaciones de costos de un testigo que desconoce las diferencias significativas en indicadores económicos clave, tales como tasas de inflación, entre los tres países relevantes para su evaluación comparativa de costos.

9.125   Tercero, la Demandada sostiene que las Demandantes sugieren, de manera equivocada, una tasa de descuento completamente irracional.  Esa sugerencia se contradice directamente con al menos tres laudos de arbitraje internacional recientes contra la Demandada, dos de cuales[558] conciernen un proyecto ubicado en el mismo complejo industrial que FertiNitro y que comparten varias otras similitudes en común con FertiNitro.  Asimismo, la Demandada sostiene que la tasa de riesgo país del 2 % contenida en la tasa de descuento de las Demandantes es inapropiada, ya que se basa, entre otras cosas, en una encuesta que se acepta no es representativa, en una aplicación sin precedentes de un descuento por liquidez y en un factor *lambda* arbitrario y sin fundamentos. Una tasa de riesgo país del 2 % es, afirma la Demandada, la tasa que se aplica normalmente a países como Italia. Además, dicha tasa tampoco encuentra sustento en el laudo dictado por el tribunal en el

---

[558] A saber, *Mobil c. PDVSA* (EO-45); *Venezuela Holdings c. Venezuela* (RLA-153).

caso *Gold Reserve c. Venezuela*[559] que las Demandantes—también incorrectamente—afirman justifica su posición.

9.126 Cuarto, la Demandada sostiene que los chequeos originales de "razonabilidad" de las Demandantes no sustentan su valoración. Asimismo, las comparaciones adicionales que introdujeron las Demandantes por primera vez en la Segunda Audiencia (noviembre), tales como el valor contable de FertiNitro o las inversiones de proyecto estimadas para nuevas plantas en Guiria y José, no alteran esa conclusión.

9.127 Quinto, la Demandada alega que la valoración que realiza KNI de su participación en el *Offtake Agreement* utiliza un método de valoración erróneo, se basa en prueba insuficiente e ignora los cambios fundamentales en la industria de fertilizantes mundial y de los EE. UU. que ya estaban ocurriendo a la fecha de la valoración.

9.128 Sexto, la Demandada sostiene que el experto de las Demandantes, el Sr. Giles, se ha basado ciegamente, en reiteradas ocasiones, en la supuesta *expertise* ofrecida por otros, tales como el Sr. Sanders o el Sr. Sorlie, sin aplicar su propia opinión crítica. Por el contrario, la Demandada afirma que su experto, el Dr. Flores, ha considerado cuidadosamente la historia de la Planta FertiNitro y sus condiciones operacionales actuales en Venezuela, para su propio ejercicio de valoración. Los reiterados intentos de las Demandantes para desacreditar al Dr. Flores al solicitarle su testimonio en cuestiones de hecho relacionadas con la valoración no deberían prosperar ante el presente Tribunal. La familiaridad particular y la experiencia personal del Dr. Flores con las condiciones y procesos en Venezuela son lo que hace que su valoración sea especialmente convincente y al mismo tiempo la distingue de la "confianza ciega" que el Sr. Giles[560] tiene en cualquier información que le brindan las Demandantes.

9.129 En síntesis, por los motivos que se expondrán en mayor detalle a continuación, la Demandada sostiene que los reclamos por daños de las Demandantes por la suma de aproximadamente USD 672,4 millones son enormemente exagerados.

---

[559] *Gold Reserve c. Venezuela* (CLA-156).
[560] EPA Ven., Párrafo 177.

*(ii)   La compensación que KOMSA y KNI reclaman es enormemente exagerada*

9.130   La Demandada realiza tres alegaciones principales en lo que se refiere, en su opinión, a la enorme exageración de la compensación que proponen las Demandantes.  Esas alegaciones son las siguientes:

(a)   *Primero, el estándar relevante de compensación se encuentra en el Tratado y no en el derecho internacional consuetudinario;*

(b)   *Segundo, independientemente del estándar legal de compensación, las Partes están de acuerdo en que los expertos en daños deben aplicar el estándar de VJM; y*

(c)   *Tercero, las Demandantes finalmente omiten aplicar el estándar de VJM.*

9.131   En cuanto a (a) – el estándar relevante de compensación: la Demandada, en contraposición a las Demandantes, sostiene que el estándar relevante de compensación para los reclamos de las Demandantes está establecido en el Artículo 6 del Tratado, y no en el derecho internacional consuetudinario.  Afirma que el Artículo 6 del Tratado es *lex specialis* ante la norma de reparación íntegra del derecho internacional consuetudinario.  Como tal, en virtud del estándar del Tratado, los reclamos de las Demandantes se limitan al "valor de mercado de la inversión antes de que se llevara a cabo la acción expropiatoria o de que se hiciera pública, según lo que ocurriese primero". Al ser un estándar objetivo, el valor de mercado en este caso significa que la valoración de la participación de KOMSA en FertiNitro no debería excluir los presuntos efectos de determinadas medidas del Gobierno anteriores al anuncio de la adquisición forzosa[561].  La Demandada observa que todas las medidas de la Demandada sobre las cuales las Demandantes presentan reclamos eran de carácter general y no eran específicas a FertiNitro.

9.132   La Demandada sostiene que el estándar del Tratado es aplicable independiente de si la adquisición de la Demandada fue lícita o ilícita.

---

[561] Estos deben identificarse por vía de referencia al Alegato de Apertura de las Demandantes durante la Segunda Audiencia (noviembre), Diapositiva 31, que sugiere que los efectos del Decreto de la Urea, el impuesto municipal, la contribución de Ciencia y Tecnología; el retraso en la expedición de devoluciones del IVA y la interferencia de la Demandada en la dirección y en las operaciones de FertiNitro deberían excluirse.  La Demandada afirma que las presuntas medidas no violaron ninguna obligación de derecho internacional de la Demandada.

9.133   En cuanto a (b) – el acuerdo de las Partes de que debería aplicarse el estándar de VJM: la Demandada señala el acuerdo entre el Sr. Giles y el Dr. Flores de que los reclamos de las Demandantes deberían valorarse sobre la base del estándar de VJM a la fecha de valoración de 30 de septiembre de 2010[562].

9.134   En lo que respecta al estándar de VJM, el Dr. Flores se basa en la reconocida definición contenida en las Directrices del Banco Mundial que hacen referencia a "un monto que un comprador interesado pagaría normalmente a un vendedor interesado"[563].  Esta definición es, tal como afirma la Demandada, esencialmente idéntica a la definición de VJM que proporciona el Sr. Giles al comienzo de su Primer Informe, en el cual hacía referencia "al valor al que un comprador interesado y un vendedor interesado intercambiarían un activo"[564].  Además, la Demandada afirma que es consistente con las definiciones de VJM usadas por el Consejo de Normas Internacionales de Valoración[565].  La Demandada sostiene que el Sr. Giles interpreta equivocadamente el significado de VJM como si significara un mercado desprovisto inclusive de limitantes de ventas puramente comerciales.  La Demandada adopta el análisis del Dr. Flores, que, según ella, muestra que la interpretación del Sr. Giles "invierte" el estándar de VJM, ya que permitiría inapropiadamente valorar un activo a un valor más alto que el que habría tenido en ausencia de los hechos controvertidos.

9.135   En cuanto a (c) – la omisión por parte de las Demandantes de aplicar el estándar de VJM: la Demandada sostiene que, aunque las Demandantes están de acuerdo en el uso del estándar de VJM, finalmente el Sr. Giles no aplicó ese estándar.  En efecto, la Demandada sostiene que la valoración de FCD del Sr. Giles es "parcializada, llena de inconsistencias y basada en una selección arbitraria de datos — evidentemente no busca establecer el valor "justo" de mercado de la planta sino crear un "valor arbitrario" que ignora de manera impermisible las complicadas realidades de la planta"[566].  Asimismo, la Demandada

---
[562] Giles IP1, Párrafo 1.3; Giles IP2, Párrafo 1.9.
[563] Flores IP2, Párrafo 154, que cita las Directrices del Banco Mundial, págs. 41-42.
[564] Giles IP1, Párrafo 4.78.
[565] *IVS Framework*, Consejo de Normas Internacionales de Valoración (2011), Párrafos 30, 32. *Véase también* Flores IP2, Párrafos 155-156.
[566] EPA Ven., Párrafo 183. Estas cuestiones, según las Demandantes, incluyen un historial de defectos de construcción, decisiones pobres de mantenimiento en los comienzos de la planta, un número de cierres no planificados por arriba del promedio, problemas persistentes con el suministro de gas y electricidad fuera del alcance del control de

242

sostiene que el Sr. Giles se desvía arbitrariamente de la práctica convencional de valoración, incluso al basarse en la información de una encuesta que él mismo admite que "no se puede considerar representativa"[567] para su cálculo de tasas de riesgo país.  También reduce su tasa de descuento a través de un descuento de liquidez, mientras que dicho descuento, en la práctica convencional de valoración, se aplica únicamente para incrementar la tasa de descuento.  En cambio, la Demandada se basa en el testimonio del Dr. Flores, en el sentido de que ninguna posible transacción de venta se podría haber basado en proyecciones tan obviamente inventadas.

*(iii)  El Valor Justo de Mercado (VJM) de la participación de KOMSA en FertiNitro no era mayor a USD 34,6 millones*

9.136   La Demandada sostiene que la participación de 25% de KOMSA en FertiNitro no era mayor a USD 34,6 millones.  (Esta cifra no incluye intereses y supone que se habría mantenido la aplicación del Decreto de la Urea).  Por otra parte, según la Demandada, la valoración (corregida) del Sr. Giles en la suma de USD 361 millones es enormemente exagerada y excede por mucho el VJM de la participación accionaria de KOMSA en FertiNitro.

9.137   La Demandada basa estas alegaciones en errores en la valoración de FCD del Sr. Giles que se indica son cuatro.

9.138   Primero, el análisis de FCD de las Demandantes es inconsistente y altamente especulativo.  Conlleva "seleccionar arbitrariamente" diferentes períodos de tiempo (es decir, 2006-2008, 2006-2010 y 2008 y 2010 por separado), así como datos reales contra datos presupuestados.  Su valoración depende de qué alternativa se elija, permitiéndole así arribar a una valoración más alta.  Por el contrario, el Dr. Flores aplica de manera consistente el mismo período de datos, a saber, el período de datos de 2006-2010, y, por consiguiente, garantiza la consistencia.  La Demandada señala que esto es apropiado debido a que abarca las dos paradas programadas que se llevaron a cabo en la planta durante el período de 5 años

FertiNitro y de la Demandada, y altos costos de mantenimiento y paradas programadas derivados de los defectos pasados y de los cierres de la planta y de la situación económica especial de la Demandada.
[567] Giles IP1, Párrafo B.32.

anterior a la adquisición forzosa (en 2008 y 2010), lo cual coincide con su pronóstico de que las paradas programadas tendrían lugar cada dos años y medio.

9.139   Además, la Demandada se basa en la demostración del Dr. Flores de que la valoración del Sr. Giles es inapropiada: Primero, el Sr. Giles ignora la interrelación de los criterios individuales de valoración.   Es decir, los costos de mantenimiento y de paradas programadas afectan las inversiones de capital; ambos, a su vez, afectan los niveles de producción, que, a su vez, afectan los ingresos y los costos variables y, en definitiva, el capital de trabajo.  El desconocimiento de estas relaciones por parte del Sr. Giles es uno de los factores que lo llevan a sobrevalorar los supuestos reclamos de compensación de las Demandantes. Segundo, el enfoque del Sr. Giles de basar su valoración en períodos breves de datos de tan solo tres años de información real (2006-08) o, en algunos casos, de sólo un año de información real (o presupuestada) contradice el principio fundamental que subyace a toda valoración de FCD de proyectar ingresos futuros sobre la base de una cantidad razonable de datos históricos en una empresa en marcha en función de su disponibilidad.

9.140   Posteriormente, la Demandada sostiene que es inapropiado basarse en información presupuestada en el presente caso debido a las incertidumbres inherentes y a las fallas en el proceso de elaboración de presupuestos.  Tal como observara el Sr. Sanders en su prueba, se necesitan registros detallados para preparar los presupuestos de manera adecuada y, por ende, las deficiencias en la elaboración de registros afectarían la precisión de un presupuesto debido a que no reflejaría necesariamente el estado real del equipo o del trabajo a realizar durante ese año[568].  Las Demandantes no pueden basarse en el laudo CIADI dictado en *Venezuela Holdings c. Venezuela*[569] para argumentar que los presupuestos son una base confiable para realizar previsiones. En cambio, en ese laudo, usar los presupuestos para el año en que se llevó a cabo la expropiación fue apropiado porque la información real no se encontraba disponible para el año completo[570].  Sin embargo, en el presente caso, el

---

[568] Segunda Audiencia (noviembre) D5.182-183 (Sanders).
[569] *Venezuela Holdings c. Venezuela* (RLA-153).  *Véase* Segunda Audiencia (noviembre), Alegato de Apertura de las Demandantes, Diapositiva 39.
[570] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafos 342, 307.

Sr. Giles pretende usar presupuestos durante los años en los que estaban disponibles los datos reales.

9.141   Segundo, la Demandada sostiene que la valoración de FCD de las Demandantes excluye de manera inapropiada los volúmenes reales de producción de 2009 y 2010 al proyectar la producción futura.  En efecto, la Demandada afirma que el enfoque de las Demandantes "se trata de un intento calculado de presentar una imagen más prometedora de los volúmenes de producción de la planta que lo que indica la información real disponible"[571]. La Demandada señala diversos factores que demuestran por qué motivo este enfoque es inapropiado, de la siguiente manera.

9.142   El enfoque del Sr. Giles no se corresponde con el ciclo de paradas programadas de FertiNitro debido a que el ciclo fue menor a tres años.  Su enfoque es erróneo porque el Sr. Sanders (y, a su vez, el Sr. Giles) basaron su ciclo en una supuesta similitud (inapropiada) entre la Planta FertiNitro y las plantas de Terra OK y Point Lisa[572].  En cambio, la Demandada sostiene que el ciclo de paradas programadas de 2 años y medio que estimó el Dr. Flores refleja la historia real de los ciclos de paradas programadas de la Planta FertiNitro, y es conservador teniendo en cuenta los importantes defectos de construcción de FertiNitro y sus antecedentes de frecuentes cierres no planificados.

9.143   Los cortes de gas y electricidad, así como también las interrupciones no planificadas, no fueron significativamente mayores en 2009 y 2010 que en años anteriores[573].

9.144   Un comprador hipotético y realista en 2010 no habría supuesto que FertiNitro podría lograr de manera consistente la producción nominal en el futuro.  Según la Demandada, esto se debe a que FertiNitro nunca había logrado de manera consistente niveles de producción nominal.  La prueba aportada durante las Audiencias no proporcionó fundamento alguno

---

[571] EPA Ven., Párrafo 192.

[572] cf. Informe de Experto de Richard Sanders (30 de mayo de 2012) ("Sanders IP1"), Párrafos 9-11, 43-45.

[573] La Demandada señala la siguiente prueba: Con respecto a la planta de amoniaco, hubo un total de 30 cierres totales en 2006 (con la planta en producción durante 332 días); 22 cierres totales en 2007 (con la planta en producción durante 309 días); 21 cierres totales en 2008 (con la planta en producción durante 299 días); 32 cierres totales en 2009 (con la planta en producción durante 308 días); y 17 cierres totales en 2010 (con la planta en producción durante 304 días). Igualmente, con respecto a la planta de urea, no hubo un incremento significativo en los cierres desde el período 2006-2008 hasta el periodo 2009-2010; en 2006 la planta estuvo en producción por un total de 315 días, en 2007 por 306 días, en 2008 por 289,7 días, en 2009 por 292 días y en 2010 por 284,25 días. *Véase* Niveles de Producción y Días Operativos 2003-2010 (EO-41).

para suponer que esto cambiaría en un futuro próximo.  En particular, la maquinaria y el equipo de la Planta eran insuficientes para producir a niveles nominales de manera consistente.

9.145  La Demandada se basa en la prueba del Sr. Villarroel de que los trenes de urea podían alcanzar una capacidad nominal diaria de manera consistente pero no así los trenes de amoniaco[574].  La opinión del Sr. Sanders de que FertiNitro "debería poder alcanzar una capacidad nominal de manera consistente"[575] debería rechazarse, ya que, nuevamente, se basa en una comparación de la Planta FertiNitro con las plantas Terra OK y Point Lisa, que (tal como admitiera el Sr. Sanders durante el contrainterrogatorio) no son comparables con FertiNitro.  La alegación de las Demandantes de que la capacidad nominal real de FertiNitro se puede evaluar sobre la base del Informe Jacobs de 2003 debería rechazarse, debido a que el Informe Jacobs de 2006 superó claramente a ese informe, este último sugiriendo que no era realista esperar que FertiNitro pudiera alcanzar de manera consistente niveles de producción nominal.

9.146  Asimismo, la Demandada señala que las Demandantes no pudieron probar su alegato de que la producción nominal anual se podría lograr a través de mejoras en los procesos.  La Demandada describe ese alegato como "una simple ilusión vana"[576].  La Demandada sostiene que los equipos de la Planta FertiNitro estaban tan deteriorados que los arreglos operativos no podían aportar mucho a la resolución de la baja confiabilidad de la maquinaria y los equipos de la Planta.  La Demandada sostiene que la invocación de "dos breves publicaciones de marketing" creadas por Honeywell (que no son, en contraposición a la nomenclatura de las Demandantes, "documentos de posición") es irrelevante, y, además, esos documentos tienden a exagerar y simplificar en demasía[577].  Según la Demandada, el hincapié de las Demandantes en los errores operativos también es engañoso, ya que la mayoría de los cierres de operaciones no planificados en FertiNitro se produjeron por fallas mecánicas, pérdidas de agua y gas, e incendio, además de las interrupciones de

---

[574] Primera Audiencia (septiembre) D3.130-131 (Villarroel).
[575] Sanders IP1, Párrafo 13.
[576] EPA Ven., Párrafo 201.
[577] EPA Ven., Párrafo 202.

suministro que estaban fuera del control de FertiNitro[578].  Además, el Informe de KBC de 2007, que analiza las causas y consecuencias de las fallas en los procesos, no considera los cierres de operaciones no planificados una consecuencia de ninguna de las deficiencias operativas o basadas en los procesos que encuentra.

9.147   En consecuencia, la Demandada sostiene que, si bien las mejoras posteriores en los procesos pueden haber reducido la cantidad limitada de cierres de operaciones provocados por errores operativos, un número mucho mayor de cierres de operaciones causados por fallas mecánicas y cortes externos seguía obstaculizando la productividad de la Planta.  En cualquier caso, la Demandada sostiene que no existen pruebas de que la implementación de las recomendaciones del Informe de KBC habría permitido que FertiNitro lograra la producción nominal consistentemente.  Tal como testificara el Sr. Villarroel, cualquier mejora en los niveles de producción requeriría de "[u]Una fuerte inversión y un periodo de tiempo no corto"[579].  Después de más de diez años de funcionamiento sin el suficiente mantenimiento preventivo, se lograría poco para mejorar la producción en FertiNitro solo reformando el liderazgo de la Planta y mejorando su planificación operativa, dado el grave estado de degradación de los equipos de la Planta.  Por último, el ejercicio de valoración debe tener en cuenta que este caso se refiere a la adquisición de una participación del 25 % en FertiNitro y, por lo tanto, solo la participación minoritaria de KOMSA en el negocio[580].

