BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KOCH MINERALS SARL, et al., . Case Number 17-cv-2559

Plaintiffs,

vs. . Washington, D.C.
. December 10, 2019
. 1:36 p.m.

BOLIVARIAN REPUBLIC OF VENEZUELA,

Defendants.

- - - - - - - - - - - - - - - -

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs: ALEXANDER YANOS, ESQ.
RAJAT RANA, ESQ.
Alston & Bird LLP
90 Park Avenue
New York, New York 10016

For the Defendant: KEVIN MEEHAN, ESQ.
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue Northwest
Washington, D.C. 20006

Transcriber: SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
U.S. Courthouse, Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by audio recording.
Transcript produced by audio transcription.

P R O C E E D I N G S

(Audio recording began at 1:36:19 p.m.)

THE COURT: The record, of course, reflects the circumstances which bring us here today. The Court received the referral of this matter for the motion which has since been stayed, that is, the motion for default judgment. We will have argument this afternoon with respect to the motion to set aside default and to dismiss for lack of jurisdiction.

My -- a preliminary question I have for counsel is whether you are prepared to agree that we should bifurcate the two motions, collectively number 30, and focus in the first instance on whether or not the default should be set aside.

Have you had an opportunity to discuss that question? Have you even contemplated that question? Mr. Yanos or Mr. Rana?

MR. YANOS: Your Honor, we haven't discussed that with the other side. Our expectation is that we would be discussing all of the issues pertaining to the motion for default judgment and the motion to set aside a default judgment.

THE COURT: You may proceed in that fashion if you wish. And for the record, you are Mr. Yanos?

MR. YANOS: Yes, I am. Thank you very much.

THE COURT: Very well, Mr. Yanos. Is this a question you would like to take a moment and discuss with Mr. Meehan?

MR. YANOS: I'm happy to take a moment and discuss it with him, but I think our joint understanding is that we are

going to discuss all the issues at once since we are here.

THE COURT: Very well. What is your preference, Mr. Meehan? Would you like to take a moment and discuss this proposal with Mr. Yanos and Mr. Rana?

MR. MEEHAN: Your Honor, Kevin Meehan for defendant Bolivarian Republic of Venezuela.

Your Honor, it is our understanding that the motion to set aside the clerk's default and the motion to dismiss for lack of personal jurisdiction and improper service of process is what's being argued today. In terms of the motion for entry of default judgment, we believe that there are other issues relating to a number of issues, including the recently promulgated amendments to the Venezuela Sanctions Program, which would have to be discussed even if the Court were to deny the motion to dismiss for jurisdiction. So our understanding is that there would have to be, you know, certain subsequent issues that would have to be confronted with the Court before we could proceed to a default judgment issue.

THE COURT: So how do -- what is your contention with respect to how we should proceed? The Court, again by way of background, I stayed consideration of the motion to set aside the default, given your motion to vacate the default. I should state, consideration of the motion for default judgment, given the filing by you on behalf of your client to set aside the default and to dismiss for lack of jurisdiction.

You now appear to have raised a possibly related but a different issue which has not been briefed.

MR. MEEHAN: Yes, Your Honor. But I think even more simply, the issue of whether or not there's personal jurisdiction, improper service of process is really a threshold issue that needs to be decided before we could enter a default judgment. So our understanding and position is that today is to argue the defendant's motion to set aside the clerk's default and to dismiss.

THE COURT: And does it -- are you in agreement -- are you and Mr. Yanos and Mr. Rana in agreement that at this time the parties should present arguments with respect to both your motion to set aside the default and the motion to dismiss for a lack of jurisdiction?

MR. MEEHAN: I just want to be very clear, because we are using the word "default," and there's two issues here. There is the clerk's default, which has already been entered, and there's also a pending but stayed motion for entry of a default judgment by the Court.

Our understanding is that we are not discussing the default judgment motion but --

THE COURT: That is absolutely correct, since the Court could enter default judgment only in a circumstance in which the default has not been set aside.

MR. MEEHAN: Exactly, Your Honor.

THE COURT: Have the parties had sufficient opportunity to meet and confer to determine whether there are any agreements with respect to any of the pending issues?

MR. MEEHAN: We have not met and conferred, but I'm not sure that the issues that are currently before the Court are something that are amenable to reaching agreement upon.

THE COURT: Have you made an effort to inquire of Mr. Yanos and Mr. Rana to see if that is the case?

MR. MEEHAN: I have not, Your Honor, and I open the floor to Mr. Yanos if he has a differing opinion.

THE COURT: Very well. Thank you very much, Mr. Meehan.

MR. MEEHAN: You're welcome.

THE COURT: Mr. Yanos?

MR. YANOS: Your Honor, meeting and conferring would not produce any meaningful results, because the issues are quite discrete here, and we are in very different positions on those issues.

THE COURT: Very well. Thank you very much, Mr. Yanos.

Mr. Meehan, you are counsel for the movant. So we will hear from you first.

MR. MEEHAN: Thank you, Your Honor. Good afternoon. Kevin Meehan for defendant Bolivarian Republic of Venezuela.

