## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **KOCH MINERALS SÀRL,** *et al.***,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 17-cv-2559-ZMF** |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, Koch Minerals Sàrl ("Koch Minerals") and Koch Nitrogen International Sàrl ("Koch Nitrogen"), filed this suit against Defendant, the Bolivarian Republic of Venezuela ("Venezuela"), seeking recognition of and judgment on an arbitral award issued by the International Centre for Settlement of Investment Disputes ("ICSID"). *See* ECF No. 7 (Am. Compl.), ¶¶ 1, 8. The clerk entered default after Venezuela did not appear more than a year after they received service. *See* ECF No. 21-1 (Pls.' Aff. for Default), ¶ 11; ECF No. 24 (Clerk's Entry of Default). Plaintiffs promptly moved for default judgment. *See* ECF No. 25. A few months later, Venezuela made its first appearance, filing a Motion to Set Aside the Entry of Default and to Dismiss. *See* ECF No. 30. The Court now grants Venezuela's Motion to Set Aside Default but denies its Motion to Dismiss. Having set aside default, the Court also denies Plaintiffs' Motion for Default Judgment as moot.

1

## I.      BACKGROUND

### A.      Factual Background

#### 1.      *Arbitration Dispute and Award*

The parties' dispute arose on October 10, 2010, when then-President of Venezuela, Hugo Chavez, took control of FertiNitro—a company in which both Plaintiffs, Koch Minerals and Koch Nitrogen, had financial interests.  *See* Am. Compl., ¶13; *id.*, Exh. 1 (Int'l Ctr. for Settlement of Investment Disputes Award), ¶¶ 5.1, 5.4 ("ICSID Award").  Plaintiffs claimed that, by taking control of FertiNitro, the Venezuelan government expropriated Koch Mineral's 25% equity interest in the company and interfered with an existing contract between the company and Koch Nitrogen.  *See id.*, ¶¶ 5.1, 5.4, 5.60.  Plaintiffs further claimed that they never received any compensation for the expropriation of FertiNitro's assets.  *See id.*, ¶¶ 5.4, 7.4, 7.5.

Attempting to resolve these disputes, Plaintiffs filed a request for arbitration under the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention").  *See id.*, ¶ 5.73.  That Convention created the ICSID to "provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States."  ICSID Convention, art. 1, Oct. 14, 1966, 17 U.S.T. 1270, 575 U.N.T.S. 159.  After completing arbitration, the ICSID found that Venezuela was liable and awarded Koch Minerals $140.25 million and Koch Nitrogen $184.8 million.  *See* ICSID Award, ¶¶ 10.3,12.3, 12.4.[1]

---

[1] The arbitrators later modified Koch Nitrogen's award, reducing it from $184.8 million to $166.7 million, *see* Am. Compl., Exh. 2 (ICSID Rectification Award), ¶ 74, prompting Plaintiffs to amend their complaint, *see* Am. Compl., ¶ 26.  The awards also included pre- and post-award interest and legal costs.  *See* ICSID Award, ¶¶ 12.3–12.8.

After the ICSID issued its decision, Plaintiffs filed this suit seeking to enforce the award under 22 U.S.C. § 1650a(a), which provides that,

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID C]onvention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.

If awarded a judgment by this Court, Plaintiffs plan to seek attachment to the only significant assets Venezuela has left in the United States. *See* ECF No. 39 (Pls.' Mot. for Status Conference), ¶¶ 2–7. Those assets consist of shares held by Petróleos de Venezuela ("PdVSA")—a Venezuelan-owned oil company—in a Delaware holding company—PDV Holding, Inc. ("PDVH"). *See id.* Those assets are currently the subject of ongoing litigation in the U.S. District Court for the District of Delaware. *See Crystallex Int'l Corp. v. PDV Holding Inc.*, No. 15-cv-1082, 2019 WL 6785504, at *1, 3 (D. Del. Dec. 12, 2019) (the "Delaware Litigation"). Several Venezuelan creditors are seeking to satisfy Venezuela's debts by auctioning off PdVSA's shares in PDVH. *See id.*

These assets, however, are subject to economic sanctions as part of the broader Venezuela Sanctions Regulations. *See* Exec. Order No. 13,850 § 1(a), 83 Fed. Reg. 55243 (Nov. 1, 2018) (blocking certain Venezuelan assets located in the United States); Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594. Under these sanctions, any creditor wishing to satisfy a debt owed to them by Venezuela must first obtain a license from the United States Treasury Department's Office of Foreign Asset Control ("OFAC"). *See* 31 C.F.R. § 591.407; *Crystallex Int'l Corp.*, 2019 WL 6785504, at *3.

After Plaintiffs filed this action but before making an appearance, Venezuela petitioned the ICSID to annul the Arbitration Award. *See* ECF No. 25 (Pls.' Mot. for Default J.), Exh. 3 (ICSID

3

Annulment Procedural Order No. 1), ¶ 1.  By applying to annul the award, Venezuela triggered an automatic, provisional stay that prevented the parties from enforcing the award until the annulment dispute was settled.  *See id.*, ¶ 3; ECF No. 43 (Joint Status Report, Nov. 6, 2020), Exh. 1 (ICSID Case Details) at 9; Def.'s Mot. Set Aside Default & MTD at 8.  That stay, however, was lifted on April 1, 2019, after Venezuela failed to post the required security.  *See* ICSID Annulment Procedural Order No. 1, ¶¶ 6, 8, 29, 32, 34.  Shortly after the stay was lifted, Plaintiffs moved for an entry of default and filed their motion for default judgment.  *See* Pls.' Aff. for Default; Pls.' Mot. Default. J.

The details surrounding the annulment petition are hazy.  To clear the air, the Court ordered the parties to file a joint report regarding the current status of the proceedings.  *See* Minute Order (Nov. 3, 2020).  Although the ICSID has issued several new procedural orders since lifting the stay in April 2019, neither party attached these orders to their joint report.  *See* Joint Status Report (Nov. 6, 2020); ICSID Case Details at 10.  In fact, Venezuela maintains that it has "no knowledge of the annulment proceedings" and claims that the illegitimate government—run by Nicolás Maduro—continues to represent Venezuela before the ICSID.  Joint Status Report (Nov. 6, 2020) at 2.  It appears that Venezuela posted the required security on October 14, 2019, *see* ICSID Case Details at 9; however, the parties have not explicitly stated whether the stay was reimplemented. *See* Joint Status Report (Nov. 6, 2020).  The annulment petition is now being briefed before a three-member ICSID panel.  *See id.* at 1.  A hearing is set for July 17–18, 2021.  *See id.*

2. *Political Restructuring in Venezuela*

As this litigation was unfolding, Venezuela was undergoing significant political restructuring.  On January 10, 2019, President Maduro's term ended, but he attempted to remain in power by claiming victory in a widely discredited 2018 election.  *See* U.S. Dep't of State, *2019*

*Country Reports on Human Rights Practices: Venezuela*, at 1, available at https://www.state.gov/wp-content/uploads/2020/03/VENEZUELA-2019-HUMAN-RIGHTS-REPORT.pdf.  Venezuela's National Assembly rejected the Maduro regime's attempt to stay in power.  *See id.*  On January 23, 2019, the Assembly named Juan Guaidó the interim president of Venezuela.  *See id.*  The United States has since recognized Interim President Guaidó.  *See* Press Release, The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela* (Jan. 23, 2019), available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/ ("Press Release Recognizing Guaidó").  Several months later the National Assembly passed a resolution appointing a new Attorney General and giving him the power to represent Venezuela in all pending lawsuits against it.  *See* ECF No. 30 (Def.'s Mot. to Set Aside Default and Mot. to Dismiss), Exh. 2 (Venezuela National Assembly Resolution, Mar. 19, 2019) at 3.  This Circuit has since ruled that officials of Maduro's regime cannot represent Venezuela in U.S. courts.  *See* Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044, Doc. No. 1785518 (D.C. Cir. May 1, 2019).  In this suit, counsel for Venezuela represents the Guaidó government.  *See* ECF No. 33 (Def.'s Reply) at 9.

    B.    <u>Procedural Background</u>

Plaintiffs filed their Complaint on November 28, 2017, *see* ECF No. 1, and their Amended Complaint on May 23, 2018, *see* Am. Compl.  Well over a year after Plaintiffs delivered the initial Complaint, Venezuela had yet to appear.  *See* Pls.' Aff. for Default, ¶¶ 5, 12.  Plaintiffs thus requested an entry of default, *see id.*, which the clerk entered on May 14, 2019, *see* Clerk's Entry of Default.  Plaintiffs moved for default judgment shortly thereafter.  *See* Pls.' Mot. for Default J.