9.148   En relación con la exclusión de los volúmenes reales de producción del período 2009-2010, la Demandada sostiene que la afirmación de las Demandantes, de que dicha exclusión se justifica por una cuestión de derecho, es infundada.  La Demandada presenta seis argumentos principales de por qué razón debería rechazarse esta afirmación.  Primero, las Demandantes no han proporcionado prueba alguna de que las interrupciones se debieron enteramente a las interrupciones de suministro por PDVSA y Pequiven.  Segundo,

---

[578] En efecto, la Demandada sostiene que una evaluación de las causas de los cierres de operaciones de la Planta entre 2003 y 2010 no menciona ni una sola vez los errores operativos como causa significativa de los cierres de operaciones en ninguno de los años para ese período. (*Véase* Niveles de Producción y Días Operativos 2003-2010 (EO-41)).  Igualmente, en una sección intitulada "*FertiNitro's Complex History of Unplanned Shutdowns*" (Historial de cierres de operaciones no planificados del complejo de FertiNitro), Jacobs Consultancy ni siquiera menciona errores operativos como causa de la histórica alta tasa de cierres de operaciones no planificados de la Planta. (*Véase* Informe de Jacobs Consultancy, Informe de segunda prueba de confiabilidad diferida, Complejo de FertiNitro, José Venezuela, Razones para la no certificación (octubre de 2006) (R-57)).
[579] Primera Audiencia (septiembre) D3.134 (Villarroel).
[580] Segunda Audiencia (noviembre) D7.513 (Flores).

247

Pequiven no sería responsable por ningún incumplimiento de los contratos de suministro por parte de PDVSA y Pequiven con FertiNitro.  Tercero, PDVSA Gas no ha incumplido con sus obligaciones de suministro a FertiNitro.  Cuarto, la exclusión propuesta por las Demandantes de 2009 y 2010 de la valoración contradice la presunción básica del método de valoración de FCD.  Quinto, la existencia del Tratado no justifica la exclusión de los datos del período 2009-2010.  Sexto, la Demandada no es responsable de las dificultades operativas de FertiNitro en el período 2009-2010 que fueron principalmente resultado de defectos de construcción originales[581].

9.149   La tercera cuestión invocada por la Demandada (en sustento de su afirmación de que la valoración del Sr. Giles es errónea) es que las proyecciones que realizan las Demandantes de los costos futuros de FertiNitro se encuentran subestimadas.

9.150   En este sentido, la Demandada señala que las Demandantes se basan irracionalmente en los costos presupuestados de paradas programadas y mantenimiento en lugar de los costos reales.  Por el contrario, la Demandada sostiene que el uso por parte del Dr. Flores de los datos de los costos reales de FertiNitro, disponibles a la fecha de valoración, tiene sentido, dado que dichos datos reales reflejan adecuadamente el estado de la Planta y las condiciones operativas en Venezuela.  La Demandada también caracteriza este enfoque como justificable, dado que dichos datos reflejan adecuadamente el estado de la Planta y las condiciones operativas en Venezuela.  Rechazando las alegaciones de las Demandantes que, tal como sostiene la Demandada, pretenden atribuirle responsabilidad a esta última por los mayores costos, la Demandada afirma que estas alegaciones distraen la atención del hecho de que son las Demandantes quienes no cumplieron con la carga de la prueba para demostrar que pueden ignorar legítimamente los costos reales de FertiNitro (y así desviarse de las prácticas convencionales de valoración) y en su lugar utilizar datos presupuestados.

9.151   La Demandada señala que el motivo para estos costos es la necesidad de mayores costos de paradas programadas y mantenimiento que surgen del deterioro anticipado de las

---

[581] Dúpl. Ven., Párrafos 414-420.

máquinas y los equipos[582].  Al contrario de lo que se sostiene en los alegatos de las Demandantes, estos defectos iniciales en la construcción no fueron resueltos en su mayoría a través del Plan Principal de Mantenimiento ("MMP", por sus siglas en inglés) en 2005, tal como confirmara el testimonio oral del señor Villarroel[583].  Asimismo, la Demandada sostiene que la Planta sufrió una cantidad de cierres de operaciones no planificados superior al promedio[584].  Además, el daño que se sufrió por los cierres de operaciones no planificados a menudo fue magnificado por la falta, o mal funcionamiento, de los sistemas de protección estándares que automáticamente toman el control de las operaciones cuando se producen cortes de energía y que protegen a los equipos principales contra los daños[585].

9.152  La Demandada señala asimismo las tasas de inflación en aumento en Venezuela que redundaron en mayores costos en moneda local, que (tal como afirma la Demandada) las Demandantes han ignorado[586].  La Demandada también afirma que la inflación creciente incidió también de manera significativa en los costos de paradas programadas de FertiNitro. De hecho, entre 2007, cuando se presupuestó la segunda parada más importante de FertiNitro, y 2008, cuando dicha parada tuvo lugar, la inflación anual de Venezuela aumentó 11,7 puntos porcentuales, del 18,7 % al 30,4 %[587].  La creciente inflación llevó inevitablemente a un gran aumento en los costos de paradas programadas, ya que las paradas programadas requieren el uso de cientos de trabajadores locales externos, quienes son remunerados en Bolívares.

9.153  Al tratar la prueba pericial del Sr. Giles, la Demandada sostiene que el Sr. Giles se equivoca al alegar que la exposición de FertiNitro a la inflación local es "muy baja", ya que sólo "buena parte de sus costes están en bolívares"[588].  La Demandada describe esto como una "[e]valuación muy simplista [...] de los costos locales de la planta basada [...] en una

---

[582] *Véase* Informe de Jacobs Consultancy, Informe de segunda prueba de confiabilidad diferida, Complejo de FertiNitro, José Venezuela, Razones para la no certificación) (octubre de 2006) (R-57), páginas 10-11; Segunda Audiencia (noviembre) D5.217-218, 229-231.

[583] Primera Audiencia (septiembre) D3.136 (Villarroel).

[584] *Véase* Informe de Jacobs Consultancy, Informe de segunda prueba de confiabilidad diferida, Complejo de FertiNitro, José Venezuela, Razones para la no certificación) (octubre de 2006) (R-57), páginas 10-11.

[585] Primera Audiencia (septiembre) D3.155-156 (Villarroel).

[586] La Demandada señala el reconocimiento de esta cuestión por parte del Sr. Villarroel: Primera Audiencia (septiembre), D4.28, 30, 32.

[587] La Demandada señala las Tasas de Inflación del Fondo Monetario Internacional, 2004-2011 (R-90).

[588] Segunda Audiencia (noviembre) D6.287 (Giles).

selección oportunista de datos sobre costos (usando, por ejemplo, los costos presupuestados de 2008 de las paradas programadas, en lugar de los costos reales mucho más elevados) y se limita al período 2006-2008 (excluyendo así precisamente los años en que se disparó la inflación)"[589].   La afirmación de las Demandantes de que la inflación es una "nueva supuesta explicación" para los costos de FertiNitro más elevados que los presupuestados, tal como afirma la Demandada, debería ser rechazada por el Tribunal[590].

9.154   Posteriormente, la Demandada señala que los elevados costos de mantenimiento y paradas programadas no se deben principalmente a errores operativos en los últimos años.   En cambio, sobre la base de diversos informes[591] (la totalidad de los cuales, tal como afirma la Demandada, demuestran que los procesos en la Planta no fueron los ideales desde el principio), la prueba del Sr. Gwaltney establece que hubo una "ruptura en la estructura de la organización"[592] después de que KOMSA saliera de la administración de la Planta en octubre de 2007.   La Demandada señala también el propio reconocimiento de las Demandantes de que había habido cambios frecuentes en el personal de administración de FertiNitro, incluso durante los primeros años de la Planta[593].   La Demandada concluye que los procesos no fueron los ideales desde el principio[594].

9.155   En cuanto a las proyecciones subestimadas de costos futuros de FertiNitro por parte de las Demandantes, la Demandada señala la subestimación de otros costos, los que describe no sólo como "subestimados" sino también "muy especulativos"[595].   Con respecto a los gastos de capital, después de no tenerlos en cuenta para nada en su primer informe, el Sr. Giles proyecta un importe de USD 10 millones en su segundo informe, sobre la base de las

---

[589] EPA Ven., Párrafo 218.

[590] *Véase* Segunda Declaración Testimonial de Aníbal Villarroel (30 de diciembre de 2013), Párrafo 13.

[591] EPA Ven., Párrafo 220, que cita Haldor Topsoe, Efecto de la composición del gas natural en la producción de amoniaco (26 de agosto de 2003) (R-54), Informe de Jacobs Consultancy, *FertiNitro Fertilizer Project, Plan Improvement Cost Estimates and Revised Production Forecast* (14 de marzo de 2003) (C-125) (Véanse los resultados del Informe de Ingeniería de Thielsch de2006).   EPA Ven., Párrafo 220 en referencia al Informe de KBC, *Plant Performance Optimization Assessment Report* (18 de mayo de 2007) (C-158).

[592] Declaración Testimonial de Brent W. Gwaltney (30 de mayo de 2012) ("Gwaltney DT1"), Párrafo 60.

[593] Primera Audiencia (septiembre) D4.15 (Villaroel).

[594] La Demandada sostiene que un error operativo admitido – el no implementar un plan de mantenimiento eficaz en materia de costos – se cometió al principio de la historia de la Planta cuando KOMSA era la encargada de dirigir la Planta.

[595] EPA Ven., Párrafo 222.

sugerencias del Sr. Sanders[596].  Pero la Demandada señala que ni el Sr. Sanders, ni el Sr. Giles, explican este importe.  Más aún, el Sr. Sanders en última instancia admitió en el contrainterrogatorio que "todo depende de cuáles son [los equipos] que se han de [instalar]" es "sin duda" posible que FertiNitro necesitara más gastos de capital que los USD 10 millones de referencia que indicó en función de su experiencia en la planta de Terra OK[597].

9.156   En cuanto a los costos de gas, el Sr. Giles basó su proyección del precio base del gas natural en un solo dato: el precio del gas natural presupuestado de FertiNitro correspondiente a 2010, el cual, según la Demandada, es el precio base más bajo para todos los años del presupuesto que él analizó[598].  El intento del Sr. Giles de defender su elección como "conservadora"[599] debería ser rechazado por el Tribunal, en tanto ignora tanto el registro de precios históricos más extenso de FertiNitro como las predicciones de reconocidos analistas.  El Tribunal debería preferir la proyección del Dr. Flores, basada en tres de estos analistas de largo plazo[600].

9.157   Cuarto, la Demandada afirma que la tasa de descuento del 10,12 % propuesta por las Demandantes se encuentra infravalorada, en tanto que la tasa de descuento del 20,37 % propuesta por el Dr. Flores se encuentra plenamente justificada.  Sostiene que los cálculos de la tasa descuento del Sr. Giles son irrazonables en al menos los siguientes aspectos, a saber:

9.158   El Sr. Giles utiliza en forma inapropiada los datos de las primas de riesgo del mercado global.  La prima de mercado tiene por objeto medir el retorno adicional por encima de la tasa libre de riesgo requerida por los inversionistas en títulos de los EE. UU.  (Este riesgo de mercado refleja riesgos no relacionados con Venezuela).  El Sr. Giles calcula una tasa de un 4,75 % sobre la base de las estimaciones de riesgo de mercado *global* publicadas en 2006 (es decir, cuatro años antes de la adquisición forzosa).  La tasa de mercado del Sr. Giles no es apropiada porque los datos en los que se basa no están actualizados y el uso de

---

[596] Giles IP2, Párrafo 7.34; Segundo Informe de Experto de Richard Sanders (27 de agosto de 2013) ("Sanders IP2"), Párrafo 69.
[597] Segunda Audiencia (noviembre) D5.248-250 (Sanders).
[598] Flores IP2, Párrafo 49.
[599] Giles IP2, Párrafos 7.2-7.4; Segunda Audiencia (noviembre) D6.319 (Giles).
[600] Flores IP2, Párrafo 55.

estimaciones de riesgo de mercado global no es compatible con el método aditivo del Sr. Giles para calcular la tasa de descuento.

9.159   Conforme al método aditivo, el experto en valoración debe (tal como ha hecho el Dr. Flores) calcular los elementos de la tasa de descuento, incluida la tasa de riesgo de mercado, como si se aplicaran a una compañía con sede en los EE. UU. y luego aplicar una prima de riesgo país que refleje los riesgos adicionales de operar en cualquier otro país, en este caso, Venezuela[601].  Por lo tanto, el Sr. Giles debería haber usado datos de riesgo de mercado de los EE. UU. en lugar de datos *globales*.  Más aún, el Artículo de Fernández (en el cual se basa el Sr. Giles) contradice su propia tasa de riesgo de mercado.

9.160   El Sr. Giles se basa inapropiadamente en los datos limitados de un estudio para determinar la prima de riesgo país de Venezuela.  En este sentido, la Demandada señala que el Dr. Flores calculó una tasa de riesgo país del 11,26 % en función del promedio de tres métodos muy reconocidos: (i) modelo de país de Morningstar/Ibbotson (12,75 %); (ii) modelo de calificación de riesgo país de Morningstar/Ibbotson (14,27 %), y (iii) estimación del Profesor Damodaran (6,75 %)[602].  Según la Demandada, el Dr. Flores no aplicó otros modelos reconocidos, tales como el Indicador de Bonos de Mercados Emergentes de JP Morgan (EMBI, por sus siglas en inglés), que habría dado como resultado una prima de riesgo país comparativamente mayor para Venezuela del 12,41 %.

9.161   La Demandada afirma que la invocación por parte del Sr. Giles de un estudio (en lugar de modelos establecidos de primas de riesgo), que sugiere una prima de riesgo país para Venezuela del 5,5 %, es completamente infundada.  Nuevamente, la Demandada señala la propia prueba del Sr. Giles de que el estudio no puede considerarse representativo[603].  Señala, además, que el modelo de país de Morningstar/Ibbotson es identificado *por el propio estudio* como la fuente principal y preferida entre los participantes del estudio para determinar el riesgo país[604].  La Demandada afirma también que es inadecuado que el Sr.

---

[601] Flores IP2, Párrafo 106.
[602] Flores IP1, Gráfico 11.
[603] Giles IP1, Párrafo B.32.
[604] EPA Ven., Párrafo 229. Fernandez, Aguirreamolla & Corres, Prima de riesgo del mercado usada en 56 países en 2011: Una encuesta con 6014 respuestas 7 (mayo de 2011) (CRA-27), Tabla 4.  Ibbotson/Morningstar fue la fuente más citada con 256 respuestas, mientras que los estudios ocuparon el décimo lugar entre las fuentes más citadas

Giles se base en el estudio, ya que no ha realizado ajustes de posibles parcialidades resultantes del hecho de que la mayoría de los participantes del estudio evaluaron el riesgo país de sus propios países, respecto de lo cual, naturalmente, no son neutrales, y los propios autores del estudio no poseen una metodología de corrección de este tipo de parcialidades en el estudio.

9.162   El Sr. Giles excluye arbitrariamente el riesgo político de su tasa de riesgo país.  La Demandada sostiene que, sin brindar justificación económica alguna, el Sr. Giles excluyó "varios de los riesgos que generalmente se asocian con el concepto de riesgo país (por ejemplo, la expropiación)"[605], "cuando se le indicó que el Tratado ofrecía una posible protección"[606].   La Demandada sostiene que este enfoque resulta completamente irrazonable y contrario a decisiones recientes del CIADI, incluido el laudo en el caso *ExxonMobil* donde el tribunal sostuvo que "el riesgo de confiscación forma parte del riesgo país y debe considerarse al determinar la tasa de descuento"[607].   El tribunal en ese caso decidió que:

> "*[E]l riesgo de una posible expropiación existe, precisamente, en el momento anterior a que ésta se produzca (o de que una expropiación inminente sea de conocimiento público) y que el comprador hipotético lo tendrá en cuenta al momento de definir la suma que está dispuesto a pagar en ese momento*"[608].

La Demandada afirma que los riesgos de expropiación o nacionalización se conocían con claridad desde el inicio, ya que se habían estipulado específicamente en la Circular de Oferta de 1998[609].  Además, en contraposición al enfoque de las Demandantes de que los TBI reducen la exposición al riesgo país (un enfoque descripto por las Demandantes como "trillado"[610]), la Demandada afirma que, en general, los inversionistas no perciben que los

---

con solo 33 respuestas. De hecho, el Dr. Flores destacó que "[d]ice sí las encuestas hay que mirarlas, todo el mundo usa Ibbotson Morningstar, pero él no". Segunda Audiencia (noviembre) D6.364 (Flores).

[605] Giles IP1, Párrafo B.8; Segunda Audiencia (noviembre) D6.64 (Giles).
[606] Giles IP1, Párrafo B.77.
[607] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafo 365.
[608] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafo 365.
[609] Circular de Oferta – Emisión de bonos por USD 250.000.000 entre FertiNitro Finance Inc. y FertiNitro (8 de abril de 1998), página 38.
[610] Segunda Audiencia (noviembre), Alegato de Apertura de las Demandantes, Diapositiva 56.

TBI reduzcan el riesgo país[611] y tampoco existen fundamentos que sostengan la especulación de las Demandantes que indica que "sin duda, se esperará que un comprador goce de la protección del TBI en caso de una transacción hipotética a precio de mercado"[612].

9.163   El Sr. Giles aplica un factor *lambda* irrazonable.  La Demandada sostiene que se basa "únicamente en especulaciones"[613].  La Demandada invoca prueba del Dr. Flores, en la que afirma que ha considerado la exposición de FertiNitro al riesgo país de Venezuela, pero (en contraposición al Sr. Giles) concluyó que no era necesario apartarse del factor *lambda* estándar de 1 debido a que, para hacerlo, "tenemos que aportar pruebas contundentes de que hay diferencias efectivas"[614]. El Dr. Flores afirma que tales pruebas no existen.  La Demandada describe la evaluación de riesgo del Sr. Giles como "totalmente confusa, imprecisa y desequilibrada"[615], citando cuatro factores, que se enumeran a continuación.

9.164   Primero, la Demandada señala que el Sr. Giles no ha proporcionado cálculos ni ningún tipo de metodología que explique el modo en que alcanzó como resultado una exposición al riesgo del 40 %.  Afirma que, si bien el Sr. Giles ha identificado 22 factores de riesgo, no ha podido explicar su importancia relativa[616].  La Demandada señala nuevamente que la exclusión por parte del Sr. Giles de los factores de riesgo supuestamente protegidos por el Tratado no tiene justificación económica alguna, sino que, por el contrario, se basa en instrucciones de los abogados de las Demandantes[617].

9.165   Segundo, la Demandada afirma que el Sr. Giles ha infravalorado la exposición al riesgo de FertiNitro, incluyendo factores de riesgo que no están relacionados en absoluto con el riesgo de expropiación.  Por ejemplo, la Demandada rechaza la prueba del Sr. Giles que calificó, los seis factores de riesgo asociados con el desorden de carácter social, como

---

[611] EPA Ven., Párrafo 232. Véase Lauge Skovgaard Poulsen, "The Importance of BITs for Foreign Direct Investment and Political Risk Insurance: Revisiting the Evidence", Yearbook on International Investment Law and Policy (2010), páginas 539-542; Jason Webb Yackee, "Do Bilateral Investment Treaties Promote Foreign Direct Investment? Some Hints from Alternative Evidence", 51(2) Virginia Journal of International Law (2010) (EO-49), página 397; Segunda Audiencia (noviembre) D6.64-65 (Flores); Flores IP1, Párrafo 126; Flores IP2, Párrafo 122.
[612] Segunda Audiencia (noviembre) D8.776.
[613] EPA Ven., Párrafo 233.
[614] Segunda Audiencia (noviembre) D7.673 (Flores). Inglés: D7.161
[615] EPA Ven., Párrafo 234.
[616] Flores IP2, Párrafo 149.
[617] Giles IP1, Párrafo B.77.

"bajo", para FertiNitro [618].  El Sr. Giles realiza esta calificación porque cree que "es fácil ver cómo la ubicación estratégica de la planta FertiNitro en un complejo industrial seguro en la costa sería menos riesgoso que una planta ubicada en Caracas central, al considerar los efectos potenciales del malestar social"[619].  Sin embargo, el Dr. Flores señala que la Planta se encuentra ubicada en un área poco segura, y, aunque ningún integrante del personal de FertiNitro vive en la Planta, las situaciones de malestar social que tengan lugar en las comunidades cercanas afectarán en forma directa a FertiNitro, ya que tanto los miembros de la gerencia como los trabajadores deben trasladarse hasta y desde la Planta. En vista de la seguridad, concluye que, "[s]i se le dice a un inversor que puede obtener un dólar de ganancia al invertir en una planta de fertilizantes en Wichita o al invertir en una planta de fertilizantes en el Complejo José, creo que un dólar en el Complejo José se descartaría drásticamente"[620].  Además, debido a que todas las instalaciones de producción de FertiNitro están ubicadas en Venezuela, la empresa estaba expuesta, en forma inevitable, al riesgo país venezolano, a pesar de recibir la mayor parte de sus ingresos del exterior.