Your Honor, as we were just discussing, before the Court is

defendant's motion to set aside the clerk's default and to dismiss for lack of personal jurisdiction and improper service of process under the Foreign Sovereign Immunities Act.

Ultimately, the plaintiffs' position here is that service was completed when the courier Fed Ex handed the summons and complaint to a mail clerk at the Central Authority that is being controlled by the illegitimate Maduro regime.

Now, there are a number of arguments as to why that is wrong as a matter of law, but as an initial matter, I just want to point out that the service on the Maduro regime really has no effect, because as a matter of U.S. law, the Maduro regime is not the Republic. The United States president and the executive have recognized Interim President Juan Guaido as the president of Venezuela, and the D.C. Circuit in the *Rusoro* case in this court and several other cases have held that that determination is binding on the courts, meaning only the representatives of the Guaido government are able to have standing to come into U.S. courts and the Guaido administration is the Republic for purposes of U.S. law.

Now, the argument that --

THE COURT: May I ask, what is your argument with respect to the nexus of the circumstance you just proffered and the issue of whether service -- whether the service that was made was fully in accordance with applicable law?

MR. MEEHAN: Well, it's related, because here, the

only representative that can come into this court and argue is a representative of the Guaido government, and the Supreme Court's recent decision in *Sudan v. Harrison* makes perfectly clear that the requirements of process under the FSIA are designed to make sure that the right person in the foreign government is handed the complaint so that they can come into the court and respond. But that, obviously, wasn't done here, because the Republic, which is the Guaido -- sorry, the Guaido administration has not been served.

But there are other issues here as to the principal argument, which is that delivery of the summons of complaint to the Central Authority equals service of process. That's just wrong as a matter of law. Plaintiffs even concede that if this was a private defendant, that would be wrong.

Now, it's wrong because it's inconsistent with other courts. Courts have repeatedly recognized that delivery of what is a request for service to the Central Authority does not effect service on the party, even if that party happens to be the state itself. You can look at *Tidewater v. Venezuela*, *Mezerhane v. Venezuela*, *Jung v. Baidu*, *Cavic v. Serbia*. These cases have been cited in the briefs.

It's also the plaintiffs' argument is inconsistent with the Hague Convention itself. The Hague Convention sets up a system whereby a party requesting service serves a request for service to the designated Central Authority. The Central Authority can

then grant that request, serve it in accordance with its own domestic laws, and then prepare a certificate under Article 6 of the Convention and return it to the requesting party.

But the Central Authority can also reject the request for service. In fact, Articles 4, 6, and 13 all recognize the right of the receiving state to deny a request for service. And in particular, I would draw the Court's attention to Article 13, which states that a request for service can be denied on sovereignty grounds.

Now, plaintiffs' argument that service is complete upon the handing over of the complaint to a mail clerk at the Central Authority effectively deprives the receiving state of its rights under the treaty to evaluate the request and to deny the request. And it infringes upon the sovereignty interests that are protected under the Convention in Article 13.

Plaintiffs' argument is also inconsistent with the position of the United States government. The United States government has taken a position that merely delivering a request for service to the United States Central Authority is not service on the government.

Plaintiffs' argument is also inconsistent with the Foreign Sovereign Immunities Act. The grant of personal jurisdiction in 28 U.S.C. 1330(b) states that personal jurisdiction exists only where, quote, service is made under Section 1608. 1608(c) makes clear that service is not complete when you just deliver it to

the Central Authority. It could have said that, but it doesn't. What it says is that service is complete as of the date of the certificate issued by the Central Authority under Article 6. There is no certificate in this case.

Now, plaintiff has also made a couple of other -- actually, before I do that, I would also like to point out that there are two cases plaintiffs have relied upon here, neither of which are good law. The first is *Devengoechea*, which is an out-of-circuit decision from the Central District of Florida. That decision was issued ex parte, and it is entering a default judgment against Venezuela that was ultimately vacated. The decision doesn't address, much less analyze, the service requirements under the Hague Convention.

The other out-of-circuit case is the *Box* case from the Fifth Circuit. That case is also not good law. In that case, the Fifth Circuit determined that the procedural requirements of the Hague Convention should be applied more leniently where the defendant is a foreign state and found that service should be deemed to be made where the plaintiff has made a good faith effort to comply with the requirements of the Hague Convention and, B, there is actual notice to the foreign state.

But the Supreme Court in *Sudan v. Harrison* earlier this year said no, actual notice is not good enough under the Foreign Sovereign Immunities Act, and the Supreme Court's rationale makes clear that there are substantial policy issues that the

requirements of service of process under the Foreign Sovereign Immunities Act must be strictly complied with precisely because you're dealing with a foreign state.

THE COURT: Mr. Meehan, I would like to direct your attention to page 9 of your memorandum and the caption, Roman Numeral 1, under the term "Argument." The caption reads, "This Court Lacks Personal Jurisdiction Over Venezuela Because Plaintiffs Have Not Effected Service of Process in Strict Compliance with the FSIA." And I will emphasize "in strict compliance."

Am I correct in my understanding of your use of that phrase that you concede there was some effort to -- some compliance?