Venezuela's hibernation ended just four days before the Court was to have a hearing on the motion. *See* Minute Order (Aug. 5, 2019).  In its first appearance, Venezuela contested the entry of default and moved to dismiss the suit.  *See id.*; Def.'s Mot. Set Aside Default & MTD.  In subsequent pleadings, it objected to magistrate judge jurisdiction.  *See* ECF No. 34 (Joint Status Report, Aug. 27, 2019) at 2.

    1.    *Service of Process*

After filing their complaint, Plaintiffs delivered signed USM–94 Forms[2]—including all of the required pages and two copies of the complaint and summons in both English and Spanish—via FedEx courier to Venezuela's Ministry of People's Power of Foreign Affairs Office of Consular Affairs ("Ministry of Foreign Affairs").[3]  See Pls.' Mot. Default J. at 12.  The Forms requested service upon the Ministry of Foreign Affairs itself.  *See id.* at 13; ECF No. 18 (Pls.' Status Report, Nov. 13, 2018), Exh. 1 (Pls.' USM–94 Forms, Jan. 11, 2018) at 2, 6.  FedEx delivered the documents on January 25, 2018, to the "Power for Foreign Affairs Ministry," and K. Ordones signed for the delivery.  Pls.' Status Report (Nov. 13, 2018), Exh. 2 (FedEx Proof-of-Delivery, Jan. 25, 2018).

---

[2] When serving a foreign defendant, plaintiffs must follow specific procedures, including using the United States Department of Justice's USM–94 Form, which:

> is a three-page document that conforms to the Hague [Service] Convention's standards for submitting service requests to a country's central authority. The first page lists the names and addresses of the applicant, defendant, and foreign receiving authority as well as the documents to be served attached to the USM–94 Form. The second page of the USM–94 Form is entitled "Certificate," and is submitted blank to the foreign agency. The third page of the USM–94 Form contains a summary of the documents to be served.

*Burda Media, Inc. v. Viertel*, 417 F.3d 292, 296 (2d Cir. 2005).

[3] Formally, the *Ministerio del Poder Popular para Relaciones Exteriores Oficina de Relaciones Consulares*.

Plaintiffs then filed their Amended Complaint on May 23, 2018.  *See* Am. Compl.  They again mailed USM–94 Forms, along with the pleadings and requisite translations, to the Venezuelan Ministry of Foreign Affairs.  *See* Pls.' Status Report (Nov. 13, 2018), Exh. 4 (Pls.' USM–94 Forms, June 1, 2018); Pls.' Mot. Default J., at 13 n.6.  Plaintiffs similarly delivered the Amended Complaint package by FedEx courier to the "Receptionist/Front Desk" at the "Ministry of Popular Power Consular Relations Office" where J. Ose Vera signed for it.  Pls.' Status Report (Nov. 13, 2018), Exh. 5 (FedEx Proof-of-Delivery, June 13, 2018).  Although Plaintiffs included the required blank certificate form, they have not yet received a return certificate from Venezuela's Ministry of Foreign Affairs.  *See* Pls.' Mot. Default J. at 13; Def.'s Mot. Set Aside Default & MTD at 2.

### 2.    *Referral to a Magistrate Judge*

After filing their Motion for Default Judgment, Plaintiffs consented to referring the case to a magistrate judge for "all proceedings," including entry of final judgment, in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  *See* ECF No. 27 (Pls.' Notice of Consent).  The case was thus directly reassigned to Magistrate Judge Robinson on May 31, 2019.  *See* ECF No. 28 (Order, May 31, 2019).

Two months later, and just four days before the scheduled evidentiary hearing on the motion for default judgment, Venezuela made its first appearance in the case.  *See* Def.'s Mot. Set Aside Default & MTD.  Venezuela's motion never mentioned any objection to magistrate judge jurisdiction.  *See id.*  Magistrate Judge Robinson then postponed the evidentiary hearing and ordered additional briefing.  *See* Minute Order (Aug. 5, 2019).  Her order noted that, although the case was originally before her for a report and recommendation, Plaintiffs had since "filed a notice and consent to proceed before this court for all purposes."  *Id.*  Plaintiffs promptly responded to

Venezuela's motion.  *See* ECF No. 32 (Pls.' Response).  On August 23, 2019, Venezuela filed its

reply, which, like its original motion, did not contest magistrate judge jurisdiction.  *See* Def.'s

Reply.

On August 27, 2019, the parties filed a joint status report stating that "[i]t is the position of

Venezuela that [its] motions should be decided by the district court judge and the case dismissed"

but that Plaintiffs disagreed.  Joint Status Report, Aug. 27, 2019 at 2.  In a supplemental brief,

Venezuela reiterated that "it do[es] not consent to referral of the case to the Magistrate Judge and

that the pending motions should be decided by the District Judge."  ECF No. 35 (Def.'s First Supp.

Brief) at 1 n.2.

This case was reassigned to the undersigned upon Magistrate Judge Robinson's retirement.

*See* Reassignment (entered Sept. 11, 2020).  After reassignment, Plaintiffs requested a status

conference.  *See* Pls.' Mot. for Status Conference at 1.  At the October 13, 2020, status conference,

the parties made arguments regarding magistrate judge jurisdiction, and the Court ordered further

briefing.  *See* Minute Order (Oct. 13, 2020); ECF No. 41 (Pls.' Second Supp. Brief); ECF No. 42

(Def.'s Second Supp. Brief).

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Venezuela moves to dismiss under Rules 12(b)(2) and 12(b)(5) of the Federal Rules of

Civil Procedure for lack of personal jurisdiction and insufficient service of process.  *See* Def.'s

Mot. Set Aside Default & MTD at 1.  "When a defendant moves to dismiss under Rule 12(b)(5),

the plaintiff has the burden of establishing the validity of service of process . . . "  *E.g.*, *Hardy v.*

*Joseph I. Sussman, P.C.*, 953 F. Supp. 2d 102, 107 (D.D.C. 2013) (quoting *Freedom Watch, Inc.*

*v. Org. of Petroleum Exporting Countries*, 288 F.R.D. 230, 231 (D.D.C. 2013)).  Similarly, when

moving to dismiss under Rule 12(b)(2), the "plaintiff bears the burden of establishing a prima facie case of personal jurisdiction by coming forward with specific and pertinent facts." *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 67 (D.D.C. 2017). As Venezuela's only ground for contesting personal jurisdiction under Rule 12(b)(2) is insufficient service of process, *see* Def.'s Mot. Set Aside Default & MTD at 9, the Rule 12 analysis merges.

  B. <u>Service of Process</u>

  The Foreign Sovereign Immunities Act ("FSIA") provides the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, courts have personal jurisdiction over a foreign state when the court has subject matter jurisdiction and "proper service has been effected." *Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) (citing 28 U.S.C. § 1330(b) and *I.T. Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003)). Federal Rule of Civil Procedure 4 governs service of process. *See Hardy*, 953 F. Supp. 2d at 107 (citing *Freedom Watch, Inc.*, 288 F.R.D. at 231). Rule 4(j)(1) prescribes that service on a foreign state shall be completed in accordance with the FSIA. *See Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054 (2019) (citing 28 U.S.C. § 1608(a); Fed. Rule Civ. P. 4(j)(1)). "When serving a foreign sovereign, 'strict adherence to the terms of 1608(a) is required.'" *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). Neither "substantial compliance, nor actual notice" suffices. *Id.* (quoting *Transaero, Inc.*, 30 F.3d at 154).

  Section 1608(a) "prescribes four methods of service—'in descending order of preference'—and a plaintiff 'must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on.'" *Angellino v. Royal Family Al-*

*Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)).   First, the plaintiff should attempt service "in accordance with any special arrangement . . . between the plaintiff and the foreign state."   28 U.S.C. § 1608(a)(1). If no such arrangement exists, the plaintiff must deliver the summons and complaint "in accordance with an applicable international convention on service of judicial documents." § 1608(a)(2).   If both of those methods fail, the plaintiff may have the clerk of court dispatch service "to the head of the ministry of foreign affairs of the foreign state."   § 1608(a)(3).   Finally, if all other attempts prove unfruitful, then the plaintiff may ask the clerk of court to send notice of suit to the Secretary of State, who will then serve the papers through diplomatic channels with the foreign state.   *See Jouanny v. Embassy of France*, 220 F. Supp. 3d 34, 38–39 (D.D.C. 2016) (citing § 1608(a)(4)) (describing all methods).   When the defendant is the foreign state itself—rather than a specific department or ministry—§ 1608(a) indicated that the plaintiff must serve the "head of the ministry of foreign affairs of the foreign state concerned."   §1608(a)(3).   The ministry of foreign affairs is "the department most likely to understand American procedure."   *Transaero, Inc*, 30 F.3d at 154.