9.166   Tercero, la Demandada señala que el Sr. Giles ha ignorado factores de riesgo que incrementan la exposición de FertiNitro al riesgo país de Venezuela, incluida la dependencia de FertiNitro de un único proveedor de gas natural y el hecho de que, mientras que las empresas más pequeñas en Venezuela se encuentran exentas de determinados impuestos, como empresa de gran tamaño en el sector formal de la economía, FertiNitro se encuentra expuesta a una amplia gama de impuestos y, por lo tanto, se enfrenta a mayores riesgos en caso de que se produzcan aumentos en los impuestos.

9.167   Cuarto, la Demandada afirma que el sentido común tampoco se encuentra a favor del factor *lambda* de 0,4 determinado por el Sr. Giles, que produce como resultado una supuesta tasa de riesgo país para FertiNitro de sólo 2 %.  Esa tasa corresponde a la tasa que, generalmente, se aplica a las inversiones realizadas en países como, por ejemplo, Italia[621].  Sin embargo, tal como se pregunta la Demandada, si tuviera disponible un dólar para invertirlo, ¿le

---

[618] Segunda Audiencia (noviembre) D7.606 (Giles).
[619] Giles ER 2, Párrafo 1.26.
[620] Segunda Audiencia (noviembre) D6.368 (Flores).
[621] *Véase* Dúpl. Ven., Párrafo 458.

resultaría indiferente invertirlo en Venezuela o en Italia por el mismo rendimiento estimado?

9.168   El Sr. Giles deduce un descuento de liquidez del 1 % de su tasa de riesgo país, que la Demandada sostiene no encuentra sustento en la práctica convencional de valoración.  El Dr. Flores explicó que "nunca ha visto que un perito hiciera lo que el Sr. Giles hizo aquí". En efecto, la Demandada sostiene que la aplicación de un descuento de liquidez a la tasa de riesgo país que realiza el Sr. Giles se basa en una interpretación equivocada del estándar de valor de mercado provista en *CMS c. Argentina,* el cual requiere de un "mercado abierto y no restringido"[622].

9.169   Sin embargo, el requisito de un "mercado abierto y sin restricciones" no permite excluir restricciones *de facto* impuestas en la venta de los activos de importancia que habrían existido independientemente de los hechos controvertidos; y no permite que el experto en valoración cree un contexto en el que la participación de KOMSA en FertiNitro tenga mayor valor que el que tendría si los hechos controvertidos no existieran.  Además, la Demandada sostiene que la valoración del Sr. Giles, y su aplicación de un descuento de liquidez, ignora que el capital de KOMSA en FertiNitro es una participación minoritaria en una sociedad cerrada en un mercado pequeño y en desarrollo.

9.170   Asimismo, y yendo más allá de los errores en la propia tasa, la Demandada sostiene que la irracionalidad de la tasa de descuento de las Demandantes se ve confirmada por los dos laudos dictados en los casos *ExxonMobil y Mobil*[623] y el laudo dictado en *Flughafen c. Venezuela*[624].  La Demandada señala estos tres laudos, todos los cuales han aplicado tasas de descuento similares a aquellas propuestas por el Dr. Giles, es decir, 18 % en el caso del laudo de *ExxonMobil y Mobil*[625] y una tasa nominal de descuento del 17,28 % en el caso

---

[622] *CMS Gas Transmission Company c. República Argentina*, Caso CIADI N.º ARB/01/8, Laudo (12 de mayo de 2005) ("*CMS c. Argentina*") (CLA-130), Párrafo 402.  Además, la Demandada sostiene que el requisito de que el mercado sea "abierto y no restringido" no constituye un elemento estándar de las definiciones de VJM.  Por ejemplo, señala *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. La República del Ecuador*, Caso CIADI N.º ARB/06/11, Laudo (5 de octubre de 2012) ("*Occidental c. Ecuador*") (CLA-129), donde la definición de VJM (que citaran las Demandantes en la Diapositiva 24 de su Alegato de Apertura en materia de Cuantificación de Daños) no contiene este elemento.

[623] A saber, *Mobil c. PDVSA* (EO-45); *Venezuela Holdings c. Venezuela* (RLA-153).

[624] *Flughafen c. Venezuela* (RLA-154).

[625] *Mobil c. PDVSA* (EO-45), Párrafos 768, 777; *Venezuela Holdings c. Venezuela* (RLA-153), Párrafos 367-368.

del laudo de *Flughafen*[626].  Además, tal como estableciera el tribunal del CIADI en el contexto del caso *ExxonMobil*, "[o]tros tribunales arbitrales [...] han utilizado, en circunstancias comparables con el presente caso, [...] tasas que van desde el 18,5 % al 21 %"[627].

9.171   Posteriormente, la Demandada realiza alegaciones acerca de *Gold Reserve c. Venezuela*[628], al observar que, en ese caso, se aplicó una tasa de descuento comparativamente menor que aquella del tribunal del caso *ExxonMobil*.  Explica que "no corresponde aumentar la prima de riesgo país a fin de reflejar la percepción del mercado en virtud de la cual un Estado podría ser propenso a expropiar inversiones en violación de las obligaciones establecidas en el TBI"[629].  En cualquier caso, la Demandada sostiene que el Tribunal no debería considerar al laudo *Gold Reserve* relevante para el presente caso, ya que dicho laudo se relaciona con un proyecto que no tiene casi ninguna relación con el proyecto de FertiNitro.  Por el contrario, el proyecto de *ExxonMobil* es muy comparable con el proyecto FertiNitro, o hasta idéntico a este[630].  Debido a las similitudes del caso FertiNitro con el proyecto valuado en los laudos de los casos *ExxonMobil y Mobil* (y la falta de tales similitudes en relación con el proyecto *Gold Reserve*), la Demandada sostiene que el Tribunal debe considerar las decisiones en *ExxonMobil y Mobil* a fin de determinar la razonabilidad de las tasas de descuento de los expertos.

9.172   En contraposición a la prueba del Sr. Giles, la Demandada sostiene que el enfoque del Dr. Flores es claro.  Señala que, para calcular su tasa de descuento, consultó las fuentes más ampliamente aceptadas y las aplicó de manera objetiva.  Afirma que el enfoque del Dr. Flores ciertamente no es arbitrario, ni tampoco "simplemente una herramienta que el Dr. Flores utiliza para reducir sustancialmente la valoración de las inversiones de las

---

[626] *Flughafen c. Venezuela* (RLA-154), Párrafo 839.  La Demandada señala que el tribunal en el caso *Flughafen* no aplicó una tasa de descuento nominal del 17,28 % sino una tasa de descuento en términos reales del 14,4 % (es decir, sin considerar la inflación) a fin de conservar la coherencia con las proyecciones del flujo de caja que, a diferencia del presente caso, también se realizaron en términos reales.

[627] *Venezuela Holdings c. Venezuela* (RLA-153), Párrafo 367.

[628] *Gold Reserve c. Venezuela* (CLA-156).

[629] *Gold Reserve c. Venezuela* (CLA-156), Párrafo 841.

[630] En este sentido, la Demandada se basó en la similitud demostrada por los siguientes aspectos clave en común: (a) instalaciones de producción ubicadas en el Complejo José; (b) producción destinada principalmente a la exportación; (c) ingresos obtenidos principalmente en dólares estadounidenses; (d) celebración de un *offtake agreement;* (e) proyecto iniciado durante el período de "Apertura"; (f) uso de un memorando de emisión de bonos de 1998; (g) uso de financiamiento para el proyecto; y (h) existencia de varios accionistas, entre ellos PDVSA.

Demandantes"[631] [Traducción del Tribunal]; por el contrario, refleja la práctica convencional de valoración.

9.173  Posteriormente, la Demandada afirma que los supuestos "controles de razonabilidad" de las Demandantes no sustentan su valoración de la participación del 25% de KOMSA en FertiNitro.  En este sentido, la Demandada realiza cuatro alegaciones principales.

9.174  En primer lugar, la Demandada sostiene que el precio del MdE de octubre de 2008, si se lo ajusta correctamente, confirma la valoración del Dr. Flores, y no la valoración del Sr. Giles.  Es decir, el precio del MdE de octubre de 2008 (USD 212,5 millones) para la participación de KOMSA en FertiNitro, si se lo ajusta correctamente a los fines de una valoración de VJM al 30 de septiembre de 2010 (a USD 55,3 millones), sustenta la valoración de la Demandada.  En tanto el valor de la Planta depende de los flujos de caja futuros, toda valoración que se base en determinaciones de valor anteriores en este sentido debe ser ajustada para dar cuenta de los cambios en el precio de las mercaderías vendidas, en este caso, amoníaco y urea.  Por consiguiente, el valor de la Planta en septiembre de 2010 no puede ser el mismo que en octubre de 2008, cuando los precios y las proyecciones de precios fueron significativamente superiores.

9.175  En segundo lugar, la Demandada sostiene que los costos de construcción de otras plantas carecen de relevancia.  Más específicamente, los costos de construcción de la planta de Morón carecen de relevancia para la valoración de FertiNitro, ya que estos costos no proporcionan información acerca del valor de la Planta FertiNitro.  Lo mismo se aplica a los costos proyectados de construcción de las plantas de Guiria y José, que las Demandantes plantearon por primera vez en la Segunda Audiencia (noviembre)[632].  De hecho, debido a las demoras en la construcción o a los cambios del mercado, el valor de una construcción suele ser menor que lo que le costó la construcción al propietario[633].

9.176  En tercer lugar, la Demandada sostiene que los dos informes Advantis confirman la valoración del Dr. Flores.  A la vez, demuestran que la valoración del Sr. Giles del capital de KOMSA en la suma de USD 361 millones es una clara exageración.  La primera

---

[631] Segunda Audiencia (noviembre) D8.784.
[632] Segunda Audiencia (noviembre) D6.293.
[633] Segunda Audiencia (noviembre) D5.141-142.

valoración de Advantis, preparada en el contexto de las negociaciones para llegar a un acuerdo, valoró la participación del 25 % de KOMSA en la suma de USD 30-48 millones (o USD 120-194 millones para el 100 %), asumiendo que el Decreto de la Urea continuaba siendo aplicable, y en USD 99 millones (o USD 398 millones para el 100 %), en el supuesto de que las ventas nacionales según el Decreto de la Urea dejaran de estar en vigencia en 2012[634].

9.177   El segundo informe Advantis calculó un valor superior de USD 113 millones para la participación del 25 % de KOMSA en FertiNitro (o USD 452 millones para el 100 %) en el supuesto de que las ventas según el Decreto de la Urea dejaran de estar en vigencia en 2012.   Sin embargo, en el supuesto de que las ventas nacionales según el Decreto de la Urea continuaran en vigencia (y asumiendo el mismo impacto que la Primera Valoración de Advantis), el Dr. Flores ha demostrado que la Segunda Valoración de Advantis se reduce a USD 43,5-62 millones (la participación del 25 % de KOMSA) o USD 248-174 millones (100 % de FertiNitro)[635].

9.178   Surge, tal como afirma la Demandada, que la valoración que realiza el Dr. Flores de la participación de KOMSA en la suma de USD 34,6-64,3 millones se encuentra dentro del rango de los resultados de ambas valoraciones de Advantis en el rango de los USD 30-113 millones, o al menos son cercanos a estos, mientras que la valoración presentada por el Sr. Giles de USD 361 millones es un valor claramente atípico y supera las valoraciones de Advantis en alrededor de tres a diez veces.   Además, el Sr. Giles plantea el nuevo argumento de que la tasa de descuento aplicable sería el 13,1 % utilizando la prima de riesgo de mercado y la prima de riesgo país de Advantis (que son inferiores a las respectivas presunciones del Dr. Flores), junto con la tasa libre de riesgo y el factor *beta* del Dr. Flores (que, a su vez, son respectivamente inferiores a los utilizados en los informes de Advantis). La Demandada sostiene que este enfoque arbitrario y no explicado carece de lógica y lo describe como "otro ejemplo del enfoque inadecuado de manipulación del Sr. Giles, que

---

[634] *Véase* Primer Informe Advantis (R-86), páginas 5, 9 y 19.
[635] Informe Advantis intitulado "Valoración de FertiNitro" (julio de 2011) (C-157) ("Segundo Informe Advantis"). *Véase* presentación del Dr. Flores durante la Segunda Audiencia (noviembre), Diapositiva 55.

considera solo aquellos elementos que aumentan su valuación y excluye a aquellos elementos que la disminuyen"[636].

9.179  En cuarto lugar, la Demandada sostiene que el nuevo argumento de las Demandantes basado en el valor contable de FertiNitro es irrelevante.  La Demandada sostiene que, durante la Segunda Audiencia (noviembre), las Demandantes plantearon el nuevo argumento de que la valoración que realiza el Dr. Flores de la participación de KOMSA en FertiNitro en la suma de USD 34,6 millones se encuentra subestimada, ya que el valor contable del 25 % de FertiNitro de KOMSA en 2010 era supuestamente de USD 168,1 millones[637].  No obstante, el valor contable es irrelevante cuando se valora a una empresa en función del estándar de VJM.  En efecto, la Demandada señala lo que el Tribunal indagara durante la Audiencia, es decir, que "la disposición del vendedor a vender no está obligatoriamente conectada de manera causal o existencial con el supuesto valor entendido como factor objetivo de los activos"[638].

*(iv)  La valoración de KNI de sus derechos relativos al reclamo del Offtake Agreement es exagerada*

9.180  La Demandada sostiene principalmente que los derechos contractuales de KNI en virtud del *Offtake Agreement* no constituyen una "inversión" y/o que no ha habido ninguna expropiación de tales derechos por lo que, por consiguiente, no se debe compensación alguna a KNI. Sin embargo, el Tribunal ha resuelto de otro modo la cuestión de la jurisdicción y, por mayoría, la cuestión de responsabilidad: véase *supra*. En estas circunstancias, la Demandada aquí sostiene que el Tribunal debe determinar dicha compensación sobre la base de la valoración del Dr. Flores de USD 56,2 millones y no sobre la base de la valoración exagerada de USD 206,5 millones del Sr. Giles. Ni el Dr. Flores ni la Demandada -aducen- que, suponiendo que las cuestiones de jurisdicción y responsabilidad fueran resueltas a favor de KNI, KNI no ha sufrido ninguna pérdida como consecuencia de la expropiación de sus derechos respecto del *Offtake Agreement*.

---

[636] EPA Ven., Párrafo 252.
[637] EPA Ven., Párrafo 253, que hace referencia a la Segunda Audiencia (noviembre) D5.31 (Fietta).
[638] Segunda Audiencia (noviembre) D5.47 (Feliciano).

9.181   En primer lugar, la Demandada sostiene que las Demandantes formulan las mismas hipótesis inapropiadas en lo que se refiere a volúmenes de venta y tasas de descuento que en su valoración de la participación accionaria de KOMSA en FertiNitro.

9.182   En segundo lugar, la Demandada afirma que el período valuatorio de las Demandantes incluye indebidamente un período de dieciséis meses durante el cual KNI no sufrió pérdida alguna. Dice que la valoración de los derechos de KNI en virtud del *Offtake Agreement* debe necesariamente, por razones de hecho y de derecho, excluir los volúmenes de producción que KNI obtuvo entre octubre de 2010 y febrero de 2012 en virtud del *Offtake Agreement*. Esto es así porque (tal como arguye la Demandada) no es un tema controvertido entre las Partes que KNI continuó comprando productos fertilizantes a FertiNitro a precios del *Offtake Agreement* durante esos dieciséis meses. La Demandada señala que el Sr. Giles realiza su valoración como si estas compras nunca hubieran ocurrido y, por lo tanto, calcula daños por volúmenes de producción que KNI nunca perdió. Dicha doble compensación debe rechazarse independientemente del método de valoración que se aplique. Por el contrario, la Demandada argumenta que el Dr. Flores examina "precisamente lo que sucedió" y, en consecuencia, excluye de su valoración las compras de KNI durante el período comprendido entre octubre de 2010 y febrero de 2012.

9.183   En tercer lugar, la Demandada señala que la valoración de las Demandantes se basa en supuestos fácticos poco realistas, a saber:

    (a)   *las Demandantes calculan de manera inadecuada el lucro cesante de KNI en lugar del valor de los supuestos derechos de KNI en virtud del Offtake Agreement;*

    (b)   *las Demandantes no demuestran que nunca habrían podido reemplazar los derechos de comercialización de FertiNitro a través de compras en el mercado abierto; y*

    (c)   *los cálculos de lucro cesante de las Demandantes son erróneos y sumamente especulativos.*

9.184   En cuanto a (a), el Sr. Giles calcula el lucro cesante de KNI en lugar del valor de los supuestos derechos de KNI en virtud del *Offtake Agreement*. Además, asume que, tras la

terminación del *Offtake Agreement*, KNI podría entonces y para siempre reemplazar las cantidades debidas bajo el *Offtake Agreement* sólo a través de compras a precios NOLA y TAMPA, perdiendo así todas y cada una de las oportunidades de revender las cantidades de reemplazo de amoniaco y urea con una ganancia. La Demandada aduce, sin embargo, que el Dr. Flores calcula correctamente el valor de los derechos alegados por KNI en virtud del *Offtake Agreement* como la diferencia entre el precio medio del Caribe para el amoníaco y la urea en el mercado abierto, por un lado, y el más favorable Precio del *Offtake Agreement* (a saber, precio bajo del Caribe menos un descuento del 3 % para la urea o del 4 % para el amoníaco), por el otro. La Demandada afirma que el intento de las Demandantes de cuestionar la existencia y credibilidad de un precio medio del Caribe es "sorprendente"[639], ya que fue su propio perito (Sr. Giles) el que primero analizó este precio en su primer informe pericial[640].

9.185   En cuanto a (b), la Demandada afirma que los desarrollos en los mercados de fertilizantes de los Estados Unidos e internacional conocidos antes de la fecha de valoración indican que KNI habría podido obtener cantidades de reemplazo de amoníaco y urea a costos por debajo de los de los valores NOLA/TAMPA, y probablemente lo hizo. Como consecuencia del incremento considerable en la oferta nacional estadounidense de gas natural barato (que es el componente clave del amoniaco y la urea) desde comienzos de 2008, según las propias fuentes de las Demandantes, tanto las empresas nacionales como las extranjeras han creado nuevas plantas de fertilizantes o han reactivado las plantas cuyas actividades habían suspendido anteriormente en los Estados Unidos. Este desarrollo se traduce en un aumento en la oferta de productos fertilizantes estadounidenses y mundiales, así como en una caída en la demanda de fertilizante importado (del Caribe) en los Estados Unidos, y en otros sitios. De hecho, la Demandada sostiene que las Demandantes han reconocido los nuevos beneficios de producir fertilizantes en los Estados Unidos[641].

9.186   En este sentido, la Demandada arguye que fuentes estadounidenses e internacionales esperan que las nuevas inversiones en la industria de fertilizantes estadounidenses den

---

[639] EPA Ven., Párrafo 259.
[640] Giles IP1, Párrafos 4.14-4.15; D.3.
[641] Primera Audiencia (septiembre) D2.110-111 (Sorlie); Koch Nitrogen Company, LLC, Koch Nitrogen construirá nueva planta de urea y aumentará la producción existente (15 de mayo de 2013) (EO-71), página 1.

como resultado entre 3 y 7 millones de toneladas de capacidad adicional de fertilizantes de nitrógeno en los EE. UU.[642]. La Demandada sostiene que el aumento significativo de la oferta nacional de fertilizantes de los Estados Unidos ya ha comenzado a impactar la demanda de importación estadounidense. De ello se deduce, tal como afirma la Demandada que, como EE. UU. era el principal importador de fertilizantes provenientes del Caribe, una disminución en la importación estadounidense dará lugar a la disponibilidad de más productos del Caribe para su compra en el Caribe. La Demandada hace referencia a un reporte en el que se señala, *inter alia*, que Trinidad será "la más afectada" por la disminución general de las necesidades de importación de EE.UU.[643] Asimismo, la Demandada argumenta que los datos que proporcionó sobre el impacto de la revolución del gas de esquisto de los EE. UU. en los mercados mundiales de fertilizantes son confiables. Finalmente, el Sr. Sorlie testificó que existe la oportunidad de comprar toneladas listas de amoniaco y urea en el mercado caribeño[644]. Incluso si tal oportunidad fuera limitada, la Demandada señala que esto sería contradictorio con los alegatos de las Demandantes de que no podían (actualmente ni a futuro) sustituir ninguna de las cantidades de *offtake* de FertiNitro a los precios de mercado abierto del Caribe. Por consiguiente, tal como afirma la Demandada, las Demandantes, que tienen la carga de la prueba, no han aportado la prueba necesaria para el cumplimiento de esa carga.