MR. MEEHAN: All that was done here was a -- the initiation of the process, which is to deliver the request for service abroad to the Central Authority which is in the possession of the Maduro regime.

However, the Supreme Court, in *Sudan*, said there's -- it requires strict compliance to the FSIA, and that has always been the rule of the D.C. Circuit. In the *Transaero v. Bolivia* case, in the *Barot v. Zambia* case, the D.C. Circuit made very clear that substantial compliance is not enough. Even coming very close to effecting service is not good enough.

THE COURT: What is your characterization -- you may have anticipated my next question.

What is your characterization of the effort that was made?

Would you term it substantial compliance or something else?

MR. MEEHAN: No. I think it was -- all they had done was initiate.

I mean, there's another issue here, and this --

THE COURT: Let's make sure we have the answer to that question before you move on. You would not characterize the plaintiffs' effort as even substantial compliance; is that correct?

MR. MEEHAN: I would say no, it's not substantial compliance.

THE COURT: So what is your characterization of the effort undertaken by plaintiffs?

MR. MEEHAN: I think it's fairly minimal. All they did was provide Fed Ex with copies of the complaint.

And I would like to point out that the Hague Convention is not the only way in which you can serve a foreign state under the Foreign Sovereign Immunities Act. It's one of several ways you can do this. And obviously, it's not a secret here that there are other creditors of the Republic, and they have not had the same problems, because there are other methods. But plaintiffs chose not to pursue those methods. Instead, they sent a Fed Ex package to the Maduro regime, did nothing after the recognition of Guaido, and then sought to get a default judgment.

There are two other arguments -- sorry.

THE COURT: You have repeatedly characterized the individual who received the delivery as, quote, a mail clerk, closed quote.

What -- first of all, what is the basis of that characterization, and second, what is the significance with respect to the issue that the Court must address?

MR. MEEHAN: Well, I mean, in fairness, there has been no identification of who these persons were, even a first name. There's just a first initial and a last name. I'm just assuming that's where mail comes in is through the mail office.

However, it really doesn't matter. Even if it's sent to the very person in charge of the Central Authority, that's not service of process. Service of process occurs when the Central Authority receives the request for service and then serves it in accordance with the domestic law of the receiving state.

There are two other arguments that have been raised by the plaintiff. They argue that service by mail under Article 10(a) of the Hague Convention has been effected here. However --

THE COURT: But before you move on, I do have one other question. Since you've indicated that you do not know who received the delivery -- and you have characterized the recipient as, quote, a mail clerk -- what is the basis of your contention that the Central Authority did not receive the delivery?

MR. MEEHAN: Your Honor, we have no contention that

the Central Authority of the Maduro regime did or did not receive this. There has been a signed -- we understand a signed receipt from Fed Ex. However, the point being is that -- is twofold. One, serving the Central Authority that's being occupied by the Maduro regime is not service on the Republic because the Republic is the Guaido administration. Service on the Central Authority -- or excuse me, delivery of the request for service on the Central Authority, which was done here, is not service of process. It's the initial step. It's the -- they're asking the foreign government, I would like some help to serve, please do so. And then there's another step in which the Central Authority then effects service under its own laws. And there's no evidence that that was done. There's no evidence that plaintiffs ever followed up to see if it was being done or to request a certificate under Article 6 of the Hague Convention.

THE COURT: Does that mean, then, for purposes of the argument on this motion, you concede that the Maduro regime was served?

MR. MEEHAN: No, because all they did was serve the Central Authority. The Central Authority is not the government. They would then have to serve the government in accordance with Venezuela law. For example, the United States has a Central Authority, which is under, I believe, the Justice Department, and the United States government has taken the position that

that's not service on the government. What has to happen is that request has to be processed by the Central Authority and then served on the specific agency that's responsible for that case.

THE COURT: Very well. You may continue.

MR. MEEHAN: So I will go back to the other issue, which was service by mail under Article 10(a). Article 10(a) applies only where the foreign government has not objected to service by mail. Venezuela has objected to service by mail. The United States Supreme Court in *Water Splash* decision said that service by mail under Article 10(a) is not available where the foreign government has objected. The United States government has echoed that position, stating that service on a foreign government that has objected under the Hague Convention 10(a) is not applicable. There are numerous courts, *Prince v. China*, *Jung v. Baidu*, which have also recognized that Article 10(a) service by mail is not applicable where the government has objected to service by mail.

The next issue is Article 15, which allows a default judgment to be entered where the situation is the defendant has not appeared and there's no certificate of service under Article 6. Now, we would argue that that doesn't apply because the defendant is here and is objecting to service of process. It also -- in order for that to apply, there has to be a showing that the documents were transmitted to the defendant and that

the plaintiff has taken every reasonable effort to obtain a certificate.

Now, here, there's no evidence whatsoever that the Guaido administration has received notice or the papers at all, and there's no evidence that plaintiffs have made any attempt, let alone every reasonable effort, to obtain a certificate under Article 6.

Finally, I would like to address the issue of delay.

THE COURT: You may.

MR. MEEHAN: Plaintiff has said that all this is just a delay tactic and that the Republic shouldn't be able to get out of responding because of technical requirements under service of process.