C.   <u>Motion to Set Aside Default</u>

Federal Rule of Civil Procedure 55(c) allows courts to "set aside an entry of default for good cause."   The burden is on the moving party to demonstrate there is good cause, but the burden is lower than it would be if the party were challenging a default judgment under Rule 60(b).   *See Azamar v. Stern*, 275 F.R.D. 1, 4 (D.D.C. 2011).   Courts look to "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Mohamad v. Rajoub*, 634 F.3d 604, 606 (D.C. Cir. 2011) (quoting *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980)).   "No single factor is dispositive."   *Mohammad*

*Hilmi Nassif & Partners v. Republic of Iraq*, No. 17-cv-2193, 2020 WL 1444918, at *20 (D.D.C. Mar. 25, 2020) (citing *Africa Growth Corp. v. Republic of Angola*, No. 17-cv-2469, 2018 WL 6329453, at *6 (D.D.C. Dec. 3, 2018)). "When balancing these factors, 'all doubts are resolved in favor of the party seeking relief.'" *Acree v. Republic of Iraq*, 658 F. Supp. 2d 124, 127 (D.D.C. 2009) (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). "[W]hile a court has discretion to decide whether to set aside an entry of default, 'there is a strong policy favoring the adjudication of a case on its merits[.]'" *Acree*, 658 F. Supp. 2d at 127 (quoting *Strong–Fisher v. LaHood*, 611 F. Supp. 2d 49, 51 (D.D.C. 2009)). "These policies are heightened in cases involving foreign states, such that there is a 'strong presumption against the entry of default judgment against a foreign state that has appeared in the case and expressed a desire to contest the claims.'" *Mohammad Hilmi Nassif*, 2020 WL 1444918, at *20 (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005)).

## III.   ANALYSIS

### A.   Jurisdiction

#### 1.   *Service of Process*

The parties agree that only the second method of service provided for in § 1608(a)(2)—service by methods prescribed in a treaty—is at issue here. *See* Def.'s Mot. Set Aside Default & MTD at 5; Pls.' Response at 4.  The Hague Service Convention,[4] to which both the United States and Venezuela are parties, governs this dispute.  *See* Def.'s Mot. Set Aside Default & MTD at 5; *see also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988) ("[C]ompliance with the [Hague Service] Convention is mandatory in all cases to which it applies . . . .").

---

[4] Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, Feb. 10, 1969, 20 U.S.T. 361, T.I.A.S. No. 6638 ("Hague Service Convention").

The Hague Service Convention requires signatories to "designate a Central Authority" to receive and process service requests.  Hague Service Convention, art. 2.  Parties seeking to serve process within a signatory state are to send requests for service—including USM–94 Forms and translated copies of the complaint and summons—to the receiving state's Central Authority.  *See generally Burda Media, Inc.*, 417 F.3d at 296 (describing proper procedure for requesting service abroad under Hague Service Convention).  The Central Authority must then "serve the document or . . . arrange to have it served" on the party identified in the request for service.  Hague Service Convention, art. 5.  Venezuela has designated the Ministry of Foreign Affairs as its Central Authority.  *See* Hague Conference on Private International Law, Venezuela – Central Authority & practical information (Nov. 4, 2020), available at https://www.hcch.net/en/states/authorities/details3/?aid=280 ("Venezuela – Central Authority & practical information").

The Central Authority must respond to a request for service by completing a certificate that "state[s] that the document has been served and . . . include[s] the method, the place and the date of service and the person to whom the document was delivered."  Hague Service Convention, art 6.  "If the document has not been served, the certificate shall set out the reasons which have prevented service."  *Id.*  Service is deemed effective under § 1608(a)(2) "as of the date of receipt indicated in the certification, signed and returned postal receipt, *or* other proof of service applicable to the method of service employed."  28 U.S.C. § 1608(c)(2) (emphasis added).  A signed postal receipt is effective as of "the date shown on a document signed by the person who received it from the carrier . . . [because] the individuals who signed for the service packet could be trusted to ensure that [it] is handled properly and expeditiously."  *Harrison*, 139 S. Ct. at 1059.

Venezuela does not contend that Plaintiffs' service packet lacked the proper forms and documents.  *See* Def.'s Mot. Set Aside Default & MTD at 8.  Rather, Venezuela argues that service

12

was improper because: (a) the Central Authority never provided the required certificate under Article 6, *see id.* at 9–10, 12, (b) Plaintiffs' use of a FedEx courier constitutes improper service-by-mail under Article 10(a) of the Hague Service Convention, *see id.* at 12, and (c) Plaintiffs failed to serve the Guaidó government after the United States recognized it as the government of Venezuela in January 2019, *see* Def.'s Reply at 2–3.  Venezuela, however, fails on each point.

### a.    Certificate Requirement

Plaintiffs never received a service certificate from the Ministry of Foreign Affairs as required by Article 6 of the Hague Service Convention.  *See* Def.'s Mot. Set Aside Default & MTD at 12.  However, Article 15 provides two exceptions to the certificate requirement—one general exception and one specific to cases involving a defaulting party.

### i.    General Exception

Plaintiffs meet the requirements for the general exception, which provides that service without a return certificate may be proper if "the document was actually delivered to the defendant . . . in sufficient time to enable the defendant to defend."  Hague Service Convention, art. 15, ¶ 1(b).  The FSIA sheds light on what it means to "actually deliver[]" a document, stating that service is deemed effective "as of the date of receipt indicated in the . . . *signed and returned postal receipt.*"  28 U.S.C. § 1608(c)(2) (emphasis added); *see also Harrison*, 139 S. Ct. at 1059 (service occurred on the "date shown on a document signed by the person who received it from the carrier").

These provisions demonstrate that the certificate requirement should not be weaponized into a formalistic defense allowing states to thwart proper service on themselves.[5]  *See Mezerhane*

---

[5] A Central Authority does not have to effectuate service just because a party properly requests it to do so.  Indeed, a Central Authority may "refuse to comply therewith[, but] *only* if it deems that compliance would infringe its sovereignty or security."  Hague Service Convention, art. 13

*v. República Bolivariana De Venezuela*, No. 11-cv-23983, 2013 WL 12091160, at *3 (S.D. Fla. Mar. 19, 2013) (suggesting that states should not be permitted to "deliberately frustrat[e] the service of process");[6] *see also Burda Media, Inc.*, 417 F.3d at 301 ("It was certainly not [plaintiff's] fault that the [foreign] authorities did not return a formal Certificate [as required under Article 6].").  "'[S]ervice of process [is] properly perfected under the Hague [Service] Convention, notwithstanding the failure of the Central Authority to return a Certificate' when the plaintiff attempts in good faith to comply with the Hague [Service] Convention and the defendant had sufficient notice 'that no injustice would result.'"  *See Box v. Dallas Mexican Consulate Gen.*, 487 F. App'x 880, 886 (5th Cir. 2012) (quoting *Burda Media, Inc.*, 417 F.3d at 301)).

Venezuela has a documented history of playing a shell game: circumventing service by refusing to issue a certificate when the party to be served is the *same entity* that it has designated as its Central Authority.[7]  *See Crystallex Int'l Corp.*, 2019 WL 6785504, at * 11.  The *Crystallex*

---

(emphasis added).  Even so, "[t]he Central Authority shall, in case of refusal, *promptly inform the applicant* and state the reasons for the refusal."  *Id.* art. 13 (emphasis added).  The Ministry of Foreign Affairs has not communicated that it was invoking its right to refuse service under Article 13.  *See* Pls.' Aff. for Default at 4; Pls.' Mot. Default J. at 1; *see also Zhang v. Baidu.com Inc.*, 932 F. Supp. 2d 561, 565 (S.D.N.Y. 2013) (finding no direct service on China after its Central Authority provided return certificate under Article 6, but "expressly invoked Article 13 and refused to effect service pursuant to the Convention on the ground that doing so would 'infringe' its 'sovereignty or security'").

[6] *Mezerhane* involved an opposite response from the Venezuelan Central Authority, who attempted to comply with Article 6's requirements.  *See* 2013 WL 12091160, at *3.  The Venezuelan Central Authority there was not deliberately frustrating service of process given that it "respon[ded] to [the p]laintiff's inquiries regarding the status of service, and [it] actual[ly] execu[ted service]" upon a different defendant.  *Id.*  Moreover, the Venezuelan Central Authority there requested additional time to serve the remaining defendants, indicating that "the proper certification [was] likely forthcoming."  *Id.*  Contrast this with this case, where Plaintiffs received the silent treatment from the Venezuelan Central Authority.  *See* Def.'s Mot. Set Aside Default & MTD at 12.