9.187   En tercer lugar, la Demandada sostiene que los cálculos de lucro cesante de las Demandantes son "erróneos y altamente especulativos"[645]. En este sentido, la Demandada señala que las Demandantes simplemente asumen que KNI habría podido exportar a EE. UU. las mismas cantidades de producto fertilizante a los mismos precios que en el pasado. Sin embargo, la Demandada sostiene que esto ignora completamente los cambios importantes en el mercado estadounidense de fertilizantes, lo que sugiere que la demanda estadounidense de productos fertilizantes extranjeros continuará disminuyendo y que los precios de los mercados NOLA/TAMPA bajarán; de esta forma, se generarán márgenes de

---

[642] Documento de posición del CEIFIC, Las implicaciones de la revolución del gas de esquisto para la industria química europea (15 de marzo de 2013) (R-88).
[643] eAmmonia, ¿Es el auge del amoníaco en América del Norte un peligro para las plantas de amoníaco de Trinidad? (21 de mayo de 2013) (R-87).
[644] Primera Audiencia (septiembre) D2.105-106 (Sorlie).
[645] EPA Ven., Párrafo 266.

ganancia y volúmenes de venta reducidos para KNI a lo largo de los años. Señala el reconocimiento del Sr. Giles "[d]el aumento de manera drástica de las reservas de gas en los EE. UU. y la consiguiente reducción de los precios y de la demanda de GNL importado en EE. UU."[646]. Lo que resulta cierto para el GNL es cierto en relación con el amoníaco y la urea.

9.188   Asimismo, la Demandada arguye que los cálculos de lucro cesante del Sr. Giles no son confiables debido a que los costos de transporte que éste utiliza son altamente especulativos. No puede utilizarse como base la prueba del Sr. Sorlie de que la estimación de costos del Sr. Giles es razonable, ya que se basó solamente en las facturas de dos años (2009 y 2010), que es claramente un período demasiado corto para cualquier evaluación apropiada[647]. En cambio, tal como explicara el Dr. Flores, "[en] la industria naviera cuando los precios de los productos básicos ascienden en 2006, 7, 8, los costos de envío suben también y luego recaen en el 2009, 2010. Y me parece un poco sospechoso que aquí se nos hayan dado solamente unos pocos datos del año 2010, unas cifras que dicen que han obtenido internamente para el 2009 y no se da el menor dato para el 2007, 8"[648]. Además, el cálculo de los costos de transporte del Sr. Giles también resulta "descuidado", puesto que ha utilizado de manera incorrecta datos de transporte para Taft, Luisiana, en vez de Tampa, Florida, para calcular los costos de transporte de amoniaco desde José a Tampa.

9.189   Por último, la Demandada señala que el Sr. Giles ignora los costos asociados con la empresa, tales como los costos fijos. La alegación de las Demandantes de que los costos fijos eran irrelevantes para los cálculos de los costos sigue sin haberse demostrado.

**(5)   *Análisis y Decisiones del Tribunal***

9.190   *Cuestiones Principales:* Teniendo en cuenta las alegaciones de las Partes resumidas *supra*, en relación con la cuestión de la compensación en virtud del Artículo 6 del Tratado, las tres cuestiones principales que se plantean para la determinación del Tribunal son las siguientes:

---

[646] Giles IP1, Párrafo 2.16.
[647] cf. Segunda Declaración Testimonial de Jim Sorlie (26 de julio de 2013) ("Sorlie DT2"), Párrafo 23 (Tabla 1).
[648] Segunda Audiencia (noviembre) D6.375 (Flores). Inglés: D6.139

*Cuestión (1):*   ¿Cuál es el estándar adecuado de compensación por expropiación ilícita en virtud del Artículo 6 del Tratado?

*Cuestión (2):*   ¿Cuál es la compensación pagadera a KOMSA por su participación expropiada en FertiNitro?

*Cuestión (3):*   ¿Cuál es la compensación pagadera a KNI por sus derechos expropiados respecto del *Offtake Agreement*?

9.191   Cada una de estas cuestiones plantea muchas cuestiones secundarias, cuya naturaleza se desprende claramente de las amplias presentaciones escritas y orales de las Partes, resumidas *supra*. Las cuestiones secundarias se abordarán en la medida apropiada a continuación, como parte de las tres cuestiones principales.

*Cuestión (1): ¿Cuál es el estándar adecuado de compensación?*

9.192   El Tribunal comienza con el Artículo 9(3) del Tratado. Exige que el Tribunal se limite a otorgar una compensación por daños y perjuicios pagaderos por la Demandada a KOMSA o KNI en los casos en que el Tribunal haya determinado que la Demandada no ha cumplido con una obligación en virtud del Tratado. En cuanto a dicha compensación ante un incumplimiento del Artículo 6 del Tratado, tal disposición se refiere, en el caso de una expropiación lícita, a una "compensación efectiva y adecuada" que "representará el valor de mercado de la inversión expropiada inmediatamente antes de que las medidas expropiatorias fueren tomadas o se hicieren del conocimiento público, si ocurriere antes". Es evidente que todas las Partes coinciden en que un valor de mercado tal, o valor justo de mercado (VJM), es el estándar adecuado de compensación que se aplicará a los reclamos de compensación tanto de KOMSA como de KNI en contra de la Demandada (véanse las síntesis de las alegaciones respectivas de las Partes *supra*).

9.193   En las circunstancias de este caso, tanto para KOMSA como para KNI, la fecha para dicha valoración es el 10 de octubre de 2010 inmediatamente antes del Decreto de Expropiación y de las declaraciones públicas del Ministro responsable (que deberán tratarse como un suceso compuesto) del 11 de octubre de 2010. Las Partes han utilizado la fecha del 30 de septiembre de 2010. Para Tribunal, la diferencia no es relevante a los efectos de este Laudo.

La fecha del 10 de octubre de 2010 o 30 de septiembre de 2010 (utilizada por las Partes) es la fecha pertinente para calcular la compensación debida a KOMSA y a KNI, sin retrospectiva y basada en factores posteriores. El Tribunal ha tomado conocimiento del debate no resuelto en otros arbitrajes sobre si, y en caso afirmativo, en qué medida, los factores posteriores a la expropiación ilícita (en sus diferentes formas) hasta la fecha del laudo pueden ser pertinentes para el cálculo de la compensación, en particular, las decisiones emitidas en el marco de los casos *Quiborax c. Bolivia* y *Burlington c. Ecuador*[649]. No es necesario entrar en este debate en el presente caso, habida cuenta de los términos expresos del Tratado aplicados por las Partes.

9.194   En este caso, es innecesario que el Tribunal decida sobre cualquier diferencia entre una expropiación ilícita en violación del Artículo 6 del Tratado y una expropiación conforme al Artículo 6 que no sería ilícita si la Parte Contratante hubiese tomado medidas para dar lugar a "una compensación efectiva y adecuada". Si bien otros tribunales han realizado esfuerzos para dirimir esta cuestión controversial en virtud del derecho internacional y los términos del tratado, las Partes en el caso que nos ocupa han acordado que, cualquiera sea la respuesta correcta, la compensación correspondiente a KOMSA y a KNI debe basarse en el valor justo de mercado de la inversión expropiada a la fecha pertinente en ausencia de cualquier violación del Tratado por parte de la Demandada (el "estándar de VJM"), o en su escenario contrafáctico. Por lo tanto, la respuesta para la expropiación ilícita es la misma que para la expropiación lícita, bajo el Artículo 6 del Tratado. Por lo tanto, aquí la compensación a KOMSA y KNI debe estar basada en el mismo VJM

9.195   En cuanto a sus respectivas metodologías, en su carácter de expertos en daños, tanto el Sr. Giles (para los Demandantes) como el Dr. Flores (para la Demandada) se refieren a un valor justo de mercado (VJM) como el valor al que un comprador dispuesto y un vendedor dispuesto intercambiarían un activo en efectivo, actuando en condiciones de plena competencia en un mercado abierto y sin restricciones, ambos con conocimiento razonable de los hechos pertinentes.

---

[649] *Quiborax S.A. y Non Metallic Minerals S.A. c. Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Laudo (16 de septiembre de 2015) (RLA-157); *Burlington Resources, Inc. c. República de Ecuador*, Caso CIADI No. ARB/08/5, Decisión sobre Reconsideración y Laudo (7 de febrero de 2017).

9.196  En consecuencia, este estándar de VJM, conforme a dicha formulación, es un criterio común entre las Partes y sus expertos en daños como metodología de compensación para este caso[650]. El enfoque de las Partes es consistente con las decisiones sobre metodología de cuantificación de daños, tales como *CMS c. Argentina* y *Occidental c. Ecuador*[651]. En estas circunstancias, el Tribunal está conforme de adoptar el enfoque común de las Partes tanto para KOMSA como para (por mayoría) KNI.

9.197  No obstante, al calcular el VJM para la participación accionaria de KOMSA en FertiNitro, los dos expertos de las Partes, el Sr. Giles y el Dr. Flores, aplicaron metodologías que produjeron resultados muy diferentes, respecto de los cuales el Tribunal ha tenido reservas, tal como se explicará *infra*. Al calcular el VJM de los derechos de KNI respecto del *Offtake Agreement*, los mismos dos expertos también han empleado supuestos diferentes, a saber, el Sr. Giles ha calculado el lucro cesante partir de 2010 (al calcular básicamente los precios de reventa de Tampa/NOLA menos el precio del *Offtake Agreement* menos los costos de transporte); y el Dr. Flores ha excluido el período anterior al 28 de febrero de 2012 (al calcular básicamente las diferencias de precios con el mercado abierto del Caribe).

*Cuestión (2): ¿Cuál es la compensación pagadera a KOMSA por su participación expropiada en FertiNitro?*

9.198  En sus respectivos cálculos del VJM, tal como se ha resumido *supra*, los expertos de las Partes difieren significativamente, en particular, en cuanto a las tasas de descuento aplicables y a la producción y los costos de FertiNitro. El Tribunal se refiere a los puntos de desacuerdo entre estos expertos en la Tabla 2 *supra*.

9.199  En cuanto a las tasas de descuento, el Dr. Flores y la Demandada presentan una mayor tasa de riesgo de mercado, tasa de riesgo país, *lambda*, "Riesgos del TBI" y ajuste de liquidez. En cuanto a la producción y los costos de la Planta FertiNitro, el Dr. Flores y la Demandada invocan deficiencias existentes en la construcción de la Planta FertiNitro, mantenimiento poco satisfactorio en los primeros años de operación de la Planta, excesivos cierres no planificados de la Planta, altos costos de mantenimiento debido a la historia y condición

---

[650] Segunda Audiencia (noviembre) D5.44; Tercera Audiencia (junio), Diapositiva 3.4 (Demandada).
[651] *CMS c. Argentina* (CLA-130), Párrafo 402; *Occidental c. Ecuador* (CLA-129).

defectuosa de la Planta; problemas con el suministro de gas y electricidad a la Planta; y la situación económica generalmente adversa de Venezuela.

9.200 La Demandada también acusa al Sr. Giles de seleccionar ventajosamente la información, en particular, en lo que respecta a los costos de gas natural, las paradas programadas, el mantenimiento, los gastos de capital y, en cuanto a los datos de producción, la exclusión de 2009 y 2010. La Demandada rechaza los controles de razonabilidad del Sr. Giles en relación con el MdE de octubre de 2008, los costos de construcción de otras plantas en otros lugares y el valor contable de FertiNitro.

9.201 En cuanto a las tasas de descuento, el Sr. Giles aplica diferente información inicial. Como riesgo de mercado, utiliza una prima histórica "ajustada" que, con otras diferencias, deriva en una tasa de descuento total del 10,1 %, en contraposición con la tasa del Dr. Flores del 20,4 %. En lo que se refiere a las cifras de producción y costos, el Sr. Giles utilizó valores reales, pero, en los casos en que consideró que estos no eran confiables, utilizó cifras presupuestadas (en particular, para 2008, 2009 y 2010). El Sr. Giles estaba claramente preocupado por el nivel históricamente alto de costos reales de paradas y mantenimiento de la Planta.

9.202 En cuanto a las verificaciones de validez, el Sr. Giles utilizó un valor contable para los activos de FertiNitro y calculó así la participación del 25 % de KOMSA en USD 168,1 millones (pero también reconoció que el valor contable de los activos por sí solo no constituye una valoración de FertiNitro como empresa en marcha). En cuanto a los costos de construcción históricos de FertiNitro, ellos ascendían a USD 273 millones para KOMSA (a precios de 2001). Respecto de las valoraciones del MdE en 2008 para la participación del 25 % de KOMSA, el Sr. Giles ajustó estas cifras para excluir el impacto del Decreto de la Urea, revirtió el efecto de los nuevos impuestos e incrementos fiscales de FertiNitro y llegó a una cifra de USD 360,8 millones.

9.203 En opinión del Tribunal, no existen pruebas convincentes de que realmente alguno de los precios de los MdE en 2007 o 2008 entre Pequiven y KOMSA fueran objeto de un acuerdo. La primera oferta llegó a través de un mensaje de correo electrónico de fecha 9 de octubre de 2007 del Sr. Toro de Pequiven con una valoración de USD 1,175 millones por el 100%

del capital de FertiNitro, menos el monto pendiente de pago a sus bancos y tenedores de bonos (que calculó en USD 450.000, presuntamente USD 450 millones)[652]. El 7 de noviembre de 2007, KOMSA respondió con su borrador de MdE y una valoración de USD 1,210 millones menos las deudas con los bancos y tenedores de bonos más el excedente de efectivo en FertiNitro[653]. Las discusiones se interrumpieron entre estas partes a principios de 2008. Sin embargo, Pequiven reapareció en octubre de 2008 con un borrador de MdE revisado que preveía un pago de USD 212,5 millones a KOMSA por su participación en el capital de FertiNitro[654]. En última instancia, ningún MdE o valoración fueron acordados o firmados entre KOMSA y Pequiven. Pequiven declaró que la compra de las acciones de los accionistas privados en FertiNitro ya no era una prioridad. No obstante, el Sr. Parra (de KOMSA) afirmó en su declaración testimonial (párrafo 69) que los representantes de KOMSA entendieron que no había "otra alternativa racional más que acceder a la propuesta de Pequiven"[655]. En estas circunstancias, la única cifra equivalente a una valoración "acordada" era la suma de USD 212,5 millones propuesta por Pequiven a KOMSA en octubre de 2008 (que mantuvo el Decreto de la Urea y los diversos impuestos). Sin embargo, tal como se indicara, esta cifra nunca fue de hecho acordada entre KOMSA y Pequiven o la Demandada.

9.204  En estas circunstancias, el Tribunal no atribuye peso alguno a estas negociaciones incompletas en 2007 y 2008 con el fin de llegar al VJM apropiado mucho más tarde en septiembre/octubre de 2010.

9.205  De manera más significativa, a la fecha de valoración requerida del 10 de octubre de 2010 (o del 30 de septiembre de 2010) en virtud del Artículo 6 del Tratado, la Planta FertiNitro no era lo que había sido en 2007 y 2008. Estaba en una situación de dificultad, operada por una empresa con problemas, con un directorio dividido, dentro de una economía nacional en deterioro. También estaba mal gestionada, mal mantenida, mal administrada y con

---

[652] Correo electrónico de F. Toro a B. Gwaltney y T. Parra re: Negociaciones de FertiNitro (9 de octubre de 2007) (C-90).

[653] Borrador de Memorándum de Entendimiento de KOMSA (sin fecha) (C-92). Este proyecto había sido presentado anteriormente por los Sres. Parra y Gwaltney (testigos para KOMSA) a los Sres. Toro y Lazo (de Pequiven) en una reunión celebrada el 7 de noviembre de 2007 (*véase* Gwaltney DT1, Párrafo 112).

[654] Borrador de Memorándum de Entendimiento de Pequiven (sin fecha) (C-93)

[655] *Véase* Mem. Koch, Párrafos 144-152.

costos que eran un "espiral fuera de control" en los términos de su directorio el 5 de agosto de 2010.  En ese momento ya existían altas tasas de inflación en Venezuela; y, con la devaluación de la moneda venezolana, sus costos expresado en USD habían aumentado significativamente (aunque en cierta medida reducían los costos locales). También había un creciente malestar industrial y social que perjudicaba el funcionamiento de la Planta FertiNitro, tal como declarara el Sr. Gwaltney[656]. Por ende, el Tribunal no considera que la situación de FertiNitro el 10 de octubre de 2010 sea comparable a su estado anterior en el período 2007-2008, por lo que los datos anteriores son sustancialmente irrelevantes, incluidos los costos de construcción históricos, los niveles de producción más altos y (tal como se resolviera *supra*) las valoraciones del borrador de MdE para 2007 o 2008.

9.206   En estas circunstancias, el Tribunal considera que ninguno de los dos expertos, a pesar de su obvia competencia profesional y pericia, ha logrado establecer un valor justo de mercado confiable para la participación de KOMSA en FertiNitro. En general, las diferencias de los expertos se pueden atribuir principalmente a desacuerdos amplios en cuanto a la relevancia y al alcance de las inferencias fácticas y los supuestos fácticos. El Tribunal ha resumido ampliamente su enfoque *supra* y de ello puede observarse que cada uno critica severamente el análisis y las conclusiones del otro. Aunque ninguno de ellos logra afianzar su enfoque en su propio fundamento, partes de esa crítica bastan para menoscabar la confianza del Tribunal en el enfoque del otro en su carácter de experto en daños. Es como si dos boxeadores en el ring generaran un *knock out* simultáneo, sin ganar la contienda.

9.207   Por consiguiente, el Tribunal aborda los dos informes Advantis, en particular, su segundo informe de julio de 2011, el cual presenta dos escenarios. El primer escenario pareciera ser una mera revisión del primer informe de mayo de 2011, ya que no se da ninguna explicación para la cifra alcanzada de USD 113 millones como el valor de la participación del 25 % de KOMSA en FertiNitro[657]. Al aplicar una metodología FCD para llegar a un VJM y al tener en cuenta varios factores no considerados en el primer informe, este segundo escenario valoró la participación del 25 % de KOMSA en FertiNitro en USD 140,25 millones (el 25 % de un valor total de USD 561 millones) a septiembre de 2010,

---

[656] Gwaltney DT1, Párrafos 60 y ss.
[657] Primer Informe Advantis (R-86).

sobre la base exclusiva de los datos disponibles hasta 2010. Ni KOMSA ni la Demandada aceptan ninguna de las valoraciones de Advantis; pero las Partes y los expertos en daños de las Partes (el Sr. Giles y el Dr. Flores) se refirieron a los informes Advantis en numerosas ocasiones con diferentes fines.

9.208 Los informes Advantis se realizaron con la forma de presentaciones PowerPoint, preparadas en idioma español. Aunque en parte lacónicos, posiblemente incompletos y con autores no puestos a disposición del Tribunal como testigos en este arbitraje, el Tribunal considera que estos informes son suficientes a los efectos actuales, en particular, el "segundo escenario" del segundo informe.