Now, again, the *Harrison* case says that delay doesn't really matter. Where you're serving a foreign state, you have to strictly comply with the requirements, even if vacating a judgment and starting all over would cause delay.

The other issue is that much of the delay is plaintiffs' own fault. As I said, there are other creditors. There are other means of serving the Guaido administration, but plaintiff has not availed itself of any of those means.

And finally, the issue of delay is sort of a red herring at this point because of the significant amendments made by OFAC to the Venezuelan sanctions.

Late last month, the Office of Foreign Asset Control under

the U.S. Treasury Department issued new sanctions regulations. In particular, 31 C.F.R. 591.407 prohibits the enforcement of any judgment or arbitral award or decree or order absent a specific license from OFAC. Obviously, this is relatively new and has not been briefed, and there's no indication that Koch has such a license.

But if the Court were to make --

THE COURT: May I ask, what is the nexus between the action to which you just referred and the matter for which we are here at the moment?

MR. MEEHAN: So in response to plaintiffs' argument that there's really nothing here, that there's no -- nothing else that has to be decided, but that's not true. The Court is going to have to decide what the impact of the sanctions regulations are on the ability to go forward, particularly where the sanctions are pretty specific, that you cannot enforce an arbitral award, which is precisely what Koch is trying to do here.

THE COURT: Is that a matter that you believe should be briefed in writing?

MR. MEEHAN: Your Honor, if the Court were -- I don't think it's necessary at this time. If the Court wants it or is inclined to deny the motion to dismiss, then certainly, we would like the opportunity to brief that issue.

THE COURT: You may continue.

MR. MEEHAN: Nothing further, Your Honor, unless you have any further questions for me.

THE COURT: Not at this time. Thank you very much, Mr. Meehan.

MR. MEEHAN: Thank you, Your Honor.

THE COURT: Mr. Yanos or Mr. Rana? Mr. Yanos?

MR. YANOS: Good afternoon, Your Honor.

THE COURT: Thank you. Good afternoon.

MR. YANOS: As has been previously stated, my name is Alex Yanos, and I am here for Koch Minerals SARL and Koch Nitrogen International SARL. I am here with my colleague, Rajat Rana. We are both from the firm of Alston & Bird.

A lot of things came out. I want to start with the last thing that was discussed, the sanctions issue, just because it's completely inapplicable, and I just want to set the Court's mind at ease.

The sanctions pertain to any efforts to attach or in any way, you know, secure money from Venezuela, which is something that would certainly come once we have the judgment, but it in no way implicates our efforts to obtain the judgment on our award.

In fact, perhaps Mr. Meehan didn't read them or maybe he just didn't want to read them, but there was an FAQ issued by OFAC yesterday, which his co-counsel actually submitted in another court, that very clearly state that what we're doing is

in no way impacted by the sanctions regime.

THE COURT: I will ask you the same question I asked Mr. Meehan. Is this a matter that the parties should brief in writing, bearing in mind that my task at this time is preparation of a report and recommendation for consideration by the district judge initially assigned to this matter, who will have no written record which to consider, no written record to consider with respect to this issue --

MR. YANOS: If it would be helpful to the Court, we can submit a very short document that copies -- you know, provides the OFAC frequently asked questions, which literally go through the exercise of explaining exactly how the regulations impact this proceeding, although it doesn't mention this proceeding by name, obviously, and says that there's no issue there. So if it would be helpful to the Court, we would be happy to do that. It's no big deal.

So taking a step back, we heard on numerous occasions from Mr. Meehan that it was somehow significant that the Guaido administration was not served in this case. But it isn't. It's a temporal issue that is very straightforward. At the time that service was perfected, we say, the Guaido administration didn't exist. There was certainly no recognition of that administration. The fact that later that administration did come to exist and was then recognized by the U.S. government doesn't change the fact that service had already been perfected.

THE COURT: Now, what is your response to Mr. Meehan's contention that irrespective of what you've just said, service was not perfected in accordance or not effected in accordance with the applicable laws --

MR. YANOS: I will cover that in one moment, Your Honor, for sure. My point is, I just wanted to address first that issue, because it's very straightforward, and I think I can, you know, end about 10 minutes of argument with a few sentences.

It's really no different than if, I don't know, Federal Express gets served with a complaint and then a new CEO and president gets appointed. It doesn't matter who is in charge. It's still the same legal entity, whether it's Federal Express or the Bolivarian Republic of Venezuela. Once you serve it once, it's not like the change in government somehow requires a new set of service. Once jurisdiction is established, it's established once and for all. The government doesn't impact that.

Now, to come to your question of did we follow the letter of the Hague Convention, and the answer is absolutely. The Hague Convention requires us to serve a document, and we can do it by mail, which is the way we did it on the Central Authority, and request that the Central Authority then provide the document to the party that needs to be served.

Now, in this case it just happened to be that the two --

the Central Authority and the party that needed to be served were the same, same address, same person, same everything. So when we submitted the document to the Central Authority and they accepted it -- and who is the Central Authority? It is the Ministry of Foreign Affairs of Bolivarian Republic of Venezuela, the organ that is responsible for the conduct of administrations with the world. And that is the party we asked the Central Authority to serve.