[7] Other provisions of the FSIA contemplate that when the defendant is the foreign sovereign, service should be on the "head of the ministry of foreign affairs of the foreign state concerned," as compared to a specific department or ministry.  § 1608(a)(3); *see also Transaero, Inc*, 30 F.3d at 154 ("[S]ection 1608(a) mandates service of the Ministry of Foreign Affairs, the department most

plaintiff "couriered service papers" to Venezuela's Central Authority and, thus, effectively "served the Republic, notwithstanding the Republic's failure to provide [the plaintiff with] a certificate." *Id.*  The court concluded that such service satisfied the general exception of "*actual[] deliver[y] to the defendant*." *Id.*  To find otherwise would "permit a foreign sovereign to feign non-service by its own failure to complete and return the required certificate." *Id.*; *see also Box*, 487 F. App'x at 886 (noting that a certificate confirming service is less important when the defendant is "the foreign government itself").

The same conclusion is called for here.[8]  Plaintiffs sent the completed USM–94 Forms to the Ministry of Foreign Affairs as the Central Authority and the party to be served.  *See* Pls.' USM–

---

likely to understand American procedure.").  Venezuela elected to house its Central Authority within its Ministry of Foreign Affairs.  *See* Venezuela – Central Authority & practical information.

[8] Venezuela's efforts to invoke the United States' policy statements regarding how to effectuate service on the United States via its Central Authority are inapposite here.  The United States has created an office within the Department of Justice—the Office of International Judicial Assistance (the "OIJA")—to serve as its Central Authority.  *See* U.S. Dep't of Justice, *Service of Judicial Documents on the United States Government Pursuant to the Hague Service Convention* at 1 (Jan. 12, 2018), available at https://www.justice.gov/civil/page/file/1036571/download.  The United States' guidance on international service states:

> The U.S. Central Authority receives and executes requests for service on the U.S. Government, but the Central Authority is not the legal representative or agent of the U.S. Government.  Therefore, pursuant to Article 5 of the Hague Service Convention, receipt of a request for service from a foreign court by the U.S. Central Authority is not effective service.  Service is *only complete upon receipt of the documents by the appropriate U.S. Government office or agency.*

*Id.* at 2 (emphasis added).  Such guidance might have been relevant if Plaintiffs were, say, attempting service on Venezuela's Ministry of Defense.  In that case, transmission of the documents to the Ministry of Foreign Affairs would not suffice, just as a request to serve the U.S. Department of Treasury would not be effected by mailing litigation documents to the OIJA, as it is not an agent of the Department to be served.  But here, Plaintiffs were requesting service *upon the Ministry of Foreign Affairs itself*.  *See* Pls.' USM–94 Forms (Jan. 11, 2018) at 1 (listing exact same address for receiving authority—*i.e.* Central Authority—and party to be served).  In the United States, such a situation would only arise if a litigant was attempting service *on the OIJA itself*.  The United States' guidance thus addresses a different set of circumstances entirely.

94 Forms (Jan. 11, 2018) at 1.  When K. Ordones and J. Ose Vera signed for the service documents,

they accepted the documents *both* as representatives of the Central Authority *and* as employees of

the Defendant entity itself, as service was on the Ministry of Foreign Affairs as representative of

Venezuela.  *See* FedEx Proof-of-Delivery (Jan. 28, 2018); FedEx Proof-of-Delivery (June 13,

2018); *see also Devengoechea v. Bolivarian Republic of Venezuela*, No. 12-cv-23743, 2014 WL

12489848, at *1 (S.D. Fla. Apr. 25, 2014) ("Service was effectuated on Venezuela, through its

Central Authority under the Hague Convention, . . . when it received the Summons, Complaint

and transmittal documents.").

### ii.    Specific Defaulting Exception

Plaintiffs also meet the requirements for the specific exception which provides that a court

may enter judgment against a defaulting party "even if no certificate of service or delivery has

been received."  Hague Service Convention, art. 15, ¶ 2.  This exception has three conditions:

(i) the documents were "transmitted" via a method provided for in the Hague Service Convention,

(ii) a period of time—not less than six months—considered "adequate" by the judge has passed

since document transmission, and (iii) "no certificate of any kind has been received, even though

every reasonable effort has been made to obtain it through the competent authorities of the State

addressed."  *Id.*

Here, Plaintiffs "transmitted" their service documents via FedEx courier to the Venezuelan

Central Authority.  *See* FedEx Proof-of-Delivery (Jan. 25, 2018).  The Hague Service Convention

provides for this method of service.  *See Marschhauser v. Travelers Indemity Co.*, 145 F.R.D. 605,

607, 609 (S.D. Fla. 1992) (finding the use of FedEx to send documents to a foreign state's Central

Authority proper).  A more than "adequate" period of over fifteen months passed between the time

Plaintiffs first delivered the documents and Plaintiffs' Motion for Default Judgment.  *See* FedEx

Proof-of-Delivery (Jan. 28, 2018); Pls.' Mot. Default J; *see also Marschhauser*, 145 F.R.D. at 609 (finding "nearly nine months" an adequate amount of time).  "Finally, the Court [is] certain that no certificate of any kind has been received by the applicant," *Marschhauser*, 145 F.R.D. at 609, as Venezuela has admitted that "Koch has not yet obtained [a] certificate of service," Def.'s Mot. Set Aside Default & MTD at 12.  Transmitting a second certificate with the amended complaint, which was unnecessary to send, *see Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 94, 96 n.4 (D.D.C. 2011), sufficiently demonstrates that Plaintiffs made every reasonable follow-up effort.  *See* Pls.' Mot. Default J. at 13 n.6.  Because all three requirements are met here, Plaintiffs do not need a certificate to proceed with this litigation.

b.     Service by Mail

Venezuela next contends that Plaintiffs' use of a FedEx courier was improper.  *See* Def.'s Mot. Set Aside Default & MTD at 12.  Although Articles 2 through 6 of the Hague Convention establish Central Authorities as the primary method of service on a foreign party, Article 10 also allows for service by alternative means, such as service "by postal channels, *directly* to persons abroad" "[p]rovided the State of destination does not object."  Hague Service Convention, art. 10(a) (emphasis added).  Venezuela, however, objects to direct service upon parties by mail.  *See* Venezuela – Central Authority & practical information.

But service-by-mail under Article 10(a) is merely an alternative method of service, should the plaintiff elect not to—or improperly—serve a party through the Central Authority.  *See Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017) (listing Article 10 service-by-mail as one of several "additional methods" of service approved by the Hague Service Convention *other than* the most common method—service through a Central Authority); *Marschhauser*, 145 F.R.D. at 609 ("Article 10 only provides for alternative means of service and for the sending of documents, and

it has no bearing on Articles 3–6, which prescribe the normal method of service under the Convention.").  Plaintiffs thus correctly conclude that "Article 10(a)'s service-by-mail provision does not apply to service on a State, through its Central Authority; it applies only to instances where a plaintiff serves a third-party directly, cutting out the Central Authority."  Pls.' Response at 11.

The authorities Venezuela cites illustrate this point, as they involve instances where the parties turned to Article 10(a)'s service-by-mail provision after service through the Central Authority failed, *see Zhang*, 932 F. Supp. 2d at 565, 567 (finding FedEx service to Central Authority insufficient to overcome China's refusal to serve documents under Article 13 when China also objected to direct service-by-mail under Article 10(a)), or where there was no indication that the party attempted service through the Central Authority at all, *see Willamette Green Innovation Ctr., LLC v. Quartis Capital Partners*, No. 13-cv-848, 2014 WL 5281039, at *3 (N.D. Cal. Jan. 21, 2014) (finding FedEx service shipped directly to defendant in Netherlands was proper as the Netherlands did not object to Article 10(a)'s service-by-mail provision, but never mentioning any attempt to serve defendant through Central Authority); *United States ex rel. Walterspiel v. Bayer AG*, 639 F. App'x 164, 167 (4th  Cir. 2016) (concluding service improper when plaintiff mailed documents directly to defendant because "Germany has objected to Article 10(a), and has [rather] established Central Authorities to execute requests for international service").