9.209 En su primer informe de mayo de 2011, Advantis valoró la participación de KOMSA en USD 30-48.5 millones si el Decreto de la Urea continuaba en vigor (en diferentes escenarios) y en USD 99.5 millones si finalizaba a finales de 2012.[658]

9.210 En su segundo informe de julio de 2011, Advantis valoró la participación de KOMSA en dos escenarios adicionales. En virtud de un primer escenario, calculado en un valor base de USD 452 millones, Advantis valoró dicha participación en USD 113 millones[659]. En virtud del segundo escenario, Advantis calculó un valor base para FertiNitro de USD 561 millones, ajustado del valor base de USD 452 millones para tener en cuenta seis factores lo que incluía precios más altos para amoniaco y urea (algunos de dichos factores que aumentaban y otros que disminuían el valor de FertiNitro, resultando en un aumento neto de USD 109 millones). Este segundo escenario dentro del segundo informe Advantis valoró la participación de KOMSA en FertiNitro en USD 140,25 millones, correspondiente al 25% de USD 561 millones.[660]

9.211 Estos seis factores eran los siguientes: los precios ajustados del amoníaco y la urea, según se establece en un apéndice separado para el período 2011-2016 (+ USD 125 millones); 10 % en concepto de descuentos para nuevas inversiones, según se establece en un apéndice separado para el período 2011-2016 (+ USD 4 millones); créditos fiscales tendientes a reducir la tasa vigente del impuesto a las ganancias para el período 2007-2010, según se

---

[658] Primer Informe Advantis (R-86), páginas 9 y 19, calculado sobre un valor base de FertiNitro de USD 398 millones.
[659] Segundo Informe Advantis (C-157) (versión en inglés), página 2.
[660] Segundo Informe Advantis (C-157) (versión en inglés), página 4.

establece en un apéndice separado (+ USD 35 millones); mayor depreciación (+ USD 59 millones); tipos de cambio ajustados para las deudas de PDVSA y Pequiven, según se establece en un apéndice separado (- USD 41 millones); y tasas de inflación ajustadas para el impuesto a las ganancias (- USD 68 millones).  El Tribunal acepta estos ajustes.

9.212   El primer informe Advantis se discutió con los accionistas extranjeros de FertiNitro.  En su momento, lo recibió y estudió KOMSA.  El Sr. Gwaltney (para KOMSA) declaró que Pequiven suministró a KOMSA ambos Informes Advantis y que el segundo informe fue en respuesta a la carta que enviara el Sr. Gwaltney a Pequiven con las críticas respecto del primer informe[661]. A la luz de las pruebas disponibles al Tribunal, no pareciera que KOMSA haya analizado el segundo informe con Pequiven o Advantis en ese entonces.

9.213   El Tribunal consideró los distintos comentarios sobre los Informes Advantis, que realizaron las Partes y sus respectivos expertos, el Sr. Giles y el Dr. Flores.

9.214   En función de los dos informes Advantis, el Dr. Flores valoró la participación de KOMSA en USD 34.6 millones si el Decreto de la Urea continuaba y en USD 64,3 millones si quedaba sin efecto en 2012. Tal como alegó también la Demandada en la Tercera Audiencia (junio):

> *"[…] el informe Advantis es una mejor verificación de validez de esos precios del MOU debido simplemente al hecho de que contiene una valoración a partir de septiembre 2010, que es el mismo período que analizamos respecto de FertiNitro y el TBI. La valoración de Advantis, tanto la primera en mayo 2011 y la segunda valoración en julio 2011, sostienen la valoración de 34,6 millones, la valoración del doctor Flores, que es más razonable que 161 millones del doctor (Flores) [sic]. Y estamos hablando de ese por ciento de participación de KOMSA en FertiNitro"[662].*

> *Posteriormente, afirmó lo siguiente:*

> *"[La tasa de descuento s]olo se tiene en cuenta en una de las valuaciones. Pero como ambos [informes] se refieren a FertiNitro desde septiembre de 2010, es lógico que Advantis utilizó la misma tasa de descuento en ambos informes. Advantis calculó la prima de mercado y la prima de riesgo de capital a comparación con la tasa sin riesgo durante diez años. No se suele estimar así. Y la prima de riesgo de capital de*

---

[661] Segunda Declaración de Testigo de Brent W. Gwaltney (20 de agosto de 2013), Párrafo 40.
[662] Tercera Audiencia (junio) D2.311-312 (Sra. Tevini).

*Advantis, ahí hay que entender que al hacer el cálculo Advantis utiliza un EBITDA y una tasa sin riesgo superior, lo cual se repercute en el resultado. Pero tiene más sentido comparar las tasas de descuento de Advantis con las de Giles y Flores que examinar cada cual de los factores por sí solo. Hay que enfocarlo todo junto para ver si es razonable y no entrar en matices del informe Advantis"*[663].

9.215 Por el contrario, el Sr. Giles (*inter alia*) valoró la participación de KOMSA en USD 361 millones, con un impacto separado del Decreto de la Urea calculado en USD 22,4 millones. En sus presentaciones, KOMSA comparó los cálculos del Dr. Flores, de manera desfavorable, con los de Advantis, en lo que concierne a la prima de riesgo del mercado (3,5 % vs. 6,7 %), la prima de riesgo país general (7,6 % vs. 11,26 %), la producción diaria de amoníaco de la Planta FertiNitro (96 % vs. 91,3 % de capacidad nominal), y la producción de urea (98 % vs. 90,8 % de capacidad nominal). KOMSA se basa en los informes Advantis para el enfoque del Sr. Giles, pero rechaza los informes Advantis como 'verificación de validez'. No obstante, tal como KOMSA alegara finalmente en la Tercera Audiencia (junio)[664]:

*"El informe Advantis [de julio de 2011] no puede utilizarse como comprobación. Advantis fue contratado como consultor interno -- perdón, independiente, por Venezuela. Ellos no reflejan el valor de mercado justo. […] Hay algunos rasgos interesantes dentro de Advantis que se están examinando. Por ejemplo, prima de mercado, riesgo de mercado de Advantis es mucho menor que la prima adoptada por el doctor Flores, más cercana a la de Giles. Luego, prima de riesgo por país genérico más alto, 7,6 Advantis, doctor Flores 11,2. Producción: los niveles son altos, mucho más altos que el doctor Flores, 96 por ciento de capacidad nominal para Advantis y 91,3 en el caso de Flores. Eso para amoníaco. Y para urea, 98 por ciento Advantis y casi 91 por ciento Flores. Y esto es importante porque Advantis fue contratada por Venezuela para realizar esta evaluación. Y muchos de estos criterios revelan unos valores que se acercan mucho más a la valoración independiente de Flores".*

9.216 El Tribunal considera que es inapropiado escoger diferentes partes de los Informes Advantis y procurar ajustar, de una manera u otra, los diversos factores que invocan el Sr. Giles y el Dr. Flores. Este ejercicio sería difícil, o incluso imposible, para el Tribunal, ya que cada uno de los expertos que lo hizo fue criticado por la Parte contraria por hacerlo.

---

[663] Tercera Audiencia (junio) D1.273-274 (Sr. Ryan).
[664] Tercera Audiencia (junio) D1.232-233 (Sr. Beckett).

Además, sería inevitablemente un ejercicio subjetivo e interesado. Según el Tribunal, los informes de Advantis deben aceptarse tal como se presentan, aceptando en su totalidad el segundo escenario descrito en el segundo informe Advantis e interpretándolo junto con el resto de los informes de Advantis. Al menos, es justo concluir que Pequiven no habría presentado a los otros accionistas el segundo informe Advantis si no considerase que estaba proponiendo un valor justo de mercado para FertiNitro[665]. Asimismo, cabe destacar, tal como declaró el Sr. Barrientos en su testimonio oral, que "dos de los accionistas aceptaron ese valor y fue con los cuales pudimos llegar a un acuerdo amistoso"[666].

9.217 El Tribunal puede describir brevemente el resultado de su análisis de las respectivas presentaciones de las Partes, junto con el testimonio pericial de sus respectivos testigos, el Sr. Giles y el Dr. Flores. Tanto en términos generales (tal como ya se indicara *supra*) como en función de los Informes Advantis, el Tribunal no puede fundarse en testimonios y presentaciones tan divergentes, que producen resultados tan extremos e incompatibles basados en datos, inferencias y supuestos sustancialmente diferentes. En síntesis, el Tribunal considera que la valoración del Dr. Flores es demasiado baja, pero también considera que la valoración del Sr. Giles es demasiado alta. Asimismo, tuvo dificultades para adoptar en sentido literal las metodologías de cualquiera de los expertos cuando, con pequeñas variaciones fácticas entre ellas, el resultado final se puede sesgar tan radicalmente de un modo u otro.

9.218 Por ende, el Tribunal retoma el segundo escenario del segundo informe Advantis de julio de 2011, como valoración profesional independiente contemporánea (si bien fue realizada por expertos en valoración contratados por Pequiven, ante la falta de acuerdo con los otros accionistas sobre la designación conjunta de un valuador) calculada a la fecha pertinente sin retrospectiva importante. Según el Tribunal, este segundo escenario descripto en el segundo informe ofrece la mejor respuesta disponible a la cuestión objeto de consideración en virtud del Artículo 6 del Tratado, es decir, el valor (justo) de mercado de la participación de KOMSA en FertiNitro inmediatamente antes de su expropiación ilícita por parte de la Demandada el 11 de octubre de 2010.

---

[665] Primera Audiencia (septiembre) D3.79-80 (Barrientos).
[666] Primera Audiencia (septiembre) D3.80 (Barrientos).

9.219  En la Tercera Audiencia (junio), el Tribunal efectivamente solicitó a las Partes las versiones de software de los cálculos de sus expertos, en forma de matriz interactiva acordada, a fin de intentar realizar sus propios aportes y analizar los distintos resultados[667]. Lamentablemente para el Tribunal, mediante los mensajes conjuntos de correo electrónico de fecha 12 de julio de 2016, las Partes rechazaron esta solicitud por considerarla imposible de realizar[668]. En particular, el Tribunal no pudo analizar las conclusiones respectivas de los expertos sobre la base de los diferentes supuestos de hecho.

9.220  En cuanto a las verificaciones de validez, el Tribunal reconoce que su método de VJM basado en este segundo escenario da lugar a una importante reducción del reclamo de KOMSA y de la valoración del Sr. Giles.  Por el contrario, representa un aumento muy significativo respecto de la valoración del Dr. Flores (USD 34,6 millones).  El Tribunal ha contemplado verificaciones de razonabilidad invocados por las Partes, pero, en su opinión, ninguno resulta muy útil.  En particular, mientras el valor contable de USD 168,1 millones que propone el Sr. Giles podría respaldar ampliamente el enfoque del Tribunal, el Tribunal reconoce que un valor contable semejante no es compatible con el VJM de una empresa en marcha.  De modo similar, el Tribunal acepta las críticas de la Demandada con respecto a otras verificaciones de razonabilidad del Sr. Giles, tal como los costos de construcción en otras áreas.

9.221  En consecuencia, de conformidad con el Artículo 6 del Tratado, el Tribunal estima, de la mejor manera posible en función del material disponible, que el valor justo de mercado de la participación expropiada del 25 % de KOMSA en FertiNitro al 10 de octubre de 2010 (o al 30 de septiembre de 2010) era de USD 140,25 millones.

*Cuestión (3): ¿Cuál es la compensación, en su caso, pagadera a KNI por sus derechos expropiados respecto del Offtake Agreement?*

9.222  Es necesario recordar en qué se funda esta cuestión.  En primer lugar, el Tribunal (por mayoría) concluyó que la Demandada es responsable conforme al Artículo 6 del Tratado

---

[667] Tercera Audiencia (junio) D2.412-413.

[668] Véanse los respectivos mensajes de correo electrónico de las Partes de fecha 12 de Julio de 2016 ("Las partes están de acuerdo en que preparar la tabla solicitada con un nivel de detalle útil para el Tribunal sería una tarea muy complicada y costosa y llevaría mucho tiempo") [Traducción del Tribunal].

por la expropiación indirecta ilícita de los derechos de KNI respecto del *Offtake Agreement*, tal como alegara KNI.  El reclamo de KNI es un reclamo promovido exclusivamente bajo el Tratado en virtud de la disposición del Tratado sobre arbitraje ante el CIADI.  No se presenta como reclamo contractual en virtud del *Offtake Agreement* de KNI con FertiNitro. La Demandada no es parte en el *Offtake Agreement*.  El Tribunal carece de jurisdicción respecto de los reclamos contractuales de KNI en contra de FertiNitro en virtud del *Offtake Agreement* en si mismo.   De hecho, el *Offtake Agreement* contiene sus propias disposiciones sobre arbitraje comercial y derecho nacional (no internacional).  En segundo lugar, el tema de la responsabilidad en virtud del Artículo 6 es jurídicamente distinto al tema de la compensación por dicha responsabilidad.  Si bien el primero proviene del segundo, el tema de la compensación es, desde luego, muy distinto en virtud del Tratado. En tercer lugar, las Partes y sus respectivos expertos estuvieron de acuerdo en que la pérdida de KNI debía calcularse teniendo en cuenta el VJM de sus derechos respecto del *Offtake Agreement* a la fecha pertinente requerida en virtud del Tratado, es decir, 30 de septiembre de 2010 (o 10 de octubre 2010).  Ninguna de ellas abogó por una medición contractual de daños y perjuicios; y cabe destacar que el Dr. Flores no arribó a una cifra de compensación cero.  Por último, pero no menos importante, por una cuestión de equidad procesal para todas las Partes, es necesario limitar las cuestiones resueltas en este Laudo a aquellas planteadas por las Partes en función de las presentaciones legales y pruebas realizadas y aducidas por ellas en este arbitraje.

9.223   Una cuestión importante entre las Partes se relaciona con la exclusión o inclusión de las compras de KNI a la Planta FertiNitro entre el 11 de octubre de 2010 y el 28 de febrero de 2012. Las otras diferencias principales son los diversos supuestos de las Partes con respecto a los precios de mercado, los volúmenes de ventas a partir de la producción en la Planta FertiNitro, las tasas de descuento y la fecha de corte relevante para los factores *ex post*.  En la Tabla 3 *supra*, el Tribunal hace referencia a los puntos de desacuerdo entre los expertos de las Partes.   Sus diferencias resultantes son muy claras: el Sr. Giles calcula la compensación de KNI en USD 206,5 millones, mientras que el Dr. Flores la estima en USD 56,2 millones.

9.224   Al comienzo, el Tribunal advierte que el testimonio pericial del Sr. Giles, con respecto a los supuestos fácticos y de mercado, contó con un respaldo importante del testimonio del Sr. Sorlie.  El Sr. Sorlie fue un testigo que impresionó al Tribunal. Al Tribunal le inspiró confianza, tanto en su declaración escrita como en su presentación oral.  No hubo un testigo de hecho de refutación equivalente de parte de la Demandada.  Por lo tanto, mientras que el testimonio pericial del Sr. Giles contó con el respaldo de las pruebas fácticas, no se puede afirmar lo mismo respecto del testimonio pericial del Dr. Flores.

9.225   En cuanto a la cuestión del periodo que abarca desde octubre de 2010 hasta febrero de 2012, el Tribunal ha decidido a favor de KNI, tal como se decidiera en la Parte VII *supra*, con respecto a la responsabilidad.  En cuanto a la fecha de corte de los supuestos de hecho, el Tribunal se pronuncia en contra del uso por parte de la Demandada de factores que tuvieron lugar después del 10 de octubre (o 30 de septiembre) de 2010, obtenidos sólo en retrospectiva, especialmente relacionados con los desarrollos recientes de la producción de gas de esquisto en los EE. UU., la mayor oferta de amoníaco y urea en el mercado mundial y los costos de transporte diferenciales.  Se trata de factores *ex post* irrelevantes para calcular la compensación a la fecha pertinente requerida por el Tratado (30 de septiembre o 10 de octubre de 2010).

9.226   En opinión del Tribunal, las compras de KNI durante el período comprendido entre el 11 de octubre de 2010 y el 28 de febrero de 2012 redujeron la pérdida de KNI calculada en la fecha pertinente.  Era muy poco probable, o incluso imposible, que la Planta FertiNitro entregara a KNI durante este período tanto esas compras como el *offtake* al cual KNI tenía derecho conforme al *Offtake Agreement*, además de sus otros compromisos locales.  La Planta FertiNitro no contaba con esa capacidad confiable de reserva de amoníaco y urea.  En estas circunstancias, si bien esas compras no reemplazaron tales *offtakes*, operaron como forma razonable de mitigación a fin de reducir la pérdida de KNI como resultado de sus derechos expropiados respecto del *Offtake Agreement*.  El Tribunal calcula el valor de este factor en USD 21,7 millones, sobre la base de las pruebas del Sr. Giles en la Segunda

Audiencia (noviembre)[669]. En consecuencia, a criterio del Tribunal, deben deducirse USD 21,7 millones del reclamo de KNI.

9.227   En cuanto a otras cuestiones importantes, la mayoría del Tribunal considera que KNI y el Sr. Giles tienen razón al identificar el suministro principal de reemplazos con la costa estadounidense del Golfo de México a precios de esa zona (NOLA para urea y Tampa para amoníaco) en un mercado líquido, en lugar de un mercado de la zona media del Caribe a precios de esa zona en un mercado muy limitado.  Por ende, la mayoría del Tribunal concluye que no había suministro de reemplazos disponible para KNI a precios comparables con el *Offtake Agreement* para KNI.

9.228   En particular, la mayoría del Tribunal acepta las pruebas fácticas del Sr. Sorlie, en las que el Sr. Giles basó sus pruebas periciales.  Vale la pena detenerse en ellas.  En su segunda declaración testimonial, el Sr. Sorlie afirmó lo siguiente:

> *"12. […] KNI es un offtaker dedicado con tres plantas productoras de amoníaco en Trinidad y Tobago. Incluso cuando KNI compraba toneladas a FertiNitro, su demanda norteamericana de productos superaba los volúmenes de suministro del Caribe.  Como tal, KNI siempre buscó, y continúa buscando, comprar fertilizante nitrogenado rentable que esté disponible bajo condiciones Libre a Bordo ("FOB") en el Caribe. Sin embargo, dados los acuerdos de offtake a largo plazo descritos anteriormente y el hecho de que los exportadores de Trinidad y Tobago ya han establecido redes de clientes fijos, muy pocas toneladas del Caribe han estado disponibles en los últimos años para que KNI las adquiera.*
>
> *13. Desde 2006, KNI sólo ha podido adquirir una pequeña cantidad de toneladas provenientes del Caribe fuera de sus arreglos de offtake a largo plazo. El ejemplo principal fue la capacidad de KNI, entre 2006 y 2010, de adquirir un total de 211.000 toneladas métricas de amoníaco de una planta de Trinidad y Tobago perteneciente parcialmente a Terra Industries. Este volumen equivale a aproximadamente el 1 % de la producción total de Trinidad y Tobago durante este período. En 2010, CF Industries adquirió Terra Industries. Esto derivó en el transporte de casi todo el excedente de amoníaco de esa planta a los Estados Unidos por parte de CF Industries para usarlo como materia prima en su negocio norteamericano o para la venta a los clientes de CF. Como consecuencia, desde el 2011, KNI solo ha podido adquirir 3.500 toneladas métricas de amoníaco, lo cual equivale a aproximadamente el 0,1 % de la producción total de amoníaco de Trinidad y Tobago.*

---

[669] Segunda Audiencia (noviembre), presentación de Tim Giles, Diapositiva 24.