Now, for whatever reason -- Mr. Meehan says it has nothing to do with delay, whatever -- they did nothing. We effected service.

THE COURT: When you say "they," to whom do you refer?

MR. YANOS: The Ministry of Foreign Affairs. Remember, in this case service was effected twice. Right? First in January of 2018 and then again in June of 2018.

THE COURT: My question is, to whom do you refer by the pronoun "they"? Do you mean the Central Authority or the Maduro administration or some other person or entity?

MR. YANOS: It's the same person. It's the Ministry of Foreign Affairs. The Ministry of Foreign Affairs was designated by Venezuela as its Central Authority.

THE COURT: So is it your contention that the Central Authority, the Ministry of Foreign Affairs, did nothing?

MR. YANOS: Well --

THE COURT: You said, "They did nothing."

MR. YANOS: Look, if you serve me and I say I'm going to deliver this document to Alex Yanos, Alex Yanos is me, you know. I may deliver it to Alex Yanos; I may not. Once it's in my hands, I'm Alex Yanos. There's no second step to the process.

And here, it's the exact same thing. The party that Venezuela chose to designate as its Central Authority is the Ministry of Foreign Affairs. The party we asked the Central Authority to serve is the Ministry of Foreign Affairs. We gave them the same name, the same address, the same everything. So once the document was in their hands, there was nothing further for them to do other than to say, Well, I have it in my right hand, I can keep it in my right hand or transfer it to my left hand, but it's still me because there's nobody else. It's not like we said go across the street and find another organ of the Venezuelan government. The only organ of the Venezuelan government we asked them to serve was themselves.

And we never -- when I say "they did nothing," what I mean is we never received a certificate confirming service. Okay? And remember, we're talking about, as I said, the first time we perfected service, we say, through the Hague Convention was in January of 2018, and the second time was in June of 2018. All right? So we're talking about almost two years in one case and 18 months in the second case, a very, very long time. And there was no communication to us that, you know, service was

perfected.

But in a sense, it's obvious why that never happened, because it, obviously, once it's in the hands of the Ministry of Foreign Affairs, there's absolutely nothing further that the Ministry of Foreign Affairs can do to further serve the document.

THE COURT: Before you go on, I want to ask you about an argument or representation that you just made as a part of your argument.

You said that, to paraphrase, there is no indication that service was ever made.

MR. YANOS: No, I didn't say that, and if I did, I apologize. What I said is they never provided us a certificate. There is a requirement under the Hague Convention that once the Central Authority completes service, they have to provide us with a certificate confirming the completion of service.

Mr. Meehan's argument is that the reason that that's a meaningful step and it reflects the government's decision to basically reject our attempt to serve and that they have that discretion, to reject service, we say there's no such discretion in the Hague Convention. There's no pocket veto for states. States don't have the ability to say, Well, I see that you've served me, but I don't want to be served, so go away.

That's not the way the Hague Convention works. It's certainly not the way the Foreign Sovereign Immunities Act

works. And the proof of that is Article 15, which Mr. Meehan mentioned briefly.

THE COURT: In as much as the plaintiffs concede that plaintiffs have no certificate confirming completion of service, how is the Court to evaluate that for purposes of the defendant's motion to vacate the default?

It would appear that you have conceded that there is a document that would ordinarily be -- that the Court would ordinarily expect the plaintiff to produce but that you cannot produce.

MR. YANOS: Right, because they didn't provide it.

THE COURT: What does that mean for the pending motion?

MR. YANOS: Well, I was just about to explain that, Your Honor. That's what Article 15 deals with. Article 15 of the Hague Convention answers the question, Can you issue a default judgment when that hasn't happened? Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service under the provisions of the present convention and the defendant has not appeared, judgment shall not be given until it is established that -- and it's an either/or, and I'm going to go to B because that's the part that's relevant to us -- the document was actually delivered to the defendant or to his residence by another method provided for by the Convention. And in either of these cases the service or

delivery was effected in sufficient time to enable the defendant to defend.

The Hague Convention answers that question directly. It says, Well, what do you do if the defendant hasn't shown up and you don't have this certificate? And the answer is, Well, was there actual delivery? And the answer is, Yes. Has there been sufficient time for the defendant to respond? And the answer is, Yes.

How do we know that? Because the Foreign Sovereign Immunities Act itself prescribes the amount of time you must give a sovereign to defend itself, 60 days. We are well past the 60 days. From the second service, we're at 18 months.

So the Hague Convention itself addresses the question Your Honor asked and makes quite clear that where there has been actual delivery -- and there can be no question that there's been actual delivery because the Ministry of Foreign Affairs has confirmed receipt -- that's the end of the question, we say.

Now, there was another point that I wanted to mention. Mr. Meehan repeatedly made reference to the U.S. government's position as somehow relevant here. There are two points I should make.

The first is that the U.S. Central Authority is not the same Central Authority as the Central Authority in Venezuela, and the case -- and it's not always going to be the case that the DOJ is the appropriate party for service purposes, and

that's what the U.S. government said. Well, if you're suing the Ministry of Commerce, just because you delivered it to the Department of Justice isn't enough, you have to wait for that to happen.