Undercutting its own position, Venezuela also relies on a case where FedEx courier service on a Central Authority was deemed a sufficient method of transmission under Article 15 when a certificate was lacking.  *See Marschhauser*, 145 F.R.D. at 607, 609 (finding plaintiffs properly "transmit[ted]" service under Hague Service Convention by using FedEx to send documents to

Venezuelan Central Authority); *see also Crystallex Int'l Corp.*, 2019 WL 6785504, at *11 (finding proper service on Venezuelan Ministry of Foreign Affairs under Article 15 when service papers "couriered" to Central Authority).   Because Plaintiffs' service documents were "actually delivered" to the Central Authority under Articles 2, 5, and 15, that service was not *alternative* mail service running afoul of Article 10(a).

c. Service on New Regime

Finally, Venezuela argues that Plaintiffs' "steps to complete service through Venezuela's central authority at the Maduro-controlled Ministry of Foreign Affairs in Caracas are meaningless as a matter of U.S. foreign relations law."  Def.'s Reply at 9.  While true that the United States recognizes Juan Guaidó as the interim President of Venezuela, Guaidó's government only came to power *in January 2019*.  *See* Press Release Recognizing Guaidó.But Plaintiffs delivered their service documents in *January and June 2018*, which were months before the regime change and over a year before Venezuela appeared to contest service.  *See* FedEx Proof-of-Delivery (Jan. 28, 2018); FedEx Proof-of-Delivery (June 1, 2018).   Venezuela's argument ignores the linear nature of time.

In arguing that Plaintiffs should have re-served the documents on the Guaidó government, or should have initially served them on that then non-existent government, Venezuela relies on a D.C. Circuit order which held that the Maduro government does not have standing to represent Venezuela in United States courts.  *See* Def.'s Reply at 9–10; Order, *Rusoro Mining Ltd.*,No. 18-7044.  However, *Rusoro* simply clarifies that the Maduro regime lost the authority to defend that lawsuit in January 2019, when that responsibility shifted to the Guaidó government.  *See* Order, *Rusoro Mining Ltd.*, No. 18-7044 at 1; *see also* Restatement (Third) of Foreign Relations Law § 208 cmt. a (Am. Law Inst. 1987) ("Under international law, the capacities, rights, and duties [of

19

a state] appertain to the state, [and t]hey are not affected by a mere change in the regime or in the form of government or its ideology."). Venezuela is represented here by the Guaidó government, thus satisfying *Rusoro*. *See* Order, *Rusoro Mining Ltd.*, No. 18-7044 at 1 ("[T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it . . . .") (quoting *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938)). To find otherwise would create the absurd result that every lawsuit against a foreign sovereign would have to restart with regime change. That would be a waste of judicial resources and ignores that when a party serves a foreign sovereign, it serves the state, not the momentary steward at its helm. *See id.*

2. *Magistrate Judge All Purpose Jurisdiction*

a. Source of Magistrate Judge Jurisdiction

Under the Federal Magistrate Act of 1979 ("the Act"), magistrate judges may "conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specifically designated to exercise such jurisdiction by the district court . . . he serves." 28 U.S.C. § 636(c)(1). In such cases, magistrate judges maintain "full authority over dispositive motions, conduct of trial, and entry of final judgment." *Roell v. Withrow*, 538 U.S. 580, 585 (2003). The Act was meant to "relieve the district courts' 'mounting queue of civil cases' and thereby 'improve access to the courts for all groups.'" *Id.* at 588 (quoting S. Rep. No. 96-74, at 4 (1979)). "However, to preserve the litigant's right to be heard by an Article III judge, the Act requires that magistrate judges only exercise such powers when acting 'upon the consent of the parties.'" *Baker*, 810 F. Supp. 2d at 98 (quoting *Roell*, 538 U.S. at 585). Consent may be explicit or implied. *See Roell*, 538 U.S. at 590.

The Act and the Federal Rules of Civil Procedure dictate the procedural requirements of a § 636(c)(1) referral (or "all purposes" referral).  *See* 28 U.S.C. § 636(c)(2) (outlining how the option of consent must be communicated); Fed. R. Civ. P. 73(b) (requiring parties to file signed consent forms with clerk's office before referring to magistrate judge).  Implied consent satisfies § 636(c) when (a) the party was "made aware of the need for consent and the right to refuse it," and (b) the party "still voluntarily appeared to try the case before the Magistrate Judge."  *Roell*, 538 U.S. at 590.  Implied consent extends to default proceedings, so long as the defaulting party was "on notice regarding the proceedings" and was properly served with process. *Baker*, 810 F. Supp. 2d at 98; *see also Patino v. Brady Parking, Inc.*, No. 11-cv-3080, 2017 WL 5198192, at *6 n.12 (S.D.N.Y. Oct. 31, 2017) (citing *Baker* for proposition that "parties in default, who are on notice regarding the proceedings, impliedly consent to a magistrate judge's jurisdiction"); *Travelers Casualty & Surety Co. of Am. v. Gold, Scollar, Moshan, PLLC*, No. 14-cv-10106, 2018 WL 1508573, at *1 n.1 (S.D.N.Y. Mar. 14, 2018) (same).

### b.   Implied Consent

#### i.   Notice to Defaulting Party

*Baker* is instructive here.  *See* 810 F. Supp. 2d at 95–96.  There, the district judge entered default against Syria because it failed to appear after being properly served.  *See id.* at 94.  Upon consent of the appearing parties, the district judge referred the case to a magistrate judge for all purposes.  *See id.*  The magistrate judge proceeded with an evidentiary hearing and entered default judgment.  *See id.*  Syria subsequently appeared and contested the default judgment on several grounds, including improper service of process and lack of magistrate judge all-purpose jurisdiction.  *See id.* at 95.  The magistrate judge first concluded that the plaintiffs properly served Syria.  *See id.* at 96 n.4, 98.  Because service was proper, Syria necessarily had notice of the suit

and thus, of its need to consent to magistrate judge jurisdiction.  *See id.* at 98.  Yet, Syria still failed to appear in a timely fashion, and thus had impliedly consented to magistrate judge jurisdiction. *See id.* at 99.

Likewise, Plaintiffs properly served Venezuela.  *See supra* Pt. III.A.1.  Not only did Venezuela receive direct notice of this suit twice over, *see id.*, but it also had constructive notice from the media attention the instant action garnered.  *See generally* Luis Alonso Lugo, *Koch brothers sue Venezuela to collect $409 million*, AP News, Dec. 1, 2017, available at https://apnews.com/article/be062587402945be9b59138b27f08d16.    Proper service and the resulting media attention necessarily put Venezuela on notice of the need to consent and right to refuse magistrate judge jurisdiction.  *See Baker*, 810 F. Supp. 2d at 98; *Patino*, 2017 WL 5198192, at *6 n.12.

The consent analysis could stop here, however, Venezuela's initial actions in the litigation further buttress a finding of implied consent.  After entry of default, Venezuela "voluntarily appeared" before Magistrate Judge Robinson by filing its motion to set aside default.  *See generally* Def.'s Mot. Set Aside Default & MTD.  In over 25 pages of briefing, Venezuela failed to even hint at its opposition to magistrate judge jurisdiction.  *See id.*  In a subsequent minute order, Magistrate Judge Robinson expressly noted that Plaintiffs had "filed a notice and consent to proceed before this court for all purposes."  Minute Order (Aug. 5, 2019).  Even after this explicit jurisdictional declaration, Venezuela still failed to contest magistrate judge jurisdiction in its reply brief.  *See generally* Def.'s Reply.

"[Venezuela's] general appearances before the Magistrate Judge . . . supply the consent necessary for the Magistrate Judge's 'civil jurisdiction' under § 636(c)(1)."  *Roell*, 538 U.S. at 591*; see also Heft v. Moore*, 351 F.3d 278, 281 (7th Cir. 2003) (finding parties "voluntarily

consented to proceed before a magistrate judge" when they "entered general appearances before the magistrate and participated in hearings before the magistrate").  Venezuela's objection to magistrate judge jurisdiction in a subsequent Joint Status Report cannot undo its unexplained failure to contest such jurisdiction from jump street, let alone after Magistrate Judge Robinson flagged the issue.  *See* Joint Status Report (Aug. 27, 2019).  Once implied consent was triggered (as early as effective service, but no later than Venezuela's reply brief), the only vehicle for returning to a district judge is under 28 U.S.C. § 636(c)(4).  That Section provides that magistrate judge jurisdiction may only be vacated on a showing of "extraordinary circumstances" by Venezuela or "good cause" by the court.  § 636(c)(4).  The party seeking to vacate magistrate judge jurisdiction bears a heavy burden, and "[c]ourts have not been receptive to the argument that extraordinary circumstances justif[y] withdrawal of [a] case."  *Manion v. Am. Airlines, Inc.*, 251 F. Supp. 2d 171, 173 (D.D.C. 2003) (quoting 12 Charles A. Wright et al., Federal Practice & Procedure: Civil § 3071.3).[9]  Venezuela never suggested that such circumstances existed here.