> *14. Debido a las razones mencionadas anteriormente, es incorrecto que el Dr. Flores suponga que KNI puede reemplazar los volúmenes de offtake perdidos de FertiNitro al adquirir otros productos bajo condiciones Libre a Bordo ("FOB") en el Caribe. En cambio, la alternativa de KNI es adquirir amoníaco y urea a precios equivalentes a los precios de NOLA y de Tampa"[670].*

9.229   En la Primera Audiencia (septiembre), la Demandada contrainterrogó al Sr. Sorlie, *inter alia*, en los siguientes términos:

> *"PREGUNTA.- [...] ¿Tengo yo razón en suponer que KNI ha seguido abasteciendo a sus clientes estadounidenses que inicialmente recibían producto del Acuerdo Offtake?*
> *RESPUESTA.- Como dije anteriormente, seguimos efectuando ventas en los Estados Unidos debido a que tenemos un negocio sumamente competitivo y que es rentable. Así que seguiremos efectuando esas ventas con o sin el producto del Offtake de FertiNitro. Pero sin este producto, tenemos que ubicar esas toneladas en otros lugares para abastecer este mercado que tenemos.*
> *PREGUNTA.- Entonces, ¿nos dice que han sido capaces de reemplazar los montos que en el pasado tenían bajo el Acuerdo Offtake?*
> *RESPUESTA.- Sí. Sí, en una estructura de precios de NOLA y Tampa.*
> *PREGUNTA.- ¿Dice Ud. que están comprando esos mismos productos bajo los precios NOLA  y Tampa?*
> *RESPUESTA.- Puesto que no tenemos el Offtake de FertiNitro, hemos tenido que meternos al mercado y comprar esas toneladas, y eso lo estamos haciendo a precios NOLA y Tampa"[671].*

9.230   La Demandada no aceptó el testimonio del Sr. Sorlie, pero no adujo ninguna prueba fáctica convincente.  Tal como ya se indicara, el Tribunal acepta el testimonio del Sr. Sorlie en cuanto a que, sin perjuicio de qué suministros alternativos estaban a disposición de KNI como reemplazo del *offtake* en virtud del *Offtake Agreement*, estos fueron a precios NOLA y Tampa o equivalentes.

9.231   El Sr. Giles y el Dr. Flores parecen haber valorado este factor específico en USD 92,2 millones[672]. En opinión del Tribunal, a la luz de sus conclusiones *supra*, el reclamo de KNI no requiere ninguna reducción con respecto a este factor.

---

[670] Sorlie DT2, Párrafos 12-14.
[671] Primera Audiencia (septiembre) D2.148 y ss (Sorlie).
[672] Segunda Audiencia (noviembre), presentación de Tim Giles, Diapositiva 24.

9.232   En cuanto a los costos de flete asumidos, el Tribunal acepta el argumento de KNI basado en la muestra de costos de flete reales del Sr. Giles desde José, Venezuela hasta la costa estadounidense del Golfo de México.   A pesar de limitarse a facturas de transporte en 2009/2010, sigue siendo la mejor prueba de esos costos de flete aproximados, tal como confirmara el testimonio del Sr. Sorlie[673].

9.233   Con respecto al factor *lambda* y las tasas de descuento*,* el Tribunal acepta las pruebas periciales del Sr. Giles de que el factor *lamda* debe reducirse debido a que la exposición de FertiNitro al riesgo país se vio atenuada mediante el acceso a sus propias instalaciones portuarias para exportaciones de *offtakes* a KNI con arreglo al *Offtake Agreement*.   En estas circunstancias, el Tribunal adopta el factor *lambda* del Sr. Giles como 0,40 (hacia su límite superior) para FertiNitro, y no el factor de 1,0 que propone el Dr. Flores.   En cuanto a la tasa de descuento, es decir, el monto que se debe descontar de la pérdida de flujos de caja futuros de KNI para obtener su valor a la fecha pertinente, el Tribunal adopta el enfoque propuesto por el Sr. Giles.   Para estas cuestiones, parece que la diferencia total entre el Sr. Giles y el Dr. Flores asciende a USD 36,4 millones[674].  Además, el Dr. Flores reduce la valoración del Sr. Giles por la suma de USD 2 millones debido a diferencias entre los dos expertos con respecto a los volúmenes de producción.   Según el Tribunal, el reclamo de KNI no requiere ningún tipo de reducción por estos factores invocados por el Dr. Flores.

9.234   En cuanto al Decreto de la Urea y la Resolución de la Urea, el Tribunal adopta el enfoque de Advantis al suponer que, al mes de septiembre de 2010, estas regulaciones de la urea no habrían continuado en vigencia.   El enfoque del Sr. Giles no contempló para el cálculo de la compensación de KNI el efecto de las regulaciones de la urea después del 28 de febrero de 2012 (a diferencia de su cálculo separado de compensación por "Pérdidas Históricas").   El Dr. Flores asumió que las regulaciones de la urea continuarían en vigencia después del 28 de febrero de 2012. Según el Tribunal, partiendo de la premisa lógica de Advantis para septiembre de 2010, el reclamo de KNI (calculado por el Sr. Giles) no requiere ningún tipo de reducción por el efecto del Decreto de la Urea y la Resolución de la Urea.

---

[673] Sorlie DT2, Párrafo 23.
[674] Segunda Audiencia (noviembre) D6, presentación de Tim Giles, Diapositiva 24.

9.235    La aritmética resultante es relativamente clara en vista de las cifras enunciadas *supra*.  Tras distribuir la diferencia de USD 150,3 millones entre las valoraciones opuestas del Sr. Giles y del Dr. Flores, el Tribunal resuelve lo siguiente: rechaza las reducciones del Dr. Flores de USD 92,2 millones (con respecto a los precios de la zona media del Caribe) y USD 36,4 millones (con respecto a los supuestos del factor *lambda* y la tasa de descuento) y rechaza la otra reducción de USD 2 millones que propone el Dr. Flores (con respecto a los supuestos de producción), que en total ascienden a USD 128,6 millones.  En cambio, el Tribunal reduce el reclamo por USD 21,7 millones (con respecto al producto entregado a KNI durante el período que abarcó desde el 10 de octubre de 2010 hasta el 28 de febrero de 2012), como se explica en el párrafo 9.226, *supra*.

9.236    Por lo tanto, haciendo lo mejor que puede a la luz del material disponible, el Tribunal (por mayoría) calcula en virtud del Artículo 6 del Tratado el valor justo de mercado de los derechos expropiados de KNI respecto del *Offtake Agreement* al 10 de octubre de 2010 (o 30 de septiembre de 2010) en USD 184,8 millones (es decir, USD 206,5 millones menos USD 21,7 millones).

9.237    ***Decisiones:*** Por estos motivos, en virtud del Artículo 6 del Tratado, el Tribunal resuelve lo siguiente: (i) la compensación de KOMSA se fija en la suma total de capital de USD 140,25 millones; y (ii) por mayoría, la compensación de KNI se fija en la suma total de capital de USD 184,8 millones, ambas calculadas al 10 de octubre de 2010 (o, por ser prácticamente lo mismo, 30 de septiembre de 2010).

## *PARTE X: SÍNTESIS Y CONCLUSIONES*

10.1   El Tribunal a continuación sintetiza sus numerosas conclusiones alcanzadas en las partes precedentes de este Laudo.

10.2   *Jurisdicción:* El Tribunal rechaza la excepción preliminar planteada por la Demandada ante el reclamo de KNI con respecto a sus derechos relativos al *Offtake Agreement*, tal como se concluyera en la Parte VI *supra*. El Tribunal confirma su jurisdicción para resolver todos los reclamos planteados por las Demandantes contra la Demandada en este arbitraje, en virtud del Tratado y del Convenio CIADI.

10.3   *Responsabilidad:* El Tribunal resuelve que la Demandada es responsable ante KOMSA por la expropiación ilícita de su participación indirecta en FertiNitro en virtud del Artículo 6 del Tratado, tal como se concluyera en la Parte VII *supra*. El Tribunal (por decisión de la mayoría) resuelve que la Demandada es responsable ante KNI por la expropiación ilícita de sus derechos relativos al *Offtake Agreement*, como también se estableciera en la Parte VII *supra*.

10.4   El Tribunal desestima los reclamos de KOMSA ajenos a la expropiación presentados como "Pérdidas Históricas" en virtud de los Artículos 4 y 11 del Tratado, tal como se concluyera en la Parte VIII *supra*.

10.5   *Compensación:* El Tribunal determina la compensación de KOMSA en una suma total de capital de USD 140,25 millones en virtud del Tratado, tal como se estableciera en la Parte IX *supra*. El Tribunal (por decisión de la mayoría) determina la compensación de KNI una suma total de capital de USD 184,8 millones, tal como también fuera establecido en la Parte IX *supra*.

10.6   *Cuestiones principales:* El Tribunal ha utilizado las listas de las principales cuestiones expuestas en la Parte III *supra* como una lista de verificación, en los casos en que fuera aplicable, para sus numerosas conclusiones y decisiones. Con excepción de lo sintetizado *supra*, el Tribunal no considera necesario exponer aquí su enfoque respecto de cada una de estas cuestiones principales punto por punto.

282

*PARTE XI: INTERESES Y COSTOS*

**(1)  Introducción**

11.1  Con respecto a los intereses, las Partes completaron sus respectivas presentaciones referidas a los intereses mediante mensajes conjuntos de correo electrónico de fecha 26 de julio de 2016. La cuestión principal radica en determinar si el Tribunal debería ordenar que se aplique un interés simple o un interés compuesto a los montos de capital que la Demandada se encuentra obligada a pagar a las Demandantes. La cuestión secundaria se encuentra relacionada con la utilización de la tasa Libor a tres meses (tal como alegan las Demandantes) o bien el uso de la tasa Libor a tres meses o las letras del Tesoro de los EE. UU. a seis meses (tal como sostiene la Demandada).

11.2  Con el propósito de decidir acerca de los costos en este Laudo, el Tribunal ha tenido en cuenta, además de las presentaciones escritas de las Partes del 13 de febrero de 2015, las presentaciones posteriores de las Partes de fechas 8 y 12 de julio de 2016 con respecto a la asignación y al cálculo de los costos actualizados al 12 de julio de 2016.

**(2)  Intereses**

11.3  *El Argumento de las Demandantes:* En resumen[675], las Demandadas alegan que ellas tienen derecho a recibir intereses compuestos anteriores al laudo y posteriores al laudo respecto de la compensación ordenada por el Tribunal. Realizan tres alegaciones principales a favor de su argumento.

11.4  En primer lugar, las Demandantes sostienen que el Tratado confirma que la Demandada debe pagar un interés compuesto. El Artículo 6 del TBI requiere que la compensación que deba pagarse en caso de expropiación incluya intereses a una tasa comercial normal. Esa tasa comercial normal, según las Demandantes, debe incluir un elemento de capitalización. Ese enfoque es consistente con la decisión del tribunal en el contexto del caso *Venezuela Holdings c. Venezuela*[676]: "[G]eneralmente, los intereses que se calculan a una tasa

---

[675] EPA Koch, Párrafos 296-310.
[676] *Venezuela Holdings, B.V. y otros c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/07/27, Laudo (9 de octubre de 2014) (RLA-153), Párrafo 399.

comercial normal incluyen intereses compuestos […] [H]ay una tendencia creciente entre los tribunales internacionales a aplicar dicho tipo de intereses con el objetivo de garantizar la plena compensación de los daños"[677].

11.5   En segundo lugar, las Demandantes sostienen que la "*jurisprudencia constante*" del CIADI confirma que la Demandada debe pagar el interés compuesto. En ese sentido, las Demandantes hacen referencia a la decisión adoptada en el caso *Gemplus SA* c. *Estados Unidos Mexicanos*[678]:

> "*[E]s claro que, sobre la base del material jurídico que citaron las Demandantes […] la practica actual de los tribunales internacionales (incluidos los del CIADI) es adjudicar intereses compuestos y no simples. Según este Tribunal, en la actualidad, existe una suerte de "jurisprudencia constante", según la cual la presunción que existía hace aproximadamente una década ha cambiado, por lo que, hoy por hoy, resultaría más apropiado conceder intereses compuestos, a menos que se demuestre que no son apropiados y que en cambio los intereses simples sí lo son, y no al revés*"[679].

11.6   En tercer lugar, las Demandantes señalan los comentarios de la doctrina que confirman que deben pagarse intereses compuestos en las circunstancias actuales[680].

11.7   En cuanto a la tasa, las Demandantes proponen una tasa Libor a 3 meses en dólares estadounidenses más un 2 % capitalizado en forma trimestral.

11.8   *El Argumento de la Demandada:* En resumen[681], la Demandada alega que lo que corresponde son intereses simples y no intereses compuestos. Sostiene que el Artículo 6

---

[677] *Véase también Occidental Petroleum Corporation y Occidental Exploration y Production Company c. La República del Ecuador*, Caso CIADI No. ARB/06/11, Laudo (5 de octubre de 2012) (CLA-129) ("*Occidental c. Ecuador*"), Párrafo 844.

[678] *Gemplus S.A., SLP, S.A. y Gemplus Industrial, S.A. de C.V. c. Estados Unidos Mexicanos* Casos CIADI Nos. ARB(AF)/04/3 y ARB(AF)/04/4, Laudo (16 junio de 2010) (CLA-54), Párrafos 16-26.

[679] *Véanse también Joseph Charles Lemire c. Ucrania*, Caso CIADI No. ARB/06/18, Laudo (28 de marzo de 2011) en Párrafos 360-361; *El Paso Energy International Company c. La República Argentina*, Caso CIADI No. ARB/03/15, Laudo (31 de octubre de 2011) (CLA-52), Párrafos 743-745; *Occidental c. Ecuador* (CLA129), Párrafo 848; *Gold Reserve Inc. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB(AF)/09/1, Laudo (22 de septiembre de 2014) (CLA-156), Párrafo 854.

[680] En especial, S Ripinsky y K Williams, *Damages in International Investment Law* (British Institute of International and Comparative Law, 2008) ("Ripinsky – Damages") (CLA-134), página 387.

[681] EPA Ven., Párrafos 271-273; Dúpl. Ven., Párrafos 518-524 (citando, a saber, *Southern Pacific Properties (Middle East) Ltd. c. República Árabe de Egipto*, Caso CIADI No. ARB/84/3, Laudo (20 de mayo de 1992) (CLA-12), Párrafo 222; *Autopista Concesionada de Venezuela, C.A. c. República Bolivariana de Venezuela*, Caso CIADI No.

del Tratado no autoriza el otorgamiento de intereses compuestos, a menos que (lo que no ocurre en este caso) un demandante pueda probar que realmente ha sufrido intereses compuestos como daños y perjuicios. En el supuesto de que el Tribunal decidiera otorgar intereses compuestos, la Demandada sostiene que la capitalización debería ser anual y no trimestral (tal como solicitan las Demandantes) o mensual (tal como propone el Sr. Giles).

11.9    En cuanto a la tasa, la Demandada alega que lo adecuado es una tasa libre de riesgo, tal como la de las letras del Tesoro de los EE. UU. a seis meses. La propuesta de las Demandantes tendiente a calcular intereses sobre la base de la tasa LIBOR a tres meses en dólares estadounidenses más un 2 % es inapropiada para calcular intereses en el marco de una controversia entre un inversionista y un Estado. La función de los intereses anteriores al laudo es la de compensar a un demandante por el valor del dinero en el tiempo y la pérdida de la oportunidad de invertir el dinero. Sin embargo, a diferencia de las obligaciones contractuales de los negocios, no existe riesgo comercial alguno involucrado en un laudo monetario en un arbitraje entre un inversionista y un Estado en virtud del Convenio CIADI[682].

11.10   *La Decisión del Tribunal:* El Tribunal decide otorgar intereses compuestos y no intereses simples. En su opinión, la referencia que se hace en el Artículo 6 del Tratado a "intereses" incluye el interés compuesto. El texto claramente no lo excluye. De hecho, en tiempos modernos, sería "anormal" que intereses se encontraran limitados a un interés simple. Ante la falta de un texto en contrario en el TBI, el enfoque general acerca de los intereses fue confirmado hace mucho tiempo por la decisión adoptada en el contexto del caso *Santa Elena c. Costa Rica*[683].

> *"En especial, cuando el dueño de una propiedad hubiera perdido en algún momento previo el valor de su bien, pero no hubiese recibido el equivalente monetario que se*

---

ARB/00/5, Laudo (23 de septiembre de 2003) (RLA-60), Párrafos 366-397; *Desert Line Projects LLC c. La República de Yemen*, Caso CIADI No. ARB/05/17, Laudo (6 de febrero de 2008) (RLA-79), Párrafos 292-298.

[682] Dúpl. Ven., Párrafos 525-529 (que cita *BG Group Plc. c. República Argentina*, CNUDMI, Laudo Definitivo (24 de diciembre 2007) (CLA-37), Párrafo 455; *Siemens A.G. c. República Argentina*, Caso CIADI No. ARB/02/8, Laudo (6 de febrero de 2007) (CLA-15), Párrafo 396; *LG&E Energy Corp., LG&E Capital Corp. y LG&E International Inc. c. República Argentina*, Caso CIADI No. ARB/02/1, Decisión sobre Responsabilidad (3 de octubre de 2006) (RLA-123), Párrafo 102.

[683] *Compañía del Desarrollo de Santa Elena S.A. c. República de Costa Rica,* Caso CIADI No. ARB/96/1, Laudo (17 de febrero de 2000) (CLA-136), Párrafos 103 y ss.

*le adeudara, el monto de la compensación debería reflejar, al menos en parte, la suma adicional que habría ganado su dinero, y el ingreso generado por él, si hubiera sido reinvertido cada año a tasas de interés normalmente vigentes. No es el propósito del interés compuesto atribuir culpa o castigar a alguien por el retraso en el pago realizado al expropiado; es un mecanismo para asegurar que la compensación otorgada al demandante sea apropiada en las circunstancias…". [Traducción del Tribunal]*

11.11   Sería posible agregar referencias a muchas otras decisiones a este efecto, sumadas a los textos de doctrina de muchos años. Es innecesario hacerlo aquí[684].

11.12   En cuanto a la tasa, el Tribunal considera que la tasa Libor en USD es una tasa comercial más internacional que la tasa para las letras del Tesoro de los EE. UU. Es también utilizada más usualmente tanto en los arbitrajes entre inversionistas y Estados como en los arbitrajes comerciales. El Tribunal elije como la tasa apropiada para este caso la tasa Libor a seis meses en USD más el 2 % capitalizado con intervalos de ajuste a seis meses, para el interés tanto anterior al laudo como posterior al laudo. Con respecto a la mejora, ésta no refleja la presencia o ausencia de riesgo comercial, sino más bien el hecho de que la tasa Libor es calculada para su utilización entre instituciones financieras por períodos relativamente cortos – nada de lo cual es de aplicación aquí.

11.13   En cuanto a la fecha de inicio del primero, el Tribunal fija el 11 de octubre de 2010, siendo éste el día de la expropiación bajo el Artículo 6.

11.14   En conclusión, el Tribunal decide ordenar intereses anteriores al laudo desde el 11 de octubre de 2011 hasta la fecha de este Laudo sobre los montos de capital que deben ser pagados a las Demandantes respectivamente, calculados a una tasa Libor a seis meses en USD más el 2 %, capitalizado con intervalos de ajuste a seis meses.  En cuanto a los intereses posteriores al laudo desde la fecha de este Laudo hasta el pago a las Demandantes

---

[684] Por ejemplo, con respecto a los textos de doctrina, *véasne* F. A. Mann, Further Studies in International Law - Compound Interest as an Item of Damage (1990) (CLA-60), página 385;21:3 *U.C. Davis Law Review* 577 en 586; N. Affolder, "Awarding Compound Interest in International Arbitration"(2001), 12 *Am Rev Int'l Arb* 45 en 92; JY Gotanda, Compound Interest In International Disputes (2003) *Law and Policy in International Business* (CLA-61), página 393; J.M. Colón & M.S. Knoll, "Prejudgment Interest in International Arbitration", (2007) 4:6 *TDM* 1 en 7; Ripinsky - Damages (CLA-134), página 387; I. Marboe, Calculation of Compensation and Damages in International Investment *La*w, Oxford University Press, (2009) (CLA-137), Párrafos 6.102, 6.103 & 6.300; y Dolzer & Schreuer, Principles of International Investment Law (2a. ed.; 2012), pág. 298.

respectivamente, el Tribunal decide ordenar intereses calculados a la tasa Libor a seis meses en USD más el 2 % capitalizado con intervalos de ajuste a seis meses para los montos de capital mencionados precedentemente (junto a los intereses anteriores al laudo).

### (3)    Costos

11.15   Tanto las Demandantes como la Demandada solicitan que se emita una resolución sobre los costos con respecto a los honorarios y gastos en los que incurrieron ("Costos Legales"), así como los costos, honorarios y gastos del Tribunal y del CIADI relacionados con este arbitraje por los cuales las Partes son responsables en forma solidaria ("Costos del Arbitraje").