That's not the circumstance here, because the party we were serving and the Central Authority were the same.

The second point is that the U.S. has made a reservation in this respect, but Venezuela has made no similar reservation. So the fact that the U.S. has a different position isn't relevant here.

The other thing Mr. Meehan mentioned a few times that I wanted to speak to is the idea that this was somehow service by mail. It was not service by mail because we followed -- the Hague Convention permits the transmission to the Central Authority of documents by, you know, courier, which is what we did. And then what happens after that is the question for purposes of whether there was service. And as I said, here, because once the foreign ministry had the document in its hand, there were no further steps to be taken. Service was perfected.

The fact that -- I mean, Mr. Meehan said it was a mail clerk. It's true, none of us know who the -- you know, what the role is of the people who confirmed acceptance of documents. So I take exception to the notion that it was a mail clerk, because there's no evidence in the record to that effect. What we do know is that was a person in the Ministry of Foreign Affairs and

that they accepted the document on behalf of the Ministry of Foreign Affairs. That's really all that this Court needs to be concerned with.

The -- let me just check my notes, Your Honor. I do want to come back again to this issue of the Guaido administration versus the Maduro administration, because it's -- again, it's just, in our view, an attempt to confuse and delay.

As I said, the critical question is, at the moment service was effected, who was the recognized government? And in this case, because it was -- as I said, we served in January and June of 2018. In both instances, it was the previous government, the Maduro government, that was served. The fact that in February of 2019 the U.S. government chose to recognize a different regime as the legitimate regime in Venezuela does not effect a break in service and require parties to re-serve. Once service is complete, it's complete forever.

Mr. Meehan mentioned on a number of occasions that we're not the only litigant and others have done it differently. I have in this case represented other litigants against Venezuela, including Crystallex, including others, and if -- I would invite the Court, and if you want, I'm happy to present the Court with the record. All of those cases, service was done in the exact same way. The only difference is that in those cases Venezuela elected to show up, and in this case, it didn't until the day before or two days before entry of default was to be made.

And it's no surprise to me that it was -- that Venezuela waited until that moment to do so, because the goal was to slow this process down at all costs.

THE COURT: Now, the Court must consider, among other matters, in evaluating the motion to set aside the default prejudice to the nonmoving party.

MR. YANOS: Right.

THE COURT: What is your contention, for purposes of the record of this hearing, of prejudice that would be occasioned should the Court grant the motion?

MR. YANOS: I'm sure Your Honor is familiar with the record. This is a case about an unlawful expropriation. My client owned a fertilizer plant or a part of a fertilizer plant in Venezuela, and that plant was taken, and there was no compensation given.

This was almost a decade ago, and the value is in excess of $400 million. We have been waiting a very long time to be paid for what was taken from us. I mean, it's really conversion is what happened. It's just that in the international law context, we don't call it conversion. We call it unlawful expropriation.

Right now, in Delaware, the only assets that Venezuela has in the United States are in the process of being -- well, that's going to be attached as soon as all the requisite licenses are issued by a number of other creditors, including a company called Crystallex and potentially ConocoPhillips as well. And

what they're going to be doing is there are -- it's been adjudged that Venezuela is the alter ego of a oil company that it owns called PDVSA, P-D-V-S-A. PDVSA owns a holding company based in Delaware called PDVH, which ultimately owns a corporation here in the United States called CITGO. And the intention of certain creditors, Crystallex and ConocoPhillips primarily, is to auction off those shares and divide up the proceeds. And if we experience further delay here, it will prevent us from, in a timely fashion, participating in that process. So that would be the delay -- that would be the prejudice.

THE COURT: Is that a different argument or an additional argument to the one you made in writing?

MR. YANOS: Well, what's happening in Delaware is new, and, you know, we had asked for the status conference, which we almost had a couple weeks ago, to discuss this very issue. What we talked about in writing was just temporal prejudice, the time thing, but I'm trying to put a finer point on it, because not only is it a very long time, but in the current circumstances, there is a very specific activity that is taking shape in Delaware that it would be very important for us to participate in.

THE COURT: Is that a matter that you are prepared to address in writing to supplement the representations in the opposition to the motion, which do not include --

MR. YANOS: If it would be helpful to the Court, of course, we're always happy to put everything in writing.

THE COURT: Very well. You may continue, Mr. Yanos, or conclude, if that was your final response to my last question.

MR. YANOS: Yeah, I just want to conclude with one other point, Your Honor, and that's just to underline, one speaks of a default judgment, and it sounds like it's an incredibly prejudicial thing to the party against whom the default is being issued because they haven't had a chance to answer.

But I do need to put that, again just for the Court's benefit, in context. Okay? This is a situation in which we have an arbitration award, and it's not just any arbitration award. It's a very specific type of arbitration award. It's an arbitration award issued by an entity called ICSID, the International Center for Settlement of Investment Disputes. It's an organization. It's an arm of the World Bank, and it's created by treaty, that treaty which is sometimes referred to as "the Washington Convention" and sometimes the "ICSID Convention." Pursuant to that treaty, over 140 nations, including the United States and at some point Venezuela, although they've since withdrawn from the ICSID Convention, agreed that any award issued under the auspices of ICSID would have the same status as a judgment of the highest court of any

of those 140-plus countries.