Venezuela's reliance on *Henry v. Tri-Services, Inc.*, 33 F.3d 931 (8th Cir. 1994), is misplaced for three reasons.  There, the court held that a defaulting party does not "waive its right to have judgment entered . . . by an Article III judge."  *Id.* at 933.  First, that case pre-dates both *Roell* and this court's decision in *Baker*.  Second, the *Henry* court's decision was based on the plaintiff's failure to properly serve the defendant, who thus had no notice of the action.  *See id.* at 932, 932 n.1 (noting that plaintiffs merely "attempted" to serve the defendant and that the

---

[9] In *Manion*, the court emphasized the narrow circumstances that might justify a finding of "extraordinary circumstances" stating that "[t]he legislative history of § 636(c)(4) suggests that the District Court's power to vacate a referral to a Magistrate Judge should be exercised only 'where it is appropriate to have the trial before an article III judicial officer because of the extraordinary questions of law at issue and judicial decision making is likely to have wide precedential importance.'"  251 F. Supp. 2d at 173 (quoting Wright et al., *supra*, § 3071.3).

defendant did not receive actual notice).  As noted in *Baker*, *Henry* is easily distinguished where, as here, there is proper service because that is the underpinning of the *Roell* Court's finding of implied consent.  *See* 810 F. Supp. 2d at 98.  Finally, *Henry* contradicts the common practices of this jurisdiction.  *See Radmanesh v. Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *1 n.1 (D.D.C. Apr. 24, 2019) (applying *Roell* and *Baker* to conclude that "a party's default effect[s] consent to a magistrate judge's jurisdiction to decide a motion for default judgment").

ii.     Equitable Considerations

Implied consent is framed by equitable considerations.  *See Roell*, 538 U.S. at 588–89. Implied consent "checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority." *Id.* at 590.  Such gamesmanship is particularly disfavored when a defendant has "chosen default as [a] litigation strategy," *Baker*, 810 F. Supp. 2d at 95, especially if that defendant has opted for a similar strategy in other cases, *see id.* at 95, 99 ("[D]efault judgment further serves as a deterrent to parties 'who choose delay as part of their litigative strategy.'" (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970))).  In *Baker*, Syria elected to "sit back and wait" until after the court held an evidentiary hearing and issued an unfavorable default judgment order.  *Id.* at 98.  The court reprimanded this approach indicating it was "the gamesmanship that the Supreme Court condemned in *Roell*." *Id.*

Venezuela is running a play right out of Syria's playbook.  Venezuela failed to appear in several contemporaneous cases pending in U.S. courts, resulting in entries of default.  *See, e.g.*, *Tidewater Investment SRL v. Bolivarian Republic of Venezuela*, No. 17-cv-1457, 2018 WL 6605633, at *1 (D.D.C. Dec. 17, 2018) (entering default judgment against Venezuela and enforcing ICSID Convention arbitral award); *Wendell v. Bolivarian Republic of Venezuela*, No.

16-cv-11649, 2017 WL 5198375, at *1 (D. Mass. May 8, 2017) (noting default entered against Venezuela on January 17, 2017); *Devengoechea v. Bolivarian Republic of Venezuela*, No. 12-cv-23743, 2016 WL 4370067, at *1 (S.D. Fla. July 5, 2016) (appearing only after default judgment entered).  Even though Venezuela is not a "totally unresponsive party"[10] in this case, it has still exhibited a pattern of willful default, thus invoking the same concerns that led the court in *Baker* to conclude that implying consent was equitable.  *See Baker*, 810 F. Supp. 2d at 98; *see also Africa Growth Corp.*, 2018 WL 6329453, at *5 (noting that mere passage of time is enough to indicate that default was willful or strategic).

B.      Good Cause to Set Aside Default

Turning to the factors for setting aside an entry of default, the Court will apply the *Keegel* factors in seriatim.[11]

1.      *Willfulness*

The willfulness of a party's default is measured on a spectrum; on one end are "case[s] involving a negligent filing error, which is normally considered an excusable failure to respond," and on the other end is "a deliberate decision to default, which is generally not excusable." *Farmer v. Am. Fed. of Gov't Emps.*, No. 19-cv-1631, 2020 WL 2800680, at * 3 (D.D.C. May 29, 2020) (quoting *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 26 (D.D.C. 2003)).  Mere passage of time is enough to indicate that a default

---

[10] Syria did not appear in *Baker* until after the entry of default judgment, rendering it a "totally unresponsive party" that "default judgments were designed to handle." *Id.* at 95 (quoting *Jackson*, 636 F.2d at 836). Here, Venezuela appeared slightly earlier, to wit, four days before the court set a hearing on Plaintiffs' Motion for Default Judgment. *See* Def.'s Mot. Set Aside Default & MTD.

[11] Venezuela argues that the Court need not reach these factors as an "entry of default is void *ab initio* for ineffective service of process and lack of personal jurisdiction." Def.'s Mot. Set Aside Default & MTD at 16. But, as discussed above, Venezuela was properly served, and the Court has personal jurisdiction under the FSIA. *See supra* Pt. III.A.1. The Court must therefore go on to consider whether the *Keegel* factors otherwise support setting aside default.

was willful.  *See Africa Growth*, 2018 WL 6329453, at *5 (finding defendant's default was willful given "the simple fact [that] eight months lapsed" between date defendant was served and their appearance).

As Venezuela was properly served, and over eighteen months passed before it appeared, its default was presumptively willful.  Venezuela's only response is a replay of its already dispatched service argument.  *See* Def.'s Mot. Set Aside Default & MTD at 17; Def.'s Reply at 10–11.  But, "[e]ven when a default is willful, a district court does not necessarily abuse its discretion by vacating a default when the asserted defense is meritorious and the district court took steps to mitigate any prejudice to the non-defaulting party." *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 966 (D.C. Cir. 2016) (citing *Whelan v. Abell*, 48 F.3d 1247, 1258–59 (D.C. Cir. 1995)).

2.     *Prejudice*

Plaintiffs' prejudice arguments rest almost entirely on harm caused by delay, yet "[d]elay in and of itself does not constitute prejudice."  *Acree*, 658 F. Supp. 2d at 128 (quoting *Capital Yacht Club v. Vessel AVIVA*, 228 F.R.D. 389, 393–94 (D.D.C. 2005)).  Rather, the question is whether that delay presents any "accompanying dangers" such as "loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *Id.* at 129 (quoting *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003)).  However, there is a limiting principle that, "*unnecessarily* drawing out proceedings 'unfairly prejudices [a] plaintiff to some degree.'"  *Konoike Constr. Co. v. Ministry of Works, Tanzania*, No. 17-cv-1986, 2019 WL 1082337, at *3 (D.D.C. Mar. 7, 2019) (quoting *Int'l Painters*, 288 F. Supp. 2d at 31).

Delays must be considered against the backdrop that "[l]itigation on actions to enforce [ICSID arbitral] awards need not be protracted."  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic*

*of Venezuela*, 863 F.3d 96, 117 (2d Cir. 2017).  Such proceedings "are 'summary . . . in nature' and 'not intended to involve complex factual determinations.'"  *Konoike Constr. Co.*, 2019 WL 1082337, at *3 (quoting *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)) (enforcing similar arbitral award issued under an international treaty against a foreign sovereign).  "The ICSID award-debtor would be a party to the action and would be able to challenge the United States court's jurisdiction to enforce the award—for instance, on venue grounds—but would not be permitted to make substantive challenges to the award."  *Mobile Cerro Negro, Ltd.*, 863 F.3d at 118; *see also Tidewater Investment SRL*, 2018 WL 6605633 at *6 (same).

### i.   Service Delays

Venezuela is stuck on repeat and contends that any litigation delays occurred because of improper service.  *See* Def.'s Mot. Set Aside Default & MTD at 17.  This argument again fails.  *See supra* Pt. III.A.1.  The Court turns next to Plaintiffs' arguments.

### ii.   Intentional Delay

The timing of Venezuela's initial appearance reveals its intention to delay this litigation.  After more than a year of dormancy, Venezuela appeared on the eve of the default judgment hearing, which thwarted an otherwise orderly conclusion to the matter.  *See* Minute Order (Aug. 5, 2019).  Yet, that prejudice is diminished because the Court had not yet entered default judgment, nor had Plaintiffs "expended any significant efforts to satisfy their burden of proof for default judgment" at a hearing.  *Acree*, 658 F. Supp. 2d at 129; *see also Owens*, 374 F. Supp. 2d at 9 (noting that plaintiffs were "not prejudiced in any significant way" because "defendants appeared well before any . . . final judgment").  This factor weighs in favor of setting aside default.

iii.     Impact on Collection

Plaintiffs next argue that any delay prejudices their collection efforts against Venezuela's primary remaining asset in the United States, PdVSA's shares in PDVH.  *See* Pls.' Mot. for Status Conference, ¶¶ 2, 3, 7; ECF No. 38 (Dec. 20, 2019, Oral Arg. Tr.) at 27:21–28:11.  Other creditors are already litigating how to dissect PdVSA's shares in PDVH.  *See Crystallex Int'l Corp.*, 2019 WL 6785504, at *1–2 (the "Delaware Litigation").