11.16   *Costos Legales:* Con respecto a sus Costos Legales, los honorarios y gastos de las Demandantes ascienden a USD 23.248.113,56.  En cuanto a los Costos del Arbitraje, las Demandantes han realizado un pago adelantado al CIADI de USD 650.000,00 (como así también el pago de un derecho de registro de USD 25.000) de los cuales USD 628,836.435 ha sido utilizado para cubrir los cargos administrativos y gastos del CIADI, así como los honorarios y gastos del Tribunal[685].

11.17   Con respecto a sus Costos Legales, los honorarios y gastos de la Demandada ascienden a USD 11.039.280,39. En cuanto a los Costos del Arbitraje, la Demandada ha realizado un pago adelantado al CIADI de USD 650.000,00 de los cuales USD 628,836.435 ha sido utilizado para cubrir tanto los cargos administrativos y gastos del CIADI como los honorarios y gastos del Tribunal[686].

11.18   *Derechos, Honorarios y Cargos:* Las Demandantes y la Demandada dividieron sus respectivos Costos Legales en las categorías mencionadas a continuación:

(i)    *La declaración de costos actualizada de las Demandantes:*

a.   Honorarios y gastos de sus abogados

| Ítem | Importes (USD) |
|---|---|
| Honorarios y gastos de sus abogados (pagados) | 17.455.259,46 |

---

[685] Declaración de Costos Corregida y Actualizada de las Demandantes (12 de julio de 2016).
[686] Presentación sobre Costos de la Demandada (8 de julio de 2016).

Honorarios y gastos de sus abogados       1.063.346,50
(facturados y aún no pagados)

|  | Subtotal | 18.518.605,96 |

b.  Honorarios y gastos de sus expertos

| Ítem | Importes (USD) |
|---|---|
| Honorarios y gastos de sus expertos (pagados) | 2.432.898,36 |
| Honorarios y gastos de sus expertos (facturados y aún no pagados) | 173.095,73 |
| Subtotal | 2.605.994,08 |

c.  Gastos de sus testigos

| Ítem | Importes (USD) |
|---|---|
| Gastos de sus testigos (pagados) | 425.117,84 |
| Gastos de sus testigos (facturados y aún no pagados) | - |
| Subtotal | 425.117,84 |

d.  Otros costos

| Ítem | Importes (USD) |
|---|---|
| Costos del cliente adicionales a los detallados *supra* (pagados) | 1.048.395,68 |
| Costos del cliente adicionales a los detallados *supra* (facturados y aún no pagados) | - |
| Honorarios del Tribunal y del CIADI (pagados) | 650.000,00 |
| Subtotal | 1.698.395,68 |

e.  Total

| Costos y gastos totales de las Demandantes con relación al arbitraje | Importe (USD) |
|---|---|
|  | 23.248.113,56 |

*(ii)*   *La declaración de costos de la Demandada:*

   a.   Honorarios y gastos de sus abogados

| Ítem | Importes (USD) |
|---|---|
| Importes pagados | Honorarios legales: 6.786.084,21 |
| | Gastos: 1.511.651,42 |
| Importes facturados y aún no pagados | Honorarios legales: 778.491,64 |
| | Gastos: 102.838,73 |
| Subtotal | 9.179.066 |

   b.   Honorarios y gastos de sus expertos

| Ítem | Importes (USD) |
|---|---|
| Importes pagados | Honorarios profesionales: 1.012.264,97 |
| | Gastos: 16.742,73 |
| Importes facturados y aún no pagados | Honorarios profesionales: 89.901,03 |
| | Gastos: 2.450,85 |
| Subtotal | 1.121.359,58 |

   c.   Gastos de testigos y otros costos internos

| Ítem | Importes (USD) |
|---|---|
| Importes pagados | Gastos de testigos: 85.344,91 |
| | Otros costos internos: 3.509,90 |
| Subtotal | USD 88.854,81 |

   d.   Total

| Costos y gastos totales de la Demandada | Importe (USD) |
|---|---|
| | 11.039.280,39 |

11.19 *Costos del Arbitraje*: A continuación, se detallan tanto los honorarios y gastos totales del Tribunal como los cargos administrativos y gastos directos del CIADI (en USD)[687]:

Honorarios y gastos de los árbitros:

| | |
|---|---|
| V.V. Veeder | 199,186.29 |
| Marc Lalonde | 268,828.92 |
| Zachary Douglas | 72,610.72 |
| Juez Feliciano | 145,920.97 |
| Cargos administrativos del CIADI: | 180,000.00 |
| Gastos directos[688]: | 391,125.97 |
| **Total** | **1,257,672.87** |

11.20 Los costos del arbitraje mencionados *supra* fueron abonados mediante los pagos adelantados realizados al CIADI en partes iguales por las Demandantes y la Demandada[689]. Como resultado de ello, sus respectivas participaciones en los costos del arbitraje ascienden a USD 628,836.435.

11.21 *La Decisión del Tribunal*: El Artículo 61(2) del Convenio CIADI establece que: "[E]l Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo". La Regla 47(1) de las Reglas de Arbitraje CIADI establece que el Laudo del Tribunal "contendrá […] (j) la decisión […] sobre las costas procesales".

11.22 Según el Tribunal, el Convenio CIADI le concede al Tribunal una amplia discrecionalidad para asignar todos los costos del arbitraje, incluidos los honorarios de los abogados y otros

---

[687] El Secretariado del CIADI les suministrará a las partes un Estado Financiero detallado de la cuenta del caso.
[688] Este importe incluye los cargos con relación al envío de este Laudo (mensajería, impresiones y fotocopias).
[689] Todo saldo restante será reembolsado a las partes en proporción a los pagos que ellas adelantaron al CIADI.

costos, entre las partes según lo considere apropiado en vista de las circunstancias. El Tribunal no cree que tal discrecionalidad sea objeto de disputa entre las Partes.

11.23  El Tribunal considera que estas circunstancias son claras en este caso. Los argumentos de las Demandantes han prevalecido en forma sustancial pero no en forma total sobre los argumentos presentados por la Demandada, en lo relativo a la jurisdicción, la responsabilidad (salvo en cuanto a las "Pérdidas Históricas" de KOMSA), la compensación (en parte) y los intereses.  Por lo tanto, como principio general, las Demandantes deberían recuperar de la Demandada un porcentaje de sus costos legales y los costos de arbitraje que fueron asumidos por las Demandantes. En cambio, la Demandada debería afrontar sus propios costos legales y los costos de arbitraje de las Partes en su totalidad, sin posibilidad de repetición en contra de las Demandantes.

11.24  El Tribunal consideró la cuestión que consiste en determinar si los costos legales en los que incurrieron las Demandantes han sido razonables, como así también lo han sido sus importes. Existe una notable disparidad entre los importes totales de los respectivos costos legales de las Partes, aun teniendo en cuenta la carga legal de las Demandantes para probar sus respectivos argumentos. En otras circunstancias, sería necesario efectuar consultas adicionales para determinar el motivo por el cual las Demandantes gastaron casi el doble que la Demandada en concepto de costos legales. Sin embargo, este caso ha tenido desde su inicio ciertas características inusuales, agravantes y especiales. Tal como ya se ha indicado, comenzó con la controversia principal limitada al monto de compensación adeudado a KOMSA; pero pronto se tornó mucho más complicado y extenso. Este procedimiento también fue dilatado, particularmente mediante las dos recusaciones a los miembros del Tribunal planteadas sin éxito por la Demandada, las consiguientes suspensiones del arbitraje de conformidad con la Regla 9(6) de las Reglas de Arbitraje CIADI, el prematuro fallecimiento de uno de los miembros del Tribunal y el procedimiento para reemplazar a ese árbitro. Por otra parte, es una tarea difícil para cualquier tribunal cuestionar, en una fecha muy posterior, lo que una parte creyó necesario gastar en ese momento en aras de su reclamo, con su propio dinero.  Por todas estas razones, el Tribunal acepta las cifras de los costos legales presentadas por las Demandantes, con sujeción a lo siguiente.

11.25   La pretensión de KOMSA en cuanto a sus "Reclamos Históricos" no prosperó; y los reclamos de compensación de KOMSA y KNI sólo prosperaron en forma parcial. El Tribunal decide que el éxito incompleto debería reflejarse en una deducción del 25 % en el recupero de los costos legales de las Demandantes. El Tribunal considera que no es posible separar los costos legales entre KOMSA o KNI. Con respecto a los costos del arbitraje de las Demandantes, el Tribunal decide que deben ser asumidos en su totalidad por la Demandada sin deducciones.

11.26   En conclusión, el resultado de las decisiones del Tribunal puede exponerse del siguiente modo: las Demandantes recuperarán de la Demandada el importe total de USD 17.436.085,10 en concepto de Costos Legales y el importe total de USD 628.836,435, en concepto de Costos del Arbitraje. El Tribunal resuelve que estos importes totales devengarán intereses posteriores al laudo desde la fecha de este Laudo hasta su pago, a la misma tasa que resulta de aplicación a los montos de compensación adeudados a las Demandantes; pero resuelve no otorgar intereses anteriores al laudo sobre estos importes.

## *PARTE XII: LA PARTE OPERATIVA*

12.1   Por las razones expuestas *supra*, el Tribunal resuelve y ordena lo siguiente:

12.2   Se desestima la excepción de la Demandada a la jurisdicción del CIADI y la competencia del Tribunal respecto del reclamo presentado por la Segunda Demandante (KNI).

12.3   La Demandada violó el Artículo 6 del Tratado al expropiar el 11 de octubre de 2010 la participación de la Primera Demandante (KOMSA) en FertiNitro, lo cual generó pérdidas a KOMSA por la suma total de capital de USD 140,25 millones.

12.4   La Demandada violó el Artículo 6 del Tratado al expropiar el 11 de octubre de 2010 la participación de la Segunda Demandante (KNI) en el Offtake Agreement, lo cual generó pérdidas a KNI por la suma total de capital de USD 184,8 millones (esta decisión es por mayoría del Tribunal).

12.5   La Demandada deberá pagar, en concepto de compensación, a la Primera y Segunda Demandantes, respectivamente, dichas sumas de capital, junto con intereses compuestos anteriores al laudo, desde el 11 de octubre de 2010 hasta la fecha de este Laudo, calculados a la tasa USD Libor 6 meses en más 2% por períodos semestrales (o *pro rata*).

12.6   La Demandada deberá pagar a la Primera y Segunda Demandantes, en forma conjunta, la suma total de capital de USD 17,436,085.10 para cubrir los Costos Legales.

12.7   La Demandada deberá pagar a la Primera y Segunda Demandantes, en forma conjunta, la suma total de capital de USD 628,836.435 para cubrir los Costos del Arbitraje.

12.8   La Demandada deberá pagar a la Primera y Segunda Demandantes, respectivamente, intereses compuestos posteriores al laudo sobre: (i) las cuatro sumas de capital; y también (ii) la suma total de intereses anteriores al laudo respecto de las sumas de capital de USD 140,25 millones y USD 184,8 millones, desde la fecha de este Laudo hasta el pago calculado a la tasa Libor a 6 meses para operaciones en USD más 2% por períodos semestrales (o *pro rata*); y

12.9   Salvo resolución en contrario *supra*, se desestimen por medio de la presente todas las demás pretensiones, requerimientos y solicitudes de las Partes.

_____
Hon. Marc Lalonde PC, OC, QC
Árbitro

Fecha: 11 de octubre de 2017

_____
Zachary Douglas QC*
Árbitro
(Sujeto a la Opinión Disidente adjunta)

Fecha: 16 de octubre de 2017

_____
V.V. Veeder QC
Presidente del Tribunal

Fecha: 19 de octubre de 2017

* Con respecto al Párrafo 12.4 supra, se adjunta al presente una opinión disidente del Árbitro Douglas, tal como exigen las Reglas 47(3) y 49(4) de las Reglas de Arbitraje del CIADI.

KOCH MINERALS SARL Y KOCH NITROGEN INTERNATIONAL SARL

Demandantes

-c.-

REPÚBLICA BOLIVARIANA DE VENEZUELA

Demandada

CASO CIADI No. ARB/11/19

---

**OPINIÓN PARCIALMENTE DISIDENTE DEL**

**PROF. ZACHARY DOUGLAS QC**

---

## A    INTRODUCCIÓN

1.   Coincido con la decisión de la mayoría en materia de responsabilidad y en el cálculo de daños y perjuicios e intereses en lo que respecta a la reclamación de expropiación de KOMSA por su participación en FertiNitro. También estoy dispuesto a acompañar a la mayoría en lo que respecta a su decisión relacionada con las costas.

2.   Sin embargo, disiento, con todo respeto, de la decisión de la mayoría en materia de responsabilidad y del cálculo de daños y perjuicios e intereses en lo que respecta al reclamo por la expropiación de KNI por su participación en el *Offtake Agreement* por los motivos esgrimidos a continuación.

## B    RECLAMO POR LA EXPROPIACIÓN DE KNI: RESPONSABILIDAD

3.   El único reclamo de KNI en lo que respecta al *Offtake Agreement* es por expropiación. Una expropiación exige la privación total y permanente de un derecho de propiedad. Los derechos de propiedad sobre bienes inmateriales, tales como un derecho oponible a terceros (*chose-in-action*) creado por un contrato, ciertamente pueden ser objeto de

- 1 -

expropiación. Evidentemente los derechos de propiedad sobre bienes inmateriales no poseen existencia física; se trata netamente de creaciones del derecho[1].

4. El *Offtake Agreement* se rige por la ley del estado de Nueva York[2]. Por consiguiente, todo derecho de propiedad sobre bienes inmateriales surgido del *Offtake Agreement* es creado y sustentado por la ley de Nueva York.

5. La mayoría ha llegado a la conclusión de que el Decreto de Expropiación de fecha 10 de octubre de 2010 expropió los derechos de KNI en virtud del *Offtake Agreement*. El Decreto de Expropiación constituye un acto jurídico que sólo tiene efecto dentro del ordenamiento jurídico venezolano. No puede operar para despojar o invalidar los derechos de propiedad sobre bienes inmateriales de KNI creados y sustentados al amparo de la ley de Nueva York, al igual que no podría despojar o anular cualquier derecho de propiedad sobre bienes tangibles pertenecientes a KNI y situados físicamente en Nueva York[3]. Los derechos de KNI en virtud del *Offtake Agreement* siguen siendo válidos y vinculantes ante sus contrapartes ante su contrato con posterioridad al Decreto de Expropiación. KNI puede hacer valer esos derechos mediante la invocación de la cláusula de arbitraje contenida en el *Offtake Agreement*, que prevé el arbitraje de la Cámara de Comercio Internacional (CCI) en Miami, Florida[4].

6. El *Offtake Agreement* claramente fue diseñado para ser protegido de cualquier interferencia soberana por parte de Venezuela. Al seleccionar la ley de Nueva York como el derecho aplicable, Venezuela no puede utilizar sus facultades soberanas para modificar o anular los derechos y obligaciones establecidos en el *Offtake Agreement*. Al seleccionar el arbitraje de la CCI en Miami, Florida, Venezuela no puede utilizar sus facultades soberanas para interferir en la resolución de cualquier controversia que surja del *Offtake Agreement*.

7. La premisa jurídica que subyace a este análisis es difícilmente controvertida. Según el destacado escritor en esta materia, F.A. Mann:

> Si uno se pregunta en qué circunstancias un acto ilícito internacional cometido por un Estado extranjero puede implicar un incumplimiento de un contrato celebrado por el mismo Estado con un extranjero, el ámbito, analizado correctamente, es muy limitado,

---

[1] Puede encontrarse un análisis valioso en materia de derechos inmateriales como objeto de expropiación en: *Emmis International Holding, B.V. y otros c. Hungría*, Caso CIADI No. ARB/12/2, Laudo, 16 de abril de 2014, §§159-169.

[2] *Offtake Agreement* (C-19), §13.1.

[3] Por lo tanto, el presente caso se diferencia de otros precedentes internacionales en los que se ha concluido que un Estado es internacionalmente responsable de anular un contrato sujeto a su propia legislación mediante el dictado de un decreto que tiene efecto en su propio ordenamiento jurídico: véase, por ejemplo, *Shufeldt Claim* (Laudo, 1930) 2 RIAA 1079.

[4] *Offtake Agreement* (C-19), §12.2.

en tanto la cuestión tiene sentido sólo cuando coinciden tres condiciones.

En primer lugar, el contrato debe regirse por la ley del Estado parte en el contrato que ha cometido el acto ilícito. Si el contrato se rige por cualquier otro ordenamiento jurídico, es sumamente improbable que el incumplimiento sea jurídicamente relevante en algún sentido. Por lo tanto, un contrato de concesión otorgado, aunque denunciado o modificado de manera ilegal, por un Estado de derecho determinado, necesariamente se mantiene inalterado si se rige por el derecho de otro Estado o por el derecho internacional (suponiendo que la última alternativa sea posible). La extinción o modificación de un contrato se encuentra sujeta a su respectiva ley. Esta no reconocerá interferencia por parte de otro ordenamiento jurídico excepto como hecho que cree imposibilidad de ejecución. Aun así, es difícil imaginar algún ordenamiento jurídico que le permitiría a una de las partes en el contrato que invoque la imposibilidad autoinducida de prescindir de sus obligaciones jurídicas o de rescindir un contrato contra la voluntad de la otra parte[5]. [Traducción del Miembro del Tribunal]

8. Estas observaciones son aplicables con mayor fuerza con relación a un contrato en el que el propio Estado ni siquiera es parte, tal como sucede en lo que respecta al *Offtake Agreement* (KNI es contraparte de FertiNitro).

9. El expediente de hechos en el presente caso acredita que el Estado de Venezuela no ha intentado hacer lo que es jurídicamente imposible (es decir, pretender expropiar un contrato regido por la ley de Nueva York):

   9.1. No hay mención expresa del *Offtake Agreement* en el Decreto de Expropiación.

   9.2. Tampoco hay mención implícita alguna. La frase introductoria del Artículo 1 alude a la '*adquisición forzosa de los bienes muebles e inmuebles*', lo que constituye una referencia clara a bienes tangibles. El vínculo entre los bienes y FertiNitro se describe como titularidad o posesión, lo que también es consistente con el objeto del Artículo 1, que son bienes tangibles en lugar de derechos inmateriales en virtud de contratos. Posteriormente, el Artículo 3 alude a los '*bienes expropiados*' que '*pasarán libres de gravámenes o limitaciones*', lo que constituye nuevamente un lenguaje apto para describir bienes tangibles, pero no derechos inmateriales. Por último, el Artículo

---

[5]  F.A. Mann, '*The Consequences of an International Wrong in International and National Law*', *Further Studies in International Law* (OUP, 1990), págs. 188-189. El entendido autor expresó lo mismo muchos años antes en '*State Contracts and State Responsibility*', *Studies in International Law* (OUP, 1973), pág. 303: 'En primer lugar, no puede surgir el problema particular que requiera de una solución salvo que el contrato en cuestión, ya sea en todo o en parte, se rija por la ley del Estado cuya responsabilidad se encuentra involucrada, en tanto, según los principios establecidos del derecho internacional privado, solamente en ese caso el acto del Estado contratante puede ser de algún modo relevante. Si el contrato se encuentra sujeto a la ley de un país distinto del Estado contratante, la defensa resultante del derecho pertinente no puede ser extracontractual [en virtud del derecho internacional] (y la defensa resultante del derecho del Estado demandado debe ser irrelevante)' [Traducción del Miembro del Tribunal].

6 hace alusión a la '*ocupación de los bienes indicados en el artículo 1… a los fines de su puesta en productividad, administración y aprovechamiento*'. Esta frase carece de sentido en relación con derechos inmateriales en virtud de un contrato.

9.3.   Las partes en el *Offtake Agreement* siguieron comprando y vendiendo productos del *offtake* (amoniaco y urea) a los precios fijados por el *Offtake Agreement* durante alrededor de dieciséis meses con posterioridad al Decreto de Expropiación.