Now, it's not a self-executing treaty. So the United States adopted legislation to implement its obligations under the ICSID or Washington Convention, and that is 22 U.S.C. 1650(a), which we have, of course, cited in our papers. And 1650(a) provides that an award issued by ICSID creates a right arising under a treaty of the United States and shall be given the same full faith and credit as if the award were a final judgment of general jurisdiction of one of the several states.

So in the eyes of the law, the award is already tantamount to a judgment issued in New Jersey. Okay? That has been confirmed by the Supreme Court of the State of New Jersey, and we were bringing it here to have it converted into a judgment of this court, in this jurisdiction.

But to say it's a default judgment in the sense that Venezuela has never had a chance to answer to the claims or respond to the claims would be disingenuous, to say the least, because we've already had a very lengthy arbitration that took many years, and it was adjudicated, and we were successful, and following that, we were issued an award, and that award, the United States has promised and the U.S. Code has required, must be treated as if it were a judgment of one of the several states.

Just for the avoidance of doubt --

THE COURT: You don't suggest, I assume, that merely

because Venezuela was heard during the course of the arbitration proceedings, that the requirements of service are somehow --

MR. YANOS: No. My point is, that's really the only issue. I'm not saying that service was completed because of that. Obviously, we are serving -- we have served them through the Hague Convention. We have discussed why we believe that we've complied with the Hague Convention and, therefore -- and the Foreign Sovereign Immunities Act that service was complete and this court has jurisdiction to enter the judgment.

My point is simply that the act of issuing a default judgment is not so drastic as it might be in other circumstances where the sovereign has never had a chance to defend on the merits. It's had a chance to defend on the merits. It's had many chances to defend on the merits.

The only thing I was going to say, just as you were asking your question, Your Honor, is that for the avoidance of doubt, the 1650(a) also specifically repeats that the Federal Arbitration Act shall not apply to the enforcement of awards rendered pursuant to the Convention. And why is that significant? Because the defense is to enforcement, and the opportunities to stay enforcement that are enumerated in the Federal Arbitration Act do not apply in this case. We have an award. That award is tantamount to a judgment of one of the several states.

The only question before this Court is, is there

jurisdiction, and if so, enforce. So it's a -- you know, basically in front of you of whether you view it in terms of their motion to set aside the default or our motion to have a default or if this were a summary judgment motion, we would be talking about the exact same things in all three circumstances, because there's no debate that the award is valid. There's no debate that the award is enforceable under the U.S. Code. So that's all there is.

And with that, unless there's further questions, I will sit down.

THE COURT: Very well. Thank you very much, Mr. Yanos.

MR. YANOS: Thank you.

THE COURT: Mr. Meehan, I will hear your reply.

MR. MEEHAN: Thank you, Your Honor. I will try to be brief, and I appreciate your time. Kevin Meehan once again for the Bolivarian Republic of Venezuela.

Perhaps I will start off just by addressing what was just discussed by Mr. Yanos with respect to the ICSID Convention and the enforcement of ICSID awards. All of that is essentially irrelevant for the very discrete issue that's before this court, which is service of process. The *Mobil Cerro Negro* case in the Second Circuit resolved the issue that when you are enforcing an ICSID award, you have to comply with all of the requirements of the Foreign Sovereign Immunities Act, including service of

process. I believe Mr. Yanos conceded that point. So I will move on.

I would like to address the primary issue which has been repeatedly asserted but no authority presented for the position that once the courier delivers the summons and complaint to the Central Authority, it's over, service is complete. That's just simply wrong as a matter of law, as I've explained. Several courts have rejected that construction, and it has to be that way because otherwise it would be inconsistent with the Hague Convention itself.

THE COURT: What is your response to Mr. Yanos's contention that in this instance, the Central Authority is the entity on which service was required?

MR. MEEHAN: It still doesn't create this novel exception that's nowhere in the Hague Convention or in the FSIA. This is precisely what is in the Hague Convention. What is in the Hague Convention is the express right of the receiving state to reject a request for service. So if service is complete at that precise moment where the courier, the Fed Ex person hands it to this person at the Central Authority, if that's it, if that's the moment, then the Central Authority essentially has -- is deprived of its right under the Hague Convention to reject service of process.

And now, Article 13, which allows a receiving state to reject service of process on grounds of sovereignty, has

actually been litigated in courts in the United States. And I will refer you to the cases of *Prince v. China* and *Jung v. Baidu,* which are cited in our briefs. And in those cases, the United States court respected China's rejection of the request for service of process under Article 13.

So the point being here is very simple. If it happens when plaintiffs say it happens, then all of these other articles, Articles 4, 6, and 13, which expressly reserve the right of the receiving state to reject a request for service of process are essentially a nullity. It also would mean that service of process triggers the time to respond, which is 60 days under the Foreign Sovereign Immunities Act. It would mean that this court would be creating a novel exception to the Foreign Sovereign Immunities Act that all of a sudden the time to respond is 60 days from the date on the receipt of a Fed Ex or DHL or whatever courier was used to mail the complaint to the Central Authority.