To understand Plaintiffs' sense of urgency, some background on the Delaware Litigation is necessary.  In August 2018, the Delaware district court ruled that PdVSA was the "alter-ego" of the Venezuelan government—and therefore PdVSA's shares in PDVH could be used to satisfy judgments against Venezuela.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 406 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020).  On September 17, 2020, the court held a hearing to determine the procedures for a possible sale of PDVSA's assets.  *See* Oral Order, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-mc-151 (Aug. 4, 2020); *id.*, Tr. from Oral Arg. (Sept. 17, 2020).  Plaintiffs cannot intervene in the Delaware Litigation until they obtain a final judgment from this Court.  *See* Dec. 20, 2019 Oral Arg. Tr. at 27:21–28:11; Pls.' First Supp Brief at 3–4.

"[T]he standard [for prejudice] is whether [the plaintiff's] ability to pursue his claim will be hindered."  *Farmer*, 2020 WL 2800680, at *3 (quoting *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 701 (9th Cir. 2001)).  The Delaware Litigation is not yet in the ninth inning.  Several plaintiffs there are having to "re-establish the alter ego determination . . . in light of [Venezuela's] change in government."  ECF No. 44 (Oct. 13, 2020, Oral Arg. Tr.) at 9:9–15; *see also Crystallex Int'l Corp.*, 2019 WL 6785504, at *7 ("The question of whether PDVSA can, *under the present circumstances*, be deemed an alter ego of [Venezuela] is not identical to the issue decided in the

[August 2018 opinion] . . . ." (emphasis added)).  Moreover, recovery there may be delayed as the parties sort out whether they need an OFAC license prior to obtaining a judgment.  *See* 31 C.F.R. § 591.407; *Crystallex Int'l Corp.*, 2019 WL 6785504, at *3.  In order to preclude Venezuela from running out the clock here and thereby preventing Plaintiffs from making it to Delaware in time,[12] this Court will order expedited briefing of the remaining issues.  *See* ECF No. 45 (Accompanying Order, Dec. 23, 2020).

The slow pace of federal litigation is an endemic problem.  Moreover, "the impact of [delays caused by] the global pandemic on civil litigation over the past six months cannot be understated."  *Faulkner v. Aero Fulfillment Servs.*, No. 19-cv-268, 2020 WL 6261698, at *1 (S.D. Ohio Oct. 23, 2020).  Plaintiffs fail to demonstrate how delay here will *uniquely* cause loss of evidence, unnecessary or challenging discovery, or an enhanced risk of fraud.  *See Acree*, 658 F. Supp. 2d at 129 (quoting *KPS & Assocs., Inc.*, 318 F.3d at 15).  Without such a showing, this factor weighs in favor of setting aside default.

       3.    *Meritorious Defense*

This factor is a "modest requirement," *Gilmore*, 843 F.3d at 966, that "is not a high bar," *Marino v. Drug Enforcement Admin.*, 685 F.3d 1076, 1080 (D.C. Cir. 2012).  A defense is "meritorious if [it] contain[s] even a hint of a suggestion which, proven at trial, would constitute a complete defense."  *Gilmore*, 843 F.3d at 966 (quoting *Keegel*, 627 F.2d at 375).  "[T]he movant is not required to prove a defense, but only to assert a defense that it may prove at trial."  *Whelan*, 48 F.3d at 1259.  "Likelihood of success is not the measure."  *Keegel*, 627 F.2d at 374.  Regardless

---

[12] Although one can only assume the nature of Venezuela's underlying litigation strategy, the Court is not ignorant to the fact that counsel for Venezuela in this matter also represents PdVSA in the Delaware Litigation.  *See Crystallex Int'l Corp.*, 2019 WL 6785504.

of the other two factors, the court may set aside the entry of default if there is a meritorious defense. *See id.* (citing *Whelan*, 48 F.3d at 1258–59)).

Unsurprisingly, Venezuela recycles improper service of process and a related lack of personal jurisdiction as its primary defense. *See* Def.'s Mot. Set Aside Default & MTD at 16–17. Having two strikes against it on this point, Venezuela has now struck out on its third attempt. However, Venezuela raises two other arguments, the latter of which is a walk-off home run.

a.      Venezuela Sanctions Regulations

First, Venezuela argues that recent amendments to the Venezuela Sanctions Regulations, 31 C.F.R. § 591, bar this court from issuing any judgment in favor of Plaintiffs. *See* Def.'s First Supp. Brief at 5.[13]

The International Emergency Economic Powers Act ("IEEPA") allows the President to "regulate, . . . nullify, void, prevent or prohibit, any acquisition, . . . use, transfer, . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country . . . has any interest." 50 U.S.C. § 1702(a)(1)(B). The President may take such action to "deal with any unusual and extraordinary [foreign] threat . . . to the national security, foreign policy, or economy of the United States." § 1701(a). In 2015, President Obama declared a national emergency under § 1701(a) as the political situation in Venezuela escalated. *See* Exec. Order No. 13,692, 80 Fed. Reg. 12747 (Mar. 8, 2015). President Trump has since issued additional executive orders addressing the situation in Venezuela. *See generally* U.S. Dep't

---

[13] The Venezuelan Sanctions Regulations are made up of a web of legal authorities including executive orders, statutes, and OFAC regulations. *See* Exec. Order No. 13,884 (Aug. 5, 2019), 84 Fed. Reg. 38843; Exec. Order No. 13,857 (Jan. 25, 2019), 84 Fed. Reg. 509; Exec. Order No. 13,850 (Nov. 1, 2018), 83 Fed. Reg. 55243; 31 C.F.R. § 591; *see also generally* U.S. Dep't Treasury, *Venezuela-Related Sanctions*, available at https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/venezuela-related-sanctions (last visited Nov. 11, 2020).

Treasury, *Venezuela-Related Sanctions*, available at https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/venezuela-related-sanctions.  In response, the Department of Treasury issued the Venezuela Sanctions Regulations, *see* 31 C.F.R. § 591, which it amended in 2019 to incorporate subsequent executive orders.  *See* 84 Fed. Reg. 64415-02, *codified at* 30 C.F.R. § 591.

The amendments govern "[s]ettlement agreements and enforcement of certain orders through judicial process."  31 C.F.R. § 591.407.  "[T]he entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property . . . is prohibited unless authorized pursuant to a specific license issued by OFAC . . . ."  *Id.*  Assets held by PdVSA are blocked under these sanctions.  *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, (Jan. 28, 2019), available at https://home.treasury.gov/news/press-releases/sm594.

OFAC has since issued guidance concerning the amended sanctions regulations.  *See* U.S. Dep't of Treasury, *OFAC Frequently Asked Questions – Venezuela Sanctions*, available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/1581 ("FAQ").  A FAQ issued on December 9, 2019, addressed the following question:

> [Q]: Do I need a specific license from OFAC to file a suit in U.S. court against a person designated or blocked pursuant to Venezuela-related sanctions? Does a U.S. court, or its personnel, need a specific license from OFAC to hear such a case?
>
> [A]: No.  A specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case.  However, a specific license from OFAC is required for the entry into a settlement agreement or the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to the

Venezuela Sanctions Regulations . . . .   This includes the purported creation or perfection of any legal or equitable interests (including contingent or inchoate interests) in blocked property.   While terminology may vary in different jurisdictions and proceedings, a specific license from OFAC would be required for measures such as:

- Taking Possession (Actual or Constructive)
- Seizing
- Levying Upon
- Attaching
- Encumbering
- Pledging
- Conveying
- Selling (Final or Contingent)
- Freezing
- Assuming or Maintaining Custody [or]
- Sequestering

*Id.* (FAQ No. 808).

Venezuela argues that sanctions bar this Court from enforcing the arbitration award until Plaintiffs obtain an OFAC license.  *See* Def.'s First Supp. Brief at 5.  Plaintiffs acknowledge that they have not applied for, or obtained, an OFAC license.  *See* Pls.' First Supp. Brief at 4.  But, Plaintiffs are "only seek[ing] an order converting their ICSID Award into a judgment of this Court [under 22 U.S.C. § 1650a]."  *Id.* at 2.  Because Plaintiffs are not entering into a "settlement agreement" or "enforce[ing]" a judgement, no OFAC license is needed to resolve this matter.  *See* FAQ No. 808.  Codifying the ICSID award does not reach into PdVSA's pockets.[14]

b.      Annulment Proceedings

Second, Venezuela claims that the ICSID award is not final because Venezuela has initiated annulment proceedings.  *See* Def.'s Mot. Set Aside Default & MTD at 17.  Lacking a final judgment would be fatal to Plaintiffs' claim.  *See Micula v. Gov't of Romania*, No. 15-mc-

---

[14] Plaintiffs hope to enforce a judgment from this Court in the Delaware Litigation.  *See* Pls.' Mot. for a Status Conference, ¶¶ 2, 7.  Plaintiffs may have to obtain an OFAC license at that future date; however, that is not a consideration for this Court today.