9.4.   FertiNitro envió dos comunicaciones por separado con posterioridad al Decreto de Expropiación, el 26 de noviembre de 2010[6] y el 1 de diciembre de 2010[7], confirmando que seguiría cumpliendo con sus obligaciones en virtud del *Offtake Agreement*.

9.5.   Finalmente, FertiNitro repudió el *Offtake Agreement* mediante carta de fecha 28 de febrero de 2012[8], lo que habría sido superfluo si se hubiese expropiado de algún modo el *Offtake Agreement* el 10 de octubre de 2010 y si en el ínterin las partes no hubiesen cumplido con sus obligaciones en virtud del *Offtake Agreement*.

10.   La mayoría funda su posición contraria en dos documentos. El primero es un registro de un discurso dirigido a los trabajadores en la planta de FertiNitro que pronunciara el Ministro de Energía y Petróleo de Venezuela (Sr. Rafael Ramírez) al otro día del Decreto de Expropiación[9]. La mayoría considera que ese discurso contiene referencias implícitas al *Offtake Agreement*, y, sobre esa base, la mayoría llega a la conclusión de que el Decreto de Expropiación debe interpretarse de manera que su alcance se extienda a derechos inmateriales bajo el *Offtake Agreement*. Con relación a esta prueba:

10.1.   Independientemente de si el discurso del Ministro contiene referencias implícitas al *Offtake Agreement* o no, el alcance del Decreto de Expropiación no puede extenderse a derechos creados y sustentados por el ordenamiento jurídico de otro Estado. En el supuesto de que el Ministro hubiese declarado que el Decreto de Expropiación expropiaba también, por ejemplo, amoniaco y urea ubicados físicamente fuera de Venezuela, esto tampoco habría sido posible: tanto el derecho internacional público como el derecho internacional privado circunscriben el alcance del Decreto de Expropiación al territorio nacional de Venezuela.

10.2.   El propio texto del Decreto de Expropiación no aborda de manera expresa ni implícita los derechos inmateriales. No se presentaron alegaciones al Tribunal, ni de parte de los expertos ni de otro modo, respecto de si el Decreto de Expropiación se extendía a los derechos inmateriales como cuestión de derecho

---

6    Comunicación de FertiNitro del 26 de noviembre de 2010 (C-111).

7    Comunicación de FertiNitro del 1 de diciembre de 2010 (C-112).

8    Comunicación de FertiNitro del 28 de febrero de 2012 (C-114).

9    Artículo titulado "Rafael Ramírez presidió la toma de instalaciones de Fertinitro en el estado Anzoátegui," Noticias 24, 11 de octubre de 2010 (C-107).

venezolano. Lo que diga un Ministro en un discurso político a los trabajadores en una planta no puede llenar este vacío.

11. El otro documento es invocado por la mayoría para refutar la observación que se hiciera anteriormente de que las partes siguieron cumpliendo con el *Offtake Agreement* con posterioridad al Decreto de Expropiación. Se trata de un correo electrónico de KNI a FertiNitro de fecha 3 de diciembre de 2010 que establece que KNI '*acuerda comprar el producto conforme a términos consistentes con el Offtake Agreement*' y que el pago a cambio del producto se realice '*a las mismas cuentas bancarias históricas*'[10] [Traducción del Miembro del Tribunal]. El mismo correo electrónico hace alusión a la reclamación de expropiación de KNI y sus derechos en virtud del derecho internacional. Sobre la base de este correo electrónico, KNI y la mayoría afirman que las adquisiciones de urea y amoniaco durante el período de dieciséis meses posteriores al Decreto de Expropiación se realizaron conforme a '*acuerdos ad-hoc*' [Traducción del Miembro del Tribunal] con exactamente los mismos términos que el *Offtake Agreement* y a las mismas cuentas bancarias, aunque no conforme al *Offtake Agreement*, ya que, en su opinión, este ya había sido expropiado. En relación con este documento:

   11.1. El correo electrónico de KNI, que fue claramente redactado con la intervención de asesores jurídicos internacionales, no puede modificar de manera unilateral la realidad jurídica que consistía en que el Offtake Agreement—regido por la ley de Nueva York—continuaba en plena vigencia con posterioridad al Decreto de Expropiación.

   11.2. Si, en realidad, las partes no compraban y vendían urea y amoniaco conforme al Offtake Agreement durante los dieciséis meses posteriores al Decreto de Expropiación (no se controvierte que las compras se realizaron exactamente a los mismos precios fijados por el *Offtake Agreement*), la ulterior repudiación del *Offtake Agreement* por parte de FertiNitro el 28 de febrero de 2012 no habría tenido sentido.

   11.3. La mayoría ha aceptado que KNI no debería tener derecho a una indemnización por daños durante este período de dieciséis meses, lo que es coherente con la realidad de que KNI no sufrió pérdida alguna en tanto FertiNitro siguió cumpliendo sus obligaciones en virtud del *Offtake Agreement* hasta la repudiación de este.

   11.4. FertiNitro afirmó en dos ocasiones separadas con posterioridad al Decreto de Expropiación que seguiría cumpliendo con el *Offtake Agreement*.

12. Llego a la conclusión de que KNI no ha establecido que Venezuela expropió sus derechos en virtud del *Offtake Agreement*. No obra prueba alguna en el expediente del presente arbitraje de que se hayan anulado o revocado los derechos de KNI en virtud de un contrato regido por la ley de Nueva York. KNI no ha explicado por qué motivo sus derechos al amparo del *Offtake Agreement* no son oponibles a sus contrapartes, incluida FertiNitro, impulsando un arbitraje de la CCI en virtud de la *lex arbitri* de Miami,

---

[10] Comunicación de KNI a FertiNitro del 3 de diciembre de 2010 (C-113) (énfasis agregado).

Florida. En tanto los derechos de KNI al amparo del *Offtake Agreement* se mantengan plenamente adquiridos y exigibles es jurídicamente imposible hablar de su expropiación. Aunque la pérdida de valor no pueda constituir el referente exclusivo de una expropiación, el hecho de que KNI conserve el derecho al otorgamiento de una indemnización por daños y perjuicios por cualquier violación de sus derechos al amparo del *Offtake Agreement* demuestra de manera concluyente que los derechos de KNI no han sido despojados de la totalidad de su valor.

## C   RECLAMO POR LA EXPROPIACIÓN DE KNI: CÁLCULO DE DAÑOS

13. El derecho internacional no les da *carte blanche* a los expertos en valoración para determinar el monto de la compensación que surge del incumplimiento de una obligación internacional. El derecho define los límites de una pérdida recuperable y de qué manera ha de evaluarse. Cuando se haya expropiado un derecho de propiedad sobre bienes inmateriales en virtud de un contrato, el objeto de la compensación en el derecho internacional consiste en poner a la parte inocente en la posición en la que se habría encontrado si el contrato se hubiera cumplido de la manera prevista por las partes en el momento de su celebración[11]. El derecho internacional exige que la pérdida recuperable pudiese haber sido anticipada o prevista por las partes en el momento de la celebración del contrato[12]. La pérdida que pudo haber sido prevista por las partes en el *Offtake Agreement* en caso de que se anulara o revocara el derecho de KNI a adquirir urea y amoníaco a los precios y en las cantidades fijados por el contrato constituye el lucro cesante de KNI ocasionado al FertiNitro no haber proporcionado a KNI las mercaderías en cuestión. El lucro cesante del comprador en el contexto de un contrato de compraventa de mercaderías se calcula como la diferencia entre el precio del contrato y el precio pagado por el comprador por las mercaderías de reemplazo[13] o la diferencia entre el precio del contrato y el precio de mercado en el momento en que se deberían

---

[11] *Sapphire International Petroleum v. NIOC* (1963) 35 ILR 136, 185-6 ('Según la opinión generalizada, el objeto consiste en colocar a la parte a quien se le otorga la compensación en la misma posición pecuniaria en la que se habría encontrado si el contrato se hubiera cumplido de la manera prevista por las partes en el momento de su celebración') [Traducción del Miembro del Tribunal]; *Amco Asia Corp., et al. c. República de Indonesia*, Caso CIADI No. ARB/81/1, Laudo, 31 de mayo de 1990, §§183-6 (*Amco c. Indonesia II*).

[12] *Amco Asia Corp. y otros c. República de Indonesia*, Caso CIADI No. ARB/81/1, Laudo, 20 de noviembre del 1984, §268 ('[S]egún los principios y normas comunes a los principales sistemas jurídicos nacionales y al derecho internacional, la indemnización por daños que se otorgue debe cubrir sólo el perjuicio directo y previsible')(énfasis omitido) [Traducción del Miembro del Tribunal]; *Amco c. Indonesia II*, §§172, 178. El principio de previsibilidad es también aplicable a escenarios no contractuales: *Joseph Charles Lemire c. Ucrania*, Caso CIADI No. ARB/06/18, Laudo, 28 de marzo de 2011, §§169-172; *Ioannis Kardassopoulos y Ron Fuchs c. República de Georgia*, Caso CIADI Nos. ARB/81/1ARB/05/18 & ARB/07/17, Laudo, 3 de marzo de 2010, §469. Véanse también los Principios UNIDROIT sobre los contratos comerciales internacionales (2004) ('Principios UNIDROIT') Art. 7.4.4; Convención de las Naciones Unidas sobre los Contratos de Compraventa Internacional de Mercaderías (1980) ('CISG' por sus siglas en inglés), Art. 74.

[13] Véanse, por ejemplo, CISG, Art. 75; Principios UNIDROIT, Art. 7.4.5.

haber realizado las entregas en el supuesto de que no se adquieran mercaderías de reemplazo[14].

14.  En el presente caso, el Sr. Sorlie fue el testigo principal de KNI en relación con el *Offtake Agreement* y efectivamente fue la persona responsable de administrar las adquisiciones de urea y amoníaco en virtud de ese contrato por parte de KNI.  El Sr. Sorlie no presentó en ninguna de sus dos declaraciones testimoniales pruebas respecto de si KNI adquirió o no mercaderías de reemplazo tras la supuesta expropiación del *Offtake Agreement* el 10 de octubre de 2010.  Esta constituye una omisión sorprendente dado que se trata de una prueba crucial, exigida por ley, para establecer la pérdida real de KNI.

15.  Recién en el contrainterrogatorio el Sr. Sorlie prestó declaración sobre esta cuestión. Declaró que, tras la expropiación del *Offtake Agreement*, KNI adquirió mercaderías de reemplazo en las cantidades equivalentes de la ex Unión Soviética y Egipto, así como de '*otras regiones*'[15].  No se incorporó al expediente prueba alguna respecto de los precios que se pagaron por esas mercaderías de reemplazo.  El experto en valoración de KNI declaró que había tenido a la vista esas pruebas, pero que había optado por '*excluirlas*' a los fines del cálculo de la pérdida de KNI[16].

16.  En síntesis, KNI no ha presentado prueba alguna de los precios que realmente pagó por las cantidades de reemplazo de urea y amoníaco tras la presunta expropiación del *Offtake Agreement*, y el experto en valoración de KNI ha excluido esta prueba a los fines de sus cálculos.

17.  No se trata de un caso en el que las pruebas de las pérdidas reales del inversionista ya no se encuentran disponibles debido a un acto atribuible al Estado receptor (por ejemplo, cuando las autoridades del Estado receptor han destruido o confiscado documentación perteneciente al inversionista).  Se trata de un caso en el que las pruebas se encontraban claramente disponibles, pero fueron excluidas deliberadamente por el inversionista y su experto en valoración.  En estas circunstancias, la única conclusión aceptable es que KNI no ha logrado establecer su pérdida sobre la base del criterio de preponderancia de la prueba—es decir, en cumplimiento del estándar probatorio habitual.

18.  En cambio, lo que han hecho KNI y su experto en valoración es plantear una teoría en materia de indemnización por daños y perjuicios que viola el principio de previsibilidad de la pérdida reconocido por el derecho internacional y que es inviable en los hechos. KNI afirma que su indemnización por daños debe calcularse sobre la base de la siguiente hipótesis al efecto de llegar al '*valor justo de mercado*' del *Offtake Agreement*:

18.1.  Con anterioridad a la expropiación: KNI podía comprar al precio de *offtake*, enviarlo a NOLA/Tampa (Costa del Golfo de los Estados Unidos) y vender a

---

[14]  Véanse, por ejemplo, CISG, Art. 76; Principios UNIDROIT, Art. 7.4.6.  Siempre existe una obligación de mitigar la pérdida: CISG, Art. 77; Principios UNIDROIT, Art. 7.4.8.

[15]  Primera Audiencia (septiembre) D2/P148/L9-15 (Sorlie).

[16]  Segunda Audiencia (noviembre) D6/P314/L17-22 (Giles).

precios NOLA/Tampa. Por lo tanto, la rentabilidad era el precio NOLA/Tampa menos los costos de envío menos el precio de *offtake*.

18.2. Con posterioridad a la expropiación: KNI sólo podía comprar a precios NOLA/Tampa y vender a precios NOLA/Tampa. Por lo tanto, la rentabilidad era nula.

19. Para ser claro: ambos aspectos de la hipótesis no son lo que realmente ocurrió, sino que se trata de supuestos basados en lo que razonablemente podría haber ocurrido según el experto en valoración de KNI[17].

20. Hay una gran cantidad de errores en este enfoque:

20.1. Viola el principio de previsibilidad, ya que ninguna de las partes en el *Offtake Agreement* podría haber contemplado dicha pérdida, que se basa en una serie de supuestos y sigue un enfoque que carece de precedentes en el cálculo de daños en este escenario.

20.2. Es inadmisible sustituir la prueba de la pérdida real por una teoría de pérdida hipotética en el cálculo de daños[18]. En tanto la pérdida real de KNI se podría haber calculado sobre la base de operaciones aritméticas sencillas por vía de referencia a las pruebas disponibles, la deducción inexorable es que KNI prefirió una teoría de pérdida hipotética porque redundaba en una cifra sustancialmente mayor. El resultado es que la pérdida alegada por KNI probablemente se encuentra excesivamente sobrevalorada.

20.3. La hipótesis carece de sentido. Un enfoque que pretenda calcular el *'valor justo de mercado'* del *Offtake Agreement* debe fundarse en el principio de que un tercero comprador habría estado dispuesto a pagar un precio equivalente a ese valor en la fecha de expropiación. En el caso de KNI, esto significa que un tercero habría estado dispuesto a pagar USD 206,5 millones por sus derechos en virtud del *Offtake Agreement* en octubre de 2010 (es decir, una suma significativamente mayor al valor de la participación accionaria de KOMSA en FertiNitro en ese mismo momento). Pero un tercero comprador, como KNI, habría podido adquirir los productos en cuestión—urea y amoníaco—en mercados de todo el mundo. ¿Por qué motivo un tercero comprador calcularía el valor del *Offtake Agreement* en octubre de 2010 sobre la base de que los productos sólo podrían haberse adquirido en NOLA/Tampa, cuando la demanda es siempre muy elevada y, en consecuencia, los precios son también muy elevados? Un tercero comprador calcularía el valor del *Offtake Agreement* sobre la base de la prueba de las tendencias a largo plazo de los precios de urea y amoníaco en los mercados mundiales y calcularía la diferencia entre esos precios de mercado y los precios fijados por el *Offtake Agreement*. Un tercero comprador no calcularía el valor del *Offtake*

---

[17] Segunda Audiencia (noviembre) D6/ P86/ L7-14 (*Giles*).

[18] *Amoco International Financial Corp c. Irán* (Laudo Parcial, 14 de julio de 1987) Tribunal de Reclamaciones de Irán-EE. UU. Caso No. 56, §238 '[N]o puede otorgarse reparación alguna por daños especulativos o inciertos' [Traducción del Miembro del Tribunal].

*Agreement* sobre la base de una obligación inexistente de adquirir estos productos exclusivamente en el mismo lugar en que era más lucrativo vender esos productos.

20.4. El supuesto de la hipótesis contradice la propia prueba de KNI de cómo funcionan los mercados internacionales para el amoniaco y la urea. El Sr. Sorlie declaró que: *'El amoniaco y la urea importados hacia los EE. UU. provienen típicamente de una de las cuatro áreas principales de producción de fertilizante nitrogenados para exportación en el mundo: el Caribe, África del Norte, la región del Mar Negro y el Golfo Árabe*[19] . ¿Por qué motivo un tercero comprador no recurriría a adquirir los productos en esas regiones para su venta a NOLA/Tampa y aprovecharía el diferencial de precios? Y como ya se observara, el supuesto de la hipótesis contradice también lo que hiciera realmente KNI tras la expropiación del *Offtake Agreement*: según el Sr. Sorlie, KNI adquirió mercaderías de reemplazo de la ex Unión Soviética, Egipto y otras regiones. ¿Por qué motivo se habría tomado KNI la molestia de hacer eso si sólo podría haber obtenido el mismo precio que en NOLA/Tampa?

21. En relación con este último punto, la mayoría parece adjudicarle un peso decisivo al testimonio del Sr. Sorlie en el contrainterrogatorio de que KNI pudo adquirir amoniaco y urea de reemplazo *'en una estructura de precio de NOLA y Tampa*[20]. La mayoría establece que *'acepta el testimonio del Sr. Sorlie en cuanto a que, sin perjuicio de qué suministros alternativos estaban a disposición de KNI como reemplazo del offtake en virtud del Offtake Agreement, estos fueron a precios NOLA y Tampa o equivalentes*' porque la Demandada *'no adujo ninguna prueba fáctica convincente*[21]. Encuentro varias dificultades en esta conclusión:

21.1. El interrogante, adoptando la metodología en materia de daños de KNI, no es qué suministros alternativos estaban a disposición de KNI, sino qué suministros estaban a disposición de un tercero comprador hipotético del *Offtake Agreement* en la fecha de expropiación y a futuro.

21.2. La **única** prueba que obra en el expediente en sustento de la conclusión de la mayoría es la declaración del Sr. Sorlie en el contrainterrogatorio. Esa declaración se ve refutada por el testimonio del Sr. Sorlie en cuanto a que KNI adquirió mercaderías de reemplazo de la ex Unión Soviética, Egipto y otras regiones (y no habría existido motivo comercial alguno para hacerlo si sólo pudieran obtenerse a precios NOLA/Tampa). La afirmación del Sr. Sorlie de que KNI adquirió mercaderías de reemplazo a los mismos precios que en NOLA/Tampa no se aborda en ninguna de sus dos declaraciones testimoniales, y KNI no proporciona prueba alguna en lo que respecta a los precios que pagó realmente por las mercaderías de reemplazo ni prueba alguna en lo que respecta a los precios en los distintos mercados a nivel mundial. KNI tiene la carga de establecer esta premisa fáctica fundamental para su cálculo de la indemnización por daños y no ha cumplido con esa carga.

---

[19] Primera Declaración Testimonial de Jim Sorlie (29 de mayo de 2012), §17.

[20] Laudo, §9.229.

[21] Laudo, §9.230.

21.3. La Demandada ha exhibido sus propias pruebas fácticas y son más sólidas que una afirmación sin fundamento de un único testigo durante el contrainterrogatorio. Fertecon es el principal proveedor mundial de información y análisis de mercado sobre fertilizantes y materias primas fertilizantes. El experto de la Demandada exhibió informes de Fertecon para urea y amoniaco en 2010 (que constituyen en su conjunto más de 350 páginas de análisis)[22]. Lo que muestran estos informes, que no resulta sorprendente, es que los precios de urea y amoniaco en los distintos mercados mundiales diferían de manera significativa tanto históricamente como en 2010 y los precios en Nola/Tampa en los Estados Unidos eran casi invariablemente los más elevados.

22. En conclusión, aun si Venezuela hubiera expropiado efectivamente el *Offtake Agreement* mediante el dictado del Decreto de Expropiación, lo que no acepto, habría llegado a la conclusión de que KNI no ha demostrado su pérdida de manera satisfactoria. En consecuencia, habría concluido asimismo que KNI no tiene derecho a percibir intereses.

---

[22]   Informes Periciales de Daniel Flores (EO-7 y EO-8).

Zachary Douglas QC
Árbitro

Fecha: 8 de octubre de 2017