That can't be right, because Section 1608(c) of the Foreign Sovereign Immunities Act says service is made as of the date in the certificate, meaning the certificate issued under Article 6 of the Hague Convention, meaning that clearly Congress could have written service is effective as of the date the Central Authority receives the complaint. They didn't do so. They said the date in the certificate. There's no certificate here.

I would also like to point out the argument that Mr. Yanos has made that it's essentially irrelevant that Mr. Guaido has

been recognized as the president of Venezuela. That recognition took place in January of 2019, which occurred well before plaintiffs sought their default judgment, meaning that they sought a default judgment knowing that the papers had never been delivered or really having no basis to believe that the papers had been delivered to the only party that could respond in this case. And I think that that is definitely significant in terms of whether or not they can seek a default judgment.

I would also like to touch upon Article 15, which was also referenced by Mr. Yanos. He, in fact, read the language to the Court, and there's a couple of key pieces that need to be addressed here.

Number 1 is when the defendant hasn't appeared. Well, the defendant has appeared here. So Article 15 allows a court to enter a default judgment where the defendant has not appeared. The defendant has appeared. So Article 15 doesn't apply.

In addition, other courts, including the *Jung v. Baidu* cases and, I believe, others, have read Article 15 to mean that there is a requirement that the plaintiff use every reasonable effort to obtain a certificate under Article 6 of the Hague Convention. Here, plaintiffs have not provided any evidence of any effort, let alone every reasonable effort to obtain a certificate.

And again, if they wanted to do something and they wanted to end the delay, they could have exercised one of the other

options available to a plaintiff to serve a foreign state under Section 1608(a). They didn't do so. They, instead, tried to get a default judgment.

I will briefly end -- and I think I agree with Mr. Yanos. I think he said that he was willing to brief some of these issues, but he brought up the notion of the *Crystallex* case and the ongoing proceedings there to, you know, attach shares of PDVH and hold an auction.

Now, Mr. Yanos also represented that the new regulations that were just promulgated by OFAC preclude a party from getting an attachment and entering into those proceedings without a license. Mr. Yanos has not said that Koch Industries has undertaken anything to apply for such a license or that it's obtained a license.

There's also, I believe, some authority and some case law that would suggest that -- let me strike that.

I did, as Mr. Yanos suggested, read the guidance that was issued last night by OFAC, and it does make clear that a plaintiff may initiate a case. What is less clear is whether or not a judgment could be entered. There is some case law in some of the regulations out there that would suggest that that would be inappropriate without a license to obtain a judgment.

Unless the Court has any further questions, I think that's it.

THE COURT: Very well. Thank you very much,

Mr. Meehan.

MR. MEEHAN: Thank you very much.

THE COURT: Counsel, I will require of you further briefing. I state that with some degree of reluctance because you have already addressed the issues thoroughly in writing. But each of you has raised a matter that was -- that you did not address in writing, and in order to ensure that our written record is complete, I must require this of you.

The first issue is the one that you raised, Mr. Meehan, concerning action taken just yesterday with regard to OFAC.

The second issue is the one you raised, Mr. Yanos, concerning what I will call activity in Delaware.

I would like for you to take a moment, please, and consider how much time you wish to be allowed to brief the issues and whether you believe a single memorandum by each of you is sufficient or whether one side -- each side should file a memorandum and the other have an opportunity to respond. I'm happy to accommodate your preferences, but I want to know what your preferences are.

I can excuse myself so you can discuss this matter, or if you think you'll only need a moment, then you can take a moment while we're here.

MR. MEEHAN: I shall hope it only takes a moment.

THE COURT: Thank you.

(Pause.)

THE COURT: Mr. Yanos?

MR. YANOS: Yes, Your Honor. We discussed quickly, and we have agreed to exchange one brief on both issues simultaneously a week from Friday. That would be the 20th of December.

THE COURT: Very well. One memorandum by plaintiffs, one memorandum by defendant?

MR. YANOS: Correct.

THE COURT: And nothing further?

MR. YANOS: No, that should be more than adequate.

THE COURT: Very well. Thank you. In the entry with respect to today's proceeding, we will indicate that the parties -- that each side will file a supplemental memorandum by no later than December 20th.

I do not believe that further oral argument would be necessary, but if you disagree, I will ask you to so indicate in the memorandum that you file.

Very well. Thank you very much. Is there anything further with respect to this matter at this time, Mr. Yanos or Mr. Rana?

MR. YANOS: Nothing from us, Your Honor. Thank you so much.

THE COURT: Thank you, Mr. Yanos.

Mr. Meehan, is there anything further on behalf of the defendant?

MR. MEEHAN: Nothing further from defendants. Thank

you, Your Honor.

THE COURT: Very well. Thank you very much. You may all be excused. Have a pleasant afternoon.

(Proceedings adjourned at 2:41:09 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF TRANSCRIBER

I, Sara A. Wick, certify that the foregoing is a true and correct transcript, to the best of my ability, from the audio-recorded proceedings in this matter.

/s/ Sara A. Wick December 14, 2019

SIGNATURE OF TRANSCRIBER DATE