107, 2015 WL 4643180, at *4 (S.D.N.Y. Aug. 5, 2015) (citing ICSID Convention, art. 53), *rev'd on other grounds*, 714 F. App'x 18 (2d Cir. 2017).

"While ICSID awards cannot be appealed, a party may submit an application before an ICSID committee to annul the award on limited grounds." *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-1871, 2020 WL 5816012, at *1 (D.D.C. Sept. 30, 2020).  An annulment petition "challenges the tribunal's substantive decision." *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, No. 17-cv-102, 2018 WL 4705794, at *1 (D.D.C. Sept. 30, 2018).  "When a party seeks annulment, ICSID convenes an *ad hoc* committee of three members, which is authorized 'to annul the award or any part thereof.'" *Id.* (quoting ICSID Convention, art. 52).  "If the award is annulled the dispute shall . . . be submitted to a new [ICSID] Tribunal . . . ."  ICSID Convention, art. 52(6).  American courts cannot give an annulled ICSID award full faith and credit.  *See generally* ICSID Convention arts. 52 – 54; 22 U.S.C. § 1650a(a).

While the annulment proceedings are pending, the ICSID may implement a provisional stay preventing enforcement of an award until the committee renders a decision.  *See TECO Guatemala Holdings, LLC*, 2018 WL 4705794, at *1 (citing ICSID Convention, art. 53).  "But, '[e]xcept to the extent that enforcement' has been stayed, the tribunal's award remains 'binding on the parties and shall not be subject to any appeal or to any other remedy' other than those set forth in the ICSID Convention."  *Id.* (quoting ICSID Convention, art. 53).

"[C]ourts in this district have issued stays in cases arising under the ICSID [Convention], even when the ICSID lifted its stay on enforcing an award before issuing a decision in annulment proceedings." *9REN Holding*, 2020 WL 5816012 at *3 (citing Minute Order, *Infrastructure Servs. Lux. S.A.R.L. v. Kingdom of Spain*, No. 18-cv-1753 (D.D.C. July 15, 2020) and *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, No. 18-cv-2395, 2020 WL 2996085, at *3–4 (D.D.C. June 4,

2020)); *see also NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, No. 19-cv-1618, 2020 WL 5816238, at * 3 (D.D.C. Sept. 30, 2020) (same).  In *Unión Fenosa*, the court set aside default—which the plaintiffs did not oppose—and stayed enforcement of an ICSID award after "the ICSID lifted its own stay of enforcement following [the defendant's] failure to post the required security." 2020 WL 2996085, at *2, 5.  The court concluded that,

> [t]his decision does not suggest that a stay is always or even often warranted whenever a losing party petitions to annul an ICSID award.  Rather, this case involves several *unique circumstances* that, taken in conjunction, counsel in favor of a stay—namely, the size of the award, the nature of the divided [ICSID] panel opinion, the duplicative arguments in play both here and before the ICSID, and uncertainties regarding an unprecedented global pandemic.

*Id.* at *5 (emphasis added).

Although Venezuela is not currently petitioning for a stay, *see* Def.'s Mot Set Aside Default & MTD at 17, *Unión Fenosa* is instructive as the stay was based on the strength of the defendant's annulment defense.  Both cases involve "a parallel proceeding that is ongoing[,]" presenting the "possibility that the award will be set aside."  *Unión Fenosa*, 2020 WL 2996085, at *4 (quoting *Higgins v. SPX Corp.*, No. 5-cv-846, 2006 WL 1008677, at *4 (W.D. Mich. Apr. 18, 2006)).  Although the three "unique circumstances" of *Unión Fenosa*, *id.*, are not identical to this case, there is a fraternal similarity which provides a "hint of a suggestion" that Venezuela could provide a complete defense on the merits by nullifying the ICSID judgment.  *Gilmore*, 843 F.3d at 966 (quoting *Keegel*, 627 F.2d at 375).

As to the first circumstance, the ICSID awarded Unión Fenosa Gas over $2 billion in damages against the defendant, Egypt.  *See Unión Fenosa*, 2020 WL 2996085, at *2.  The court was "loath to plunge so deeply into a sovereign's treasury during a period of immense uncertainty if there [was] a chance that the award might be set aside or mitigated to some extent."  *Id.* at *4. Particularly because such enforcement could cripple the Egyptian economy.  *See id.*  Here,

Plaintiffs were awarded $166.7 million and $140.25 million respectively.  *See* ICSID Award, ¶¶ 12.3–12.8; ICSID Rectification Award, ¶ 74.  Though not as large, this award is nonetheless a significant sum and would arguably shatter the already fragile Venezuelan economy.  *See* Stacey Vanek Smith & Cardiff Garcia, *Coronavirus Comes to Venezuela*, NPR, Aug. 11, 2020, available at https:// www.npr.org/2020/08/11/901501100/coronavirus-comes-to-venezuela.  Such concerns are supercharged by the "unprecedented global pandemic"—which insulated Egypt from the court enforcing a judgment and offers a similar reprieve for Venezuela.  *See id.*; *Unión Fenosa*, 2020 WL 2996085, at *5.

Second, both Unión Fenosa's and the Plaintiffs' ICSID opinions contained a dissenting opinion.  Hopes for an annulment are "not merely wishful thinking" when there is a dissent, as that is "a relatively rare outcome in [ICSID] cases."  *Unión Fenosa*, 2020 WL 2996085, at *4 (citing Anton Strezhnev, *You Only Dissent Once: Re-Appointment and Legal Practice in Investment Arbitration* 2 (Nov. 8, 2015), http://scholar.harvard.edu/files/astrezhnev/files/dissent_draft_1.pdf (describing "dissent aversion" in international investment arbitration)).  In *Unión Fenosa*, the dissenting opinion disagreed with the majority's award on all fronts including the "jurisdictional holding, merits conclusion, and calculation of damages."  *See id.*  However, the dissent was much more limited in Venezuela's case.  It was only a partial dissent as to Venezuela's liability to Koch Nitrogen and the corresponding damages—with no disagreement over jurisdiction or the award as to Koch Minerals.  *See* ICSID Award at 290, ¶¶ 1–2.  Yet, a dissent still exists and cannot be ignored.

Third, the court in *Unión Fenosa* concretely identified overlapping arguments between the annulment and U.S. court proceedings, *see* 2020 WL 2996085 at *4, which justified deference to the ICSID proceedings.  However, while this Court comes to a similar conclusion, it does so with

lesser confidence. *Both* parties have provided scant information about what arguments are before the annulment committee, even after a request from this Court. *See* Joint Status Report (Nov. 6, 2020). Given that similar prior-proceeding have had overlap, a fair inference is that there is again a likelihood here. *See id.* This is reason enough to allow the annulment proceedings to conclude, particularly with a hearing upcoming in July 2021. *See id.* at 1.

Thus, Venezuela has provided at least a "hint of a suggestion" that the pending annulment proceeds could provide a fruitful defense on the merits. *See Gilmore*, 843 F.3d at 966 (quoting *Keegel*, 627 F.2d at 375). Because Venezuela has "assert[ed] a defense that it may prove at trial," this Court should set aside the entry of default. *Whelan*, 48 F.3d at 1259. This holding is further justified given that the prejudice Plaintiffs face from such delay is manageable.

C.   Local Rule 7(g)

Finally, the Court takes up Venezuela's request for a waiver of Local Rule 7(g), which requires the filing of a verified answer concurrent to a motion to set aside an entry of default. *See* Def.'s Mot. Set Aside Default & MTD at 17–18. Here, Venezuela did not file a verified answer. *See id.* But, "[d]espite the local rule's text, '[c]ourts routinely allow defendants to file a motion to dismiss in place of an answer despite a prior entry of default.'" *Africa Growth Corp.*, 2018 WL 6329453, at *8 (quoting *Owens*, 374 F. Supp. 2d at 9). Given that Venezuela's Motion to Set Aside the Entry of Default was accompanied by a motion to dismiss, the motion did not run afoul of Local Rule 7(g) in practice. *See id.*

**IV.     CONCLUSION**

For the foregoing reasons, the Court grants Defendant's Motion to Set Aside the Entry of Default, denies Defendant's Motion to Dismiss, and denies Plaintiffs' Motion for Default Judgment as moot.  A separate order so stating will issue this day.

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE